In the Matter Of:

# NORMAN V. BRIGHT HORIZONS

8:12-cv-01301-EAK-TBM

# BRENDA HAYES

*May 23, 2013*



800.211.DEPO (3376)
EsquireSolutions.com

**Page 1**

```
         UNITED STATES DISTRICT COURT
           MIDDLE DISTRICT OF FLORIDA
                 TAMPA DIVISION

JANICE NORMAN and
VANESSA SMITH,

     Plaintiffs,

V.        CASE NO.: 8:12-cv-01301-EAK-TBM

BRIGHT HORIZONS FAMILY
SOLUTIONS, LLC, d/b/a BRIGHT
HORIZONS CHILDREN'S CENTERS,

     Defendant.
_____/

            Florin Roebig, P.A.
            2101 West Platt Street
            Tampa, Florida 33606
            Thursday, May 23, 2013
            1:50 p.m. - 3:25 p.m.

         DEPOSITION OF BRENDA HAYES

     Taken on behalf of the Plaintiffs
before Julie R. Palitto, RPR, Notary Public in
and for the State of Florida at Large, pursuant to
Plaintiffs' Notice of Taking Deposition in the above
cause.
```

**Page 2**

```
APPEARANCES:

Counsel for Plaintiffs:

     GREGORY A. OWENS, ESQUIRE
     Florin Roebig, P.A.
     777 Alderman Road
     Palm Harbor, Florida 34683
     (727) 786-5000
     Greg@florinroebig.com

Counsel for Defendant:

     CARLOS J. BURRUEZO, ESQUIRE
     Littler, Mendelson, P.C.
     111 North Magnolia Avenue, Suite 1250
     Orlando, Florida 32801-2366
     (407) 393-2935
     Cburruezo@littler.com


Also Present: Jennifer Whitley
```

**Page 3**

```
                    INDEX
BRENDA HAYES                       PAGE NO.
Direct (Owens)                        4
Cross (Burruezo)                     59
Stipulations                         62
Certificate                          63
Errata Sheet                         65

                  EXHIBITS
PLAINTIFFS' EXHIBITS               PAGE NO.
No. 1  Bright Horizons Family Solutions   19
       Employee Conference Memo (Reprimand)
       (Two Pages)
No. 2  Bright Horizons Family Solutions   31
       Employee Conference Memorandum (Counsel)
       (Two Pages)
No. 3  Bright Horizons Family Solutions   50
       Employee Conference Memo (Termination)
       (One Page)
No. 4  6/17/2011 Interviews with Krissy and Sara  55
       (Two Pages)
```

**Page 4**

```
                 PROCEEDINGS
THEREUPON:
             BRENDA HAYES,
was called as a witness and, having been first duly sworn
and responding, "Yes, I do" was examined and testified as
follows:
              DIRECT EXAMINATION
BY MR. OWENS:
    Q   Can you please state and spell your name for the
record?
    A   Yes.  Brenda, B-R-E-N-D-A, Hayes, H-A-Y-E-S.
    Q   Okay.  Ms. Hayes, my name is Greg Owens.  I
represent Janice Norman and Vanessa Smith in connection
with the legal claims against -- I'm just going to call
it Bright Horizons if that's okay with you.  That's how
I'm going to refer to it today.
        Have you ever had your deposition taken before?
    A   Yes.
    Q   Okay.  When was the most recent time that you've
had a deposition taken?
    A   I think it was in August when my house was
robbed.
    Q   Okay.  I'm sorry to hear about that.
        Other than that circumstance with your home, did
you ever have your deposition taken for any other reason?
```



Page 5

1  A  No.
2  Q  Okay. And although the context, I guess, will
3  be much different, the rules are essentially the same.
4  A  Yes.
5  Q  So I won't waste your time with going over them.
6  We'll just get started.
7      Are you currently employed by Bright Horizons?
8  A  Yes, I am.
9  Q  What is your current job title?
10 A  Executive director.
11 Q  As executive director, does that mean you are
12 the highest level, from a chain of command standpoint,
13 highest level employee at your location?
14 A  Yes.
15 Q  All right. What location do you work at?
16 A  Citi Group Family Center in Tampa.
17 Q  How long have you been the executive director at
18 the Citi Group location in Tampa?
19 A  Just over a year.
20 Q  And it's the one at Queen Palm Drive?
21 A  Yes.
22 Q  Prior to being the executive director at the
23 Citi Group location in Tampa, what, if any, position did
24 you hold with Bright Horizons?
25 A  At the same center, I was assistant director. I

Page 6

1  was program coordinator. I was a lead teacher and a
2  support teacher.
3  Q  How many years total have you worked for
4  Bright Horizons?
5  A  It will be 13 years in August.
6  Q  How did it come to be that you were promoted
7  from the assistant director position to executive
8  director?
9  A  There was -- I was the interim director when I
10 was -- when our director left on a medical leave. And
11 then when she came back and then left Bright Horizons, I
12 was promoted.
13 Q  Okay. And is that director that you've been
14 referring to Linda Horner?
15 A  Yes.
16 Q  And you said that was about a year ago that you
17 were, I guess, permanently placed in the executive
18 director role?
19 A  Yes.
20 Q  As the executor director at the Citi Group Tampa
21 Center, who is your direct supervisor?
22 A  My direct supervisor is Jennifer Whitley.
23 Q  Has she also in the past been known as
24 Jennifer Todd?
25 A  Yes.

Page 7

1  Q  And I would presume during the period of time
2  that you were assistant director, your direct supervisor
3  would have been the executive director, Ms. Horner,
4  correct?
5  A  Yes.
6  Q  Does Bright Horizons utilize what's often known
7  as a progressive disciplinary policy?
8  A  Yes, they do.
9  Q  And to your understanding, what are the steps in
10 the progressive discipline at Bright Horizons?
11 A  You have a written counsel; then a reprimand,
12 and then I have a final reprimand or termination.
13 Q  And these various steps that you talked about,
14 when an employee is disciplined using any of those, is it
15 put in writing on a standardized company document?
16 A  Yes, it is.
17 Q  Now, are there also times where a supervisor of
18 Bright Horizons would verbally counsel an employee?
19 A  Yes.
20 Q  And when an employee is verbally
21 counseled -- and I'm only asking for your own personal
22 experiences. When you would verbally counsel an employee
23 at Bright Horizons, would you somehow put in writing the
24 fact that you had that verbal counseling session with an
25 employee?

Page 8

1  A  Yes, I would.
2  Q  In your practice in all the various roles that
3  you've had, but specifically when you've been a
4  supervisor, is that something that you would do in
5  handwritten form, or do you type it on a computer?
6  A  I would put it on a counsel form, but where it
7  says "counsel," I would put "verbal." I would type
8  "verbal" before it so they knew it wasn't a written
9  counsel, it's a verbal counsel, but it would be on the
10 form to show what the content was.
11 Q  Okay. And that would be that same standardized
12 document we were just talking about?
13 A  Yes.
14 Q  And would you agree that for the most part, it's
15 an expectation of you as the supervisor at
16 Bright Horizons to follow that progressive disciplinary
17 policy?
18 A  Yes.
19 Q  And would you also agree, though, that at times
20 employees can engage in infractions that are so serious
21 that it would require you or allow you to skip some of
22 those steps?
23 A  Yes. But if you were going to skip a step, then
24 I would have to speak with my supervisors to let them
25 know why I felt that instead of a written consult, it



Page 9

1 needed to be a reprimand and what the severity was.
2  Q   Okay. And in your mind, somebody who has been
3 doing this for quite some time at Bright Horizons, are
4 there particular employee infractions that you believe
5 are so serious that warrant skipping over steps or maybe
6 even going directly to termination?
7  A   Yes.
8  Q   Could you tell me some of those infractions?
9  A   If a child is left alone outside for a period of
10 time; if someone -- if a child was endangered or hurt due
11 to negligence.
12  Q   Any others?
13  A   I guess if there was physical violence and a
14 harassment type of thing where someone got hurt.
15  Q   Okay. And it sounds like any time there would
16 be abuse or neglectful behavior toward the children, that
17 could possibly be something that would lead directly to
18 termination?
19  A   Yes.
20  Q   Okay. And is it your understanding that
21 Bright Horizons has a zero tolerance policy when it comes
22 to abuse or neglect with regard to the children --
23  A   Yes.
24  Q   -- they provide services for? Yes?
25  A   Yes.

