In the Matter Of:

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS

---

DEPOSITION OF

JANICE NORMAN

*May 10, 2013*

---



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150

```
 1                  UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                          TAMPA DIVISION

 3

    JANICE NORMAN and
 4  VANESSA SMITH,

 5       Plaintiffs,

 6  vs.                     CASE NO.:   8:12-cv-01301-EAK-TBM

 7  BRIGHT HORIZONS FAMILY
    SOLUTIONS, LLC, d/b/a
 8  BRIGHT HORIZONS
    CHILDREN'S CENTERS,

 9
         Defendant.
10  _____/

11

12             DEPOSITION OF JANICE NORMAN

13

14  DATE:          Friday, May 10, 2013

15  TIME:          9:40 a.m. - 12:37 p.m.
                   1:35 p.m. - 2:35 p.m.
16
    PLACE:         Office of Florida Roebig, P.A.
17                 2101 West Platt Street
                   Tampa, Florida 33606
18                 813-855-1037

19

20  Reported by:
    Fransesca St. John,
21  Court Reporter

22

23

24

25
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                                    Pages 2..5

Page 2

```
1              A P P E A R A N C E S
2    FOR THE PLAINTIFFS:
3        GREGORY A. OWENS, ESQ.
4        Florin Roebig, P.A.
5        777 Alderman Road
6        Palm Harbor, Florida 34683
7        800-226-6501
         greg@florinroebig.com
8
9    FOR THE DEFENDANT:
10       CARLOS J. BURRUEZO, ESQ.
         Littler Mendelson, P.C.
11       111 North Magnolia Avenue, Suite 1250
         Orlando, Florida 32801
12       407-393-2900
         cburruezo@littler.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                 I N D E X
2    TESTIMONY OF JANICE NORMAN
3                                          PAGE
4    Examination by Mr. Burruezo              4
5    Certificate of Oath                    150
6    Certificate of Reporter                151
7
8                 E X H I B I T S
9    NO.  DESCRIPTION                       PAGE
10   1    Bright Horizons Diversity Commitment   38
11   2    Bright Horizons job description        40
12   3    Employee Handbook Acknowledgement Statement  44
13   4    Workplace Safety and Violence Prevention     44
14   5    Employee conference memo 8/24/2010     54
15   6    Complaint documentation form 4/18/2011 66
16   7    Employee conference memo May 20, 2011  82
17   8    Krissy and Sara interviews             90
18   9    Employee conference memo 6/17/2011    109
19   10   Correspondence dated 5/13/11          122
20   11   Correspondence dated 5/16/2011        122
21   12   Correspondence dated 5/17/2011        122
22
23
24
25
```

Page 4

```
1                    JANICE NORMAN,
2    was duly sworn to tell the truth and nothing but the
3    truth, and was examined and testified as follows:
4                    EXAMINATION
5    BY MR. BURRUEZO:
6        Q   Good morning, Ms. Norman.
7        A   Good morning.
8        Q   It's nice to see you again.  We met some months
9    ago at the mediation of the case in Tampa, and so it's
10   good to see you again this morning.
11       Of course today's purpose is a bit different
12   than the last time we met.  Today we're here to take
13   your deposition.  And I'm not sure if you've ever had
14   your deposition taken before, but let me share with you
15   a couple of the nuances in terms of what is going to
16   happen today.
17       This is my chance to question you about your
18   claims and the basis for your claims.  I'll be asking
19   you a series of questions related to the underlying
20   facts of why you are making the claims that you are
21   against our client, Bright Horizons, in this matter.
22       I'll be asking you some questions, and so in
23   connection with that process it's really important that
24   we follow certain protocols so that we can have
25   effective communication, which is my primary goal for
```

Page 5

```
1    us, you and I, to have very effective communication in
2    the course of today.
3        So if you don't understand my question, let me
4    know that and I'll be able to — I'll be happy to
5    rephrase it and make it more understandable.  Because
6    whatever answer you give me, I will interpret to be a
7    truthful answer to the question that I've asked.  So if
8    you don't understand the question, that means that
9    you're going to give me an answer that doesn't really
10   reply to the question I've asked.  So do not hesitate in
11   the course of the deposition to say, Carlos, I don't
12   understand your question, can you rephrase it.  And I'll
13   be happy to.
14       If you need to take a break at any point in
15   time, let me know that and I'll be happy to accommodate
16   you in that regard.
17       It will be very important as you respond to the
18   questions that you respond audibly so the court reporter
19   can take everything down that's being said in the room.
20   It's not uncommon in normal human discussion to nod your
21   head or roll your eyes or shrug your shoulders, but the
22   court reporter can't take those things down, so it will
23   be important for you to respond audibly to whatever it
24   is that I ask.
25       The other point with regard to communication is
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 6

1   that, again, although you might anticipate my question
2   or the end of my question, or I might anticipate your
3   answer or the end of your answer, it's really important
4   that we each give each other the chance to complete
5   either the question or the answer, because the court
6   reporter cannot take two people talking at the same
7   time.
8       A   Okay.
9       Q   So if you'll just pause so I can say my
10  question, and then I'll pause so you can say your
11  answer, we'll have a nice clean record, and the court
12  reporter won't be punching us during the break if we
13  make her life too difficult.
14      A   Okay.
15      Q   You are under oath as if you were in a
16  courtroom, so there's an expectation for you to testify
17  truthfully as if you were in front of a judge or a jury.
18  Okay?
19      A   Okay.
20      Q   All right.  With that, let's go ahead and get
21  started.  Go ahead and state your name, spell your last
22  name, and tell me your residence address.
23      A   Norman is my last name, N-O-R-M-A-N.  First
24  name is Janice.  Address is currently 7517 North 40th
25  Street, Apartment L like Linda 211, Tampa, Florida

Page 7

1   33604.
2       Q   All right.  And how long have you resided at
3   this particular address?
4       A   Five months.  Six months, I'm sorry.  Six
5   months now.
6       Q   Where did you live immediately prior to this
7   address?
8       A   4312 Mariner's Cove Court, Unit 202, Tampa,
9   Florida 33610.
10      Q   And how long did you live at this second
11  address you just gave me?
12      A   Off and on, four or five years, because I did
13  move another time as well.  I forgot about that address.
14      Q   Okay.  How long have you lived in the Tampa,
15  Florida area?
16      A   Five years now.
17      Q   And where did you move from?
18      A   Los Angeles, California.
19      Q   And how long did you live in Los Angeles?
20      A   From 1970 to 2008.
21          MR. OWENS:  Off the record real quickly.
22          THE WITNESS:  1968, I'm sorry.  1968.
23          MR. BURRUEZO:  That was almost a good year.
24          THE WITNESS:  Yes.
25          MR. OWENS:  Off the record for a minute.

Page 8

1           (Discussion off the record)
2           MR. OWENS:  We can go back on.
3   BY MR. BURRUEZO:
4       Q   I say almost good year because I'm a New York
5   Mets fan and they won the World Series in 1969, so.
6       A   Oh, okay.
7       Q   So you're a little bit of a year off.
8           What brought you to Tampa?
9       A   I was going through some difficult times in my
10  life, and my son suggested that I move from California
11  and come to Florida where he and his wife and children
12  lived, just to get away, and I did.  And I've been doing
13  better since then.
14      Q   Well I want to come back and talk about this a
15  little bit in terms of what you described as difficult
16  times.  Let me just sort of button up a couple of other
17  things and then I want to come back and talk with you
18  about that.
19          Do you live with anybody at the address that
20  you gave me?
21      A   No.
22      Q   And have you lived with anybody while you've
23  been residing in Tampa?
24      A   My son.  And also a girlfriend of mine from
25  church.

Page 9

1       Q   And what is her name?
2       A   Gale Everrett.
3       Q   And where does Gale live now?
4       A   She now lives — she moved.  She lives in
5   Brandon.
6       Q   And when did she live with you?
7       A   I lived with her.
8       Q   When did you live with her?
9       A   Let's see, this is '13.  2012, off and on I
10  would go back from my son's to her.  2012, for about
11  nine months I lived with her in between.
12      Q   And what was the reasoning between you going
13  back between your son and Gale Everrett's home?
14      A   My son and his wife have four children, and I
15  was just trying to give them space periodically.  And so
16  I would move in with her, and then sometimes go back to
17  babysitting and so forth with my son and his wife.  I
18  wanted them to have as much room as they could without
19  me there.
20      Q   And by the way, what is your son's name?
21      A   Bryant Pryor.
22      Q   And how old is he?
23      A   Bryant is 33.
24      Q   Do you have any other children?
25      A   No.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 10

1    Q   And Bryant lives in Tampa?
2    A   Tampa.
3    Q   What is his wife's name?
4    A   Latasha Pryor.
5    Q   And you said they have four kids?
6    A   Four kids.
7    Q   And how old are their kids?
8    A   One is 15, the girl.  And then they have one
9    that's eight, and one that's 6, and 16 months.
10   Q   And what address do they reside at?
11   A   4312 Mariners Cove.
12   Q   Okay.  So you lived with them off and on for
13   four or five years, and you also lived with Gale for a
14   bit in 2012.  But you now live by yourself at the
15   apartment that you gave me?
16   A   Senior citizen apartment, yes, on 40th Street.
17   Q   Okay.  What's your date of birth?
18   A   1/18/1952.
19   Q   Capricorn.  You had referenced some difficult
20   times which was sort of at the root of your move to
21   Florida in 2008.
22   A   Yes.
23   Q   What were the difficult times that you were
24   experiencing that sort of were at the center of your
25   decision to move to Florida?

Page 11

1    A   I had remarried again to a young man by the
2    name of Albert Scott, and he was very verbally abusive,
3    and I just had to get away.
4    Q   How long were you married to Mr. Scott?
5    A   About a year.
6    Q   And what time period were you married to him?
7    A   Well I was widowed because he passed away in
8    2009.
9    Q   Okay.  And so you married in 2008?
10   A   2008.
11   Q   Okay.  So did he pass away while you had
12   relocated here to Tampa?
13   A   Yeah.  Well I had visited here, and then I
14   left.  I went back.  And then I came back, and he passed
15   away then around December.
16   Q   How old was he?
17   A   I'm 61.  So he was 56 — 53.  You mean when he
18   passed away?
19   Q   Right, when he died.
20   A   When he died he was 53.  I think it's 53.  I'm
21   pretty sure it was 53.
22   Q   And what did he die of?
23   A   He had a heart attack, I think.  Heart attack.
24   Q   Now you say that he was verbally abusive to
25   you.  Can you kind of — and I certainly don't intend to

Page 12

1    rehash your past — but can you describe for me the
2    kinds of things he would say?
3    A   Yes.  He was visually impaired, I mean, and he
4    went totally blind.  And he would just get very
5    aggressive and call me names like B-I-T-C-H, and didn't
6    really want me to leave out of his presence without him.
7    And he would just pick up things sometimes and throw it
8    random.  And mostly just verbally abusive.
9    Q   How many times have you been married?
10   A   Three.
11   Q   So you were married to Mr. Scott for about a
12   year?
13   A   Yes.
14   Q   Who was the husband immediately before
15   Mr. Scott?
16   A   Alford Norman.
17   Q   Alford?
18   A   A-L-F-O-R-D.
19   Q   And how long were you married to him?
20   A   Sixteen years.
21   Q   Do you recall the period of time that you were
22   married, from what year to what year?
23   A   No, not right off.
24   Q   Was there much of a gap between your marriage
25   to Mr. Norman and Mr. Scott?

Page 13

1    A   It was seven, eight months.  About eight months
2    before I married him, Mr. Scott.
3    Q   All right.  So did you divorce Mr. Norman in
4    like 2007, 2008?
5    A   Yes, 2008.  And I remarried in 2008 the
6    beginning of the year.  I divorced, and then I remarried
7    in about seven months.  But the years were like 2007,
8    2008 and 2009.
9    Q   Okay.  And what was the reason for your
10   marriage to Mr. Norman falling apart?
11   A   He was cheating.
12   Q   All right.  So he was unfaithful?
13   A   Yes.
14   Q   Anything else besides that that was at the root
15   of —
16   A   Yes, alcoholism.
17   Q   He was an alcoholic?
18   A   Yes.
19   Q   Was there any abuse associated with his
20   alcoholism?
21   A   No abuse.
22   Q   So how was his alcoholism a problem in your
23   marriage?
24   A   Around the thirteenth or fourteenth year, it
25   just got excessive.  He would just drink, drink, drink.



Case 8:12-cv-01301-TBM   Document 34   Filed 06/28/13   Page 6 of 40 PageID 626

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                           Pages 14..17

**Page 14**

1  And it was just intolerable, really, because he was
2  always drinking.
3       Q   And then you had a husband before Mr. Norman.
4       A   Yes.
5       Q   And what was his name?
6       A   Gregory Pryor.
7       Q   And how long were you married to Mr. Pryor?
8       A   Seven years.
9       Q   Do you recall the time period?
10      A   I married him in '78 and divorced in '83.  I
11  mean 1978 to '85.
12      Q   '85?
13      A   Correct, yes.
14      Q   And what were the reasons for the demise of
15  that marriage?
16      A   We just grew apart.
17      Q   Any issues of abuse in that relationship?
18      A   No, no.  Unfaithfulness, but that was it.
19      Q   He was unfaithful?
20      A   Yes.  Had got someone else pregnant.
21      Q   Do you anticipate a change in your marital
22  status in the near future?
23      A   Yes.
24      Q   And tell me about that.  Are you engaged?
25      A   Yes.

**Page 15**

1       Q   And who is your fiance?
2       A   His name is Mario Howard.
3       Q   And where does he live?
4       A   He lives at the same address but in a different
5  apartment.
6       Q   And when are you planning to tie the knot?
7       A   We haven't really set the date yet, we're just
8  engaged, and we're getting the ring and all that in
9  about another week.
10      Q   You anticipate —
11      A   We haven't set the date, but we're doing it
12  this year.
13      Q   Are you going to be married in 2013?
14      A   Yes.
15      Q   Well there was a smile on your face when you
16  said that, so he must be pretty meaningful to you.
17      A   Yes, he is.
18      Q   All right.
19          MR. BURRUEZO:  I have no further questions.
20          MR. OWENS:  She'll read.
21          (Laughter)
22  BY MR. BURRUEZO:
23      Q   All right, I've covered a little bit of your
24  family history and your marital history.  Let me ask
25  you, I guess at this juncture, are you taking any

**Page 16**

1  medications currently for any reason?
2       A   Yes, I take medication.
3       Q   Tell me one by one each medication that you
4  take.
5       A   I take metformin for —
6       Q   Can you spell that?
7       A   M-E-T-F-O-R-M-I-N.
8       Q   Metformin?
9       A   Yes.  That's for diabetes.  They said like
10  borderline, but they have me on it, so.  It's for
11  diabetes.  And then high blood pressure, I take
12  Amlodipine I think it's called.  I have it written down
13  here.  And it's a water pill with that
14  hydrochlorothiazide.  It's called amlodipine,
15  A-M-L-O-D-I-P-I-N-E.
16      Q   Okay.  And this is for high blood pressure?
17      A   Yes.  And it's a water pill included in there
18  with hydrochlorothiazide to help with it.
19      Q   And what are the milligrams that you take for
20  the diabetes medication?
21      A   It's 1000 milligrams.
22      Q   And what about the high blood pressure?
23      A   2.5 milligrams.
24      Q   Any other medicines that you take?
25      A   No.

**Page 17**

1       Q   And how long have you been on the diabetes
2  medication?
3       A   Since I've been down — let's see, about six
4  years now.  A little bit before I came here.  About six
5  years.
6       Q   And how about the high blood pressure medicine?
7       A   Around the same time.
8       Q   About six years?
9       A   (Nods head affirmatively.)
10      Q   Did these medicines get prescribed to you while
11  you were still living in California?
12      A   Yes.
13      Q   And who was the physician in California who
14  prescribed these to you, if you recall?
15      A   No, I don't remember his name.
16      Q   Do you see doctors here locally to continue the
17  administration of these medicines?
18      A   Yes.  Well I don't see him, but he still
19  prescribes it because I don't have insurance, so.  But
20  he still prescribes it, Dr. Werden.  William Werden.
21      Q   William, W-A-R —
22      A   W-E-R-D-E-N.
23      Q   William Werden.  And he's in California?
24      A   He's here.
25      Q   He's here in Tampa?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 18

1    A   Dr. Werden, yeah.
2    Q   What type of physician is Dr. Werden?
3    A   He's just a general doctor, general
4    practitioner.
5    Q   Have you seen any other doctors or visited any
6    other doctors in the time that you were employed with
7    Bright Horizons to the present?
8    A   At the hospital when I had surgery, yes.
9    Q   And what was the surgery for?
10   A   To remove a disc.  And it's called lumbar
11   surgery.  They had to go through my neck and remove a
12   disc at Brandon Hospital.
13   Q   When was this?
14   A   2011.
15   Q   Was this before or after your separation from
16   Bright Horizons?
17   A   Right after was when I had the surgery.
18   Q   And what is it that they removed exactly?
19   A   Number 3 and number 5 discs.
20   Q   In your spine?
21   A   From my shoulder.
22   Q   From your shoulder?
23   A   Yes.
24   Q   And what was the issue that you were
25   experiencing with your shoulder that led to the —

Page 19

1    A   My whole arm was paining.  Arm, shoulder
2    and side.
3    Q   And what did the doctor determine as to what
4    was the root cause for that pain that you were
5    experiencing in your shoulder?
6    A   Well, he didn't really say.  He just said it
7    could be from several things, so.  He just know I needed
8    to have surgery.  I said it was from when I picked up
9    one of the kids at the school because that's when I
10   remember that I snapped my arm, like it pulled out of
11   place from the same job.  And he said I needed surgery,
12   so I had to have it.  He had to go through here in my
13   neck, and go through it.  And I was there for about 10
14   days in the hospital.
15   Q   Have you been diagnosed either — or ever I
16   guess should say.  Let me ask the broader question
17   first.  Have you ever been diagnosed with having any
18   emotional or mental condition?
19   A   No.
20   Q   Have you visited with any psychiatrist,
21   psychologist or therapist of any kind ever in the course
22   of your life?
23   A   No.
24   Q   Have you ever been diagnosed with depression or
25   anxiety disorder, anything that sort of touches upon

Page 20

1    some emotional condition or deficiency?
2    A   No.
3    Q   Have you ever felt the need to go and visit
4    with a therapist or psychologist or psychiatrist?
5    A   No.
6    Q   Do you feel that in the course of your
7    lifetime, whatever period, that you have maintained what
8    you would consider to be a balanced sort of emotional
9    state?
10   A   No.
11   Q   Let me rephrase it, it was kind of a convoluted
12   question.
13   A   Okay.
14   Q   Let me ask it a little bit differently.  Do you
15   feel that you have been emotionally healthy throughout
16   your life?
17   A   Emotionally healthy throughout my life?  Not
18   always.  When I was going through the changes in my
19   marriage, I wasn't.
20   Q   Okay.  And during the time that you were going
21   through those changes in your marriage, what did you
22   feel?  What was it that made you feel less emotionally
23   healthy during those periods?
24   A   The name callings would make me really feel bad
25   inside.

Page 21

1    Q   Did you seek any kind of help or assistance for
2    how you were feeling at that time?
3    A   Just reached out to my family members, mostly
4    my aunt in Las Vegas.  She would help me verbally a lot
5    in telling me what to do, what I should do and what I
6    shouldn't take and so forth.
7    Q   So I take it, and I don't mean to mis-summarize
8    something if I'm not being accurate, but it sounds to me
9    that whenever you've had, throughout these periods in
10   your life where you didn't feel as good as you normally
11   felt or feel, that you would rely on family members for
12   support as opposed to healthcare professionals whose
13   primary focus is emotional health and well being?
14   A   Absolutely.
15   Q   Has there ever been a period in your life where
16   you felt sort of depressed where you didn't want to
17   leave your bed or go and talk to people, be reclusive?
18   A   I've had those feelings before.
19   Q   And when have you felt that way in the course
20   of your life?
21   A   At the time of the marriage to Albert Scott I
22   felt really emotionally distressed.  I felt, like I
23   said, just a bad feeling inside of me.  I didn't, I
24   didn't like the way I was feeling.
25   Q   How do you feel today?



