# In the Matter Of:

## NORMAN vs. BRIGHT HORIZONS

8:12-cv-01301-EAK-TBM

# JENNIFER WHITLEY

*May 23, 2013*



ESQUIRE SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com

Case 8:12-cv-01301-TBM   Document 35   Filed 06/28/13   Page 3 of 18 PageID 663

JENNIFER WHITLEY
NORMAN vs. BRIGHT HORIZONS
May 23, 2013
1-4

## Page 1

```
 1      UNITED STATES DISTRICT COURT
         MIDDLE DISTRICT OF FLORIDA
 2            TAMPA DIVISION

 3   JANICE NORMAN and
     VANESSA SMITH,
 4
          Plaintiffs,
 5
     vs.          CASE NO.: 8:12-cv-01301-EAK-TBM
 6
     BRIGHT HORIZONS FAMILY
 7   SOLUTIONS, LLC, d/b/a BRIGHT
     HORIZONS CHILDREN'S CENTERS,
 8
          Defendant.
 9
                                        /
10
11          Florin Roebig, P.A.
            2101 West Platt Street
12          Tampa, Florida 33606
            Thursday, May 23, 2013
13          3:37 p.m. - 5:12 p.m.

14       DEPOSITION OF JENNIFER WHITLEY

15   Taken on behalf of the Plaintiffs
16   before Julie R. Palitto, RPR, Notary Public in
17   and for the State of Florida at Large, pursuant to
18   Plaintiffs' Notice of Taking Deposition in the above
19   cause.
20
21
22
23
24
25
```

## Page 2

```
 1   APPEARANCES:

 2   Counsel for Plaintiffs:

 3       GREGORY A. OWENS, ESQUIRE
         Florin Roebig, P.A.
 4       777 Alderman Road
         Palm Harbor, Florida 34683
 5       (727) 786-5000
         Greg@florinroebig.com
 6
     Counsel for Defendant:
 7
         CARLOS J. BURRUEZO, ESQUIRE
 8       Littler, Mendelson, P.C.
         111 North Magnolia Avenue, Suite 1250
 9       Orlando, Florida 32801-2366
         (407) 393-2935
10       Cburruezo@littler.com
```

## Page 3

```
 1                    I N D E X
 2   JENNIFER WHITLEY              PAGE NO.
 3   Direct (Owens)                    4
 4   Stipulations                     55
 5   Certificate                      56
 6   Errata Sheet                     58
 7
 8              E X H I B I T S
     PLAINTIFFS' EXHIBITS            PAGE NO.
 9   No. 1 Bright Horizons Family Solutions    27
           Employee Conference Memo for Vanessa Smith
10         (Reprimand)
11   No. 2 June 17, 2011 Action Plan to Vanessa Smith  35
12   No. 3 June 17, 2011 To Whom It May Concern Letter 41
13   No. 4 June 20, 2011 Bright Horizons Family    43
           Solutions Memorandum Administrative Leave
14         to Vanessa Smith
15   No. 5 Bright Horizons Family Solutions    47
           Employee Conference Memo for Vanessa Smith
16         (Termination)
```

## Page 4

```
 1              P R O C E E D I N G S
 2   THEREUPON:
 3              JENNIFER WHITLEY,
 4   was called as a witness and, having been first duly sworn
 5   and responding, "Yes, I do" was examined and testified as
 6   follows:
 7              DIRECT EXAMINATION
 8   BY MR. OWENS:
 9       Q   Could you please state and spell your name for
10   the record?
11       A   Jennifer Whitley, W-H-I-T-L-E-Y.
12       Q   And, Ms. Whitley, is it true that at one point
13   in time you went by the name of Jennifer Todd?
14       A   Yes.
15       Q   When did your name change officially to Whitley?
16       A   July 2011.
17       Q   Well, we've met more than once.  Again, my name
18   is Greg Owens, and I represent Ms. Norman and Ms. Smith
19   in their claims against Bright Horizons.  I'm going to
20   spare you all the introductory stuff because you were and
21   have been the corporate representative for
22   Bright Horizons throughout the day today, correct?
23       A   Yes.
24       Q   Okay.  And in your role as corporate
25   representative, have you had the opportunity generally to
```



Page 5

1  hear the testimony of the employees of the company as the
2  day has drawn on?
3  A  Yes.
4  Q  And I'm not going to quiz you on everything that
5  they've said, but generally speaking, the testimony that
6  you've heard about progressive discipline and the
7  termination process, for the most part, is that fairly
8  accurate in terms of the policies and practices of
9  Bright Horizons? And if it's not, if there's anything
10  that you felt was inaccurate, let me know.
11  A  I would say it's accurate.
12  Q  Okay. And similarly, in terms of the company's
13  policy related to child abuse and neglect, would you say
14  that the testimony that you've heard today from your
15  co-workers and fellow employees at Bright Horizons has
16  been pretty accurate in terms of the company's policy?
17  A  I would say it's pretty accurate.
18  Q  All right. Let's talk a little bit about the
19  allegations that were levied against Ms. Turner. When
20  did you first find out that there had been allegations
21  that Ms. Turner had engaged in abusive behavior toward
22  children?
23  A  The midday of the day that Child Protective
24  Services and the Sheriff's Department appeared at the
25  Citi Family Center.

Page 6

1  Q  All right. And how did it come to be that you
2  found out when CPI showed up?
3  A  Director Linda Horner telephoned me at some
4  point during that day to tell me that they were there
5  questioning individuals.
6  Q  Okay. Did Ms. Horner at that point in time tell
7  you whether there had been any previous internal
8  complaints about alleged abuse by Ms. Turner?
9  A  I had not been informed of any complaints of
10  abuse against Ms. Turner.
11  Q  Okay. At that time or at any time?
12  A  No internal complaints were brought to my
13  attention.
14  Q  Okay. And we'll get back to that because I just
15  realized that I hadn't asked you what your current job
16  title is with Bright Horizons.
17  A  I'm the regional manager.
18  Q  How long have you been regional manager?
19  A  I've been a regional manager since May of 2007.
20  Q  Prior to that, did you hold any other positions
21  with Bright Horizons?
22  A  Yes. I was a center director with
23  Bright Horizons since March of 2002.
24  Q  Okay. As regional manager, is there a
25  particular center or location that you have an office

Page 7

1  that you work out of?
2  A  I have a home office.
3  Q  Okay. And when we talk about a region,
4  obviously that has some sort of meaning. What is the
5  region that you're responsible for currently?
6  A  I work with five centers in the Tampa,
7  St. Petersburg area.
8  Q  And in the approximately six years that you've
9  been the regional manager, have those centers changed in
10  any way, or has it been pretty much the same centers?
11  A  No. I've worked with the same five centers the
12  entire time.
13  Q  And is one of those centers the Citibank
14  location at Queen Palm?
15  A  It is.
16  Q  And is another location USF Moffitt?
17  A  There's actually two locations; there's the
18  Moffitt Cancer Center and the USF Family Center.
19  Q  Okay.
20  A  They're two separate centers.
21  Q  Are those both under or within your region?
22  A  Yes, they are.
23  Q  All right. Do you have a direct supervisor?
24  A  Yes, I do.
25  Q  Who is your direct supervisor?

