Condensed Transcript

# In the Matter Of:

## NORMAN vs. BRIGHT HORIZONS

8:12-cv-01301-EAK-TBM

## KRISTIN TURNER

*May 23, 2013*



ESQUIRE SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

**Page 1**

```
         UNITED STATES DISTRICT COURT
           MIDDLE DISTRICT OF FLORIDA
                 TAMPA DIVISION

JANICE NORMAN and
VANESSA SMITH,

     Plaintiffs,

vs.              CASE NO.: 8:12-cv-01301-EAK-TBM

BRIGHT HORIZONS FAMILY
SOLUTIONS, LLC, d/b/a BRIGHT
HORIZONS CHILDREN'S CENTERS,

     Defendant.
_____/

            Florin Roebig, P.A.
            2101 West Platt Street
            Tampa, Florida 33606
            Thursday, May 23, 2013
            9:35 a.m. - 10:50 a.m.

     DEPOSITION OF KRISTIN TURNER

Taken on behalf of the Plaintiffs

before Julie R. Palitto, RPR, Notary Public in

and for the State of Florida at Large, pursuant to

Plaintiffs' Notice of Taking Deposition in the above

cause.
```

**Page 2**

```
 1  APPEARANCES:
 2  Counsel for Plaintiffs:
 3      GREGORY A. OWENS, ESQUIRE
        Florin Roebig, P.A.
 4      777 Alderman Road
        Palm Harbor, Florida 34683
 5      (727) 786-5000
        Greg@florinroebig.com
 6
    Counsel for Defendant:
 7
        CARLOS J. BURRUEZO, ESQUIRE
 8      Littler, Mendelson, P.C.
        111 North Magnolia Avenue, Suite 1250
 9      Orlando, Florida 32801-2366
        (407) 393-2935
10      Cburruezo@littler.com
11
12  Also Present:  Jennifer Whitley
```

**Page 3**

```
               INDEX
KRISTIN TURNER                    PAGE NO.
Direct (Owens)                        4
Stipulations                         49
Certificate                          50
Errata Sheet                         52

             EXHIBITS
PLAINTIFFS' EXHIBITS              PAGE NO.
No. 1  Statement Written by Kristin Turner   24
       (One Page)
No. 2  Handwritten Statement by Kristin Turner  40
```

**Page 4**

```
 1              PROCEEDINGS
 2  THEREUPON:
 3            KRISTIN TURNER,
 4  was called as a witness and, having been first duly sworn
 5  and responding, "Yes, I do" was examined and testified as
 6  follows:
 7            DIRECT EXAMINATION
 8  BY MR. OWENS:
 9      Q   Good morning.  Could you please state and spell
10  your name for the record?
11      A   Sure.  Kristin Turner, K-R-I-S-T-I-N, Turner,
12  T-U-R-N-E-R.
13      Q   Other than Kristin Turner, have you gone by any
14  other names?
15      A   Allen was my maiden name, A-L-L-E-N.
16      Q   When did your name change to Turner?
17      A   2009 I was married.
18      Q   Still married?
19      A   Yes.
20      Q   What's your husband's name?
21      A   Justin, J-U-S-T-I-N.
22      Q   That's my brother's name.
23          All right.  Good morning.  Again, my name's
24  Greg Owens.  I represent Janice Norman and Vanessa Smith
25  in connection with their legal claims against
```



Page 5

1  Bright Horizons Family Solutions, LLC, doing business as
2  Bright Horizons Children's Centers. If it's okay with
3  you, I'm just going to refer to it as Bright Horizons; is
4  that all right?
5     A  That's okay.
6     Q  All right. I'm sure that the company lawyer has
7  kind of talked to you about the format of the deposition,
8  things of that nature. And before we start, I don't want
9  to know anything that you've talked to the lawyer about;
10 that's privileged. So I'm just going to get started. If
11 there's things that happen during the deposition, I'll
12 kind of reiterate the rules to you. But in the interest
13 of being efficient and timely, I'll just get started,
14 okay?
15    A  Okay.
16    Q  All right. One thing I will tell you; I don't
17 anticipate taking a whole lot of your time. If you need
18 a break at any time, let me know. The only thing I'll
19 ask is if we're in the middle of a question, let's finish
20 that question and then we can take a break; fair enough?
21    A  Yes.
22    Q  All right. Ms. Turner, what do you currently do
23 for a living?
24    A  I work in child care.
25    Q  Okay. Who do you work for?

Page 6

1     A  Bright Horizons.
2     Q  How long have you worked for Bright Horizons?
3     A  This current time, since 2009.
4     Q  Okay. It sounds to me like you worked for them
5  prior to 2009?
6     A  Correct.
7     Q  Okay. Can you tell me about that?
8     A  I started in 1999, but have left twice just to
9  pursue another career opportunity, and always have come
10 back.
11    Q  Okay. So off and on since 1999?
12    A  Yes.
13    Q  And you said your current stint has been from
14 2009 to the present, correct?
15    A  Yes.
16    Q  During your most recent period of employment at
17 Bright Horizons, what age of children are you responsible
18 for?
19    A  Toddlers one to two years old and infants. So
20 all about under two.
21    Q  What is your job title?
22    A  A resource teacher.
23    Q  Is there a difference -- because obviously I
24 don't work there. Is there a difference between a
25 resource teacher and a regular teacher?

Page 7

1     A  It's a promotion, a step up from an associate
2  teacher or --
3     Q  Did you receive a promotion since 2009?
4     A  Just recently.
5     Q  When was that?
6     A  This year.
7     Q  Do you remember, roughly, the month or the date?
8     A  March.
9     Q  How did you come to learn in, roughly, March of
10 this year that you were going to receive a promotion to
11 resource teacher?
12    A  I was acting as resource teacher for the
13 past -- I'm not sure how long. I'm trying to think of
14 how long it was. Just a few months. And seeing if you
15 like the position and if it's something that fits and if
16 it's something that I fit for the business. And then in
17 March, when my review was up, they offered me to stay in
18 the position.
19    Q  And when you say "they," who are the individuals
20 that offered you that promotion?
21    A  Ms. Brenda.
22    Q  Brenda Hayes?
23    A  Ms. Brenda Hayes, yes.
24    Q  Okay. Other than --
25    A  Well, I'm sure it goes up the ladder, but the

