**Page 1**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

JANICE NORMAN and

VANESSA SMITH,

Plaintiffs,

vs.     Case No.: 8:12-cv-01301-EAK-TBM

BRIGHT HORIZONS FAMILY

SOLUTIONS, LLC, d/b/a BRIGHT

HORIZONS CHILDRENS' CENTERS,

Defendant.

_____

DEPOSITION OF LINDA HORNER

Monday, June 10, 2013

9:55 a.m. - 11:43 p.m.

Florin Roebig, P.A.

2101 West Platt Street

Tampa, Florida

_____

REPORTED BY:

THERESA LYNN KIRKMAN, RPR

Notary Public, State of Florida

Esquire Deposition Solutions - Tampa, Florida

(813) 221-2535 - (800) 838-2814

Job No. 378317

**Page 2**

1  APPEARANCES:

2     GREGORY A. OWENS, ESQUIRE
       Florin Roebig, P.A.
3      777 Alderman Road
       Palm Harbor, Florida 34683
4      727.786.5000
       Greg@FlorinRoebig.com
5         Attorney for Plaintiffs

6

7     JASON M. LEO, ESQUIRE
       Littler, Mendelson, P.C.
8      111 North Magnolia Avenue
       Suite 1250
9      Orlando, Florida 32801-2366
       407.393.2940
10     jleo@littler.com
          Attorney for Defendant

11

12         INDEX          PAGE

13  Examination by Mr. Owens.................  03

14  Certificate of Reporter...................  75

15  Certificate of Oath.......................  76

16  Signature Page/Errata Sheet...............  77

17

18         EXHIBITS

19  NO.  DESCRIPTION          PAGE

    01  Complaint                49

20

    02  Job Performance Appraisal-Janice Norman  58

21

    03  Bright Horizons Employee Conference Memo  59

22

23

24

25

**Page 3**

1        The deposition of LINDA HORNER was taken

2  pursuant to notice by counsel for the Plaintiffs on the

3  10th day of June 2013, commencing at 9:55 a.m., at Florin

4  Roebig, P.A., 2101 West Platt Street, Tampa, Florida.

5  Said deposition was reported by Theresa Lynn Kirkman,

6  RPR, Notary Public, State of Florida.

7        - - - - - - - - -

8        THE REPORTER:  Ma'am, would you raise your

9  right hand, please?

10       THE DEPONENT:  Yes.

11       THE REPORTER:  Do you solemnly swear your

12  testimony you're about to give in this case is the

13  truth, the whole truth and nothing but the truth?

14       THE DEPONENT:  Yes, I do.

15       THE REPORTER:  Thank you.

16  WHEREUPON:

17            LINDA HORNER,

18  a witness, having been duly sworn to tell the truth, the

19  whole truth and nothing but the truth, was examined and

20  testified as follows:

21            EXAMINATION

22  BY MR. OWENS:

23       Q.  Could you please state and spell your name for

24  the record?

25       A.  Linda Horner, L-I-N-D-A, H-O-R-N-E-R.

**Page 4**

1        Q.  Have you gone by any other names other than

2  Linda Horner?

3        A.  No.

4        Q.  Okay.  Do you have any intention --

5        A.  Oh, I had a maiden name --

6        Q.  Okay.

7        A.  -- sorry.

8        Q.  What's your maiden name?

9        A.  Yes.  L-U-C-A-R-I-N-E.

10       Q.  Do you have any plans to change your name from

11  today going forward in the next year or so?

12       A.  No, I do not.

13       Q.  What's your current address?

14       A.  10633 Tavistock, T-A-V-I-S-T-O-C-K, Drive,

15  Tampa, Florida 33626.

16       Q.  Okay.  Miss Horner, we've met already; but,

17  again, my name's Greg Owens, I represent Janice Norman

18  and Vanessa Smith in connection with their legal claims

19  against Bright Horizons Family Solutions, LLC, doing

20  business as Bright Horizons Childrens' Center.  If it's

21  okay with you, I'm just going to call it Bright Horizons;

22  is that all right?

23       A.  Yes.

24       Q.  All right.  Have you ever had your deposition

25  taken before?



Page 5

1    A.   No --
2    Q.   Okay.
3    A.   -- I have not.
4    Q.   I'm going to quickly go through the rules.  I
5    don't want to keep you here too long today, but I want to
6    get through the rules so we're on the same page.
7         As you probably know, I'm going to be asking
8    you questions today under oath; you're expected to
9    provide truthful answers.  I don't always ask perfect
10   questions, so if I ask one that you don't understand or
11   you didn't hear, just ask me to repeat it or rephrase it
12   and I'll do that for you, okay?
13   A.   Uh-huh.
14   Q.   Is that a yes?
15   A.   Yes.
16   Q.   All right.  That's the second rule.
17   A.   Okay.
18   Q.   As you can see, we have a court reporter here
19   taking down everything that we say.  It's difficult for
20   her to take down shakes of the head, nods of the head,
21   uh-huhs or uh-uhs.  If you can try your best to verbalize
22   as a "yes" or "no," I know she'll appreciate that, okay?
23   A.   Yes.
24   Q.   All right.  It's very typical that we do that
25   in human conversation and interactions, so if you say

Page 6

1    "uh-huh" or nod your head, I'll just try to remind you.
2    I'm not being rude, okay?
3    A.   Okay, yes.
4    Q.   All right.  Again, I don't plan on taking too
5    much of your time, but if at any time you need to take a
6    quick break, just let me know.  The only thing I ask is
7    if I'm in the middle of a question, let's finish that
8    question and answer and then we certainly can take a
9    break, fair enough?
10   A.   Yes.
11   Q.   All right.  Miss Horner, are you currently
12   employed?
13   A.   No, I am not.
14   Q.   All right.  What was last job that you held?
15   A.   I was the Director of the Bright Horizons
16   center for Citi.
17   Q.   All right.  When did you first -- first
18   become -- meaning, when were you hired for that job as
19   Director of Bright Horizons?
20   A.   December the 6th, 13 years back.  I'd have to
21   do the math.
22   Q.   Roughly 1999/2000 time frame?
23   A.   Yes, I believe it was '99.
24   Q.   Okay.  When was the last day that you worked at
25   Bright Horizons?

Page 7

1    A.   January 2nd, 2012.
2    Q.   From roughly December of '99 to January of 2012
3    you were the Director at the Bright Horizons Citi Center
4    location the whole time?
5    A.   Yes.
6    Q.   All right.  Prior to 1999, did you hold any
7    other position with Bright Horizons?
8    A.   No.
9    Q.   Okay.  Prior to 1999 regarding your position at
10   Bright Horizons, did you hold any other child care or
11   educational-related jobs?
12   A.   Yes.
13   Q.   How many years would you say you've been in
14   that field?
15   A.   Thirty-three -- roughly 33.
16   Q.   And in January of 2012, how was it that your
17   employment ended with Bright Horizons?
18   A.   I separated from them; it was a mutual
19   agreement.
20   Q.   And when you say "mutual agreement," what do
21   you mean by that?
22   A.   It was a very bad time in my life, I was really
23   not able to continue my work the way I would be happy
24   doing it; and, honestly, my performance was not what it
25   should have been.  I had some very traumatic things

Page 8

1    happen in my life, and it was best for me not to
2    continue.
3    Q.   Okay.  And I don't want to make you relive any
4    of the traumatic things that happened in your life.
5    Would you say that you left voluntarily or that they
6    terminated you?
7    A.   I would say it was mutual.
8    Q.   Okay.  Leading up to your separation from
9    Bright Horizons, did you feel like there was an intent or
10   design by Bright Horizons to terminate your employment at
11   some point?
12   A.   I was really under quite a bit of stress and it
13   was difficult for me to continue my work as it should
14   have been.
15   Q.   Were there -- let me back up.  At the time of
16   your separation from Bright Horizons, who was your direct
17   supervisor?
18   A.   My direct supervisor was my regional manager.
19   Q.   Was that Ms. Todd or Ms. Whitley?
20   A.   Yes.
21   Q.   Okay.  Was Ms. Todd -- we'll just call her Ms.
22   Todd for the purposes of the deposition.  Was Ms. Todd,
23   in the months leading up to your separation from Bright
24   Horizons, critical of your performance?
25   A.   Yes.



