MARILYN FULLER
NORMAN -vs- BRIGHT HORIZONS FAMILY

June 05, 2013
1—4

**Page 1**

1   UNITED STATES DISTRICT COURT
    MIDDLE DISTRICT OF FLORIDA
2       TAMPA DIVISION

3   CASE NO.: 8:12-cv-01301-EAK-TBM

4

5   JANICE NORMAN and
    VANESSA SMITH,
6
        Plaintiffs,
7
    -vs-
8
    BRIGHT HORIZONS FAMILY
9   SOLUTIONS, LLC, d/b/a BRIGHT
    HORIZONS CHILDRENS' CENTERS,
10
        Defendant.
11   _____/

12

13

14       DEPOSITION OF MARILYN FULLER
        Taken By Counsel for Plaintiff
15          (Pages 1-117)

16

17       WEDNESDAY, JUNE 5, 2013
        2:42 P.M. - 5:09 P.M.
18

19

20       FLORIN ROEBIG, P.A.
        2101 WEST PLATT STREET
        TAMPA, FLORIDA 33606
21

22   --------------------------------

23
    Reported By: Jennifer Sirois
24   Esquire Deposition Solutions - Tampa Office
    Phone - 813.221.2535, 800.838.2814
25   Esquire Job No.: 377789

**Page 2**

1   APPEARANCES:

2

3   GREGORY A. OWENS, ESQUIRE
    Florin Roebig, P.A.
4   777 Alderman Road
    Palm Harbor, Florida 34683
5   727.786.5000
    greg@florinroebig.com
6
        Attorney for Plaintiffs
7

8

9   JASON M. LEO, ESQUIRE
    Littler Mendelson, P.C.
10   111 North Magnolia Avenue, Suite 1250
    Orlando, Florida 32801
11   407.393.2940
    jleo@littler.com
12
        Attorney for Defendant
13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 3**

1           INDEX

2

3   DEPOSITION OF MARILYN FULLER        PAGE

4   Examination by Mr. Owens            4

5   Examination by Mr. Leo              110

6   Certificate of Reporter             114

7   Certificate of Oath                 115

8

9   EXHIBITS                    PAGE

10   1       Memo                66

11   2       Action Plan         81

12   3       Memo                85

13   4       Termination Memo        85

14   5       Statement from Miss Gaines  94

15   6       Statement           102

16   7       Statement           104

17   8       Statement           105

18

19

20

21

22

23

24

25

**Page 4**

1   Deposition taken before Jennifer Sirois, Court

2   Reporter, in the above cause.

3   - - - - - - - - - -

4       THE COURT REPORTER:  Please raise your

5   right hand.

6       Do you swear or affirm that the

7   testimony you're about to give will be the

8   truth, the whole truth and nothing but the

9   truth?

10       THE WITNESS:  Yes.

11       THE COURT REPORTER:  Thank you.

12   THEREUPON,

13       MARILYN FULLER,

14   having been duly sworn or affirmed, was examined

15   and testified as follows:

16

17       DIRECT EXAMINATION

18   BY MR. OWENS:

19       Q.   Could you please state and spell your

20   name for the record.

21       A.   It's Marilyn, M-A-R-I-L-Y-N, last name

22   Fuller, F-U-L-L-E-R.

23       Q.   Other than Marilyn Fuller, have you

24   gone by any other names?

25       A.   No.



Page 5

1    Q.   Miss Fuller, my name is Greg Owens.  I
2  represent Janice Morgan and Vanessa Smith in
3  connection with their legal claims against
4  Bright Horizons Family Solutions, LLC, doing
5  business as Bright Horizons Childrens' Centers.
6  If it's okay with you, I'm just going to call it
7  Bright Horizons; is that all right?
8    A.   Bright Horizons, yes.
9    Q.   Have you ever had your deposition
10  taken before?
11    A.   Yes.
12    Q.   When was the last time that you had a
13  deposition?
14    A.   Actually, May 16th of this year.
15    Q.   What was the reason that you had your
16  deposition taken on May 16th?
17    A.   I had a car accident two years ago and
18  I have an attorney, and I was injured and had
19  surgery and all of that.  So they took the
20  deposition for that case.
21    Q.   Okay.  So it's your case that you
22  brought and you were the person injured in the
23  car accident, correct?
24    A.   Yes.
25    Q.   So I'm not going to waste your time

Page 6

1  going over the rules.  If there's anything that
2  pops up during the deposition, I'll talk to you
3  about it, but fair to say you generally
4  understand the format of what we're doing here
5  today, right?
6    A.   Yes.
7    Q.   Miss Fuller, what do you currently do
8  for a living?
9    A.   I am the director for the Moffitt
10  Child Development Center for Bright Horizons.
11    Q.   How long have you been the director of
12  the Moffitt location for Bright Horizons?
13    A.   I have been there since November 2005.
14    Q.   Prior to your position as the director
15  at Moffitt for Bright Horizons, did you hold any
16  other positions with the company?
17    A.   Yes, I was the director for the All
18  Children's Hospital Center in St. Pete.
19    Q.   How long were you the director at All
20  Children's?
21    A.   From -- I did that for five years.
22    Q.   Prior to that, any other jobs with
23  Bright Horizons?
24    A.   Assistant director for the USAA Center
25  in Tampa and I was there from -- for

Page 7

1  approximately about three years and nine months,
2  and that's when I started my time with Bright
3  Horizons.
4    Q.   Understood.  So roughly almost sixteen
5  or seventeen years with Bright Horizons?
6    A.   Close to fifteen.
7    Q.   All in management positions?
8    A.   All in management.
9    Q.   Let's just focus on your job now at
10  Moffitt.  As the director, what are your job
11  duties and responsibilities?
12    A.   Operations, staffing.  I arrange doing
13  annual performance appraisals on teachers,
14  having to do any disciplinary action memos
15  against them, training for staff development and
16  then reporting to the client, which is Moffitt.
17  Because I operate a budget that they set forth,
18  so I have to keep monthly meetings with them.
19    Q.   Who is your direct supervisor?
20    A.   My direct supervisor is Jennifer
21  Whitley.
22    Q.   She used to be known as Jennifer Todd,
23  correct?
24    A.   Jennifer Todd, yes.
25    Q.   Now, one of the -- well, we'll get to

Page 8

1  that later.
2         Would you be considered the highest
3  level management employee at the Moffitt Center?
4    A.   Yes, I am.
5    Q.   One of the things you started to talk
6  about in terms of your job duties was
7  discipline; do you remember that?
8    A.   Yes.
9    Q.   Does Bright Horizons utilize what's
10  sometimes known as a progressive disciplinary
11  policy?
12    A.   Yes, we do.
13    Q.   Obviously I've never worked at Bright
14  Horizons.  So can you kind of walk me through
15  the steps of the discipline policy there?
16    A.   The form is actually called an
17  Employee Conference Memo, that's the name of the
18  form.  We can utilize it for anything from
19  unexcused absence all the way to violation of
20  policies.
21         Usually you can do a verbal first and
22  you don't have to go to that form, give some
23  constructive criticism and have the person see
24  if they will take it.  And then if you see maybe
25  a second or a third occurrence, you go to the



MARILYN FULLER
NORMAN -vs- BRIGHT HORIZONS FAMILY

June 05, 2013
9—12

Page 9

1   form. The first step is a counsel, the second
2   step is a reprimand. And at each stage, they
3   know what the next step is going to be. And the
4   third step, termination.
5       Q.   So generally speaking, the steps are,
6   when you're using that form that you talked
7   about, a verbal and then a written warning and
8   then a termination?
9       A.   Yeah, you can do two written warnings
10  before you go to termination.
11      Q.   So maybe a written and a final
12  written?
13      A.   Written and a final written.
14      Q.   Understood. I think you had started
15  to talk about the fact that there are times
16  where you will verbally counsel an employee but
17  you may not use that form; is that right?
18      A.   Yes.
19      Q.   Now, as a person who's been management
20  at Bright Horizons for approximately 15 years
21  years, whenever you, as the manager, verbally
22  counsel an employee, do you generally take notes
23  of some sort to document the fact that you had
24  that conversation?
25      A.   No. When I do a verbal, I usually

Page 10

1   have a witness with me. Yes and no. If it's
2   not a serious offense but just something by the
3   way, you may talk to the person in their
4   classroom or maybe in the hallway, kind of
5   verbal. If it's a serious verbal, then I have a
6   witness with me.
7       Q.   And when it is, as you say, a serious
8   verbal and you have a witness, do you document
9   it in any way?
10      A.   Yes, you handwrite something and say,
11  This was brought to our attention, we don't want
12  to go to the form yet. We want to give you a
13  chance to redeem yourself, that kind of thing.
14      Q.   Is that something you would place in
15  the employee's personnel file?
16      A.   I think maybe -- yes. In most cases,
17  yes.
18      Q.   And when you make these notes that
19  we've been talking about, is it your practice to
20  do them in a typewritten format or do you
21  handwrite them?
22      A.   Sometimes typewritten, sometimes
23  handwritten.
24      Q.   In those either typewritten or
25  handwritten notes that you make, do you also

Page 11

1   note that there was a witness present for the
2   discussion?
3       A.   If there is a witness, I also have the
4   witness sign off on it, yes.
5       Q.   Now, in terms of the steps of the
6   progressive discipline that we've walked about,
7   do you generally follow those steps only if
8   they're the same or similar types of
9   infractions?
10      A.   If it's the same, yes, the steps are
11  followed. If I have counseled an employee, say,
12  about supervision on the playground and then the
13  employee had maybe something else happen, and
14  then that has to start a whole new process.
15      Q.   That's exactly what I was asking.
16  Thank you.
17      A.   Yes.
18      Q.   As we were talking about your job
19  duties and responsibilities, you brought up the
20  fact that you were involved sometimes in
21  terminations, correct?
22      A.   Yes.
23      Q.   What is the practice, at least at
24  Moffitt, since the time you've been the
25  director, for when you believe an employee

Page 12

1   should be terminated; what process do you have
2   to go through in order to finalize that
3   termination?
4       A.   Before any termination, I have to have
5   my regional manager, who is Jennifer, be aware
6   of the situation. Next step, I think she would
7   involve my HR representative, and together we
8   will meet with the employee or maybe if they're
9   not at the center, make a call to have them --
10  to let them know what we're about, maybe what
11  the proceedings are. I never make terminations
12  on my own.
13      Q.   So no matter what, when there's a
14  termination possibility, you always talk to Miss
15  Whitley?
16      A.   Yes, at least she's aware of it.
17      Q.   How does that generally work, would
18  you contact Miss Whitley and make a
19  recommendation to her that you think an employee
20  should be terminated and then there's further
21  discussion about it?
22      A.   If I ever have to ever go to the
23  second step on the employee conference form, she
24  is aware of it. She knows that's something I
25  had occasions to document and maybe we've had



Page 13

1 some verbal conversation with the employee.
2     At that time, she would get involved
3 and sort of guide me. We may try to see if we
4 can help the employee maybe somewhere else.
5 Maybe it's not a good fit here and we don't see
6 it's going to work, then --
7   Q.  When you say when the second step is
8 involved, you mean a written warning?
9   A.  The second written warning.
10   Q.  The possibly final written warning, is
11 that what you're referring to?
12   A.  Yes.
13   Q.  Has there ever been a time where you
14 have recommended to Miss Whitley that you
15 thought an employee under your supervision
16 should be fired and either she or human
17 resources disagreed with you?
18   A.  No.
19   Q.  During the time that you've been the
20 director at Moffitt, roughly how many employees
21 have you been involved in the termination?
22   A.  I would say three.
23   Q.  Can you remember the names of the
24 employees?
25   A.  One is a woman by the name of Gloria

Page 14

1 Lovejoy, one by the name of Tara Lobus-Mays,
2 T-A-R-A L-O-B-U-S M-A-Y-S, and then Vanessa
3 Smith.
4   Q.  What was Miss Lovejoy terminated for?
5   A.  Inappropriate interaction with
6 children and parents.
7   Q.  How about Miss Lobus-Mays, why was she
8 terminated?
9   A.  Tardiness and punctuality and
10 attendance issues and tardiness.
11   Q.  Repeated issues of tardiness?
12   A.  Repeated, mm-hmm.
13   Q.  And Miss Lovejoy, generally speaking,
14 what type of inappropriate interactions was she
15 having with parents?
16   A.  Calling children, in the presence of
17 the parents, names that children should not be
18 called.
19   Q.  Was she using cuss words?
20   A.  No, not cuss words.
21   Q.  Do you remember what types of names
22 she would call the children?
23   A.  Brats and things like that.
24   Q.  Were there complaints from the parents
25 about how she addressed the kids?

