Condensed Transcript

# In the Matter Of:

## NORMAN vs. BRIGHT HORIZONS

8:12-cv-01301-EAK-TBM

---

## SUSAN SAUNDERS

*May 23, 2013*

---

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JANICE NORMAN and
VANESSA SMITH,

Plaintiffs,

vs. CASE NO.: 8:12-cv-01301-EAK-TBM

BRIGHT HORIZONS FAMILY
SOLUTIONS, LLC, d/b/a BRIGHT
HORIZONS CHILDREN'S CENTERS,

Defendant.

_______________________________/

Florin Roebig, P.A.
2101 West Platt Street
Tampa, Florida 33606
Thursday, May 23, 2013
11:30 a.m. - 12:52 p.m.

DEPOSITION OF SUSAN SAUNDERS

Taken on behalf of the Plaintiffs before Julie R. Palitto, RPR, Notary Public in and for the State of Florida at Large, pursuant to Plaintiffs' Notice of Taking Deposition in the above cause.

APPEARANCES:

Counsel for Plaintiffs:

GREGORY A. OWENS, ESQUIRE
Florin Roebig, P.A.
777 Alderman Road
Palm Harbor, Florida 34683
(727) 786-5000
Greg@florinroebig.com

Counsel for Defendant:

CARLOS J. BURRUEZO, ESQUIRE
Littler, Mendelson, P.C.
111 North Magnolia Avenue, Suite 1250
Orlando, Florida 32801-2366
(407) 393-2935
Cburruezo@littler.com

Also Present: Jennifer Whitley

INDEX

| SUSAN SAUNDERS | PAGE NO. |
|---|---|
| Direct (Owens) | 4 |
| Cross (Burruezo) | 54 |
| Stipulations | 55 |
| Certificate | 56 |
| Errata Sheet | 58 |

EXHIBITS

| PLAINTIFFS' EXHIBITS | PAGE NO. |
|---|---|
| No. 1 Bright Horizons Family Solutions Employee Conference Memorandum (Counsel) for Vanessa Smith | 27 |
| No. 2 4/22/2011 Complaint (Two Pages) | 41 |
| No. 3 Hillsborough County Sheriff's 4/20/11 interview of Susan Saunders (One Page) | 46 |
| No. 4 CPI Interviews (Six Pages) | 49 |

PROCEEDINGS

THEREUPON:

SUSAN SAUNDERS,

was called as a witness and, having been first duly sworn and responding, "Yes, I do" was examined and testified as follows:

DIRECT EXAMINATION

BY MR. OWENS:

Q Can you please state and spell your name for the record?

A Susan Saunders, S-A-U-N-D-E-R-S.

Q Other than Susan Saunders, have you ever gone by any other names?

A Yes.

Q Okay. What was the name that you had prior to being Susan Saunders?

A Verzillo, which is my maiden name.

Q Other than Saunders and Verzillo, any other last names?

A Yes. Torony, T-O-R-O-N-Y.

Q Other than Saunders, Verzillo, and Torony, are there any other names?

A One more. Roegner, R-O-E-G-N-E-R.

Q All right. That's the last one?

A That's it.



Q Okay. And I assume those various names come from different marriages?
A Yes.
Q Okay. And your maiden name is Verzillo, correct?
A Yes.
Q Okay. How long have you gone by the name of Susan Saunders?
A Since 1997.
Q So for a while now?
A Yes.
Q Ms. Saunders, my name is Greg Owens. I represent Janice Norman and Vanessa Smith in connection with their legal claims against Bright Horizons Family Solutions, LLC, doing business as Bright Horizons Children's centers. If it's okay with you, I'm just going to call them Bright Horizons; is that all right?
A Yes.
Q Have you ever had your deposition taken before?
A I think I have once a long time ago.
Q Do you remember what the purpose behind the deposition was?
A I don't, but I remember being in a room like this.
Q Okay. You were asked questions by a lawyer?

A I really don't remember what it was about. It could have been one of the divorce cases.
Q Okay. I won't spend too much time going over the rules with you. I can talk to you about that throughout. But, you know, the most important thing is the two of us communicate effectively. So if I ask you a question that you don't understand or that you didn't hear because the air conditioner is blowing loudly or something like that, just let me know and I'll ask it a different way or re-ask it, okay?
A Okay.
Q If you need a break at any time, let me know. The only thing I ask is if I'm in the middle of a question, if I can finish that question and then we can take a break; fair enough?
A Yes.
Q Are you currently employed?
A Yes.
Q What do you do for a living?
A I am the education coordinator at Bright Horizons at Citi, which means I'm the manager of one of the wings, the infant/toddler wing.
Q How long have you been the education coordinator of the infant/toddler wing at Citi?
A The title changed, but it's been the same job

for -- it will be 15 years this December.
Q What was the name of the position prior to it being rebranded as education coordinator?
A Program coordinator.
Q And I don't need a name, but in terms of the chain of command, as the education coordinator or program coordinator, who would be the person that would be your direct supervisor?
A The director.
Q As we sit here today, who is your direct supervisor?
A Brenda Hayes.
Q Prior to Ms. Hayes, who was the director of the facility?
A Linda Horner.
Q And you said you've been in this position for 15 years. Before that, did you hold any other positions with Bright Horizons?
A No.
Q Before this, did you hold any other jobs in the education child care field?
A Yes.
Q For how many years would you say that you've been in that field?
A Since 1975.