Page 10

1  Q   Okay. You personally, do you as the executive
2 director, even when you were the assistant director,
3 personally have zero tolerance for abandonment -- or
4 excuse me -- for neglect or abuse?
5  A   I guess I'm not sure what you mean.
6  Q   Could you envision a situation in your role as
7 either the executive director or assistant director where
8 one of your employees could abuse or neglect a child
9 where you wouldn't go directly to termination?
10  A   No.
11  Q   Okay. In the April 2011 time frame, would you
12 have been the assistant director at the Citi Group site
13 in Tampa?
14  A   Yes.
15  Q   Okay. And at that time, did you become aware of
16 some allegations that were made of abusive behavior
17 toward Kristin Turner?
18  A   Yes.
19  Q   How did you first become aware that there had
20 been a complaint made about the manner in which
21 Ms. Turner was allegedly treating the children at the
22 Citi Group Center?
23  A   I was on -- I was just coming back off of
24 vacation, and when I got back, Linda Horner told me that
25 CPI was there and what the allegation was.

Page 11

1  Q   So when you returned from vacation, CPI had
2 already come in and started an investigation?
3  A   Yes.
4  Q   Do you know if at that time CPI had concluded
5 their investigation, or was it still open?
6  A   No. They just had just came there the day
7 before.
8  Q   Okay.
9  A   So it was just beginning.
10  Q   Did Ms. Horner tell you -- tell you what the
11 allegations were against Ms. Turner?
12  A   I don't remember if she told me what the exact
13 allegations were. At that point, later I -- you know, it
14 came out what they were because then I was spoke to by
15 CPI. But honestly I can't tell you which one told me
16 first.
17  Q   Okay. And let's talk about that. You were
18 interviewed by some representatives from Child Protective
19 Services?
20  A   Yes.
21  Q   When you were interviewed, how many individuals,
22 either from the police department or Child Protective
23 Services or DCF or whomever, were involved in that
24 meeting?
25  A   I want to say two. I think it was

Page 12

1 Child Protective Service and it could have been licensing
2 there.
3  Q   Was anybody, other than yourself, from
4 Bright Horizons involved in that interview?
5  A   No.
6  Q   When you had that interview with the, roughly,
7 two individuals from the government, did they tell you
8 what the allegations were?
9  A   I don't think they -- they just asked me about
10 Kristin and if I -- if I ever questioned her in the
11 classroom and stuff. It was more just questions, you
12 know, if I've seen anything in the classroom.
13  Q   What did you tell the investigators when they
14 asked you those questions?
15  A   I said I hadn't seen anything.
16  Q   Did anybody from the government during that
17 interview tell you the name of the person or people who
18 had made the complaints about Ms. Turner?
19  A   No.
20  Q   When did you first learn of who the individual
21 or individuals were who made the complaints about
22 Ms. Turner?
23  A   I don't remember. It was some time later. I
24 don't know how long ago, what time frame there was in
25 between.

Page 13

1  Q  Okay. Other than this particular interview that
2  we're talking about, were there any subsequent interviews
3  with anybody from the police department or Child
4  Protective Services or anybody from the government?
5  A  No.
6  Q  Okay. So one time you were interviewed,
7  correct?
8  A  Yes.
9  Q  Was there any sort of internal investigation
10 that was conducted by Bright Horizons into the
11 allegations?
12 A  Yes.
13 Q  Were you a person who was interviewed, or were
14 you a person who was actually taking interviews of
15 employees in regard to this investigation?
16 A  I did one set of interviews, and Linda Horner
17 did another set.
18 Q  Was there somebody at Bright Horizons who told
19 you that you were going to be responsible for doing a set
20 of interviews?
21 A  Yes.
22 Q  Who was that?
23 A  Jennifer Whitley. I did the second set.
24 Q  When you say "second set," were they just
25 different people, or was it a follow-up interview?

Page 14

1  A  It was allocated to the parents that we didn't
2  do thorough interviews, and so we then did a full set of
3  interviews to all the support teachers that were employed
4  in our center, whoever could have went on A wing to work
5  near or with Kristin.
6  Q  Okay. And pardon me for misunderstanding. When
7  you said it wasn't done completely with the parents, what
8  did you mean by that?
9  A  Somebody had told the parents -- called the
10 parents and stated that we were not interviewing. We
11 were not doing a proper investigation.
12 Q  Okay.
13 A  And so by that point, Linda Horner was already
14 gone. So I interviewed everybody.
15 Q  Do you know who the individual was who contacted
16 a parent or multiple parents and told them that the
17 investigation wasn't being conducted properly?
18 A  Yes.
19 Q  Okay. Who was that?
20 A  Janice Norman.
21 Q  How do you know that Ms. Norman contacted a
22 parent or multiple parents and told them that?
23 A  Our liaison called to the Citi and the
24 Bright Horizons representative and spoke with her.
25 Q  Okay. What's the name of the liaison?

Page 15

1  A  Robin Kramer (phonetic).
2  Q  So Kramer, you said?
3  A  Uh-huh.
4  Q  So Ms. Kramer learned from a parent that
5  Ms. Norman had reached out to them?
6  A  Yes. The Citi employees, the job of Robin is to
7  be the go-between between Bright Horizons and the Citi
8  employees. And so if the Citi employees have any -- any
9  problems or concerns, they go to her. And she was
10 getting several complaints.
11 Q  Did you personally speak with any of those
12 parents who Ms. Norman had spoken to?
13 A  Yes, I did.
14 Q  Okay. Can you remember the names of any of the
15 parents?
16 A  I could tell you children's names. I spoke with
17 Mr. and Mrs. Quinsic (phonetic).
18 Q  I'm sorry. I missed that.
19 A  I don't know how -- I don't know how to
20 pronounce it. Quinsic.
21 Q  Quinsic?
22 A  And I spoke with Janaye (phonetic) Miller's
23 mother.
24 Q  All right. Let's start with -- is it Mr. or
25 Mrs. Quinsic?

Page 16

1  A  It was Mr. and Mrs.
2  Q  Both?
3  A  Yes.
4  Q  You talked to both of them?
5  A  Yes.
6  Q  All right. And what did they tell you?
7  A  They told me that they received a phone call
8  stating that their child had been harmed and that we
9  weren't doing a full investigation.
10 Q  Did they tell you who called them?
11 A  No.
12 Q  Did you ask them who called them?
13 A  They just told me it was an employee.
14 Q  Did they refuse to tell you which employee?
15 A  Yes.
16 Q  And you said it was Ms. Miller who you talked to
17 as well?
18 A  Yes.
19 Q  All right. And what did Ms. Miller tell you?
20 A  She told me basically the same thing.
21 Q  Did she tell you the employee who had contacted
22 her?
23 A  No.
24 Q  Were the Quinsics upset about the fact that an
25 employee had called them and told them this?