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                          Pages 22..25

**Page 22**

1    A   I feel great today.
2    Q   And what is it that you feel great about?
3    A   I feel great about my life, it's moving on, and
4  that spiritually I'm more focused now and I can
5  concentrate better.  And I just feel whole now.  I feel,
6  I feel different from what I did when I first came to
7  Tampa because I met somebody.  And my family's there for
8  me.  And my grandchildren are healthy.  And there's just
9  a lot that's happened that I'm grateful for.
10   Q   And I was going to ask, you know, what is it
11 that you think is happening in your life now which puts
12 you at such a good place?
13   A   I have someone to really -- I can talk to and I
14 really trust.  And I really love at this time.  And it's
15 just different.  I feel happy.
16   Q   Feels like Valentine's Day, jeez.
17      MR. OWENS:  I can almost feel her love.
18      MR. BURRUEZO:  Yeah.  Wow, it's like forget
19 Mother's Day, it's Valentine's Day.
20 BY MR. BURRUEZO:
21   Q   And let me just say as an aside, I appreciate
22 your patience with my asking of personal questions.  I'm
23 not trying to pry in your personal business.  These
24 cases necessarily involve issues not only that dealt
25 with your job, but also that deals with, you know, where

**Page 23**

1  you're at in your life and how you feel and all that.
2  So that's really why I'm being a little nosy.
3    A   That's okay.
4    Q   Not too nosy, but a little nosy about some of
5  the issues in the course of your life.
6        Describe for me, and I know you've given me
7  some Interrogatory answers, describe for me in a sort of
8  a brief way your educational background and history.
9    A   Okay.  I graduated from Locke High School in
10 Los Angeles in 1970.  I left there and went to Southwest
11 College for four years.  It took me four years to
12 graduate.  I have an associates degree because I was
13 going part time and working simultaneously.  So I have
14 an Associates of Arts degree in just General Education,
15 mostly classes were in child development.
16        And I went to school and took a class for
17 activity coordinator, working with the elderly.  And I
18 have a certificate for that.  And that's about it.
19   Q   Okay.  And I would be remiss if I didn't ask
20 you, one of the Interrogatory questions asked for your
21 full name and other identifying information.  And can
22 you pronounce your middle name?
23   A   Havaughnia.
24   Q   Havaughnia?
25   A   Correct.

**Page 24**

1    Q   And is there a — and forgive the ignorance of
2  the question — is there a significance to that name?
3    A   No.  My godmother at the time named me that.
4  Actually, my name was Marie and she changed it to
5  Havaughnia.  My mom, they changed it some kind of way
6  when I was little, so I heard, but there's no
7  significance as far as I'm concerned.  It's just a
8  beautiful, unique name.
9    Q   And the spelling is quite unique.  Does it have
10 its origins in a different language?
11   A   Not that I know of.  And you know, I probably
12 should look into that.  But no, not that I know of.
13 It's just, Havaughnia is what she named me.
14   Q   Okay.  Do you anticipate any schooling in the
15 near future?  Do you want to go back to school and work
16 toward a degree in any respect?
17   A   Yes.
18   Q   Tell me about that.
19   A   My church has a program now that I'm involved
20 in, I work with.  And I wanted to get my — I've always
21 wanted to get my bachelor's degree, and I'm getting it
22 in — I'm going to get it in Biblical Studies through my
23 church.  We offer a program called MTI.  It's Manifest
24 Theological Institute that I'm working with now.  And I
25 plan to enroll not the next semester because I'm helping

**Page 25**

1  out with the graduation and so forth, but the very —
2  hopefully within the next six months I'm going to get
3  that going.
4    Q   And are you hoping to have this lead to a
5  particular field of work?
6    A   No.  I just want to understand more about the
7  bible and just get a degree in it.  And if I need to be
8  of assistance at the church through helping other
9  people, that's what I want to do with it.  And perhaps
10 get a job with them as well, because right now I just
11 volunteer.
12   Q   And what church do you go to?
13   A   The Center for Manifestation.
14   Q   And is it affiliated with any particular
15 denomination?
16   A   No, it's non-denomination.
17   Q   And it's a Christian denomination?
18   A   Yes.
19   Q   And that's located here in Tampa?
20   A   Yes, on Lake.
21   Q   Your employment with Bright Horizons ended in
22 June of 2011?
23   A   Correct.
24   Q   And we're going to go back and kind of talk in
25 some detail in the course of the day about your



**DISCOVERY LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 26

1  employment with Bright Horizons.  I wanted to ask you, I
2  guess as a preliminary matter, what employment have you
3  had after your separation from Bright Horizons in June
4  of 2011?
5      A  I haven't had any employment since then.  I've
6  worked about a day or two with this young lady as a
7  janitorial service type thing, which was something
8  temporarily, but that was like about two days.  Two or
9  three days.
10      Q  And what was the name of that?
11      A  I just don't recall right off.  It was, it was
12  something like — I think it may have — La Sable or
13  something like that, Janitorial Services, wherein I
14  cleaned up an office with her for about two days.  Two
15  Saturdays, on a weekend, but that was just temporary.
16      Q  When was that?
17      A  That was about a year ago, I'd say about.  No,
18  about eight months ago.
19      Q  And how much did you earn doing that?
20      A  She gave me cash.  I think about $30 or $40 for
21  that day.
22      Q  Any other employment that you've had besides
23  these two days or so with the janitorial service?
24      A  No.
25      Q  How have you been supporting yourself since

Page 27

1  your employment with Bright Horizons?
2      A  Unemployment extensions, and I get the widow's
3  pay.
4      Q  And how much is your unemployment benefit?
5      A  $200.
6      Q  A week?
7      A  A week.
8      Q  And has it been that amount since June of 2011?
9      A  Well it used to be 197 a week, but it's $3
10  more, so roughly $200 a week.
11      Q  Okay.  And then you get widow's pension?
12      A  Yes.
13      Q  And is that through — which agency is that
14  through, Social Security?
15      A  Social Security.
16      Q  And how much is that?
17      A  $657 a month.
18      Q  And how long have you been getting this?
19      A  Now, about eight months.
20      Q  Any other expenses besides this amount that
21  you've described for me?
22      A  No.
23      Q  So if I do my arithmetic correctly, you have
24  about $1500 a month in income.  Is that about right?
25      A  Yes.

Page 28

1      Q  Does family support you in any way, like your
2  son provide you any support, or your fiance?
3      A  Yeah, sometimes he — he gives money sometimes
4  if I need something, or he'll buy me something.
5      Q  Has your son provided you support as well?
6      A  Yes, he'll help me as well.  He used to, you
7  know, when I really needed it before I started the
8  widow's pay pension.  And he would give me periodically,
9  like if I needed like $50 or $60, if he had it, he would
10  give it to me, my son and his wife.
11      Q  And what are your expenses, your monthly
12  expenses?
13      A  About — really about over that.  I would say
14  about 16, $1700 now.
15      Q  And what are they in particular?  How would you
16  break that down?
17      A  Okay, the rent is $435.  Then I have the light
18  bill which is mostly about $50, $60 a month.  And then I
19  have my life insurance which is $25 a month.  And I have
20  basic cable which is about $40 a month.  I really
21  haven't calculated the food and the gas for my car and
22  all that.  But then I have — I don't have the other
23  bills with me.
24      I have other bills, like I had some outstanding
25  loans that I was paying back to some friends from long

Page 29

1  time ago, you know, when I first got down here, and I
2  paid that, but that's not really like a bill, I just
3  paid that.  Like my aunt and my uncle, they used to help
4  me too, and my mom in Las Vegas.  So periodically I pay
5  back.  I don't really owe a whole lot to them now, but
6  it's less than like $500, that I owe out in personal
7  loans.
8      And then I have a AmeriLoan, I had to make a
9  loan with them, that I just recently paid that off.  So
10  it was $60 a month, so.  And then I have — I used to go
11  to Amscot and get a payday, you know, a loan, and then I
12  would pay it back.  So I would pay like $50 a month on
13  that before my friend actually started helping me now
14  that he's working off and on.
15      Q  So how do you make up the deficit, your monthly
16  deficit of a hundred or $200 a month?  How do you
17  compensate for that?
18      A  Clothes and just personal items that I need.
19      Q  And so who — I guess my question was a little
20  bit strangely worded.  But your expenses exceed your
21  income by a couple hundred dollars a month, so how do
22  you make up the difference?  Who helps you with that
23  difference?
24      A  Mario, my fiance.
25      Q  I had a feeling that would be the answer.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                                    Pages 30..33

Page 30

1    Are there any anticipated increases in either
2  your income or your expenses coming up in the near
3  future?
4    A   No.
5    Q   Do you anticipate your financial situation
6  remaining kind of steady in the near future?
7    A   Yes.  Well I'm 61 now, so at 62 I'll get SS,
8  I'll get Social Security, I think.  That change like
9  that you mean, change in the income?
10   Q   Right.  Okay.  Do you know if that impacts
11 whether or not you'll get the death benefit or you'll
12 continue getting the death benefit for your former
13 husband, the widow's pay?
14   A   Oh, I think -- once I marry I don't think I get
15 that.  I don't know for sure.  I was told that maybe I
16 would because the type of insurance that he -- the
17 pension that he had, I may still get it.  But I have to
18 go and talk with someone at the Social Security office
19 to make sure.  But I don't think so.  I don't know,
20 because I'll be getting my own at 62.  I don't know.
21   Q   All right, let's shift gears again and talk
22 about your previous work history prior to joining Bright
23 Horizons in 2008.
24   A   Okay.
25   Q   Tell me about any experiences you had in child

Page 31

1  care prior to joining Bright Horizons?
2    A   I worked for this school called Frost
3  Elementary School in special education when I first got
4  down here.  Let's see, 2008.  I worked there only for
5  about 90 days.  I didn't have a car.  And I just -- it
6  was hard getting the bus back and forth.  And so I left
7  there after the 90 days.  I was working in the special
8  ed department with kids, with another teacher.
9    Q   And that was here in Tampa?
10   A   In Tampa.
11   Q   Do you know where that was located?
12   A   Off the 301 in Riverview.
13   Q   And what was your reasoning for separating from
14 Frost Elementary?
15   A   Just hardship at the time.  Just didn't have
16 the money for the buses, and it was cold, and it was
17 just a lot of things going on at the time, you know.  I
18 didn't -- I wasn't really financially situated.  And so
19 I left there briefly before I went to Bright Horizons.
20 It was closer.  I could walk to work to Bright Horizons.
21   Q   Okay.  Did you voluntarily separate from Frost?
22   A   Yes.
23   Q   Were you asked to leave or were you fired?
24   A   No.
25   Q   Have you ever been fired from any job?

Page 32

1    A   A long time ago, back in the '70s, yeah.  I can
2  remember a couple of times, just for -- I don't even
3  remember the companies.  I was young and just didn't get
4  to work sometimes on time and whatever.  But I can
5  remember a couple of times I think I was.  But just what
6  companies and all that, I forgot because I was much
7  younger.
8    Q   And this was in the 1970s?
9    A   In the '70s, yeah.  And early '80s.
10   Q   How many jobs do you think you've been fired
11 from?
12   A   A total of two maybe.  Two or three.
13   Q   Going back to your experience in child care,
14 any other childcare experience before going to Bright
15 Horizons?
16   A   No.  It was adult daycare center.  I was with
17 adults.  Activity coordinator for adults.  Senior
18 citizens.
19   Q   And where was that, in California?
20   A   In California.  I worked at like three or four
21 different, because they were all like tied in together.
22 Part-time jobs with adult daycare centers as activity --
23 they call it a director or activity coordinator.  You
24 would drop your loved ones off, I would keep them happy
25 all day long until you come back.  With the handicap and

Page 33

1  the elderly, that was great helping them.
2    Q   And what kinds of things would you do?
3    A   I would play games with them.  I would take
4  them on nature walks.  And they loved to play bingo.  I
5  would put on talent shows for them, and we would like
6  have a modeling session.  And they would reminisce.  And
7  just do different activities with them just to keep them
8  happy until their loved ones picked them up about 5:00
9  or 6:00.
10      They would eat like two or three meals a day,
11 and I would help serve the food as well as just do
12 different activities like play board games.  And just
13 kept them active, you know, until someone picked them up
14 in the evening.
15   Q   All right.  So in terms of child care for
16 children, is it safe to say that Frost Elementary was
17 sort of the closest experience you had to child care for
18 kids?
19   A   Yes.
20   Q   All right.  Let's move, if we could, to your
21 employment with Bright Horizons.  How did you learn of
22 the availability of any positions at Bright Horizons?
23   A   I got up one morning and I got on the bus
24 looking for work, and I met this lady named Ms. Tasha on
25 the bus and I asked her where do you work, because she



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 34   Filed 06/28/13   Page 11 of 40 PageID 631

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                                    Pages 34..37

**Page 34**

1  had a badge on. And she said I work right here at
2  Bright Horizons. And I said are they hiring. And she
3  says yes they are, you want me to take your number and
4  I'll call you. And I said no I want to get off with you
5  now and go and apply. And so I did. And I applied, and
6  about maybe, I would say within a month I was hired
7  there.
8      Q   And what were you hired into?
9      A   I was hired into a teacher's assistant in the
10  classrooms on the B wing. They call it B wing. We had
11  A, B, C and D wing. But I was on the A wing as a
12  teacher's assistant.
13     Q   And can you describe for me the differences in
14  the wings, the A, B and C wings?
15     A   The A wing is the baby wing. The B wing is
16  like two years and three. The C wing is the older kids,
17  like four and five -- four. And the D wing is
18  afterschool.
19     Q   And when you became employed -- and I guess I
20  didn't establish a time period, but my records show that
21  you commenced your employment on April 17th, 2008. Does
22  that sound right?
23     A   Yes.
24     Q   And when you became employed in April of 2008,
25  what position or what wing, I should say, were you

**Page 35**

1  placed as a teacher's assistant?
2      A   Wing B. B wing.
3      Q   And during the tenure -- during your tenure,
4  were you in that same wing your entire tenure?
5      A   No. I went from B to -- sometimes I would do
6  the C wing. I would go back and forth. Wherever they
7  needed me, really, I started switching around going back
8  and forth. Because it was, you know, a job where you
9  just go from wing to wing.
10     Q   Were you kind of a floater?
11     A   Floater. Yes, a floater.
12     Q   Okay. And the particular Bright Horizons
13  facility you worked at was the Citibank?
14     A   Citibank, yes.
15     Q   Okay. And who was the management at the
16  Citibank Center when you became employed?
17     A   Debra, and Linda Horner. Debra, I forgot her
18  last name, and Linda Horner.
19     Q   And what position did Debra have?
20     A   Debra was assistant director, and Ms. Linda was
21  the director.
22     Q   Okay. And how was, generally, your
23  relationship with them when you first became employed in
24  April of 2008?
25     A   It was great with both of them.

**Page 36**

1      Q   Was there ever a point in time when your
2  relationship changed with either or both of them?
3      A   Well, with Ms. Debra one time it changed. She
4  asked me to do some work, it's called a Commons area,
5  along with working with another teacher at the same
6  time. It was just a little bit too much, and I became a
7  little frustrated and told her she would have to just
8  hold up a minute and wait because I was giving some
9  bathroom breaks for another wing, and I think I kind of
10  upset her with my tone. So she spoke with me about that
11  verbally, and said it was just verbally and it wouldn't
12  go no further. And I apologized because I did raise my
13  voice, and she was okay with it. And I never heard
14  anything else about that until later.
15     MR. BURRUEZO: Excuse me just one minute let
16  me shut this off.
17     MR. OWENS: Can we take just one minute?
18     (Short break was taken.)
19  BY MR. BURRUEZO:
20     Q   Okay, so you had a great relationship, you were
21  saying before our brief break, with your managers. And
22  you described for me a moment ago sort of an encounter
23  that you had with Debra, and you ended up apologizing
24  because you recognized some tone issue on your part?
25     A   Yes.

**Page 37**

1      Q   Any others with regard to your relationship
2  with either Debra or Linda that came up?
3      A   With Linda, in reference to the case, we spoke
4  and she asked me some questions. And it didn't seem
5  like she was happy with my answers, so. But that was
6  all.
7      Q   So generally speaking, and I don't mean to
8  mis-summarize, but generally speaking, it sounds to me
9  like your relationship was pretty positive with the
10  exception of some episodes from time to time. Is that a
11  fair --
12     A   Yes, that's a fair assessment, yes.
13     Q   All right. And we'll get to some of those
14  episodes. Let me try to get a little organized here.
15     A   Okay.
16     Q   Now when you first became employed with Bright
17  Horizons, was there any training that you were given?
18     A   Off and on, we would -- I would take classes,
19  like classes in reference to the children, the
20  procedures and things like that.
21     Q   Did you ever, or were you ever given a copy of
22  the Employee Handbook to review at the start of your
23  employment?
24     A   Yes.
25     Q   Did you take any time to review the handbook,



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013
Pages 38..41

Page 38

1 from what you can recall?

2     A  Yes, I reviewed it.

3     Q  Did you, in the course of your review, observe

4 anything in the handbook concerning the company's

5 commitment to diversity?  Remember anything about that?

6     A  I remember reading it.  But just to describe it

7 right now, I can't.

8     Q  What about the company's commitment to equal

9 employment opportunity, do you recall reading anything

10 about that?

11     A  Yes.  I recall that it was, or it is an equal

12 opportunity company, I remember.  But just to say what's

13 in it, I don't -- right now I don't recall that.

14     Q  Do you recall anything in the handbook related

15 to its commitment not to retaliate against employees who

16 raised issues with the company?

17     A  I don't recall reading that.

18     Q  What about any mechanism that was available to

19 employees to complain if they felt they were being

20 discriminated against or harassed in any way?

21     A  I briefly remember.  I think you're supposed to

22 go to your supervisor first, if I recall correctly.

23     Q  Well let me -- so that we can all kind of be on

24 the same page and singing from the same hymn note -- let

25 me give you what I'll ask the court reporter to mark as

Page 39

1 Exhibit Number 1.

2         (Defendant's Ex. No. 1 marked for

3         identification.)

4 BY MR. BURRUEZO:

5     Q  Ms. Norman, I've handed you what's been marked

6 Exhibit Number 1 by the court reporter, and these are

7 excerpts from the Employee Handbook that Bright Horizons

8 maintained during the time that you were employed.  And

9 I don't desire us to go through and read word for word

10 whatever's here, I just wanted to focus largely on the

11 headings.

12         The first of which is the Bright Horizons

13 Diversity Commitment on the first page of the Exhibit.

14 The second one is the company's commitment to Equal

15 Employment Opportunity, which discusses the company's

16 policy to not discriminate persons on the basis of a

17 person's protected characteristics.

18         There's a heading concerning accommodations for

19 equal opportunity, as well as the positive

20 discrimination harassment-free work environment they

21 wish to foster.

22         If you turn the page after that, you'll see

23 that there is a complaint process, a disciplinary action

24 process, as well as a commitment by the company on the

25 second column against retaliation to anybody who might

Page 40

1 complain about discrimination or harassment.

2         And the final page discusses the complaint

3 resolution procedure, which includes an 800 number for

4 human resources in the event that the person felt the

5 need to contact human resources as a result of some

6 workplace unfairness they thought they were

7 experiencing.

8         And I know I did that using broad brush, but I

9 just wanted to show this to you and ask you whether you

10 recall sort of observing this or reading this during the

11 course of your employment with the company.

12     A  I do.

13     Q  And does this appear to be sort of an accurate

14 reflection to the company's commitment to diversity and

15 equal opportunity and anti-discrimination,

16 anti-harassment and also anti-retaliation?