Page 8

1  A  Mark Mendel.
2  Q  What is Mr. Mendel's title?
3  A  Division vice president.
4  Q  Has Mr. Mendel been your supervisor for the
5  entire time you've been regional manager?
6  A  Yes, he has.
7  Q  Where is Mr. Mendel's, if he has one, primary
8  office located?
9  A  Deerfield Beach, Florida.
10  Q  All right. Back to what we were originally
11  talking about, the child abuse allegations. You said
12  that the first time you found out about it is after some
13  representatives from the state and local government
14  showed up, correct?
15  A  Yes.
16  Q  Okay. And Ms. Horner told you that they were
17  there. Did she tell you the nature of the allegations?
18  A  No. She said who the allegations were lodged
19  against, but that was it.
20  Q  Okay. Did Ms. Horner at that time tell you who
21  had made the complaints to the government?
22  A  No.
23  Q  Did you give Ms. Horner any direction as to how
24  you thought she as a supervisor at that location should
25  handle the investigation by Child Protective Services?



Case 8:12-cv-01301-TBM   Document 35   Filed 06/28/13   Page 5 of 18 PageID 665

JENNIFER WHITLEY
NORMAN vs. BRIGHT HORIZONS
May 23, 2013
9–12

Page 9

1  A  Yes.
2  Q  Okay. Go ahead.
3  A  I told her to comply fully with any of their
4  requests and to provide them with a place to conduct
5  their interviews. Most of that, she was already doing
6  because they had been there for a while. And just to
7  keep me apprised of the situation.
8  Q  After Child Protective Services concluded their
9  investigation, was there any sort of discipline levied
10 toward Ms. Horner for anything that she did or did not do
11 during the investigation?
12 A  No.
13 Q  Okay. Were you interviewed by anybody from
14 Child Protective Services or the government of any sort?
15 A  No.
16 Q  During the time that you've been regional
17 manager, was there ever a circumstance or a time where
18 you had witnessed Ms. Turner treating kids in an
19 inappropriate fashion?
20 A  No.
21 Q  Other than Ms. Horner, were there any other
22 Bright Horizons employees who reached out to you as the
23 regional manager during the time that the government was
24 conducting their investigation?
25 A  I had contact with many Bright Horizons

Page 10

1  employees in the course -- during the time line of the
2  investigation.
3  Q  Okay. Was it because you were contacting them
4  or were they contacting you?
5  A  I would say most of the contacts I initiated.
6  Q  Okay. And why were you initiating contact with
7  the employees at the Citibank location?
8  A  It would have been with -- not necessarily
9  people at Citibank; it would have been with
10 Carol Stegall, for example, to inform her of the
11 situation; Therla Kozy, to inform her. I'm trying to
12 think. Mark Mendel. It was more me communicating about
13 it to the -- following the chain of command.
14 Q  And that's fair. That was a bad question.
15    Was there any employees at the Queen Palm
16 location that you talked to during the government's
17 investigation into the child abuse allegations?
18 A  Yes, but not necessarily with regard to that.
19 By being at the center, I would speak with all of the
20 employees or many of the employees.
21 Q  Okay. Did you personally interview any
22 employees at the Queen Palm location to find out what, if
23 anything, they had observed in their interactions with
24 Ms. Turner?
25 A  No.

Page 11

1  Q  Did you direct anybody to have such interviews?
2  A  I did direct both Linda Horner, and at a later
3  date, Brenda Hayes to interview employees.
4  Q  And did Ms. Horner and Ms. Hayes conduct those
5  interviews per your request?
6  A  Yes.
7  Q  Did you ask that Ms. Horner and Ms. Hayes either
8  get written statements or take their own notes of their
9  interviews with these employees?
10 A  I did.
11 Q  Did they do that?
12 A  To the best of my knowledge.
13 Q  Did Ms. Horner and Ms. Hayes subsequently submit
14 those investigation notes or statements to you?
15 A  I don't have copies of them, but I know that I
16 have read all of them.
17 Q  Okay. If you don't have copies of them, do you
18 know where they might be?
19 A  I would say they're at the center.
20 Q  Okay. And I think your testimony was that you
21 read them, correct?
22 A  I have read them.
23 Q  Okay. When you read them -- and I know it was
24 some time ago. In reading them, was there anything
25 contained in those either witness statements or

Page 12

1  investigation notes that gave you some pause or concern
2  about what people had observed with Ms. Turner?
3  A  There was very little in Linda Horner's notes
4  that related to the case. I recall reading Kristin's
5  statement. I can't say that I recall reading anyone's
6  statement in Linda's notes that gave me pause.
7  Q  Okay. How about with regard to Ms. Hayes' notes
8  or witness statements; any in there that gave you concern
9  or pause?
10 A  Yes. We did discuss any of the statements that
11 were the -- any interactions were not where we felt that
12 the teacher needed support, but not any that read as if
13 it were abuse or neglect.
14 Q  Okay. Did you have any concern with the manner
15 in which Ms. Horner conducted these investigations or the
16 notes that she took in connection with the investigation?
17 A  I didn't have any concerns with the accuracy of
18 what she reported to me. No.
19 Q  When did you first learn of the individual
20 responsible for making these allegations to
21 Child Protective Services, DCF, police, whomever?
22 A  It would be difficult to give an exact date, but
23 I believe it was when Vanessa made a request to transfer
24 to another center. I believe she said in that request
25 that -- since she had levied a complaint. If it wasn't



Case 8:12-cv-01301-TBM   Document 35   Filed 06/28/13   Page 6 of 18 PageID 666

JENNIFER WHITLEY                                                May 23, 2013
NORMAN vs. BRIGHT HORIZONS                                          13–16

Page 13

1  then, then she made the statement to Linda Horner, and
2  Linda told me that Vanessa had made that statement.
3    Q   Okay. Did you come to learn whether there were
4  any other employees at the Queen Palm location who had
5  made complaints about Ms. Turner to the government other
6  than Ms. Smith?
7    A   No. I didn't know the outcome of any of the
8  other interviews that the government had with anyone that
9  day. They were private.
10   Q   Okay. And is it your understanding that
11 ultimately the allegations were unfounded with regard to
12 Ms. Turner?
13   A   I believe the statement that came from the
14 Child Protective Service and from licensing were that it
15 was unfounded.
16   Q   Okay. And when it was unfounded, did
17 Child Protective Services and licensing similarly share
18 the summaries that they had done in connection with their
19 investigation?
20   A   Licensing provided -- I believe licensing
21 provided the center with a statement because that would
22 have been made against the center. So the center was
23 entitled to that. With the Child Protective Services,
24 that was made against a person, and so ultimately Kristin
25 had to provide the statement that she received from

Page 14

1  Child Protective Services as that proof --
2    Q   Okay.
3    A   -- that it was unfounded.
4    Q   And did she, in fact, do that?
5    A   Yes.
6    Q   Okay. And so is it fair to say that you were
7  aware of the individuals at the center who were involved
8  in the investigation by licensing and/or Child Protective
9  Services?
10   A   I knew of all the people that were -- that they
11 requested that they interview.
12   Q   All right. And is that kind of how it works,
13 the folks from the government request that they want to
14 interview particular employees with regard to this
15 allegation?
16   A   Yes. And it could take place on-site or they
17 may ask for telephone numbers of certain individuals or
18 contact information.
19   Q   And obviously I don't work in your field. So is
20 that fairly typical that the government would make that
21 request of the organization, or was that unique to this
22 particular case in your experience?
23   A   In my experience, that's typical.
24   Q   Okay. And to your knowledge, as regional
25 manager, would you have the ability to say to the