Page 8

1  person I only spoke to, Brenda Hayes; and Sue Saunders is
2  my immediate supervisor.
3     Q  Was Ms. Saunders involved in the decision to
4  promote you as far as you understand?
5     A  I'm the resource teacher for her, for her group.
6     Q  Is Ms. Hayes currently the director of the
7  facility that you work at?
8     A  Yes.
9     Q  And what is the -- I guess from the company's
10 perspective, what is that facility known as? Does that
11 make sense?
12    A  I don't understand.
13    Q  All right. I'll try it again.
14       Isn't the location at a Citibank?
15    A  Yes.
16    Q  Okay. And is that on Queen Palm Drive in Tampa?
17    A  Queen Palm Drive, yes.
18    Q  Have you worked at that location since this --
19    A  Yes.
20    Q  -- most recent stint in 2009?
21    A  Yes.
22    Q  Okay, one of the rules that I'll talk to you
23 about -- and everybody's guilty of it. As you can see,
24 we have a court reporter taking everything down that we
25 say. It's very normal in human conversation for us to



Page 9

1 anticipate what one of us is about to say, and we jump in
2 and answer. It's hard for her to take down when both of
3 us are talking at the same time. So if we can both try
4 our best not to do it; I'm as guilty as anybody, so I'll
5 make that promise to you if you make the promise to me;
6 fair enough?
7   A   Yes.
8   Q   All right. And I think what we were talking
9 about was the fact that you have worked at the Queen Palm
10 location since 2009, correct?
11   A   Yes.
12   Q   All right. From a job duty and responsibility
13 standpoint, what's the difference between an associate
14 teacher and a resource teacher?
15   A   I guess I'm more of -- I assist the teachers or
16 an associate teacher is a teacher in the classroom over a
17 specific group of children, primary teacher. They have
18 their children they care for on a daily basis. They make
19 their lesson plans and teach their children things. And
20 I am responsible for the entire wing, which consists of
21 eight classrooms. So I am a -- like an assistant to all
22 of them. If they need something, I step in and help
23 them. I also help teach them and train them the right
24 way to do things.
25   Q   Okay. So it sounds to me -- and tell me if I'm

Page 10

1 wrong -- that you don't necessarily have your own
2 classroom anymore; is that fair?
3   A   I don't have my own classroom anymore.
4   Q   And there are eight classrooms that you have the
5 responsibility of, in a way, overseeing; is that correct?
6   A   Yes.
7   Q   And I think you told me earlier that there was
8 kind of a trial period as a resource teacher that you
9 were working in until you actually received a promotion,
10 correct?
11   A   Yes.
12   Q   Okay. Who was it that first came to you and
13 offered you the opportunity to kind of be an acting
14 resource teacher?
15   A   It was asked at a team meeting who -- we had
16 recently lost our A wing, which is that eight classrooms,
17 our wing, resource teacher. She had moved to another
18 center. So it was asked if anybody was interested in
19 fulfilling that position or trying out the position, to
20 come forward.
21   Q   I assume you came forward?
22   A   Yes.
23   Q   Other than yourself in that meeting, did anybody
24 else offer to come forward to try out the resource
25 teacher position?

Page 11

1   A   I think -- I mean, I don't know personally. It
2 wasn't like raise your hand in the middle of everything.
3 I think you had to go and meet with Ms. Brenda yourself.
4 So unsure. I think one other did. So I don't know
5 exactly how many.
6   Q   Do you know who the other person was that
7 inquired about the position?
8   A   Ms. Veronica.
9   Q   Do you know Veronica's last name?
10   A   Dargolt (phonetic), D-A-R -- I'm not sure
11 exactly.
12   Q   All right. Let's shift away from the 2009 to
13 present time frame.
14       During your other periods of employment with
15 Bright Horizons, did you ever receive any sort of
16 formalized discipline or reprimand from anybody?
17   A   No.
18   Q   Any sort of -- again, during that period before
19 2009, any sort of verbal counselings that you received
20 from any supervisor?
21   A   No.
22   Q   Let's go back to the 2009 to present time frame.
23 From 2009 to present, at the Queen Palm location, have
24 you received any sort of formalized discipline or
25 reprimand?

Page 12

1   A   No, until later. I mean, no would be the
2 answer. I haven't received a disciplinary action.
3   Q   And you started to say "until later." What did
4 you mean by that?
5   A   After an investigation was completed -- I was on
6 probation for a couple of weeks. And once it was
7 unfounded, I -- I don't recall what's in my file, but I
8 don't think it's a disciplinary action in my file.
9   Q   Okay. And we'll look at some documents so that
10 will help you out.
11   A   All right.
12   Q   So you said there was an investigation. Are you
13 referring to the, for lack of a better term, DCF
14 investigation back in 2011?
15   A   Yes.
16   Q   Around April?
17   A   Yes.
18   Q   Because I just want to make sure. Was there any
19 other sort of investigation that you were the focus of
20 other than the one back in 2011?
21   A   No.
22   Q   Okay. Who at Bright Horizons first came to you
23 and told you that you were going to be placed on
24 probation for a period of time?
25   A   Ms. Linda Horner.



Case 8:12-cv-01301-TBM   Document 36   Filed 06/28/13   Page 6 of 16 PageID 684

KRISTIN TURNER
NORMAN vs. BRIGHT HORIZONS
May 23, 2013
13–16

Page 13

1  Q  At that time, what position did Ms. Horner hold?
2  A  The director of the center.
3  Q  Is Ms. Horner still employed with Bright
4  Horizons?
5  A  Not that I know of. Not at our center.
6  Q  Understood. When was the last time that
7  Ms. Horner, to your knowledge, worked at your center?
8  A  I'm not sure. I don't -- I don't know.
9  Q  Okay. Maybe we can try to put it into context.
10  From the time that that investigation took place back in,
11  roughly, April 2011, do you know how long after that
12  Ms. Horner stayed on at your location?
13  A  She was still there for a few months.
14  Q  Okay. All right. So we were talking about
15  probation. Ms. Horner came to you and notified you that
16  you were going to be placed on probation, correct?
17  A  Yes.
18  Q  All right. When you were notified by
19  Ms. Horner, was there anybody else present to witness
20  that conversation?
21  A  Ms. Brenda Hayes and Ms. Jennifer was on
22  the -- on a conference call on the phone.
23  Q  All right. Where did this meeting take place?
24  A  In Ms. Linda's office.
25  Q  All right. And if you could, kind of put me in