Page 9

1    Q.  What specific areas of your performance was she
2  critical of?
3    A.  I would say being able to meet deadlines that
4  were placed on me.
5    Q.  Okay.  Anything else?
6    A.  No.
7    Q.  Did you receive any sort of formalized written
8  reprimands related to your performance in the months
9  leading up to your separation from Bright Horizons?
10    A.  Yes.
11    Q.  How many do you think, roughly?
12    A.  Several.
13    Q.  Were the reprimands that you received in
14  writing primarily from Ms. Todd?
15    A.  Yes.
16    Q.  Okay.  Were they all for the same or similar
17  workplace infractions or performance issues?
18    A.  Yes.
19    Q.  Okay.  And were those the failing to meet
20  deadlines you were just describing?
21    A.  As well as, you know, other -- other things
22  that were needing to be done.
23    Q.  Okay.  Like what?
24    A.  I'm just thinking now.  Maybe it was like more
25  interaction with parents, managing my leadership staff in

Page 10

1  a better way.
2    Q.  Were there complaints from parents about you?
3    A.  Not that I'm aware of.
4    Q.  Were there complaints from the teachers at your
5  center who you supervised about you?
6    A.  No, not that I'm aware of.
7    Q.  And to your understanding, how did Ms. Todd
8  know that you were having issues with communicating with
9  parents and your subordinates?
10    A.  How did she know?
11    Q.  Right.
12    A.  I don't know.
13    Q.  And we were talking about the --
14    A.  Let me just back up and say --
15    Q.  Sure.
16    A.  -- I was gone for a period of time from May
17  27th till about early August, and at that time my
18  assistant director managed the center.
19    Q.  Who would have been at that time?
20    A.  Brenda Hayes.
21    Q.  And I cut you off a little, but was there
22  something else you wanted to explain about that?
23    A.  Just that, you know, I wasn't there for a
24  period of time.
25    Q.  Okay.  When you came back in approximately

Page 11

1  August of 2011, did you feel like Bright Horizons had an
2  intention to move Ms. Hayes into your position and force
3  you out?
4    A.  Did I feel that way?  Yes, I felt that way.
5    Q.  All right.  Why was it that you felt that way?
6    A.  Just because the communication between myself
7  and Miss Hayes had broken down completely, whereas we
8  were very communicative before that.
9    Q.  Why do you think the communication broke down?
10    A.  I don't know.
11    Q.  And, again, without getting into any personal
12  issues, from May until August, were you on some sort of
13  medical leave or leave of absence?
14    A.  Yes.
15    Q.  Was it a medical leave?
16    A.  It was a leave of absence due to the death of
17  my husband.
18    Q.  Okay.  Sorry to hear that.
19        And did, in your opinion, Bright Horizons
20  provide you with a fair bereavement leave for you to take
21  time to grieve?
22    A.  Absolutely.  However, I shouldn't have even
23  come back when I did, I wasn't ready.
24    Q.  Now, we were talking earlier about the formal
25  reprimands that were put in writing and given to you; do

Page 12

1  you remember that?
2    A.  Yes.
3        MR. OWENS:  Do you need to take a break?
4        THE DEPONENT:  No, I'm okay.
5        MR. OWENS:  Are you sure?  If you need to, just
6    let me know, okay?
7        THE DEPONENT:  (Nods head.)
8        MR. OWENS:  All right.
9  BY MR. OWENS:
10    Q.  And you said that you received several, and
11  obviously that term means different things to different
12  people.  When you say "several," I assume that means more
13  than one, correct?
14    A.  Yes.
15    Q.  Okay.  Does that mean more than five?
16    A.  Well, I met with my supervisor weekly --
17    Q.  Okay.  Were you --
18    A.  -- and they were, you know, follow-ups.
19    Q.  Okay.  But I guess what I'm asking is, in terms
20  of actual formalized written reprimands that were handed
21  to you tangibly, how many do you think there were of
22  those?
23    A.  Maybe four or five.
24    Q.  Okay.  Were you ever put on any sort of action
25  plan?

Page 13

1   A.  Yes.
2   Q.  Okay.  And is that why you were meeting with
3   your supervisor --
4   A.  Yes.
5   Q.  -- pretty frequently?
6   A.  Yes.
7   Q.  Okay.  When you were given an action plan -- I
8   know every company is different, but when you were given
9   an action plan, did they give you a certain amount of
10  time until the action plan would expire?
11  A.  Yes.
12  Q.  Okay.  How long did they give you?
13  A.  Well, each action plan had its own time
14  limit --
15  Q.  Okay.
16  A.  -- you know, to do certain tasks.
17  Q.  Each task had a time limit?
18  A.  More or less, yes.
19  Q.  Okay.  How many action plans did they give you,
20  approximately?
21  A.  Well, each week there was an action plan for
22  each communication.
23  Q.  I understand.  Okay.
24      Did you feel like you were achieving the goals
25  in the action plans when they gave them to you?

Page 14

1   A.  I felt that I was able to achieve some of them,
2   but they were not to the satisfaction of my supervisor.
3   Q.  Ms. Todd?
4   A.  Yes.
5   Q.  Did she tell you that?
6   A.  No -- did she tell me that?
7   Q.  Did she tell you that you weren't meeting the
8   expectations that she had for you?
9   A.  Well, obviously I wasn't because I was getting
10  additional action plans.
11  Q.  Sure, sure.  Is that how you learned of that,
12  it was because you got additional action plans, not
13  because Ms. Todd told you?
14  A.  I don't really remember if she told me, you
15  know.  I mean, we had a discussion every week, so I'm
16  sure that came up.
17  Q.  Okay.  Between August of 2011 and the end of
18  your employment at the beginning of 2012, did you miss
19  any other blocks of time during that period?
20  A.  Yes.
21  Q.  Okay.  And just roughly how long?  And are we
22  talking a week, are we talking months?
23  A.  I want to say approximately a month.
24  Approximately a month, from what I recall.
25  Q.  Was that some time towards the fall or winter

Page 15

1   of 2011?
2   A.  Yes.
3   Q.  Okay.
4   A.  Yes.  As I recall, yes.
5   Q.  We've talked a little bit about written
6   reprimands.  During the time that you were the director
7   at Bright Horizons' Citi location, did you understand the
8   company to have what's often known as a progressive
9   disciplinary policy?
10  A.  Yes.
11  Q.  Okay.  And, you know, I realize that every
12  company has its own policies and rules, what did you
13  understand the progression through their disciplinary
14  policy to be?
15  A.  Basically I understood that, you know, if --
16  applying to myself as the director over, you know,
17  teachers, if a teacher was not doing, you know, what she
18  should be doing, to discuss it with her and set out some
19  goals; and then if the teacher continued to do an
20  infraction or something like that, to have a written
21  reprimand.
22  Q.  Okay.  And we'll take it step by step.  Is it
23  your understanding that kind of the first step of the
24  progressive disciplinary policy would be a verbal
25  counseling?

Page 16

1   A.  Yes --
2   Q.  Okay.
3   A.  -- depending on what the infraction was.
4   Q.  That's fair.  Is it fair to assume that there
5   are infractions that are so serious they may lead
6   directly to termination?
7   A.  Exactly.
8   Q.  Okay.  But if it's an infraction that wouldn't
9   lead directly to termination, would the first step
10  generally be a verbal counseling?
11  A.  Yes.
12  Q.  Okay.  When you give an employee -- and, again,
13  I'm only talking about employees that you personally
14  supervise as the director.  When you would give an
15  employee a verbal counseling, is that something that you
16  put in writing as well?
17  A.  Depending again.
18  Q.  What would it depend upon?
19  A.  The seriousness of it.  I mean, usually we were
20  encouraged to document any kind of, you know, discussion
21  that you had with an employee about whatever it was.
22  Q.  Who would encourage you to do that?
23  A.  Management, our company.
24  Q.  But specifically was it Ms. Todd, was it human
25  resources?



LINDA HORNER
NORMAN vs. BRIGHT HORIZONS

June 10, 2013
17—20

1   A.   I would say human resources.

2   Q.   Was that Ms. Kozy?

3   A.   Yes.

4   Q.   And, in fact, was that your practice when you

5   would have a verbal counseling with an employee, to try

6   to keep notes of the date and the substance of

7   conversation that you had with the employee?

8   A.   I try to, uh-huh.

9   Q.   Were there times when you failed to?

10   A.   I would say yes.

11   Q.   All right. After verbal counseling, would it

12   go to a written reprimand?

13   A.   Yes.

14   Q.   Presumably that's in writing, correct?

15   A.   Correct.

16   Q.   Is there a standardized company form or

17   document that you would utilize for the written

18   reprimand?

19   A.   Yes.

20   Q.   Was there any such thing as a final written

21   warning that would be provided for an employee to put

22   them on notice that one more infraction could lead to

23   their termination?

24   A.   I would say it was the same basic form; it had

25   different options to check, whether it was a reprimand or

1   termination.

2   Q.   Was it your practice as a supervisor, when you

3   felt like an employee maybe only had one more option, to

4   put them on notice that this is their final warning and

5   if it happens again they would be terminated?

6   A.   Okay. Repeat that for me, please.

7   Q.   Of course. Was it your practice as the

8   director, if you had an employee who engaged in some

9   infractions and you felt like if it happened one more

10   time you were going to terminate them, would you let them

11   know through one of these reprimands that it was their

12   final warning?

13   A.   Yes.

14   Q.   We've talked about action plans. Was there

15   ever a time that you put one of your subordinates on an

16   action plan?

17   A.   Yes.

18   Q.   And in terms of the steps of the progressive

19   discipline policy, where would the action plan fall?

20   A.   I think I only had one person who was on an

21   action plan, and I really don't remember, honestly.

22   Q.   Okay.

23   A.   If it was in writing it was probably, you know,

24   a second infraction.

25   Q.   Do you remember the employee who you had on an

1   action plan?

2   A.   Yes.

3   Q.   Who was it.

4   A.   Mercy Gilbert.

5   Q.   What -- I assume she was a teacher?

6   A.   No, she was the office manager.

7   Q.   And, generally speaking, what was the action

8   plan related to, what kind of problems was Ms. Gilbert

9   having?

10   A.   She was in charge of the billing, so problems

11   with the billing.

12   Q.   At that time, were you having any other

13   concerns about Ms. Gilbert and the way she was performing

14   her job?

15   A.   No, not at all.

16   Q.   Did Ms. Gilbert have any sort of personality

17   conflicts or issues with her coworkers?

18   A.   No, not that I'm aware of.

19   Q.   And, obviously, the final step in discipline is

20   termination. When there would be an employee who you

21   were responsible for supervising that you felt should be

22   terminated from their job, is -- is that a decision that

23   you could have made on your own?

24   A.   No.

25   Q.   Okay. What would be the steps or the process

1   by which you would have a termination of an employee?

2   A.   You were -- and I did -- supposed to keep your

3   regional manager in the loop, so to speak, and let her

4   know what was happening, and then it would go on to the

5   HR department often.

6   Q.   So would it be a situation where you, as the

7   director, would make a recommendation to your supervisor

8   in human resources that you felt like an employee should

9   be terminated?