Page 15

1   A.  Yes.
2   Q.  With Miss Lovejoy, was the progressive
3 discipline policy followed or did you go
4 straight to termination with her?
5   A.  No. The very first one I did and the
6 second -- the day I did the second, she -- it
7 was partly termination because it was heading
8 that way and she went home and decided, I'm not
9 coming back. I don't think she wanted to be
10 served a termination letter.
11   Q.  And again, focussing just on Moffitt
12 during the time that you've been the director
13 there, have you ever had any of the employees
14 under your supervision complain about how their
15 coworkers were treating them?
16   A.  Many times.
17   Q.  Can you give an example of one you can
18 remember specifically?
19   A.  Sometimes, you know, not handling the
20 workload. Maybe one of the policies, they
21 cannot use cell phones on the job and another
22 teacher may observe one teacher and they come
23 and say, This is not fair, or something like
24 that.
25   Q.  Fairly normal workplace issues that

Page 16

1 you'd see --
2   A.  Yes, workplace issues.
3   Q.  How about employees under your
4 supervision at Moffitt, have they ever
5 complained about the way a parent treated them
6 as an employee?
7   A.  No.
8   Q.  Is it your experience as a director
9 that from time-to-time parents get frustrated
10 with how their kids are being treated at the
11 center?
12   A.  I wouldn't say frustrated. I would
13 say maybe have a concern. Like they didn't get
14 their daily notes or something like that, or --
15 and sometimes those are things we can quickly
16 rectify because you have parents and
17 grandparents maybe picking up the same child and
18 it may have gone home with one parent and the
19 mom didn't get it and she may complain, things
20 like that.
21     Parents are pretty okay, they usually
22 will talk to me if there is something happening.
23   Q.  My wife is a teacher, so one thing
24 that I know is that from time-to-time there are
25 parents who can be somewhat difficult to deal



Page 17

1  with; is that your experience as a director?
2      A.   Yes.  I mean, you have all types of
3  parents.
4      Q.   Sure.  From time-to-time, do the
5  teachers at your center come to you with
6  concerns about how a particular parent is acting
7  toward them?
8      A.   No.  I think because we have so many
9  conferences and opportunities for the teachers
10  and the parents to dialogue, I think we don't
11  have those situations elevating.  I think
12  they're sort of dealt with at that level because
13  we have a lot of parent/teacher meetings.
14      Q.   So it's your testimony that you can't
15  recall a single time where a teacher under your
16  supervision came to you with a concern about how
17  a parent was addressing them or acting toward
18  them?
19      A.   Well, the one time that I had a parent
20  come to me -- I know when Vanessa was there, I
21  had a parent come to me about Vanessa, more than
22  one parent come to me about -- about one child
23  not getting something and another child not
24  getting done properly.  And the third and final
25  issue was with a parent who said she didn't feel

Page 18

1  comfortable with her putting on some cream on
2  her child.
3      Q.   We'll talk about that in detail a
4  little bit later.  Maybe I'm asking the question
5  poorly.  I'm talking about an employee who you
6  supervised, have they ever come to you and said,
7  Hey, Miss Fuller, I'm really concerned about how
8  this parent is addressing me as a teacher or how
9  they're acting toward me as their child's
10  teacher?
11      A.   One teacher I had -- the teacher, they
12  use Clorox in the center to sanitize.  And there
13  might have been a mixing of -- the strength
14  wasn't correct and so that's a four-year old
15  child.  I think after the teacher cleaned the
16  table, the child may have leaned on the table
17  and got this white mark, which the teacher did
18  not notice.
19          The parent noticed and the parent had
20  already come to me the morning to share with me
21  what had happened and I offered to replace the
22  clothes and talk to the teachers about mixing
23  the Clorox.  We even suggested maybe going to
24  one person doing all the mixing so if there's a
25  problem, we go to that one person instead of

Page 19

1  figuring out who was the teacher that mixed.
2          I thought it was handled there but the
3  parent became cold towards the teacher.  Just,
4  you know -- and the teacher said, you know, I
5  tried everything.  I say good morning to her, I
6  greet her and still she's very indifferent
7  towards me.
8          To be able to help them, I had to have
9  a meeting with both of them and we sort of met
10  at the table, talked about the issue and the
11  situation was resolved.
12      Q.   Did the parent admit that he or she
13  was acting cold toward the teacher?
14      A.   The parent said, No, but the teacher
15  said, That's how I feel.
16      Q.   Did you have any other -- well, let's
17  back up.
18          What was the name of the teacher that
19  was involved in this situation?
20      A.   She's no longer with us.  She's in the
21  school system but her name was Linda Flemming.
22      Q.   Did any of Miss Flemming's co-teachers
23  ever tell you they witnessed this particular
24  parent being cold toward her?
25      A.   Yes, they did.

Page 20

1      Q.   And when you had the conference and
2  the teacher who you supervised said she felt
3  that the parent was being cold and the parent
4  said that he or she wasn't, did you believe your
5  teacher?
6      A.   Not that I believed her.  I asked what
7  was some of the things that she felt that the
8  mom wasn't very welcoming or forthcoming with
9  information.  What did she do to try to draw the
10  mom out.  She could make the first step instead
11  of waiting for the mom to address her.  She
12  could be the one to address the mom every
13  morning.
14          She said, I just felt uncomfortable
15  reaching out to her if she's not saying anything
16  to me.  We sort of put a plan in place where we
17  talked about these are some of the things you
18  can do in the morning before she even says
19  anything, you greet her, those kinds of things.
20          And eventually the relationship worked
21  out for both of them and they became very good
22  friends.
23      Q.   Was the teacher ever reprimanded for
24  the Clorox issue?
25      A.   She was spoken to and we asked her to



**Page 21**

1 take the training again.  Because there is a
2 training online by Bright Horizons University
3 about sanitation safety issues.  So it was
4 recommended that she sit through the training
5 again.
6    Q.    During the roughly 15 years that
7 you've been a manager at Bright Horizons, has
8 there ever been an allegation or accusation of
9 child abuse against any of the teachers that you
10 supervised?
11    A.    No.
12    Q.    Have you ever been involved in any
13 way, shape or form, in any sort of investigation
14 of child abuse at any of the centers you worked
15 at?
16    A.    No.
17    Q.    My client, Janice Norman, do you know
18 her?
19    A.    I know her by seeing her but I don't
20 know her personally.
21    Q.    How would it be that you would
22 recognize Miss Norman if you saw her?
23    A.    By face.
24    Q.    When was the first time you saw her
25 face?

**Page 22**

1    A.    Oh boy, I know she worked at Citibank
2 and the only way that I know her is because I
3 would go to Citibank to do training for their
4 teachers, and that's how I met Janice.  But to
5 say that I ever had a conversation -- so I'm not
6 sure when she started, I just saw her.
7    Q.    But fair to say the first time you
8 ever saw her was through your work at Bright
9 Horizons?
10    A.    Through working together.
11    Q.    Was it that sometimes she would be
12 kind of at a receptionist position at Citibank
13 and you would see her when you would go in that
14 way?
15    A.    Yes, I saw her in that way.
16    Q.    Did you ever have any personality
17 conflicts or anything like that with Miss
18 Norman?
19    A.    No.
20    Q.    Did you ever supervise Miss Norman at
21 any time?
22    A.    No.
23    Q.    Are you aware that Miss Norman, along
24 with other employees at Bright Horizons, were
25 interviewed as part of some allegations of child

**Page 23**

1 abuse at the Citibank Center?
2    A.    No.
3    Q.    Do you have any knowledge of the facts
4 or circumstances surrounding Miss Norman's
5 separation from Bright Horizons?
6    A.    I know she was separated from Bright
7 Horizons and I didn't know anything about the
8 facts as to what happened.
9    Q.    How did you find out that her
10 employment was separated from Bright Horizons?
11    A.    Through Miss Vanessa.
12    Q.    Can you tell me about that
13 conversation you had with Miss Smith?
14    A.    When she came to my center, she
15 informed me that Janice was no longer there
16 either at the center.  She just said, you know,
17 there's a whole lot of mess going on and Janice
18 is no longer at Citi.
19    Q.    Do you know if that was true when --
20    A.    I am not sure.  I never even asked.
21    Q.    Other than what Miss Smith told you
22 about Miss Norman, did anybody else tell you
23 about Miss Norman's termination from Bright
24 Horizons?
25    A.    It wasn't -- yes.

**Page 24**

1    Q.    Who was another person that told you
2 about --
3    A.    I found out from Jennifer that Janice
4 was no longer at the center.
5    Q.    Did she tell you that in person or by
6 phone?
7    A.    No, we had a meeting and I shared with
8 her what Vanessa had said and she said, Yes,
9 that's right, she's no longer at Citi, and I
10 can't remember when that was.
11    Q.    Other than Miss Smith and Miss
12 Whitley, did anybody else talk to you about Miss
13 Norman's termination?
14    A.    No.
15    Q.    Other than what we've already talked
16 about, do you have any knowledge related to
17 Janice Norman's employment with Bright Horizons,
18 other than what we've already discussed?
19    A.    No.
20    Q.    Let's talk about Miss Smith.
21          When did you first meet Vanessa Smith?
22    A.    The Thursday before she started
23 working for me.  To be honest, I can't even
24 remember the date, but the Thursday prior to her
25 working for me.



Page 25

1  Q.  The two of you met in person?
2  A.  Yes.
3  Q.  Where did you meet?
4  A.  At my center.
5  Q.  And why was it that Miss Smith was
6  coming to meet you at the center?
7  A.  I requested that I meet her before she
8  started employment at my center.
9  Q.  Why did you make that request?
10  A.  I think it's only fair that I know who
11  she is. I had never known her before.
12  Q.  That was the first time you ever met
13  her?
14  A.  That was the first time I had ever met
15  her.
16  Q.  When you had the opportunity to sit
17  down and meet with her that day, what were your
18  impressions of her?
19  A.  She was soft spoken. We talked about
20  different things like logistics about the job;
21  like parking, where she would park, that she had
22  to get a badge, that I would like her to meet
23  the teachers before she actually started on
24  Monday, those type of things. She just
25  responded Yes, No, Sure, those things.

Page 26

1  Q.  The reason you were meeting with Miss
2  Smith is because she was being transferred to
3  your location?
4  A.  Transferred to my location.
5  Q.  How did you first come to learn that
6  Miss Smith was going to be transferred to the
7  Moffitt Center?
8  A.  I got a call from my regional manager,
9  Jennifer.
10  Q.  What did Miss Whitley tell you?
11  A.  She said there is an employee at Citi
12  who is being transferred to my center. I had
13  posted a vacancy because I had a teacher that
14  had left my center, so I had a vacancy that was
15  posted on the website. I don't know what the
16  logistic was, but she was replaced to sort of
17  fill that vacancy.
18  Q.  What position was the vacancy for?
19  A.  An infant position with the
20  possibility to assist in other classrooms.
21  Q.  When we say "infant," what ages are we
22  talking roughly?
23  A.  Six weeks to a year.
24  Q.  You said with a possibility to help
25  with other ages?

Page 27

1  A.  Other classroom when the numbers were
2  low.
3  Q.  Did Miss Whitley tell you whether Miss
4  Smith had requested the transfer or if it was
5  being done by Bright Horizons' management?
6  A.  I really can't remember. I really
7  can't remember.
8  Q.  Other than the conversation we're
9  talking about with Miss Whitley, did you have a
10  conversation with anybody else at Bright
11  Horizons about Miss Smith being transferred to
12  your facility, prior to Miss Smith arriving?
13  A.  No.
14  Q.  Other than the conversation that you
15  and Miss Smith had the Thursday before she
16  started, did the two of you talk again before
17  she started that Monday?
18  A.  Yes, I called her on Friday -- I take
19  that back.
20  It might not have been her, I think I
21  may have called her center to let them know what
22  her shift was going to be because I wasn't able
23  to tell her that on the Thursday.
24  I think I called the center, I'm not
25  sure if I spoke with her or if I spoke to the

Page 28

1  receptionist, but that was another conversation
2  prior to her starting.
3  Q.  Now, when you talked to the people at
4  the Citi Center where Miss Smith worked, did you
5  ask them at all about her work performance or
6  her employment history while she was working
7  there?
8  A.  No, I didn't.
9  Q.  Was it your feeling at the time when
10  she transferred to you center it was going to be
11  a fresh start between the two of you?
12  A.  Yes, as with any employee.
13  Q.  You were treating her essentially as a
14  new employee?
15  A.  As a new employee.
16  Q.  At any time did you tell Miss Smith
17  that you didn't have a position available for
18  her?
19  A.  No.
20  Q.  Did you ever tell Miss Smith that she
21  had two strikes against her when she got to your
22  center?
23  A.  No.
24  Q.  Did you ever tell her anything like
25  that?



Page 29

1   A.   No.
2   Q.   Did you ever tell her that the strikes
3   against her was because she complained of child
4   abuse and got you involved?
5   A.   I didn't know that because I wasn't
6   involved in child abuse.
7   Q.   Be that as it may, did you ever tell
8   her that?
9   A.   No, I didn't.
10   Q.   Did you ever tell her anything like
11   that?
12   A.   No.
13   Q.   And when Miss Smith started at your
14   center, did she take over that infant vacancy we
15   just talked about?
16   A.   The first day she did not go into the
17   infant room because we had quite a lot of babies
18   stay home that day, so I placed her into my
19   preschool room the first day.
20   Q.   After that first day, did Miss Smith
21   then --
22   A.   She did go into the infant room many
23   times after that, but the infant room is a room
24   where -- because they're that young, parents
25   stay home with them from time-to-time.  So

Page 30

1   whenever the numbers drop, the teachers go to
2   different rooms to assist.
3   Q.   Was that what Miss Smith was doing
4   when she wasn't in the infant room --
5   A.   Whenever she wasn't in the infant, she
6   would be assisting in other rooms.
7   Q.   One of the rules you may have heard
8   this at your last deposition, it's very normal
9   for us to anticipate what we're about to say.
10   Sometimes I ask longer questions than maybe I
11   should, so if you could try your best to let me
12   finish my question and I promise I'll do the
13   same to you.  If you give a long answer, I'll
14   try not to jump in either; is that fair?
15   A.   Yes.
16   Q.   It's normal.
17   So Miss Smith was working in the
18   infant room when the ratios were appropriate,
19   correct?
20   A.   Yes.
21   Q.   When they weren't, meaning that there
22   were kids that weren't there, there was no need
23   for additional teachers, she was helping in
24   other classrooms; is that pretty accurate?
25   A.   Yes.