Q Since you've been at Bright Horizons, have you ever received any sort of formalized discipline or reprimands for anything?
A Yes.
Q When was the most recent reprimand or discipline that you received?
A I believe it was in 2011.
Q What was the accusation or discipline that was levied toward you?
A It was that I -- I'm trying to remember the wording of it. But I believe I -- something I should have done. I should have directed an employee to my superior or to human resources for something that she needed.
Q Do you remember who that employee was?
A It was Vanessa Smith.
Q Okay. Let's talk about that. It sounds like Ms. Smith came to you with an issue; is that fair?
A Yes.
Q Okay. What was the issue that Ms. Smith came to you about?
A Well, she had gotten a write-up that particular day, and at the very end of the day -- actually it was 7 p.m. It was a Friday night, and she came to me asking me how to file a grievance. And I honestly didn't know



the exact way to do that because I had never done that before in my career with Bright Horizons. So I told her that she has -- I told her she has a handbook; to consult the handbook, but I would definitely find out more about it the following Monday when we came back to work.
Q Okay. Did you, in fact, follow up on it that next Monday?
A The following week, I honestly don't remember what happened that following Monday. Well, she did not come to work that day; that, I do know.
Q So Ms. Smith was coming to you, saying that she wanted to file some sort of grievance to contest the write-up that she had received?
A I believe so.
Q Who was the individual or individuals who disciplined you for the situation?
A It was Ms. Horner, Linda Horner.
Q Did Ms. Horner tell you what she thought you should have done as opposed to what you had done with Ms. Smith?
A I don't remember. I honestly don't remember how it all went down at that point.
Q Since that particular situation that we just talked about, have you ever received any other sort of discipline at Bright Horizons?

A No.
Q How about prior to that, had you received any?
A One.
Q Do you remember roughly when that was?
A I think it was in 2010.
Q Okay. What were the circumstances surrounding that discipline?
A I was counseled. I don't remember if it was an actual reprimand, but it was a counsel because we were undergoing observations at the time, and I happened to be in a baby room and was told that the observer at the window saw me walk away from an infant that was on the floor.
Q And when you say that there were observations, was it from some sort of state or local agency?
A Yes.
Q You said that, I guess, one of the auditors, we'll call them, saw you do this and reported it to somebody at Bright Horizons; is that correct?
A Yes.
Q Okay. And did somebody at Bright Horizons come to you and ask you, Ms. Saunders, did you, in fact, do this?
A I believe so.
Q Did you admit doing it, or did you deny it?

A No. I admitted it.
Q Was Ms. Horner the individual who gave you the reprimand?
A Yes. No. You know what. I'm sorry. No. That is not true. Ms. Jennifer actually and Ms. Debra, who was the acting director, I believe, at the time or the assistant director at the time.
Q So with regard to the issue of walking away from the infant, your recollection is that Ms. Todd, I guess she goes by Ms. Whitley now, she was the one that was involved along with Ms. Neverson?
A Yes.
Q As the education coordinator/program coordinator, what role, if any, do you have in levying discipline or reprimands toward the employees who were under your supervision?
A I'm not sure I understand the question.
Q Sure. And we'll back up a little bit. In your role, do you have employees who you are considered to be their supervisor?
A Yes.
Q For those employees, if you believe that they have engaged in some sort of infraction of company rules or they're not performing their job up to your expectations, are you permitted to discipline them?

A Yes.
Q And do you need to get approval from any of your supervisors in order to discipline an employee?
A No.
Q When you discipline an employee, are you expected to have anybody there to witness such discipline?
A Yes.
Q Does Bright Horizons, to your understanding, utilize what's often known as a progressive disciplinary policy?
A Yes.
Q Okay. And every company is different. I've learned that over the years.
A Uh-huh.
Q For Bright Horizons, could you explain to me what the different levels of discipline are in the policy?
A Yes. There would be a verbal counsel, and it also depends on the severity of the infraction. But normally a verbal counsel and then a written counsel, and any time a written counsel is given, that's when there has to be two management people there. So anything above that. So a written counsel and then a reprimand and a final reprimand, which could lead to termination.



Q And I know you at least mentioned that there are times when you can skip over some of the steps; is that correct?
A No. I don't think I said that.
Q Okay. All right. Maybe I misunderstood. Because you had said depending on the infraction, so I assumed you meant that there were times if the infraction was so serious, you could skip over a step.
A Okay. Okay. I wasn't thinking that way. I was thinking the opposite way, where a verbal counsel is something that I wouldn't normally have to have another management person with me.
Q Okay.
A But once it gets written.
Q All right. And so is it fair to say that it's the expectation of you as a manager from Bright Horizons that you try to do your best to follow the steps in the progressive disciplinary policy?
A Yes.
Q And would you agree, though, that there are some infractions that are so serious that it would warrant maybe going straight to termination or at least going to one of the higher steps before utilizing the lower steps?
A Yes.
Q And can you think of some of the types of

workplace behavior that in your mind as a manager are so serious that it would require going past some of the lower steps and maybe even going straight to termination?
A Yes.
Q Could you tell me some of those in your mind?
A Leaving a child outside by themselves, forgetting a child somewhere; corporal punishment. At the moment, those are the two -- I mean, things with children obviously.
Q Sure.
A Neglect or abuse.
Q So abuseful or neglectful behavior toward children would be ones that you, in your mind, as somebody who's been doing this for a very long time are so serious that it could warrant skipping some of the steps in the procedure?
A Uh-huh.
Q Correct?
A Uh-huh.
Q Is that a yes?
A Yes.
Q Okay. And that's one of the rules, too. Do your best if you can to say yes or no.
A Okay.
Q We all do it, so don't worry about it. And I'll

remind you from time to time. I'm not being rude; I'm just trying to help the court reporter out.
A Okay.
Q If that situation were to arise where you believed in your role as a manager that an employee was being abusive or neglectful toward a child, and you believed that it warranted, let's say straight to termination, what would you be expected to do as a manager, meaning who would you be expected to go and talk to about that situation?
A I would have talked to my immediate supervisor first. Yes.
Q Have you ever had a situation in your 15 years at Bright Horizons where something happened toward a child that you felt was so serious that it warranted skipping over some of the steps?
A Yes.
Q When is the most recent one that you can think of?
A I can't tell you how many years ago it was, but one that serious was probably six or seven years ago where a teacher left a child outside and a parent found the child.
Q Serious stuff, right?
A Yes.