Page 17

A Yes. They were upset.
Q Upset at the employee for doing it or upset about the potential that their kid might have been harmed?
A Upset that -- upset that they were put in this position of not knowing if their child was harmed or not. It was very upsetting to them, you know, to have that because they really liked Kristin and now they felt torn.
Q Did they mention whether they felt relieved to know that there was an employee who had notified them of these things?
A No. They didn't sound relieved.
Q Okay. But it doesn't sound like they were angry with the person who told them this information, correct? They weren't upset about the actual information itself; is that fair?
A I don't know if they were angry that the person told them or not. I just know that they were very upset about the content of the phone call.
Q Sure. And you can appreciate a parent being upset and learning that there's a possibility their child has been harmed, right?
A Absolutely.
Q How about Ms. Miller, did she appear to be upset with the simple fact that somebody had told her, or was

Page 18

she similarly upset about the possible circumstances at hand with her child?
A Right. The possibility that their child could have been harmed.
Q Okay. All right. Other than the Quinsics and Ms. Miller, did you talk to any other parents about an employee reaching out to them?
A No.
Q Did you follow up with either the Quinsics or the Miller parent to ask them if, in fact, it was Janice Norman who had talked to them?
A I didn't bring up her name. I just asked if they would -- if they wanted to tell me who the employee was.
Q And how was it that you ultimately learned or believed that it was Ms. Norman?
A I -- Robin Kramer had spoken to Carol Stegall, who is our Citi and Bright Horizons person, and she told her. And Janice was brought in and she admitted it.
Q So ultimately you found out by Janice admitting to doing it?
A Absolutely.
Q Okay. I understand. Did you personally speak with Ms. Norman about talking to these parents?
A I don't know -- I know we spoke to her and told

Page 19

her that she wasn't allowed to call the parents.
Q And when you say "we," who else was involved other than yourself?
A Linda Horner and Carol Stegall.
Q Did Ms. Norman explain to yourself or Ms. Horner or Ms. Stegall why she felt it appropriate to talk to these parents?
A She just said as a grandmother, she felt that she needed to do that.
MR. OWENS: Take a short break, please.
(Off the record at 2:10 p.m. to 2:15 p.m.)
(Plaintiffs' Exhibit 1 was marked for identification.)
BY MR. OWENS:
Q Ms. Hayes, I am handing you a document marked Exhibit 1. Take your time and have a look at it. Whenever you're ready to answer questions, just let me know. (Tendering).
A (Receiving). Okay.
Q Okay. This document marked as Exhibit 1, do you recognize it?
A Yes, I do.
Q Okay. And what do you recognize it to be?
A It was the counsel that was given to Janice when Carol came to our center and had learned about Janice

Page 20

calling the families.
Q Okay. This is the situation that before the break we had been talking about, correct?
A Yes.
Q All right. And I just want to make sure this wasn't a different one than what we've been talking about.
A No. This is it.
Q Okay. Were you the person who typed this information into this document?
A No.
Q Do you have any idea who it might have been?
A It would either be Linda Horner or Carol.
Q And do you agree looking at pages one and two that your signature doesn't appear anywhere on this document?
A Yes.
Q Were you responsible in any way for providing this document to Ms. Norman to look over and sign?
A No. I wasn't part of this counsel at all.
Q Okay. All right. I think we started this conversation by talking about your role in investigating internally, I guess, Ms. Turner's behavior loosely. And you said that you got involved after some parents had complained about the thoroughness of the investigation



Page 21

1  essentially, correct?
2  A  Yes.
3  Q  All right. Can you remember all of the
4  employees that you interviewed?
5  A  Yes.
6  Q  Okay.
7  A  I interviewed all of the employees that were
8  support teachers at that time in our center.
9  Q  How many would that have been, roughly?
10 A  It felt like a whole bunch when I was doing it.
11 Probably at least 10.
12 Q  Okay. And we don't have to go interview by
13 interview. But were there any employees that you
14 interviewed who told you that they found Ms. Turner's
15 treatment toward children at any time to be
16 inappropriate?
17 A  Yes.
18 Q  Okay. Can you think of at least one employee
19 who told you that?
20 A  Yes.
21 Q  Okay. Who is that employee?
22 A  Wendy.
23 Q  I guess she currently goes by Wendy Valenzuela?
24 A  Yes.
25 Q  She was Wendy --

Page 22

1  A  Arango.
2  Q  -- Arango at the time, correct?
3  A  (Deponent nods head).
4  Q  Is that a yes?
5  A  Yes. I'm sorry.
6  Q  What did Ms. Arango tell you about -- I guess
7  what did Ms. Arango tell you during the interview?
8  A  Okay. I asked her if she ever worked with
9  Ms. Kristin, and she stated yes. And I asked if she ever
10 had any concerns with the way that Kristin handled the
11 children. And she said yes and explained to me that she
12 was in the classroom during break time and the children
13 had gotten up early. And when Kristin came in, Kristin
14 was then putting the children back on the cot and told
15 Ms. Wendy that her children stay on the cot, and she
16 takes them one at a time; that it was too early.
17    Ms. Arango's idea was that when the children
18 wake up, she takes them off the cot and lets them go to
19 the table with quiet toys and lets them begin their day;
20 whereas, Kristin wants them to finish resting throughout
21 the nap.
22 Q  And did Ms. Arango tell you what particularly
23 about that situation concerned her?
24 A  She just stated that -- the way that Kristin
25 had -- with one child, the first child, which she had

Page 23

1  taken him and put him on the cot quickly with his arm an
2  took him over there to the cot, and that she felt that
3  that was a rough way of doing it; that she would have
4  just said, you know, come on, come on, let's go over here
5  and brought something to the cot to coax him to it
6  instead of taking him over and physically putting him on
7  the cot.
8  Q  Okay. When you heard that from Ms. Arango, did
9  it concern you?
10 A  Not at that point. It concerns me if she -- you
11 know, until she explained to me what it was that she did.
12 I asked her if she felt it was abuse or that she harmed
13 him in any way, and she said no. I asked if he cried.
14 No. So then I was not -- I was not alerted.
15 Q  Okay. Did you report that to any of your
16 supervisors meaning what Ms. Arango had told you during
17 that interview?
18 A  Oh, yes. I gave copies of all of my interviews
19 to my supervisor.
20 Q  Okay. To Ms. Horner?
21 A  No. Ms. Horner at that time was already on her
22 leave.
23 Q  Okay. Who did you give your investigation notes
24 to?
25 A  To Jennifer Whitley.

Page 24

1  Q  Now, the notes that you took during your
2  investigations, did you handwrite them, or did you type
3  them out?
4  A  I handwrote them, and then I had the -- whoever
5  I was interviewing read them, and then if they agreed
6  with it or if I misquoted anything, then we would change
7  it and we both signed. We did not sign until they agreed
8  with what the writing was.
9  Q  Okay. Other than Ms. Arango, were there any
10 other employees who articulated any sort of concerns that
11 they had about Ms. Turner?
12 A  One other employee, Tiara, felt that Kristin's
13 voice tone is louder than it should be; that she should
14 talk softer to the children.
15 Q  Okay. And I'm sorry. I didn't get the name of
16 the employee?
17 A  Tiara.
18 Q  Do you know what her last name is?
19 A  Newton.
20 Q  Other than Ms. Arango and Ms. Newton, any other
21 employees who articulated any sort of concerns about
22 Ms. Turner?
23 A  Not that I recall. Those were the two that I
24 can recall.
25 Q  Okay. After you completed your investigation,



Page 25

1  did you make any sort of recommendation to Ms. Todd or
2  anybody else about what you thought should happen, if
3  anything, to Ms. Turner?
4    A   I felt, given the situation with the parent,
5  that for best practice, it would be good for Ms. Turner
6  to do essentials again just to refresh her mind on
7  different ways of doing at nap time, you know, if they
8  were all done resting, you know, they can get up and
9  different positive guidance things.
10   Q   Okay. Well, again, I don't work at
11  Bright Horizons obviously, but what are "essentials"?
12   A   Essentials is a training program that we have
13  online that all of your new employees go through, and it
14  just gives you basic early child information and child
15  development.
16   Q   Okay. Who did you make that recommendation to,
17  meaning that Ms. Turner should try to do essentials
18  again?
19   A   It was in a conversation that Jennifer and I
20  had, and we were just speaking candidly with each other
21  of what to do because nothing was, you know, really
22  showing up. But I think whenever there's allegations
23  made, you always want to show that we follow through.
24   Q   When you say nothing was really showing up, what
25  did you mean by that?