17     A  Yes.

18     Q  In the course of your employment, did you feel

19 comfortable approaching management or human resources

20 about any concerns you might have had?

21     A  Yes.

22     Q  And did you feel the company was open to

23 listening to any concerns you might have raised either

24 at the management level or at the level of human

25 resources?

Page 41

1     A  Yes.

2         MR. BURRUEZO:  Let's go next to Exhibit 2.

3         (Defendant's Ex. No. 2 marked for

4         identification.)

5 BY MR. BURRUEZO:

6     Q  Let's go now to what's been marked as Exhibit

7 Number 2.  And this is a job description for the

8 assistant teacher position.

9     A  Okay.

10     Q  And let me ask you just generally before we

11 kind of go over this, is that the position you held

12 during the course of your employment with the company,

13 that is, the assistant teacher position?

14     A  No, I had other positions.

15     Q  What other positions did you have with Bright

16 Horizons besides the associate teacher position?

17     A  It was called administrative

18 assistant/receptionist.

19     Q  Any other jobs besides associate teacher --

20     A  Afterschool care.

21     Q  Okay.  Any others?

22     A  No.

23     Q  So would you sort of say that you had kind of,

24 during the time that you were employed for a little more

25 than three years, kind of three positions?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 34   Filed 06/28/13   Page 13 of 40 PageID 633

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                        Pages 42..45

**Page 42**

1  A  Yes.
2  Q  Associate teacher, the aftercare and
3  administrative assistant/receptionist position?
4  A  Right.  They called it floater.
5  Q  Well let's focus on this job description which
6  concerns the teaching position that you had.  And that
7  is, it's titled Associate Teacher.  And you reported to
8  the director, which I assume at the time was Linda
9  Horner.  Is that right?
10 A  Reported to, yes, Linda Horner.
11 Q  Okay.  And if you look at the job description
12 again, kind of like the handbook, there's no need to
13 kind of go through word for word.
14 A  Okay.
15 Q  But I wanted just to call your attention to
16 just the headings and the information below the headings
17 which deal basically with, you know, the expectations
18 that were made of you concerning your interaction
19 between you as associate teacher and the children.
20     There's the issue of assisting in the provision
21 of adequate curriculum to the kids.  If you turn the
22 page, it discusses the importance of faculty/parental
23 interactions.  That same page discusses the importance
24 of maintaining a physical environment that's healthy and
25 safe for the kids.

**Page 43**

1  A  Yes.
2  Q  The next page talks about the importance of
3  professionalism and teamwork in the organization amongst
4  your colleagues and peers.
5  A  Yes.
6  Q  And the next couple of pages sort of deal with
7  some more basic requirements to maintain a position like
8  being at least 18 years old and having an ability to
9  have — the physical ability to have and maintain your
10 position.  And I know that we've sort of perused this,
11 we haven't read it, you know, word for word, but if you
12 need to that's fine, we have the time to do that.
13     But as a general matter, would you say that
14 this is an accurate description of the job that you held
15 when you were associate teacher at Bright Horizons?
16 A  Yes.
17 Q  Did you read this job description when you
18 became employed?
19 A  Yes.  It was mandatory, yes.
20 Q  And did you understand and appreciate that all
21 these things were important as part of your job?
22 A  Yes.
23 Q  To have the good interaction between the
24 parents and yourself, and to foster a positive healthy
25 environment for the kids?

**Page 44**

1  A  Yes.
2  Q  And to act professionally in the workplace and
3  to be a team player?
4  A  Yes.
5  Q  Is there anything about this that you felt was
6  not appropriate for the position that you held?
7  A  No.  Everything was appropriate.
8     (Defendant's Ex. No. 3 marked for
9     identification.)
10 BY MR. BURRUEZO:
11 Q  Let me show you what's been marked Exhibit
12 Number 3.  And this is the Employee Handbook
13 Acknowledgement Statement.  And it appears to have your
14 signature at the bottom, and it's dated April 17th,
15 2008.  Does this appear to be your signature on the
16 bottom?
17 A  Yes.
18 Q  This is the acknowledgement that you received
19 the Employee Handbook.  And does this appear to be an
20 accurate copy of that acknowledgement that you signed?
21 A  Yes.
22     MR. BURRUEZO:  Okay, Exhibit 4.
23     (Defendant's Ex. No. 4 marked for
24     identification.)
25 BY MR. BURRUEZO:

**Page 45**

1  Q  All right.  I just wanted to share another
2  couple of pages from the Employee Handbook.  And these
3  excerpts concern workplace safety and violence
4  prevention, and also the importance of maintaining
5  confidential information.  Do you see that?
6  A  Yes.
7  Q  Okay.  Did you observe these policies as well
8  as part of the Employee Handbook?
9  A  Yes.
10 Q  And there's no doubt on your part that this is
11 part of the handbook that you observed and acknowledged
12 when you first became employed?
13 A  Yes, no doubt.
14 Q  Now my notes indicate, and correct me if I'm
15 wrong, Ms. Norman, that about a month after you started
16 your employment — you started in April of 2008?
17 A  Yes.
18 Q  About a month after your start, there was sort
19 of an altercation issue that you had with a co-worker.
20 Do you remember anything about that?
21 A  Right after I started?
22 Q  About a month into your employment.
23 A  I don't.
24 Q  Do you recall a point in time in the course of
25 your employment when you essentially expressed a desire



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

**Page 46**

1  to resign from your job, but then you sort of changed
2  your mind and wished to rescind your resignation?

3      A   No, I don't recall that.  I recall being in a
4  classroom and it was just chaotic in there, it was so
5  many kids, and I had them by myself, and I got a little
6  frustrated and I left.  But I was called back, so I went
7  back.

8      Q   Tell me about that episode.  I'm curious to
9  hear what you recall about that incident.  Because
10  obviously that seems memorable to you.  And what I
11  described to you doesn't seem to be jogging any
12  memories.  But I want to hear your story and what you
13  recall.

14     A   I recall it was a lot of kids in the classroom
15  at that particular time, and it was two teachers at the
16  time, myself and Ms. Sandy was her name, at the time,
17  before she left.  And I just recall just becoming really
18  overwhelmed and frustrated that day because it was just
19  so much going on.  And it was like I was handling
20  everything by myself.

21         And I, on my lunch break, I just wrote a note
22  and said that I was leaving and I was overwhelmed with
23  everything, but the room was covered before I left.  And
24  I just got really frustrated.  And Ms. Brenda called me
25  and said that she understood, but she said I was, you

**Page 47**

1  know, a pretty good worker, she wanted me to come back,
2  and they offered me the position as receptionist.  And
3  that's how that came about.  That's what I thought you
4  were talking about.

5      Q   So we may be talking about the same thing.
6      A   Okay.

7      Q   My words probably weren't as useful to you in
8  triggering whatever it was that you were remembering.
9      A   Yes.

10     Q   So if I understand correctly, to summarize, and
11  correct me if I'm wrong because I really do want to
12  understand what you remember and how you experienced it,
13  so if I say something that's not accurate, please
14  correct me.

15     A   Okay.

16     Q   As I understand it, you were working in the
17  classroom one day as an associate teacher, things didn't
18  feel right to you, you felt overwhelmed.  You wrote a
19  note about your desire to leave, sort of implying a
20  resignation from your job.  You had a meeting with Debra
21  who sort of talked you into staying or coming back.

22     A   I had a meeting with Brenda.

23     Q   With Brenda, I'm sorry.  Brenda what?

24     A   Brenda Hayes.

25     Q   And what was her position at the time?

**Page 48**

1      A   She was the assistant to Ms. Linda.  She was an
2  assistant.  Program director, I'm sorry.

3      Q   Program director?

4      A   Program director for the B wing.

5      Q   All right.  So you had a meeting with Brenda
6  Hayes, and so she sort of talked you into remaining, and
7  you came back as the assistant/receptionist?

8      A   Yes.  As a floater, teacher's assistant,
9  receptionist mostly now.

10     Q   All right.  Are you satisfied with the manner
11  in which Bright Horizons dealt with whatever frustration
12  you were experiencing on that day?

13     A   Yes.

14     Q   Is there anything about that incident, that
15  frustration you felt, and you tendering your
16  resignation, and you coming back into a new position
17  that's part of this case at all in your mind?

18     A   Yes.  It's the fact that it was so many kids
19  and they weren't really getting adequate attention with
20  that much going on in the classroom.  It was so many
21  kids in there.  It was over the ratio, but it was
22  ignored.  And it was just, I couldn't handle all of that
23  at that time.

24     Q   How many kids were in there?

25     A   It seemed to be, if I can remember, at least

**Page 49**

1  20, 15.

2      Q   And what was the ratio at the time?

3      A   I think it was 11 to 14 or 13.  I really don't
4  recall the exact, the ratio.  I've really forgotten.
5  But it was too many in there.

6      Q   But you're saying the ratio was like 11 kids to
7  one teacher?

8      A   To two, I think.

9      Q   To two teachers?

10     A   11 or 12 to two teachers.  But it was like
11  about 15 crowded in there.

12     Q   And how many teachers were in there?

13     A   It was two of us.  It was two of us in there,
14  Ms. Sandy and myself.  But when Ms. Sandy would go on a
15  break, another teacher would come in.

16     Q   Okay.  So what you're saying is, that day when
17  you felt frustration, the ratio was out of whack by two
18  or three kids?

19     A   Yeah.  And they were like running around.  And
20  it was just a lot.  And I didn't feel like it was enough
21  help in there with the kids that was in there.  It was
22  too many.  I've really forgotten exact number.  All I
23  know, I can remember it was too many.

24     Q   Okay.  So the significance of that story to
25  this case, if I understand what you're trying to tell


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                                    Pages 50..53

Page 50

1   me, is that on that particular day the ratio was not
2   what it needed to be?
3       A   On that particular day, yes.
4       Q   Okay.  But you're otherwise satisfied with the
5   manner in which Brenda and the Bright Horizons
6   management addressed your concern and how they dealt
7   with your then resignation and their invitation to bring
8   you back in a different position?
9       A   Yes.
10      Q   All right.  Do you recall at any point in time
11  shortly after this episode that we've discussed, do you
12  recall anything having to do with a confrontation you
13  had with a co-worker, a co-teacher in front of a parent?
14      A   In front of a parent?  No.
15      Q   Do you recall anything about having a
16  confrontation with a security guard officer around this
17  same time?
18      A   Yes.
19      Q   Okay.  Tell me what you recall about the
20  security officer issue.
21      A   The security guard issue was, she would always
22  stand up over me when I would like answer the phone, or
23  she was just always in my space.  Like, you know, she
24  was -- I forgot her name.  I forget her name right now,
25  but if you call it I would know it.

Page 51

1       Q   And this is the time when you worked as the
2   receptionist and administrative assistant?
3       A   Yes, the receptionist.  And I would assist in
4   the office also with the records and things.  And she
5   would always come in there and just be going through
6   things that she didn't have any business, I thought,
7   doing, because she was security.  And we used to just --
8   she and I sometimes just would have verbal -- words, but
9   it was nothing that we couldn't get through with talking
10  it out.  I would either ignore it and continue to do
11  what I was doing.  But we just didn't click for some
12  reason, I don't know.  We just didn't.
13      Q   You know, I certainly was not there, so part of
14  this exercise is for you to take me back in time and put
15  me at that place so I can appreciate and understand what
16  was occurring at the time.  Can you give me an example,
17  Ms. Norman, in terms of the kinds of things you would
18  say to each other?
19      A   I would say like I don't work for you, I work
20  for Ms. Linda, or something like that.  And I would say
21  things like why are you in my space, or why are you up
22  here, I'm the receptionist, you're not, like that.
23  Things like that.
24      Q   And how would she respond to you?  What things
25  would she say to you that would get under your skin?

Page 52

1       A   She would say oh, Janice, like that.  Or she
2   would go into Ms. Linda's office sometimes and say
3   things to Ms. Linda.  But Ms. Linda would never say
4   anything to me about it.  I think one time she did
5   because I went to her, Ms. Linda, and Ms. Linda said she
6   would talk with her.
7       Q   Now do you, looking back at it now in
8   retrospect, do you think that maybe you might have been
9   somewhat disrespectful to the security guard?
10      A   No, not disrespectful.  I would just, would be
11  bold enough to talk back to her if she said something to
12  me.  I just can't remember exactly what the words were.
13  But if she would say something that I thought was
14  negative, I would talk about it to her.
15      Q   Do you think that you were unprofessional at
16  times in addressing the security guard?
17      A   I don't think unprofessional, I was just
18  responding.
19      Q   Were you ever reprimanded in any way by Linda
20  Horner or any other management as a result of any
21  interactions with the security guard?
22      A   No, not that I remember.
23      Q   Okay.  What I have found over the years, too,
24  Ms. Norman, is that when you talk about something long
25  enough, especially past events, sometimes other things

Page 53

1   will trigger a memory of other things.  So when I asked
2   you earlier whether you recalled whether you had any
3   confrontation with a teacher in front of a parent, you
4   said that you hadn't had a memory of that.  But as we
5   talk throughout the day, if something clicks and you,
6   you know, kind of remember that, please let me know.
7       A   Okay.
8       Q   Because I do want to be able to go back in time
9   and recreate, if you will, what happened, so I can
10  appreciate and understand your employment with Bright
11  Horizons.
12      A   Okay.
13      Q   So I know now because telling me that you can't
14  recall any confrontation with a co-worker in front of a
15  parent, but if you do, let me know.
16      A   Okay.
17      Q   And I may come back to it later to see if you
18  might remember it.  Do you recall ever being counseled
19  by Bright Horizons because of any inappropriate behavior
20  or anger that you exhibited, or un-professionalism that
21  you exhibited toward any other team member at the
22  facility?
23      A   Ms. Debra, when that altercation took place, I
24  was called into her office and we discussed it.
25      Q   Which altercation is that that you recall?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 54

1    A   With Ms. Debra when I thought she was putting a
2  lot of work on me, the assistant director.  I spoke with
3  her, and she verbally gave me some information as far as
4  she thought I was unprofessional with her.
5    Q   Okay.  Did you agree with her?  Did you feel
6  that you were?
7    A   Yes, my tone.
8    Q   And is that the same incident that we discussed
9  earlier?
10    A   Yes.
11    Q   All right.
12        MR. BURRUEZO:  Well let me go ahead and have
13    this marked as Exhibit 5.
14        (Defendant's Ex. No. 5 marked for
15         identification.)
16  BY MR. BURRUEZO:
17    Q   And ask you to take a moment to look at it.
18  And I'll just read it out loud while you're reading it
19  as well.
20    A   Okay.
21    Q   And it looks, by the way, that Debra's name is
22  Debra Neverson.  Does that ring a bell?
23    A   Yes.
24    Q   All right.  Exhibit 5 is Bright Horizons Family
25  Solutions Employee Conference Memo, and it's dated

Page 55

1  August 24th, 2010.  So this is about, a little more than
2  two years into your employment.  And it's a counseling.
3        And it says:  Inappropriate conduct and
4  behavior toward management and was disruptive to Bright
5  Horizons business on two separate occasions.  On
6  Wednesday, August 18th, 2010, Janice had a verbal
7  outburst with the assistant director, Debra Neverson,
8  when she was asked what was taking her so long to get to
9  the infant room.  On the following day, Thursday, August
10  19th, 2010, Janice had another verbal outburst with the
11  office manager at the front desk in front of parents.
12        And then it goes on to discuss the need for you
13  to maintain professionalism in respect to supervisors
14  and co-workers at all times, and so on and so forth.
15        Is that your signature that appears at the
16  bottom of this?
17    A   Yes.
18    Q   And it looks like you had a conversation on the
19  25th of August of 2010?
20    A   Yes.
21    Q   And there are no comments written in the
22  Employee Section.  Do you see that?
23    A   Yes.
24    Q   Do I take that to mean that you sort of agreed
25  with whatever was being addressed to you at the time?

Page 56

1    A   Yes.  Except for the verbal with the office --
2  I remember the office manager, but I just don't remember
3  in front of the parents.  But yes, I guess I can say
4  that I signed it, but I just don't remember this part
5  being on here about -- I know the manager, but in front
6  of the parents, but yeah, I did sign it.  This is my
7  signature.
8        And I remember now, yes, Ms. Mercy, she was
9  discussing me wanting her job with another employee.
10  And I did say Ms. Mercy I don't want your job, I heard
11  you say that, but I don't want your job.  And she felt
12  like -- I mean, well, the way I said it, she went and
13  told Ms. Debra.
14        But these were like on two different occasions
15  and it looks like they put it together here for some
16  reason.  This is my signature.  It happened.  But I
17  don't remember -- it wasn't no parents.  And I don't
18  remember this being on here about the parents.  But it
19  did happen.  I did tell her that.  I said Ms. Mercy I do
20  not want your job, you do not have to be afraid of that,
21  like that.  And she was -- so it did happen.  I had
22  forgot about that, sorry.
23    Q   That's okay.  I don't remember what I had for
24  dinner last night, so.  I'm asking you to recall what
25  happened almost three years ago.