Page 15

1  government, no, I'm not going to allow my employees to be
2  available for these interviews?
3    A   No. That's not part of our policy.
4    Q   Okay. So is it fair to say it's more of a
5  logistics-type thing just getting everything organized
6  and coordinated in order to be able to interview the
7  employees at the facility?
8    A   Yes.
9    Q   And you had testified earlier that you believed
10 that Vanessa Smith told, you believe, that her managers
11 at the location that she was the one that made the
12 complaint to the governmental entities, correct?
13   A   I believe that she told Linda Horner, because
14 Linda would have been the person doing the first round of
15 interviews that I had requested. And so it could have
16 been at that time, or as I say, it could have been in the
17 request to transfer. But Vanessa would have already been
18 out of the center by the time Brenda conducted the second
19 round of interviews.
20   Q   Now, at any time, did any of the supervisors
21 under your supervision tell you that Ms. Norman had come
22 to them and made any additional complaints about
23 Ms. Turner?
24   A   The only conversation I'm aware of with regard
25 to Ms. Norman and Ms. Turner would have been when Lind

Page 16

1  interviewed her as part of the process.
2    Q   Okay. Other than that interview, you weren't
3  aware of any other complaints that Ms. Norman had made
4  about Ms. Turner, correct?
5    A   No. Correct.
6    Q   Okay. And you started to mention that
7  Ms. Smith was out of the center for a particular period
8  of time. And maybe I just misunderstood. Are you
9  talking after she transferred or before she transferred?
10   A   No. She transferred May 9th or something like
11 that, and Brenda's interviews were, I believe, a week or
12 so later if I have my dates correct.
13   Q   Okay.
14   A   Just from my memory.
15   Q   Okay. Sure. Now, I'm sure you heard Ms. Turner
16 testify that there was a period of time that she was
17 placed on administrative leave, correct?
18   A   Yes.
19   Q   And during that time, was Ms. Smith relieved of
20 her duties in the classroom, or was she continuing on
21 doing the same duties during the period of time that
22 Ms. Turner was on administrative leave?
23   A   I do not believe she returned to that classroom.
24 I know that she did spend some time in training, and I'm
25 not sure if -- if other -- what other classrooms she may



Case 8:12-cv-01301-TBM   Document 35   Filed 06/28/13   Page 7 of 18 PageID 667

JENNIFER WHITLEY                                                May 23, 2013
NORMAN vs. BRIGHT HORIZONS                                         17–20

Page 17

1 have worked in. I believe it was a brief time that she
2 was at the center working between the day that
3 Child Protective Services arrived at the center and the
4 day that she transferred.
5    Q   Okay. Who was responsible for making the
6 decision to have Ms. Smith performing the duties that you
7 just described during that period of time?
8    A   The training?
9    Q   The training and any other periods of time where
10 she was out of the classroom before she transferred.
11 And to be specific, was it your decision as the regional
12 manager?
13    A   I'm sure I was consulted, but I don't recall
14 whose decision it was.
15    Q   Who is Marilyn Fuller?
16    A   Marilyn Fuller is the center director at the
17 Moffitt Child Development Center.
18    Q   And generally speaking, how long has Ms. Fuller
19 been the director at the Moffitt Center?
20    A   I would say approximately four years.
21    Q   Is she currently on some sort of leave of
22 absence?
23    A   She's on medical leave of absence.
24    Q   And I don't want to get into the details of her
25 personal medical issues certainly. But how long has she

Page 18

1 been out on leave as of today?
2    A   This is her second week of leave. She had
3 surgery approximately two weeks ago.
4    Q   Has Ms. Fuller given you any indication as to
5 when she intends to return to work?
6    A   When she's released from her doctor, but I think
7 it will be the end of this month.
8    Q   So soon?
9    A   Yes.
10    Q   Okay. There was some discussion earlier with
11 the previous witnesses about in the progressive
12 disciplinary, sometimes there would just be more of a
13 verbal counseling where you would just sit down with an
14 employee and talk to them about a concern that you would
15 have with a supervisor; do you remember that?
16    A   Yes.
17    Q   Is it the expectation of you as the regional
18 manager that when these managers have verbal counseling
19 with their employees, that they make some note that they
20 had that verbal counseling and the date that it took
21 place?
22    A   If they deem that it's a verbal counsel, no.
23 It's not required that they make note; most of them do.
24    Q   Okay. Would you say that it's the practice of
25 most of them to make such notes?

Page 19

1    A   I would say most of them practice that.
2    Q   Okay. And it sounds to me like there's no
3 necessarily written policy by Bright Horizons that they
4 make such notes; is that fair?
5    A   Not for verbal.
6    Q   Okay. In your opinion as regional manager and
7 somebody who's been doing this for a while, do you think
8 it's good practice to make such notes so that there's a
9 record of having the verbal consultations and counseling
10 with the employees?
11    A   Since it's not required, I can -- I wouldn't
12 really have an opinion.
13    Q   How about you personally; if there's ever a time
14 where you have a verbal counseling with one of your
15 subordinates, do you try your best to keep a record of
16 it?
17    A   It would depend on the seriousness of the event.
18    Q   With regard to Ms. Smith, did there come a time
19 during Ms. Smith's employment where you became aware of
20 some performance or behavior concerns related to her at
21 the Citi Group Center?
22    A   Yes.
23    Q   Okay. When did you first become aware as
24 regional manager of some concerns about Ms. Smith?
25    A   I would say it was approximately around the 1st

Page 20

1 of April.
2    Q   And who informed you of such concerns?
3    A   Linda Horner.
4    Q   What did Ms. Horner tell you?
5    A   She said there -- one of the new
6 employees -- it's routine for to us speak about new
7 employees and how they are doing with their training and
8 learning our policies and procedures. And she mentioned
9 there was a new employee that was struggling with the
10 policy on supervision. And I'm not certain that I
11 received any other details about it, but I said
12 that's -- that the -- her direct supervisor should be
13 working very closely with her and make sure that she
14 provided her the support she needed for her to be
15 successful.
16    Q   Did Ms. Horner mention Ms. Smith by name during
17 that conversation?
18    A   I don't recall.
19    Q   After that situation you just described, when
20 was the next time that you learned from anybody, either
21 at the City Group Center or Moffitt Center about concerns
22 related to Ms. Smith?
23    A   I was contacted when the parent reported that
24 a -- that children were not supervised in the bathroom.
25 And I asked -- I'm assuming it was Ms. Horner. I'm going



Case 8:12-cv-01301-TBM   Document 35   Filed 06/28/13   Page 8 of 18 PageID 668

JENNIFER WHITLEY                                                    May 23, 2013
NORMAN vs. BRIGHT HORIZONS                                              21–24

Page 21

1  to say it was. I assumed that was Linda that contacted
2  me and told me that. And I said that she should make
3  sure that the parent is spoken with and any of the
4  teachers involved in the incident, and to let me know
5  what the outcome of that was.
6      Q   Okay. Did she, in fact, inform you of the
7  outcome?
8      A   She did. And that the employee would -- I
9  believe it was prior to the employee having the employee
10 conference memo, and I agreed that that was appropriate.
11     Q   You agreed that it was appropriate discipline?
12     A   Yes.
13     Q   Did you at any time think that the discipline
14 should have been more harsh?
15     A   No. Because the children were within the
16 classroom, I felt that was appropriate.
17     Q   And in your role as regional manager, do you
18 have the authority and ability to override a
19 recommendation of discipline by one of your subordinates
20 if you think it should be more or less harsh?
21     A   I consult human resources if it's a situation
22 that is a reprimand or a term -- if I'm recommending a
23 reprimand or a termination or if the director, whoever
24 I'm supervising, is recommending a reprimand or a
25 termination, then HR is brought in. Occasionally they're