Page 14

1  that meeting with you. Who was the person of the three,
2  meaning Ms. Horner, Ms. Hayes, and Ms. Todd --
3  Ms. Whitley I guess she goes by now -- that primarily
4  spoke to you about the probation issue?
5  A  Ms. Linda.
6  Q  Okay. And what specifically to your
7  recollection did Linda Horner tell you?
8  A  Just that I was -- while I was under
9  investigation with CPS, they couldn't keep me in the
10  center for my protection. So I'd be on like
11  administrative leave until the investigation was
12  complete.
13  Q  You used the term "CPS." Is that Child
14  Protective Services?
15  A  Yes.
16  Q  And that was your understanding as to who was
17  conducting the investigation?
18  A  Yes.
19  Q  All right. And Ms. Horner told you that you
20  were being placed on probation or administrative leave
21  for your own protection?
22  A  Yes.
23  Q  Did she tell you what she meant by that?
24  A  So that there was, you know -- if there was
25  rumors going around or so that I wasn't in an environment

Page 15

1  where things could happen further. She didn't specify
2  any more than that. That's how she put it.
3  Q  At that time, did you have an understanding of
4  what the allegations were against you?
5  A  An understanding. Not specific allegations, but
6  an understanding because the prior day was when CPS was
7  there at the center.
8  Q  Okay. Do you remember the specific date that
9  you were placed on administrative leave?
10  And before you answer that, I want to make sure
11  we're on the same page. When I say "administrative
12  leave" and you say "probation," are we talking about the
13  same thing?
14  A  It's the same thing.
15  Q  Okay.
16  A  I think I called it "probation," but they -- the
17  center calls it "administrative."
18  Q  All right. Do you remember the date that you
19  were placed on administrative leave?
20  A  It was -- no. I don't remember the exact date.
21  Q  Okay. And I believe you said it was your
22  understanding that it was the day after CPS performed
23  their investigation?
24  A  I believe it was.
25  Q  And at that time, we talked about the fact that

Page 16

1  you had a generalized understanding of what the
2  allegations were against you. So at that time, what did
3  you understand them to be?
4  A  At the time of the meeting?
5  Q  At the time you were placed on administrative
6  leave. Yes.
7  A  I understood that there was an accusation of
8  rough handling with my children and possibly
9  discrimination of some of the colored children in the
10  class.
11  Q  Have you ever handled, in your opinion, a child
12  roughly at the center?
13  A  No.
14  Q  Have you ever treated any minority children less
15  favorably than white children?
16  A  No.
17  Q  Other than the accusation of being rough and the
18  accusation of, I guess, discrimination, for lack of a
19  better term, did you understand there to be any other
20  accusations against you at that point in time?
21  A  No.
22  Q  Okay. So back to the meeting. Ms. Horner told
23  you that you were going to be placed on administrative
24  leave for your protection. Did Ms. Horner tell you
25  anything else during that meeting?



Case 8:12-cv-01301-TBM   Document 36   Filed 06/28/13   Page 7 of 16 PageID 685

KRISTIN TURNER
NORMAN vs. BRIGHT HORIZONS
May 23, 2013
17–20

Page 17

1   A   No. No. I mean, maybe; not that I recall.
2   Q   Okay. Did Brenda Hayes say anything during the
3   meeting?
4   A   She may have said a few words. I can't exactly
5   understand -- you know, remember what she said.
6   Q   And I believe you said Jennifer Todd was on the
7   phone, correct?
8   A   Yes.
9   Q   Did she say anything to you during the meeting?
10  A   No. She introduced herself in the beginning to
11  let me know she was there, but --
12  Q   Did they tell you whether your leave was going
13  to be paid or unpaid?
14  A   They told me -- I asked that question. They
15  said it's unpaid. If CPS' investigation and
16  Bright Horizons' investigation were to come back with no
17  findings, that they would pay me for the time.
18  Q   Okay. Ultimately, what was your understanding
19  as to the results of the investigation?
20  A   Yes.
21  Q   It was unfounded?
22  A   That it was -- what was -- repeat it one more
23  time.
24  Q   Sure. After the investigation concluded, did
25  anybody at Bright Horizons tell you what the results of

Page 18

1   the investigation were?
2   A   Yes.
3   Q   Okay. What did they tell you?
4   A   Nobody -- well, nobody at Bright Horizons told
5   me what CPS' investigation results were. That was up to
6   me to find out.
7   Q   Okay.
8   A   Bright Horizons did their own investigation.
9   Q   Okay. And let's take those one at a time.
10      In terms of Bright Horizons' own internal
11  investigation, did they tell you what the results of that
12  was?
13  A   They didn't tell me exactly what was said from
14  anybody or -- so, no.
15  Q   Do you know the individual or the individuals at
16  Bright Horizons who conducted the investigation?
17  A   No.
18  Q   And you said it was your duty to, if you wanted
19  to, I assume, follow up with CPS to find out what the
20  results of their investigation were, correct?
21  A   Right.
22  Q   Did you do that?
23  A   Yes.
24  Q   What did you understand the results of their
25  investigation to be?

Page 19

1   A   Unfounded on all counts.
2   Q   How long were you on administrative leave?
3   A   Two weeks and a couple of days. So it was two
4   full weeks and I believe maybe the Friday prior and the
5   Monday after.
6   Q   How did you come to find out that you were going
7   to be reinstated to your position and that your
8   administrative leave would be over?
9   A   I had called Ms. Linda maybe once or twice
10  during my leave. She said I could call and check in and
11  see if they had heard the results from CPS. So I called
12  to ask if she knew, and she told me I could call CPS. So
13  between the two of us, she wasn't sure who was going to
14  get results first. So I actually one day contacted CPS,
15  and they told me the results were in; it was unfounded,
16  and I could pick them up.
17      So that day I called Ms. Linda to advise her
18  that the results were in and I could bring her the
19  paperwork, but I had to do it. They wouldn't send it.
20  Q   All right. Did you, in fact, do that?
21  A   Yes. She set up a meeting, a time for me to
22  come with the paperwork.
23  Q   "She" being Ms. Horner?
24  A   Ms. Linda.
25  Q   You said you picked up the results. Where did

Page 20

1   you pick those up from?
2   A   Child Protective Services building. It's on
3   Falkenburg Road.
4   Q   Once you brought the results from CPS to
5   Ms. Horner, were you then at that point reinstated to
6   your job?
7   A   Not that exact day. I don't recall exactly how
8   it happened. It was the next day or a day after. It was
9   a couple days.
10  Q   Did Bright Horizons pay you for that time that
11  you were on administrative leave based on the
12  investigative findings?
13  A   Yes. I got paid.
14  Q   Was there any further investigation into this
15  issue from April 2011 at any time thereafter, meaning
16  after you got restored to your position?
17  A   Not that I know of.
18  Q   Do you know if at any time that you've worked at
19  Bright Horizons if there has been a parent or parents who
20  have complained about the manner in which you treated
21  their children at the facility?
22  A   No.
23  Q   And have you had your deposition taken in
24  connection with any legal matter other than this one
25  related to that investigation back in 2011?