10   A.   That would be the procedure. I myself did not

11   do that very much.

12   Q.   Okay. Why not?

13   A.   Because I didn't have that many to do, that

14   many problems.

15   Q.   Okay. Roughly how many employees -- and I know

16   you were there for a while, let's just focus on the last

17   couple of years with your employment with Bright

18   Horizons. How many employees were you involved in --

19   A.   It could be as many as --

20   Q.   -- their termination?

21   A.   -- 70 or more, 73 maybe, at any time. You

22   know, there were often substitute teachers or that kind

23   of thing, so the numbers of teachers fluctuated a little

24   bit.

25   Q.   Okay. And I think we might have missed each



LINDA HORNER
NORMAN vs. BRIGHT HORIZONS

June 10, 2013
21—24

Page 21

1  other a little bit. I was asking how many employees you
2  were involved in their terminations.
3    A.  Oh, I'm sorry.
4    Q.  That's okay.
5    A.  Oh, I have no idea.
6    Q.  Were there many?
7    A.  I would say no.
8    Q.  Was there ever a time where you felt like an
9  employee should be terminated and either Ms. Todd or Ms.
10 Kozy in human resources disagreed with you?
11   A.  No, I don't think so.
12   Q.  All right. My client, Janice Norman, did you
13 know her prior to the two of you working together at
14 Bright Horizons?
15   A.  No.
16   Q.  Were you responsible in any way for hiring Ms.
17 Norman?
18   A.  Yes.
19   Q.  Did you interview her?
20   A.  Yes.
21   Q.  All right. And, ultimately, Ms. Norman was
22 hired, correct?
23   A.  Yes.
24   Q.  All right. What was it about Ms. Norman that
25 made you feel, as the director, comfortable hiring her to

Page 22

1  work at the center?
2    A.  She was being hired as a part-time receptionist
3  and she had a very pleasant personality with the parents;
4  and, being the receptionist, that is often the first
5  thing parents see, and I saw that as a good quality.
6    Q.  Was there a time where Ms. Norman moved to a
7  full-time receptionist position?
8    A.  Possibly when the other receptionist was on
9  vacation or something like that.
10   Q.  Only when she was filling in --
11   A.  Yes.
12   Q.  -- for the other receptionist?
13   A.  As far as I can remember, yes.
14   Q.  Was there also a time where Ms. Norman would
15 float to the various rooms to cover for teachers who were
16 either on break or out for whatever reason?
17   A.  Yes.
18   Q.  Was that fairly consistent throughout Ms.
19 Norman's employment at Bright Horizons?
20   A.  Yes.
21   Q.  Did you feel like Ms. Norman -- well, backing
22 up. You would have been considered Ms. Norman's
23 supervisor, correct?
24   A.  The final supervisor. There was a program
25 coordinator who was her immediate supervisor.

Page 23

1    Q.  Who was that?
2    A.  That would have been Miss Hayes.
3    Q.  And as the director for Bright Horizons at the
4  Citi Center, you would have been the highest-level
5  management employee at that location, correct?
6    A.  I need to make a correction.
7    Q.  Sure.
8    A.  Okay. Not only Miss Hayes, but also the infant
9  and toddler coordinator, Miss Saunders.
10   Q.  All right. And back to my question. As the
11 director at the Bright Horizons Citi location, you would
12 have been considered the highest-level management
13 employee at that location, correct?
14   A.  Yes.
15   Q.  Was Ms. Norman respectful to you as her
16 supervisor?
17   A.  Yes.
18   Q.  Did you ever have any personality conflicts
19 with Ms. Norman?
20   A.  I myself did not.
21   Q.  Did you personally ever have any concerns with
22 the manner in which she performed her job as a
23 receptionist?
24   A.  Occasionally.
25   Q.  Tell me about those.

Page 24

1    A.  I was trying to work with Miss Norman --
2  occasionally she would have gotten into an inappropriate,
3  let's say, argument or something like that with a
4  coworker and it would be in front of parents or in front
5  of other teachers, which I considered unprofessional. So
6  I was trying to help her learn why that was not a good
7  thing to do.
8    Q.  You verbally counseled her?
9    A.  Yes.
10   Q.  Do you know if you documented that anywhere?
11   A.  I don't believe I did.
12   Q.  In going back to that; if, in fact, you would
13 document a verbal counseling for any employee, is that
14 something that you would place in their personnel file?
15   A.  Not necessarily.
16   Q.  Where would you put it?
17   A.  Well, I just would keep some notes in my desk.
18   Q.  After you had the conversations with Ms. Norman
19 that you were just describing, did you feel like she was
20 doing better after that?
21   A.  Not all the time.
22   Q.  Did you have to have follow-up conversations
23 with her?
24   A.  I believe so.
25   Q.  Did you document those anywhere?



Page 25

1    A.  I don't think so.
2    Q.  My client, Vanessa Smith, did you know her
3 prior to the two of you working together at Bright
4 Horizons?
5    A.  No.
6    Q.  Were you involved in any way in the decision to
7 hire her?
8    A.  Yes.
9    Q.  Did you interview her?
10    A.  Yes.
11    Q.  What about Ms. Smith led you to feel
12 comfortable, as the director, to hire her at the Citi
13 Center?
14    A.  She seemed very interested in working with
15 children and eager to become part of the team there.
16    Q.  Did you feel that -- based on her work
17 experience, that she was qualified?
18    A.  I believe she had some good recommendations.
19 So, yes, at the time, uh-huh.
20    Q.  And what position ultimately was Ms. Smith
21 hired for?
22    A.  An assistant teacher.
23    Q.  What does it mean to be an assistant teacher at
24 Bright Horizons?
25    A.  What does it mean?  It means that you probably

Page 26

1 are an additional teacher in the classroom.
2    Q.  You assist another teacher in their particular
3 classroom?
4    A.  Yes.
5    Q.  Who was Ms. Smith -- when she was first hired,
6 who was Ms. Smith assisting?
7    A.  Oh, gosh.  It may -- I don't really remember
8 who was in that room.
9    Q.  Is it possible it was Kristin Turner?
10    A.  She was in that room.
11    Q.  And it could have been somebody else as well?
12    A.  Well, I think there was another person in that
13 room as well, I don't really recall.
14    Q.  Was Ms. Smith respectful to you as her
15 supervisor?
16    A.  Yes.
17    Q.  Did you ever have any personality conflicts
18 with Ms. Smith?
19    A.  Personality conflicts, no.
20    Q.  Did you ever have any concerns with regard to
21 the manner in which Ms. Smith was performing her job as
22 an assistant teacher?
23    A.  Yes.
24    Q.  How so?
25    A.  Her immediate supervisor would tell me that she

Page 27

1 was not performing her job duties as were expected.
2    Q.  Who was the immediate supervisor that told you
3 that?
4    A.  Susan Saunders.
5    Q.  Did you personally have the opportunity to
6 witness Ms. Smith's performance as an assistant teacher?
7    A.  No.
8    Q.  So it's fair to say that you don't have any
9 first-hand knowledge as to whether she was performing
10 well or not, other than what other people told you?
11    A.  Yes.
12    Q.  Was there a point in time when you were the
13 director at the Citi location where there was an
14 investigation into allegations of child abuse?
15    A.  Yes.
16    Q.  How did you first come to learn there was an
17 accusation of child abuse at the center?
18    A.  When Social Services appeared at the center.
19    Q.  Prior to Social Services coming to the center,
20 was there any employees at Bright Horizons who would come
21 to you first and articulated any concerns about alleged
22 abuse?
23    A.  Well, I mean, are you talking about one
24 specific time or -- because there was more than one time.
25    Q.  Okay.  And we'll talk about all of them, and

Page 28

1 that's a fair point.  Let's focus on accusations against
2 Kristin Turner, okay?
3    A.  Okay.
4    Q.  You understood that there were allegations that
5 Ms. Turner was being abusive toward the children,
6 correct?
7    A.  When Social Services came to the center.
8    Q.  All right.  And that was in your -- to your
9 recollection, that was the first time you'd heard about
10 it, correct?
11    A.  Yes.
12    Q.  All right.  What did Social Services tell you
13 when they first talked to you?
14    A.  They didn't really say very much at all, they
15 just came in and went right into the classroom, which was
16 very shocking.
17    Q.  Why was it shocking?
18    A.  Because normally that wasn't the procedure.
19    Q.  What is the procedure normally?
20    A.  Well, usually they would talk to me first and
21 then talk -- you know, say they wanted to talk to this
22 teacher or that teacher, whatever, and then subsequently
23 perhaps go into the classroom.
24    Q.  Okay.  After going to the classroom, did a
25 representative from Social Services come and speak to



LINDA HORNER
NORMAN vs. BRIGHT HORIZONS

June 10, 2013
29—32

Page 29

1 you?
2    A.  Gosh, I'm trying to remember.  I don't really
3 recall.  I don't recall.
4    Q.  So was it just --
5    A.  I know I didn't have a lot of contact with them
6 after that whole incident at all.
7    Q.  Okay.  Was it simply because some
8 representatives from Social Services showed up that you
9 just kind of generally came to understand that they were
10 performing an investigation?
11    A.  Yes.  That's, you know, not an unusual thing
12 that happens at a center.
13    Q.  Sure.  Did somebody from Social Services or the
14 sheriff's department ever come and talk to you about the
15 allegations and specifically what were?
16    A.  At that time.
17    Q.  Okay.  That same day that they showed up at the
18 center?
19    A.  Uh-huh.
20    Q.  Is that a yes?
21    A.  Yes.
22    Q.  All right.
23    A.  Sorry.
24    Q.  What did the -- well, who was the
25 representative that spoke to you that day?