Page 31

1   Q.   Was it that way the whole way up until
2   her employment ended?
3   A.   Yes.
4   Q.   Did you feel like you got along with
5   Miss Smith during the time you were her
6   supervisor?
7   A.   When she first started, yes.
8   Q.   Was there a point in time where you
9   started to not get along with her?
10   A.   I was always very cordial and soft
11   spoken and gentle with her, but I wouldn't say
12   not get along.  I respected her right up until
13   she left.
14   Q.   Did you feel like she respected you?
15   A.   Yes, I think so.
16   Q.   Was she courteous towards you as her
17   supervisor?
18   A.   In the beginning, very much so;
19   towards the end, a little bit off.
20   Q.   How so?
21   A.   In some of her statements and her tone
22   of voice and...
23   Q.   Can you think of any statements she
24   said that you felt were borderline discourteous
25   towards you?

Page 32

1   A.   In one instance, I had her in my
2   office after we had a meeting and my assistant
3   director might have been there, I'm not sure,
4   and I was just trying to explain to her
5   policies, ratios, things like that; and she
6   denied that whatever I was saying didn't happen.
7   I really can't remember the exact
8   instance but I remember what she said to me.
9   She looked at me and she said to me, Do you know
10   what is happening at Citi?
11   And I said, No, I don't.
12   She said, Well, I like you a lot, so
13   don't let me have to get that way here.
14   I said to her, I feel very threatened
15   by you.  I said, Why would you make a statement
16   like that to me?
17   Q.   In terms of the time frame when she
18   was working with you, that happened more toward
19   when she began at the Moffitt Center or was that
20   toward the end of her employment?
21   A.   Somewhere past the middle point.  I
22   can't really say exactly when it was.
23   Q.   Speaking of that, when did you first
24   come to learn that Miss Smith was involved in
25   these allegations of child abuse against another



MARILYN FULLER
NORMAN -vs- BRIGHT HORIZONS FAMILY

June 05, 2013
33–36

Page 33

1  teacher at the Citi Center?
2    A.   Maybe about the second week she
3  started working for me.
4    Q.   How did you find out about that?
5    A.   One of my teachers came down and was
6  able to tell me from beginning to end as to what
7  was happening, which some of the details I was
8  shocked at because I wasn't aware of that.  And
9  at that point, I spoke to Vanessa.
10   Q.   Who is the teacher that told you all
11 the details?
12   A.   She was in a classroom with two
13 teachers and both teachers mentioned that there
14 was a lot of talk about things that happened at
15 Citi.
16   Q.   What are the names of those two
17 teachers?
18   A.   One was Nicole Olah and one of them
19 might have been the teacher whose name I called
20 prior, Linda Flemming.
21   Q.   Did these two teachers come to you
22 together --
23   A.   No, they came at different times.
24   Q.   Were they concerned Miss Smith was
25 talking --

Page 34

1    A.   No.  They just said, We were in a
2  classroom and we're trying to get things done
3  and she said that she liked being at Moffitt,
4  that it was very -- a very calm place and -- as
5  opposed to where she came from.  And just
6  started to say they treated me poorly over
7  there, things like that.
8         And the teacher said -- because I
9  never let my teachers -- all they knew was that
10 she was transferring.  No one, not even myself,
11 knew details, so I couldn't give them any.
12        When they heard this -- one teacher
13 said to me, Did you know all of this?
14        I said, I'm not aware.
15        The other teacher said, These are
16 things we don't need to be hearing about.  These
17 are things she should keep to herself instead of
18 sharing these things with us.
19   Q.   And then at that point you went and
20 talked to Miss Smith about it?
21    `A.   I called her in my office and I told
22 her -- I said, We need to -- whatever happened
23 at Citi, let it rest there.  You are here to
24 start anew at Moffitt.  Let's just make the best
25 of it.

Page 35

1    Q.   Jumping back a little bit.  You
2  testified that Miss Whitley was one that first
3  notified you that Miss Smith was going to be
4  transferring to your center, correct?
5    A.   Yes.
6    Q.   At the time, did you ask Miss Whitley
7  why this particular employee was transferring to
8  your center?
9    A.   No, because we've made transfers
10 before.  Sometimes centers may have a drop in
11 enrollment and before terminating the person,
12 they'll give the person the option to move at
13 another center.
14   Q.   During the conversation that you had
15 with Miss Smith about what had happened at Citi,
16 did she share with you the specific details of
17 the allegations of child abuse?
18   A.   Not in the beginning.
19   Q.   At some point in time?
20   A.   At some point in time, yes, she did;
21 but in the beginning of her employment, no.
22   Q.   How did it come to be that at some
23 point in time she shared with you the specific
24 details?
25   A.   I think -- I don't know why we would

Page 36

1  have been talking and it was not like punitive
2  in any way.  I think we were just chitchatting
3  in my office.  Many times she would stop at the
4  end of the day and say goodbye to me and say,
5  Thank you very much.
6         So it could have been just a general
7  conversation and then she shared with me what
8  happened at Citi, yes.
9    Q.   Can you remember the specifics of what
10 she told you happened at Citi?
11   A.   She told me that -- something about a
12 child and that she called licensing and she felt
13 she was targeted after that and that she was
14 hurt, physically hurt, I think her back or her
15 knee or something; physically hurt from lifting
16 children after she had a doctor's note or
17 something like that.  So I think it's something
18 to that effect.
19   Q.   She told you that she contacted
20 licensing, correct?
21   A.   She told me she contacted licensing.
22   Q.   Did Miss Smith tell you whether she
23 called the Florida abuse hotline?
24   A.   No, I'm not sure.
25   Q.   Did she tell you that there was an



Page 37

1  investigation conducted by either DCF or the
2  licensing board or both?
3      A.   She might have said that but I can't
4  recall that.
5      Q.   Did she ever tell you about her being
6  interviewed as part of the investigation?
7      A.   No.
8      Q.   Did anybody at Bright Horizons, prior
9  to Miss Smith's employment ending, ever tell you
10  or talk to you about that investigation at the
11  Citi Center?
12     A.   No, I didn't know about that.
13     Q.   Other than the conversations that we
14  just talked about that you had with Miss Smith
15  about the situations over at Citi, were there
16  ever any other conversations the two of you had
17  about Citi specifically?
18     A.   Prior to her working in that room with
19  the two teachers and maybe -- because I have two
20  rooms sort of close to each other, so there were
21  four teachers. Two teachers in particular heard
22  what she said.
23          She had the opportunity to come down
24  into the infant room and while in the infant
25  room, she also made another statement that the

Page 38

1  teachers brought to my attention. The statement
2  something to the effect of -- I think after I
3  spoke with her -- I'm trying to get everything
4  in perspective.
5          I think after I spoke with her she was
6  a little bit -- even though she would greet me
7  and say Hello and Good morning, she made
8  statements like, I like Miss Marilyn a lot and
9  she had better tow the line with me because I
10  don't want her to end up in anything like what
11  Citi has right now.
12         So when she made that statement in the
13  infant room, these are teachers who have been
14  there for quite a number of years, have known me
15  all my tenureship at Bright Horizons. The
16  teacher said something to me and at that point I
17  said, Vanessa, if you have anything to say, come
18  and talk to me. Don't say things in the
19  classroom.
20     Q.   Who were the teachers that came to you
21  and told you this?
22     A.   Well, I can't even remember the
23  teacher's name. I can't remember, it's been so
24  long. But I know she said it in the infant
25  room.

Page 39

1          Let me see if I can go back. Who's
2  there now, because it's a totally new staff
3  that's there now. I don't want to call a name
4  and that person -- I've changed around my infant
5  staff completely, so I can't remember who was in
6  that classroom.
7      Q.   Let me see if I can help out. I know
8  that you had mentioned that there was a teacher
9  or some teachers who have been with you a long,
10  long time. Who were you thinking of when you
11  mentioned this?
12     A.   I have three teachers in there who
13  were there for a long time. So I can't remember
14  -- they work on different sides, so I don't
15  want to call a name and it wasn't that one. And
16  then we have other people there who are new.
17         So I'm not quite sure who it was but I
18  know that that was a statement that was brought
19  toward myself and my assistant director.
20     Q.   When you talked to Miss Smith about
21  it, what was her response?
22     A.   She denied saying that and she said
23  she might have said something about Citi, but
24  she did not say that full statement.
25     Q.   If you think of those teachers names

Page 40

1  at some point today, just let me know, okay?
2      A.   I will.
3      Q.   Earlier you had mentioned the
4  assistant director, who was the assistant
5  director during the time that Miss Smith was
6  working with you?
7      A.   Katina James.
8      Q.   Is she still the assistant director?
9      A.   She is still my assistant director.
10     Q.   Did you participate in the decision to
11  terminate Miss Smith's employment at Bright
12  Horizons?
13     A.   Yes.
14     Q.   Why was Miss Smith terminated from her
15  position?
16     A.   Miss Smith was terminated because I
17  think -- because of violation of policy,
18  disrupting business, I would say, disruptive
19  business. There were health and safety
20  violations.
21     Q.   Anything else?
22     A.   And I think overall just not having
23  great relationship with parents.
24     Q.   When you said violations of policy,
25  were you thinking the disruption to business and



Page 41

1 health and safety violations or were there other
2 policy violations that you were describing?
3     A.   Policy violation; one of the main
4 one -- not the main one but the one that I think
5 we noted for her was the feeding.
6     Q.   When you say "the feeding," what do
7 you mean by that?
8     A.   She gave a child the wrong bottle of
9 food, wrong jar of food; an infant.
10     Q.   Any other violations of policy that we
11 haven't gone over?
12     A.   Ratios.
13     Q.   Meaning that she would leave the room
14 or leave the group of kids --
15     A.   She left the room that was outside of
16 ratios.
17     Q.   Any other violations of policy that we
18 haven't talked about?
19     A.   Ratio and the health and safety.
20 Safety issue would have been bringing a child
21 outside of their classroom to leave with the
22 cook so that she can go to the restroom, that
23 was the safety issue.
24     Q.   Make sure I understand.  Miss Smith
25 took a child outside, left the child with the

Page 42

1 cook and went to the restroom?
2     A.   She took the child out of the
3 classroom, did not notify the teacher where she
4 was going, but I think she had an emergency, had
5 to use the bathroom.  And so in her judgment, if
6 I took one child out, that will help the class
7 to stay in ration.  But she was taking the child
8 to a cook who is operating the kitchen, where
9 the children are not supposed to be in the
10 kitchen, and we had to talk to her about that
11 one.
12     Q.   And what about that would be either a
13 health or a safety violation?
14     A.   Because children are not supposed to
15 go in the kitchen.  The kitchen is only for the
16 cook or adults who --
17     Q.   A -- sorry to interrupt you.  Go
18 ahead.
19     A.   Adults who have their food license to
20 be in the kitchen, like myself or my assistant
21 director.
22     Q.   So the child was physically in the
23 kitchen with the cook while Miss Smith was going
24 to the restroom?
25     A.   She put the child at the door and the

Page 43

1 cook was in the kitchen doing her work and I
2 asked the cook, Where were you going to take the
3 child?
4         And she said, In the kitchen with me.
5         And I said, You guys cannot do that.
6     Q.   So it sounds to me like the cook never
7 actually took the child in the kitchen, correct?
8     A.   Actually, the teacher -- this is the
9 kitchen and this is the classroom, and I had a
10 teacher there that actually saw her talking to
11 the cook who called me on the phone.  By the
12 time she was getting ready -- and I saw the cook
13 with her hands on the child, so she was about to
14 take the child in with her.
15         There's a long hallway, as I turned
16 that hallway, I saw it.  And I waited for
17 Vanessa to come out of the bathroom and I spoke
18 to all of them right in the hallway there, and I
19 was holding the child at that time.
20     Q.   So you reprimanded both Miss Smith and
21 the cook?
22     A.   And the cook, yes.
23     Q.   Did you write that down anywhere else?
24     A.   No, I did not.  And of course, my hand
25 got slapped for not documenting that.