Q Okay. How did you come to find out that this had happened?
A Another teacher told me. I was in my office, and another teacher told me that this teacher came in from outside with a buggy minus one of the children who was outside.
Q And the teacher who left the child outside, was he or she one of the ones under your supervision?
A Yes.
Q At that point in time when you found this out, did you believe that that was so serious that the person should be terminated immediately?
A Yes.
Q Did you tell that to somebody?
A Yes.
Q Who did you tell that to?
A I believe it was Linda Horner.
Q Was that employee, in fact, terminated?
A Yes.
Q Immediately?
A Yes.
Q And you said that was six or seven years ago, to your recollection?
A It could be even longer than that. I'm not clear on the time.



Q All right. Were there any situations similar to that more recently within the last two to three years?
A Not that I'm aware of.
Q We've talked a little bit about terminations. What role, if any, do you have as the education coordinator/program coordinator in terminating employees under your supervision? What I mean by that is: Do you have full authority to terminate an employee if you believe they should be?
A No.
Q If there is a time where you believe there's an employee under your supervision who should be terminated, are you expected to go to the director?
A Yes.
Q And is it then a collaborative effort between you and the director to determine what the appropriate punishment should be for that employee?
A Yes.
Q Do you consult human resources or Ms. Todd or anybody else?
A The director would go up the chain of command. Yes.
Q So it sounds like it would be a situation where you perhaps would make a recommendation to the director, and then the director would kind of take it from there;

is that fair to say?
A Yes.
Q Okay. And we were talking earlier about progressive discipline, and I think you said the first step is verbal, verbal counseling, correct?
A Yes.
Q And I think you said -- again, correct me if I'm wrong -- that when there's a verbal counseling, that's something that you can do on your own for an employee under your supervision, correct?
A Yes.
Q When you give an employee verbal counseling, is there any sort of formalized company document that you utilize to write down that you had a verbal counseling with that employee?
A No. There is a conference report that we would write out for a written counsel, but for a verbal, that's what it is, is a verbal.
Q Okay. So hypothetically, let's say I work under you and you decide that I deserve a verbal counseling; you provide that to me verbally, correct?
A Uh-huh.
Q Yes?
A Yes. Sorry.
Q All right. After you give a verbal counseling

such as that, would you personally, as the education coordinator, take some handwritten notes on your own that on -- well, today is May 24th, I think -- May 24th, 2013, I gave Greg Owens verbal counseling about this; is that something that you would do?
A Yes, I would.
Q Okay. When you do that, do you then put that in the employee's personnel file?
A I have personnel files in my office of my own, for my own staff that I would put that in. And then if we needed that, you know, as time went on, it would be there.
Q Do you generally take those notes of verbal counselings in a handwritten form, or do you do it on a computer?
A Both.
Q And obviously the word would dictate when you give somebody a written reprimand, that's something that you would do in writing, correct?
A Yes.
Q And then I think you were alluding to standard company documents that you would use to put that write-up in writing?
A Yes.
Q Okay. Does Bright Horizons, to your knowledge,

have a zero tolerance policy when it comes to child abuse and neglect?
A Yes.
Q And judging by what you've told me, I would assume that personally you have zero tolerance for abuse and neglect; is that correct?
A Yes.
Q Now, my client, Janice Norman, were you involved in any way in the decision to hire her to work at Bright Horizons?
A No.
Q Okay. Same with Ms. Smith, Vanessa Smith, were you involved in any way in the decision to hire her?
A I was. Yes.
Q What role did you play in the decision to hire Vanessa Smith for the position at Bright Horizons?
A I believe I did a first interview on her.
Q After doing that first -- well, during that first interview, was anybody else involved other than yourself?
A No.
Q After the first interview with Ms. Smith, did you recommend that she be hired for the position?
A I probably did, but I don't remember.
Q And if, in fact, you did, was there anything in



particular about Ms. Smith that impressed you to the point that you felt like she would be an appropriate employee for Bright Horizons?
A At that time, she was very pleasant. She answered the questions correctly, the way I would have expected someone who had experience to answer. So I thought she was a viable candidate.
Q After that initial interview that you had with Ms. Smith, were you involved in any subsequent interviews with her?
A No.
Q And ultimately, Ms. Smith was hired to work at Bright Horizons, correct?
A Yes.
Q Was she one of the employees who would have been under your supervision as the -- were you program coordinator at the time?
A Yes.
Q Okay. So would she have been under you as program coordinator?
A Yes.
Q Did there come a point in time when you were supervising Ms. Smith that you learned of her making an internal complaint at Bright Horizons about Kristin Turner?

A No.
Q Ms. Smith never came to you personally and told you that she felt like Ms. Turner was treating the kids inappropriately?
A No.
Q When was -- if at all, when was the first time that you found out that Ms. Smith had made a complaint about Ms. Turner and her treatment of the children?
A The day that the police arrived and the CPI arrived. That was the first day I knew anything about that.
Q I know it's been a little over two years, but do you remember the date in which the police and CPI arrived at the facility?
A I know it was the week after the write-up, so I believe that would have been the week of the 18th of April.
Q And I think I know the write-up you're talking about. We'll look at it, and maybe it will help us with the time frame.
So governmental officials, the police and otherwise, show up at the facility, and how did you first learn why they were there?
A They called me in.
Q Who all -- when you say "they called me in," who

is "they"?
A Well, they were in Linda Horner's office, the CPI. I think there were three people from CPI or from child care licensing and the Sheriff. I don't know. There were four or five people in there.
Q Okay. So the four or five individuals from the government, loosely speaking, and yourself, correct?
A I don't remember who else was in the office. I know Linda Horner was there.
Q Linda was with you when they interviewed you?
A Yes.
Q Okay. And put me in the room, if you would. How did the interview start? What did they tell you their purpose was?
A I don't remember. Well, they told me the purpose was that they were investigating Kristin Turner.
Q Okay. Did they tell you what specifically they were investigating with regard to Ms. Turner?
A I don't think so. I don't remember.
Q Did at that time they tell you who was responsible for making the complaints about Ms. Turner?
A I don't remember.
Q Do you remember specifically what you told them during that interview?
A No.