Page 26

1   A   There was nothing to substantiate that
2  Ms. Turner had abused or neglected any of the children.
3   Q   And why was it that you felt in your mind that
4  it was important to do something to show that you were
5  following best practices?
6   A   The parents were very upset, and I think that
7  any time that there's a question and in a teacher's
8  ability to redirect or to -- to manage their classroom, I
9  think it's good to review basic things. And Kristin was
10  more than willing to do the training again just to
11  refresh her mind on it.
12   Q   As a result of this situation with Ms. Turner,
13  were there parents who removed their children from her
14  classroom?
15   A   Ms. Miller, she removed Janaye.
16   Q   Did she remove her from the entire facility or
17  just from her classroom?
18   A   No. Just from the classroom.
19   Q   Anybody else that you can think of?
20   A   We had a withdrawal, but I -- the withdrawal
21  wasn't solely based on the accusation.
22   Q   How did you know that?
23   A   Because the parent was upset. The parent felt
24  that the director had lied to her.
25   Q   How did you come to learn that this particular

Page 27

1  parent felt that the director lied to her?
2   A   Because my office is across from -- was across
3  from the director's office, and you could hear her
4  speaking.
5   Q   When we're saying "director," we're talking
6  about Ms. Horner?
7   A   Yes.
8   Q   Was this parent Ms. Alston, Arline Alston?
9   A   Yes.
10   Q   Do you have any understanding as to what she
11  felt or what she believed Ms. Horner lied to her about?
12   A   I don't know the content of that.
13   Q   Was it -- to your understanding, did it have
14  something to do with the abuse investigation with
15  Ms. Turner?
16   A   Yes.
17   Q   Were there any other sort of parent complaints
18  regarding the manner in which Ms. Turner was treating
19  their children?
20   A   No. Not to my knowledge.
21   Q   Other than the interviews that you took as part
22  of the internal investigation and the CPI portion of the
23  investigation, were there any other interviews that you
24  either took or were part of that we haven't already
25  talked about?

Page 28

1   A   No. I think that's all.
2   Q   Was there any sort of discipline levied toward
3  Ms. Turner as a result of the allegations toward her and
4  the ensuing investigation?
5   A   During the investigation, she was on leave. She
6  was put on leave -- on the leave while we did it. She
7  did get paid for that leave, though, since the
8  investigation allegations were unfounded. So she did get
9  to get paid for it. She was written up for -- because of
10  her voice tones that -- they said that she had spoke
11  harshly or loudly, I guess, was the words that they were
12  saying. And so that was one of the reasons why we did
13  the essentials for the positive guidance part.
14   Q   Was Ms. Turner written up in connection with the
15  information that Ms. Arango told you?
16   A   That's between Tiara and Wendy. It was the
17  voice tones.
18   Q   Okay. But what about -- I know you said
19  Ms. Arango told you about her, I guess, physically taking
20  the kid to -- back to his nap. Was Ms. Turner
21  reprimanded in any way for that?
22   A   It's the same -- it was the same write-up.
23   Q   Okay. I apologize if we covered this already.
24  But when was it that you first learned -- well, did you
25  ever learn of who the employee or employees were that



Page 29

1 notified Child Protective Services and made allegations
2 about Ms. Turner?
3   A   I couldn't tell you when all of that came about.
4   Q   But ultimately when you did learn, who did you
5 understand the employee or employees to be?
6   A   That called, I understood it to be
7 Vanessa Smith.
8   Q   Okay. Anybody else?
9   A   No.
10  Q   And you can't remember if it was somebody from
11 the government or somebody from Bright Horizons that told
12 you that?
13  A   I can't.
14  Q   Did it upset you in any way to learn that
15 Ms. Smith had made these allegations?
16  A   Yes.
17  Q   How so?
18  A   Well, it's upsetting to think that someone would
19 make that type of allegation because I watched the pain
20 that the parents went through.
21  Q   Do you think that Ms. Smith made it up?
22  A   Yes.
23  Q   Do you have any belief or understanding as to
24 why she would have made such a thing up?
25  A   I don't know why anyone would do that.

Page 30

1   Q   After the investigation came back from the
2 government as unfounded, did you hold it against
3 Ms. Smith that she had made this allegation?
4   A   No.
5   Q   Did you see Ms. Smith at all once you came back
6 from your vacation until she was transferred to another
7 location?
8   A   I was a witness during one of her counsels.
9 Whenever we do a counsel, we always have somebody in with
10 us, another manager, and I sat in on one of her counsels.
11 But that was -- the counsel happened before the
12 allegation.
13  Q   Yeah. That's kind of what I was getting at.
14 After the allegations, did you ever see Ms. Smith again?
15  A   Yes. She did some training down in the resource
16 room. She was finishing her essentials. And then she
17 was out sick a little while. And then -- then she was
18 transferred. She put in for a transfer to Moffitt.
19  Q   Okay. So it sounds like Ms. Smith was at the
20 location; she just might not have been in the classroom
21 that she was previously in?
22  A   Right. Right.
23  Q   And was that a decision that you --
24  A   She hadn't finished her essential training, and
25 so she was out finishing the training.

Page 31

1   Q   Who was the person responsible for telling
2 Ms. Smith that she had to do this essential training?
3   A   Linda Horner.
4   Q   Were you involved in any way in that decision?
5   A   No. All of the new employees do that training.
6 And they're supposed to -- you have -- with
7 Bright Horizons, you have a period of time to finish
8 that. And normally you have like six months. I'm not
9 sure of the time, but it's quite a few months to do it.
10 Since then, we now have them do it in the first two weeks
11 of their employment.
12  Q   Was Ms. Smith removed from the classroom that
13 she shared with Ms. Turner during this investigation?
14  A   I can't recall. I don't think so. I think she
15 was still in there.
16      (Plaintiffs' Exhibit 2 was marked for
17      identification.)
18 BY MR. OWENS:
19  Q   All right. Ms. Hayes, I've handed you what has
20 been marked as Exhibit 2. The same deal. Just take a
21 look at it, and whenever you're ready to talk about this
22 document, just let me know. (Tendering).
23  A   (Receiving). Okay.
24  Q   You all set?
25  A   Yes.

Page 32

1   Q   That was fast. All right. Do you recognize
2 Exhibit 2?
3   A   Yes.
4   Q   What do you recognize Exhibit 2 to be?
5   A   This is the counsel that I witnessed with
6 Susan Saunders from Vanessa Smith where a parent had
7 reported finding three toddlers in the bathroom by
8 themselves.
9   Q   Okay. And other than -- well, beside the
10 "witness signature," is that your signature?
11  A   Yes.
12  Q   All right. And other than in that spot, does
13 your handwriting appear on this document anywhere else?
14  A   No.
15  Q   Why was it that you were called to be a witness
16 to this counseling?
17  A   Because I was a manager.
18  Q   Meaning you were Ms. Saunders' manager or
19 Ms. Smith's manager?
20  A   No. It's -- you as a supervisor always have
21 another manager sit with you. He doesn't have to be your
22 supervisor; you had to have another manager.
23  Q   Okay. So Ms. Saunders had you sit in as a
24 manager?
25  A   Yes.



Page 33

1  Q  Understood. Did you have any knowledge of this
2  complaint by the parent prior to the counseling session
3  with Ms. Smith?
4  A  Just when Ms. Sue asked me to sit in on it; then
5  she told me what had happened and who the parent was.
6  Q  Okay. So the first time you learned of it was
7  when you were sitting in as a witness to this meeting
8  where Ms. Smith --
9  A  Prior to sitting in at the meeting. She gave me
10 a heads-up of what the counsel was and what was the
11 result for it.
12 Q  Understood. So Ms. Saunders comes to you and
13 says, hey, we have a situation; this is what it is, and
14 then ultimately the two of you met with Ms. Smith?
15 A  Yes.
16 Q  And that preliminary conversation you had with
17 Ms. Saunders was the first time you heard of this,
18 correct?
19 A  Yes.
20 Q  Okay. In reviewing this document, is there
21 anything contained in here that you think is inaccurate
22 with regard to what it says versus what Ms. Saunders told
23 you?
24 A  No.
25 Q  So to your understanding, the information

Page 34

1  contained in this document, Exhibit 2, is accurate to
2  your recollection?
3  A  Yes.
4  Q  Okay. And do you see the line on Exhibit 2
5  where it says, "Has employee been counseled for a similar
6  incident"? It's about halfway down the page; almost
7  exactly halfway down.
8  A  Yes.
9  Q  Okay. And it says, "Verbally," and it gives two
10 dates. Do you see those?
11 A  Uh-huh.
12 Q  Is that a yes?
13 A  Oh, I'm sorry. Yes.
14 Q  That's all right. Did you have any knowledge of
15 these prior verbal counselings that are contained in this
16 exhibit?
17 A  I had knowledge of one of them when a child was
18 left unattended in the hallway.
19 Q  Okay. How did you come to learn of that
20 situation?
21 A  When the resource teacher had found the child, I
22 was -- I was in the area when she was telling Ms. Sue,
23 and so I had heard.
24 Q  Okay. Were you responsible in any way for
25 counseling Ms. Smith about that situation?