Page 57

1        All right, let's sort of fast forward now a few
2  months into your employment into April of 2011.  Do you recall any situation
3  involving additional confrontations you had with
4  co-workers at the Citibank facility?
5    A   I don't recall.  Because I'm trying to think
6  of -- there's a Ms. Wendy that was in a classroom, and I
7  remember going in to help her, to assist her.  And,
8  again, I was the one who would go in and assist, and
9  sometimes if I felt like they were putting more work on
10  me than I thought that I should do, then I would say
11  something.  I would say something like no, I think you
12  should help me or whatever.  And they say well you're
13  the one that's supposed to come in and assist.
14        And, you know, if I felt like they were trying
15  to put more work on me than I should do, then I would, I
16  would say something to them.  But it wasn't mean like.
17  It was --
18    Q   Do you think that the person hearing you might
19  have felt that you were sort of raising your voice or
20  being unprofessional in some way?
21    A   Probably so, because I'm kind of loud at times.
22    Q   So you recognize and acknowledge that even
23  though your intentions were honorable and noble, that
24  someone might take offense to how you say something if
25  you raise your voice or say it in a way that they might



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 34   Filed 06/28/13   Page 17 of 40 PageID 637

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                      Pages 58..61

Page 58

1  view differently than the way you intend?
2     A   Yes, I could see that.
3     Q   And do you think that there might be times that
4  people might perceive that, whether you agree with it or
5  not, as perhaps being unprofessional or not consistent
6  with appropriate teamwork?
7     A   Yes.  And if they brought it to my attention, I
8  would always apologize.  But, you know, after it's said
9  and done, I guess -- but I would -- I could see that.
10 But it's not like -- you know, it's just that my voice
11 carries.  And I would always apologize if I thought it
12 was wrong, or if I said it in a way that they didn't
13 deem it to be appropriate or whatever.
14      But that didn't really happen that many times.
15 It's just, I mean, I was peaches and ice cream before
16 all of this, so I don't understand it, I really don't.
17 This is like -- it's like they're thinking about every
18 little thing now that really didn't mean nothing.  It
19 was between us as teachers.  And we would always be okay
20 with it, because they did me like triple times worse
21 sometimes and wouldn't even apologize, so.
22      I just don't comprehend all this like this.  I
23 really don't.  I don't think it was bad/bad.  It was
24 just verbal communication between two teachers, you
25 know.  We would be okay afterward.  We'd go out to lunch

Page 59

1  and everything.  It wasn't bad to me like that.
2     Q   Do you recall working side by side with your
3  co-Plaintiff in this case, Vanessa Smith?
4     A   Yes.
5     Q   And what do you recall about the time that you
6  worked together, anything of significance or import when
7  you worked together?
8     A   No.  We liked each other as far as, you know,
9  when I would go in and give her a break or go in and
10 work with her.
11    Q   Now she worked -- to kind of put this in a
12 little bit of a time context, you started your
13 employment in April of 2008.
14    A   Yes.
15    Q   Ms. Smith started her employment at Citibank in
16 January of 2011?
17    A   Yes.
18    Q   And so she was at that facility for about five
19 months until about May of 2011.  How would you describe
20 your day-to-day interaction with Ms. Smith during that
21 five-month period that you worked together?
22    A   I would describe it as being -- she was a happy
23 teacher.  She liked, I thought, what she was doing.  And
24 we worked well together.  I didn't see anything -- you
25 know, sometimes she would say things like, you know, she

Page 60

1  was -- she didn't think that she had enough help, or,
2  you know, how the kids would be treated, or, you know,
3  what she was observing.  But she continued to do her
4  work.  Her paperwork sometimes would be a little
5  overwhelming, but she would do it still.  I didn't
6  detect anything bad about her.
7     Q   Did you both at times sort of meet together to
8  discuss workplace issues that you were having?
9     A   Meet together?  No, I never met with her.  I
10 don't remember.
11    Q   Did you ever sort of coordinate with her in the
12 filing of any complaints with any agency?
13    A   No.
14    Q   Like, for example, did you coordinate or decide
15 together to file a complaint with the Department of
16 Children & Families about any issues that you observed?
17    A   No.  I didn't call the people, she did.  I
18 didn't call them.
19    Q   Did you ever contact any agency for the purpose
20 of filing a complaint against Bright Horizons?
21    A   No.
22    Q   Did you ever file a complaint with OSHA?
23    A   OSHA, Mr. Scarcliff, when I was in the
24 hospital.
25    Q   Did you ever file a complaint with Department

Page 61

1  of Children & Families?
2     A   Never.  I didn't call.
3     Q   Either the Licensing Division or the Child
4  Investigative Unit?
5     A   No.  But they called me into the office to talk
6  to me at the location of Bright Horizons.
7     Q   Did you ever file a complaint with the police
8  authorities of any kind --
9     A   Never.
10    Q   -- whether it be the Hillsborough County
11 Sheriff's Office or the police, the Tampa police?
12    A   No.
13    Q   What was the complaint that you filed with OSHA
14 that you could recall?
15    A   I was given Mr. Scarcliff's name to call to --
16 I understand he's the one that helps you out if you have
17 a case against the company as far as -- I really don't
18 recall what his position was, but I was told that he was
19 -- he would take the complaint down about what happened.
20 He was separate from DCF and all of that.  But that
21 was done after the fact.
22    Q   Okay.  And do you know what happened with the
23 results of the OSHA investigation that -- excuse me,
24 strike that.
25      Do you recall what happened with the OSHA



37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 34   Filed 06/28/13   Page 18 of 40 PageID 638

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                                     Pages 62..65

**Page 62**

1  complaint that you filed?
2       A   Never.  I heard from him one time via email to
3  respond back as to what happened in a short form, and I
4  did.  But I never heard from him again.
5       Q   And do you recall what the nature of the
6  complaint was that you filed with OSHA?
7       A   The child abuse case against Ms. Kristin.
8       Q   And you're sure that was with OSHA?
9       A   OSHA.  Mr. Scarcliff was with OSHA.
10      Q   Or do you think he might have been with the
11  Department of Children & Families?
12      A   No, he wasn't.  I never called the Department
13  of Children & Families.  I reported what I saw to
14  Ms. Sue.  I never called the Department of Children &
15  Families.  I don't recall.  I never called them.  I
16  don't recall calling them.
17      Q   Okay.  What do you recall about the incidents
18  involving Kristin Turner?
19      A   I recall seeing her throw kids on cots.  When
20  she would feed them, she would throw the food, throw the
21  plates, the little spoons and forks, whatever.  If they
22  would fall on the floor, she would pick it up and she
23  would throw it to them.  And talk to them kind of bad, I
24  would think.
25          And, you know, one little boy's head almost hit

**Page 63**

1  the cot, hit the end of the cot, but it didn't.  And
2  then she would say things like you have to hold his head
3  down, you have to make him go to sleep.  And I would
4  tell her I don't want to do that, I don't do that like
5  that, you know.  And she said with this kind of kid, you
6  have to, you know, hold him down.  So many times
7  little things she used to say I just don't remember
8  everything.
9          But I remember the throwing on the cot and the
10  throwing the food to them, and pushing the food to them.
11  If the food would fall on the floor she would just take
12  it up and just still give it to them.  And she would
13  like just holler at them, scream at them.
14      Q   Did you initiate a complaint with the
15  authorities because of that, what you saw, or was that
16  something that you reported during the course of an
17  investigation that had been started?
18      A   When I saw it, I reported it to Ms. Sue.
19      Q   Okay.  Sue who?
20      A   Saunders.
21      Q   Do you recall when that happened?
22      A   Not the date.
23      Q   And what was Ms. Sanders position at the time?
24      A   She was supervisor for the A wing for where the
25  babies were.

**Page 64**

1       Q   What was Ms. Saunders' response to the
2  complaint?
3       A   She said I'll take care of it.  Well, at first
4  she said well let me ask you, is it Ms. Kristen or is it
5  Ms. Vanessa.  And I said it's Ms. Kristen.  And she said
6  are you sure.  I said yes.  And she said oh, okay, well
7  I'll look into it.  It was almost just like that.
8       Q   And did you write up any statements or give any
9  other oral statements to anybody who might have been
10  investigating this?
11      A   When DCF came, they called me in the office.
12      Q   So is it your testimony that you never
13  initiated with DCF any complaint involving Kristin
14  Turner?
15      A   Never.
16      Q   And is it your testimony that the only comments
17  that you initiated, or complaints that you initiated,
18  was when you raised the issue with Ms. Saunders
19  internally?
20      A   Yes.
21      Q   That is internal with Bright Horizons's
22  management?
23      A   Within the company, yes.
24      Q   Did you feel that Ms. Saunders' response to you
25  was adequate?

**Page 65**

1       A   I felt like she would handle it.  She said she
2  would.
3       Q   And to your knowledge, do you know whether
4  Bright Horizons management handled the situation?
5       A   I don't know, because that's kept secret like.
6  It's for management to take care of.
7       Q   And would you agree that that's important in an
8  investigation, to maintain the confidence in whatever
9  they might be looking into and handling?
10      A   Yes.
11      Q   And would you agree that maintaining that
12  confidence would be consistent with the policies that we
13  addressed earlier?
14      A   Yes.
15      Q   Before you went to Ms. Saunders to address the
16  issue involving Kristin Turner, did you have any
17  conversation with Vanessa Smith about Kristin Turner?
18      A   Before that day, no.
19      Q   Did you ever have any conversations with
20  Vanessa Smith about the Kristin Turner situation?
21      A   I think I did, yes.
22      Q   And what do you recall in terms of any
23  conversations you had with Ms. Smith about the
24  Ms. Turner situation?
25      A   I can recall asking her can you believe the way



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 66

1   that Ms. Kristin throws the kids sometimes on the cots
2   like that, and would be angry with whoever she was angry
3   with and take it out on the kids. I would say something
4   like that to her, to Ms. Vanessa. And she would
5   respond, yeah, that's happening but they're not doing
6   anything like that, like that. That's all.
7       Q   Do you ever tell Ms. Smith what Ms. Saunders
8   asked you in terms of are you sure it's Ms. Turner and
9   not Ms. Smith? Did you ever relay that to Ms. Smith?
10      A   No. I don't remember relaying that to
11  Ms. Smith. I don't recall relaying that to her.
12          (Defendant's Ex. No. 6 marked for
13          identification.)
14  BY MR. BURRUEZO:
15      Q   I guess, let me do it this way to save a little
16  time. Let me show you what's been marked as Exhibit 6.
17  It's a two-page document, but I put them together for
18  purposes of our discussion.
19          And my apologies, the top portion is cut off.
20  This page is sort of blown up a little bit so it's
21  easier to read, but the top of the page is the heading
22  for the Hillsborough County Child Care Licensing
23  Department, and it has their address, there's a little
24  logo, and then it has its phone numbers. But that's
25  what's missing from this document.

Page 67

1       A   Okay.
2       Q   It's a form from the Hillsborough County Child
3   Care Licensing Division. And the first page is a
4   complaint which Hillsborough County received on April
5   18th. The second page is a complaint the Hillsborough
6   County office received two days later on April 20th of
7   2011. The second complaint deals with alleged
8   inappropriate discipline. And the first complaint that
9   is the first page deals with sick kids not isolated or
10  sent home, issues about drinking water and issues about
11  toilets not flushing properly at the facility.
12          So these are two separate complaints that the
13  Hillsborough County Child Care Licensing received
14  concerning the Citigroup Family Center where you worked
15  and where Ms. Smith worked at the time.
16      A   Yes.
17      Q   Is it your testimony, if I understand you
18  correctly, Ms. Norman, that you did not initiate either
19  of these complaints to the Hillsborough County Child
20  Care Licensing unit. Is that right?
21      A   No, I did not.
22      Q   Do you know who did?
23      A   Yes.
24      Q   Who initiated these complaints?
25      A   Ms. Vanessa.

Page 68

1       Q   And how do you know that?
2       A   She told me. I remember talking with her
3   later, and she told me that this is what all took place.
4   And she, she had called.
5       Q   Okay. Now, as part of any investigation they
6   might have conducted, do you recall being interviewed by
7   any representative of the Hillsborough County Child Care
8   Licensing unit?
9       A   Yes.
10      Q   And did you provide them information, and
11  information related to your own observations in terms of
12  what you saw?
13      A   Yes.
14      Q   Did Bright Horizons in any way interfere with
15  any investigation that the Hillsborough County licensing
16  office conducted relative to these complaints that are
17  set forth in Exhibit 6?
18      A   Yes.
19      Q   Pardon me?
20      A   Or Ms. Linda.
21      Q   Explain to me, how did she interfere?
22      A   Well, she called me into her office and she
23  told me that I must tell her what happened and what I
24  told DCF. And I told her, DCF told me that I didn't
25  have to really explain anything to anyone else about

Page 69

1   what they asked me. And she demanded that I tell her.
2       Q   Okay. So you're telling me that after you
3   spoke to Hillsborough County licensing, that Ms. Horner
4   called you into her office and asked you what you
5   discussed with them?
6       A   Yes.
7       Q   Okay. And what did you say to her?
8       A   I said, well I didn't tell them anything that
9   didn't happen. I said but I'm not supposed to really
10  discuss anything with you what I discussed with them.
11  And she said, well, for her records, that she had to
12  catch up on things and that she would appreciate me
13  telling her what they asked me.
14      Q   What did you say in response to that?
15      A   I told her that they asked me questions
16  about -- since she's my supervisor, I told her they
17  asked me questions about what I saw. And she said well
18  just briefly tell me because I got to do a report now.
19  She said she didn't have a report, so she must do a
20  report on what happened on what I saw.
21      Q   And did you share with her what you saw?
22      A   Yes.
23      Q   What did you tell her?
24      A   I told her what I saw, what Ms. Kristin did
25  with the kids.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 70

1    Q   And what about the issue concerning the sick
2   children, drinking water and the toilets, did you —
3       A   I didn't know anything about this at that time.
4   I don't think — I didn't tell her anything about that
5   part because it was already reported to her by
6   Ms. Vanessa.
7       Q   Okay.  So in this meeting that you had with
8   Ms. Horner, she asked you what you discussed and you
9   told her what you discussed with Hillsborough —
10      A   I told her briefly some things, yes.  Because
11  she insisted that I tell her because she had to do a
12  report, so.
13      Q   Okay.  How did you feel about your conversation
14  with her?
15      A   How did I feel?  I felt obligated to her
16  because she was my boss.  So I felt like I had to say
17  something, but not into detail/detail what they asked
18  me.  I just felt like I should tell her what I saw.
19      Q   Did she have any reaction to what you told DCF?
20      A   She just said I just didn't know about it.  She
21  said I didn't really know it was that bad, and she
22  wished that she would have known.  She said Ms. Saunders
23  was the one that was taking care of this and she was the
24  supervisor of that wing.  And she's sure that if it had
25  anything that was really bad, that Ms. Sue — she had

Page 71

1   confidence in Ms. Sue as being her, one of her leaders,
2   that she would tell her if anything was that bad.  And
3   that's it.
4       Q   Did you feel satisfied with your conversation
5   with Ms. Horner?
6       A   Satisfied in the fact that I worked with her
7   and I should tell her some things about what happened,
8   yes.
9       Q   Okay.  Did you feel — well let me ask it
10  differently.  Strike that.
11          Were you reprimanded or counseled in any way
12  because of anything you told DCF?
13      A   I think so.  I was called in her office like
14  three or four times that day, and just making sure that
15  I told her everything that I thought — you know, that
16  she thought that she should know.  And I just assured
17  her that I did tell her what I —
18      Q   Okay.  Did you as a result — I guess my
19  question is maybe not quite the way you answered.
20      A   Okay.
21      Q   But did you suffer any job consequence, or were
22  counseled, or reprimanded or written up or demoted, or
23  change of pay?
24      A   I think so, yes.
25      Q   As a result of that conversation?

Page 72

1       A   As a result, I think that was the genesis of
2   the things that were — the way I was treated
3   afterwards.  I felt that.
4       Q   So we're going to get to that.  We're going to
5   talk about all the treatment that you said that you
6   experienced after that episode.  I guess in the
7   immediate — let me ask it slightly differently.
8           Immediately after your conversation with
9   Ms. Horner, were you reprimanded in some way?  Were you
10  suspended or counseled or anything immediately after
11  your conversation with Ms. Horner concerning the DCF
12  investigation?
13      A   Immediately, no.
14      Q   But I take it that what you're saying is that
15  as time passed there were a number of things that came
16  up that you feel ultimately were connected to this DCF
17  investigation?
18      A   Yes.
19      Q   Is that a fair summary?
20      A   Yes.  Because her boss, Carol Stegall, is the
21  one that came down and questioned me after that.  So
22  many people questioned me.
23      Q   All right, tell me about Carol Stegall.  When
24  did she come to talk to you?
25      A   Carol came to boost the morale, I think, of all

Page 73

1   the teachers that were there and to find out what
2   happened.  She said she was there just to bring some
3   peace or some justice to what happened, and she wanted
4   me to explain to her what I thought went on.  And I told
5   her what went on.  And we prayed together, she prayed
6   with me, I prayed with her, and she said we'll get
7   through it.
8       Q   Was there anything sinister or bad about your
9   conversation with Carol Stegall?
10      A   No, not bad.  It's just a lot of questions.
11      Q   Did you think it was consistent with her job
12  responsibility to kind of get a handle in terms of what
13  was going on at the facility?
14      A   You know, at first I didn't really know what
15  her position was.  I just knew — I thought she was from
16  the company Bright Horizons.  But then I had later heard
17  she was from Citibank.  So I really didn't know what her
18  position was.  All I know is I was trying to get through
19  it, and I would answer her questions.  And then the next
20  day she came back and she asked me more questions in
21  front of Ms. Linda Horner in another office.  And they
22  just kept asking me questions over and over.
23      Q   Do you think that it's legitimate, or it was
24  legitimate for Bright Horizons at that point in time to
25  find out information relative to allegations of child


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 34   Filed 06/28/13   Page 21 of 40 PageID 641

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                                    Pages 74..77

Page 74

1   abuse?
2       A   Yes.
3       Q   And do you think it's legitimate because you
4   observed this behavior on the part of Kristin Turner,
5   according to you, that it was important for them to know
6   directly from someone who had observed the behavior what
7   was going on in order to protect kids?
8       A   Yes.
9       Q   Okay.  So you're not, then, saying, are you,
10  that it was inappropriate for Bright Horizons to ask you
11  questions, because you had firsthand and personally
12  observed the behavior of Kristin Turner towards kids?
13      A   I don't think it was inappropriate.  It's just
14  the way it happened, and the timing and the questions.
15      Q   Again, this is my effort to try to put myself
16  in the place that you were at at the time.  So I hear
17  you saying almost two things that are a little bit
18  contradictory.  On the one hand I hear you saying that
19  it was legitimate for Bright Horizons to ask you
20  questions because you had personally observed the
21  behavior, and on the other hand I hear you saying that
22  there was something wrong with the way they did it.  Can
23  you explain that nuance or difference for me a little
24  bit more?
25      A   Well, I think they — they should have asked me

Page 75

1   all that at the beginning when it was reported, not wait
2   until DCF came in and then ask me all these questions.
3   That's what I felt the difference was.
4       Q   Oh, I see.  So what you're saying is not what
5   they were asking about, it's the timing about what they
6   were asking you about?
7       A   Yes, absolutely.
8       Q   Do you know how much time passed between the
9   conduct, or the alleged conduct of Kristin Turner, and
10  the complaint that was lodged with DCF?
11      A   I would say like three or four weeks, because I
12  went on vacation, and when I came back that's when
13  everything was changed, my position.  I went to another
14  department, not told really what to expect.  And I would
15  say a few weeks.  I don't recall exactly how many
16  though.  But after I came back from vacation I was just
17  given this, they said you're no longer on the desk.
18      Q   All right, well let's look back at Exhibit 6
19  for a minute because I want to button down some timing
20  issues and get a sense of your memory.
21      A   Okay.
22      Q   If you look at the second document, the second
23  page, because the first one deals with toilets and
24  drinking water and vomiting.
25      A   Yes.

Page 76

1       Q   So if you look at the second document, it looks
2   like this report was made on the 20th of April.  Do you
3   see that?
4       A   Yes.
5       Q   And there's been an indication in this case
6   that this behavior on the part of Kristin Turner
7   occurred on the 15th of April, five days before.
8       A   Okay, five days.
9       Q   So the issues with Kristin Turner allegedly
10  happened on April 15th.  The complaint to DCF is made on
11  the 20th of April.  In connection with that five-day
12  period, when is it that you think you went to
13  Ms. Saunders to relay to her the issues involving
14  Kristin Turner?
15      A   I think it was around — I would say about two
16  weeks or three weeks before all of this taking place.
17      Q   Well, but the conduct of Kristin Turner
18  happened on April 15, 2011, five days before the report
19  to DCF.
20      A   That was maybe —
21      Q   So if you saw anything, and correct me if I'm
22  wrong, but if you apply the timing to this, if you saw
23  anything, it would have been on April 15th, 2011,
24  because that's the day that it's alleged to have
25  happened.  Do you have any reason to dispute that?