Page 22

1  also consulted for a counsel.
2      Q   Okay. And why is it your practice to consult
3  human resources in a situation where there's going to be
4  either a reprimand or a termination?
5      A   Because in the steps of progressive counseling,
6  it's further up the chain. And I want them to be aware
7  of any type of employee behaviors or interactions that
8  may need their attention or to provide me or any of the
9  other leaders with support or direction if they feel we
10 can do our job better in coaching them.
11     Q   All right. After the situation you just talked
12 about, when was the next time you can recall being
13 contacted by somebody related to concerns they had about
14 Ms. Smith?
15     A   I think it would be when she made the statement
16 that she was not comfortable at Citi because of
17 the -- that she had made the allegation; that she had
18 lodged the complaint.
19     Q   Okay. Did this complaint come before or after
20 she transferred to Moffitt?
21     A   Before.
22     Q   Okay. And did Ms. Smith come directly to you
23 and tell you that she felt uncomfortable?
24     A   No. She -- I believe she spoke to Linda Horner.
25     Q   Okay. And then Ms. Horner contacted you to let

Page 23

1  you know that she had learned that from Ms. Smith.
2      A   Yes.
3      Q   Did you set up any sort of phone conference or
4  in-person meeting with Ms. Smith to talk to her about her
5  concerns?
6      A   Initially I spoke with Ms. Horner, Mark Mendel,
7  Therla Kozy, and then we did have a telephone conference
8  call including Vanessa with all of us.
9      Q   The individuals you named plus Ms. Smith?
10     A   Yes.
11     Q   Okay. And during that phone conference, did
12 Ms. Smith elaborate on why she felt uncomfortable?
13     A   I don't recall specifics.
14     Q   Was it during that conversation where there was
15 a discussion about the possibility of a transfer?
16     A   Yes.
17     Q   Did somebody in the management group bring up
18 the idea of transfer, or was that something that
19 Ms. Smith had suggested.
20     A   Ms. Smith had requested the transfer prior to
21 that. So the call was to -- I did put it in writing that
22 I was signing off on her transfer. There's a process for
23 employees to transfer, and I'm a person that has to
24 approve it. So I had approved it in writing, but the
25 conversation was also to talk with her about that.

Page 24

1      Q   All right. So Ms. Smith transfers ultimately to
2  the Moffitt Center, correct?
3      A   Correct.
4      Q   And when was the next time that you heard from
5  either Ms. Smith or anybody else regarding issues
6  surrounding Ms. Smith, if at all?
7      A   I would say it was within two weeks of her
8  transfer. I had a request from the center -- I believe
9  it would have been Marilyn Fuller -- to contact
10 human resources because Ms. Smith was having difficulties
11 in her performance. And when she was coached by her
12 supervisor, she would bring up the fact that she had not
13 been treated fairly at Citi rather than working through
14 the coaching of her performance.
15     Q   And were you the person that contacted
16 human resources, or was that something that you had
17 Ms. Fuller do?
18     A   I believe I initiated the contact with Therla
19 Kozy.
20     Q   Was there a similar meeting like you had before
21 where you and Ms. Kozy and Ms. Smith talked to one
22 another about her concerns?
23     A   Yes, over the telephone.
24     Q   Okay. And did Ms. Smith give any particulars
25 about what she was concerned about at the Moffitt Center



Case 8:12-cv-01301-TBM   Document 35   Filed 06/28/13   Page 9 of 18 PageID 669

JENNIFER WHITLEY                                          May 23, 2013
NORMAN vs. BRIGHT HORIZONS                                       25–28

Page 25

1  in terms of treatment?
2     A   I don't recall any specifics. It seemed like
3  most of it was directed towards Citi because I do recall
4  Ms. Kozy telling her that now that she is no longer at
5  Citi, that we're leaving that chapter in the past and
6  that we wanted to focus on her success at Moffitt, both
7  in our interactions with her and her interactions with
8  the children and families.
9     Q   What was the ultimate outcome of that
10 conversation?
11    A   I believe the -- I know for certain that
12 Ms. Kozy told Vanessa that conversations about things
13 that had happened at the Citi Center and any ways that
14 she felt she was treated at the Citi Center were
15 inappropriate in the Moffitt workplace, and that we were
16 going to focus on her having the support that she needed
17 to do her job well at the Moffitt Center.
18    Q   Did Ms. Smith say that she understood and would
19 comply?
20    A   I don't recall if she specifically said that.
21 There was some type of indication that we were going to
22 move forward.
23    Q   Okay. And I think you said this was roughly two
24 weeks after she had transferred?
25    A   Yes.

Page 26

1     Q   Okay. All right. And then after that, when was
2  the next time you had -- the next time you were contacted
3  by anybody from the Moffitt Center with regards to
4  Ms. Smith?
5     A   I would say approximately a week to two weeks
6  after that there were some incidents that -- where
7  Vanessa's performance was unsatisfactory regarding
8  feeding an infant and a demand to be sent home
9  immediately, I believe.
10       Marilyn Fuller reached out to me to speak to me
11 about those concerns, and I reached out to Therla Kozy.
12 Therla suggested that we create a set of goals for
13 Vanessa to give her performance indicators to focus on.
14 And so we created a document with goals for her to be
15 successful.
16    Q   And similarly, was there some sort of in-person
17 or phone conference with Ms. Smith to go over this
18 information with her?
19    A   There was; however, there was one -- in the
20 course of completing the document, there was another
21 incident that occurred at the center with relation to
22 Vanessa's performance, Ms. Smith's performance. That
23 situation was brought to the attention of the management
24 there; I believe it was the education coordinator that
25 was first told of it; that a parent was concerned about

Page 27

1  Vanessa's handling of her child.
2     Q   And was the situation where Ms. Smith was
3  changing the child's diaper and the parent came and
4  removed the child from her possession, I guess?
5     A   Yes.
6     Q   Okay. And we'll get to that.
7        This suggested set of goals by Ms. Kozy, was it
8  put into writing and presented to Ms. Smith?
9     A   It was put into writing. We had the meeting
10 with Ms. Smith to discuss the goals, and I don't recall
11 if we ever made it to discussing the goals.
12    Q   And what do you mean by that?
13    A   We began the conversation about her performance,
14 and she became very agitated, and I'm not sure we got to
15 that point of the conversation before she left.
16    Q   And that document that outlines the goals, do
17 you have any idea currently where that document may be?
18    A   I would say Moffitt should have a -- should have
19 it. I have read it.
20       (Plaintiffs' Exhibit 1 was marked for
21       identification.)
22 BY MR. OWENS:
23    Q   All right. Ms. Whitley, I've handed you what's
24 been marked as Exhibit 1. Do you recognize this
25 document? (Tendering).

Page 28

1     A   (Receiving). I do.
2     Q   And what do you recognize this document to be?
3     A   An "Employee Conference Memo" for Vanessa Smith.
4     Q   Is this the standard document that's used when
5  employees are either counseled, reprimanded, or
6  terminated pursuant to the progressive disciplinary
7  policy?
8     A   It's the standard template.
9     Q   Okay. And is that your signature at the bottom
10 of the page on the line that says "witness signature"?
11    A   Yes, it is.
12    Q   Okay. Now, in the body of this conference memo,
13 there's some information typed in here. Were you the
14 person responsible for typing in this information?
15    A   I did not type the information.
16    Q   Did you have the opportunity to review this
17 employee conference memo before it was provided to
18 Ms. Smith?
19    A   Yes.
20    Q   Is it your understanding that Ms. Fuller was the
21 person responsible for entering the information into this
22 conference memo?
23    A   That is my understanding.
24    Q   How was it that you first became aware of
25 Exhibit 1? For example, did Ms. Fuller e-mail it to you,



Case 8:12-cv-01301-TBM   Document 35   Filed 06/28/13   Page 10 of 18 PageID 670

JENNIFER WHITLEY                                                May 23, 2013
NORMAN vs. BRIGHT HORIZONS                                           29-32