Case 8:12-cv-01301-TBM   Document 36   Filed 06/28/13   Page 8 of 16 PageID 686

KRISTIN TURNER                                           May 23, 2013
NORMAN vs. BRIGHT HORIZONS                                      21–24

Page 21

1  A  I don't understand --
2  Q  Sure.
3  A  -- the question.
4  Q  Well, let's make it easier. Have you ever had
5  your deposition taken other than today?
6  A  No.
7  Q  All right. That makes it simple.
8  A  Okay.
9  Q  All right. Do you know if any parent has
10 brought legal action against Bright Horizons alleging
11 that you mistreated, abused, or neglected their child?
12 A  I don't know.
13 Q  Did there come a point in time where you learned
14 of the person or people who contacted CPS about you back
15 in April of 2011?
16 A  Yes.
17 Q  Okay. When did you first learn who the
18 individual or the individuals were?
19 A  During the questioning with CPS.
20 Q  Okay.
21 A  They were the ones who confirmed who it was.
22 Q  And who did CPS tell you that the person or
23 people were?
24 A  Vanessa Smith.
25 Q  And I assume that was the investigator from CPS

Page 22

1  that told you that?
2  A  The investigator.
3  Q  Do you know his or her name?
4  A  I don't remember her name.
5  Q  Okay. Did that investigator ever tell you about
6  any other aspects of the investigation in terms of what
7  other people were saying about you when they were
8  investigated?
9  A  No.
10 Q  Did the investigator ever tell you that others
11 had told them during their investigation that they saw
12 you handle children in a rough manner?
13 A  No.
14 Q  Other than Vanessa Smith, have there ever been
15 any other employees at Bright Horizons who have
16 complained about the manner in which you treat the
17 children at the facility?
18 A  Not that I know of. No.
19 Q  Going back for a moment. The location that you
20 work at, does it have some sort of connection -- I can
21 see your bottle sitting in front of you -- with Citibank?
22 A  Yes.
23 Q  Okay. And to your understanding, what is the
24 connection between Citibank and the Bright Horizons
25 location that you work at?

Page 23

1  A  I believe -- I don't know how it's worded in the
2  business aspect -- that we are -- Bright Horizons is a
3  client of Citibank brought on to run the day care center
4  for the Citibank employees.
5  Q  All right. So are the children who are at the
6  facility that you work at entirely children of Citibank
7  employees?
8  A  Yes.
9  Q  Do you have any family who currently works for
10 Citibank?
11 A  Yes.
12 Q  How many family members?
13 A  One.
14 Q  Which family member currently works for
15 Citibank?
16 A  My mother.
17 Q  What's your mom's name?
18 A  Brenda Hoover.
19 Q  What does your mom, Ms. Hoover, currently do for
20 Citibank?
21 A  I don't know her title.
22 Q  All right.
23 A  Banking. It's a banking thing.
24 Q  Okay. And I'm no banking expert either, but I
25 know tellers. Is she a teller?

Page 24

1  A  No.
2  Q  Is she a management-level employee at Citibank?
3  A  I think she is.
4  Q  Does she work at the Citibank location that is
5  connected with the Bright Horizons location that you work
6  at?
7  A  Yes.
8  Q  Have you ever told anybody at Bright Horizons
9  that Bright Horizons can't do anything from a reprimand
10 standpoint to you because your mom works for Citibank?
11 A  No.
12 Q  Have you ever said anything similar to that?
13 A  No.
14    (Plaintiffs' Exhibit 1 was marked for
15    identification.)
16 BY MR. OWENS:
17 Q  Ms. Turner, I am going to hand you a document
18 that's been marked as Exhibit 1 to your deposition. Take
19 as much time as you can to look through that document.
20 Whenever you feel comfortable and ready to answer
21 questions, just let me know, and we'll talk about it,
22 okay? (Tendering).
23 A  (Receiving). Okay.
24    Okay. I'm done. That's only one page.
25 Q  All right. And we'll talk about that in a



Case 8:12-cv-01301-TBM   Document 36   Filed 06/28/13   Page 9 of 16 PageID 687

KRISTIN TURNER
NORMAN vs. BRIGHT HORIZONS
May 23, 2013
25–28

Page 25

1  second.
2  A  Okay.
3  Q  All right. The document that I handed you,
4  Exhibit 1, do you recognize it?
5  A  Yes.
6  Q  What is Exhibit 1?
7  A  I was asked to write a statement when they put
8  me on administrative leave.
9  Q  Who asked you to write the statement?
10 A  Ms. Linda Horner.
11 Q  You would agree that this appears to be
12 something that was typed, correct?
13 A  Yes.
14 Q  All right. Did you type this while you were at
15 work, or did you do it from home?
16 A  I did it from home.
17 Q  I think you started to allude to it when you
18 finished reading the document, it appears that this is
19 incomplete, correct?
20 A  Yes.
21 Q  And because this is all that I have, maybe you
22 can help me out a little bit. Presumably there is more
23 than one page; is that fair to say?
24 A  There should be, yes.
25 Q  In the original. There's more than one page in

Page 26

1  the original, not the one that I gave you, correct?
2  A  Yes.
3  Q  All right. Do you know how many pages the
4  original document consisted of?
5  A  I think it was two.
6  Q  And we'll talk a little bit about what was
7  written in the exhibit that I've handed you. But to your
8  recollection, what did you write on the original, page
9  two; what would have been page two of this statement?
10 A  Just the end of what happened that day.
11 Q  Okay. We had talked earlier about being placed
12 on administrative leave and that you understood that
13 there was an investigation being conducted about treating
14 the children in a rough manner and being discriminatory.
15 Did you write anything about how you handled the children
16 or discrimination against children on page two or any
17 additional pages that we don't have in front of us today?
18 A  No.
19 Q  Okay. So it sounds like this particular
20 document had more to do with a child getting sick and
21 throwing up at the center?
22 A  Yes.
23 Q  All right. In the first, very first sentence of
24 Exhibit 1, you said you're presenting this statement in
25 regards to the reasons of which you were put on