Page 30

1    A.  I don't recall her name.
2    Q.  Do you remember if she was from the sheriff's
3 office or from Child Protective Services?
4    A.  I believe it was Child Protective Services.
5    Q.  What did she tell you they were there
6 investigating?
7    A.  Inappropriate handling of a child.
8    Q.  By Ms. Turner?
9    A.  By Ms. Turner.
10    Q.  Did they say it was just one specific child or
11 several children?
12    A.  It was one specific child, as I recall.
13    Q.  What information were they seeking from you
14 related to this accusation against Ms. Turner?
15    A.  They didn't really ask me very much.
16    Q.  Did she ask you if you ever witnessed Ms.
17 Turner being aggressive or abusive towards children?
18    A.  Yes.
19    Q.  Had you?
20    A.  Never.
21    Q.  Did they tell you who made the complaint about
22 Ms. Turner to Child Protective Services?
23    A.  I believe they did.
24    Q.  Who did they tell made the complaint?
25    A.  Vanessa.

Page 31

1    Q.  At that time, did you have any reason to
2 believe that Ms. Smith was being untruthful about what
3 she told the government?
4    A.  At that time, there were a lot of other issues
5 going on with Miss Smith at the center, and there seemed
6 to be something new all the time cropping up.  She at one
7 time said that a parent tried to -- what was the word I
8 would use -- a parent was interested in her.  She claimed
9 that her lunch was stolen one day.  There was always
10 something new going on with Miss Smith.
11    Q.  And I appreciate all that, my question was a
12 little different though.  When you learned that Ms. Smith
13 had made the accusation against Ms. Turner, did you have
14 any reason to believe that she was being untruthful?
15    A.  I honestly didn't know what to believe from
16 her.
17    Q.  Did it upset you in any way that Ms. Smith had
18 made this accusation against Ms. Turner?
19    A.  It would upset me that any teacher made an
20 accusation about another teacher mishandling a child; so,
21 yes.
22    Q.  How so?
23    A.  How so.
24    Q.  What about the accusation would upset you as
25 the director?

Page 32

1    A.  I would never want to see a child mishandled.
2    Q.  I think we can all agree on that.  I guess what
3 I was asking, were you upset with the fact that Ms.
4 Turner had made the accusation -- or, I'm sorry, that Ms.
5 Smith had made the accusation against Ms. Turner?  Not
6 whether it was true or not, just about whether she --
7 about her making the accusation.
8    A.  Well, that is stressful for a director to hear.
9    Q.  Did it stress you out at the time?
10    A.  I was very concerned.
11    Q.  Were you concerned about whether it was true
12 that Ms. Turner had, in fact, done -- performed these
13 acts toward these children?
14    A.  Yes.
15    Q.  After this initial conversation that you had
16 with a representative from Child Protective Services, did
17 you have any follow-up conversations with anybody from
18 Child Protective Services or the sheriff's office?
19    A.  There was very little communication, as I
20 recall.
21    Q.  When you first learned of the investigation,
22 did you contact any of your supervisors at Bright
23 Horizons?
24    A.  Immediately.
25    Q.  Who did you contact?



LINDA HORNER
NORMAN vs. BRIGHT HORIZONS

June 10, 2013
33–36

Page 33

1    A.  My regional manager.
2    Q.  Ms. Todd?
3    A.  Yes.
4    Q.  What did you tell her?
5    A.  I told her what the accusation was and what
6  happened.
7    Q.  What did Ms. Todd tell you?
8    A.  Specifically, I really don't remember.
9    Q.  Do you remember generally what she told you?
10    A.  Well, obviously this was something that, you
11  know, was of serious concern and I believe -- I can't
12  remember how that went, if we notified Child
13  Protection Services -- I mean, licensing or not. I can't
14  remember.
15    Q.  Okay. Why would you have contacted licensing
16  about it?
17    A.  To self-report that this was going on -- that
18  this was an allegation anyway, I mean.
19    Q.  Is that something that licensing expects the
20  centers to self-report issues like this?
21    A.  I would say, yes, it's important to keep them
22  abreast of what's going on.
23    Q.  Do you recall contacting licensing to let them
24  know?
25    A.  I don't recall if they came out before I could

Page 34

1  even do it.
2    Q.  Other than Ms. Todd, did you talk to any of
3  your other supervisors about the fact that Child
4  Protective Services was there and performing an
5  investigation?
6    A.  I don't recall.
7    Q.  At that point in time -- well, I guess after
8  that point in time when Child Protective Services started
9  their investigation, was there any sort of internal
10  investigation conducted by Bright Horizons into the
11  allegations by Ms. Turner?
12    A.  Yes.
13    Q.  Who, to your recollection, was involved in the
14  investigation?
15    A.  Myself and her immediate supervisor, Ms.
16  Saunders.
17    Q.  What responsibility did you have in the
18  investigation?
19    A.  To talk with other teachers to see if they ever
20  saw anything like that before.
21    Q.  Who all did you speak with?
22    A.  Oh, gosh. Obviously her teammates and probably
23  anybody else that, you know, worked with her. I don't
24  really remember exactly who they were now.
25    Q.  Can you remember any names?

Page 35

1    A.  Maybe Mary Ann, and I've forgotten her last
2  name.
3    Q.  Is it --
4    A.  Hurns.
5    Q.  -- Hurns?
6      THE REPORTER:  What was that?
7      MR. OWENS:  Hurns, I think it's H-U-R-N-S.
8      THE DEPONENT:  Uh-huh.
9    A.  Gosh, I really have -- I mean, my recall is not
10  the greatest.
11    Q.  And it's not an exam, just do the best you can.
12    A.  Miriam, perhaps, I've forgotten her last name.
13  Marty Gonzalez. There were several teachers that -- I
14  mean several, maybe four, so --
15    Q.  Of the teachers that you interviewed, did any
16  of them share with you any concerns that they had about
17  the manner in which Ms. Turner was interacting with the
18  children?
19    A.  No.
20    Q.  Did any of them ever say they saw her handling
21  them inappropriately?
22    A.  No, I don't believe so.
23    Q.  And I think you said Ms. Saunders also did --
24  or participated in the investigation, correct?
25    A.  Yes.

Page 36

1    Q.  Who told you that the two of you were going to
2  be responsible for doing interviews related to this
3  investigation?
4    A.  Who told us. That was just part of our job.
5    Q.  That was something that the two of you decided
6  to do on your own?
7    A.  No, HR would encourage us to talk to the other
8  teachers.
9    Q.  Did you and Ms. Saunders have a conversation
10  about what you learned through the interviews?
11    A.  Yes. I vaguely remember, yes.
12    Q.  Did Ms. Saunders tell you if any of the
13  teachers she spoke with articulated any concerned about
14  Ms. Turner and the way she treated the children?
15    A.  She did not tell me about anyone.
16    Q.  She didn't tell you anything generally or she
17  didn't tell you anything about any concerns that she
18  heard?
19    A.  Any concerns she heard.
20    Q.  During this time that Ms. Turner was being
21  investigated both by Bright Horizons and the government,
22  was she still there working with the children?
23    A.  No, I believe she was put on administrative
24  leave.
25    Q.  Was that something that you decided to do?



Page 37

1    A.  With the advice of HR.
2    Q.  Were you the person responsible for meeting
3  with Ms. Turner to tell her that she was being placed on
4  administrative leave?
5    A.  Myself and Miss -- and Susan Saunders.
6    Q.  What were the reasons that you told Ms. Turner
7  as to why she was being place on administrative leave?
8    A.  Because these allegations were made against
9  her.
10    Q.  Other than, I guess, mishandling the children,
11  were there any other allegations against Ms. Turner at
12  that time?
13    A.  I don't believe so.
14    Q.  Did you tell Ms. Turner that you were putting
15  her on administrative leave for her protection?
16    A.  Yes.  It was policy to remove the teacher from
17  the center for her protection.
18    Q.  Okay.  Is that a written policy?
19    A.  I'm trying to remember.  I believe it may have
20  been.
21    Q.  Why did you feel that Ms. Turner needed
22  protected?
23    A.  Well, we didn't want -- first of all, we didn't
24  want other parents to -- you know, because we're -- you
25  know, these kinds of things get known, okay, through the

Page 38

1  parent population, and we wouldn't want the parents to
2  think that we had somebody who was accused of something
3  still in the classroom working with the children.
4    Q.  And because Ms. Smith was the one that made the
5  accusations, did you similarly put her on leave to
6  protect her?
7    A.  I don't believe so.
8    Q.  Why not?
9    A.  That wasn't policy, as I understood it.
10    Q.  So was Ms. Smith, during the period of time the
11  investigation was being conducted both internally and
12  externally, still working with the children?
13    A.  Yes.  I believe so, yes.
14    Q.  When you were having the interviews with the
15  teachers as part of the internal investigation at Bright
16  Horizons, were you taking notes as to what they were
17  telling you?
18    A.  Yes.
19    Q.  Were you doing that in handwritten form or were
20  you typing it on a computer?
21    A.  Handwritten form.
22    Q.  After you made these handwritten notes of what
23  the witnesses or teachers, I guess, were telling you, did
24  you provide them to somebody?
25    A.  No --

Page 39

1    Q.  Okay.  Where did you --
2    A.  -- I don't believe --
3    Q.  -- put them?
4    A.  -- so.
5    Q.  Do you remember where you put them?
6    A.  Just probably in my files; but they were
7  required to write up their statement.
8    Q.  Each teacher?
9    A.  Uh-huh.
10    Q.  Is that a yes?
11    A.  Yes, it is.
12    Q.  Did they give them to you after they wrote them
13  up?
14    A.  Yes.
15    Q.  All right.  And then I think you said you put
16  them in some files?
17    A.  Yeah, just -- if they were just loose, written
18  notes, I probably put them in my desk.
19    Q.  All right.  You didn't provide them to Ms. Todd
20  or human resources?
21    A.  The teacher statements were.
22    Q.  The teacher statements were given to Ms. Todd?
23    A.  Miss Kozy.
24    Q.  Okay.  Did you e-mail those to her?
25    A.  I think they were faxed.