Page 44

1     Q.   What do you mean by that?
2     A.   Jennifer would be like, No, these are
3 things you need to put.
4     Q.   When did Miss WHitley slap you on the
5 wrist for --
6     A.   She didn't.
7     Q.   I know she -- figuratively slapped you
8 on the wrist.
9     A.   We have a meeting every week and we
10 just go over things in our center, and she does
11 that with every one of her centers.  We talk
12 about these things and she's like, These things
13 are the things you need to write.  You can't
14 have these things go unattended.
15     Q.   Other than the situation with the cook
16 that we just talked about, any other health and
17 safety violations that you were contemplating
18 earlier related to Miss Smith's termination?
19     A.   Those were the health and safety
20 violations.  And then the disruptive behavior --
21 no other health and safety violation.
22     Q.   You were going to start talking about
23 the disruptive behavior.
24     A.   And then we had the disruptive
25 behavior with the parent, the one where she gave



MARILYN FULLER
NORMAN -vs- BRIGHT HORIZONS FAMILY

June 05, 2013
45–48

**Page 45**

1 the child carrots and the child was not supposed
2 have carrots but have peach -- the child was not
3 supposed to have peach but have carrots, and she
4 gave the child -- took the carrots that she was
5 supposed to give one child and gave it to
6 another child.
7      When the parent brought it to her
8 concern, she basically just turned her back on
9 the parent and did not respond to the parent.
10   Q.   Did the parent come to you with that
11 concern?
12   A.   Yes.
13   Q.   What was the name of that parent?
14   A.   The parent was, I think Sophia Huo,
15 H-U-O. I can't remember the mom's name but
16 their last name was Huo, H-U-O.
17   Q.   Miss Smith gave Miss Huo's child the
18 wrong food, the parent confronted Miss Smith
19 about it and Miss Smith turned her back on it?
20   A.   Not the child who got the food. The
21 child whose food was missing, the mom came to
22 her and the mom ask her, How come my child's
23 carrots are not in here?
24      And she turned her back on the mom and
25 never answered. So we had to take steps to talk

**Page 46**

1 to the mom about what happened and explain to
2 the mom.
3   Q.   Now, with the -- we'll just call it
4 the carrot situation so we know what we're
5 talking about. With the carrot situation, did
6 you document that anywhere?
7   A.   Yes. There's a food form that is
8 filled out and that was actually requested when
9 all the files were requested for -- by Jennifer.
10 So there was like a documented form of the
11 child's day and what they ate and the food. And
12 the child who was to be fed the carrots, it
13 shows that that sheet, that the child did not
14 get the carrots.
15   Q.   It sounds like at some point in time
16 Miss Whitley had made a request to you for some
17 documents related to Miss Smith?
18   A.   I think when we did the action plan we
19 had to -- when you get to an action plan, you
20 have to at least go over the file.
21   Q.   Any other disruptive or disruptions to
22 the business in terms of issues related to Miss
23 Smith's termination that we haven't talked
24 about?
25   A.   I think when -- I think the allegation

**Page 47**

1 that a parent pushed her or a parent mishandled
2 her, that caused her to call the police.
3   Q.   Tell me about that situation. What do
4 you remember about that?
5   A.   I remember that she said that she was
6 changing a child's diaper and she did not see
7 the parent come in, all she felt was someone
8 push her and said, Why is my baby crying? Why
9 is my baby crying?
10      She said she just moved aside and let
11 the parent take the child off of the changing
12 table. The parent's account is that we have
13 glass doors before you enter the infant room and
14 the parent she said from the time she came
15 through the double doors, she heard the familiar
16 voice of her child's cry and it sounded like he
17 was in distress. So she went to the glass doors
18 and she stood for a moment and she watched and
19 she saw the rough handling of her child.
20      Even though her child was crying, the
21 teacher was not making any effort to calm the
22 child. There was no conversation between the
23 teacher and the child, because you can hear out
24 of the doors. She said at that moment she
25 opened the door and she went in and she said to

**Page 48**

1 her, Why is my baby crying?
2      And she didn't know what Miss Smith
3 said to her and she said, Just leave him alone
4 and I'll take care of him. And she said she
5 never touched Miss Smith, she said Miss Smith
6 backed away and she took her child, went down on
7 the floor with him. She forgot about changing
8 his diaper at that time. She went down on the
9 floor with him and tried to soothe him.
10   Q.   Okay. It sounds like Miss Smith told
11 you that the parent somehow came in physical
12 contact with her, correct?
13   A.   Yes.
14   Q.   Did Miss Smith tell you the details in
15 terms of how the woman came in contact with her?
16   A.   She said the parent pushed her from
17 the side away from -- because the changing table
18 is like this, so she's facing the changing table
19 and there is only one way she can go, which is
20 to her right.
21      Because right here there's a gate that
22 separates this infant room to the next infant
23 room's changing area. So I try to set up the
24 role play in the room because I couldn't -- the
25 way she was changing, the table -- changing the



MARILYN FULLER
NORMAN -vs- BRIGHT HORIZONS FAMILY

June 05, 2013
49—52

**Page 49**

1  child at this table, there isn't any room for
2  another person to get in there to push her to
3  her right.
4      I said, Are you sure you went to your
5  right?  Did you go backwards to your right?  And
6  she held out that it was to her right.  But
7  looking at the space, I was like -- I sort of
8  questioned.  But she said it was to her right
9  that the parent pushed her.
10    Q.   Obviously we're not videotaping this
11  deposition.  One of the things that you did is
12  you kind of threw out your elbow a little bit in
13  the way somebody would maybe shoved somebody
14  with their elbow.  Is that how Miss Smith
15  described it to you?
16    A.   No, she kept saying, She pushed me.
17      I was like, Well, where did she push
18  you from, because I'm trying to get it myself.
19  Did she push you from the front and push you
20  backwards or did she push you from here because
21  it's the only place to go this way.
22      She said, The parent shoved me.
23  That's as far as I got.
24    Q.   Nonetheless, Miss Smith said the
25  parent physically touched her?

**Page 50**

1    A.   Physically touched her.
2    Q.   Now, did you first learn about this
3  situation from Miss Smith or from the parent or
4  from somebody else?
5    A.   I first learned of that situation --
6  that happened on a Thursday, I think, I want to
7  believe, and I learned of the situation as soon
8  as I got into the center on Friday morning.
9      I learned of the situation from my
10  educational coordinator, Janet Williams, because
11  she is the direct supervisor for those rooms.
12  So it was brought to her attention when she
13  first got in in the morning.  So as soon as I
14  walked in, she said she would like to meet with
15  me and she shared that information with me.
16    Q.   Now, did Miss Williams say that she
17  witnessed any of the situation?
18    A.   No, she did not witness.  She leaves
19  at 3:30.  Her shift is 6:30 to 3:30.
20    Q.   So this happened after Miss Williams
21  had left?
22    A.   Yes.
23    Q.   But I think you said that somebody
24  went to Miss Williams about it prior to Miss
25  Williams coming to you, correct?

**Page 51**

1    A.   Somebody must have told her.  Because
2  if she got in at 6:30 and I got in at nine,
3  somebody must have said something to her.
4    Q.   Did Miss Williams tell you who said
5  something to her before she came to you?
6    A.   I am not sure.  I'm sure she did but
7  right now, I can't recall that.
8    Q.   So you arrive at work that day, you
9  become aware of the situation, what's the first
10  thing that you do?
11    A.   I waited for Vanessa to come in
12  because Vanessa's shift was nine or 9:30, nine
13  to six or 9:30 to 6:30, and so I waited for
14  Vanessa to come in.
15      I took her into my office and I said,
16  What happened at the end of the day yesterday?
17  And what I told you is what she shared with me.
18    Q.   She described what she felt was some
19  sort of pushing situation?
20    A.   Pushing situation.
21    Q.   At that point, had there been any
22  communication from the parent to you?
23    A.   The parent had left a voice-mail,
24  which I did not have time to pick up, just
25  saying, Miss Marilyn, I would like to speak with

**Page 52**

1  you.
2    Q.   Did you listen to that voice-mail
3  before or after you talked to Miss Smith?
4    A.   After I spoke to Miss Vanessa.
5    Q.   Did you call the parent back?
6    A.   No, I didn't call the parent back
7  because while I was talking to Miss Vanessa, the
8  parent came in.  The parent saw Vanessa in my
9  office, so the parent waited to speak to me
10  after I was finished speaking with Miss Vanessa.
11    Q.   And you keep saying "the parent,"
12  what's the parent's name?
13    A.   Christina with a C, I-C-L-O-Z-A-N,
14  Iclozan.
15    Q.   All right.  So Miss Iclozan is waiting
16  for you while you're talking to Miss Smith?
17    A.   Yes.
18    Q.   Did you then meet with Miss Iclozan?
19    A.   I did.  I met with her.
20    Q.   What did she tell you?
21    A.   I asked her what happened and she just
22  shared with me what I told you, just what she
23  said.  As she's coming into the center, before
24  she gets to her child's door, there is a double
25  door.  She said, As I pushed that double door, I



Page 53

1  heard my child's voice and I went to the door to
2  see why he was crying.  And she said, I stood
3  there and Miss -- and the lady's back is to me,
4  and I had to correct her many times and say
5  "Miss Vanessa, Miss Vanessa."
6         She said, The lady's back is to me so
7  she did not see me, and I saw her with my son's
8  legs in the air -- and she's actually showing me
9  the motion -- and she said, She's doing like
10  this -- and I can see the motion -- and my child
11  is crying more and more.
12         She said, She never talked to him to
13  calm him or she didn't see anything like hugs or
14  anything like that.  At that point she pushed
15  the door and went into the room and said to her,
16  Why is he crying?
17         And she said Vanessa did respond but
18  she did not understand what Vanessa said and she
19  said she told her just leave him, leave him,
20  don't finish the diaper and I'll take care of
21  him.
22     Q.   Did Miss Iclozan make any requests of
23  you going forward, meaning, did she tell you
24  what she wanted done about this situation, if
25  anything?

Page 54

1     A.   No.
2     Q.   She just wanted you to be aware of it?
3     A.   She just wanted me to be aware of it
4  and she asked me questions about Miss Vanessa,
5  Who is she?  Where did she come from?
6         And I responded to her by saying
7  she's -- I send an e-mail out every Monday
8  morning to all the parents via their work e-mail
9  informing them of any changes in the center.  So
10  apparently she may have missed that e-mail.  So
11  I said if you go back to your e-mail, you will
12  see that I said, We had a transfer in from Citi,
13  that's the teacher.
14     Q.   Was the parent upset during this
15  conversation with you?
16     A.   She was a little.  She says, I just
17  want to know my baby is getting good care.  I
18  never had to question my baby's care.  I'm
19  nervous now to bring him in.  Is she always
20  going to be in that room, and questions like
21  that she had.
22     Q.   Prior to the situation with Miss
23  Smith, did you ever have any other teachers at
24  the school talk to you about any concerns that
25  they had with Miss Iclozan?

Page 55

1     A.   No.
2     Q.   Isn't it true that Miss Iclozan had
3  had issues at other centers prior to coming to
4  Moffitt?
5     A.   She had had an issue at another center
6  and she brought her child and we've never had a
7  problem.  That's something I always talk about.
8     Q.   How did you first learn about the
9  issue that Miss Iclozan had at the other center?
10     A.   She told me.
11     Q.   What did she tell you about that
12  situation?
13     A.   She just said she wasn't happy.  She
14  didn't give details, anything like that.  She
15  just said, I wasn't happy.
16     Q.   Did you know whether Miss Iclozan had
17  voluntarily decided to take her child out of
18  that other center or if she was asked to leave
19  that center with her child.
20     A.   I don't know.
21     Q.   Now, during the conversation you had
22  with Miss Smith, was she upset about the
23  situation?
24     A.   She was.  She said that that is not --
25  you know, made statements like, That is not

Page 56

1  fair, that is abuse in some form, and things
2  like that.
3     Q.   Did she ask you, as the director, to
4  do anything for her about that situation?
5     A.   No.
6     Q.   After you talked to Miss Williams,
7  Miss Smith and Miss Iclozan, did you talk to
8  anybody else at the center about this particular
9  situation between the parent and Miss Smith?
10     A.   I didn't speak to anyone at the
11  center.  What I did, I immediately got on the
12  phone and I called Jennifer about it, because
13  that's now a serious allegation.
14         So I called my regional manager and
15  informed her and I also called my -- since this
16  is an employee of Moffitt, and I know that
17  employee would go over and talk about it there,
18  I called my liaison at Moffitt and I informed
19  her -- just to give her a heads-up -- of what
20  had happened.
21     Q.   Were there any follow-up conversations
22  with the Moffitt liaison about further
23  communications from this particular parent?
24     A.   No.  They were aware, Jennifer was
25  aware of it and a lot of times they leave us to



Page 57

1  do our own internal investigations or to do
2  things like that without them stepping in. So a
3  lot of times it's left up to us and they just
4  expected follow-up later on.
5     Q.    You said you talked to Miss Whitley
6  because it was some serious allegations, are you
7  talking --
8     A.    Of the parent saying she was pushed --
9  of Miss Smith saying she was shoved or pushed by
10 the parent and that she was going to reach out
11 to authorities.
12    Q.    Miss Smith told you that?
13    A.    She said, This is something that the
14 authorities need to know about because this is
15 almost abuse.
16    Q.    Did Miss Smith at that time tell you
17 that she was going to be contacting USF Police?
18    A.    No.
19    Q.    When you told Miss Whitley this, what
20 was her reaction?
21    A.    She just asked me to document the
22 situation and that she and I would have a
23 meeting later that day on Friday.
24        MR. OWENS: Why don't we take a short
25    break and we'll come back in a couple of

Page 58

1  minutes.
2        (Off the record.)
3     Q.    (By Mr. Owens) All right, Miss Fuller,
4  we're back on the record.  Same rules apply.
5        We were talking about a conversation
6  that you had with Miss Whitley related to the
7  issue with Miss Smith and the parent, remember
8  that?
9     A.    Mm-hmm.
10    Q.    And you said that Miss Whitley told
11 you to document everything, correct?
12    A.    Yes.
13    Q.    When you say that, how did you go
14 about documenting this particular situation?
15    A.    First we had to try to get a statement
16 from Vanessa, statement from the parent and a
17 statement from Janet Williams as to how she was
18 informed of the situation.
19    Q.    Did you do that?
20    A.    Yes.
21    Q.    Once you got those three statements,
22 did you provide those to Miss Whitley?
23    A.    I didn't.  She read them when she came
24 to my center.
25    Q.    Did you keep those three statements

Page 59

1  that you got after you showed them to Miss
2  Whitley that day?
3     A.    Yes.  I don't have them in my
4  possession because I think they were funneled up
5  to the top somehow to someone.
6     Q.    So as we sit here today, you don't
7  have them or have a copy of them?
8     A.    I have nothing on Miss Vanessa, yes.
9     Q.    How long has it been since you've had
10 anything related to Miss Smith?
11    A.    Some time last year.
12    Q.    So it sounds like people of higher
13 authority at the company other than you had
14 requested those documents from Miss Smith and
15 you passed them along?
16    A.    I passed them to Jennifer and where
17 they maybe went to, I'm not sure.
18    Q.    So you get a statement from Miss
19 Williams, correct?
20    A.    Mm-hmm.
21    Q.    And Miss Iclozan and Miss Smith,
22 correct?
23    A.    Mm-hmm.
24    Q.    Is that a "yes"?
25    A.    Yes.