Q At that point in time, had you ever witnessed Kristin Turner handle children in a way that you felt was inappropriate?
A No.
Q Did you ever witness Kristin Turner in your opinion treating children in an inappropriate manner at all?
A No.
Q And prior to the interview with the police and CPI, had anybody at Bright Horizons, any employee ever come to you and told you that they had some concerns about the manner in which Kristin Turner was treating the children?
A No.
Q All right. After this initial interview with the police and CPI, were there any -- were there ever any follow-up interviews that they conducted with you regarding this investigation?
A I don't remember.
Q Did Bright Horizons begin an investigation of their own into these issues?
A Yes.
Q What role, if any, did you have in that investigation?
A I don't remember if I had to do anything.

Q Did anybody from Bright Horizons interview you to find out what you knew about the situation?
A I don't remember.
Q Do you remember you personally going and having to interview an employee to find out what they knew about the situation?
A No.
Q Can you recall who the individuals were from Bright Horizons who were conducting interviews?
A I believe Carol Stegall came down from Jacksonville. Ms. Jennifer was there. That's really all I remember.
Q You mentioned Ms. Stegall from Jacksonville. Do you know what job she had with Bright Horizons?
A She is -- I don't know what her title is off the top of my head. She's in charge of the Citi Centers throughout the country over the liaisons.
Q Okay. Prior to, I guess, the starting point of these investigations both by Bright Horizons and by the government, had you ever had any parents who had come to you with any concerns about the manner in which their children were being treated by Ms. Turner?
A No.
Q Did any of your co-workers at Bright Horizons ever tell you that they had parents come to them raising

concerns about Ms. Turner.
A No.
Q And once you had the conversation with the individuals, both the police and CPI, did you have an understanding as to the specific allegations against Ms. Turner?
A I don't remember.
Q During your interview with the police and the CPI, did you bring up Vanessa Smith in any way?
A I don't remember. I don't know why I would have.
Q Did anybody ever tell you what the results of the government's investigation into Ms. Turner were?
A I know what they are. I don't remember how I found out how they are.
Q Okay.
A But I know that she was cleared.
Q Was Ms. Turner placed on administrative leave during this investigation period?
A Yes, she was.
Q Were you responsible in any way for putting her on administration leave?
A No.
Q Were you involved in the meeting when she was notified that she was being placed?

A No.
MR. BURRUEZO: Greg, when you have a chance, if we could take like a five-minute break.
MR. OWENS: Now is fine. Actually, you know what? Let me ask one more question, and then we'll take a break.
MR. BURRUEZO: It doesn't have to be now. It could be 30 minutes from now.
MR. OWENS: I'll just close this line of questioning.
BY MR. OWENS:
Q In terms of the internal investigation at Bright Horizons, did you ever become aware of what the findings were with regard to Bright Horizons' investigation into Ms. Turner?
A No.
MR. OWENS: We can break now.
(Off the record at 11:59 p.m. to 12:03 p.m.)
(Plaintiffs' Exhibit 1 was marked for identification.)
BY MR. OWENS:
Q All right. Ms. Saunders, I'm going to hand you a document that's been marked as Exhibit 1. (Tendering).
A (Receiving).
Q At your last deposition, I don't know if there

were a whole lot of documents. But take your time and look through this, and as soon as you feel comfortable answering my questions with regard to this document, just let me know, okay?
A Uh-huh. Yes.
Q All set?
A Yes.
Q Ms. Saunders, Exhibit 1 that I've handed you, do you recognize it?
A Yes.
Q What do you recognize Exhibit 1 to be?
A It's an "Employee Conference Memorandum" that I wrote on the 15th of April.
Q All right. And before we get into the contents of this document, do you see where it says, "date," "employee name" and "supervisor name"?
A Yes.
Q That's all your handwriting right there?
A Yes.
Q And then where the document requires a description of the specific circumstances, is all that handwriting there yours?
A Yes.
Q And then where it says, "Has employee been counseled for a similar incident"?

A Yes.
Q Is that your handwriting there as well?
A Yes.
Q Same under "corrective action," your handwriting?
A Yes.
Q And then on the lines "scheduled completion date" and "possible consequence," also your handwriting?
A Yes.
Q And then there's an "employee comments" section, I presume that's not your handwriting, correct?
A That is not.
Q Okay. At the bottom of the page under "supervisor signature," is that your signature?
A Yes.
Q And I think you already stated it's dated April 15th, 2011, right?
A Yes.
Q Is this the write-up that you had alluded to before when we were trying to find a time frame with regard to when you were interviewed by the Child Protective Investigator and the police?
A Yes.
Q All right. Also at the bottom of the page, it says "witness signature," and it appears that says

"Brenda Hayes." Was she the witness for this disciplinary action?
A Yes. Yes. We did this together.
Q All right. How was it that you presented Ms. Smith with this employee conference memorandum?
A I was on vacation on the 13th of that month. I wasn't there that day. And when I came back on -- I was also off on the 14th. When I came back on the 15th, Ms. Brenda brought it to my attention that this was reported to her, but she wanted to wait. She wanted me to do this with her --
Q Okay.
A -- because Vanessa was my employee.
Q So Ms. Horner said to you she was waiting for you because --
A No. Ms. Brenda.
Q I'm sorry. Ms. Hayes.
A I don't believe Ms. Linda Horner was there that week.
Q Okay.
A I don't remember.
Q And I misspoke. I apologize for that. So Ms. Hayes told you she wanted to wait for you because Ms. Smith was under your supervision?
A Yes.