Page 35

1  A  No.
2  Q  And the other incident, you said you had no
3  knowledge of at the time; is that correct?
4  A  I'm sorry. Yes. That's correct.
5  Q  Okay. And would you agree that the situation as
6  it's outlined in Exhibit 2 is serious?
7  A  Yes.
8  Q  And because it's serious, did you tell
9  Ms. Saunders that you felt like the discipline should be
10 more severe than just counseling?
11 A  No.
12 Q  Okay. And why did you think this was an
13 appropriate measure of counseling for this particular
14 infraction?
15 A  She was still in the classroom. She was
16 standing by the counter, which is near -- near the
17 bathroom. If you're standing at the counter, you can't
18 see in the bathroom, but you are near. So she was still
19 in the classroom with him, but needed to be over to the
20 child -- to the children in the bathroom.
21 Q  Would you characterize what Ms. Smith allegedly
22 did as a form of neglect?
23 A  It's a form of mis-supervision.
24 Q  How far away would she have been, Ms. Smith,
25 been away from the children who were in the bathroom?

Page 36

1  A  I don't know because I don't know where by the
2  counter she was at.
3  Q  What would -- if she was at the furthest end of
4  the counter, how far would that be from the children who
5  were in the bathroom?
6  A  Maybe eight feet.
7  Q  In a situation such as this where children are
8  left unsupervised or unattended to, is there any
9  responsibility or requirement on the part of
10 Bright Horizons or you as the manager to report it to any
11 sort of outside licensing agency or anything like that?
12 A  If you leave a child unsupervised? If you leave
13 them -- if you leave them unsupervised alone, you -- as
14 long as the -- I don't know. Not if the child is not
15 harmed. But we as a Bright Horizons employee, we do need
16 to alert our supervisor and bring it up the chain that a
17 child was left unattended, and the child's parent is
18 called.
19 Q  Were you in any way responsible for contacting
20 the parents of the three toddlers that are noted in this
21 Exhibit 2?
22 A  No.
23 Q  Do you know who was responsible for doing that?
24 A  Because they were in the same -- in the
25 bathroom, they wouldn't have been contacted. The child



Page 37

1 who was left in the hallway would have been contacted.
2   Q   Did you have any responsibility for contacting
3 that parent?
4   A   No.
5   Q   Do you know who might have had that
6 responsibility?
7   A   It would be Sue.
8   Q   Did Janice Norman ever have a meeting with you
9 to describe what she had witnessed in terms of how
10 Ms. Turner treated the children in her room?
11   A   No. Just on that last interview is the only
12 time and when I called her in and we did written
13 interviews with everybody.
14   Q   Okay. Tell me about that. I'm not following
15 you. There was a later interview that you had with
16 Ms. Norman?
17   A   When I did the second set of interviews and I
18 called everybody in.
19   Q   The ones that we talked about earlier?
20   A   Yes.
21   Q   Okay. Ms. Norman was one of the individuals you
22 interviewed?
23   A   Yes.
24   Q   Okay. What did Ms. Norman tell you during that
25 interview?

Page 38

1   A   That she had concerns and -- she had said that
2 she couldn't think of specific dates when it happened,
3 but she said -- she stated that Ms. Kristin had fallen
4 asleep in the classroom. And I asked if she ever brought
5 that information forward, and she said she had
6 talked -- spoken with Sue.
7   Q   Other than telling you that Ms. Turner had
8 fallen asleep in the room, did Ms. Norman tell you
9 anything else?
10   A   She talked about her voice, her voice tones, and
11 about the cot -- a cot incident, about putting children
12 on the cot. And she named three children that she felt
13 Kristin was more rough with, but felt that the one little
14 boy, Benjamin, whose parents she had contacted, was more
15 playing with him.
16   Q   Okay. So Ms. Norman said that she felt like
17 Ms. Turner was rough with at least one child?
18   A   Yes.
19   Q   And you also similarly put this in the notes
20 that you --
21   A   Yes.
22   Q   -- ultimately provided to Ms. Todd, correct?
23   A   Yes. And she signed them.
24   Q   The interviews that you had with the employees
25 at Bright Horizons, did those take place after you were

Page 39

1 interviewed by the Child Protective Investigator?
2   A   Yes.
3   Q   And after you learned this information, did you
4 follow up with the Child Protective Investigator or the
5 police department or anybody to let them know what you
6 had learned from three different employees about their
7 concerns regarding Ms. Turner?
8   A   No. I had no specific dates.
9   Q   What do you mean by that?
10   A   Child Investigative Services was investigating a
11 specific date. These people had no dates to give me.
12   Q   Okay. Other than that reason, is there any
13 other reason why you didn't let them know about what you
14 found during your investigation?
15   A   No. I didn't feel it was abuse.
16   Q   If it's not abuse, how would you characterize
17 the information that you learned from those three
18 employees, Ms. Arango, Ms. Newton, and Ms. Norman during
19 those interviews? Meaning, the information they shared
20 with you, did you find that it was inappropriate for
21 Ms. Turner to treat the children that way?
22       MR. BURRUEZO: Let me object to the form of the
23   question. You have two questions in one.
24 BY MR. OWENS:
25   Q   You can answer.

Page 40

1   A   The thing that would raise my -- that would
2 bring concern are inappropriate is we don't speak to
3 children with loud or harsh tones or inappropriate tones.
4 We speak, you know, normally with children. We don't
5 raise our voices. And we -- you can guide children to
6 redirect them to their cots or seats by -- with your
7 hand, you know, taking them by the hand and walking them.
8 So my -- my tone would be my -- and when I spoke with
9 Kristin -- that is if you normally have a louder voice,
10 you have to really pay attention to it even more than
11 someone with a softer voice so that -- you know, to make
12 sure that people don't think that you're yelling.
13   Q   Did the tone of voice information that you
14 learned concern you more than the information you learned
15 from Ms. Norman when she told you that Ms. Turner was
16 being rough with the children physically?
17   A   Ms. Norman, when she said that she felt she was
18 too rough, I asked her if she felt that she was harming
19 the children or I think I said either harming or abusing
20 the children, and she said no. I asked her if the
21 children cried, and she said no. So I did not have a
22 concern. Everybody has a different view of what rough
23 is. What I think rough is different probably than what
24 everyone else in the room thinks rough is. So I don't
25 let adjectives guide. I'd rather -- I ask questions if



**Page 41**

1 they're crying, if the children are upset, and that tells
2 me, if a child felt it was rough.
3    Q   Were you employed by Bright Horizons when
4 Ms. Norman started her employment there?
5    A   Yes.
6    Q   Were you involved in any way in the decision to
7 hire Ms. Norman?
8    A   Yes.
9    Q   Okay. How were you involved?
10    A   I was the education coordinator who interviewed,
11 did one of the interviews with Ms. Norman, and I hired
12 her to be a support teacher on my wing.
13    Q   Okay. And what was it about Ms. Norman that
14 made you feel comfortable that she would be an
15 appropriate person to have as an employee at
16 Bright Horizons?
17    A   When I interviewed her, she was very
18 soft-spoken, talked very lovingly about children and her
19 passion for children. And I felt for a support teacher,
20 that she would be very good in the classroom with young
21 children.
22    Q   And I guess there was a point in time where
23 Ms. Norman was moved into more of an administrative
24 assistant-type position; is that right?
25    A   Yes.