Page 77

1       A   I just really don't remember, I'm sorry.
2       Q   Okay.  And do you know, if what you observed
3   occurred on April 15, do you know when it is that you
4   reported it to Ms. Saunders?
5       A   With throwing the kids on the cots and throwing
6   the forks — the spoons to the kids, rather, and the
7   food, shoving the food and just screaming at the kids,
8   that's what I reported to Ms. Sue, I remember that
9   really good.
10      Q   Right.  But when do you think you did that?
11      A   That's what I don't remember, what day I went
12  in her office.
13      Q   Well, do you know how long it took DCF to
14  conclude its investigation on this?
15      A   Yeah.  It was about, it was about a week and a
16  half, because they kept coming back.
17      Q   And do you know what the conclusion of their
18  investigation was?
19      A   No, not exactly.  I heard what it was.  I heard
20  what it was.  That the kids didn't — they were too
21  small to testify, so they had to assume that, that it
22  didn't happen.  Or they couldn't prove that it happened,
23  just going on what he said.
24      Q   Okay.  And how did you learn of the results of
25  the investigation?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 34   Filed 06/28/13   Page 22 of 40 PageID 642

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                            Pages 78..81

Page 78

1    A  Ms. Vanessa.  I talk with Ms. Vanessa off and
2  on now.  We actually became friends afterwards.
3    Q  And did you ever have a chance to review the
4  investigative summary, what was concluded by DCF?
5    A  I can't remember.  Yes, I think I called and
6  got a copy.  Did I get a copy or read it off of
7  Ms. Vanessa's copy?  I don't recall how I learned about
8  it, but I did, I do remember.
9    Q  When was the last time you talked to Ms. Smith?
10   A  I talked with Ms. Smith -- I called her
11 yesterday.  She called me back.
12   Q  After the deposition?  After her deposition?
13   A  I guess she had been out of here about an hour
14 or two.
15   Q  And what did she tell you about her experience
16 yesterday?
17   A  She just said that she really -- you can't talk
18 about it too much, she said, but it wasn't as bad as she
19 thought it was.  And that you were very benevolent, and
20 you weren't harsh on her.
21   Q  Well I guess I didn't do my job too well.
22   A  That's what she told me.  That's what she said.
23   Q  Well let me show you what was marked yesterday
24 as Exhibit Number 5.  Actually I'll show it to you, but
25 it's the only copy I have with me.  I didn't anticipate

Page 79

1  the need to use it today.  But I'm going to read to you,
2  and I'll show it to you, I'll read to you what the
3  summary of the findings are by DCF.
4        It says:  This investigation is being closed
5  with not substantiated findings based on statements from
6  the witnesses.  There were concerns referring to how the
7  AP, Ms. Kristin, was handling the children and her using
8  profanity in the presence of the children.  The children
9  were observed free of visible marks or bruises.
10        They were not interviewed due to their ages and
11 limited verbal skills.  Kristin was interviewed and she
12 denied ever handling the children roughly, using
13 profanity in the presence of the children.  She stated
14 that the child, John A, did vomit, but not profusely.
15 She also stated she did not notify the parent because it
16 was not a large amount of vomit.
17        She further stated the child was not running a
18 fever.  She stated her only problem with her co-worker,
19 Ms. Smith, who does not help with the children when
20 needed.
21        It sorts of continues:  Parents of the victim
22 were contacted and neither of them had any specific
23 incidents prior to being notified of the investigation.
24 Once they were notified of them -- however, once they
25 were notified, some of them indicated concerns due to

Page 80

1  the children not wanting to go to class or concerns with
2  information from parents who had already withdrawn their
3  children.
4        The child care licensing inspector said that he
5  was not taking corrective action due to him not being
6  able to prove this complaint.  The case is being closed
7  as unfounded.
8        So that was sort of the investigative summary.
9  And I guess, have you seen Exhibit 5 before?
10   A  Yes.
11   Q  Okay.  And that's Exhibit 5 to Ms. Smith's
12 deposition.
13        All right.  Anyone else besides Ms. Horner,
14 Ms. Stegall and Ms. Saunders with whom you discussed the
15 issues involving Ms. Turner?
16   A  No.  Oh yes there was, I'm sorry.  One lady,
17 Ms. Shardawn.  I was at the desk and she walked up to me
18 and said that I heard about the investigation.  And she
19 said that Ms. Kristin did do that to those kids, because
20 she told me that Ms. Wendy told her that she's been
21 doing it for a long time.  And then I went back in
22 Ms. Linda's office and told her that Ms. Shardawn said
23 that on that particular day.  And then she called
24 Ms. Shardawn into her office, but what happened after
25 that, I don't know.

Page 81

1    Q  So it sounds to me like whatever conversation
2  you had with Ms. Shardawn -- and what is her first name?
3    A  Shardawn.
4    Q  That's her first name?
5    A  Her last name -- she got married, I think,
6  right before I left.  I forgot her last name.
7    Q  So after she told you the information, you
8  yourself initiated the conversation with Ms. Horner?
9    A  Yes.
10   Q  And then she, to your knowledge, had a
11 conversation with Ms. Shardawn?
12   A  Yes.  I remember Ms. Shardawn going into her
13 office and talking to her.  But not Ms. Wendy, but
14 Ms. Shardawn.
15        MR. BURRUEZO:  Okay.  I was going to suggest
16 we take a few minutes break.  And I'm looking at
17 my watch, it's sort of 11:40, so I want to take
18 a pulse of the room.  I can just take a few
19 minutes and then come back and go for another
20 little while.
21        THE WITNESS:  It doesn't matter to me.
22        MR. BURRUEZO:  Or if you want to do your
23 lunch break now and then come back in 30 or 40
24 minutes and continue, and probably wrap up.
25        THE WITNESS:  I can wait.  I can go through.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 34   Filed 06/28/13   Page 23 of 40 PageID 643

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                            Pages 82..85

**Page 82**

1    (Discussion off the record)
2    (Short break was taken.)
3  BY MR. BURRUEZO:
4    Q   Okay. Before the break, we were discussing
5  that time period, Ms. Norman of that April of 2011 phase
6  where this Kristin Turner situation had been occurring.
7  What I'd like to do is sort of move forward a little
8  bit, and that takes us to May of 2011.
9    MR. BURRUEZO:  And we are at Exhibit 7.
10    (Defendant's Ex. No. 7 marked for
11    identification.)
12  BY MR. BURRUEZO:
13    Q   All right. And what I've handed you, it's a
14  Bright Horizons Family Solutions Conference Memo and
15  it's dated May 20, 2011. And it's a reprimand from
16  Linda Horner.
17    And it says in the body, it says that "on May
18  19th," the day before, "our liaison, Robin Kraemer
19  notified Carol Stegall that she received information
20  from three Citi employees that they were contacted by
21  you regarding confidential information at the Family
22  Center. Robin stated the information that you shared
23  was inappropriate, inflammatory and disruptive to Citi's
24  work environment. These communications that you are in
25  direct violation of the following company standards and

**Page 83**

1  policies as listed at page 43 of the Employee Handbook:
2    Item 13, conduct that is detriment to children
3  or Bright Horizons Family Solutions' reputation in the
4  community.
5    Item 15, violation of confidentiality policy.
6    Item 18, actions or behavior that is disruptive
7  to the operation of the business.
8    And then it continues and says has the employee
9  been counseled for similar incidents, and it references
10  a date of August 24th, 2010, inappropriate conduct or
11  behavior toward management and with co-workers in front
12  of staff, parents and children.
13    This is signed Carol Stegall at the bottom,
14  5/20/2011. And there's a notation that the employee
15  refused to sign. And I guess, let's kind of talk about as
16  much of this as possible. And the preliminary question
17  to you is: Do you remember any conversation with
18  Ms. Stegall on May 20th about the items that I just read
19  aloud?
20    A   Any conversations? Because I've never seen
21  this, so I'm trying to see any conversation. She asked
22  me had I ever talked with any parents that came to the
23  center. But I've never seen this.
24    Q   Have you talked to the parents at the center
25  about any information or things that were going on?

**Page 84**

1    A   Yes.
2    Q   Describe for me, if you would, the kinds of
3  things you discussed with parent.
4    A   I can remember one parent came to the front
5  desk and she was crying after she left Ms. Linda
6  Horner's office, and she told me that she couldn't
7  believe that she wasn't notified along with the other
8  parents that their kids were allegedly — if that's how
9  you pronounce it — abused as well.
10    And I forgot her name, but she was crying and
11  saying that she just couldn't understand why Ms. Linda
12  wouldn't let her know, and that she and her husband
13  would be taking further action. And she asked me was I
14  ever in the room with Ms. Kristin — she knew her name
15  and everything — was I ever in the room, did I ever
16  work directly with Ms. Kristin, and I told her yes.
17    And she said — I can remember her asking me
18  was Ms. Kristin rude to the kids. She didn't ask me. I
19  don't remember her asking me whether was she abusive or
20  whatever, like that. She asked me was Ms. Kristin kind
21  of mean with the children, what did she do. And I told
22  her sometimes her voice would be elevated and that
23  sometimes she was kind of angry with the children. I
24  did say that to her.
25    Q   Okay. Do you remember the parent?

**Page 85**

1    A   I forgot her name, but it's Raphael's mother.
2  And I told her that it was going to be okay, don't worry
3  about it, everything was being taken care of. And she
4  still cried, and, you know, she just said she couldn't
5  understand what would happen. And that was my job, to
6  make the parents feel good, but.
7    Q   Do you recognize or do you feel, in retrospect,
8  now that we're here a few years removed looking back at
9  the time, do you feel that you shared with this parent
10  information that could be viewed as confidential?
11    A   Now I do, but at first I just thought I was
12  helping her to feel better about her child.
13    Q   Okay. And I can understand. I can understand
14  why you thought at the time you were comforting this
15  parent and trying to allay her fears, and all that sort
16  of seems to be consistent with what you're describing
17  for me. But at this point, you would agree that it
18  could be viewed as an inappropriate disclosure of
19  confidential information to a parent who otherwise
20  should not have been given that information directly
21  from you?
22    A   Yes.
23    Q   Okay. And you recognize that the sharing of
24  that information, if it were confidential, would be in
25  violation of the company's confidentiality policy?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 86

1    A    Now I do.  But I just wasn't thinking at that
2    time, but yes.
3    Q    And it would be the confidentiality policy that
4    we referred to earlier when we looked at the handbook,
5    correct?
6    A    Yes.
7    Q    Okay.  Carol Stegall, you had made a reference
8    to her earlier.  In looking at this, do you now recall
9    maybe who she was within the organization, or what her
10   role was?
11   A    I just -- yes, I recall her being a part after
12   we talked.  I don't know if I assumed it or what, that
13   she was just, you know, higher up with Bright Horizons.
14   And she was there to kind of like -- because the whole
15   center was just in chaos, so she was there to just
16   question everybody about what happened.
17   Q    Now in your meeting with Ms. Stegall, who else
18   was present, if anyone?
19   A    Just the two of us.
20   Q    And do you recall her handing you any document
21   that looked like this that outlined a concern or
22   reprimand that she was giving to you?
23   A    No.  The two of us, it was verbal.  I just
24   don't remember, she didn't show me anything like that.
25   Q    So do you recall her handing you anything that

Page 87

1    you didn't want to sign?
2    A    I don't recall her giving me anything.
3    Q    Is it possible that she might have given you
4    something to sign but that you wished not to?
5    A    With Carol, no.  I just don't remember.
6    Q    Do you recall being given something by anyone
7    else, one of your managers to sign, that you refused to
8    sign?
9    A    Yes.  In the office with Linda Horner and
10   Carol, that's right.  It was another office, it wasn't
11   the same office with Carol and I.  It was in the office
12   adjacent to Carol.  It was in Ms. Brenda's office.
13   Q    And what was the purpose of that meeting?
14   A    She just wanted to conclude, and wanted me to
15   explain again in front of Ms. Linda what happened, so
16   all three of us could like, you know, work it out.  She
17   said that I'm not going to terminate you, I just want to
18   make sure that you're not talking to parents, because if
19   you're talking to parents, you know, that's going to
20   jeopardize everything and everybody could get in
21   trouble.
22   Q    And do you recall in that meeting when
23   Ms. Linda Horner was present that you expressed a
24   reluctance to sign anything?
25   A    Yes.

Page 88

1    Q    And do you think it was this document,
2    Exhibit 7?
3    A    I just don't remember seeing this one.  It
4    could have been, but I just don't remember.
5    Q    Okay.  Now immediately after this conversation,
6    you maintained your employment, correct, and your pay,
7    your benefits and everything else?
8    A    Yes.
9    Q    Nothing changed in your job immediately after
10   this discussion with Ms. Horner and Ms. Stegall about
11   the disclosure of confidential information to parents.
12   Is that right?
13   A    No, nothing changed.  Except for I was just
14   going back and forth to different departments, from one
15   wing to another wing, and everybody was looking at me
16   strange.  And it was just strange.  I just can't explain
17   it.  It was different.
18   Q    Well describe to me what was going on with your
19   job at that time in terms of your assignments?
20   A    My assignments, I was floating, and I had to
21   close sometimes.  Nobody wanted to stay late, so I would
22   stay late and close up.  I continued to answer the
23   phones back and forth, but just doing a variety of
24   things.  Whatever they asked me, I would just have to
25   do.

Page 89

1    But it just was different.  Different in a way
2    that I was looked upon by management, you know — it was
3    just strange.  You know, every move I made seemed like
4    there were eyes on me.  And it was just a big difference
5    from when I, you know, when I was just doing my regular
6    job, which was receptionist.  That's what I was gifted
7    with, and I was told that so many times, and got so many
8    compliments and things.  And then all of a sudden, you
9    know, it was just different.
10   Q    Okay.  And I wanted to direct your attention to
11   one final point on Exhibit 7.  And that is, toward the
12   line right above where it says Employee Comments, it
13   says possible consequence if actions are not taken —
14   meaning if you don't improve your performance as
15   outlined in this — would be termination.  Is that
16   right?
17   A    I see termination.
18   Q    Yeah.  So is it fair to say that after your
19   meeting with Ms. Horner, that she expressed to you that,
20   you know, we're not terminating you now and that's not
21   our desire, but if there isn't improvement that's
22   something that we'd have to look at?
23   A    Carol Stegall said that I'm not going to
24   terminate you, I just want to make you're sure not
25   talking to parents, absolutely not talking to parents.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 34   Filed 06/28/13   Page 25 of 40 PageID 645

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                                    Pages 90..93

Page 90

1   Not Ms. Linda.
2       Q   Okay.  Did you appreciate or understand at that
3   point that if you made no improvement or had further
4   performance issues that it could lead to your
5   termination?
6       A   Just if I talked to parents it could lead to
7   termination, yes.
8       Q   Okay.
9           (Defendant's Ex. No. 8 marked for
10          identification.)
11  BY MR. BURRUEZO:
12      Q   Let me show you what's been marked as Exhibit
13  8.  And these are notes concerning — notes by Brenda
14  Hayes concerning interviews of Krissy and Sara.  Do you
15  know who Krissy and Sara?
16      A   I know Krissy and Ms. Sara.  There was two
17  Sara(s), I think.
18      Q   And who were they to your best memory?
19      A   Ms. Krissy, both of them were teachers.
20      Q   Do you know Krissy's last name?
21      A   Turner.
22      Q   All right.  So this was Kristin —
23      A   Oh, no, the other Ms. Krissy.  I don't know her
24  last name, but I know who you're talking about, Ms.
25  Krissy.

Page 91

1       Q   Okay.  But it's not Kristin Turner?
2       A   No, it's another Krissy.  One was Kristin and
3   the other one was Krissy.
4       Q   And then what about Ms. Sara, do you know her?
5       A   I know Ms. Sara.
6       Q   Okay.  And what's her last name?
7       A   I done forgot her last name, but I know Ms.
8   Sara.  Ms. Sara, yeah.
9       Q   Well let me ask you to read along with me, and
10  I'm going to ask you whether or not — I'm sorry, you
11  can't read along with me if I'm keeping the exhibit from
12  you.
13          And this references interviews with Krissy and
14  Sara concerning outbursts in the classrooms with
15  Ms. Janice over the last two weeks, and it's dated
16  6/17/2011.
17          It says:  On Wednesday June 15th as I was
18  leaving, Ms. Krissy stopped me in the hallway and asked
19  if I could see her tomorrow because there was a
20  situation that happened last week she needed to talk to
21  me about.  I said yes and asked if she wanted to talk
22  now, and I would go back into the office.  She briefly
23  told me it was about an incident that happened in the
24  classroom on Monday night, June 6, with Ms. Janice.
25          I brought her into my office and she explained

Page 92

1   that Janice was over in B4, which is the classroom on
2   the other side of the suite.  The children were all
3   moving to combine in B4 with Ms. Janice at 6:30.
4   Ms. Krissy would be joining her because she was also the
5   closer that night.  Ms. Krissy was changing a child on
6   the changing table and the child wanted to go to B4 with
7   his friend, so he was upset about getting his diaper
8   changed.  Ms. Krissy was tell (sic) the child that he
9   would get to go with his friends as soon as she was
10  finished just like every night.
11          Ms. Janice overheard Ms. Krissy talking to the
12  child and told Ms. Krissy to stop running her mouth and
13  what was her problem.  Ms. Krissy said she was surprised
14  by the confrontation and said what are you talking about
15  Ms. Janice, I was just telling Jonathan he would be able
16  to go with friends when I finished.  Ms. Janice
17  continued to say that I know you don't want to say that,
18  so just leave.  You just run your mouth and go tattle to
19  Ms. Brenda.
20          Krissy said I am supposed to stay until 7:00
21  tonight, there was a mix up in the schedule, so I told
22  Sara she could go home early and I would stay.
23  Ms. Krissy told Janice she did not have a problem with
24  staying.  On Tuesday, Ms. Sara came to Krissy and asked
25  her why she complaining to Ms. Janice about staying

Page 93

1   since she volunteered to stay.  Ms. Krissy told Sara she
2   never said anything to Janice about staying and she
3   was fine.
4           Do you recall this situation?
5       A   I recall this situation.  But it didn't happen
6   like this.
7       Q   How did it happen in your view?
8       A   In my view, it happened — she wasn't changing
9   a kid on the table.  I went in to assist her because she
10  had so many kids.  I can remember opening the door and
11  — I think whoever the receptionist was said that you
12  need to go and help in that room.  So I went over to
13  help in the room, but she wanted me to just do all the
14  tables, do the sweeping, do everything.  And I told her,
15  Ms. Krissy, you're going to have to help me, I'm not
16  going to do everything.
17          I don't remember nothing about Jonathan or
18  nobody else in there.  And I said, you know, actually
19  I'm not supposed to be staying until 7:00, I said but I
20  will stay.  I said it's your turn to stay until 7:00.
21  And then she asked me what are you talking about, you
22  know.
23          And from there, it was just words, but it
24  wasn't nothing like, you know, a problem or anything.
25  It was just me letting her know that I wasn't going to



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                                    Pages 94..97

**Page 94**

1  do the tables and the sweeping and everything too. I
2  was — you know, that she would have to help me.
3  Because, again, I was the one that would go in and
4  assist. But as soon as -- sometimes I think I would
5  just do so much until they kind of like took me for
6  granted. So, you know, when I didn't want to do it all,
7  you know, it became a problem. I think that's what
8  happened.
9        But Jonathan and all this, I don't remember. I
10  remember the 7:00, I told her I would stay but I wasn't
11  supposed to stay because it was her turn to stay. And
12  then when I saw Ms. Sara, I thought this was the next
13  day, and I told Ms. Sara that — I may have said it to -- I
14  forgot exactly what I said to her, but that she was
15  supposed to stay, why didn't she stay. And she went to
16  Ms. Krissy and asked Ms. Krissy, and Ms. Krissy got
17  angry and came back to me. It was just petty teachers.
18  We did this all the time so it was never no problem.
19  And, you know, it wasn't like it's written up here.
20        Q   Okay. Well, let's continue.
21             It says:  I brought Sara in to talk to her
22  about the situation, and Sara said Ms. Janice came to
23  her and said Krissy was complaining to her about staying
24  and running her mouth all night.  She stated that Krissy
25  said she was doing Sara a favor, and flipping out about

**Page 95**

1  the fact she had to stay.  Sara said she asked Krissy
2  about it and Krissy looked hurt that Janice would say
3  something like that, and said she didn't say those
4  things.  Sara felt Krissy was telling her the truth and
5  that Janice had lied to her to start trouble.
6             Sara went on to say that while she was speaking
7  to Krissy, Janice came abruptly into the classroom
8  asking for a cup.  But Krissy and Sara were by the
9  changing room and Sara pointed that there were extra
10  cups in the changing area cubby.  Janice went in got a
11  cup and left slamming the door behind her.  All these
12  confrontations happened in the classroom in front of the
13  children.
14             Let me stop there.  Do you agree with what's
15  described here?
16        A   I agree with the cup, getting the cup from the
17  cubby. But I didn't slam the door. I probably did say
18  something, but it wasn't like the children were in
19  danger or anything, it was just the response between her
20  and I.
21        Q   Now, up to now, do you think that, in
22  retrospect, you might have raised your voice or used a
23  tone that might have seemed unprofessional or offensive
24  to somebody?
25        A   I may have said something like I refuse to do

**Page 96**

1  it all, you all will help me, like that. Because I used
2  to tell them that like that, yeah.
3        Q   Okay.  And do you think in retrospect that
4  perhaps someone might have viewed that as being curt?
5        A   Yeah, because they weren't used to me being
6  like that. I was always like Ms. Goody Two Shoes like
7  to them. You know, I would always just do whatever they
8  asked me. But when I would get overwhelmed and when I
9  would get like I would think it was too much, then I
10  would say something like I'm not your flunky, you're
11  going to help me, or something like that. But it was
12  never no problem. It was not like this at all, really.
13        Q   Well, do you think that maybe now that you've
14  had the distance of time separating when these things
15  occurred and you're looking at it now in the rearview
16  mirror, that perhaps you were curt or unprofessional in
17  your tone to your co-workers?
18        A   I wouldn't say unprofessional, I was just like
19  a little different to them because they weren't used to
20  the Ms. Janice, they were always used to me being
21  submissive and talking low. But when I got fed up and
22  said I'm not going to do it all, they were like
23  astonished. They would look at me like this is not
24  Ms. Janice, I know this is not Ms. Janice.
25        Q   Well, let me ask you a little bit differently.