Page 29

1  or did the two of you meet in person about it?
2    A   I believe I was on-site and read it.
3    Q   Did you have any questions for Ms. Fuller upon
4  reading the information in Exhibit 1?
5    A   I don't recall that I did, but I know that
6  because it's a reprimand, I would have asked her to have
7  Therla Kozy review it.
8    Q   Okay. And for example, you see in this document
9  under the "specific circumstances," it says on May 23rd a
10 child was mistakenly fed a jar of carrots?
11   A   Yes.
12   Q   Okay. Did you ask Ms. Fuller if she had any
13 sort of proof or evidence that that took place?
14   A   I can only tell you what the standard procedure
15 is.
16   Q   And what is that?
17   A   That before preparing this, she would have
18 interviewed all the people involved in the situation.
19   Q   Okay. And same on the June 8th, 2011, "failed
20 to give a child food," did Ms. Fuller provide you with
21 any sort of documentation or evidence to show that that,
22 in fact, happened?
23   A   Again, practice dictates that she would have,
24 but I don't recall.
25   Q   Okay. And then if you would go toward the

Page 30

1  middle of the page where it says, "Has this employee been
2  counseled for a similar incident," and it says, "Yes"; do
3  you see that?
4    A   Yes.
5    Q   And it lists four different dates for a verbal
6  warning -- well, it doesn't say anything; it just says
7  "verbal." Do you see that?
8    A   Yes.
9    Q   All right. Did Ms. Fuller provide you with any
10 sort of proof that there were, in fact, verbals on any of
11 those dates?
12   A   I don't recall.
13   Q   Okay. Do you recall asking Ms. Fuller if she
14 had any sort of documentation or facts to back up what
15 she was putting here under the employee counseling for
16 similar incidents in the past?
17   A   I don't recall asking her that, but I do know
18 that Therla Kozy would have asked for that as part of our
19 practice.
20   Q   Okay. Was Ms. Kozy involved in this -- in the
21 process related to this employee conference memo marked
22 as Exhibit 1?
23   A   Yes, she was.
24   Q   How so?
25   A   Before we issue a reprimand or a termination, we

Page 31

1  involve Therla Kozy to review all of the evidence, all of
2  the supporting documents, and to provide us with her
3  expertise as to if the outcome, the corrective action,
4  all of the different pieces are appropriate in place.
5    Q   Okay. And you felt comfortable that that
6  process had worked itself through before providing
7  Ms. Smith with this employee conference memo?
8    A   Yes. We had a telephone conference call with
9  Therla Kozy.
10   Q   And speaking of which, how was it that Ms. Smith
11 was ultimately provided with this employee conference
12 memo?
13   A   In a meeting in the director's office at the
14 Moffitt Center with myself and Marilyn Fuller present,
15 and Therla was on the telephone.
16   Q   Do you see where it says above "employee
17 signature," "employee refused to sign"?
18   A   Yes.
19   Q   Do you know whose handwriting that is?
20   A   That is my handwriting.
21   Q   Okay. And why did you write that as opposed to
22 having Ms. Smith write it?
23   A   Because she wouldn't touch it.
24   Q   And do you see in her employee comments,
25 "Employee will provide written statement"; is that also

Page 32

1  your handwriting?
2    A   Yes, it is.
3    Q   Did Ms. Smith, in fact, provide a written
4  statement?
5    A   Not on that day.
6    Q   Okay. Did she at some point in time?
7    A   I don't recall.
8    Q   All right. And you had started to talk about a
9  complaint by a parent related to how much diaper cream
10 was being applied to a child and how Ms. Smith was
11 handling the child roughly; do you remember that?
12   A   Yes.
13   Q   Okay. How did you first come to learn of that
14 parent complaint?
15   A   I believe through a phone call from
16 Marilyn Fuller.
17   Q   And can you remember the specifics of what
18 Ms. Fuller told you?
19   A   I believe Ms. Fuller said that she was first
20 approached by another Bright Horizons' employee that is
21 typically on-site at the end of the day. That person
22 told her that a parent would be reaching out to her to
23 make a complaint about an interaction that she had
24 observed and had with a teacher.
25       And so the director spoke with the parent. The



Case 8:12-cv-01301-TBM   Document 35   Filed 06/28/13   Page 11 of 18 PageID 671

JENNIFER WHITLEY
NORMAN vs. BRIGHT HORIZONS
May 23, 2013
33–36

Page 33

1 parent said that she entered the room, and her child was
2 crying while having his diaper changed, and that the
3 teacher was not doing anything to soothe the child; the
4 teacher just continued to apply the cream and was wiping
5 him in a manner that was not helping to soothe him or to
6 stop his cries. And eventually the mother just took the
7 child because she said to the teacher, What's happening;
8 what are you doing, and wasn't getting a response. So
9 she just took the child to soothe him and help him to
10 stop crying. And the parent felt that the teacher was
11 not caring enough in her interactions with her child and
12 wasn't responsive enough in her -- in allowing him to
13 continue to cry as she changed his diaper.
14   Q   Okay. And you said "the teacher"; you're
15 referring to Ms. Smith, correct?
16   A   It was Ms. Smith.
17   Q   Were there any other witnesses to this event
18 other than the parent who you say talked to Ms. Fuller?
19   A   There was another teacher in the suite.
20   Q   Was that teacher spoken to about this
21 circumstance?
22   A   Yes.
23   Q   Okay. Did the teacher feel that Ms. Smith did
24 anything inappropriate?
25   A   The teacher did not report that she did anything

Page 34

1 inappropriate.
2   Q   And if the eyewitness felt that Ms. Smith didn't
3 do anything inappropriate, why was it noted in
4 Ms. Smith's employee conference memo on June 17, 2011?
5   A   Any time there is a parent complaint, then part
6 of the coaching is that we -- how we work with parents.
7 The job is caring for children, but also working with
8 parents and understanding them and their expectations for
9 their children.
10   Q   Had this particular parent had issues at other
11 Bright Horizons centers prior to this?
12   A   She had been at another Bright Horizons center;
13 I'm not sure if she had issues there or not.
14   Q   Were there any employees, or anybody for that
15 matter, who reported to you that this particular parent
16 had some mental issues?
17   A   No.
18   Q   What was the name of this particular parent that
19 made this complaint?
20   A   I don't know the name of the parent. I know the
21 name of the child.
22   Q   Do you know the last name?
23   A   I don't recall.
24   Q   Is it possible the parent's name is Sophia?
25   A   I just can't say with certainty.

Page 35

1   Q   All right. And in Exhibit 1, it says here,
2 "Corrective actions required. See attached action plan."
3 I'm going to actually show that to you.
4       (Plaintiffs' Exhibit 2 was marked for
5       identification.)
6 BY MR. OWENS:
7   Q   Handing you Exhibit 2, which is presumably the
8 action plan that's noted in Exhibit 1, but if you can
9 confirm that for me, I'd appreciate it. (Tendering).
10   A   (Receiving). Yes. That is the action plan.
11   Q   Okay. What role, if any, did you have in
12 actual -- the actual drafting of this action plan?
13   A   I worked with Marilyn Fuller and Therla Kozy to
14 draft the action plan.
15   Q   Okay. Do you know who the person was who is
16 actually responsible for typing this up?
17   A   No. It would have either been Therla Kozy or
18 Marilyn Fuller.
19   Q   But it wasn't you, correct?
20   A   It was not me.
21   Q   Did you provide them with any suggestions in
22 terms of the language that should be used in the action
23 plan?
24   A   I can't identify any specific wording, but yes.
25   Q   Is it typical to attach an action plan for an