Page 27

1  administrative leave; do you see that?
2  A  Uh-huh.
3  Q  Is that a yes?
4  A  Yes.
5  Q  All right. Do you know why at the time you
6  didn't mention anything about how you handled the
7  children or discrimination or anything in that regard?
8  A  When Ms. Linda asked me to write a statement of
9  my information as to why I was on administrative leave, I
10 questioned, you know, am I writing just about this last
11 day because what CPS brought up were all allegations that
12 I stated were false. And she told me to write what I
13 knew of that happened. So this is --
14 Q  All right. And do you see the sentence that
15 begins with "first" and then a comma?
16 A  Yes.
17 Q  You say, "First, allow me to discuss the fact
18 that the Administrative Leave Memorandum states the
19 events that occurred on 4/15/2011 were brought to the
20 attention of Bright Horizons on 4/19/2011. This
21 statement is false." Do you see that?
22 A  Yes.
23 Q  What about that statement in the Administrative
24 Leave Memorandum was false?
25 A  The memorandum stated that the information about

Page 28

1  this case, this day about this child vomiting was just
2  brought to the attention when CPS arrived on the 19th.
3  But I, myself, right after the event happened, went to
4  the director's office to talk to her.
5  Q  Ms. Horner?
6  A  Ms. Horner.
7  Q  Do you know who drafted the Administrative Leave
8  Memorandum?
9  A  No, I don't.
10 Q  And who was your audience when you wrote this
11 letter? I mean, was it intended for Ms. Horner?
12 A  Yes. She told me to write it. Yes.
13 Q  Okay. Who do you think the individual
14 responsible for putting false information in your
15 Administrative Leave Memorandum was?
16 A  I don't know that it was on purpose. I just
17 stated my fact that I brought it to their attention to
18 cover myself.
19 Q  And I appreciate that. Whether it was
20 intentional or not, who do you think the person
21 responsible for putting that information into the
22 Administrative Leave Memorandum was?
23 A  I don't know. But I would guess Ms. Linda would
24 have made the form.
25 Q  All right. After you submitted this letter



**Page 29**

1 that's marked as Exhibit 1, was the information in your
2 leave memorandum changed to reflect the information that
3 you put into this letter?
4    A   Not the copy that they gave me.
5    Q   Did it concern you that there was false
6 information in your administrative leave memo?
7    A   No. Just that one date. That's why I specified
8 on my -- my statement.
9    Q   Did anybody come to you and say, You know what,
10 you're right; we made a mistake; in fact, you came to us
11 immediately on April 15th, not on April 19th?
12    A   Mrs. Linda may have at that point, said oh,
13 yeah, I do remember you coming to me. But I had already
14 had the paper in my hand. She didn't change it right
15 there or anything. No.
16    Q   Is it fair to say that you didn't have a very
17 good working relationship with Vanessa Smith?
18    A   No.
19    Q   Did the two of you have personality conflicts?
20    A   I didn't think so at the time. We were
21 different people, but we never argued or fought or
22 anything like that.
23    Q   Why do you think Ms. Smith reported, in your
24 opinion, to be false accusations to the state and local
25 government about the manner in which you treated

**Page 30**

1 children?
2    A   During the last couple weeks that we were
3 together, she started -- she continued to do things
4 wrong, which a new employee does and you correct them.
5 And during the last couple weeks when I would correct
6 her, she got very defensive; that she was older and she
7 was more experienced than me, so I shouldn't be able to
8 tell her what to do. And I think that she was
9 reprimanded a couple of times, not harshly, just talked
10 to maybe. I don't know the extent of what she got pulled
11 in the office for or what have you. I think she just was
12 retaliating against me.
13    Q   So if I understand your testimony correctly, you
14 think that Ms. Smith was retaliating against you for, I
15 guess, being counseled in relation to how she was
16 performing her job?
17    A   Yes.
18    Q   After these accusations had been made by
19 Ms. Smith, did the two of you ever work together again in
20 the same classroom?
21    A   No.
22    Q   Did you see her at all after the allegations had
23 been made?
24    A   I never even saw her again.
25    Q   When you were interviewed by the child

**Page 31**

1 protective investigator -- well, strike that.
2         How many different child protective
3 investigators were you interviewed by?
4    A   Who was in the room during that interview?
5    Q   Sure.
6    A   Is that what you're asking? I believe it was
7 one investigator and one person in training. I don't
8 know if it was the investigator in training; two police
9 officers, and state licensing -- I believe the gentleman
10 that comes to our center to do our state licensing.
11    Q   Do you remember the individuals' names who were
12 in that meeting?
13    A   No. I know the licensing representative because
14 we've seen him a lot.
15    Q   What's his name?
16    A   His first name is Vernon, but I don't know the
17 last name.
18    Q   During the interviews that the folks from the
19 government had with you, did you tell them that you felt
20 like these accusations were coming because Ms. Smith was
21 retaliating against you?
22    A   Yes, I did.
23    Q   Did you talk to them as well about concerns that
24 you had about Ms. Smith during those last couple of weeks
25 that the two of you were working together?

**Page 32**

1    A   Yes, I did.
2    Q   Why did you feel at that time it was important
3 to tell these representatives from the state of Florida
4 who were investigating accusations against you about
5 these issues you were having with Ms. Smith?
6    A   Because I knew that it was false, and I felt
7 that she was just coming after me for something.
8    Q   I know that Ms. Smith was only at the
9 Queen Palm facility for a short period of time. How long
10 were the two of you actually working together in your
11 classroom before all this took place with the allegations
12 of child abuse and the investigation?
13    A   She worked with me personally in my classroom
14 the entire time she was at that location except for about
15 a week of training prior to entering the classroom.
16    Q   Did you ever see Ms. Smith personally, did you
17 witness Ms. Smith, ever do anything in the classroom that
18 you felt was abusive or neglectful toward the children?
19    A   No.
20    Q   Did you ever witness Ms. Smith leaving children
21 in the bathroom unattended?
22    A   I did not witness that.
23    Q   Did you ever witness Ms. Smith leaving the
24 children unattended at all?
25    A   Yes.



Page 33

1   Q   Okay. Tell me about that.
2   A   She had run into the hallway one day, which
3   is -- there's a window, but it's still unattended for
4   Bright Horizons standings. Ran into the hallway one day
5   and left the children there or ran to the classroom next
6   door, which it's a suite and it's open, but it's still
7   unattended; run to the next classroom and leave them
8   there.
9   Q   She could still see the children, correct?
10  A   I guess if she would turn, she could have seen
11  them.
12  Q   But she wasn't as close to the children
13  physically as you thought she should have been, correct?
14  A   Right. Yes.
15  Q   Did you report that to anybody at
16  Bright Horizons?
17  A   No. I -- not like that. I had brought it up a
18  little later maybe that I had seen this, but I was
19  working with her. She was brand-new.
20  Q   Did you bring that information up during the
21  investigation into the allegations against you?
22  A   I don't think so.
23  Q   Were you ever involved in any sort of verbal
24  reprimand against Ms. Smith for leaving children
25  unattended in any way?