Page 40

1    Q.  And your handwritten notes of what you learned,
2  you said you just kept them in your desk?
3    A.  Yeah.
4    Q.  What was the outcome of the internal Bright
5  Horizons investigation that you were part of?
6    A.  Well, it went on for quite a while because we
7  were waiting for the determination on Kristin.  So what
8  was the outcome?  The outcome was basically, after quite
9  a while, she was allowed to come back to work.
10    Q.  Were the allegations against Ms. Turner, in
11  your opinion, unfounded?
12    A.  Based on the fact that I never witnessed her,
13  you know, handling a child -- mishandling a child, I
14  would say yes.
15    Q.  Okay.  But isn't it true that there were other
16  teachers that told investigator, both internally and
17  externally, that they had concerns about the manner in
18  which Ms. Turner was treating the children?
19    A.  I don't recall.
20    Q.  Did anybody from Child Protective Services or
21  the sheriff's office or licensing or anybody from the
22  government share with you the findings of their
23  investigation?
24    A.  It was only after I called licensing that I
25  found out that they were unfounded.  It took a long time.



Page 41

1    Q.   And when you say "a long time," are we talking
2 weeks, months?
3    A.   Probably a month or so.
4    Q.   At that point, is that when the internal
5 investigation at Bright Horizons was closed?
6    A.   Yes, I think so.
7    Q.   As a result of this investigation into Ms.
8 Turner, were there any parents who removed their children
9 from Bright Horizons?
10    A.   Yes.
11    Q.   How many?
12    A.   One, that I'm aware of.
13    Q.   Do you remember the name of the parent?
14    A.   No, I don't.
15    Q.   Were there any parents that requested that
16 their child be moved out of Ms. Turner's classroom and
17 into another Bright Horizons classroom?
18    A.   There may have been one, but I'm not really
19 even sure about that.
20    Q.   Were there any parents who filed suit against
21 Bright Horizons based on the situation with Ms. Turner?
22    A.   Not that I'm aware of.
23    Q.   After this particular complaint and
24 investigation that we've been talking about for the last
25 ten or 15 minutes, were there any complaints about

Page 42

1 teachers' treatment of children at the center from that
2 time until the end of your employment?
3    A.   I don't believe so.
4    Q.   Was there a complaint in June of 2011 at the
5 child care licensing about children not being provided
6 water at your location?
7    A.   Yes.  Yes, that's right.
8    Q.   Okay.  Tell me what you remember about that,
9 please.
10    A.   I think -- I'm not sure who it was that
11 complained, but someone complained that the children did
12 not have water during outside play.
13    Q.   Was there an investigation done by the
14 government into that complaint?
15    A.   I think licensing came out on it, uh-huh.
16    Q.   Do you know what the outcome of that
17 complaint -- or of the investigation was?
18    A.   We rectified the situation immediately and I
19 think it was resolved.
20    Q.   When you say, "We rectified the situation," how
21 did you rectify it?
22    A.   We provided water to the children daily during
23 outdoor play.
24    Q.   So is it true that the children were not being
25 provided water?

Page 43

1    A.   Well, there are bubblers out there, but I don't
2 know if at the time they weren't working or what the
3 problem was; but the teachers, you know, would make sure
4 that the children had something to drink.
5    Q.   Do you know who made the complaint to
6 licensing?
7    A.   I think -- I'm not sure if it was Vanessa or
8 not, I'm not sure.
9    Q.   At that point in time, was Vanessa still
10 working at your location or had she since moved?
11    A.   I don't remember.
12    Q.   When you learned of the water-related complaint
13 to licensing, did you again contact Ms. Todd to let her
14 know?
15    A.   I'm sure I did.
16    Q.   Did you also contact Ms. Kozy?
17    A.   I don't remember.
18    Q.   Do you know if Ms. Norman had any role in this
19 complaint about the water?
20    A.   I don't believe so.
21    Q.   Did Ms. Norman ever complain to you about the
22 children not having sufficient water, in her opinion,
23 during the time that you two worked at the center
24 together?
25    A.   I don't believe so.

Page 44

1    Q.   Did Ms. Norman ever come to you during the time
2 she worked with you and tell you she had concerns about
3 the way Ms. Turner was treating the children?
4    A.   I'm trying to remember if she did or not.  I
5 think she may have after this.
6    Q.   Okay.  After Child Protective Services came in
7 to do an investigation?
8    A.   I don't remember when it was in the time frame.
9    Q.   All right.  What specifically do you recall Ms.
10 Norman telling you?
11    A.   You know, I really don't remember.  I don't
12 remember exactly what she said.  I just vaguely remember
13 that she may have said something about the way Kristin
14 was treating children.
15    Q.   Other than -- well, did Ms. Smith ever come to
16 you personally and share any concerns that she had about
17 the way that Ms. Turner was treating the children?
18    A.   I know she said that she did, I don't recall
19 her doing that.
20    Q.   When you say, "I know she said that she did,"
21 how did you learn of that?
22    A.   Because I believe Miss Saunders told me
23 that she said that Vanessa told Miss Saunders and myself.
24    Q.   But your recollection is that --
25    A.   I don't remember --



Case 8:12-cv-01301-TBM   Document 37   Filed 06/28/13   Page 12 of 19 PageID 706

LINDA HORNER                                                      June 10, 2013
NORMAN vs. BRIGHT HORIZONS                                        45—48

Page 45

1   Q. -- Ms. Smith never told you?
2   A. I don't remember her telling me that.
3   Q. Other than potentially Ms. Norman telling you
4   that she had concerns about Ms. Turner, were there any
5   other teachers at the center that came to you and shared
6   any concerns they had about the way Ms. Turner was
7   treating the children?
8   A. No.
9   Q. Okay. When Ms. Norman told you, did you think
10  she was being truthful?
11  A. I didn't know.
12  Q. Was Ms. -- was Kristin Turner ever formally
13  reprimanded in connection with the investigation into her
14  alleged behaviors?
15  A. "Formally reprimanded," what do you mean by
16  that?
17  Q. Well, did she receive any sort of reprimand
18  that was put on a company document and provided to her?
19  A. She would have received a document that stated
20  that she was placed on administrative leave.
21  Q. Okay. Other than the administrative leave, was
22  she given any sort of formal reprimand or final warning?
23  A. No, I don't believe so.
24  Q. Did you receive any sort of counseling or
25  discipline from any of your supervisors for the manner in

Page 46

1   which you handled the situation with Ms. Turner?
2   A. Did I receive a written reprimand did you say?
3   Q. Yes.
4   A. No, I don't believe so.
5   Q. Did you receive any sort of verbal counseling
6   from your supervisors?
7   A. Yes.
8   Q. Okay. From who?
9   A. Miss Todd.
10  Q. Okay. What did Ms. -- what specifically was
11  Ms. Todd counseling you about?
12  A. Informing the other parents in the classroom.
13  Q. Meaning that you informed the other parents or
14  you failed to inform the other parents?
15  A. Both, because I informed the other parents
16  except for one because I thought that that parent knew
17  about the situation, so I didn't call her and
18  specifically discuss it with her again. And that would
19  have been the parent that withdrew child.
20  Q. Okay. So after you learned of the
21  investigation that was being conducted by Child
22  Protective Services, is it true that you then informed
23  the parents of what was going on?
24  A. Yes.
25  Q. Just the parents of the children in Ms.

Page 47

1   Turner's classroom?
2   A. Yes, I believe so.
3   Q. All right. And you informed all except for one
4   you said, correct?
5   A. Right.
6   Q. Okay. So was Ms. Todd primarily counseling you
7   based on the fact you failed to inform the one parent?
8   A. That was part of my --
9   Q. What was the other part?
10  A. Well, the other part was that she informed me
11  to inform the other parents. She talked to me about
12  informing the other parents in that room.
13  Q. Because you hadn't done it to that point?
14  A. Well, she was counseling me all along, as soon
15  as this incident happened, as to what my next steps would
16  be.
17  Q. All right. Was Ms. Todd critical of you in any
18  way for informing the parents about what was going on?
19  A. No.
20  Q. So it sounds like the only thing that Ms. Todd
21  was critical of you was related to the fact that you
22  failed to inform one of the parents; is that fair?
23  A. In the same manner that all the other parents
24  were informed.
25  Q. How did you inform all the other parents?