Page 60

1     Q.    Other than the three of them, did you
2  get statements from anybody else related to this
3  situation between Miss Smith and the parent?
4     A.    No.
5     Q.    Did you ever ask around to see if
6  there were any other witnesses, whether it were
7  parents or other teachers at the school, who saw
8  this incident?
9     A.    There was no other parent.  There was
10 another teacher in the classroom.
11    Q.    Who was the other teacher?
12    A.    I want to believe her name was Keisha.
13    Q.    Did you talk to Keisha?
14    A.    Janet spoke with Keisha for me.
15    Q.    Do you know what Keisha told Miss
16 Williams about the situation?
17    A.    I think she stated that the parent
18 came in, the parent heard her child cry, the
19 parent said, Why is my child crying?  She did
20 not see any physical contact.  She did not see
21 any like shouting or yelling between the parent.
22 She saw the mom take her child across the gate
23 and sit with the child.
24    Q.    Do you remember Keisha's last name?
25    A.    Gaines.



MARILYN FULLER
NORMAN -vs- BRIGHT HORIZONS FAMILY

June 05, 2013
61–64

Page 61

1    Q.   Did Miss Gaines provide a written
2  statement?
3    A.   I believe so.  I want to believe so.
4  It's been a while, I think so.  I think she did.
5    Q.   But it's your understanding that
6  outside of Miss Gaines, there was nobody else
7  who would have been a witness to this event; is
8  that correct?
9    A.   Those were the last two teachers, it
10  was almost the end of the day.
11    Q.   Other than getting statements from
12  these individuals, was there any other sort of
13  investigation conducted into this issue between
14  Miss Smith and the parent?
15    A.   No, that's as far as I went with the
16  investigation.
17    Q.   Fair enough.  Was there ever a time
18  where anybody from any sort of police department
19  came in to do an investigation?
20    A.   The police came and my security from
21  Moffitt came.
22    Q.   Did the police -- let's start with the
23  police, how many police officers came?
24    A.   I think one may have been in the car
25  but one came inside with us.

Page 62

1    Q.   Was it USF police?
2    A.   USF police.
3    Q.   The one that came inside, did he or
4  she go around and talk to employees at the
5  center?
6    A.   He spoke to Miss Gaines because she
7  was the person in the room with Miss Smith.  And
8  I -- Miss Smith was not inside, she remained
9  outside.  So he spoke with Miss Gaines and then
10  after speaking with Miss Gaines, at that time
11  Moffitt security had come down and they spoke
12  about the incident, which Moffitt security took
13  a statement from the police officer.
14    Q.   Do you know if the representative from
15  Moffitt security interviewed any of the
16  employees at the center?
17    A.   No, they did not.  They just spoke to
18  me and asked me if everything was okay and if I
19  needed someone to be there in the building, and
20  I told them that once Vanessa left, I was okay.
21    Q.   Do you know if Miss Smith ever decided
22  to press charges against the parent?
23    A.   No.
24    Q.   Do you know what the result of the
25  police investigation was; meaning, were there

Page 63

1  charges levied against the parent?
2    A.   No.
3    Q.   Was there any sort of results of the
4  investigation that you were made aware of from
5  the police department?
6    A.   No.
7    Q.   Following the police investigation,
8  did you have any follow-up conversations with
9  the parent about her situation with Miss Smith?
10    A.   The parent -- I think that happened
11  Friday when she came with the USF police.  I
12  stayed there at the center almost until eleven
13  p.m. because I had to provide statements to
14  Moffitt, which is my CEO and president.
15        Security notified them, so they were
16  calling me, so I stayed, I had to fill everybody
17  in on everything that occurred.  At some point
18  in time during the evening, the late evening
19  hours, the parent reached out to me and just
20  told me that she felt nervous having her child
21  at the center and she didn't think she was going
22  to be bringing her child back.
23        I asked her to sit on it and we've had
24  a good relationship and we would talk about it
25  on Monday.  So those were the conversations I

Page 64

1  had that Friday with her.
2    Q.   Did the parent remove her child from
3  Bright Horizons?
4    A.   No, the child is still there.
5    Q.   Now, you said you had to provide
6  statements to Moffitt?
7    A.   Verbal.  I had to inform them of what
8  happened.
9    Q.   You explained to them what was going
10  on?
11    A.   I explained to them what happened.
12  It's their center, so they want to know all the
13  details.  So I had to sort of talk to them.
14    Q.   Other than what you verbally told the
15  folks at Moffitt, did you provide them with any
16  of the written statements from any of the
17  employees?
18    A.   No.
19    Q.   Backing up.  Did you review Keisha
20  Gaines' statement that she provided?
21    A.   Yes, I read it.  I think I read all
22  the statements.  But sitting here, I can't tell
23  you what's in any of them.
24    Q.   We were talking about Miss Smith's
25  termination.  Other than all the stuff that



MARILYN FULLER
NORMAN -vs- BRIGHT HORIZONS FAMILY

June 05, 2013
65–68

Page 65

1  we've talked about up to this point, are there
2  any other reasons that you can think of related
3  -- or as to why Miss Smith was terminated from
4  her position at Bright Horizons?
5      A.   At the moment, I can't think of
6  anything else.
7      Q.   How was Miss Smith informed that she
8  was going to be terminated from her job?
9      A.   Over the phone.
10     Q.   Were you on the phone call?
11     A.   Yes.
12     Q.   Was it just you and Miss Smith?
13     A.   Myself and I believe she was with an
14  admin and then -- no, I think Jennifer might
15  have been there too.
16     Q.   Did you explain to Miss Smith during
17  the phone call why she was being terminated?
18     A.   Yes.  I think I read -- just read
19  verbatim what the form said.
20     Q.   From the termination form?
21     A.   The termination form.
22     Q.   Did Miss Whitley tell Miss Smith
23  anything about why she was being terminated, to
24  your recollection?
25     A.   I don't think she said much.  I think

Page 66

1  I did most of the talking.
2      Q.   What do you remember, if anything,
3  Miss Smith saying about being terminated?
4      A.   The only question she asked me was
5  when -- how was she going to get her last
6  paycheck or what arrangements we were going to
7  make to get her her last paycheck.
8          MR. OWENS:  Exhibit 1.
9          (Exhibit-1, Memo, marked for
10         identification.)
11     Q.   (By Mr. Owens) Miss Fuller, I'm
12  handing you what's been marked as Exhibit 1.
13  Take your time and read through this and
14  whenever you're prepared to answer questions,
15  just let me know, okay?
16     A.   I'm okay.
17     Q.   Miss Fuller, do you recognize
18  Exhibit 1?
19     A.   Yes, I do.
20     Q.   What is Exhibit 1?
21     A.   It's a conference memo.
22     Q.   Is this the style of employee
23  conference memo that you described to me before?
24     A.   Yes.
25     Q.   This is the standard document that's

Page 67

1  used when an employee is being reprimanded
2  formally?
3      A.   Yes.
4      Q.   Would you agree this appears to be
5  dated June 17, 2011?
6      A.   Yes.
7      Q.   At the bottom of the page above
8  supervisor's signature, is that your signature?
9      A.   Yes, it is.
10     Q.   Do you see above that line where it
11  says, "Employee refused to sign"?
12     A.   Yes.
13     Q.   Is that your handwriting?
14     A.   No, that's Jennifer Whitley's
15  handwriting.
16     Q.   And then if you continue, I know we're
17  working from the bottom up, but do you see where
18  it says, "Employee comments:  Employee will
19  provide written statement"?
20     A.   Yes.
21     Q.   Is that your handwriting?
22     A.   That Jennifer's handwriting.
23     Q.   Was Miss Smith presented with this
24  employee conference memo in person?
25     A.   Yes.

Page 68

1      Q.   Did Miss Smith ever provide a written
2  statement with regard to this particular
3  employee conference memo?
4      A.   She might have.
5      Q.   Do you know why Miss Whitley would
6  have written in the employee section as opposed
7  to handing it to Miss Smith for her to put her
8  handwriting?
9          MR. LEO:  Objection; form.
10         I'm just stating an objection for
11  the record.  You can answer, if you know.
12         MR. OWENS:  Unless he tells you not
13  to, you can answer.
14         THE WITNESS:  I don't know.
15     Q.   (By Mr. Owens) Did Miss Smith ask to
16  be able to write on this document?
17     A.   No.
18     Q.   Was Miss Smith ever provided the
19  opportunity to write on this document?
20     A.   Yes.  Whenever we do a conference
21  memo, we would give it to the employee and tell
22  the employee they have the right to put comments
23  and sign.  And the employee can say, I refuse to
24  sign.
25     Q.   Is that what Miss Smith did?



Page 69

1    A.   I want to believe so if this is
2  written.
3    Q.   Let's work back toward the top.
4        The box is checked next to
5  "Reprimand," correct?
6    A.   Yes.
7    Q.   So this would be a written reprimand
8  as we talked about before?
9    A.   Yes.
10   Q.   Did you consider this at the time to
11 be a first or second written reprimand?
12   A.   This might have been the first
13 reprimand.
14   Q.   And if there are no other documents
15 from the time -- no other reprimand documents
16 from the time that Miss Smith started at your
17 center, up until this one, is it fair to say
18 this was the first time at your center that Miss
19 Smith was reprimanded using this employee
20 conference memo?
21   A.   If there was no other document of
22 reprimand, then it might be the first if there
23 is no other.
24   Q.   Now, there's some language that
25 appears to be typed into this document under the

Page 70

1  specific circumstances or observations; do you
2  see that?
3    A.   Yes.
4    Q.   Were you the individual who typed that
5  information in?
6    A.   Yes.
7    Q.   Did you type that information on
8  June 17, 2011, the date that this is signed?
9    A.   That's usually the procedure; you do
10 it the day you're going to have the memo done.
11   Q.   And you write, "Once again, it has
12 been brought to my attention that your lack of
13 communication and attention to detail, as it
14 related to the care and attention to children,
15 has caused real issues at this center"; is that
16 accurate?
17   A.   Yes.
18   Q.   And then you note three different
19 dates, is that -- when you say "Again brought to
20 my attention," are you referring to those prior
21 events?
22   A.   The prior events in May and then in
23 June; and then June 14th, which led to this, and
24 June 17th.
25   Q.   And you go in, I guess, reverse

Page 71

1  chronological order.  You note on June 14th a
2  parent requesting a meeting with you related to
3  diaper cream being applied.  Is that the
4  situation between Miss Smith and Miss Iclozan
5  that we've been talking about?
6    A.   Yes.
7    Q.   That's what you're referring to there
8  on June 14th, okay.
9        And is that, to your understanding,
10 the date that that situation occurred?
11   A.   I want to believe so.  I want to
12 believe so.
13   Q.   And if the calender shows that
14 June 17, 2011 is a Friday, would you agree that
15 June 14th, then, would have been a Tuesday?
16   A.   Yeah.
17   Q.   So when you said earlier that you
18 think you learned of it on a Thursday, is it
19 possible you learned about it earlier than that?
20   A.   I think maybe the Wednesday, the day
21 after.
22   Q.   And then you say, "After further
23 review, we discovered this was not the first
24 parent complaint."
25       Who are you referring to when you say

Page 72

1  "we discovered"?
2    A.   Myself and my assistant director,
3  because we both reviewed the forms.
4    Q.   That would be --
5    A.   Katina.
6    Q.   -- Miss James?
7    A.   Yes.
8    Q.   Why were you and Miss James reviewing
9  these forms as you described?
10   A.   Whenever you have an employee
11 conference memo done, you kind of look back at
12 the others to see what the pattern is, what is
13 happening.  It's done with every employee.
14   Q.   What was the prior parent complaint
15 that you learned of at that point in time?
16   A.   The prior parent concern?
17   Q.   Yes.
18   A.   The two that were before, the June 8th
19 and the June 23rd -- I mean, May 23rd.
20   Q.   And when you were reviewing
21 information, what did you discover that helped
22 you understand that there were prior parent
23 complaints?
24   A.   Because I realized there was not
25 consistency of care.  I think we were reviewing



Page 73

1  at the time to decide whether the infant room
2  was a fit for her.
3          Some people work better in a different
4  environment and I think that's the reason we
5  were reviewing the form because all of these
6  were infant room issues.
7      Q.   I think maybe my question was bad.
8          Did you go into Miss Smith's personnel
9  file to look back on things that had happened
10 previously when you were reviewing for this
11 employee conference memo?
12     A.   Yes.
13     Q.   What did you find that showed you that
14 there were issues on May 8th and May 23rd?
15     A.   We had the parent -- the daily sheet
16 where she did not feed the child carrots. I had
17 kept that to show, I didn't document maybe this
18 but I had the form showing where there was a
19 misfeeding for the parent that was missing the
20 jar and then the child who was fed the jar
21 incorrectly.
22          And then the failure to give another
23 child another day food that was labeled for him,
24 clearly had his name on it, and she refused to
25 give it to the child.