Q At the time, what was Ms. Hayes' job title?
A I think she was the assistant director, I believe.
Q And on this document, it says, "This memorandum is to be used for the following purpose," and you checked "counsel"; do you see that?
A Yes.
Q And these terms are, I guess, just slightly different than the ones that you had talked to me about before in terms of the progressive discipline. Would this fall under a verbal counseling, or would this be considered a written counseling?
A This is a written counseling.
Q Okay. Do you see the box where it says "reprimand"?
A Yes.
Q You had talked before kind of about a final warning, so to speak. Is that what a reprimand would be, essentially a final warning in terms of the progressive discipline?
A I'm sorry. I don't understand your question.
Q Sure. Like I said, the terminology that you used earlier is slightly different than the terminology that's used in this document. Is the progression counseling a reprimand and then termination?

A Yes. But there could be more than one counsel before a reprimand depending on the severity.
Q Sure. And are there times where perhaps there are counselings for different things that maybe wouldn't go to the next level?
A Yes.
Q For example, if an employee was late and got a counseling for that as opposed to being bad at their job and having a counseling for that, those would be two different things, correct?
A Yes.
Q Okay. So under "specific circumstances," it starts out by saying, "It was reported that on 4/13/11" -- I'm going to stop right there. What specifically was reported?
A A teacher reported to Ms. Brenda, Brenda Hayes, that a parent told her that there were children left in a bathroom by Ms. Vanessa.
Q Okay. Who is the teacher that told Ms. Hayes?
A Marty Gonzalez.
Q And who is the parent that told Ms. Gonzalez?
A Betilda Ramirez.
Q All right. Did Ms. Gonzalez say that she witnessed personally Ms. Smith leaving the children in the bathroom?

A She wrote a statement. I don't see it right here, but I believe that's what it said because of her -- because of where -- the logistics of the room and where she was.
Q So it's your recollection that Ms. Gonzalez wrote a statement where she said that she personally witnessed Ms. Smith leaving the children in the bathroom unattended?
A What she personally witnessed was Ms. Smith without the children. The children were in the bathroom by themselves. So she didn't see the children, but she saw the teacher not with them.
Q All right. So how did the parent fit into this? If Ms. Gonzalez saw it, I guess what I'm trying to understand what relevance the parent has. Can you help me out with that?
A Yes.
Q Okay.
A The parent walked in the room. You would have to know how the rooms are set up. She walked in the room, right when you first walk in, the bathroom is right there. There are half doors. So she then -- and then the bathroom connects two classrooms. Ms. Smith was in this classroom; Ms. Gonzalez was in this classroom (indicting). Ms. Marty was changing a child in the

changing area, which is directly on the other side of the little bathroom. It's all open. There's another half door going in there. Ms. Ramirez walked into the classroom, saw the children in the bathroom with no teacher with both of the doors closed and proceeded to Ms. Gonzalez, who had her child in the changing area, and said, Ms. Marty, there are children in the bathroom by themselves because those doors are accessible from both classrooms.
Ms. Smith was standing on the other side of the changing table where Ms. Ramirez and Ms. Gonzalez could see her, and there are children in the bathroom. So Marty proceeded to tell the parent I'll take care of it. They're not my children; my children are right here. I'll take care of it.
Q Okay. Other than the conversation that Ms. Ramirez had with Ms. Gonzalez, did Ms. Ramirez make any sort of complaint to you or anybody else in management at Bright Horizons?
A I asked her about this incident, and she confirmed exactly what Ms. Marty said.
Q Okay. Did Ms. Ramirez provide any sort of written statement about what she witnessed?
A I don't remember.
Q Obviously I've never been to where you work.

And so in these bathrooms, what all is in it; a sink and a toilet or --
A Two sinks and two toilets.
Q How old would the children have been that were in the bathroom?
A Under two.
Q Did you talk to Ms. Smith about this and ask her what her side of the story was?
A I don't remember if I spoke to her verbally before we did this. I don't remember.
Q Okay. And would you agree that it would be dangerous to leave three children under the age of two in a bathroom alone?
A Yes.
Q Okay. Would you consider it to be neglectful?
A Yes.
Q Did you recommend to Ms. Horner or Ms. Hayes that Vanessa Smith be terminated for this behavior?
A I don't remember if I said that actually.
Q Okay. You told me earlier you had zero tolerance for this. But you can't recall one way or another whether you recommended termination, correct?
MR. BURRUEZO: Let me object to the form of the question. You can go ahead if you understand it.
THE DEPONENT: I don't remember if I recommended

termination.
BY MR. OWENS:
Q In a situation such as this where an employee leaves children unattended and potentially in a dangerous situation, is it your responsibility, once you find out, to notify the Department of Children and Families?
A No.
Q Okay. Is it your responsibility to, assuming the parent wasn't there, is it your responsibility to notify the parents?
A Yes.
Q And I know the parents saw it in this situation, so it doesn't apply, but just generally speaking.
Are there any sort of licensing boards or anything else like that that you would be required to report such a situation to?
A Well, we're governed by the Hillsborough County child care licensing. I don't know if there's an actual requirement that we report ourselves, but we have done that in the past.
Q Okay. In this particular situation that we're looking at in Exhibit 1, was Hillsborough County licensing contacted about the situation with Ms. Smith?
A I don't think so.
Q Now, toward the middle of the page, it says,