**Page 42**

1    Q   And do you know, roughly, when that happened?
2    A   It happened after she walked off the job as a
3 teacher, as a support teacher. The director then called
4 her and asked if she wanted to be the night receptionist.
5    Q   What does it mean to be the "night
6 receptionist"?
7    A   Our receptionist in the day leaves at 5:00. And
8 what -- at that time we were staying open until -- until
9 7:15, and so we had her cover the desk from that time.
10    Q   Okay.
11    A   And then during, when the receptionist was on
12 lunch and things, she covered the desk.
13    Q   What did Ms. Norman do the rest of the day when
14 she wasn't covering the desk?
15    A   She would do different things with -- you know,
16 to help Ms. Linda. Various. Once in a while she would
17 do breaks.
18    Q   Did you ever have any concerns with the manner
19 in which Ms. Norman was performing her actual job duties
20 and responsibilities?
21    A   Yes.
22    Q   Okay. Tell me about that. When did you first
23 have concern?
24    A   When she walked off the job. When she was upset
25 with a teacher. Prior to that, she had come to my office

**Page 43**

1 and was upset because she felt the younger
2 teachers -- she didn't want to take orders from them, and
3 I explained to her as a support teacher, the primary
4 teacher, when she goes on a break, she will tell them
5 what needs to be done next; it's not necessarily an
6 order; it's just what to cover in a classroom. Janice
7 had a hard time with that, with the younger girls doing
8 that, and there was some conflict.
9    Q   Okay. Focusing in on her role as the -- you
10 said night receptionist; is that the position?
11    A   Uh-huh.
12    Q   How did you feel she performed the duties and
13 responsibilities of that job?
14    A   She was very warm to the parents, welcomed them
15 in, answered the phone very professional.
16    Q   And with that particular job, any concerns with
17 the manner in which she actually performed those duties
18 and responsibilities?
19    A   She had a couple incidences where she had had
20 some confrontation with other employees at the front desk
21 in the front lobby that she had to be counseled on.
22    Q   Other than more personal confrontations with
23 employees, putting that aside, any other concerns that
24 you might have had with the actual way that she performed
25 her job duties?

**Page 44**

1    A   No. Except that at -- at the -- at our center,
2 after all of this phone calling to the parents and
3 allegations, the parents, one of their complaints was
4 that the managers weren't up at that desk to answer the
5 calls. So then it was decided to put the managers on the
6 desk in the morning, at nap time, you know, and when the
7 receptionist went on her break and at night so that
8 parents always had availability to us.
9    Q   Okay. And maybe I'm misunderstanding. How was
10 that a problem in terms of the way that Ms. Norman was
11 performing her job?
12    A   Because -- well, it wasn't a problem with how
13 she was performing except she was calling the parents.
14 But if we were going to be at the front desk, then she
15 wouldn't be needed there. So instead of cutting her
16 hours, we then put her back at her -- what she was
17 originally hired for, which was support teacher, and let
18 her go back into the classroom and support the rooms that
19 way.
20    Q   Okay. And what does it mean at Bright Horizons
21 to be a support teacher?
22    A   The support teacher is one that assists in the
23 classroom. They're not responsible for writing lesson
24 plans and doing the letters to the parents and the
25 observations. They're the support person for that



BRENDA HAYES  
NORMAN V. BRIGHT HORIZONS  
May 23, 2013  
45–48

Page 45

1  teacher. They do -- they do the closing at night because
2  that's not the primary learning hours, and they go room
3  to room. They're not assigned to one classroom.
4     Q   During the time that Ms. Norman was acting in
5  that role as a support teacher, were there any parents
6  that had made any complaints about the way she treated
7  their children?
8     A   No. She was good with children.
9     Q   Did you participate in any way in the decision
10 to terminate Ms. Norman's employment?
11    A   Yes, I did.
12    Q   Okay. Could you tell me what role you had in
13 that decision-making process?
14    A   I was the one who wrote her up on her final
15 termination counsel. And then I took it to my
16 supervisor, which then Jennifer would refer it to
17 Therla Kozy.
18    Q   Did you personally make a recommendation either
19 to Ms. Horner or Ms. Todd or anybody else that you
20 believed that Ms. Norman should be terminated from her
21 job?
22    A   It was a joint decision that we made together
23 after we went through the whole history of the behavior
24 that was going on. Yes.
25    Q   When you say we went through the history of the

Page 46

1  behavior, who was included along with you?
2     A   Ms. Jennifer and Therla, our HR person.
3     Q   Therla Kozy?
4     A   Yes.
5     Q   Was there an agreement amongst the three of you
6  that Ms. Norman should be terminated from her job?
7     A   Yes.
8     Q   And what is the reason or reasons as to why
9  Ms. Norman was terminated from her job at
10 Bright Horizons?
11    A   Because of her performance and the
12 confrontations that she was having, and it kept
13 disrupting our -- you know, the business flow.
14    Q   I thought you told me earlier, though, that
15 Ms. Norman's actual job performance was good.
16       MR. BURRUEZO: Object --
17       THE DEPONENT: Part of the job performance is
18    performing in the classroom. You can't have
19    outbreaks and yelling at your co-workers and that be
20    good job performance.
21       MR. BURRUEZO: I was going to object to the form
22    of the question before the question was answered.
23 BY MR. OWENS:
24    Q   Did you ever witness Ms. Norman -- I think your
25 word was having an outburst toward co-workers?

Page 47

1     A   Yes.
2     Q   Okay. When did you witness that?
3     A   When she -- I witnessed it when she did it with
4  our -- our executive assistant who worked in the morning,
5  our daytime receptionist. I firsthand witnessed it when
6  she did it to myself. I witnessed it when she -- when
7  she had left the infant room and had an altercation in
8  there.
9     Q   I think the first one you told me was a
10 situation where she had an issue with the daytime
11 receptionist; is that what you said?
12    A   Yes.
13    Q   Okay.
14    A   We were in an admin meeting, and we heard
15 Ms. Janice speaking very loudly to the receptionist, and
16 the receptionist was upset and walked -- said something
17 back and walked away and was going to her break. It was
18 in the front, and that's where our front lobby is where
19 parents come through. And so Ms. Debra went out there
20 and spoke to her.
21    Q   Debra Neverson?
22    A   Uh-huh.
23    Q   Is that a yes?
24    A   Yes.
25    Q   Who was the receptionist that this happened

Page 48

1  with?
2     A   Judy Azzaro (phonetic).
3     Q   And when you witnessed this, did you talk to
4  Ms. Norman about this?
5     A   No. I wasn't her direct supervisor, and she was
6  being spoken to by Debra Neverson.
7     Q   Okay. And another occasion you told me was when
8  she -- you felt she was disrespectful toward you
9  personally?
10    A   Yes.
11    Q   Okay. When did that take place?
12    A   I can't give you a time frame when that -- a
13 date or anything when that took place. It was before all
14 of this.
15    Q   Before the child abuse investigation?
16    A   Yes.
17    Q   Okay. And tell me about the circumstances
18 surrounding that situation.
19    A   She confronted me in the front. There was
20 parents walking through and co-workers, and she told me
21 that she heard from another employee that I said she was
22 too heavy to wear a skirt that she had worn and asked me
23 who did I think I was, you know. And I told her I had no
24 idea what she was talking about, but if she wanted to
25 come in my office, you know, we would speak in there, but



Page 49

1   I would not speak to her out in the front lobby. It was
2   inappropriate. I brought her in my office and asked her
3   where she was coming from with this and asked who she
4   heard this from. She said she didn't want to tell me,
5   and that I took it to Ms. Linda. And I felt that she
6   needed to disclose where this came from because this
7   is -- you know, this is crazy allegations. And I did not
8   appreciate that tone being done and the allegation in the
9   front. She didn't want to say and said that, you know,
10  that -- she said she was fine and that it would be done.
11  It was Ms. Horner's decision then to let it go.
12     Q   And I think you said there was a third situation
13  that you witnessed, and I believe you said it was in the
14  classroom?
15     A   Yes. She had just -- she went into the infant
16  classroom, and she was in there for just a little bit.
17  And a teacher came out upset and was about in tears. And
18  another teacher, right before that, had said -- told
19  Ms. Sue to go in there because Ms. Janice was raising her
20  voice to her. And when she came out, she was very upset.
21     Q   You didn't personally witness --
22     A   No.
23     Q   -- Ms. Norman raising her voice then?
24     A   No. Just the aftereffect of that.
25

Page 50

1        (Plaintiffs' Exhibit 3 was marked for
2        identification.)
3   BY MR. OWENS:
4      Q   Okay. I have handed you what's been marked as
5   Exhibit 3. Do you recognize it? (Tendering).
6      A   (Receiving). I do.
7      Q   What is this document?
8      A   This is the final termination counsel that I did
9   with Ms. Janice and Jennifer Todd, who is now
10  Jennifer Whitley, was there with me.
11     Q   Was Ms. Todd with you personally when you
12  prepared this?
13     A   She was the witness.
14     Q   Okay.
15     A   But she knew of the content of this.
16     Q   Okay. Did you prepare this document, Exhibit 3?
17     A   I did.
18     Q   So this is not your writing necessarily, but you
19  typed this information in, correct?
20     A   I did.
21     Q   And is that your signature at the bottom of the
22  page?
23     A   It is.
24     Q   Do you see where it says, "Employee denied
25  allegations" and "Employee did not sign"?