**Page 97**

1  Kind of a similar question, but slightly different. And
2  that is:  Do you think that your tone or what you said,
3  the words you used, the way that you inflected your
4  voice, the way that you engaged in non-verbal mannerisms
5  might have been perceived by your co-workers as being
6  curt and unprofessional?
7        A   Yes, with Ms. Krissy, but not like with
8  Ms. Sara. With Ms. Krissy I would say so, because she's
9  kind of like -- well, I don't want to --
10        Q   She's like what?  What were you going to say?
11        A   Like she's paranoid. You know, she's kind of
12  like -- everybody knows. Ms. Brenda always would say
13  she's kind of like that. She was paranoid. She gets
14  paranoid quick.
15        Q   Well let's continue.  It says:  Sara stated
16  that Ms. Janice, Tuesday night, June 14th was upset in
17  B1 about the children that were passed in her classroom.
18  Ms. Sara saw she was upset and called to classroom and
19  spoke to Ms. Emily to see if they needed any help, or if
20  they would like to pass any children to her and
21  Ms. Shardawn.  Ms. Emily said no, that they were fine.
22  A couple minutes later, Ms. Janice came into the
23  classroom and yelled Sara, do you have something to say
24  to me, say to my face. Sara said what, I called Emily
25  to see if you guys needed help, because when you came in



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM Document 34 Filed 06/28/13 Page 27 of 40 PageID 647

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013 Pages 98..101

**Page 98**

1 to get our numbers you looked stress. Sara stated that
2 Janice said oh, and left the classroom.
3       I circled back to Ms. Emily, which is
4 Ms. Janice's co-teacher in the classroom that night, and
5 asked about Ms. Sara's call. She stated that Ms. Sara
6 just called to see if they needed any help because
7 Ms. Janice looked stress when she came to her room to
8 check numbers. And Ms. Emily stated she was not present
9 when Ms. Janice had her conversation with Ms. Sara
10 because she was in her classroom.
11       Both girls stated they were uncomfortable
12 working with Ms. Janice because she can have these blow
13 ups at anytime. They feel uneasy talking to management
14 because they worry about the confrontation that would
15 take place with Ms. Janice when she finds out they had
16 said anything.
17       What is your comment to this second episode?
18 How did it happen in your view?
19     A In my view, with Ms. Sara, she would like go
20 back and forth with teachers, you know, and say what one
21 would say and the other would say. And I did -- I kind
22 of -- I remember Ms. Sara asking her did she have
23 something to say, but what led up to that I forgot. But
24 I did ask Ms. Sara that. I can remember vividly.
25     Q Did you raise your voice?

**Page 99**

1     A No. I didn't raise my voice at her, I just
2 said Ms. Sara do you have something to say to me,
3 because you just keep coming back and forth, like that,
4 saying what Ms. Emily said or what Ms. Krissy said. And
5 she would say no. She would always be like a
6 troublemaker, but she would do it at ease.
7       She would -- you know, it's been a while ago,
8 so I just -- we just had words as teachers. We always
9 went back and forth like that, you know. No it's not my
10 turn to do this, you do the tables, you do the -- you
11 know, like. And we all would become frustrated
12 sometimes because it was a job that was frustrating at
13 times. So to just remember verbatim what I said, I
14 really don't. But I remember some of the instances in
15 here, but it's just not exactly the way it's written up.
16     Q And I understand that you disagree with some of
17 the nuances. Do you agree that, in retrospect, that
18 someone might have perceived your comment or maybe the
19 way that you said your comment to have been
20 disrespectful or unprofessional in some way?
21     A I just don't see it that way. Maybe so if my
22 tone of voice was higher or something like that, but,
23 you know, they did it, I did it, we all just did it, you
24 know. But the kids were our priority. As long as those
25 kids were taken care of, we didn't -- we never did

**Page 100**

1 report each other and all that. We never did that.
2     Q Do you think as a general matter -- and I just
3 sort of want you to kind of separate yourself from these
4 events for a moment -- do you think as a general matter
5 that it would be appropriate for an employer to
6 terminate an employee who had shown a pattern of
7 breaching employment policies?
8       Generally. I'm not talking about you in
9 particular. I'm just saying in general, do you think it
10 would be appropriate for an employer to terminate an
11 employee, who, over a period of time, violated a number
12 of employment policies?
13     A Yes.
14     Q So, now applying it to you, if Bright Horizons
15 felt -- and I understand that you might disagree with
16 the details, but if Bright Horizons felt that over the
17 course of a three-year employment period, you had
18 violated a number of policies, and if they had warned
19 you that any further violations would result in
20 termination, that it was justified for them to terminate
21 you?
22     A No. Because it was the timing in which they
23 did it in, and the way they did it to me. It wasn't the
24 way that it's written up, like I said. If it was a
25 problem, why didn't they terminate me before? I mean,

**Page 101**

1 why wait until after all this happened. It was --
2     Q And what is it about the timing that causes you
3 some pause?
4     A Well, after the allegation of the abuse, they
5 went back and started talking about these things. They
6 didn't do this, they didn't have all this in my record
7 or anything, it was like a verbal reprimand, you know.
8 It was like maybe one that wasn't, right. The other
9 ones were. It's like they went back and put it in there
10 or something. Because at first, it wasn't --
11     Q Well if you look back at Exhibit 5, that was a
12 reprimand that was issued in August of 2010 concerning
13 inappropriate workplace behavior. Exhibit 5.
14     A Exhibit 5, yeah.
15     Q And that's in August of 2010. That's eight or
16 nine months --
17     A But this wasn't put in there -- this was just
18 in Ms. Debra's office. She unequivocally, she said,
19 this will not go in your -- she said we're just talking.
20 She said but I have to write it up. And it didn't go in
21 my files. And now all of a sudden it's in there. So
22 why did they go and dig it up so you can get it now. I
23 mean, it wasn't in my files at first. It was just --
24     Q Well, let's sort of bypass the issue of whether
25 it was in your file or not. I just want to talk timing



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 102

1    at this point.  You received this reprimand, this
2    counseling, in August of 2010, right?
3          A   Yes.
4          Q   And you signed off on it in August of 2010?
5          A   Yes.
6          Q   And you agree that this reprimand came eight
7    months before any complaint that you made concerning
8    Kristin Turner, right?
9          A   Yes.
10         Q   And you'll agree that the issues addressed in
11   the August 2010 counseling report deals with
12   unprofessional workplace behavior on two occasions,
13   right?
14         A   Two different occasions, yes.
15         Q   And it's the same theme that's been running
16   with other situations.  We've talked about other
17   counseling(s) and other issues, and it's sort of a
18   workplace professionalism issue, correct?
19         A   Yeah.
20         Q   All right.  Now, in the course of your work
21   performance, if we take out for a moment, and we
22   magically remove from the chronology of events the
23   complaint that you made concerning Kristin Turner, if we
24   remove that complaint completely for the purposes of our
25   next question, would you agree that someone who shows a

Page 103

1    pattern of workplace issues related to professionalism
2    should be fired if they engage in violations of policy
3    related to professionalism and teamwork in the
4    workplace?
5          A   Fired then, not later.
6          Q   So you're saying that Bright Horizons is at
7    fault because they gave you too many chances to act
8    professionally in the workplace?
9          A   No.  I'm saying that it must have not been that
10   bad to them, had they not put it in my record.  We just
11   talked about it.  It's just something that happened.  It
12   was not like violating a policy, it was just me raising
13   my voice.  And it was so much on me that day, and Ms.
14   Debra understood it and she accepted the apology.  And
15   it didn't go in my record.  I don't know how to really
16   answer that.
17         Q   Yeah, what I'm asking is not necessarily your
18   perception or perspective, I'm asking from the
19   perspective or perception of management.  If they're
20   trying to manage two dozen people in the workplace and
21   they want to foster a healthy work environment by
22   insisting on professionalism, meaning appropriate
23   communications between employees, and if they have a
24   perception that you haven't been doing that, and you've
25   shown a pattern of not doing that since August of 2010,

Page 104

1    that it would be appropriate for them to terminate your
2    employment if you can't get it right.
3          A   Well, I don't think 2010.  I mean, going back
4    from 2010 up until — why did you wait that long.  I
5    mean, if you wanted to terminate me —
6          Q   Well, is it possible they liked you and wanted
7    to encourage you to do better?  Are you saying that
8    Bright Horizons should have fired you in August of 2010?
9          A   No, I'm not saying they should have, but they
10   give me another chance because it wasn't bad like that.
11         Q   Right.  They gave you multiple chances because
12   they wanted to encourage and foster you to become a
13   better employee, correct?
14         A   If you put it that way, I guess so, but.
15         Q   Okay.  And so, again, for purposes of my
16   question, if you remove from the chronology, from the
17   story, the complaint that you made in April of 2011, and
18   you have six or seven separate episodes of
19   unprofessionalism in the workplace, do you think that it
20   would be appropriate for management to terminate an
21   employee who has that record of unprofessionalism?
22         A   I don't see it that way as unprofessionalism.
23   I just made a mistake or something.
24         Q   Well, let's not — let's have a hypothetical
25   employee.  Let's pick on the court reporter.  If the

Page 105

1    court reporter, if she was working at a childcare center
2    with kids and co-workers, and if you were the court
3    reporter's manager at the daycare center, and if the
4    court reporter had engaged in seven or eight instance of
5    disrespectful behavior to co-workers and violations of
6    confidentiality and engaging in discussion with parents
7    about confidential information, would you not terminate
8    the court reporter after seven or eight instances of
9    workplace violations?
10         A   After I spoke with her, and if she didn't think
11   it was disrespectful, she thought she was within her
12   rights, I wouldn't just fire her.  I would talk with her
13   and see what happened.
14         Q   But you're the manager, you get to make those
15   choices and decisions.  So if you've talked to her after
16   the first time and she didn't get the message and she
17   engages in more unprofessional workplace behavior; if
18   you talk to her after the second time and she doesn't
19   get the message and engages in a third instance of
20   workplace unprofessionalism; if she doesn't get it after
21   the third time and engages in a fourth episode of
22   unprofessional behavior; and if she doesn't get it after
23   the fourth time and engages in a fifth time of
24   unprofessional workplace behavior; and doesn't get it
25   after the fifth or sixth or seventh time and engages in



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 34   Filed 06/28/13   Page 29 of 40 PageID 649

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                          Pages 106..109

Page 106

1  eight instances of unprofessional behavior; would you
2  not as a manager terminate the court reporter?
3      A  As a manager I probably would.  But it didn't
4  happen like that, the way you're saying it.  It didn't.
5      Q  All right.  At what point in your view is too
6  much -- strike that.
7          At what point in your view does an employee
8  have to violate policy before they ought to be
9  terminated from their job?
10     A  If they do something to kids, or if they don't
11 come into work, and don't do their work the right way.
12 But just altercations with each other, other teachers --
13     Q  So you think workplace altercations should be
14 permitted in the workplace?
15     A  I mean, if you have difference of opinions,
16 it's just difference of opinions.  It's really not
17 disrespect to me.  It's the way that the person
18 perceived it.  I mean, the way they were doing me was
19 way worse.  And at least I verbalized it, you know.  I
20 just don't see it that way, but.
21     Q  Well let me ask is this way.  Do you think that
22 management has the discretion, whether or not you agree
23 with it or not, but because management is the one that
24 establishes policy, establishes workplace expectations,
25 do you think management has the discretion to make the

Page 107

1  determination that enough is enough?
2      A  Yes.  What does that have to do with what I saw
3  though, the abuse?  If I saw it, I saw it.  I mean, they
4  can bring up a thousand things that I did, but it
5  doesn't alleviate what I saw.  I saw what I saw.  And
6  that's what this --
7      Q  Yeah, and no one's arguing with what you saw,
8  are they?
9      A  That's why we're here, right, to say --
10     Q  No.
11     A  -- whether it was done or not.
12     Q  All right.  Well let's talk about that for a
13 few minutes.  You went to Janice Horner -- or, excuse
14 me, Susan Saunders, and told her what you saw.  She
15 listened to what you said, correct?
16     A  Yes.
17     Q  Okay.  She handled it in her own way, to your
18 knowledge, or maybe without your knowledge, because you
19 don't know what she did, right?
20     A  I don't.
21     Q  You then had several conversations with Linda
22 Horner and others, including representatives of DCF, and
23 also Ms. Stegall, concerning whatever you saw, correct?
24     A  Yes.
25     Q  You had conversations and expressed your

Page 108

1  observations.  Isn't that true?
2      A  Yes.
3      Q  No one tried to tell you don't tell me.  No one
4  tried to tell you I don't want to hear what you have to
5  say.  No one told you I don't believe you.  Right?
6      A  Right.
7      Q  Okay.  So whatever you raised at the company
8  was listened to by the company, and how they dealt with
9  it or acted on it in connection with their investigation
10 was within their prerogative, correct?
11     A  Okay.
12     Q  But they treated you professionally.  They
13 listened to you.  They even asked you further questions
14 and invited you to more meetings to discuss what you
15 saw.  Right?
16     A  They invited me to more meetings to interrogate
17 me, I think.
18     Q  So nobody ever said to you, oh my God, we don't
19 want to hear what you have to say, right?
20     A  No.
21     Q  Nobody said don't tell us, we don't care about
22 abuse, we don't care what you heard.
23     A  No.
24     Q  Okay.  So you are telling me, then, that the
25 company gave you an ear and listened to whatever you had

Page 109

1  to say with regard to the abuse which you say you saw on
2  the part of Kristin Turner, correct?
3      A  Yes.  Once they called me into the office,
4  yeah.
5          MR. BURRUEZO:  Okay.  Well I think now is a
6  good time for a break.  It's 12:35, so let's
7  maybe take a 30- or 40-minute break, whatever
8  you guys need.
9          (Recess was taken at 12:35 p.m.; deposition
10         resumed at 1:35 p.m.)
11         MR. BURRUEZO:  Okay.  I think we're on
12 Exhibit 9.
13 BY MR. BURRUEZO:
14     Q  Let me hand you what's been marked as Exhibit
15 Number 9.  And before we kind of talk about the
16 particulars of Exhibit 9, I wanted to ask you,
17 Ms. Norman, whether you remember any meetings you had as
18 it related to the termination of your employment.
19     A  I remember meeting with Ms. Brenda Hayes and
20 Ms. Jennifer Todd.
21     Q  Okay.  So both Ms. Todd and Brenda Hayes were
22 in attendance, as well as you?
23     A  Yes.  I was on my lunch break.
24     Q  What was Jennifer Todd's position at that time,
25 do you recall?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                                    Pages 110..113

Page 110

1    A   She was a manager for — they call it
2  divisional manager or something like that.
3      Q   Okay.  And Brenda Hayes was what at that time?
4      A   At that time she had moved up to assistant
5  director to Ms. Linda, because Ms. Debra Neverson was
6  gone.
7      Q   What was Ms. Horner's role, if any, in
8  connection with your termination meeting?
9      A   None.
10     Q   She was not present?
11     A   No.
12     Q   Did you have any discussions with her at all
13 concerning your termination?
14     A   No.
15     Q   Well tell me what happened at that meeting;
16 what was discussed with you; what was said to you; and
17 what did you respond.  Take me back.  I wasn't there, so
18 take me back and tell me what happened.
19     A   Okay.  I had just went on my lunch break and I
20 was into about 10 minutes of my lunch break in the
21 cafeteria.  And Ms. Brenda came in and she said we need
22 to talk to you.  And so I said okay.  And she said I'll
23 allow you to finish your lunch.  But she didn't, she
24 came back in about five more minutes and she want to
25 see you now.  So I left and went into the office of

Page 111

1  Ms. Brenda Hayes, because she had moved to another
2  office.
3          And she said we have evidence that you were not
4  getting along with Ms. Krissy, or something like that,
5  or some of the employees said that you were not nice to
6  them, or I was rude, or something like that.  I forgot
7  exactly what it was, but.  And I said I don't think so,
8  I don't agree with that.  And so she said well yeah, we
9  have proof, and we have to let you go.
10         No, Ms. Jennifer's the one that said we have to
11 let you go, we have to terminate you at this time
12 because we have proof of something, but I forgot exactly
13 what it was.  I think it was either talking with
14 parents, or — I forgot exactly what it was.  Now it's
15 not coming to me, but I think it was not getting along
16 with the employees, if I'm not mistaken.
17     Q   Is it safe to say that your memory's a little
18 bit foggy in terms of the details as to what transpired?
19     A   Now it is, yeah.  I thought I had went over it,
20 but for some reason it's not coming back to me exactly
21 the reason.
22     Q   Well let's look, then, at Exhibit Number 9, and
23 maybe this will help refresh some of the issues related
24 to that.  And this is a Bright Horizons Family Solutions
25 Employee Conference Memo dated June 17th, 2011.  It

Page 112

1  references you and it lists your supervisor's name as
2  Brenda Hayes.  And it has the Termination box checked.
3          And it says the following:  On June 16, 2011,
4  employee approached our assistant director, Brenda
5  Hayes.  She stated she had not come forward the day of
6  the incident, that she feared the retaliation.  On
7  Monday June 6th, Ms. Janice confronted the teacher in
8  the shared diaper area while the teacher had a child on
9  the changing table.  Ms. Janice said you need to stop
10 running your mouth, all you do is complain.  The teacher
11 did not respond but continued diapering the child.  Ms.
12 Janice continued to say you are a tattle tale, so go
13 ahead, run to Ms. Brenda.
14         It says:  Also upon further investigation,
15 Brenda Hayes learned that in a separate incident on
16 Wednesday, June 8, 2011, Ms. Janice left her classroom
17 out of NAEYC ratio.  She left the room with 11 children
18 and one teacher to confront a different teacher in
19 another classroom and yelled, if you have something to
20 say, say it to my face, while children were present.
21         These interactions are a direct violation to
22 the following company standards and policies as listed
23 on page 49 and 50 of our Employee Handbook.
24         Item 13, conduct that is detrimental to
25 children or Bright Horizons Family Solutions reputation

Page 113

1  in the community.
2          Item 18, actions or behavior that is disruptive
3  to the operation of the business.
4          Has the employee been counseled for similar
5  incidents?  Yes.  August 24, 2010; May 20th, 2011.
6  Inappropriate conduct and behavior toward management,
7  with co-workers in front of the staff, parents and
8  children.  And the consequence is the termination.
9          Let me ask you for a moment, and I want you to
10 sort of remove yourself from this situation altogether.
11         Would you agree that the behavior listed in
12 this documents, if true, in addition to other behaviors
13 that we've reviewed, if true, would be sufficient to
14 terminate an employee?
15     A   If true, yes.
16     Q   Okay.  Now comment for me, if you would, about
17 what's listed in the items that I read.  Does that
18 accurately reflect what occurred at the meeting?
19     A   At the meeting, yes.  That's why I didn't sign
20 it.  Yes, because I didn't agree with it.  And I told
21 them verbally that I didn't agree with it.  And that's
22 the only reason I didn't sign it, because it didn't
23 happen like this.  And Ms. Brenda, I don't know, she
24 didn't — I didn't leave the kids in the classroom, so I
25 don't — she said — I remember the NAEYC ratio.  It's



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 34   Filed 06/28/13   Page 31 of 40 PageID 651

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                          Pages 114..117

Page 114

1  not true, that didn't happen. So for her to say that, I
2  don't know why she said that, because that did not
3  happen. I never left kids out of ratio.
4      Q    And it says, by the way, in the Employee
5  Comments that employee denied allegations. Do you see
6  that?
7      A    Yes, sir.
8      Q    So they documented your contesting of what was
9  being said at the meeting. And then it also references
10 that you did not sign it. And I guess, is that part
11 true?
12     A    That's true. And then the tables, the lady,
13 Ms. -- she was not -- Ms. Krissy was not doing -- saying
14 something about the tables. That was not in the shared
15 diapering area, the changing tables and all that where
16 the kids were, that didn't happen like that.
17     Q    Okay. How did it --
18     A    It happened when we were just talking with Ms.
19 Krissy and I. And I said all you do is complain, and I
20 remember saying that. But it just did not happen
21 exactly the way it is on here.
22     Q    Okay. Well let me ask you this. Putting aside
23 some of the details about changing table and all that,
24 did you say to whoever it was you need to stop running
25 your mouth, all you do is complain?