Page 36

1 employee to one of their employee conference memos?
2   A   Yes.
3   Q   And is that your signature on the second page of
4 Exhibit 2?
5   A   Yes.
6   Q   Where it says, "Employee refused to sign," is
7 that your handwriting?
8   A   That is my handwriting.
9   Q   Did you provide this to Ms. Smith in the same
10 meeting that you provided her with Exhibit 1?
11   A   Yes.
12   Q   And just generally speaking, because you said
13 that this is not, I guess, presumably not the first time
14 that somebody has been given an action plan. What is the
15 purpose in your mind as a regional manager for putting an
16 employee on an action plan?
17   A   When an employee is placed on an action plan, it
18 is to identify what they need to do to be successful in
19 their job. It may give them some logic or philosophy or
20 thought behind what we're asking for or why we're asking
21 for it, but then it will also give very specific details
22 as to what is expected so that the outcome can be that
23 they are successful and they can maintain their job with
24 appropriate performance.
25   Q   And I've seen action plans in other contexts,



Page 37

1 and sometimes they have a time period associated with
2 them, whether it's a 30-day or 90-day or whatever the
3 case may be. And I might have overlooked it. I didn't
4 see it in this document. Was there any sort of time
5 frame attached to this action plan whereby Ms. Smith was
6 told you have this much time to get better or else you
7 could be subject to termination?
8   A   It speaks about the meetings that will occur and
9 that her performance will be discussed and her continued
10 employment.
11   Q   And I agree with that. I guess my question
12 was -- and maybe it was a poor question -- was at that
13 point in time, did anybody verbalize to Ms. Smith that
14 these ongoing meetings would end at some point in time
15 and she would be off of an action plan?
16   A   I can't answer that. I don't recall.
17   Q   You never personally told her that; is that
18 correct?
19   A   I didn't give a specific end date. I can say
20 that.
21   Q   All right. Did you participate in the decision
22 to terminate Ms. Smith's employment?
23   A   Yes, I did.
24   Q   And what was your level of participation in that
25 decision?

Page 38

1   A   I was on a conference call with several other
2 people. I related this meeting and the following
3 incident that occurred at the Moffitt Child Development
4 Center.
5   Q   What is that incident that you're referring to?
6   A   In the course of this meeting, Vanessa became
7 agitated and said that a parent had pushed her; that the
8 parent had pushed her in the classroom, and that she was
9 going to take action against the parent. She left the
10 center and returned with a police officer, who then
11 investigated her allegation. And so many different
12 people were interviewed, and there was follow-up from
13 that, that allegation.
14   Q   Okay. You said a lot. So I want to break it
15 down a little bit.
16       All right. So on the 17th of June 2011, you
17 provide Exhibits 1 and 2, the employee conference memo
18 and the action plan to Ms. Smith, correct?
19   A   Yes.
20   Q   Roughly, what time of day did that happen?
21   A   Afternoon to early evening.
22   Q   Okay. And during that meeting, it's your
23 testimony that Ms. Smith stated that that same parent who
24 had made the allegation against her about being rough
25 with her child with the diaper cream, et cetera, had, in

Page 39

1 fact, made some sort of physical contact with her,
2 correct?
3   A   Yes.
4   Q   And that she was going to take action -- she was
5 going to take some sort of action, right?
6   A   Yes.
7   Q   Did she say that she was going to contact the
8 police?
9   A   I don't recall.
10   Q   But it is your recollection, and in fact, she
11 did go to the police department to report this, correct?
12   A   I believe she flagged down a car, an officer.
13   Q   Okay. Was it a USF officer?
14   A   Yes.
15   Q   All right. And this is -- we're still on
16 June 17, 2011?
17   A   I believe it all happened within that 24-hour
18 time period.
19   Q   Now, did this particular officer come in and do
20 any interviews in the center about this allegation?
21   A   Yes; very lengthy.
22   Q   Okay. Do you know who the individuals were that
23 were interviewed by this particular police officer?
24   A   I know he interviewed me. He interviewed
25 Marilyn Fuller. He interviewed Keisha Gaines. The

Page 40

1 reason he interviewed Keisha Gaines is because she was
2 the other person in the suite when the parent and
3 Vanessa Smith had the interaction. He may have
4 interviewed other Bright Horizons employees that day.
5 But those are the ones I can attest to for certain.
6   Q   And you weren't an eyewitness to any of this
7 with regard to that parent and the child and the diaper
8 cream, correct?
9   A   Correct.
10   Q   Did the police officer tell you why he was
11 interviewing you as part of his investigation?
12   A   Because I was there at the time.
13   Q   You were just physically at the center, but you
14 didn't witness anything, right?
15   A   I was at the center, and I had been one of the
16 persons Vanessa was speaking to before she left the
17 center.
18   Q   Okay.
19   A   He did ask me what had occurred at the center
20 prior to Vanessa leaving that day.
21   Q   Prior to Vanessa leaving and flagging him down?
22   A   Yes.
23   Q   Now, we've got a police officer doing an
24 investigation. Did you or anybody else at
25 Bright Horizons have your own investigation into this



Case 8:12-cv-01301-TBM   Document 35   Filed 06/28/13   Page 13 of 18 PageID 673

JENNIFER WHITLEY
NORMAN vs. BRIGHT HORIZONS
May 23, 2013
41–44

Page 41

1  matter on that day, on the 17th?
2  A  I did not investigate it further. I know that
3  it was necessary for Marilyn Fuller to get everyone's
4  statement regarding the day that that occurred. I
5  believe she had already done that, however, because it
6  played into this as opposed to playing into
7  Vanessa Smith's claim.
8  Q  So Marilyn Fuller was getting statements from
9  employees at some point on the 17th?
10  A  I don't know if it was on the 17th. Probably
11  before that because the same incident that Vanessa is
12  reporting to the police is the incident that we are
13  referring to in the this employee conference memo.
14  Q  Well, I've got a whole bunch of statements that
15  were done on June 17, 2011. Do you know if those would
16  have been done internally by Bright Horizons, or if those
17  were the statements that were provided to the police
18  officer? If I showed you one, would that help?
19  A  Yeah. I could try.
20      (Plaintiffs' Exhibit 3 was marked for
21      identification.)
22  BY MR. OWENS:
23  Q  And I'll tell you some of them look like this
24  and some of them don't. But I've handed you what's been
25  marked as Exhibit 3, and this is a statement. I can't

Page 42

1  make out what the person's name is. It appears to be
2  Tracy, but I can't say for certain. But it's one
3  paragraph, "To whom it may concern" on June 17, 2011. Do
4  you see that? (Tendering).
5  A  (Receiving). Yes.
6  Q  Do you know if this would be a statement that
7  was taken by the police, or if this was something that
8  was done internally at Bright Horizons?
9  A  This is an internal document.
10  Q  Okay. Because I think you said you gave a
11  statement to the police, and I don't have any sort of
12  statement from you to the police, so I would assume this
13  is something internal?
14  A  (Deponent nods head).
15  Q  Okay. Now, on the 17th, after the officer came
16  and did his interviews, was there a determination that
17  day by the USF police department as to whether they were
18  going to press charges against the parent?
19  A  I don't know when USF made their determination.
20  Q  Okay. Was there a point in time, though, that
21  you learned of what the determination was by the police
22  department?
23  A  Verbally. I never saw any report.
24  Q  Okay. Who gave you that verbal update? Was it
25  somebody from the police department?