Page 34

1   A   No. In the way that you ask it, no.
2   Q   Okay. Sounds like something else is coming to
3   mind for you. What are you thinking about?
4   A   We had a small meeting. Ms. Sue, which was our
5   supervisor personally, myself, Vanessa and Mairin, who
6   was the resource teacher at the time for the A wing, just
7   to help Vanessa and help her grow and help her learn
8   because she didn't seem to be grasping the policies. So
9   during that that little meeting, things were brought up,
10  and I probably would have said something at that time,
11  I'm sure.
12  Q   Did you perceive that meeting to be any sort of
13  disciplinary session toward Ms. Smith?
14  A   No.
15  Q   As a teacher of young children, what is your
16  responsibility if you personally witness somebody being
17  abusive or neglectful toward a child?
18  A   To report child abuse.
19  Q   And where are you supposed to report that to?
20  A   To Florida State Child Abuse. We have a phone
21  number and --
22  Q   An abuse hotline?
23  A   Yes. An abuse hotline.
24  Q   Does Bright Horizons, to your knowledge, have a
25  policy that asks you to go to a supervisor before

Page 35

1   contacting the Florida abuse hotline?
2   A   No. I don't -- not that I know of.
3   Q   Has anybody told you, any of your supervisors
4   ever told you that you're expected to go to them first
5   before contacting the abuse hotline?
6   A   They do say if you ever suspect abuse, you know,
7   it would be helpful for you to talk to a supervisor. But
8   I don't think it's a rule.
9   Q   Okay. Have you ever had to report abuse either
10  to a supervisor -- let me back up. Abuse, neglect, or
11  anything that caused concern to you about the manner in
12  which children were being treated at the center, have you
13  ever had to report that to either a supervisor or the
14  Florida abuse hotline during the period of time that
15  you've worked at Bright Horizons?
16  A   No.
17  Q   Janice Norman, did you know her prior to the two
18  of you working at Bright Horizons?
19  A   No.
20  Q   To your understanding, when you were working at
21  Bright Horizons, what was Ms. Norman's job title or job
22  responsibilities?
23  A   She was a receptionist at the front desk.
24  Q   Were there times when Ms. Norman would be
25  responsible for assisting the classrooms if -- in order

Page 36

1   to keep ratio?
2   A   She would offer teachers a bathroom break.
3   That's it.
4   Q   How often in a day or a week would you say that
5   you personally interacted with Ms. Norman?
6   A   Once or twice a day.
7   Q   Was she respectful to you as a co-worker?
8   A   Yes.
9   Q   Did you ever have any personality conflicts with
10  Ms. Norman?
11  A   No. No.
12  Q   Did you ever have any concerns with the manner
13  in which Ms. Norman performed her job duties as an
14  administrative employee?
15  A   No.
16  Q   Okay. Did Ms. Norman ever act hostile toward
17  you?
18  A   No.
19  Q   Did you ever become aware of what Ms. Norman
20  told the CPS investigators during the April 2011
21  investigation into the allegations against you?
22  A   Not what she told them. No.
23  Q   Okay. Would it surprise you if Ms. Norman said
24  that you handle children rougher than she would have
25  liked?



Case 8:12-cv-01301-TBM   Document 36   Filed 06/28/13   Page 12 of 16 PageID 690

KRISTIN TURNER
NORMAN vs. BRIGHT HORIZONS
May 23, 2013
37–40

Page 37

1   A   It would surprise me. Yes.
2   Q   And if she, in fact, said that, could you think
3   of any motive or reason why Ms. Norman would say that
4   about you?
5   A   Her and Vanessa had become friends, and Vanessa
6   was manipulative. In my, you know, time with her, I
7   would know her to be manipulative. So I would guess
8   that.
9   Q   And that's speculation; you don't know for
10  certain?
11  A   That's my speculation. You're right.
12  Q   I know you were on administrative leave for a
13  period of time. But were you back and working at the
14  Queen Palm center around the time that Ms. Norman's
15  employment ended at Bright Horizons?
16  A   I was there. Yes.
17  Q   Okay. Do you have any knowledge as to the
18  reason or reasons why Ms. Norman's employment ended?
19  A   No.
20  Q   Did you ever personally witness Ms. Norman
21  acting inappropriately in front of parents?
22  A   I did. I was witness to her meeting -- driving
23  out -- going out and meeting a parent in the parking lot
24  and having a conversation outside, which was odd.
25  Q   Okay. Was that before or after the period of

Page 38

1   time that you were on administrative leave?
2   A   After.
3   Q   Did you hear what the contents of that
4   conversation were?
5   A   No.
6   Q   Other than the fact that Ms. Norman was talking
7   to a parent in the parking lot, was there anything else
8   about it that struck you as out of the ordinary?
9   A   That specific parent that same afternoon took
10  her child -- didn't come in the building with her child.
11  It seemed that's what she was on her way to do when
12  Janice intercepted her. And I think shortly after, that
13  child was taken out of my classroom and put into another
14  classroom.
15  Q   After the time that the investigation took place
16  and you were placed on administrative leave, were there
17  children under your supervision who had their parents
18  remove them from Bright Horizons?
19  A   Yes. One.
20  Q   One? I don't care to know the child's name, but
21  what was the mom or dad's name?
22  A   I don't remember.
23  Q   Did you have a parent by the name of
24  Arline Alston?
25  A   That one.

Page 39

1   Q   That was the one that removed her child?
2       Do you have any understanding as to why she
3   removed her child from your classroom?
4   A   Sitting in with myself, Ms. Linda, and
5   Ms. Carol Stegall as one conversation in the office,
6   Carol Stegall received a phone call from this mother or
7   called her to tell her we had some of his things, if she
8   wanted to get them. And I overheard her conversation.
9   She stated that she was notified by -- and she was just
10  uncomfortable. She was notified of what the situation
11  was, and she was uncomfortable with her child there.
12  Q   But to your recollection, Ms. Alston was the
13  only parent that removed her child from your classroom
14  after the investigation?
15  A   That one and the one that -- well, you said from
16  the center. He's the only one that was removed from the
17  center; from my classroom, from the center.
18  Q   Okay. And I understand what you're saying.
19  A   Okay.
20  Q   Were there other children who were moved from
21  your classroom to another classroom after the
22  investigation?
23  A   The one that I already spoke of, Janice talked
24  in the parking lot to the mother, went to another
25  classroom; and Alston left the center.