Page 48

1   A. By phone.
2   Q. How did you inform this other parent?
3   A. This -- I'm trying to remember. This other
4   parent -- this other parent knew about the situation, and
5   I don't know how she found out about it.
6   Q. Did that parent confront you about what was
7   going on after she had learned about it --
8   A. In a meeting --
9   Q. -- from other source?
10  A. -- with the parents.
11  Q. Is that the policy of Bright Horizons -- or is
12  it the policy of Bright Horizons to inform the parents of
13  children in a particular classroom where there are
14  accusations against the teacher?
15  A. The policy, yes, I believe it is.
16  Q. Okay. Did you ever have any conversations with
17  Vanessa Smith where you asked her what the government
18  representatives were asking her during their
19  investigation?
20  A. I don't recall.
21  Q. Okay. And same question for Ms. Norman, did
22  you ever have a meeting with Ms. Norman as to what she
23  was being asked during the government's investigation?
24  A. I don't recall.
25  Q. Do you remember a situation where a child



**Page 49**

1  vomited in Ms. Turner's classroom and the parent was not
2  informed?
3      A.  Yes.
4      Q.  All right.  Were you ever counseled about that
5  situation?
6      A.  From my supervisor?
7      Q.  Yes.
8      A.  I may have been, I don't remember exactly.  It
9  wasn't normal policy to let a parent know if a child
10  vomited, I think, as I recall, in the way this child
11  vomited.  This wasn't something where the child was sick,
12  I don't think.
13      Q.  Okay.  Did you counsel or reprimand in any way
14  Ms. Turner for not contacting the parents when this
15  particular child vomited?
16      A.  I would say probably, yes, because from that
17  point on we made a policy of notifying parents for any
18  vomiting.
19          (Exhibit Number 1 was marked.)
20  BY MR. OWENS:
21      Q.  I am showing you what's been marked as
22  Exhibit 1, it's two pages.  The second one really doesn't
23  have any language on it, so if you could just focus on
24  the first page.  Take a moment and look through it.
25  You're more than welcome to read the entire thing, all

**Page 50**

1  I'd like you to focus on ultimately for purposes of this
2  deposition is the very first paragraph under "Summary,"
3  okay?  But take your time and just let me know whenever
4  you're ready.
5      A.  Okay.
6      Q.  All right.  Ms. Horner, Exhibit 1 that I've
7  handed you, do you recognize it?
8      A.  I --
9      Q.  Let me ask it differently.  Prior to today,
10  have you ever seen Exhibit 1?
11      A.  I don't remember.  I don't remember if this is
12  something that came back from licensing or not.
13      Q.  If you look at the top of the document where it
14  says, "Date" --
15      A.  Uh-huh.
16      Q.  -- it says April 22nd, 2011.  Do you think
17  that's approximately the time frame that the
18  investigation was being conducted into the allegations
19  related to Ms. Turner?
20      A.  I honestly do not remember.
21      Q.  And you see where it says, "Complaint, possible
22  inappropriate discipline"?
23      A.  Yes.
24      Q.  Was it your understanding at the time that that
25  was what the government was investigating related to Ms.

**Page 51**

1  Turner?
2      A.  Yes.
3      Q.  All right.  In the first paragraph it talks
4  about an interview of you, do you see that?
5      A.  Yes.
6      Q.  Have you had the opportunity to read that
7  paragraph?
8      A.  Yes.
9      Q.  Is there anything in that paragraph, after
10  reading it, that you believe is inaccurate?
11      A.  Inaccurate.  The only thing I would say that I
12  really don't remember, I know it says here that Linda
13  states that on -- let's see here.  "Linda states that she
14  spoke briefly with staff member Vanessa who brought this
15  same allegation to her attention."  I'm very fuzzy about
16  that, I don't remember that.
17      Q.  Do you think it's possible that you told the
18  investigator that?
19      A.  I don't know.
20      Q.  In your experience of over 30 years in this
21  industry, if there's an investigation conducted into
22  child abuse or neglect and the government finds, in fact,
23  abuse or neglect occurred, what kind of ramifications are
24  there, not for the individual who performed the acts of
25  abuse, but for the organization itself?

**Page 52**

1          MR. LEO:  Objection, form.
2          I'm just stating an objection for the record.
3  BY MR. OWENS:
4      Q.  You can answer.
5      A.  Oh, okay.  Ask the question again, please.
6          MR. LEO:  Tricky lawyer talk.
7  BY MR. OWENS:
8      Q.  Sure, of course.  Of course.
9          In your experience, if there's an allegation of
10  abuse or neglect that ultimately is found to be true by
11  the government, what kind of ramifications are there for
12  the -- for the company; not the individual, but for the
13  company?
14      A.  What kind of ramifications for the company.
15  I'm sure this is not something that the company wants to
16  have happen.
17      Q.  I think we can all agree on that.
18      A.  But, I mean, other than that, specifically I
19  don't know.
20      Q.  Okay.  And maybe doing it through a
21  hypothetical would be easier.  Let's assume, under this
22  particular circumstance, either Child Protective Services
23  or the Department of Children and Families or licensing
24  or whomever found that, in fact, Mrs. Turner abused a
25  child or children in her classroom --



LINDA HORNER
NORMAN vs. BRIGHT HORIZONS

June 10, 2013
53–56

Page 53

1    A.  Okay.
2    Q.  -- let's assume that happened, would the
3  facility have possibly been fined or shut down or had any
4  other sort of penalties levied against it?
5         MR. LEO:  Objection, form.
6    A.  I imagine that that could happen, it never
7  happened to me.
8    Q.  Sure.  And are you aware of any laws, either
9  federally or in the state of Florida or even locally,
10  that say that when a center that's responsible for the
11  care and well-being of children is found to have a
12  teacher who abuses them, it can be held responsible
13  criminally or civilly?
14         MR. LEO:  Objection, form.
15    A.  I'm not aware.
16    Q.  Okay.  In your experience during your 30-plus
17  years in the industry, has there ever been a facility
18  that you worked for that had a fine levied against it for
19  child abuse or neglect or was it shut down in relation to
20  those allegations?
21    A.  No.  Not that I recall, no.
22    Q.  Do you recall a situation where Vanessa Smith
23  was criticized for leaving children alone in a bathroom?
24    A.  Yes.
25    Q.  What do you remember about that?

Page 54

1    A.  I don't remember -- I believe that Miss
2  Saunders made me aware of that.
3    Q.  Did you ever personally witness Ms. Smith
4  leaving children in a bathroom?
5    A.  No.
6    Q.  And Ms. Saunders told you that she witnessed
7  it?
8    A.  I don't believe she witnessed it directly.
9    Q.  Do you know if anybody witnessed Ms. Smith
10  allegedly leaving children alone in a bathroom?
11    A.  I'm trying to remember the details of that
12  situation.  I don't remember.
13    Q.  Were you personally involved in any way in
14  counseling or reprimanding Vanessa Smith in connection
15  with these allegations about leaving the children in a
16  bathroom?
17    A.  I believe I discussed it with Miss Sue, who
18  wrote that up.
19    Q.  Had you ever -- prior to that, have you -- did
20  you ever have any personal -- I'll just ask it
21  differently.
22         Prior to the situation that we're talking about
23  with regard to Ms. Smith and children in the bathroom,
24  did you ever witness Ms. Smith leaving children
25  unattended in any way?

Page 55

1    A.  In a center that size, I was not in the
2  classroom very much, so I did not.
3    Q.  Okay.  And, again, prior to this situation with
4  Ms. Smith and the children in the bathroom, did any of
5  your other managers who you supervised ever tell you that
6  they witnessed Ms. Smith leaving children unattended?
7    A.  Other than this situation that we're talking
8  about here?
9    Q.  Correct.
10    A.  I don't believe so.
11    Q.  Okay.  Now, at some point in time Ms. Smith
12  left the Citi Center, correct?
13    A.  Yes.
14    Q.  Okay.  And was that because she was
15  transferred?
16    A.  Yes.
17    Q.  What role, if any, did you have in the decision
18  to transfer Ms. Smith to another center?
19    A.  It was discussed with my supervisor, and
20  because she was unhappy at the center as well, it was
21  thought that she maybe she would be more successful at
22  another center.
23    Q.  Did you know of Ms. Smith to be unhappy at the
24  Citi Center?
25    A.  Well, I believe things were not really going

Page 56

1  well in the classroom, I was aware of -- you know, made
2  aware of that.
3    Q.  But did Ms. Smith ever tell you personally that
4  she was unhappy at the -- at Citi?
5    A.  I think she -- she wanted to be transferred, so
6  that made me think that she wanted to.
7    Q.  Other than that, did Ms. Smith ever tell you
8  that she was unhappy there?
9    A.  I don't remember.
10    Q.  Let me just jump back for a moment.  We were
11  talking about the accusation that Ms. Smith had left
12  children in the bathroom.  Do you remember if that
13  happened before or after the allegations against Ms.
14  Turner were being investigated?
15    A.  I don't remember.
16    Q.  Did Ms. -- did Vanessa Smith ever tell you that
17  she felt like she was being harassed at the Citi
18  location?
19    A.  Harassed.  She may have.
20    Q.  If, in fact, she did tell you that, was that
21  after the child abuse investigation was conducted?
22    A.  I would say yes.
23    Q.  Can you recall any specifics about what Ms.
24  Smith might have said to you related to harassment?
25    A.  No.