Page 74

1      Q.   Let's start with the jar of carrots
2  that we talked a little bit about before.
3          You became aware of that fairly
4  quickly after it happened, correct?
5      A.   The same day.
6      Q.   But you didn't document it anywhere,
7  correct?
8      A.   Because she wasn't there, she had
9  left.
10     Q.   Who had left?
11     A.   Miss Smith had left the center already
12 because our center closed at 8:30.
13     Q.   But at no point in time did you ever
14 document it, correct?
15     A.   No, I just took the sheet and we
16 talked about it and I asked her if she
17 understood how to document feeding of children.
18 And she said, Yes, she had done it.
19          And I asked her to review the sheet
20 with me and she did. And I said, Do you see
21 clearly how if I'm a parent, how I can see that
22 this wasn't done.
23          It was a first offense, the one on May
24 23rd, so I did more of a coaching with her to
25 help her to understand how the forms are done.

Page 75

1      Q.   Because it was a nonserious offense?
2      A.   It was a nonserious offense and she
3  said she understood. And I said, Okay, so if
4  you're ever in the infant room -- she didn't
5  know the food was taken from another child's bag
6  or whatever. And I said, All the food is
7  labeled. And I told her to be specific to names
8  and different things like that, she said she
9  understood.
10          So the second offense when it
11 happened, it was another case of something being
12 labeled with a child's name and her just not
13 giving it to the child.
14     Q.   Another nonserious offense, correct?
15     A.   Well, in this case it was because the
16 child actually went home with a long span of not
17 eating.
18     Q.   But you didn't document it in an
19 employee conference memo?
20     A.   No, I didn't document it in --
21     Q.   Outside of that food form, you didn't
22 document it anywhere else, correct?
23     A.   Only have the sheet that she didn't do
24 it, which she agreed that she did not.
25     Q.   So that's a "yes". So outside of that

Page 76

1  form, you didn't document it anywhere else,
2  correct?
3      A.   Yes.
4      Q.   And then this employee conference memo
5  was the first time that you documented the
6  parent situation with Miss Iclozan on June 14th,
7  correct?
8      A.   Yes.
9      Q.   Why did you wait until June 17th to
10 document that situation?
11     A.   I had to talk -- I had to get proper
12 coaching as to the right thing to say for that,
13 Number 1, because I wanted to make sure I was
14 writing the correct thing.
15     Q.   Why did you feel like you needed to do
16 that?
17     A.   Because of her statement made on
18 June 8th, where she said, I was not going to
19 feed a child because I didn't -- I was
20 accused already. And that sort of raised a red
21 flag with me, that one word "accused".
22     Q.   What did the food situation on
23 June 8th have to do with this parent situation
24 on June 14th?
25     A.   Just that I just wanted to be sure



Page 77

1  that I was writing it exactly the way it should
2  have been written.
3      Q.   Who did you get coaching from?
4      A.   I called my HR person.
5      Q.   Is that Miss Kozy?
6      A.   Yes.
7      Q.   Did Miss Kozy give you advice as to
8  how to document this?
9      A.   No, she just told me to just be
10 specific and be objective and exactly what
11 happened, and just state exactly what the parent
12 said and summarize it into two sentences or
13 something like that.
14     Q.   If you could go down to -- do you see
15 where it says, "Has this employee been counseled
16 for a similar incident?"
17     A.   Yes.
18     Q.   And then it asks for dates?
19     A.   Mm-hmm.
20     Q.   And you write down four different
21 verbal dates; do you see that?
22     A.   Yes.
23     Q.   Two of them are consistent with what
24 we talked about on June 14th and June 8th,
25 correct?

Page 78

1      A.   Yes.
2      Q.   You also note a May 11th verbal, what
3  are you referring to there?
4      A.   On May 11th -- May 11th, I can't
5  really remember right now.  Can't really
6  remember that right now.
7      Q.   Do you think it's possible that on May
8  11th that you documented something related to
9  Miss Smith's performance or any sort of
10 reprimand?
11     A.   Can't remember.
12     Q.   How about June 7th, another date that
13 you mark in there, what happened on June 7th
14 that you had to counsel Miss Smith related to?
15     A.   It's been so long ago.  It's been so
16 long, I cannot remember that one.
17     Q.   And specifically on June 14th, what
18 was it that Miss Smith did wrong from your
19 perspective as the director?
20     A.   What did she do wrong?  I think --
21 what I think is I think she should have had a
22 better parent communication at that time.  She
23 may not -- because it was just her saying she
24 was pushed, the parent saying I didn't push her,
25 the other teacher maybe saying I didn't push

Page 79

1  her.
2          This is something I did say to her, I
3  said, All you could have done was talk to the
4  parent and --- because the parent use the word
5  "hostile," she felt she was hostile.  And she
6  said she did not feel she was hostile.  And I
7  said, If you had engaged that parent in
8  communication -- you just left this parent to
9  believe what she saw is really what happened.
10         There was no helping the mom to
11 understand that the crying child did not mean I
12 was doing anything wrong.  So that parent
13 communication is such a key thing at our center
14 and I felt that the parent communication was
15 lacking at that time.
16     Q.   There was only one eyewitness, Miss
17 Gaines, correct?
18     A.   Miss Gaines.
19     Q.   Did Miss Gaines ever say that Miss
20 Smith communicated improperly or inappropriately
21 with the parent?
22     A.   She said she did not communicate
23 anything with the parent except when the parent
24 asked, Why is my child crying?
25         She said something to the parent but

Page 80

1  Miss Gaines did not hear what it was, and Miss
2  Smith walked away from the parent and there was
3  no communication.
4          Even when the mom took the child and
5  was sitting, she didn't try to appease the mom
6  by saying, I'm sorry, he was crying.  Maybe he
7  was upset or something like that.
8      Q.   Was there anything inappropriate about
9  Miss Smith stating that this parent made
10 physical contact with her?
11     A.   If she said that, no, if that's what
12 she said.  I -- no.
13     Q.   Did you have kind of a sit-down
14 meeting with Miss Smith and Miss Iclozan similar
15 to what you did with the parent and teacher --
16     A.   No, Miss Iclozan did not want a
17 meeting with her.  She did not want to be
18 present with her.
19     Q.   You see on this Exhibit 1 it says,
20 "Possible consequence if actions are not taken,
21 termination of employment."  You wrote that,
22 correct?
23     A.   Yes.
24     Q.   Miss Smith wasn't terminated after you
25 provided her with this document?



MARILYN FULLER
NORMAN -vs- BRIGHT HORIZONS FAMILY

June 05, 2013
81–84

**Page 81**

1    A.   She was?
2    Q.   She was not terminated as a result of
3  this particular document, correct?
4    A.   No.
5    Q.   And then it says, "See attached action
6  plan."
7        MR. OWENS:  And I actually separated
8  them, so I'm going to mark it as Exhibit 2.
9        (Exhibit-2, Action Plan, marked for
10       identification.)
11       (Off the record.)
12       MR. OWENS:  Back on the record.
13   Q.   (By Mr. Owens) Miss Fuller, we're back
14  on the record.
15       Prior to us taking a break I handed
16  you Exhibit 2, which is an action plan, correct?
17   A.   Yes.
18   Q.   Is that the action plan you were
19  referring to in Exhibit 1 when you wrote "See
20  action plan"?
21   A.   Yes.
22   Q.   This document on the second page of
23  Exhibit 2, is that your signature above
24  "Director"?
25   A.   Yes.

**Page 82**

1    Q.   It's dated same date, June 17, 2011,
2  right?
3    A.   Yes.
4    Q.   Again it says, "Employer refused to
5  sign." Is that Miss Todd or Miss Whitley's
6  handwriting?
7    A.   Yes.
8    Q.   Now, the actual body of this document
9  is typewritten, correct?
10   A.   Yes, that's --
11   Q.   Are you the person that typed this
12  out?
13   A.   No, that's a standard document with
14  our job responsibility and action items.
15   Q.   Is there anything in here that you
16  added that wasn't a standard document that is
17  normally used?
18   A.   The conclusion.
19   Q.   Okay.
20   A.   No. Program, program requirement.
21  The action steps and the conclusion.
22   Q.   Okay.  The last two sections of this
23  document?
24   A.   Yes.
25   Q.   So the plan was that either you or a

**Page 83**

1  supervisor was going to meet weekly with Miss
2  Smith to review the job requirements outlined in
3  the action plan, correct?
4    A.   Yes.
5    Q.   And periodically observe her
6  classroom, right?
7    A.   Yes.
8    Q.   Did you in fact do that?
9    A.   We didn't have the time to do that
10  because I think, I'm not sure, but I think the
11  date we did this, I think that's the day she
12  left, I want to believe.  I think that's the day
13  she came back with the officer, I want to
14  believe that.  I'm not sure.  Or the next day
15  and then, yes.
16   Q.   Let's assume that June 17, 2011, was
17  in fact a Friday, okay?
18   A.   Yeah.
19   Q.   Did you give Miss Smith Exhibits 1 and
20  2 in the morning, afternoon or late in the day
21  that day?
22   A.   No, it occurred maybe about 1:30-ish
23  two, somewhere there.
24   Q.   And then you said some time after that
25  is when she --

**Page 84**

1    A.   If it's the same day, that's when she
2  left and returned with the officer.
3    Q.   Is it your recollection that it most
4  likely was the same day as this that she went
5  and saw the officers?
6    A.   I kind of want to believe if it's not
7  the same day, it's the day after.
8    Q.   If this was a Friday, do you think she
9  went to see the officers on a Saturday?
10   A.   No. If it was a Friday, then she went
11  and got the officer on a Friday, yes.  But if it
12  was a Thursday, it's possible it could have
13  happened on a Friday.
14   Q.   As the director, when you gave her
15  this action plan, was it your intention to try
16  to work with her through this action plan going
17  forward?
18   A.   Definitely.
19   Q.   What happened -- was it her seeking
20  the assistance of the officer that changed
21  things after that point?
22   A.   I guess.
23   Q.   When you say you guess --
24   A.   Well, when she brought the officer and
25  the client became involved, and, of course, we



Page 85

1  had to then report it to our HR manager. We had
2  to think of possible consequences now because we
3  have the officer going to a parent's house, we
4  have the officer on Moffitt's property and I
5  think after this it kind of left my hands,
6  because now the client is talking to Bright
7  Horizons.
8       MR. OWENS: Exhibit 3.
9       (Exhibit-3, Memo, marked for
10      identification.)
11   Q.   (By Mr. Owens) I'm going to hand you
12  what's been marked as Exhibit 3, it's a few
13  pages. Same thing, take your time and look at
14  it and let me know whenever you're ready to talk
15  about it.
16      MR. OWENS: You know what, my mistake.
17  I'm going to actually break that apart.
18  I'm going to mark the second page as
19  Exhibit 4, if that's okay. I didn't
20  realize these were attached to one another.
21      I'll give this to you but if you can
22  keep it aside for a minute.
23      THE WITNESS: Okay.
24      (Exhibit-4, Termination Memo, marked
25  for identification.)

Page 86

1    Q.   (By Mr. Owens) Exhibit 3 that I've
2  handed you, do you recognize it?
3    A.   Yes.
4    Q.   What is Exhibit 3?
5    A.   An administrative leave memo.
6    Q.   This says that it's to Miss Smith from
7  you, correct?
8    A.   Yes.
9    Q.   It's dated June 20, 2011?
10   A.   Yes.
11   Q.   Fair to assume that if in fact June
12  17th was a Friday, June 20th would be Monday?
13   A.   Yes.
14   Q.   Does it make sense you would have
15  given her this on a Monday?
16   A.   Yes.
17   Q.   Did you complete this document that's
18  been marked as Exhibit 3?
19   A.   Yes, I did.
20   Q.   And it says that you were placing Miss
21  Smith on administrative leave pending an
22  investigation of the events which may have
23  occurred on June 17, 2011.
24      What were the events on June 17th that
25  may have occurred?