"Has employee been counseled for a similar incident"; do you see that?
A Yes.
Q And you write "verbally," correct?
A Yes.
Q And you write two dates. Let's start with the February 28th date. I assume that means February 28, 2011, right?
A Yes.
Q Okay. Tell me about what happened on February 28th, 2011 that was similar to the situation that you reprimanded Ms. Smith for in Exhibit 1.
A I don't remember which date she did what. Let's see. I don't remember what 2/28 was. But apparently I explained what 3/31 was, and I remember that one, but --
Q Okay. What do you remember about the 3/31 incident?
A My resource teacher, Rosanna, came to me and told me that another teacher who was in the commons area, which the commons area is here where the children do large motor play. There's a hallway here (indicating), and Ms. Vanessa's room is the first classroom on the left. And she walked through the commons with her five children and only took four of them in the room and left one in the hallway. And Ms. Rosanna was given that

information by a teacher, Mary Ann Hums, who was in the commons and saw this happen, and Rosanna just happened to be walking through. So she said this child is in the hallway because she didn't go in with her class. So Rosanna brought that to my attention.
Q Okay. Let's start with the 2/28 incident. You said you don't remember the specifics of that.
A I don't.
Q But I would assume, since it says, "Has employee been counseled," that, in fact, Ms. Smith was counseled for that in February of 2008; is that fair?
A Yes. That's fair.
Q Do you know if you were the person that counseled her?
A I don't remember.
Q Okay. Since you were Ms. Smith's supervisor, does it seem like you probably would have been that person?
A Yes.
Q Okay. And if you would have been that person, as we talked about before, you would have either typed out the fact that you talked to her, handwritten it somewhere that you had a verbal counseling with Ms. Smith?
A Possibly, but not necessarily if it was minor.

For instance, if she was walking down the hall and a child was straggling behind, I might have said to her, you need to make sure you keep all the children in your view, which isn't something that I necessarily would have written. But I don't honestly remember what happened that day.
Q Okay. And without any sort of if, in fact, you didn't write it down, without any sort of written proof, how would you have been able to remember in April of 2011 that it happened on that date?
A I don't know. I must have written it down, but I honestly don't remember.
Q Same with 3/31; I assume that Ms. Smith was talked to about leaving a child unattended in the hallway, correct?
A Yes.
Q Do you recall speaking with her about that?
A Yes.
Q I think you told me that already. I'm just making sure we're clear.
Do you recall whether you handwrote or typed out proof that you had that conversation with Ms. Smith?
A I believe I did.
Q Now, under the section for "employee signature," it doesn't appear that there is any signature; would you

agree with that?
A I agree with that.
Q Did Ms. Smith inform you that she was refusing to sign this particular counseling?
A I don't remember.
Q And if you look at the second page of this document, it appears to be a rebuttal or a response by Ms. Smith; do you see that?
A Yes.
Q Do you remember receiving this on April 20th, 2011?
A I actually don't remember receiving it. I remember seeing it at some point, but I don't remember actually receiving it on that day.
Q Okay. We briefly discussed Marty Gonzalez.
A Yes.
Q Does Ms. Gonzalez still work for Bright Horizons?
A Actually, she does. She just came back about a week ago. She was gone for a while.
Q Okay. Was she on some sort of leave or did she --
A No.
Q Okay.
A She quit, but now she's back.



Q And I think you also mentioned a Mary Ann Hurns?
A Hurns, H-U-R-N-S.
Q Does Ms. Hurns still work for Bright Horizons?
A Yes, she does.
Q How about Barbara Lidtak, does she still work for Bright Horizons?
A No, she does not.
Q When, roughly, did her employment end?
A Maybe last summer.
Q Okay. Well, did you have any role in the decision-making process to terminate her employment?
A No. I believe she left on her own.
Q She did? All right.
A Yes.
(Plaintiffs' Exhibit 2 was marked for identification.)
BY MR. OWENS:
Q Ms. Saunders, I'm handing you what has been marked as Exhibit 2. (Tendering).
A (Receiving).
Q And feel free to look through the whole document, but really I'm probably going to focus mostly on the first two paragraphs, okay?
A Uh-huh. Yes.
Q All set?

A Yes.
Q Okay. I handed you what's been marked as Exhibit 2, and it's two pages. Have you ever seen this document before?
A I don't believe so.
Q Okay. And would you agree that it appears to be a summary from Hillsborough County regarding a complaint about possible inappropriate discipline?
A Yes.
Q In the first paragraph, there's some discussion about an interview with Linda Horner. Did you have the opportunity to read through that?
A I did.
Q And it says that -- well, I guess I'll just read it. "The allegation is that the staff member was being physically rough when handling the children. Linda states the allegation is regarding staff member Kristin Turner. Linda states that she spoke briefly with staff member Vanessa Smith, who brought this same allegation to her attention." Do you see all that?
A I see that.
Q Okay. Were you personally -- and I think earlier you said you weren't involved in any sort of complaint that Ms. Smith had come to you about regarding Ms. Turner, correct?

A Correct.
Q All right. It goes on to say, "Linda states that she and curriculum specialist, Sue Saunders, followed up on the allegation." That's not true, is it?
A I don't -- this is confusing to me. I don't understand.
Q Well, it sounds like -- again, feel free to disagree with me, but it sounds like Linda Horner is telling whoever is putting together this document that yourself and Ms. Horner followed up on the allegation made by Ms. Smith regarding Kristin Turner and possible inappropriate discipline. Would you agree with that's how it sounds?
A That's how it sounds. Yes.
Q Okay. But you told me earlier that prior to the CPI and the police coming, you had never heard anything about this, correct?
A Correct.
Q So something about this isn't accurate, whether it's the person writing it or Ms. Horner, right?
A Yes.
Q In the second paragraph -- I'm sorry. In that first paragraph toward the end, it says, "Linda states that Sue is Kristin and Vanessa's direct supervisor"; that's true?