Page 51

1      A   Uh-huh.
2      Q   Is that a yes?
3      A   Yes.
4      Q   Okay. Is that your handwriting?
5      A   No.
6      Q   Okay. Did you provide this to Ms. Norman to
7   review and she wrote that in?
8      A   No. I believe Jennifer wrote that in to say
9   that she didn't sign it.
10     Q   Okay. Did you have a meeting with Ms. Norman
11  and provide this document to her related to her
12  termination?
13     A   Yes.
14     Q   Was anybody else in the meeting other than
15  yourself?
16     A   Ms. Jennifer.
17     Q   Okay. Was she there in person or by phone?
18     A   In person.
19     Q   Okay. And when you provided this to Ms. Norman,
20  did she have any sort of response?
21     A   She had like a half smile on her face, and we
22  read it, and she just said, okay, that she wasn't going
23  to sign.
24     Q   Okay. Can you remember her saying anything
25  else?

Page 52

1      A   No. I don't remember what her words were.
2      Q   All right. Let's go through this document a
3   little bit. You write on June 16th, 2011 an employee
4   approached yourself?
5      A   Uh-huh.
6      Q   Who is that employee?
7      A   Krissy Hodel.
8      Q   And Ms. Hodel told you that she had not come
9   forward earlier because she feared retaliation?
10     A   Yes.
11     Q   From -- did she say who she was fearing
12  retaliation from?
13     A   Ms. Janice.
14     Q   And it says, "On Monday, June 6, Ms. Janice
15  confronted the teacher in the shared diaper area." Are
16  you referring to Ms. Hodel when you say "the teacher"?
17     A   Yes.
18     Q   Okay. And did Ms. Hodel tell you that Janice
19  said to her, "You need to stop running your mouth; all
20  you do is complain"?
21     A   Yes.
22     Q   And did she also tell you that Janice Norman
23  said to her, "You are a tattletale, so go ahead, run to
24  Ms. Brenda"?
25     A   Yes.



**Page 53**

1  Q  Was this the first time that Ms. Hodel had come
2  to you with concern about a co-worker?
3  A  A concern in what fashion?
4  Q  Anything. Prior to this situation that you've
5  noted here in Exhibit 3, had Ms. Hodel ever come to you
6  and complained about one of her co-workers?
7  A  Yes.
8  Q  Who had Ms. Hodel come to you to complain about
9  in the past?
10  A  She came to me to complain about Ms. Wendy when
11  she first started, but they -- they worked it out
12  afterwards. But she complained about her. Let me think.
13  She's com- -- if it was -- if you're talking about during
14  this time, or are you talking about her the whole time?
15  Q  Any time.
16  A  She complained about one of our infant room
17  teachers who's caring for her son.
18  Q  Who was that? Do you remember who the infant
19  room teacher was?
20  A  Kathy Sutton.
21  Q  Who else?
22  A  She complained about the kitchen staff before.
23  That's the only one that's coming to my mind.
24  Q  If you can think of any others before the
25  deposition is over, just let me know, okay?

**Page 54**

1  A  Okay.
2  Q  You then say upon further investigation, you
3  learned that there was a separate incident. Tell me
4  about this further investigation that you conducted.
5  A  Well, what I did is I went to everyone who works
6  on -- in this evening shift that this incident happened
7  and asked if they had seen or heard this happen. And
8  when I did, Sara had said that Ms. Janice had come over
9  to her room and was very upset with her and told her if
10  she was going to say anything, she needs to say it to her
11  face.
12     I asked her what happened. She said that when
13  they were -- there seemed to be tension when they would
14  move children at the end of the night to the rooms. And
15  when she was calling to move children, one of the
16  teachers was moving kids, and she saw that Janice was
17  upset. So she had called over to the classroom and spoke
18  to Ms. Emily, who was Ms. Janice's co-worker, and asked
19  if -- what their numbers were and if they are okay and if
20  they wanted to pass a couple because her numbers were
21  low. And Emily had stated no; that the numbers were
22  fine, and she hung up. Well, when Janice went in there,
23  she thought -- Janice thought that Sara was speaking of
24  her and got upset and left out of the room and went into
25  Sara's room and yelled at her for -- because she thought

**Page 55**

1  she was speaking about her.
2  Q  Okay. So it sounds like there's a
3  misunderstanding among co-workers; is that fair to say?
4  A  Yes.
5  Q  Okay.
6  A  Except it's inappropriate to raise your voice in
7  front of children and to have confrontations like that.
8  Q  Is it even more inappropriate to use cuss words
9  in front of small children?
10  A  I guess I would need to know the circumstance of
11  it. But I think that if -- if a teacher is yelling and
12  in a threatening manner, I think that is far worse than
13  if a teacher slips with a cuss word. I don't think
14  either one is appropriate.
15     (Plaintiffs' Exhibit 4 was marked for
16     identification.)
17  BY MR. OWENS:
18  Q  I've handed you Exhibit 4. Do you recognize
19  this document? (Tendering).
20  A  (Receiving). Yes, I do.
21  Q  What is this document?
22  A  This is the interviews that I did with Krissy
23  and Sara after Krissy had come to me regarding a
24  confrontation that she had experienced with Ms. Janice
25  and which ultimately ended up being part of the

**Page 56**

1  termination conference that is referenced here.
2  Q  Okay. And on the second page, is that your
3  signature?
4  A  Yes, it is.
5  Q  And when you say, "Respectfully submitted," who
6  did you submit this to?
7  A  Whenever I do documentation of interviews and by
8  investigating what a teacher has alleged (sic) that has
9  happened, then I submit this to Jennifer, and if I'm
10  going to do a write-up and stuff, then it's to show that
11  it warrants the write-up. And then ultimately it then
12  went up to Ms. Therla.
13  Q  Were you asked by Ms. Kozy or Ms. Todd to
14  conduct this investigation?
15  A  I -- we do conduct investigations.
16  Q  I appreciate that, but --
17  A  No. It's standard.
18  Q  Okay. My question was a little different,
19  though. Did either Ms. Kozy or Ms. Todd instruct you to
20  perform an investigation into what you had learned from
21  Ms. Krissy the day before?
22  A  No.
23  Q  This is something you chose to do on your own,
24  correct?
25  A  Right.



Page 57

1  Q  And according to your notes here, it appears
2  that this took place in the morning of June 17th, 2011?
3  A  The interviews, yes.
4  Q  And similarly, that day on the 17th, did you
5  also interview Ms. Norman?
6  A  Yes.
7  Q  Do you have notes associated with your meeting
8  with Ms. Norman?
9  A  With Ms. Norman, I would assume I did. I don't
10 know.
11 Q  Okay. So it's your testimony that similar to
12 this document marked as Exhibit 4, you took notes with
13 your -- with regard to your interview of Ms. Norman?
14 A  I don't know. I can't tell you.
15 Q  And also in this document you mentioned
16 Ms. Shardawn. Who is Ms. Shardawn?
17 A  She's another -- was at that time another
18 teacher on that side.
19 Q  Did you interview Ms. Shardawn?
20 A  I don't see that her name was in here.
21 Q  If you look at the end of the first page and
22 into the second page, you say, "Ms. Sara saw she was
23 upset and called to classroom and spoke to Ms. Emily to
24 see if they needed any help or if they would like to pass
25 any children to her and Ms. Shardawn."