Page 115

1      A    Yes.
2      Q    Okay. And did you say it in a manner that
3  someone might have perceived it as being disruptive or
4  rude our unprofessional?
5      A    No, because I had told her that before. So I
6  always just -- you just always complain, Ms. Krissy, you
7  just complain all the time. And she did. She did. And
8  I used to tell her that all the time.
9      Q    Do you think someone might have taken it as
10 being rude? Could the listener to what you said
11 consider it to be rude?
12     A    The listener? No, I don't think so. Not with
13 her as being a listener, because everybody always told
14 her that, because she does complain all the time. I
15 wasn't the only teacher who ever told her that. I
16 witnessed a lot of teachers telling her that.
17     Q    And what if it was somebody else and not her,
18 could somebody have taken what you said as being rude or
19 unprofessional?
20     A    If someone else had been in there, I don't
21 remember. Yes, if somebody else had been in there,
22 maybe. Not rude, just telling her how I felt. That's
23 not rude. I don't consider it as being rude.
24     Q    I'm not asking you whether you consider it
25 rude, but whether somebody else might perceive it

Page 116

1  that way.
2      A    No, not because of the way that I said it.
3      Q    Do you agree, generally, that people might
4  perceive the same events in a different way?
5      A    Yes.
6      Q    And do you think that, given that, given your
7  acknowledgement of that, that people might perceive what
8  you say in the way that you didn't intend them to be?
9      A    Perhaps. But they all know me, and they know
10 I'm not that kind of person, so. Well, I guess so. But
11 I could see if they didn't know me. But they all knew
12 me, and we all knew each other's personalities. And
13 there never was no problem before when I said it. It's
14 just -- to answer your question, maybe yes.
15     Q    All right. What about the second incident that
16 talks about -- the June 8th incident where you went to
17 somebody and said if you have something to say, say it
18 to my face?
19     A    That happened, but with Ms. Sara. That was
20 another time. It wasn't like at this time.
21     Q    But you did say that to somebody?
22     A    I said it to Ms. Sara. I asked Ms. Sara,
23 because Ms. Sara kept -- different people kept coming
24 back and telling me Ms. Sara said, Ms. Sara said, Ms.
25 Sara said. So when I saw Ms. Sara, I recall myself

Page 117

1  nipping it in the butt by asking her directly, Ms. Sara,
2  do you have something to say to me. I remember that
3  vividly. I did say that to Ms. Sara. But it wasn't at
4  this time of this incident, I don't think.
5      Q    Were children present when you said that?
6      A    We were in the doorway transitioning from one
7  room to the other. Ms. Sara was coming in one way, I
8  was coming in another way. It was like two different
9  doors. She was coming out of the B wing, one room on
10 the right, and I was going -- I was coming in, she was
11 going -- and she was coming in, but it was at different
12 times.
13     Q    Were children present in the area?
14     A    No, not in the area because they were in the
15 classroom. And we had two other teachers in there.
16     Q    Was the door going into the classroom?
17     A    Into the classrooms.
18     Q    So children could have heard?
19     A    Their tables were like way in the back. They
20 weren't right there in the door. The children could
21 have heard, but they don't --
22     Q    And you said earlier that you have a voice that
23 projects.
24     A    Yeah, but not that loud.
25     Q    So it's possible that children could have



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                              Pages 118..121

Page 118

1  heard?
2      A   It's possible.
3      Q   All right.  So then what happened?  So they
4  told you you were terminated, and what happened next?
5      A   And I said well I don't agree with what's
6  happening here and I think this is more about something
7  else than what you're saying, and thank you very much.
8  I got my purse and I just left.
9      Q   Did you explain what you meant when you said I
10 think this is more about something else?
11     A   I don't remember explaining it.
12     Q   Okay.  How long did that meeting last?
13     A   It was 10 minutes.  Maybe five.  It wasn't that
14 long.  It was very rapid.
15     Q   Okay.  So you took your purse and you left the
16 premises?
17     A   I went and got my purse out of the room, and I
18 wanted to say goodbye to everybody, but I didn't.  They
19 just told me to leave, so I left.  Ms. Jennifer, the one
20 that didn't really know what was happening, she's the
21 one that terminated me, not Ms. Brenda.  Ms. Jennifer
22 did.  So that was it.
23     Q   Okay.  Do you know who Thearla Kozy is?
24     A   I know Ms. Thearla, because I wrote her a
25 letter.  Ms. Thearla I think is in human resources.  I

Page 119

1  wrote her a letter.
2      Q   Have you ever met Thearla Kozy?
3      A   No, I never met her.
4      Q   Have you ever talked to her on the phone?
5      A   Yes.
6      Q   How many times have you talked to her on the
7  phone?
8      A   I talked to Thearla, I think, twice.
9      Q   During or after your employment?
10     A   During.  I never talked to her afterwards.
11     Q   Did you ever write her a letter after you were
12 fired?
13     A   No, before.
14     Q   When did you write her a letter?
15     A   When I found out that -- when did I write her?
16 I was still there when I wrote her.  I don't remember
17 the exact date, but I think when I came back from
18 vacation and learned that I would be moved, that's when
19 I wrote her a letter.
20     Q   And what happened with your letter, did she
21 respond?
22     A   I think she called me at work, if I'm not
23 mistaken.  Because she told me that just to go along
24 with the program, that Ms. Krissy would be dealt with,
25 and to not worry about anything.  But she did, you know,

Page 120

1  get my letter and everything.  But she said it's a
2  reason why everything is happening the way it is, just
3  stay put and stay focused and wait until she's dealt
4  with.  That's what she said, dealt with.
5      Q   Until who was dealt with?
6      A   Krissy.  Ms. Krissy.  Because I had mentioned
7  some things in the letter, if I'm not mistaken, about
8  what I thought was going on to Ms. Thearla.
9      Q   Okay.  Well, the situation with Krissy didn't
10 come out until the very end, right?
11     A   When I got back from vacation, I knew -- no
12 that was before.  Before I went on vacation.
13     Q   Are you talking about the situation involving
14 Kristin Turner?
15     A   Kristin Turner.  Oh yeah, Turner, not Krissy.
16     Q   Okay, that was the center of my confusion.  My
17 question is:  What is the time period of when you raised
18 something to Ms. Thearla Kozy?
19     A   Right after I got back from vacation.  Nothing
20 had happened with Ms. Krissy.  This was the other,
21 Kristin Turner.  Nothing about Ms. Krissy.  This was
22 about -- I don't know the time span, but it was all
23 within like a week, a few days apart, or -- I done
24 forgot the dates and everything.
25     Q   And did Ms. Kozy satisfactorily deal with your

Page 121

1  concerns at that time?
2      A   No.  Because to my --
3      Q   I'm not saying what you think of it now.  At
4  the time, did you feel satisfied with whatever
5  Ms. Kozy --
6      A   No.  I felt like it wasn't, because Ms. Krissy
7  would still be coming to work day after day.  And if it
8  was dealt with, then she wouldn't be on the job.  That's
9  how I felt in my head.  Why is she still here if they're
10 taking care of it, that's the way I perceived it in my
11 mind at the time, if I'm remembering correctly.
12     Q   So you're saying you didn't speak to Ms. Kozy
13 after your termination?
14     A   After the termination, no.
15     Q   Okay.  Do you know whether or not human
16 resources received any letters you wrote to them?
17     A   Yes.  Because I faxed them and I have the
18 copies.  The returned and everything, confirmation
19 numbers and --
20     Q   You have confirmation --
21     A   I have copies of what I sent, and then
22 confirmations that it was faxed, because I faxed it, I
23 think, through Amscot if I'm not mistaken.  And then
24 right after I wrote the letter, I was in Ms. Brenda's
25 office when Ms. Jennifer Todd acknowledged that she



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 122

1 received the letters. Because Ms. Brenda said well I
2 understand that she wrote something and she's in my
3 office now, and that's when they stopped talking. That
4 was another occasion.
5 **Q All right. Let me pull these out.**
6         (Defendant's Ex. Nos. 10, 11 and 12 marked
7         for identification.)
8 BY MR. BURRUEZO:
9 **Q Let me show you Exhibit 10, Exhibit 11 and**
10 **Exhibit 12.**
11 A (Witness reviews documents.)
12 **Q Have you had a chance to read Exhibit 10?**
13 A Yes.
14 **Q Is this the letter that you were referring to**
15 **that you sent to Thearla Kozy?**
16 A Yes.
17 **Q And this references a call that you made to her**
18 **that same day.**
19 A Yes.
20 **Q Is that the first time that you talked to**
21 **Ms. Thearla Kozy, on May 11th of 2011?**
22 A May 13th?
23 **Q I'm sorry, May 13th, 2011. I stand corrected.**
24 A Yes.
25 **Q And what did she tell you on the phone?**

Page 123

1 A That she was looking into it, and that things
2 would be taken care, and just hold on.
3 **Q And did she ask you to put in writing your**
4 **concerns?**
5 A No, I just did that.
6 **Q And you said you sent this to her. Is that**
7 **right?**
8 A Yes.
9 **Q All right. I did not receive in my package any**
10 **fax confirmation that I saw. Do you have anything in**
11 **your records that would show that this document was**
12 **received by Thearla Kozy?**
13 A Yes. I think I have it at home. One was sent,
14 I think, mail, certified mail, I have that. And this
15 one may have been faxed, I thought. Faxed or either I
16 have a letter. If I mailed it I have everything.
17         MR. OWENS: I just had a thought, and we can
18 have this on the record. And I could be
19 completely making this up, so don't hold me to
20 it. But I remember when I was going through the
21 documents that you provided, I thought I saw on
22 some handwritten documents, some fax, you know
23 up at the top of the page how there's some fax
24 notification. If in fact that's true, it could
25 have just cut off when we were making copies and

Page 124

1 it's not there. The point is --
2         MR. BURRUEZO: That's a possibility.
3         MR. OWENS: -- I'll look when I get back to
4 the office.
5         MR. BURRUEZO: Okay.
6         MR. OWENS: If there is such a thing and I'm
7 not completely crazy and making this up -- THE
8 WITNESS: I have it, I think, at home. MR.
9 OWENS: -- I'll certainly provide it to you.
10 But it just jogged my memory when she mentioned
11 fax, so I'll take a look.
12         MR. BURRUEZO: Yeah, that will be helpful.
13         THE WITNESS: Yeah, I faxed it.
14         MR. BURRUEZO: I mean, unless I missed it, I
15 didn't see that, and so it would be helpful to
16 see any confirmation you might have received.
17 And if it's not in Mr. Owen's file, if you could
18 check your files and provide it to him.
19         THE WITNESS: Yeah, I'm sure I have it,
20 because I have the originals, yeah.
21         MR. BURRUEZO: That will be helpful.
22         THE WITNESS: Okay.
23 BY MR. BURRUEZO:
24 **Q In your letter, you say the following are my**
25 **concerns. Number one on the second page: Management**

Page 125

1 **favoritism. What are you referring to there?**
2 A I was referring to positions that were given to
3 some people that had more experience in certain areas
4 and working with kids, and to me it was favoritism.
5 **Q Like who? Can you name names?**
6 A Ms. Wendy. Ms. Krissy. And let's see, there's
7 another lady in the back, I forget her name. I forget.
8 It's been three years, I just forgot names altogether.
9 But some of them were given longer lunches than others.
10 And, you know, some of them would punch out and wouldn't
11 punch back in, or have other people punch them back in
12 and they would never get in trouble. Things like that.
13 **Q What benefits did Wendy get? What's Wendy's**
14 **last name?**
15 A I forget her last name, but she's the only
16 Wendy there.
17 **Q What position did she have?**
18 A She was a teacher in B1. She was a teacher in
19 B1, and then they moved her up to -- she would be like
20 a, like a little leader, assistant leader for the D
21 wing. And she would -- she had got caught punching --
22 you know, going out for lunch, and then coming back she
23 would have one of her teachers punch her back in. And
24 she -- and that was like stealing time from the company,
25 but she -- she got reprimanded for that, but she never



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 126

1  got fired or anything like that.  Now that's policy too.
2      Q    Okay.  To your knowledge, Wendy got reprimanded
3  for having somebody punch in for her?
4      A    Yes.
5      Q    What race is Wendy?
6      A    She's Hispanic.
7      Q    How about Ms. Krissy, what race is she?
8      A    She's Caucasian.
9      Q    And so what favoritism did Krissy experience?
10     A    She would go and come whenever she got ready.
11  She would be late all the time.  And I never heard or
12  even saw her get wrote up.  Because she, you know, she
13  knew Ms. Brenda really well.  Her and Ms. Brenda was
14  like very, very close.  She would always call
15  Ms. Brenda.  She had Ms. Brenda's home number, cell
16  number.  And they were just close as friends, so.
17     Q    Anybody else got any favoritism that you can
18  recall?
19     A    It was a couple of teachers on the A wing, but
20  I just forgot their names.
21     Q    And do you know whether Krissy was ever
22  reprimanded or counseled about anything during the
23  course of your employment?
24     A    She was counseled like about five or six times
25  on different things, but what they were I don't know.

Page 127

1  She, you know, just seemed to always be able to stay
2  there.  But she was counseled a lot of times.  Because
3  Ms. Brenda herself would tell me that Ms. Krissy would
4  always get, you know, in trouble.
5      Q    So the two people that you can recall who
6  received management favoritism, Ms. Wendy, Ms. Krissy,
7  themselves were counseled about certain performance
8  deficiencies that they experienced, is that right?
9      A    Yes.  I didn't see them get counseled.  It's
10  just something that I heard that they would get
11  counseled.  But they never were terminated or anything
12  like that, they were given chances over and over and
13  over and over again.
14     Q    Now, do you know if Ms. Wendy or Ms. Krissy
15  ever complained about Kristin Turner?
16     A    I just heard Ms. Wendy did.  No, not complain,
17  but she knew of Ms. Krissy abusing the kids.
18     Q    You mean Ms. Kristin Turner?
19     A    Ms. Kristin, yes.  Ms. Wendy knew of
20  Ms. Kristin, because she said that she witnessed it, she
21  seen her do it.  That's what Ms. Shardawn told me
22  anyway.
23     Q    Okay.  So you believe, to the best of your
24  knowledge, that Ms. Wendy complained about Kristin
25  Turner, or was aware of the conduct?

Page 128

1      A    She was aware.
2      Q    And Ms. Krissy never complained, to your
3  knowledge, about Ms. Kristin Turner's behavior?
4      A    No.
5      Q    And both of them, to your knowledge, received
6  some form of counseling in the course of their
7  employment, as far as you know?
8      A    Yes.  One, Ms. Wendy, for stealing time, and
9  the other one, Ms. Krissy for -- Ms. Brenda used to
10  always just tell me she would, you know, she'd talk a
11  lot and she always got something to say.  But they were
12  friends, so I guess they could say that about one
13  another, I don't know, before Ms. Brenda got into
14  management.
15     Q    What's the second item?  It looks like it's a
16  repeat of management, and then you have parenthesis that
17  says relative working for her, A/D?
18     A    Oh, relative working for -- Ms. Brenda's
19  daughter-in-law worked there, and she received all kind
20  of favoritism.  She could leave and come back without
21  punching out.  And she just -- Ms. Brenda's
22  daughter-in-law is Ms. Brenda's son's wife.
23     Q    And what's her name?
24     A    Her name is -- oh my goodness, it's right on
25  the tip of my tongue.  I can't think of it right now,

Page 129

1  but I'll think of it in a minute, I'm sorry.
2      Q    Okay.  What is the hostile work environment
3  that you were complaining of?
4      A    Hostile in the sense of the way that some of
5  the teachers would act.  Working environment.  Hostile,
6  at that time, what did I mean?  Just the way that after
7  the allegations, it seemed like I was targeted as far as
8  the way that I was greeted in the mornings.  And I could
9  say goodbye and they wouldn't say goodbye.  Or it was
10  just a cold environment after everything took place.  It
11  was just different.
12     Q    And what's the --
13     A    I used the word hostile because it seemed to
14  be.  It wasn't the same as prior.
15     Q    And what is the prejudice that you referenced
16  in the number 4?
17     A    Same as the favoritism mostly.
18     Q    And what do you mean when you say in number 5
19  no grievance forms when problems arise?
20     A    Like if you had some type of problem, you know,
21  there was nothing to write up, there were no papers or
22  anything to write up if you had a problem and turn in to
23  management.
24     Q    Number 6 you say security.  What is that?
25     A    Ms. Donna, the one you asked me about



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 34   Filed 06/28/13   Page 35 of 40 PageID 655

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                          Pages 130..133

Page 130

1  previously, about how she would go on and answer the
2  phone.  Before I could pick up the phone, she would come
3  around and answer the phone.  She would be snooping all
4  in employees' files and things like that.  And picking
5  up kids, and she wasn't supposed to be because she
6  was security.
7      Q    What was Ms. Donna's race?
8      A    Caucasian.  She didn't work for Citi, she just
9  worked for another company, but she was there all the
10  time.  She's security for another company -- through
11  another company.  She didn't work directly for
12  Citibank — I mean for Bright Horizons.
13      Q    Number 7?
14      A    Employees worked overtime and we were told that
15  we have to take 30 minutes to an hour lunch at a time.
16  We couldn't get overtime.  We had to make it up by
17  taking a longer lunch.
18      Q    And number 8?
19      A    The resource teachers like Ms. Wendy, or a
20  couple other teachers that -- other teachers had degrees
21  and things like that, but these people were chosen over
22  them.  Just qualifications was not the same as the --
23  credentials and things were not the same as the ones
24  that they chose to be like lead teachers and so forth
25  like that, so.  They called them resource teachers.

Page 131

1      Q    And number 9, who were the Hispanic employees
2  who you were referencing who you believed were being
3  rude by talking Spanish in your presence?
4      A    Ms. Marty.  Ms. Wendy.  It's like three or four
5  people that would talk Spanish all the time.  And when
6  Ms. Sue would tell them that they couldn't do it, they
7  still would do it.  But Ms. Sue didn't start telling
8  them that they couldn't do it until after this was
9  received.
10      Q    And you're making reference to the complaint
11  that you sent to Ms. Kozy?
12      A    After the complaint, yes, to Ms. Kozy.
13      Q    So after you sent them to Ms. Kozy —
14      A    I heard Ms. Sue myself tell Ms. Marty and a
15  couple other teachers that they can't talk Spanish no
16  more.  That it was rude to talk Spanish.
17      Q    What was Ms. Marty's last name?
18      A    Ms. Marty's last name -- I don't know her last
19  name.  I don't think she's there anymore.  I forgot her
20  last name.
21      Q    What was her position?
22      A    She was assistant teacher in the A wing, baby
23  wing, with Ms. Sue.  She worked for Ms. Sue.
24  Martinez —
25      Q    How long did she work for — Marty Martinez?