Page 43

1  A  No. It was Marilyn Fuller.
2      (Plaintiffs' Exhibit 4 was marked for
3      identification.)
4  BY MR. OWENS:
5  Q  Okay. All right. I'm handing you what's been
6  marked as Exhibit 4. (Tendering).
7  A  (Receiving). Okay. I have read it.
8  Q  Thank you. Can you hand that back to me? To
9  make things easier, I'm going to actually split it into
10  two, and mark one Exhibit 4 and one Exhibit 5. I think
11  it's probably easier that way.
12      All right. So I've handed you Exhibits 4 and 5
13  together. We'll start with Exhibit 4. Do you recognize
14  this document?
15  A  I do.
16  Q  Okay. And what is Exhibit 4?
17  A  Exhibit 4 is the document that Bright Horizons
18  uses to place an employee on administrative leave; in
19  this case it was to place Vanessa Smith on administrative
20  leave.
21  Q  Okay. And is that your signature above
22  "signature of witness"?
23  A  Yes, it is.
24  Q  All right. Were you the person responsible for
25  composing this document?

Page 44

1  A  Not solely. I worked with Marilyn Fuller and
2  Therla Kozy. I did not type it.
3  Q  Okay. Thank you. And it says, "Administrative
4  leave pending an investigation of the events which may
5  have occurred on June 17, 2011." What were the events on
6  that Friday, the 17th, that were being investigated?
7  A  Primarily it was the conversation that occurred
8  in the office and then Vanessa making the police report.
9  Q  Okay. What needed to be investigated about what
10  Vanessa said or Vanessa making a police report?
11  A  When Vanessa made the allegation, we needed to
12  investigate if it was accurate or not.
13  Q  Okay. And I think we were just missing each
14  other because it's my understanding that Ms. Smith was
15  terminated for filing a false police report, correct?
16  A  Yes.
17  Q  Okay. And so that was the investigation, to
18  find out what -- whether what she had filed was true or
19  false; is that fair to say?
20  A  Yes.
21  Q  All right. And it notes on here -- well, it
22  asks that she provide a written statement outlining her
23  perspective. Do you know if she ever did that?
24  A  I don't know.
25  Q  And it also notes that this leave may be paid or



Case 8:12-cv-01301-TBM   Document 35   Filed 06/28/13   Page 14 of 18 PageID 674

JENNIFER WHITLEY                                                May 23, 2013
NORMAN vs. BRIGHT HORIZONS                                           45–48

Page 45

1 unpaid. Do you know if she was paid?
2  A  She was not paid.
3  Q  Whose decision was it whether to pay Ms. Smith
4 for her administrative leave?
5  A  I'm not sure who made this decision, but
6 according to policy, if the person is found that the
7 allegation is accurate, that -- if what she did was
8 deemed inappropriate, then she would not be paid. If
9 it's found that what she did was -- any employee did was
10 appropriate, then they would be paid. That's the typical
11 policy.
12  Q  Okay. All right. So if we assume that
13 June 17th was Friday, according to my calendar, I'll tell
14 you that's what it says, we'll assume it's a Friday, so
15 that will make June 20th a Monday, right?
16  A  Yes.
17  Q  Okay. And was it that point in time, then, that
18 an investigation into whether this police report was true
19 or false was conducted by Bright Horizons?
20  A  It actually had to begin on the 17th because
21 when the police arrived on the Moffitt campus, then
22 Moffitt security arrived. So they interviewed everyone
23 as well. And so it began as early as the 17th.
24  Q  Were you provided with copies of the interviews
25 by Moffitt security?

Page 46

1  A  I do not have those.
2  Q  Do you know if anybody at Bright Horizons has
3 those?
4  A  I do not know.
5  Q  Internally, was there anybody who conducted
6 investigations into the issue as to whether it was a true
7 or false police report by Ms. Smith?
8  A  Not as to if it was a true or false police
9 report, but the person who was in -- the other
10 Bright Horizons' employee who was in the classroom when
11 the said event occurred was questioned.
12  Q  Okay. Were you involved in questioning this
13 particular employee?
14  A  No.
15  Q  Do you know who it was?
16  A  As far as internally, Marilyn Fuller.
17  Q  And so it sounds like we had an employee,
18 Ms. Gaines, correct --
19  A  Yes.
20  Q  -- who said that she witnessed the situation and
21 she didn't see the woman batter or get physical with
22 Ms. Smith, correct?
23  A  Yes.
24  Q  And yet Ms. Smith is saying that yes, in fact,
25 it did, correct?

Page 47

1  A  Yes.
2  Q  Outside of the two of them, were there any other
3 potential witnesses other than small children who
4 couldn't testify available to --
5  A  The parent.
6  Q  Okay. And is there any statement, to your
7 knowledge, from the parent about whether she put her
8 hands on Ms. Smith in any way?
9  A  I'm not aware of a written statement.
10       (Plaintiffs' Exhibit 5 was marked for
11    identification.)
12 BY MR. OWENS:
13  Q  If you will go, please, to Exhibit 5. Do you
14 recognize this document? (Tendering).
15  A  (Receiving). I do.
16  Q  And this appears to be an "Employee Conference
17 Memo," correct?
18  A  Yes, it is.
19  Q  And this is for Vanessa Smith, right?
20  A  Yes.
21  Q  Is your signature on this document?
22  A  No.
23  Q  Did you have any role in drafting Exhibit 5?
24  A  Yes.
25  Q  And what role did you have in drafting this

Page 48

1 document?
2  A  I was on a conference call with Marilyn Fuller
3 and Therla Kozy, and I believe there may have been other
4 representatives from Bright Horizons on that call, but I
5 can't say for certain.
6  Q  Okay. Was Mr. Mendel on the phone?
7  A  I can't say for certain.
8  Q  Did you consult with Mr. Mendel at all about the
9 decision to terminate Ms. Smith?
10  A  He was involved in the decision and
11 communications from June 17th on.
12  Q  Okay. And when you say, "He was involved," what
13 level of involvement did Mr. Mendel have?
14  A  He was made aware of the conversation we were
15 having with Vanessa on that day, what the documents were
16 that were going to be provided to her, and then what her
17 reaction and response to that was in going to flag down
18 the police officer, bring him to the Moffitt campus, and
19 of the communications that I had made with Moffitt as far
20 as our clients to inform them what had occurred at the
21 child development center.
22  Q  Did Mr. Mendel provide any guidance or counsel
23 on what he thought should be done in this situation?
24  A  I believe one of his comments was that in
25 addition to following all of our HR protocols, that we



Page 49

1 also needed to work with the client closely because the
2 situation was occurring on their campus.
3   Q   And speaking of Mr. Mendel -- kind of reversing
4 back to the allegations of child abuse -- what role, if
5 any, did he have in any sort of investigations related to
6 the allegations against Ms. Turner?
7   A   Awareness.
8   Q   Okay.
9   A   Actually --
10   Q   Go ahead.
11   A   -- I believe Mark Mendel was the person that
12 recommended -- on the day that I learned of the
13 investigation of Child Protective arriving at the center,
14 I believe he was the person that instructed me to
15 instruct Linda Horner to speak with each family of that
16 classroom and make sure that they were made aware that
17 there was an investigation, there was a complaint lodged,
18 so that all of the parents would have knowledge of the
19 situation. I believe he was the person that suggested
20 that first.
21   Q   Okay. All right. So back to Exhibit 5, the
22 notice essentially of termination for Ms. Smith. It says
23 that on June 19, you were placed on administrative leave.
24 Looking back at the documents; is that accurate?
25   A   No. Not based on the administrative leave memo;