Page 40

1   Q   Okay. I think I just asked you this. I
2   apologize. Do you know the name of the parent that
3   Ms. Norman intercepted in the parking lot?
4   A   Not her first name. The child's last name was
5   Miller. So I would guess the mother had the same last
6   name.
7       (Plaintiffs' Exhibit 2 was marked for
8       identification.)
9   BY MR. OWENS:
10  Q   Ms. Turner, I'm handing you what is Exhibit 2.
11  It's a composite. So it's a handful of pages. I don't
12  necessarily need you to read it verbatim. If you could
13  just skim through it. (Tendering).
14  A   (Receiving). Okay.
15  Q   Because the way that it was provided, there's
16  some duplicate pages. And again, I don't want to go
17  through it word for word with you. But if you could just
18  take a quick look, and then if you need more time, just
19  let me know. I'm certainly happy to provide that to you.
20  A   Okay.
21  Q   The documents that I handed you that's marked as
22  Exhibit 2, do you recognize it?
23  A   Yes.
24  Q   What is this document?
25  A   I wrote this.



Case 8:12-cv-01301-TBM   Document 36   Filed 06/28/13   Page 13 of 16 PageID 691

KRISTIN TURNER
NORMAN vs. BRIGHT HORIZONS
May 23, 2013
41–44

Page 41

1  Q  Okay. This is your handwriting --
2  A  Yes.
3  Q  -- throughout the document, correct?
4  A  Yes.
5  Q  Is there anybody else's handwriting on this
6  document other than yours?
7  A  No.
8  Q  Can you turn to the one at the bottom of the
9  page that says "DEF" and then it has some zeros and it
10 says "67"?
11 A  Uh-huh.
12 Q  On the side of the page -- I'll point to it for
13 you there -- appears to be some cut-off handwriting.  Can
14 you tell if that's your writing?
15 A  I can't tell.
16 Q  Do you have any idea what it says?
17 A  No.
18 Q  All right.  Exhibit 2, what was the reason for
19 you putting this document together in your handwriting?
20 A  On the meeting I spoke of prior with myself,
21 Sue, Vanessa, and Mairin, it was either the 30th of March
22 or 31st; I'm not sure exactly.  It was the end of March.
23 During that conversation, Vanessa was denying things that
24 we were trying to teach her and saying that she was doing
25 them right all along.  So it was stated after that

Page 42

1  conversation with myself and Ms. Sue, Ms. Sue advised me
2  that I should just start taking notes of everything so
3  that we'd have -- I'd have a -- not my word against her
4  word; I'd have it, you know, written down on notes.
5  Q  Okay.  So Ms. Saunders suggested that you start
6  taking notes such as the ones we're looking at in
7  Exhibit 2?
8  A  I believe it was Ms. Saunders.  Either
9  Ms. Saunders or Ms. Horner, but I would believe it was
10 Ms. Saunders.
11 Q  And why is it that sitting here today you would
12 believe that it was Ms. Saunders that made that
13 suggestion?
14 A  Because she's my immediate supervisor, and I was
15 in the meeting with her.
16 Q  Prior to you beginning to take these notes here
17 in Exhibit 2, had you ever taken notes similar to this
18 during your employment at Bright Horizons?
19 A  No.
20 Q  And it appears that you were taking these in
21 some sort of spiral notebook; do you agree with that?
22 A  Yes.
23 Q  Is what I've handed you in Exhibit 2 the extent
24 of the handwritten notes that you took related to
25 yourself and Ms. Smith?

Page 43

1  A  I can't be certain.  I don't remember.  But
2  I -- I want to say it was a few more pages.  I
3  don't -- these are multiple, you know.
4  Q  If, in fact, there are more pages, what do you
5  think those pages could have been talking about?
6  A  It's the same thing; day-to-day stuff with what
7  I was continuing to have to teach Ms. Vanessa over and
8  over and she wasn't grasping.  I was writing down the
9  items I had typically taught her and if she had any
10 confrontation or conflict with me about me trying to help
11 her.
12 Q  Let's go back to the page that has 67 at the
13 bottom.
14 A  Yes.
15 Q  In the last paragraph you write, "She tried to
16 lock all the children in the book area again."  Do you
17 see that?
18 A  Yes.
19 Q  What do you mean by that?
20 A  We have a classroom, open classroom, but you
21 have shelves and furniture.  And I believe at that time
22 we had such a -- a carpet with some books, a library area
23 with maybe a shelf here and a shelf here.  She would
24 place or move another shelf so that they were kind of
25 stuck there, or she would even place herself there.  I'm

Page 44

1  not saying she did it without her there.  She would be
2  there, but where they couldn't leave that area.
3  Q  Okay.  There wasn't a physical lock placed on a
4  door or anything like that, correct?
5  A  No.
6  Q  She --
7  A  Would corral them, keep them in one area, which
8  we're not supposed to do.
9  Q  Okay.  Could the children get out of that area
10 should they want to?
11 A  She wouldn't let them out of that area.
12 Q  Did you report that to anybody at
13 Bright Horizons?
14 A  That -- I mean, yes; I put it on here, and I
15 would talk, you know, to a supervisor about things like
16 that, but I mean, that's just -- that's a learning thing
17 or a teaching where I would be expected to tell her,
18 Bright Horizons does things this way.  So I'm noting it
19 here maybe that she had done it continually even though I
20 was correcting her.
21 Q  Do you have any specific memory of a person or a
22 date in which you physically went and talked to somebody
23 about Vanessa Smith, in your words, locking all the
24 children in the book area?
25 A  No.



Page 45

1  Q  Were you periodically submitting Exhibit 2 to
2  your supervisors so that they could see what you were
3  writing in your notebook?
4  A  No. I asked if they wanted it, you know, each
5  night, and they said just keep it; it's for my own notes.
6  Q  Was there any point in time where you gave this
7  to any of your supervisors?
8  A  I was asked for all of my notes, and I don't
9  remember when.
10  Q  Do you know if it was before or after
11  Vanessa Smith left the Queen Palm center?
12  A  I don't remember. I'm not sure.
13  Q  Jumping back to your administrative leave.
14  Other than being placed on administrative leave, did you
15  receive any other sort of formalized discipline along
16  with that in association with the investigation that took
17  place in April 2011?
18  A  No.
19  Q  And since then, you have not received any sort
20  of formal discipline at Bright Horizons, correct?
21  A  Right.
22  Q  In fact, you've been promoted, right?
23  A  Yes.
24  Q  When you got promoted, was there a pay increase
25  that went along with that?