Page 57

1    Q.  After the investigation was concluded related
2  to the allegations against Ms. Turner, did you hold it
3  against Ms. Smith -- or did you hold against Ms. Smith
4  the fact that she had made the accusations against Ms.
5  Turner?
6    A.  Did I?  No.
7    Q.  Did you think that -- at that point in time,
8  did you think that Ms. Smith was lying about the whole
9  thing?
10    A.  I thought it could be a possibility.
11    Q.  And at that point, did you think that Ms.
12  Norman was lying when she told you about the concerns
13  that she had about Ms. Turner?
14    A.  I suppose I thought it was possible.
15    Q.  As we sit here today, do you think that Ms.
16  Smith and Ms. Norman were being untruthful about -- or, I
17  guess, untruthful in general about what they claim Ms.
18  Turner did with the children?
19    A.  I think it was a matter of interpretation.
20    Q.  Explain what you mean by that, please.
21    A.  Well, I mean, I think that, you know, what Miss
22  Smith and perhaps Miss Norman saw in the classroom
23  wasn't -- wasn't really abusing a child.
24    Q.  Okay.  Do you think that what Ms. Norman and
25  Ms. Smith saw in terms of the behavior by Ms. Turner was

Page 58

1  inappropriate?
2    A.  I don't know.  I don't know.
3    (Exhibit Number 2 was marked.)
4  BY MR. OWENS:
5    Q.  Miss Horner, I'm handing you what's marked as
6  Exhibit 2, it's several pages.  If you would turn to the
7  very last page with me.
8    A.  (Deponent complying.)
9    Q.  Do you see where it says "supervisor's
10  signature"?
11    A.  Uh-huh.
12    Q.  I know it's kind of fuzzy, but does that appear
13  to be your signature?
14    A.  Yes.
15    Q.  And the date that's beside it, would you agree
16  it looks like maybe April 2nd, 2010?
17    A.  Possibly, yes.
18    Q.  Okay.  And then if you'd turn to the very first
19  page, would you agree this appears to be a job
20  performance appraisal for Ms. Norman?
21    A.  Yes.
22    Q.  And the date of review is April 10th, 2010?
23    A.  Yes.
24    Q.  Do you have any reason to believe that this
25  performance review that you conducted of Ms. Norman is

Page 59

1  inaccurate in any way?
2    A.  No.
3    Q.  Meaning that when you conducted this
4  performance appraisal and filled out this form, you were
5  being truthful?
6    A.  Yes.
7    (Exhibit Number 3 was marked.)
8    MR. OWENS:  Sorry it's not stapled (tendering).
9    MR. LEO:  Thank you.
10  BY MR. OWENS:
11    Q.  All right.  Ms. Horner, I've handed you what's
12  been marked as Exhibit 3, it's two pages; but, again, the
13  first page is the one essentially that has all the
14  writing on it.  Just let me know whenever you're ready to
15  discuss this document.
16    A.  Okay.
17    Q.  All right.  Exhibit 3, do you recognize it?
18    A.  I don't remember if I saw this before.
19    Q.  Okay.  And would you agree that it doesn't
20  appear that your signature is on this document anywhere?
21    A.  Yes.
22    Q.  Okay.  And earlier we were talking about
23  putting in writing counselings or reprimands, do you
24  remember that?
25    A.  Yes.

Page 60

1    Q.  Is this the kind of standard company document
2  that would be used --
3    A.  Yes.
4    Q.  -- to do that?
5    Now at the top beside supervisor's name your
6  name is typed in there, correct?
7    A.  Yes.
8    Q.  Do you know if you had any role whatsoever in
9  typing in the information into this Employee Conference
10  Memo?
11    A.  I don't remember if I typed this or not.
12    Q.  Are you aware of the situation that's discussed
13  in this document?
14    A.  Yes, now that I read it.  I mean, I had
15  forgotten about it, but now that I read it --
16    Q.  Okay.  Do you ever personally witness or hear
17  Ms. Norman talking to parents about anything --
18    A.  No.
19    Q.  -- that was going on at the center?
20    A.  No.
21    Q.  How did you find out about the information
22  that's contained here in Exhibit 3?
23    A.  I believe Carol Stegall notified me.
24    Q.  Who's Carol Stegall?
25    A.  She is the Citi liaison between Bright Horizons



**Page 61**

1  and Citi -- she's the Bright Horizons' Lison, excuse me.
2      Q.  What did Ms. Stegall tell you?
3      A.  That she was notified that three employees had
4  said that Janice had told them information -- center
5  information. I believe that's right.
6      Q.  Okay. Ms. Norman told three parents
7  information about the center, correct?
8      A.  Yes.
9      Q.  Do you know what information Ms. Norman told
10  those individuals?
11      A.  I think it was related to the inappropriate
12  handling of a child.
13      Q.  Were those parents of the children who were in
14  Ms. Turner's classroom?
15      A.  They might have been. I'm not sure if it was
16  only them or all, you know.
17      Q.  At that point, had you already informed --
18      A.  I don't remember.
19      Q.  -- the parents what --
20      A.  That's what I was -- I don't remember that time
21  frame.
22      Q.  All right. Did you agree that Ms. Norman
23  should have been reprimanded for telling the parents what
24  was going on?
25      A.  She should have been spoken to about that,

**Page 62**

1  absolutely.
2      Q.  Why?
3      A.  Because that would be considered
4  unprofessional; it wasn't her role to go directly to
5  parents with that kind of information.
6      Q.  Was it unprofessional for you to go to the
7  parents with that information?
8      A.  Was it unprofessional for me? I think that was
9  in the scope of my -- my role.
10      Q.  Okay. So the criticism of Ms. Norman was that
11  she was acting outside of the scope of her employment and
12  role at Bright Horizons?
13      A.  Yes.
14      Q.  Were you consulted in any way with regard to
15  writing up Ms. Norman for this?
16      A.  I believe -- I believe I was informed by Carol
17  Stegall.
18      Q.  Were you informed after it had already
19  happened?
20      A.  I don't remember.
21      Q.  If you had been the supervisor that found out
22  about Ms. Norman talking to the parents, would you have
23  given her a formal reprimand like this or would you have
24  just spoken to her about it?
25      A.  I'm sure I would have discussed it with HR and

**Page 63**

1  followed their lead, and my immediate supervisor, of
2  course.
3      Q.  Do you know if the parents that Ms. Norman
4  spoke to were upset about the fact that she told them?
5      A.  I don't know.
6      Q.  Do you know if any of the parents provided any
7  statements about what Ms. Norman told them?
8      A.  Not that I recall.
9      Q.  Did you participate in the decision to
10  terminate Ms. Norman's employment from Bright Horizons?
11      A.  I did not.
12      Q.  Why not?
13      A.  I was on leave.
14      Q.  When you returned from leave, did somebody
15  notify you that Ms. Norman was no longer employed?
16      A.  Miss Hayes.
17      Q.  Did Ms. Hayes tell you why?
18      A.  Briefly, uh-huh. I was really not in the right
19  place.
20      Q.  Sure. Do you have any recollection of what Ms.
21  Hayes told you?
22      A.  I think at this time it was something about
23  changing a schedule or perhaps moving her into -- I don't
24  remember. It had something to do with taking her off the
25  receptionist position and then putting her in the

**Page 64**

1  classroom, and perhaps a change of schedule or something
2  like that. I don't recall.
3      Q.  Did you have -- other than Ms. Hayes, did you
4  have conversations with anybody else at Bright Horizons
5  about why Ms. Norman was terminated from her position?
6      A.  I may have. My supervisor may have mentioned
7  it to me, but I don't remember anything, you know,
8  specific or lengthy about it; and I really can't rely on
9  what I -- what was happening at that time.
10      Q.  How about Ms. Smith, were you involved in any
11  way in the decision to terminate her employment?
12      A.  To terminate her employment, no, I don't
13  believe so.
14      Q.  At some point in time, did you learn that Ms.
15  Smith was terminated from her employment at another
16  location?
17      A.  I believe it was after I separated from the
18  company.
19      Q.  How did you learn about it after you separated?
20      A.  I think a former -- I mean, a fellow director
21  told me.
22      Q.  Who was that?
23      A.  Justin. It was the director of the -- I
24  believe it was the director of the center where she had
25  transferred to.

Case 8:12-cv-01301-TBM   Document 37   Filed 06/28/13   Page 17 of 19 PageID 711

LINDA HORNER                                                 June 10, 2013
NORMAN vs. BRIGHT HORIZONS                                        65–68

Page 65

1    Q.   Marilyn Fuller?
2    A.   Yes.
3    Q.   How did it come to be that you and Ms. Fuller
4  had a conversation about Ms. Smith?
5    A.   I just -- it was normal, you know, to just ask
6  each other how things were going with staff in the
7  center.  It was just normal conversation that directors
8  would normally have.
9    Q.   But you said it was after you were separated
10  from Bright Horizons.
11    A.   I believe it was.
12    Q.   Are you and Ms. Fuller friends?
13    A.   No more than I was friends with any other
14  director.
15    Q.   What did Ms. Fuller tell you about Ms. Smith's
16  termination?
17    A.   She just said she was gone.  You know, it
18  wasn't a lengthy discussion about it.
19    Q.   And how was it that Ms. Smith's name came up in
20  your conversation with Ms. Fuller?
21    A.   I just had asked her about, you know, how --
22  did she have much turnover or -- that was just normal
23  conversation between teachers -- I mean, between
24  directors.
25    Q.   Did you ask her specifically about Ms. Smith?