Page 87

1    A.   Her coming with the police officer, I
2  think is what -- yeah.
3    Q.   And you ask for Miss Smith to provide
4  a written statement outlining her perspective of
5  the incident described on June 17th; did she in
6  fact do that?
7    A.   I'm not sure. I don't want to -- I'm
8  not sure.
9    Q.   At that point in time, what did you
10  need to know from Miss Smith -- I mean, it
11  sounds to me like everybody knew she talked to
12  the police?
13   A.   Yes --
14   Q.   I guess what I'm trying to ask is:
15  What was the incident?
16   A.   The incident because the police came
17  -- the incident the police is coming to
18  investigate is that she was abused on the job.
19      So I just -- and the statement that
20  was being asked was to be provided to the client
21  at that time because the client asked -- the
22  client was part -- all during the weekend we had
23  conversations about this back and forth.
24      I had the HR president call me, this
25  person call me, whatever. And it was designated

Page 88

1  at that time to place her on admin leave while
2  they do their investigation. She was to respond
3  giving a detailed written report as to what
4  occurred.
5    Q.   What occurred when?
6    A.   On the day that she alleged that the
7  parent shoved her or pushed her.
8    Q.   So was the investigation related to
9  what happened that day between Miss Smith and
10  the parent or something that happened three days
11  later on the 17th?
12   A.   I am not sure. I am not sure. All
13  that I'm asked is to have her give me a detailed
14  -- pending the investigation that occurred on
15  June 17th, and what she had to write is to give
16  -- Please provide a written statement outlining
17  your perspective of the indent that happened on
18  June 17th.
19      What I think Moffitt is doing now is
20  lining up -- and I'm just assuming that they're
21  taking June 14th, June 17th, what happened?
22  Let's get Mrs. Smith's perspective on it.
23   Q.   I'm not asking you to speculate as to
24  what Moffitt was doing. I just want to know
25  what you were doing.



Page 89

1    A.    Right.
2    Q.    You filled out this document, you said
3  there was going to be an investigation, correct?
4    A.    Yes.
5    Q.    Tell me about the investigation, did
6  you interview anybody?
7    A.    I had to recall the parent in.
8  Because by that time, now the parent had
9  received the police at her house and the parent
10  had -- came to talk to me.
11        The parent actually had to speak to --
12  went to Moffitt because she was a little bit
13  distraught, couldn't go to work she said because
14  the police had never been at her door and that
15  was very heart-wrenching for her, she said.  So
16  she spoke to her people over there.
17        In the meantime, security, who spoke
18  with the police officer, now has to report to
19  his upper security people.  And I think they
20  were just going back and forth, taking all the
21  information as they received it.  I am not even
22  sure if they reached out to USF police, if they
23  got anything from them.
24    Q.    So other than talking to the parent
25  again, did you talk to anybody else as part of

Page 90

1  an investigation into this?
2    A.    No.
3    Q.    What was the result -- well, was there
4  any sort of result of your personal
5  investigation that you did at Moffitt?
6    A.    The result of my investigation was
7  gathering all the documents, speaking to
8  everyone, gathering all the documents and giving
9  it to Jennifer.
10    Q.    What documents were you gathering?
11    A.    The statements made by Janet or
12  talking back on June 14th incident, that was the
13  part of my investigation.  I didn't have to
14  investigate anything about June 17th because I
15  just had the police come in and ask me
16  questions.
17    Q.    So the investigation was more related
18  to what happened on June 14th, correct?
19    A.    Because that's why they showed up on
20  June 17th.
21    Q.    And you had already gotten statements
22  from Miss Williams and Miss Gaines and the
23  parent and Miss Smith, correct?
24    A.    Yes.
25    Q.    Other than that, you didn't get any

Page 91

1  statements from anybody else?
2    A.    No.
3    Q.    Because nobody else saw it, right?
4    A.    Nobody else saw it.
5    Q.    Other than maybe kids but you can't
6  get statements from them, right?
7    A.    Yes.
8    Q.    Now, draw your attention to Exhibit 4.
9  I'll give you a minute to look through, just let
10  me know when you're ready.
11    A.    Okay.
12    Q.    Exhibit 4, what do you recognize it to
13  be?
14    A.    That's the termination memo.
15    Q.    You signed it above "Supervisor"
16  signature?
17    A.    Yes.
18    Q.    It's dated June 24, 2011?
19    A.    Yes.
20    Q.    Now, at the top of the page it's dated
21  June 23, 2011, why are there two different
22  dates?
23    A.    Because I started it on one day and
24  didn't do it until the next day.
25    Q.    Why is that?

Page 92

1    A.    I don't know.  I got sidetracked.
2    Q.    Now, in the body of this document, did
3  you type that information in?
4    A.    Yes.
5    Q.    Starts by saying, On June 19th, you
6  were placed on administrative leave --
7    A.    Which was June 17th -- wasn't June
8  17th.  The paper was done on June 17th but she
9  did not -- I did not contact her until Sunday.
10    Q.    Well, the administrative leave
11  document, I think it's Exhibit 3, it's dated
12  June 20th; do you see that?
13    A.    The date...
14    Q.    So was she placed on administrative
15  leave June 20th or June 19th?
16    A.    June 20th, sorry, that day.  That's
17  the day I called her.
18    Q.    You say, "You were placed on
19  administrative leave pending an investigation of
20  actions which were disruptive to the operation
21  of Bright Horizons' business interest," what
22  does that mean?
23    A.    Parents, that relationship/partnership
24  with parents that would cause -- because it was
25  a disruptive evening.  Parents were standing



MARILYN FULLER
NORMAN -vs- BRIGHT HORIZONS FAMILY

June 05, 2013
93–96

Page 93

1 outside my door wondering what happened, if
2 their children were in danger, they saw the
3 police car.
4    Q.   We're talking about June 17th when the
5 police were there?
6    A.   Yes.
7    Q.   Now, in this paragraph you talk about
8 Miss Smith's allegation that the parent, in her
9 words, attacked her.  And then you say, "This
10 alleged allegation was not shared with your
11 supervisor at time of incident nor was it
12 reported to center management."
13        Well, that's not true, Miss Smith did
14 tell you about it, correct?
15    A.   She shared it with -- I called her in
16 the office and she has my phone, she could have
17 called me the very same day it happened and
18 shared that with me, but she didn't.  And I had
19 asked her, Why didn't you call me on my phone
20 for something that serious.
21        And she said, I didn't want to bother
22 you.  She has my number -- every single teacher
23 in the center has my number, my assistant
24 director's number and her educational
25 coordinator's number for any emergencies when we

Page 94

1 leave and early morning before the start of the
2 day.
3        And she called me on my phone before
4 that, so she couldn't say she didn't have my
5 number because we had spoken prior because I had
6 called her before she came to my center telling
7 her of her shift time.
8    Q.   On the second paragraph it talks about
9 the investigation, which included acquiring
10 witness statements, are those the statements you
11 talked to me about earlier?
12    A.   Yes.
13    Q.   You say, "It was confirmed by the
14 witness," are you referring to Miss Gaines?
15    A.   Miss Gaines.
16    Q.   "That the allege attack did not
17 occur."
18    A.   Yes.
19    Q.   Didn't you have Miss Gaines' statement
20 well before this termination?
21    A.   I am not sure what date she wrote it.
22    MR. OWENS:  Exhibit 5.
23        (Exhibit-5, Statement from Miss
24    Gaines, marked for identification.)
25    Q.   (By Mr. Owens) Take a look at

Page 95

1 Exhibit 5.
2    Q.   Is that the statement from Miss Gaines
3 that we've been talking about?
4    A.   Yes.
5    Q.   It's dated June 17, 2011, correct?
6    A.   Mm-hmm.  Yes.
7    Q.   So three days before you place my
8 client on administrative leave, you already have
9 Miss Gaines' statement, correct?
10    A.   Yes.
11    Q.   So what did you learn during the
12 administrative leave that made you feel
13 comfortable that it was appropriate to terminate
14 Miss Smith's employment?
15    A.   I think after reviewing all the
16 statements that we received, giving her the
17 action plan, I think what culminated is that
18 bringing in the police officer and making the
19 alleged claim that she was attacked to the
20 police and that she needed them to come to get
21 statements from us.
22        Which they didn't really take a
23 statement from me as such.  I think putting all
24 of that together and now sharing with the client
25 that we had the police officer on-site, which

Page 96

1 caused quite a disruption for the business, I
2 think is the decision -- this decision was made
3 to go ahead and terminate her.
4    Q.   Did you ask Miss Gaines for this
5 statement, Exhibit 5?
6    A.   If I ask Miss Gaines for the
7 statement?
8        No, I ask Miss Janet to get the
9 statement from Miss Gaines and Miss Vanessa, if
10 she could have given her one.
11    Q.   Did that happen before or after the
12 police came to the facility on June 17th?
13    A.   The same night the police was there.
14    Q.   So Miss Gaines wrote this sometime in
15 the evening of June 17th?
16    A.   Actually, in the evening of June 17th,
17 the police asked her to write this statement.
18    Q.   Okay.  Did you ever ask Miss Gaines if
19 it was possible that the parent made physical
20 contact with Miss Smith and she just didn't see
21 it?
22    A.   She said from where she was standing,
23 she could see both of them.
24    Q.   From June 20th, when Miss Smith was
25 placed on administrative leave, to her



MARILYN FULLER
NORMAN -vs- BRIGHT HORIZONS FAMILY

June 05, 2013
97–100

Page 97

1    termination on the 24th, so for those four days,
2    what was going on related to Miss Smith at the
3    Moffitt Center?
4       A.    Me having calls with Moffitt.  When
5    they met with the parent, they called me to just
6    tell me what the parent said that the -- what
7    the parent said backed up what the -- I think
8    Keisha's statement that the police had maybe
9    provided them.
10          Then myself having a call with
11   Jennifer and Therla and then I think myself
12   having a call with Jennifer and Therla and maybe
13   my divisional vice president, I can't remember
14   if he was actually on the call.  So just having
15   calls with everyone.
16      Q.    Was there ever a disagreement among
17   the group as to whether Miss Smith should be
18   terminated or given a final warning?
19      A.    I don't think so.  I don't think so.
20      Q.    When was the decision ultimately made?
21      A.    To terminate Miss Smith?
22      Q.    Yes.
23      A.    I think it might have been made on the
24   23rd, the day before I actually gave it to her.
25   Yeah, maybe the day before I gave it to her.

Page 98

1       Q.    Can we agree that the final written
2    step of the progressive discipline policy was
3    skipped in this particular situation?
4       A.    Final?  Just repeat that.
5       Q.    Sure.  You told me earlier that the
6    steps in the progressive disciplinary policy are
7    counseling and then two reprimands, a first one
8    and a second one, and then a termination?
9       A.    No, sometimes we skip the counsel and
10   instead of doing the counsel, you do two
11   reprimands.  Just do two reprimands and then
12   termination, and that has to do with the
13   seriousness of the incident.
14          Because in some instances, I may not
15   do counsel and reprimand, I may go straight to
16   termination.  If a child is left on a
17   playground, there's no reprimand for that, you
18   go straight to termination.
19      Q.    Fair enough.  But there was no child
20   left on the playground here, correct?
21      A.    No, there was no child left on the
22   playground but a child was left unattended.
23      Q.    But she wasn't fired for that, right?
24      A.    No, she wasn't fired.  She was --
25      Q.    All right.  What I'm asking though --

Page 99

1    and I appreciate all that.  With regard to the
2    reprimand, Miss Smith was only reprimanded once
3    before she was terminated, correct?
4       A.    On paper, yes.
5       Q.    So you skipped the second written
6    reprimand and went straight to termination,
7    correct?
8       A.    The second written reprimand on paper.
9       Q.    So that's a yes?
10      A.    Yes.
11      Q.    Why is that?
12      A.    Because the seriousness of the
13   allegations.
14      Q.    The seriousness of what allegation?
15      A.    The allegation on -- not the
16   allegation but the actual act of having the
17   officers on-site.
18      Q.    If you could look back at Exhibit 4,
19   the termination form.
20      A.    Mm-hmm.
21      Q.    It asks about being counseled for a
22   similar incident, you state, "Yes," and then
23   give the date of May 24, 2011.
24          What happened on May 24, 2011, that
25   was similar to calling the police?

Page 100

1       A.    I don't think it was the incident
2    about calling the police.  I think that May 24th
3    issue could have been a parent issue.  I don't
4    think that that was a calling -- she had never
5    called the police at my center other than that
6    one time.  I think that could have been the
7    instance of a parent concern.
8       Q.    Do you know if there's any
9    documentation anywhere about that alleged May
10   24th incident?
11      A.    I am not sure.
12      Q.    How is a parent complaint incident
13   similar to contacting the police?
14      A.    I don't think that that's in reference
15   to calling the -- because it lists -- it was
16   confirmed by the witness that the other -- your
17   behavior was unacceptable, unprofessional and
18   insensitive to the parent.
19          And I think that is also that
20   insensitivity to parents, that May 24th.  I did
21   not relate that to calling the police.
22      Q.    And this May 24th incident was not
23   noted in any way, shape or form on the reprimand
24   of just a few days later on June 17th, correct?
25      A.    No.  May 24th issue could have been in



Page 101

1  here but not dated. Having a parent concern
2  could have been that carelessness and caring for
3  children, I think that was one of the concerns
4  of a parent also.
5      Q.   Outside of you putting it in that
6  document and saying it today, we have no other
7  proof that that's accurate or true, correct?
8      A.   It might have been there but I'm not
9  sure if it ever went up to them, but I don't
10 have it.
11     Q.   Was the problem with what Miss Smith
12 did more her simply contacting the authorities
13 or is it your belief she was being untruthful
14 with the authorities?
15     A.   I think she was -- should I think?
16 Can I think?
17     Q.   Yeah, I'm asking your opinion.
18     A.   You're asking my opinion. My opinion,
19 I want to believe there was some untruth. I
20 believe there might have been exchange of words
21 with her parent -- with the parent, but I
22 honestly do not believe that there might have
23 been a shoving and a pushing as she indicated.
24     Q.   If Miss Gaines would have said that
25 she witnessed some sort of physical contact,

Page 102

1  would Miss Smith have been fired?
2      A.   No. If Miss Smith had gone to the
3  police?
4      Q.   Yes.
5      A.   Maybe, yes. But just for that
6  incident, maybe no. Because then I would have
7  to take Miss Smith's word because I have a
8  witness over the parent.
9          MR. OWENS: Exhibit 6.
10         (Exhibit-6, Statement, marked for
11     identification.)
12     Q.   (By Mr. Owens) Handing you Exhibit 6.
13     A.   Okay.
14     Q.   Do you recognize Exhibit 6?
15     A.   Yes.
16     Q.   What is this document?
17     A.   When one of the teachers brought a
18 sandwich, she was talking about in the
19 classroom, I asked the teacher to just document
20 it for me.
21     Q.   This is dated June 17, 2011?
22     A.   Yes.
23     Q.   Do you know the teacher who wrote
24 this?
25     A.   Miss Tracey.