A Yes.
Q So it says, "Sue continued to work with the employees after a discussion with them." Do you have any idea what that means?
A Well, we had had -- we had had some mini meetings to try to work things out in that classroom. So that's the only thing I can think of she would be referring to.
Q Okay. And were Ms. Smith and Ms. Turner having some issues with one another in the classroom prior to all of this?
A Ms. Turner was having a problem with Ms. Smith in that she felt like she wasn't pulling her weight.
Q Okay. And did Ms. Turner come to you personally and tell you that she felt that way?
A Yes.
Q Okay. And if you would go to the third paragraph that starts with, "Staff members Maritza."
A Yes. That's Marty. Yes.
Q Okay. Halfway through, it says, "Sue states that when she was made aware of the allegations, she visited the classroom and spoke with Vanessa and Kristin"; is that accurate?
A Yes.
Q Now, is this after you learned of the



allegations?
A No. This is before. I was working with them before all this happened. I was observing in the classroom, and I sent my resource teacher in there to help with, you know, with the day-to-day duties to help them work things out. So that's where this gets a little muddled because it's going back and forth; appears to me.
Q Okay. Well, would you agree that prior to that when they're talking about allegations, they're talking about slinging food at the children, inappropriate discipline and things of that nature in that paragraph?
A I'm sorry. What was the question actually?
Q Would you agree that in reading this paragraph that we're looking at right now, the third full paragraph from the top, that prior to that sentence that I just read to you, the writer of this document is talking about inappropriate discipline, redirection, profanity, and slinging food?
A That's what I'm reading here --
Q Right.
A -- if that's what you're asking.
Q And then it says that, "Sue states that when she was made aware of the allegations," it sounds like they are saying the allegations that they're talking about slinging food, et cetera, but you said that you weren't

made aware of those?
A I wasn't made aware of those allegations, no.
Q All right. Not until -- well, were you made aware of those allegations when the CPI and the police talked to you?
A Yes. Later on, after this whole thing --
Q All right.
A -- came out.
Q After you learned of that from the CPI and the police, did you then go and speak with Vanessa and Kristin like it says here?
A No, because by then, Vanessa never went back in a classroom.
Q Okay. So again, something about this sentence is inaccurate as well?
A Yes.
Q And is it true that when you had your interview with the police and the CPI that you brought up Vanessa Smith and some situations that she was having with Ms. Turner?
A I don't remember.
(Plaintiffs' Exhibit 3 was marked for identification.)
BY MR. OWENS:
Q (Tendering).

A (Receiving).
Q All set?
A Uh-huh.
Q Ms. Saunders, the document I handed you marked Exhibit 3, have you seen that prior to today?
A No.
Q Okay. Do you recall somebody from the Hillsborough County Sheriff's Office putting you under oath and asking you questions?
A I do remember that now.
Q And in reading this brief, I guess, synopsis of your interview, do you see anything in here that you think is inaccurate in any way?
A I don't know how accurate -- I mean, if they say I said this, if it's verbatim -- I mean, I don't know.
Q Yeah. And I think we can agree we don't know whether they're quoting you or whether they're paraphrasing.
A Exactly.
Q But generally speaking, is this the type of information that you shared with the investigators when they were there?
A I don't know, but I may have.
Q Okay. And can you think of any reason why during an investigation into Ms. Turner you would have

told these investigators about complaints, reprimands, and disciplinary actions against Vanessa Smith?
A I don't know.
Q At that time, were you upset with Ms. Smith for making a complaint about Ms. Turner?
A I don't know how I was at that time.
Q Did you feel like Ms. Smith made the whole thing up?
A In retrospect, yes.
Q After the investigation concluded, did you hold it against Ms. Smith that she had brought this complaint against Ms. Turner?
A She never came back to my -- she did not want to work for -- on my wing anymore, so she didn't.
Q In fact, she went to another facility, correct?
A Correct. I don't think I ever saw her again after that day.
Q Okay. After this investigation into Ms. Turner, were there some parents who removed their children from Ms. Turner's classroom?
A There was one. I believe one was removed and one moved to another classroom with, but all the rest stayed.
Q Okay. Other than in this situation we're talking about back in April of 2011, had any other



Page 49

parents, to your knowledge, ever complained about the manner in which Ms. Turner has treated their children?
A No.
Q Do you know if any parents of the children who were removed from Ms. Turner's classroom have filed any sort of lawsuit against Bright Horizons?
A I don't know.
Q Was there a time where you spoke with Kristin Turner about a child who had gotten sick and vomited in her classroom?
A I don't know.
(Plaintiffs' Exhibit 4 was marked for identification.)
BY MR. OWENS:
Q I'll show you a document and see if we can do this. (Tendering).
A (Receiving).
Q Ms. Saunders, this is several pages. I don't want to have to go through them in too much detail. What I'd ask you to focus on -- and again, as before, take as much time as you need; I don't want to rush you. But the third page of this document, which has the number down at the corner of 110 --
A Yes.
Q -- that's the one I'm primarily focusing on,

Page 50

okay?
A Yes.
Q Okay. All set? Okay. In Exhibit 4, on the page it has the number 110 in the lower right-hand corner, if you go to the bottom of the page, it says "Interview with Sue Saunders, assistant director"; do you see that?
A Yes.
Q And have you had an opportunity to read that paragraph?
A Yes.
Q And is everything contained in that paragraph accurate, to your recollection?
A Let me check it again.
Q Okay.
A Yes.
Q And does this refresh your memory about the situation with the child throwing up?
A A little bit. Yeah.
Q After that happened, did Ms. Turner come to you personally to let you know that the child had thrown up in the classroom?
A I don't remember.
Q Do you remember there being any debate as to whether the parent should be contacted about the child