Page 58

1  A  Shardawn was on the other side. She was in
2  another classroom. There's four classrooms, and they're
3  like a suite. But Shardawn wasn't a part of it.
4  Shardawn was in another room. She was just asking if she
5  wanted her to send children that way.
6  Q  And did you interview -- well, there's a
7  Ms. Emily noted. What's her last name?
8  A  She's not there anymore. Like Alias or Elias.
9  Q  Did you interview Ms. Emily with regard to the
10 circumstances that you wrote about?
11 A  Yes. It says I circled back to Ms. Emily.
12 Q  At the beginning of this document, you say
13 interviews with Krissy and Sara?
14 A  Right. There was a full interview because they
15 were the ones who said the incident happened to hem.
16 Emily was in the classroom, who got left with the
17 children when Ms. Janice left the classroom.
18 Q  They were the only two saying bad things about
19 Ms. Norman, correct, Ms. Krissy and Ms. Sara?
20 A  They were the only two who had a confrontation
21 with her that day.
22 Q  With regard to the situation that's outlined in
23 Exhibit 4, other than Ms. Krissy, Ms. Sara, Ms. Emily, of
24 course, Ms. Norman, would there have been any other
25 witnesses in that general area who might have heard what

Page 59

1  was going on?
2  A  Not to my knowledge.
3  Q  When you completed Exhibit 4, did you e-mail it
4  to Ms. Todd and Ms. Kozy?
5  A  I would assume so.
6  Q  And if this happened according to this document
7  sometime in the morning of June 17th, do you know when
8  you would have put together the document we marked as
9  Exhibit 3?
10 A  They might have asked me to type up my notes
11 from my interview, and then that was typed up and sent to
12 them. I don't remember how this all came through, you
13 know, each step I did. But this would have been done
14 afterwards once the -- once a decision was made what to
15 do.
16    MR. OWENS: All right, ma'am. That's all I have
17 for you. Thank you for your time.
18    MR. BURRUEZO: Ms. Hayes, I have a few short
19 questions that I want to explore with you.
20          CROSS-EXAMINATION
21 BY MR. BURRUEZO:
22 Q  I want to take you back to your conversation
23 with opposing counsel concerning the investigation that
24 you conducted, sort of what we've been calling in the
25 course of your deposition sort of the second set of

Page 60

1  interviews; do you recall that?
2  A  Yes.
3  Q  All right. And I want to sort of maybe put all
4  this in context and get your thoughts in terms of whether
5  my impression is correct.
6     It seems to me that the investigation that was
7  being conducted by the Department of Children and
8  Families or some similar agency was a narrow one, meaning
9  that it was related to particular allegations that were
10 made relating to a particular incident or related to
11 incidents in early April of 2011; is that a fair --
12 A  Yes.
13 Q  -- characterization of what that investigation
14 entailed?
15 A  Yes.
16 Q  Is it safe to say that your investigation was
17 sort of much broader in scope; that is you are inquiring
18 of all of your staff, whoever might have encountered or
19 worked with Ms. Turner, of any semblance of abuse or
20 inappropriate neglect or other substandard significant
21 behavior on the part of Ms. Turner?
22 A  Yes.
23 Q  So it was more than just a simple date, but
24 rather a broad range of time?
25 A  Yes. It was if they ever worked with her in the



**Page 61**

1 period of time that they have been employed with
2 Bright Horizons.
3  Q  In connection with anything you heard from
4 anyone whatsoever in your interviews, did you ever walk
5 away or hear that Ms. Turner had engaged in abusive
6 behavior toward kids?
7  A  No.
8  Q  And if you had heard or had the impression that
9 Ms. Turner had engaged in abusive behavior, what would
10 you have done?
11  A  Then she would have been -- she would have been
12 counseled on that, reprimanded on that, and if it was
13 abuse, she would have been let go. She would not have
14 been able to stay.
15  Q  And would you have apprised the Department of
16 Children and Families of any abuse that you would have
17 uncovered in your second set of interviews?
18  A  Yes. As a mandated reporter, we are required to
19 do that.
20  Q  So it's then safe to say that -- I guess
21 conclude from what you've said that there was nothing
22 that you heard related to any teaching behaviors on the
23 part of Ms. Turner that would rise to the level of abuse
24 or neglect or any kind of behavior that would require you
25 to report as a mandatory reporter to the authorities?

**Page 62**

1  A  No. There was nothing. And when Ms. Turner
2 went back into the classroom, it was noted on the notes
3 of the CPI worker that when she went in, the children ran
4 to her lovingly. And, you know, they missed her being
5 out of the room, and they greeted her. And that made an
6 impression also on them, you know, on how warm it was.
7  Q  Would it be fair to characterize that what you
8 did here is sort of teaching stylistic differences?
9  A  Yes. And the reason we chose to do everybody in
10 the center for the whole broad spectrum is I wanted to
11 show the parents that we are very transparent and not
12 just one day that we're investigating. We are
13 investigating any time, and at any time there was nothing
14 that showed her as abusive or neglectful with their
15 children.
16    MR. BURRUEZO: I have nothing further. Thank
17 you.
18    MR. OWENS: Nothing further here.
19    MR. BURRUEZO: And we will read.
20    (The deposition of BRENDA HAYES was concluded
21 at 3:25 p.m., and reading and signing is not waived.)

**Page 63**

1    CERTIFICATE OF REPORTER
2 STATE OF FLORIDA  )
3 COUNTY OF PINELLAS )
4    I, JULIE R. PALITTO, RPR, Registered Professional
5 Reporter, certify that I was authorized to and did
6 stenographically report the deposition of the foregoing
7 witness; that a review of the transcript was not
8 requested; and that the transcript is a true and complete
9 record of my stenographic notes.
10    I FURTHER CERTIFY that I am not a relative,
11 employee, attorney or counsel of any of the parties to
12 this cause, nor am I a relative or employee of any of the
13 parties' attorney or counsel connected with this action,
14 nor am I financially interested in the outcome of this
15 action.
16    Dated this  day of   2013, at Clearwater,
17 Pinellas County, Florida.
18
19    JULIE R. PALITTO, RPR-CP

**Page 64**

1    CERTIFICATE OF OATH
2 STATE OF FLORIDA  )
3 PINELLAS COUNTY  )
4    I, JULIE R. PALITTO, RPR-CP, the undersigned
5 authority, certify that BRENDA HAYES, the witness named
6 herein, personally appeared before me for the taking of
7 the foregoing deposition and was by me first duly sworn
8 to tell the whole truth.
9    Witness my hand and official seal this ____ day
10 of _____, 2013.

*Julie Palitto*

JULIE R. PALITTO, RPR-CP
Notary Public, State of Florida
My Commission No. EE 854401
Expires: December 4, 2016



Page 65

1 PLEASE ATTACH TO THE DEPOSITION OF:
  BRENDA HAYES
2 DATE TAKEN: May 23, 2013
  IN THE CASE OF: JANICE NORMAN and VANESSA SMITH
3 vs. BRIGHT HORIZONS FAMILY SOLUTIONS, LLC, d/b/a BRIGHT
  HORIZONS CHILDREN'S CENTER
4
          ERRATA SHEET
5 INSTRUCTIONS:
       After reading the transcript of your deposition,
6 please note any change, addition, deletion on this sheet.
  Do Not make any marks or notations on the transcript
7 itself. Please sign and date this errata sheet and then
  kindly return it to the court reporter whose name is
8 shown below.

9 Page Line       CORRECTION AND REASON THEREFOR

10

11

12

13

14

15

16

17

18

19
       Under penalties of perjury, I declare that I
20 have read the foregoing document and that the facts
   stated in it are true. SIGNED AT_____Florida,
21 this,_____day of_____, 2013.

22

23            BRENDA HAYES

24

25