Page 132

1      A    -- I think is her last name.
2      Q    So number 10, there have been teachers cheating
3  on time, clocking in and out, some receive occurrences
4  and some don't?
5      A    Ms. Wendy.
6      Q    So you were referring to Ms. Wendy there?
7      A    Yes.
8      Q    And then number 11, who do you refer to there?
9      A    Teachers late, leaving early, etc.  Some get
10  occurrences, some don't.  Strictly favoritism.
11          Sometimes Ms. Wendy would leave late, and a
12  couple teachers on the A wing would leave early, and
13  Ms. Krissy would leave early all the time.  She would
14  leave early, but she wouldn't clock out, she would --
15  like she was still on the clock.  And then Ms. Sue used
16  to talk with her about that, but she still would do it
17  sometimes.
18          And then all of a sudden she started clocking
19  out when she was -- when she found out Ms. Sue was
20  knowledgeable of what was happening.  But she got away
21  with that for a long time, not clocking out.  She would
22  leave but not clock out.  She would have leave, but she
23  wouldn't clock out.  She would have somebody clock her
24  out.  Several teachers did that.
25          MR. BURRUEZO:  Okay.  Off the record.

Page 133

1          (Discussion off the record)
2  BY MR. BURRUEZO:
3      Q    So looking at this last page, it says:  And as
4  soon as a door opens up for me with another company, I
5  will put my two-weeks notice.  In the meantime, thanks
6  for reading this letter.  If management does not change,
7  you may have legal actions in the future.  Management
8  team talks about Ms. Linda very badly when she is not in
9  their presence.  Thanks.  Janice Norman.
10          So at this point, as of May of 2011, you
11  certainly contemplated looking for another job.  Is that
12  right?
13      A    Yes.
14      Q    And did you take active steps to look for
15  another position?
16      A    Not that I remember right then.  I was kind of
17  like angry when I was writing this, and I just was
18  telling everything that I saw that was happening at the
19  company.  And that's what happened.
20      Q    All right.  Let's go to Exhibit 11.  And what
21  is this?  This one's dated 5/16/2011.  What is the
22  significance of this?
23      A    Ms. Brenda called me in her office and she said
24  Ms. Janice now that I'm in the position that I'm in, I
25  want you to sit down and just to the best of your



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 134

1   ability just to tell me, just between me and you what
2   really happened, do you mind if I write it down.  And I
3   said no, because I'm going to tell you the same thing I
4   told everybody else.  And I don't know why everybody's
5   -- different people are questioning me, but, you know, I
6   will tell you to the best of my knowledge what I
7   remember.  If I miss some things, I miss some things.
8   So she said okay, well just tell me what you witnessed.
9   Just tell me.  And that's what I did.
10      Q   And this is a meeting that you had with her on
11  the 16th of May?
12      A   Yeah, Ms. Brenda, correct.
13      Q   And this basically just simply outlines what
14  you observed with regard to Ms. Kristin?
15      A   Yes, sir.
16      Q   All right.  Let's go to Exhibit 12.
17      A   Okay.  I sent this certified mail, yes.
18      Q   And I'm assuming you have the certification?
19      A   Yes, I have it.  Where they signed for it, yes.
20      Q   It looks like the document's somewhat cut off.
21  And maybe you can recall what you wrote, because my page
22  is sort of cut off at the top.
23      A   At the top?
24      Q   At the bottom of the first page where it says
25  Friday, May 13th, 2001, when I picked up --

Page 135

1       A   My check.
2       Q   Okay, so it goes onto the next pay page, "my
3   check."  What is this down here, this squiggle?  Is this
4   your signature?
5       A   If I had to do it all again, I will report it
6   again.
7       Q   No, on the first page, what's below when I
8   picked up, is that a squiggle or?
9       A   I don't know what that is.  I'll have to look
10  on the original.
11      Q   Do you have the original in your possession?
12      A   No.
13      Q   But you have it available to you?
14      A   Yes.
15      Q   Okay.  And then the top says "my check, I
16  called," do you know what it says there?
17      A   I called on a certain day, I forgot what that
18  day was, to pick up my check, and it was not given to
19  me.  But in the past I was always given my checks so I
20  would not have to come in early on Friday to pick it up,
21  because I'm due to report to work from 10:00 to 7:00.
22  Yeah, I remember this.  So it's my check, I called on.
23  And I have the original and it tells the date.
24      Q   Now, why did you send this letter on the 17th
25  of May to HR?

Page 136

1       A   Because I wanted to have something in writing
2   to personnel.  The letters were similar.
3       Q   Yeah, they seem to be very similar.  You sent
4   something on the 13th of May.  Again, we're talking
5   about you said you faxed that one.  But the letter of
6   May 13th is similar to this letter.
7       A   I think in my head I wanted to make sure that
8   they got it if they didn't get it via mail.  I wanted to
9   make sure I was covering myself to make sure that they
10  got it.  That's the only thing I can remember in my head
11  right now.
12      Q   Is it safe to say that what you have in your
13  letter of May 17th is similar to what you put in your
14  letter on May 13th?
15      A   Yes.
16      Q   And do you have an explanation as to why you
17  have two similar letters that are addressed four days
18  apart?
19      A   I think I may have remembered some things that
20  I didn't say in the first letter that I wanted to convey
21  in the second letter.  Things that I had remembered, and
22  I didn't want to forget, so I jotted them down and just
23  sent another letter.  And some things were left out
24  that's more extensive on here, on this letter, than --
25  that's what I can -- in my own head that's what I'm

Page 137

1   thinking that I did.
2           Because I kept getting questioned, and I didn't
3   understand why I kept getting questioned by so many
4   different people.  I thought maybe they were trying to
5   perplex my thinking ability or something, and I just
6   wanted to make sure that everything was covered, you
7   know.  That's the only thing I can think of in my head
8   right now.
9       Q   And did Thearla Kozy ever respond to your
10  letters in some form or fashion in writing?
11      A   No.
12      Q   Did you have a discussion with her on the phone
13  concerning your letters?
14      A   I spoke with her on the phone.  I believe I
15  did.  I don't know what date and all that.  But I
16  believe I asked her did she receive the letters.  And I
17  believe, to the best of my knowledge, she said yes.  And
18  that's what she said, just wait and hold on, don't make
19  no moves or whatever, this is done in a way so she could
20  get caught in what she was doing, and just to go along
21  with the flow.
22      Q   At the time were you satisfied with Ms. Kozy's
23  response?
24      A   At first I was.  At first.  But then I got to
25  thinking that she works with the company, and I started

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                                    Pages 138..141

Page 138

1  thinking all kind of different ways then.  So I said I
2  better just not even believe her either.
3      Q   Do you know what Ms. Kozy's race is?
4      A   No, I don't know what her race is.  I never
5  seen her.
6      Q   When you sent these letters to her and you had
7  your phone call conversations with her, did you at the
8  time, I know what you think now, but at the time did you
9  feel satisfied with her responsiveness and the things
10 that she told you on the phone?
11     A   The very first time I spoke to her, I did.
12     Q   Was there a point in time that you complained
13 to her about any perception you had about her follow
14 through or lack thereof?
15     A   No.
16     Q   Now let me ask you a question which I hope we
17 can dispense with very quickly.  And so this question is
18 — I'm going to ask you kind of follow me carefully,
19 just so that we can dispense with it if we need to
20 quickly and not have to delve into it too deeply.
21         Now you filed, and I believe you agreed
22 earlier, a complaint with OSHA, correct?
23     A   Yes.
24     Q   And you filed your complaint with OSHA after
25 your termination from Bright Horizons.  Is that right?

Page 139

1      A   Yes.
2      Q   In fact, specifically, you were terminated from
3  Bright Horizons on June 17th, 2001?
4      A   2011.
5      Q   Excuse me, 2011.
6      A   Correct.
7      Q   And you filed your complaint with OSHA on June
8  20th, 2011, three days after you were let go.  Is that
9  right?
10     A   Yes.
11     Q   Does that make sense?
12     A   Makes sense.
13     Q   So logically, it wouldn't be reasonable or
14 correct to say that you were fired from your job at
15 Bright Horizons on June 17th for a complaint you filed
16 with OSHA three days later.  Is that right?
17     A   I don't follow, I'm sorry.  Because I only did
18 that because Ms. Vanessa gave me — somebody had gave me
19 the name for that man to call to cover myself.  I don't
20 know really even know anything about OSHA that much,
21 what it does and what they do.  I was just given
22 information about OSHA.
23     Q   All right.  Well, Let me ask it differently.
24 You're not complaining in this case that you were fired
25 from Bright Horizons because you complained to OSHA?

Page 140

1      A   No.
2      Q   Okay.  So that's not part of your theory?
3      A   No.
4      Q   Okay.  So why is it that you feel you were
5  fired from Bright Horizons?
6      A   I feel that I was fired because I didn't open
7  up all the way with Ms. Linda.  I told her some things.
8  And that the company got upset because I wouldn't answer
9  all their questions after I talked with DCF.  And that
10 the child abuse allegation that I witnessed, they wanted
11 me to like maybe cover it up or something.
12     Q   Now you're speculating when you say that,
13 right?
14     A   Yes.
15     Q   Because you can't get into the mind of Linda
16 Horner or any of the people —
17     A   Her reactions, though, is what I'm going on.
18     Q   Okay, well we'll talk about that in a second.
19 But you can't get into the mind of Linda Horner, right?
20     A   No.
21     Q   You can't get into the mind of Brenda Hayes or
22 Carol Stegall or Susan Saunders or any other person who
23 was a member of the management team?
24     A   No.
25     Q   So it's fair to say that you really don't know

Page 141

1  what was in their mind when they made the decision to
2  terminate your employment.  Is that right?
3      A   No, I just assumed from their reactions and
4  from the way they asked me questions, and looking at
5  them.
6      Q   Right.  And I'll ask about their reactions.
7  I'm curious as to what you observed.  But I'm speaking
8  now from a point of logic.  That is, you can't get into
9  the mind of someone else as they make decisions about
10 other things?
11     A   No.
12     Q   So you don't know what it was that the
13 management team at Bright Horizons was thinking about
14 when they made a decision to terminate you?
15     A   No.
16     Q   In fact, it's reasonably possible that the
17 reason they terminated you, whether you disagree or
18 agree, that they did so because of what they believed to
19 be a record of policy violations, right?
20     A   No.
21     Q   That's not possible in the world of
22 possibilities?
23     A   It's possible, but not — well, it's possible.
24 But I'm not —
25     Q   Yeah, I'm not asking whether you believe it.


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                           Pages 142..145

Page 142

```
1    A   Okay.  Possible, yes.
2    Q   I'm simply saying it's possible that in the
3  minds of the Bright Horizons management team, that they
4  let you go because of what they believed to be ongoing
5  violations of policy, correct?
6    A   Yes, correct.
7    Q   And it's possible they made the decision about
8  your employment independent of any complaint that you
9  made concerning Kristin Turner?
10   A   I just don't think so.
11   Q   In the world of possibility, again, not whether
12 you agree or disagree.
13   A   In the world of possibilities, that's kind of
14 touch and go.  If you put it that way, I guess yes.  But
15 I don't --
16   Q   Okay.  Now what is it about the reactions of
17 Linda Horner that caused suspicion in your mind?
18   A   The way that she was asking me the questions,
19 and she didn't have anything in writing, in concrete of
20 what happened.  She didn't document things.  She was
21 trying to see what I knew.  Because she said she had to
22 make a report up since she didn't document anything
23 previously; she had to have something that she had, as
24 she said, get to the personnel file, she said
25 expeditiously, because she didn't have anything that was
```

Page 143

```
1  already on paper and needed to know what I told them.
2  And as an employee, that I deserved to tell her because
3  she was my supervisor, and she believed this it was in,
4  you know, my best interest that I tell her, so to speak.
5        It kind of like was a threat to me in a way.
6  I'm serious about that.  The way that she conveyed it to
7  me, you know, it was almost like, you want your job, you
8  better do what I -- you know, you better respond.
9  That's just how I felt, though.  That's how I felt.
10   Q   Right.  You don't know what she was thinking?
11   A   No.  No, I don't know what she was thinking.
12 It's just from her reactions.  And she was like nervous.
13 And she was saying she got to write up some kind of
14 report.  She got to get it to them in a certain time,
15 you know, so she can cover herself.  She said these
16 words to me.
17   Q   Right.  Now, actually, if that's true, if I
18 follow the logic of what you're saying -- and I think
19 what you're suggesting is that she was trying to prepare
20 a report after the fact when these events happened.  Is
21 that right?
22   A   Yes.
23   Q   So point in fact, the information you had was
24 helpful to her in recreating, if you will, what it was
25 in terms of the information she needed to put in the
```

Page 144

```
1  report, correct?
2    A   Yes.
3    Q   So the information you were giving her was not
4  detrimental, but rather it was helpful to her in order
5  for her to create the report she needed for?
6    A   Yes.
7    Q   So you were providing her a benefit by telling
8  her this information?
9    A   By telling her what DCF said, yes.  Most
10 likely, yes.  Yes, absolutely.
11   Q   Well, how have you been damaged?
12   A   I feel that I've been damaged, wrongfully
13 termination.  I don't feel like I should have been
14 terminated.
15   Q   Okay, well I understand that.
16   A   I feel that way.  And I think that, you know,
17 no job, looking for work, you know, embarrassment, why
18 did you get fired, and teachers calling me and, you
19 know, saying different things, and then teachers turning
20 on me, not speaking after everything went down, it just
21 was humiliating, and I was embarrassed.  And I was hurt
22 inside, I really was.  I mean, I just felt terrible.
23        It just was a feeling that's indescribable
24 really because I loved my job, especially as a
25 receptionist, meeting and greeting people, you know, and
```

Page 145

```
1  talking to the parents.  I mean that's just something
2  that it's just an inward gift that I think I've been
3  given.  And I liked it.
4        And it just really hurt me that, you know, they
5  didn't apologize to me.  They didn't -- you know, they
6  didn't -- it's almost like, as if I didn't see what I
7  saw.  And that's what was humiliating, because I know
8  unequivocally what I saw Ms. Turner do.  I don't care
9  what comes out of this or whatever, nobody can take away
10 what I saw.  I know I saw what I saw.
11   Q   If they apologized to you, would that satisfy
12 you?
13   A   No, not now.  Had they done that earlier,
14 perhaps so.  But no, not now.
15   Q   What would satisfy you now?
16   A   Some compensation for what I've been through as
17 far as mentally.  That's how I feel.  I don't know how
18 much or anything, you know, I can't really put a price
19 on it.  Because, you know, the hardships that I have
20 incurred, it's like, you know, borrowing, you know, and
21 not being able to do certain things.  And it's just a
22 bad feeling inside.  It just was something that I wasn't
23 expecting.
24        And, you know, I mean, no benefits now.  No
25 medical.  I have to go to these doctors.  And, you know,
```



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 34   Filed 06/28/13   Page 39 of 40 PageID 659

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                            Pages 146..149

**Page 146**

1  I don't have no insurance. And, you know, my insurance
2  was cut off the same day. The people that did the
3  surgery, you know, they got paid, but then they had to
4  pay the money back because Dr. Fisherman said he didn't
5  get paid from them terminating it on the same day. Then
6  they kept taking money out of my check after they did
7  it. After they terminated me, they kept taking money
8  out of my medical, you know, and no benefits. And I had
9  to go into that 401(k) or whatever it was I had. I had
10 to get that money out, and —
11      Q   How much was in your 401(k)?
12      A   I think it was a thousand something or 2,000
13 something. I forgot the exactly the amount, but I got
14 it at home.
15      Q   And you'll agree, in terms of pay, in terms of
16 your back pay, that's just a calculation in terms of
17 what you would have earned had you not been fired at the
18 time?
19      A   Yes. Back pay and my insurance, and I would
20 have still had my 401(k) going, and I would still have
21 medical. I probably would have been promoted. I do
22 believe that, because I would take some more classes.
23 Because I was taking ongoing classes while I was there,
24 to enhance myself. And I just feel from my heart that
25 that was —

**Page 147**

1      Q   And how much is the emotional damages you say
2  you suffered worth? What is that value to you?
3      A   I really don't know. I can't put no price on
4  that. I really don't know.
5      Q   Well if you can't, who will?
6      A   If they make me an offer or something, I guess
7  I could see. But I don't know, I've never done this
8  before. I've never been this way before. I've never,
9  you know, had no suit or anything like that. I've never
10 done this before.
11      Q   I was going to ask you a question, whether you
12 in fact had ever filed a lawsuit against anybody.
13      A   No. Except for one time I got hurt with
14 workers' comp?
15      Q   Okay. When was that?
16      A   That was at Bright Horizons when I went into
17 the hospital for the surgery. But other than that, I've
18 never had no cases with no attorneys.
19      Q   Did you get any monetary settlement as a result
20 of the workers' comp?
21      A   Yes. I got —
22      MR. OWENS: Before you answer, I guess same
23 thing as I stated yesterday. I mean, to the
24 extent — I don't know if you had a settlement
25 and you signed a confidentiality agreement. I

**Page 148**

1  don't want you to breach the confidentiality in
2  your deposition.
3      THE WITNESS: Oh, yeah.
4      MR. OWENS: So if you did, don't tell him
5  and we can address the issue later.
6      THE WITNESS: Okay. I did sign one. Yeah,
7  I'm sorry.
8  BY MR. BURRUEZO:
9      Q   Aside from the workers' comp suit, any other
10 litigation or lawsuits you filed against anybody?
11      A   No.
12      Q   Anybody ever sued you?
13      A   No.
14      Q   Have you ever been convicted of a crime?
15      A   No.
16      Q   Have you ever been arrested?
17      A   No.
18      Q   Ever claimed discrimination in the context of
19 employment?
20      A   Never.
21      Q   Ever filed a claim with the EEOC?
22      A   Never.
23      Q   You know what the EEOC is?
24      A   Equal Employment Opportunity.
25      Q   Right.

**Page 149**

1      MR. BURRUEZO: All right, let me look at my
2  notes.
3      MR. OWENS: You want to take a short break
4  while you look at your notes?
5      MR. BURRUEZO: No, I can look at them real
6  quick. I have no further questions.
7      MR. OWENS: No questions here. She'll read.
8  You're all done.
9      MR. BURRUEZO: Thank you so much for your
10 time, it was a pleasure to meet you.
11      THE WITNESS: Same here.
12      MR. BURRUEZO: And I'll order.
13          (Deposition concluded at 2:35 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25



**DISCOVERY LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN & VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS DEPOSITION OF
JANICE NORMAN on 05/10/2013                                            Pages 150..151

Page 150

```
1              CERTIFICATE OF OATH
2
3    STATE OF FLORIDA    )
4                        )
5    COUNTY OF POLK )
6
7         I, Fransesca St. John, Court Reporter and
8    Notary Public in and for the State of Florida at Large,
9    say that I have read the foregoing deposition of
10   JANICE NORMAN; and hereby declare under penalty of
11   perjury that the foregoing is true and accurate.
12
13
14        Executed this 16th day of May, 2013.
15
16
17              Fransesca St. John, Court Reporter
18              Notary Public, State of Florida
19
20
21
22
23
24
25
```

Page 151

```
1              CERTIFICATE OF REPORTER
2         I, Fransesca St. John, Certified Shorthand Reporter,
3    certify;
4         That the witness, JANICE NORMAN, was by me
5    duly sworn to testify the truth and nothing but the
6    truth.
7         That the foregoing proceeding was taken before me
8    at the time and place therein set forth;
9         That the testimony of the witness, the questions
10   propounded, and all objections and statements made at
11   the time of the examination were recorded
12   stenographically by me and were thereafter transcribed;
13        That the foregoing is a true and correct transcript
14   of my shorthand notes so taken.
15        I further certify that I am not a relative or
16   employee of any attorney of the parties, nor financially
17   interested in the action.
18        I declare under penalty of perjury under the laws of
19   Florida that the foregoing is true and correct.
20
21        Dated this 16th day of May, 2013.
22
23
24              Fransesca St. John, Court Reporter
                Notary Public, State of Florida
25              Fransesca St. John, Court Reporter
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com