Page 50

1 however, I believe what happened was on -- because the
2 17th was a Friday, on Sunday, the 19th, Marilyn
3 telephoned Vanessa and asked that she not come in to work
4 at her typically-scheduled time and that we would have a
5 document for her during the day on the 20th, but that she
6 wasn't in the office at that time and didn't want Vanessa
7 to waste a trip driving to the center. So I believe it
8 was a verbal conversation on the 19th, but this wasn't
9 generated until the 20th.
10   Q   And then it says, "Has this employee been
11 counseled for a similar incident; yes, verbal: 5/24/11."
12 Do you have any idea what that the verbal counseling was
13 on May 24th, 2011?
14   A   I can't say for certain.
15   Q   Okay. And at the time this information was
16 placed in this document marked as Exhibit 5, did you have
17 any evidence whatsoever that there was any sort of verbal
18 counseling on 5/24/11?
19   A   I know that there was a telephone call with
20 Vanessa between myself, Therla Kozy, and Marilyn where we
21 discussed that her behaviors at the center were
22 disruptive to business. I don't recall if it was on that
23 day or not.
24   Q   You would agree that there was not a situation
25 in the past where Ms. Smith had made any sort of false

Page 51

1 police report, correct? This is the first time that
2 happened, right?
3   A   This is the situation that I'm aware of with
4 regard to her alleging that a parent pushed her.
5   Q   Right. There was no other allegations similar
6 to that by Ms. Smith in the past as far as you are aware,
7 correct?
8   A   With regard to a parent, no.
9   Q   Did you participate in the decision to terminate
10 Janice Norman's employment from Bright Horizons?
11   A   Yes, I did.
12   Q   And what level of participation did you have in
13 that decision?
14   A   I was on a conference call with Therla Kozy and
15 Brenda Hayes.
16   Q   What was discussed during that conference call?
17   A   The discussion on that conference call was an
18 interaction, two interactions that Janice had had at the
19 center that had been reported to Brenda and a review of
20 the previous employee conference memo that was provided
21 to Janice that stated it -- something to the effect that
22 it was a final warning.
23   Q   Can you think of anything else that was
24 discussed during that conference call?
25   A   I don't recall.

Page 52

1   Q   Okay. And in your words, why was Ms. Norman
2 terminated from her job at Bright Horizons?
3   A   She had been provided with a document,
4 progressive counseling document, a reprimand that stated
5 if she had -- if she continued or had more behavior that
6 was disruptive to the business of Bright Horizons, that
7 she would be terminated, and she did participate in
8 another interaction that was disruptive to the business
9 of Bright Horizons.
10   Q   And that alleged disruptive behavior
11 was -- well, strike that.
12       The disruptive behavior you're referring to were
13 the two employees who made a complaint about the manner
14 in which Norman spoke to them, correct, Ms. Krissy and
15 Ms. Sara.
16   A   Yes. And leaving the classroom to do that.
17   Q   How did you know that Ms. Norman left the
18 classroom in order to have these conversations with
19 Ms. Krissy and Ms. Sara?
20   A   Brenda Hayes interviewed several people that
21 were witnesses to the situation, and she reported it to
22 me and Therla Kozy.
23   Q   So is it fair to say you're relying on the
24 managers who are under your supervision when they
25 provided you this information, that it's truthful and



Page 53

1 accurate; is that fair?
2  A  Yes.
3  Q  And why was it that Ms. Norman was terminated on
4 the very same day that Vanessa Smith was placed on an
5 action plan?
6  A  That's the way the -- that's just the way the
7 time fell. There was no -- it's a coincidence. There
8 was not any rationale behind it.
9  Q  Was there ever a discussion between you and
10 Ms. Kozy or anybody else in management that these two
11 women were troublemakers and it had come time to kind of
12 do away with them and move on in terms of their
13 relationship with Bright Horizons?
14  A  No.
15     MR. OWENS: Let's take a very, very short break.
16 I think I'm done.
17     (Off the record at 5:06 p.m. to 5:10 p.m.)
18 BY MR. OWENS:
19  Q  Ms. Whitley, we're back on the record. The same
20 rules apply; still under oath.
21     We had talked about the decision-making process
22 in terms of the terminations of both of my clients, and I
23 want to get back into it just a little bit.
24     Was it a situation where a group of individuals,
25 yourself, Ms. Kozy, Mr. Mendel, and the local managers

Page 54

1 all had a collaborative discussion and kind of agreed on
2 the course of action, or was it a situation where
3 somebody made a recommendation that one or both of my
4 clients be terminated, and then there was an agreement
5 amongst the group?
6  A  It was more of a collaboration.
7  Q  Okay. During that -- well, during those
8 discussions, those collaborative discussions, was there
9 anybody within the management team who thought that
10 termination was not appropriate and that one or both of
11 my clients should be given another opportunity to remain
12 employed by Bright Horizons?
13  A  I don't recall that there was one person
14 lobbying for that specifically.
15  Q  Okay. And that's with regard to both Ms. Smith
16 and Ms. Norman?
17  A  Let me think. Yes.
18  Q  Okay.
19     MR. OWENS: I have no further questions.
20     MR. BURRUEZO: I have no questions, and we'll
21 read. And I'll spare you, because you've listened in
22 stereo four times what that means, so I'll spare you
23 the explanation.
24
25     (The deposition of JENNIFER WHITLEY was concluded

Page 55

1 at 5:12 p.m., and reading and signing is not waive

Page 56

                    CERTIFICATE OF REPORTER

1 STATE OF FLORIDA  )
2 COUNTY OF PINELLAS )
3     I, JULIE R. PALITTO, RPR, Registered Professional
4 Reporter, certify that I was authorized to and did
5 stenographically report the deposition of the foregoing
6 witness; that a review of the transcript was not
7 requested; and that the transcript is a true and complete
8 record of my stenographic notes.
9     I FURTHER CERTIFY that I am not a relative,
10 employee, attorney or counsel of any of the parties to
11 this cause, nor am I a relative or employee of any of the
12 parties' attorney or counsel connected with this action,
13 nor am I financially interested in the outcome of this
14 action.
15     Dated this   day of    2013, at Clearwater,
16 Pinellas County, Florida.
17
18          JULIE R. PALITTO, RPR-CP



Case 8:12-cv-01301-TBM   Document 35   Filed 06/28/13   Page 17 of 18 PageID 677

JENNIFER WHITLEY
NORMAN vs. BRIGHT HORIZONS
May 23, 2013
57–58

Page 57

1      CERTIFICATE OF OATH
2  STATE OF FLORIDA   )
3  PINELLAS COUNTY   )
4      I, JULIE R. PALITTO, RPR-CP, the undersigned
5  authority, certify that JENNIFER WHITLEY, the witness
6  named herein, personally appeared before me for the
7  taking of the foregoing deposition and was by me first
8  duly sworn to tell the whole truth.
9      Witness my hand and official seal this ____ day
10 of _____, 2013.
11
12     _____
       JULIE R. PALITTO, RPR-CP
13     Notary Public, State of Florida
       My Commission No. EE 854401
14     Expires: December 4, 2016

Page 58

1  PLEASE ATTACH TO THE DEPOSITION OF:
   JENNIFER WHITLEY
2  DATE TAKEN: May 23, 2013
   IN THE CASE OF: JANICE NORMAN and VANESSA SMITH
3  vs. BRIGHT HORIZONS FAMILY SOLUTIONS, LLC, d/b/a BRIGHT
   HORIZONS CHILDREN'S CENTERS
4
           ERRATA SHEET
5  INSTRUCTIONS:
       After reading the transcript of your deposition,
6  please note any change, addition, deletion on this sheet.
   Do Not make any marks or notations on the transcript
7  itself. Please sign and date this errata sheet and then
   kindly return it to the court reporter whose name is
8  shown below.
9  Page Line      CORRECTION AND REASON THEREFOR
10
11
12
13
14
15
16
17
18
19     Under penalties of perjury, I declare that I
20 have read the foregoing document and that the facts
   stated in it are true. SIGNED AT_____ Florida,
21 this____ day of_____, 2013.
22
23         _____
           JENNIFER WHITLEY
24
25