Page 46

1  A  Yes.
2  Q  How much?
3  A  One dollar.
4  Q  Per hour?
5  A  Per hour.
6  Q  I think you allude to it in Exhibit 1. I guess
7  there was a situation where there was a child that
8  vomited and you did not report that to the child's parent
9  until later; is that correct?
10  A  Yes.
11  Q  All right. Were you ever reprimanded in any way
12  for not reporting that to the parent?
13  A  I was questioned as to why and told that things
14  like that need to be talked to right away. But I had
15  gone to a supervisor right away.
16  Q  Who did you go to?
17  A  I was in Ms. Linda Horner's office.
18  Q  And that's what you talk about when you say it
19  wasn't reported on 4/19; it was, in fact, reported on the
20  same day?
21  A  Right, yes. When this teacher came in when I
22  asked for the help, Mairin came in -- on the next page it
23  may say I finished doing what I was doing and I excused
24  myself; I took a break.
25  Q  When you went to Ms. Horner about the child

Page 47

1  vomiting situation, did you tell her, hey, I think we
2  need to call the parents?
3  A  No. I didn't tell her that.
4  Q  Okay. Did she tell you one way or another
5  whether she thought the parents should be contacted?
6  A  No. She asked if I thought the child was sick
7  or ill, and I told her in my view, she wasn't; I think
8  she was hot and upset. Ms. Sue may have been in the room
9  with Ms. Linda as well; maybe had come in during the
10  conversation because I know she said we should just watch
11  her the rest of the day and, you know, see if she vomited
12  again.
13  Q  How long have you known Ms. Saunders?
14  A  She was at Bright Horizons before me, before the
15  first time. So I've known her since I've worked there.
16  Q  Did you know her prior to the two of you working
17  at Bright Horizons?
18  A  No.
19  Q  Other than being a work acquaintance, do you
20  consider her at that point in your life to be a friend?
21  A  She's my friend. We don't see each other
22  outside of work.
23  Q  Have you ever socialized with her outside of
24  work?
25  A  No. Other than a work event, no.

Page 48

1  Q  Are you familiar with employees at the
2  Queen Palm location by the name of Krissy and Sara?
3  A  I know of Krissy. I'm not sure who Sara is.
4  Q  During any time from 2009 to the present, can
5  you remember any employees either by the name of Krissy
6  or -- well, I know you said Krissy, but can you remember
7  Sara?
8  A  I know a Krissy currently, if it's the same
9  Krissy.
10  Q  Okay. Do you know what Krissy's last name is?
11  A  The one I'm thinking of?
12  Q  Yes.
13  A  It's Hodel.
14  Q  Do you know how long Krissy Hodel has worked at
15  the Queen Palm location?
16  A  She's been there a long time. "A long time," I
17  don't know exactly how long.
18  Q  All right. What specifically does Krissy Hodel
19  do at the Queen Palm location?
20  A  Now, the one I'm thinking of, she works on the
21  other end of the building with, I believe, the
22  preschool-age children, three or four, maybe four years
23  old.
24  Q  Have you ever had any issues with Krissy Hodel?
25  A  No.



KRISTIN TURNER
NORMAN vs. BRIGHT HORIZONS

May 23, 2013
49–52

Page 49
1  Q   All right.
2      MR. OWENS: Ma'am, that's all I have for you.
3  Mr. Burruezo may have some questions for you, but I'm
4  all finished.
5      MR. BURRUEZO: I have no questions, and we'll
6  read.
7      MR. OWENS: Okay. You're all finished.
8  (The deposition of KRISTIN TURNER was concluded
9  at 10:50 a.m., and reading and signing is not
10 waived.)

Page 50
1          CERTIFICATE OF REPORTER
2  STATE OF FLORIDA   )
3  COUNTY OF PINELLAS )
4      I, JULIE R. PALITTO, RPR, Registered Professional
5  Reporter, certify that I was authorized to and did
6  stenographically report the deposition of the foregoing
7  witness; that a review of the transcript was not
8  requested; and that the transcript is a true and complete
9  record of my stenographic notes.
10     I FURTHER CERTIFY that I am not a relative,
11 employee, attorney or counsel of any of the parties to
12 this cause, nor am I a relative or employee of any of the
13 parties' attorney or counsel connected with this action,
14 nor am I financially interested in the outcome of this
15 action.
16     Dated this  day of   2013, at Clearwater,
17 Pinellas County, Florida.
18
19
20         JULIE R. PALITTO, RPR-CP

Page 51
1          CERTIFICATE OF OATH
2  STATE OF FLORIDA   )
3  PINELLAS COUNTY    )
4      I, JULIE R. PALITTO, RPR-CP, the undersigned
5  authority, certify that KRISTIN TURNER, the witness named
6  herein, personally appeared before me for the taking of
7  the foregoing deposition and was by me first duly sworn
8  to tell the whole truth.
9      Witness my hand and official seal this ____ day
10 of _____, 2013.
11          _Julie Palitto_
12          JULIE R. PALITTO, RPR-CP
13          Notary Public, State of Florida
            My Commission No. EE 854401
14          Expires: December 4, 2016

Page 52
1  PLEASE ATTACH TO THE DEPOSITION OF:
   KRISTIN TURNER
2  DATE TAKEN: May 23, 2013
   IN THE CASE OF: JANICE NORMAN and VANESSA SMITH
3  vs. BRIGHT HORIZONS FAMILY SOLUTIONS, LLC, d/b/a BRIGHT
   HORIZONS CHILDREN'S CENTERS
4
           ERRATA SHEET
5  INSTRUCTIONS:
       After reading the transcript of your deposition,
6  please note any change, addition, deletion on this sheet.
   Do Not make any marks or notations on the transcript
7  itself. Please sign and date this errata sheet and then
   kindly return it to the court reporter whose name is
8  shown below.

9  Page Line       CORRECTION AND REASON THEREFOR
10
11
12
13
14
15
16
17
18
19     Under penalties of perjury, I declare that I
20 have read the foregoing document and that the facts
   stated in it are true. SIGNED AT _____ Florida,
21 this, ____ day of _____, 2013.
22
23          KRISTIN TURNER