Page 66

1    A.   I may have said, How's Vanessa doing?
2    Q.   And she told you she was terminated?
3    A.   She said she -- she just said she was gone; I
4  don't think she even said terminated.
5    Q.   Did you ask her why she was gone?
6    A.   No, uh-uh.
7    Q.   Other than Ms. Fuller, did you have a
8  conversation with anybody else at Bright Horizons about
9  the separation of Ms. Smith from the company?
10    A.   Not that I recall.  Once I had separated from
11  the company, I had very little contact with anyone.
12    Q.   The parent that you were talking about earlier
13  that was upset with you about not notifying her in the
14  same matter as the other parents, was that a Ms.
15  Mitchell?
16    A.   First name?  That doesn't sound like the right
17  name.
18    Q.   Was there a Ms. Mitchell who made any
19  complaints about you?
20    A.   There could have been, uh-huh.
21    Q.   Do you remember what -- those complaints, what
22  the nature of them were?
23    A.   I don't remember if it was related to the
24  classroom issues that we've been talking about or if it
25  was something to do with her child's menu or food or

Page 67

1  something, I don't remember.
2    Q.   Was there ever a time that you made a phone
3  call to the Florida Abuse Hotline related to the
4  situation with Ms. Turner allegedly being rough with the
5  children?
6    A.   Say it again, please.
7    Q.   Sure.  Was there ever a time, prior to the
8  investigation by Child Protective Services, where you
9  personally picked up the phone and called the Florida
10  Abuse Hotline with regard to Ms. Turner?
11    A.   I don't believe so.
12    Q.   Was there a parent who made a complaint about
13  you to any of your supervisors, or co-workers for that
14  matter, feeling that you lied to her?
15    A.   With regard to what?
16    Q.   Anything.
17    A.   Oh, gosh.
18    Q.   Can you ever remember a parent complained about
19  you allegedly lying to a parent?
20    A.   I suppose it's possible.  It was not my policy
21  to lie to parents, but -- I had very few complaints in my
22  time there, but I suppose it's possible.  I don't recall
23  the situation.  It's very hard to make over 250 parents
24  happy all the time.
25    Q.   Would you say that -- in your experience of

Page 68

1  about 12 or 13 years at Bright Horizons, that from time
2  to time parents would complain about how their children
3  were being cared for?
4    A.   Oh, I mean, you know, parents -- there were
5  complaints, you know, but normal kinds of things, you
6  know, they forgot -- the teacher forgot to put the
7  sweater on when they went outside.  I mean, nothing
8  serious; but, you know, yeah, obviously.
9    Q.   Small things that parents do because they care
10  about their kids --
11    A.   Oh --
12    Q.   -- right?
13    A.   Yes, correct.
14    Q.   Did you, from time to time, receive parent
15  complaints about, whether they were small or big things,
16  that the teachers would do?
17    A.   Of course.
18    Q.   Was that kind of your role as the director, to
19  field those complaints and deal with them appropriately?
20    A.   Yes.
21    Q.   Were there times where you had to reprimand
22  teachers based on a parent complaint?
23    A.   Reprimand, yes.
24    Q.   Were there ever -- was there ever a teacher --
25  or were there teachers that you had to terminate based on



System header

Case 8:12-cv-01301-TBM   Document 37   Filed 06/28/13   Page 18 of 19 PageID 712

LINDA HORNER                                                   June 10, 2013
NORMAN vs. BRIGHT HORIZONS                                        69–72

Page 69

1  a parent complaint?
2      A.  I'm trying to recall if there were any based on
3  a parent compliant.  Not that I recall.
4          MR. OWENS:  Let's take a short break.  I think
5      I'm just about finished, let me just look at my
6      notes quickly and then we can wrap up.
7          THE DEPONENT:  Okay.
8          (A brief recess was taken.)
9          MR. OWENS:  All right.  Miss Horner, back on
10     the record, same rules apply.
11  BY MR. OWENS:
12     Q.  We were talking about both the internal and
13  external investigation into the accusations against Ms.
14  Turner, do you remember that?
15     A.  Yes.
16     Q.  Okay.  Was there anybody from Bright Horizons
17  who came in from out of town to help out with the
18  investigation?
19     A.  I don't believe so.
20     Q.  Do you know if Ms. Kozy ever came down
21  personally to assist?
22     A.  I don't think she did.
23     Q.  Do you know if anybody from corporate
24  headquarters in Massachusetts came down to assist?
25     A.  No.

Page 70

1      Q.  Is it your opinion that, had you not mutually
2  agreed to separate your employment, that ultimately
3  Bright Horizons would have terminated you?
4      A.  No.
5      Q.  Do you think that the reprimands that you
6  received in the months leading up to your separation from
7  Bright Horizons were motivated in any way by your role in
8  the investigation into the accusations against Ms.
9  Turner?
10     A.  Well, up to that point I had really never -- I
11  had gotten stellar reviews, annual reviews; always
12  something to correct, I mean, I'm not saying I was
13  perfect, but I had very good reviews.  But after that,
14  that was such a serious thing, it personally broke me.  I
15  was very upset about that whole incident.
16     Q.  The incident related to Ms. Turner?
17     A.  Yes.
18     Q.  Okay.
19     A.  Yeah.  Say your question again, please.
20     Q.  Sure.  Did you feel -- well, you've said that
21  you were a pretty good employee prior to that.
22     A.  I believe I was.
23     Q.  Do you think that your reprimands that followed
24  that investigation were somehow motivated by your role in
25  the investigation of Ms. Turner?

Page 71

1      A.  Perhaps some.
2      Q.  What leads you to believe that?
3      A.  The inappropriate handling of the
4  investigation, as they deemed it.
5      Q.  Who deemed it?
6      A.  My supervisor, you know, I mean --
7      Q.  Ms. Todd did?
8      A.  Ms. Todd.
9      Q.  What did -- did she tell you she felt the
10  investigation --
11     A.  No.
12     Q.  -- was inappropriately handled?
13     A.  Oh, did she tell me?  I guess, yes, in terms of
14  the parent that I didn't notify.
15     Q.  Okay.
16     A.  And that was a complete mistake on my part
17  because I thought that that parent was aware.
18     Q.  Do you think that Ms. Todd similarly held
19  the -- held Ms. Smith and Ms. Norman's role in the
20  investigation against them with regard to their --
21     A.  I have no idea of that.
22     Q.  Do you think it's possible if she held that
23  against you, that she may have held it against them?
24         MR. LEO:  Objection, form.
25     I would have no way of knowing that.

Page 72

1      Q.  Okay.  Did Ms. Todd ever do anything toward Ms.
2  Smith or Ms. Norman that at the time made you feel like
3  she may be holding their role in the investigation
4  against them?
5      A.  Not that I observed.
6      Q.  Other than Ms. Todd holding against you your
7  role in the investigation, did you think that anybody
8  else at Bright Horizons might have held that same belief
9  or feeling?
10     A.  Well, first of all, I don't think that she did;
11  but, I mean, she discussed center issues with the
12  divisional vice president, perhaps he felt that way.  If
13  she did, I don't know.
14     Q.  What's his name?
15     A.  Mark Mendall.
16     Q.  Okay.  And that -- that might have been a bad
17  question on my part.  What I was asking is:  Do you
18  feel -- you, personally, do you feel that anybody else at
19  Bright Horizons might have been holding against you your
20  role in the investigation related to Ms. Turner?
21     A.  No.
22         MR. OWENS:  All right.  Ma'am, I don't have any
23     other questions.  I do appreciate your time today.
24     Thank you.
25         MR. LEO:  And I have no questions.



**Page 73**

1    MR. OWENS: Okay. One thing I will tell you,
2  since neither of us represent you, have an attorney-
3  client relationship with you, this -- I guess I'll
4  tell the court reporter that I'm going to order a
5  transcript.
6      This transcript will be ordered after the
7  court reporter types it out, you have the right and
8  opportunity to read the transcript to see and make
9  sure that everything has been taken down accurately.
10  You can also waive that right, that's entirely up to
11  you. And you can use the opportunity to make sure
12  that you don't want to make any changes to your
13  answers.
14      If you make a substantive change, for example
15  you change a "yes" to a "no" or something like that,
16  we reserve the right and opportunity to bring you
17  back and ask you why you changed your answer. But
18  if it's just a grammatical thing or something like
19  that, you can make that change.
20      Again, it's entirely up to you.
21  Unfortunately, we can't give you any advice as to
22  whether to read or waive, that's your call. But if
23  you can just let the court reporter know, she will
24  then arrange that with you.
25      THE DEPONENT: Okay. Do I have a card from you

**Page 74**

1  or something?
2      THE REPORTER: No, what we could do if you want
3  to read is they can just e-mail a copy to you so you
4  don't have to come here and read it. It's up to
5  you.
6      THE DEPONENT: Okay.
7      THE REPORTER: Is that what you want?
8      MR. OWENS: Okay.
9      THE DEPONENT: E-mail. Do you need my address?
10      THE REPORTER: Yeah. Go ahead.
11      THE DEPONENT: zero25piper@msn.com.
12      THE REPORTER: Okay. Thanks.
13      MR. OWENS: Okay. We're all finished.
14      THE DEPONENT: Okay. Could I just add one
15  thing?
16      THE REPORTER: Do you need a copy?
17      MR. LEO: Yeah, I'll take a copy.
18      MR. OWENS: Do you want to add one thing on the
19  record or just generally speaking?
20      THE DEPONENT: Just generally speaking.
21      MR. OWENS: Okay.
22      (The deposition of LINDA HORNER was concluded
23  at 11:43 a.m.)
24
25

**Page 75**

1              CERTIFICATE OF REPORTER
2
3  STATE OF FLORIDA      )
4  COUNTY OF PINELLAS    )
5
6      I, Theresa Lynn Kirkman, RPR, certify that I
7  was authorized to and did stenographically report the
8  deposition of LINDA HORNER; that a review of the
9  transcript was requested; and that the foregoing pages,
10  numbered 1-75, are a true and complete record of my
11  stenographic notes taken during said deposition.
12      I further certify that I am not a relative,
13  employee, attorney or counsel of any of the parties, nor
14  am I a relative or employee of any of the parties'
15  attorneys or counsel connected with the action, nor am I
16  financially interested in the action.
17      Dated this 19th day of June 2013.
18
19
20
21      THERESA LYNN KIRKMAN, RPR
22
23
24
25

**Page 76**

1              CERTIFICATE OF OATH
2
3  STATE OF FLORIDA      ]
4  COUNTY OF PINELLAS    ]
5
6      I, the undersigned authority, certify that
7  LINDA HORNER personally appeared before me and was duly
8  sworn on the 10th day of June 2013.
9
10
11      WITNESS my hand and official seal this 19th
12  day of June 2013.
13
14
15
16  THERESA LYNN KIRKMAN, RPR
    Notary Public - State of Florida
17  My Commission No. DD 909606
    Expires: May 17, 2014
18
19
20
21
22
23
24
25