Page 103

1      Q.   Do you know Tracey's last name?
2      A.   Tracey's last name is Childress.
3      Q.   Why was Miss Tracey providing -- well,
4  let me back up.
5          Did Miss Tracey provide you with this
6  document, Exhibit 6?
7      A.   Yes, she did.
8      Q.   Why did she do that June 17th, the
9  same day that my client was reprimanded and put
10 on an action plan?
11     A.   Because it's the morning of that she
12 was talking about it.
13     Q.   Miss Childress on her own --
14     A.   No. Miss Childress went to Miss
15 Janet, who is her coordinator, and told Miss
16 Janet that she would like to have Miss Smith
17 moved to another classroom because she feels
18 very uncomfortable working with her because what
19 she's talking about is Citi and the things that
20 happened at Citi.
21         At that moment, Janet said to her, But
22 we have spoken to her and asked her not to talk
23 about these things in the classroom and asked
24 her, Could you put it in writing?
25         Because I had already said to the

Page 104

1  teachers that whatever you guys hear anything
2  about Citi, I need to know about it because
3  she's been asked not to talk about it.
4      Q.   So your testimony is that Miss
5  Childress on her own, after talking --
6      A.   No Janet --
7      Q.   Let me finish.
8          -- after talking to Miss Williams,
9  typed that out and provided it to me?
10     A.   Janet may have asked her too, yes.
11         MR. OWENS: Exhibit 7.
12         (Exhibit-7, Statement, marked for
13     identification.)
14     Q.   (By Mr. Owens) I'm going to hand you
15 Exhibit 7.
16         Do you recognize Exhibit 7?
17     A.   Yes.
18     Q.   Do you know who wrote this?
19     A.   No.
20     Q.   How is it that you've seen this
21 document before?
22     A.   Because Miss Janet brought these to
23 me. These were all handed to me by Miss Janet.
24     Q.   Would you agree that they look pretty
25 similar in terms of the fonts that are used



MARILYN FULLER
NORMAN -vs- BRIGHT HORIZONS FAMILY

June 05, 2013
105–108

Page 105

1  and where --
2  A.  Because we use one font at the center.
3  Q.  You would agree that the dates and "To
4  whom it say concern," are both bolded exactly
5  the same, correct?
6  A.  Yeah.
7  Q.  They're on the same date, right?
8  A.  Yes.
9  Q.  And the document marked as Exhibit 7
10  doesn't say anything about Citi, correct?
11  A.  No.
12  Q.  So why did this particular employee,
13  to your understanding, write this statement?
14     MR. LEO: Objection; form.
15     THE WITNESS: I have -- I really don't
16  know.
17  Q.  (By Mr. Owens) You don't know who
18  wrote it?
19  A.  No.
20     MR. OWENS: Exhibit 8.
21     (Exhibit-8, Statement, marked for
22  identification.)
23  Q.  (By Mr. Owens) I'm going to hand you
24  Exhibit 8.
25     Have you ever seen this document

Page 106

1  before?
2  A.  Yes, this is Miss Marcia.
3  Q.  Statement by Miss Marcia?
4  A.  Yeah.
5  Q.  Did she provide this to you?
6  A.  She may have provided this to Miss
7  Janet also, because Miss Janet is her
8  coordinator, but it was passed up to me.
9  Q.  Was that on the same date as the other
10  statements we looked at?
11  A.  I am not sure because I even had to
12  read it to refresh my memory as to what it said
13  in it.
14  Q.  On June 17th, the day that my client
15  was -- Miss Smith was placed on an action plan,
16  that was the last day she actually physically
17  worked at Moffitt, correct, because she was
18  placed on administrative leave and then
19  terminated?
20  A.  Yes, that's the last day she worked
21  there.
22  Q.  Do you think it's pure coincidence
23  that all these witness statements were written
24  the same day that was actually the last day my
25  client actually worked for Bright Horizons?

Page 107

1     MR. LEO: Objection; form.
2     THE WITNESS: I only see two that was
3  done on the 17th.
4  Q.  (By Mr. Owens) Do you know if there
5  were other statements that were provided to you
6  throughout that same week, the week leading up
7  to June 17th, do you know if other statements
8  were provided to you?
9  A.  Not that I'm aware of.
10  Q.  Did you go around and solicit any
11  statements from employees?
12  A.  No. What I did is I only ask Miss
13  Williams to collect the documentation on what
14  happened with the parent. And Miss Vanessa was
15  told that if she did carry on conversations in
16  the room that if the teachers came to me that I
17  will talk to her again about it.
18  Q.  So is it your testimony that you told
19  Miss Williams to collect statements from
20  employees?
21  A.  I told Miss Williams to collect the
22  statements from Miss Vanessa and I was aware
23  that Miss Keisha had written a statement the
24  night the police was there, and I asked Miss
25  Williams to get that statement also from Miss

Page 108

1  Gaines.
2  Q.  Well, I'll tell you, the company's
3  lawyers have provided me with more statements
4  than what I've shown you all surrounding that
5  particular week that my client was reprimanded
6  -- given an action plan and placed on
7  administrative leave.
8     Other than Miss Gaines and Miss
9  Williams, none of them talk about the situation
10  between Miss Smith and that teacher. Do you
11  have any idea why there would be so many
12  statements?
13  A.  Why would there be so many statements
14  around?
15  Q.  Just about my client in general that
16  have absolutely nothing to do with the situation
17  with that parent?
18  A.  No, I have no idea why all of that
19  would be written. When I did speak with Miss
20  Smith about talking about Citi, I told her that
21  my teachers -- I really didn't want teachers
22  coming to me feeling uncomfortable of her
23  bringing another center's issues into our
24  center, and that I would check on them to make
25  sure they were comfortable and we were running



Page 109

1  as a business and not having to deal with Citi's
2  issues. So asking them for statements, I never
3  did.
4      Q.   Do you have any idea who did?
5      A.   Nobody asked them for statements that
6  I'm aware of.
7      Q.   So employees, on their own, the same
8  week that all this stuff happened leading up to
9  my client's termination, they all decided to
10  write statements on their own; is that your
11  understanding?
12      A.   I would say.
13      Q.   You knew that Miss Smith was being
14  placed on an action plan the exact same day that
15  Miss Norman was terminated from her job, didn't
16  you?
17      A.   Miss who?
18      Q.   My client, Vanessa Smith, you placed
19  her on an action plan and reprimanded her on the
20  exact same day that Janice Norman was terminated
21  from her job?
22      A.   I did not know that.
23      Q.   Miss Whitley didn't tell you that?
24      A.   No, she did. She did not tell me
25  that.

Page 110

1      Q.   Miss Kozy didn't tell you that?
2      A.   No, she did not discuss anything about
3  Citi with me.
4      Q.   I thought you told me Miss Whitley
5  confirmed at one point that Miss Norman was
6  terminated from her job?
7      A.   Yes, that's all she said. I brought
8  it to her attention that Miss Vanessa Smith was
9  telling the teachers that she and another
10  teacher are no longer at Citi.
11          My teachers do not know -- did not
12  know any of them. When I brought that to Miss
13  Whitley, she said, Yes, Miss Janice is no longer
14  there. That's all I heard about that, but I
15  didn't know date, I didn't know time, I didn't
16  know anything like that.
17          MR. OWENS: All right, ma'am, that's
18      all I have for you. I appreciate your time
19      and patience.
20          MR. LEO: I just have a couple of
21      questions.
22
23          CROSS EXAMINATION
24  BY MR. LEO:
25      Q.   Were you the decision maker to

Page 111

1  termination Miss Smith's employment?
2      A.   I was part of the decision making team
3  because Miss Kozy was on it also. And as our
4  HR, she does a lot of sitting in on terminations
5  since we are not allowed to be the final
6  decision making person.
7      Q.   So you're not allowed to be the final
8  decision making person?
9      A.   In most cases, no.
10      Q.   Were you the final decision maker in
11  Miss Smith's case?
12      A.   She asked me if I felt comfortable to
13  have her continue there after and I said, In
14  light of what happened that Friday afternoon, I
15  don't think I'll be comfortable. So I agreed
16  with their decision.
17      Q.   So it wasn't your decision to
18  terminate her?
19      A.   I would say yes.
20      Q.   So who was the final decision maker?
21      A.   No. What did you ask me, was it my
22  decision to terminate?
23      Q.   So you were the final decision maker?
24      A.   At this point, I gave my final, yes.
25  I said, "Yes".

Page 112

1      Q.   Other people were involved?
2      A.   Jennifer was sitting there. Therla
3  was on the phone and I had my assistant director
4  in there, and I said, "Yes".
5      Q.   And the investigation we talked about,
6  were you the one conducting the investigation?
7      A.   I conducted up to the piece where I
8  collected all the information and answered all
9  the questions asked by the client and asked by
10  Bright Horizons.
11          And then I think Bright Horizons maybe
12  had their -- another level of investigation and
13  then they got back to me, this is what we found
14  out and let's proceed from here, reach out what
15  the client is saying.
16      Q.   Who was that at Bright Horizons that
17  you were communicating with?
18      A.   I communicated with Therla and my
19  divisional vice president.
20      Q.   Do you know what kind of investigation
21  they were doing?
22      A.   I do not know that.
23          MR. LEO: No further questions.
24          MR. OWENS: Nothing else here. Is she
25      reading?



MARILYN FULLER
NORMAN -vs- BRIGHT HORIZONS FAMILY

June 05, 2013
113–116

**Page 113**

1    MR. LEO:  She'll read.
2    MR. OWENS:  We'll order.
3    MR. LEO:  We'll take a copy.
4    (Whereupon the deposition concluded at
5    5:09 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 114**

1    CERTIFICATE OF REPORTER
2    STATE OF FLORIDA )
3    COUNTY OF HILLSBOROUGH)
4
5    I, Jennifer Sirois, certify that I was
6    authorized to and did stenographically report
7    the deposition; that a review of the transcript
8    was requested; and that the foregoing pages are
9    a true and complete record of my stenographic
10    notes taken during said deposition.
11    I further certify that I am not a relative,
12    employee, attorney, or counsel of any of the
13    parties, nor am I a relative or employee of any
14    of the parties' attorneys or counsel connected
15    with the action, nor am I financially interested
16    in the action.
17    Dated this 16th day of June, 2013.
18
19    Jennifer Marie Sirois
20    JENNIFER SIROIS
Notary Public
21    State of Florida at Large
My Commission Number: EE131960
22    Expires:  September 19, 2015
23
24
25

**Page 115**

1    CERTIFICATE OF OATH
2
3    STATE OF FLORIDA )
4    COUNTY OF HILLSBOROUGH)
5
6    I, the undersigned authority, certify that
7    the witness in this matter personally appeared
8    before me and was duly sworn on the 5th day of
9    June, 2013.
10
11    WITNESS my hand and official seal this
12    16th day of June, 2013.
13
14
15    Jennifer Marie Sirois
16    Jennifer Marie Sirois
Notary Public
17    State of Florida at Large
My Commission Number: EE131960
18    Expires:  September 19, 2015
19
20
21
22
23
24
25

**Page 116**

1    DEPOSITION ERRATA SHEET
2    Assignment No.: 377789
Case Caption:   NORMAN, ET AL. V. BRIGHT
3    HORIZONS
4
DECLARATION UNDER PENALTY OF PERJURY
5    I declare under penalty of perjury that I have
read the entire transcript of my deposition
6    taken in the captioned matter or the same has
been read to me, and the same is true and
7    accurate, save and except for changes and/or
corrections, if any, as indicated by me on the
8    DEPOSITION ERRATA SHEET hereof, with the
understanding that I offer these changes as if
9    still under oath.
Signed on the _____ day of _____, 20_____.
10
11    MARILYN FULLER
12    Page No._____ Line No._____ Change to:_____
13    _____
14    Reason for change:_____
15    Page No._____ Line No._____ Change to:_____
16    _____
17    Reason for change:_____
18    Page No._____ Line No._____ Change to:_____
19    _____
20    Reason for change:_____
21    Page No._____ Line No._____ Change to:_____
22    _____
23    Reason for change:_____
24
25