Page 51

throwing up?
A I just don't remember the course of events that day.
Q Okay. In the same paragraph it says, "She," meaning you, "stated recently a parent reported that Ms. Smith left two children alone in the bathroom." Now, that's different than what the write-up said. The write-up said three children.
A Yes.
Q Was it two or was it three?
A It was two, but Ms. Marty in her documentation wrote three. So that's what we put on the report thinking that she --
Q How did you come to learn that it was only two?
A Because she identified the children. She said what -- what Ms. Marty said was that she thought that Ms. Ramirez said three children. That's what she wrote on there, but apparently there were only two.
Q Okay. Did you make any attempts to go back and change Ms. Smith's counseling to reflect there was actually only two students?
A I don't think I did.
Q Did Janice Norman ever come to you personally and make any complaints about the way she believed Ms. Turner was inappropriately handling the children?

Page 52

A Not that I can recall.
Q Can you recall Ms. Norman coming to you with a complaint about -- of any sort about Ms. Turner?
A No.
Q Did you ever witness Janice Norman telling parents of student at the center that either their children were being abused or Bright Horizons was attempting to cover up child abuse?
A I've never witnessed that.
Q Have you heard about it?
A I've heard about it.
Q So it was nothing that you personally ever saw or observed, correct?
A No. Correct.
Q Did you participate in any way in the decision to terminate Janice Norman's employment?
A No, I did not.
Q Did anybody come to you to get your thoughts or opinions on whether she should remain an employee at Bright Horizons?
A Not that I can recall.
Q Are you familiar with an employee at Bright Horizons by the name of Krissy?
A Yes.
Q What is Krissy's last name?



A Hodel, H-O-D-E-L.
Q Would you be considered to be one of Ms. Hodel's supervisors?
A No. Not at the present time. I was in the past.
Q At any time that you've been a co-worker or even a supervisor of Ms. Hodel, has she ever come to you with complaints about her co-workers?
A Probably, but I -- I can't identify a certain -- she's been there a long, long time.
Q All right. Have you ever had any employees come to you about concerns that they had about Ms. Hodel?
A Not that I can recall.
Q Did you ever hear about Ms. Hodel saying the word "shit" in front of students and co-workers?
A No.
MR. OWENS: Tell you what. Let's take a very, very short break. I think I'm almost finished.
(Off the record at 12:47 to 12:49 p.m.)
BY MR. OWENS:
Q Ms. Saunders, we're back on the record. Same rules apply. You're still under oath.
Was there a time that you wrote a letter of recommendation for Vanessa Smith?
A I don't remember.

Q Okay. If Ms. Smith, in her possession, has a letter of recommendation that you signed, do you have any reason to believe that you would not have done that or that it wouldn't be --
A I don't know why I would have done that if -- I don't know why I would have done that.
Q Okay. But as we sit here today, you can't remember one way or another whether you did?
A No. I can't remember writing a letter for her.
Q Okay.
MR. OWENS: No further questions on my end. Appreciate your time.
THE DEPONENT: Okay.
MR. BURRUEZO: I think I have one question, I think.

CROSS-EXAMINATION

BY MR. BURRUEZO:
Q And that is, does it make a material difference in your view whether you leave two children or three children unattended in a bathroom?
A No.
Q And why not?
A Because it's still the same offense. It really doesn't matter whether it's one child or 20 children.
MR. BURRUEZO: No further questions.

MR. OWENS: Nothing else here.
MR. BURRUEZO: And we'll read.
(The deposition of SUSAN SAUNDERS was concluded at 12:52 p.m., and reading and signing is not waived.)

CERTIFICATE OF REPORTER

STATE OF FLORIDA )
COUNTY OF PINELLAS )

I, JULIE R. PALITTO, RPR, Registered Professional Reporter, certify that I was authorized to and did stenographically report the deposition of the foregoing witness; that a review of the transcript was not requested; and that the transcript is a true and complete record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties to this cause, nor am I a relative or employee of any of the parties' attorney or counsel connected with this action, nor am I financially interested in the outcome of this action.

Dated this day of 2013, at Clearwater, Pinellas County, Florida.

JULIE R. PALITTO, RPR-CP



Page 57

CERTIFICATE OF OATH

STATE OF FLORIDA )
PINELLAS COUNTY )

I, JULIE R. PALITTO, RPR-CP, the undersigned authority, certify that SUSAN SAUNDERS, the witness named herein, personally appeared before me for the taking of the foregoing deposition and was by me first duly sworn to tell the whole truth.

Witness my hand and official seal this ____day of __________, 2013.

*Julie Palitto*

JULIE R. PALITTO, RPR-CP
Notary Public, State of Florida
My Commission No. EE 854401
Expires: December 4, 2016

Page 58

PLEASE ATTACH TO THE DEPOSITION OF:
SUSAN SAUNDERS
DATE TAKEN: May 23, 2013
IN THE CASE OF: JANICE NORMAN and VANESSA SMITH vs. BRIGHT HORIZONS FAMILY SOLUTIONS, LLC, d/b/a BRIGHT HORIZONS CHILDREN'S CENTERS

ERRATA SHEET

INSTRUCTIONS:
After reading the transcript of your deposition, please note any change, addition, deletion on this sheet. Do Not make any marks or notations on the transcript itself. Please sign and date this errata sheet and then kindly return it to the court reporter whose name is shown below.

Page Line CORRECTION AND REASON THEREFOR

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true. SIGNED AT____________Florida, this,_____day of__________, 2013.

SUSAN SAUNDERS

