Case 8:12-cv-01301-TBM   Document 40   Filed 06/28/13   Page 1 of 17 PageID 761

THEARLA KOZY                                                    June 10, 2013
NORMAN vs. BRIGHT HORIZONS                                             1–4

## Page 1

```
 1      UNITED STATES DISTRICT COURT
        MIDDLE DISTRICT OF FLORIDA
 2           TAMPA DIVISION

 3   JANICE NORMAN and VANESSA SMITH,

 4        Plaintiffs,

 5   vs.         CASE NO. 8:12-CV-01301-EAK-TBM

 6   BRIGHT HORIZONS FAMILY SOLUTIONS, LLC, dba BRIGHT
     HORIZONS CHILDRENS' CENTERS,
 7
          Defendant.
 8                                              /

 9

10

11         DEPOSITION OF THEARLA KOZY

12           Monday, June 10, 2013
             1:30 p.m. - 3:00 p.m.
13
                Saddlebrook Resort
14             5700 Saddlebrook Way
             Wesley Chapel, Florida 33543
15

16

17

18

19   REPORTED BY:
     BARBARA V. DAYS, RPR-CP
20   Notary Public, State of Florida
     ESQUIRE DEPOSITION SOLUTIONS - TAMPA, FLORIDA
21   (813) 221-2535 - (800) 838-2814
     JOB NO. 378600
22
```

## Page 2

```
 1         APPEARANCES OF COUNSEL

 2   For the Plaintiffs:

 3     GREGORY A. OWENS, ESQUIRE
       Florin Roebig, P.A.
 4     777 Alderman Road
       Palm Harbor, Florida 34683
 5     727.786.5000

 6
     For the Defendant:
 7
       JASON M. LEO, ESQUIRE
 8     Littler Mendelson, P.C.
       111 North Magnolia Avenue
 9     Suite 1250
       Orlando, Florida 32801-2366
10     407.393.2940
```

## Page 3

```
 1          INDEX OF EXAMINATION
     EXAMINATION                              PAGE
 2
     By Mr. Owens................................ 04
 3
     Signature Page/Errata Sheet................. 61
 4
     Certificate of Reporter..................... 64
 5
     Certificate of Oath......................... 65
 6

 7          PLAINTIFFS' EXHIBITS
 8   NUMBER       DESCRIPTION                PAGE

 9   Composite 1    (Employee Complaints)    46

10

11              * * * * * * *
```

## Page 4

```
 1          The deposition of THEARLA KOZY was taken
 2   pursuant to notice by counsel for the Plaintiffs on the
 3   10th day of June, 2013, commencing at 1:30 p.m., at
 4   Saddlebrook Resort, 5700 Saddlebrook Way, Wesley Chapel,
 5   Florida. Said deposition was reported by Barbara V.
 6   Days, RPR-CP, Notary Public, State of Florida.
 7            - - - - - - - - -
 8          THE REPORTER: Do you solemnly swear or
 9      affirm that the testimony you are about to give in
10      this case will be the truth, the whole truth, and
11      nothing but the truth?
12          THE WITNESS: Yes.
13   WHEREUPON:
14          THEARLA KOZY,
15   a witness, having been duly sworn to tell the truth,
16   the whole truth and nothing but the truth, was examined
17   and testified as follows:
18              EXAMINATION
19   BY MR. OWENS:
20      Q.   Could you please state and spell your
21   name for the record?
22      A.   Thearla Kozy, T-H-E-A-R-L-A, K-O-Z-Y.
23          MR. OWENS: Can we off the record for a
24      moment, please?
25          MR. LEO: Yes.
```



THEARLA KOZY
NORMAN vs. BRIGHT HORIZONS

June 10, 2013
5–8

Page 5

1 (Off-the-record discussion held.)
2 BY MR. OWENS:
3  Q.  Ms. Kozy, have you ever gone by any other
4 names?
5  A.  Alebesun.
6  Q.  Could you spell that, please?
7  A.  A-L-E-B-E-S-U-N.
8  Q.  Other than Kozy and Alebesun, any other
9 names?
10  A.  Maiden name Gordon, G-O-R-D-O-N.
11  Q.  All right. Ms. Kozy, we have met
12 already. But, again, my name is Greg Owens. I
13 represent Janice Norman and Vanessa Smith in connection
14 with their legal claims against Bright Horizons Family
15 Solutions, LLC, doing business as Bright Horizons
16 Childrens' Centers. I'll just call it Bright Horizons
17 if that's okay with you?
18  A.  That's fine.
19  Q.  All right.
20  A.  Let me turn my cell off.
21  Q.  Have you ever had your deposition taken
22 before?
23  A.  No, I haven't.
24  Q.  Okay. I assume that the company's lawyer
25 probably went over some of the general rules, but I'll

Page 6

1 go over just a few quickly and we'll get started.
2  The most important, in my opinion, is
3 effective communication between the two of us. As you
4 know there's a court reporter here taking down
5 everything that we say, and so it's important that we
6 communicate effectively.
7  A.  Okay.
8  Q.  She can't take down um-hums, uh-uhs,
9 shakes of the head, nods of the head. So if you can
10 verbalize your answers --
11  A.  Yes.
12  Q.  -- as a yes or a no, she'd appreciate
13 that. It's very common in human interaction
14 conversation for us to say um-hum.
15  A.  Um-hum. (Witness indicating
16 affirmatively.)
17  Q.  If you do it I'll try to remind you to
18 say yes or no. I'm not trying to be rude. Okay?
19  A.  I just did it.
20  Q.  All right.
21  A.  Thank you.
22  Q.  You're welcome. It's also important that
23 you understand my question. So if I ask you a question
24 that you don't understand or you need me to repeat
25 because you didn't hear it, just let me know and I'll

Page 7

1 do that. All right?
2  A.  Okay.
3  Q.  Lastly, I don't intend on taking up too
4 much of your time today. But if you need a break at
5 anytime let me know.
6  The only thing that I ask is if I'm in
7 the middle of a question, let's finish the question and
8 answer and then take a break. Fair enough?
9  A.  Yes.
10  Q.  All right. Ms. Kozy, are you currently
11 employed?
12  A.  Yes.
13  Q.  What do you do for a living?
14  A.  Human resource manager with Bright
15 Horizons Family Solutions.
16  Q.  How long have you been the HR manager
17 with Bright Horizons?
18  A.  Fifteen years.
19  Q.  Prior to your position as HR manager for
20 Bright Horizons, did you hold any other positions with
21 the company?
22  A.  With this company, no.
23  Q.  Okay. Where is your office located?
24  A.  Oh, I'm sorry. Yes.
25  Q.  Okay.

Page 8

1  A.  For six months, office manager.
2  Q.  Where is your office located?
3  A.  In Nashville, Tennessee.
4  Q.  Have you worked in Nashville for the
5 entirety of your employment with Bright Horizons?
6  A.  Yes.
7  Q.  Is Nashville where Bright Horizons
8 corporate headquarters is located?
9  A.  No.
10  Q.  Why is it that you work in Nashville?
11  A.  We have regional -- or divisions -- and I
12 support the southeast region.
13  Q.  Would -- in laymen's terms -- be
14 considered the southeast regional office headquarters?
15  A.  I would not be considered the
16 headquarters, no.
17  Q.  Okay.
18  A.  The headquarters is in Boston.
19  Q.  No, no. Would the national office be
20 considered the southeast headquarters?
21  A.  No.
22  Q.  Okay. How many people work in the
23 Nashville office?
24  A.  I work from my home office.
25  Q.  Okay. And where -- and what's the



800.211.DEPO (3376)
EsquireSolutions.com

Case 8:12-cv-01301-TBM   Document 40   Filed 06/28/13   Page 3 of 17 PageID 763

THEARLA KOZY                                                      June 10, 2013
NORMAN vs. BRIGHT HORIZONS                                              9–12

Page 9

1  address?
2  A.   It's 108 Oak Hollow -- two words --
3  Hermitage, Tennessee.
4  Q.   What's the zip code?
5  A.   37076.
6  Q.   Who is your direct supervisor?
7  A.   Melissa Sposodo, S-P-O -- I have to write
8  it. Oh, goodness. S-P-O -- wow. S-P-O-S-O-D-O.
9  Q.   What is Ms. Sposodo's position?
10 A.   She is the senior -- I don't know her
11 exact title. But she is the human resource manager --
12 she's the senior HR manager, I believe.
13 Q.   Where is her office located?
14 A.   In Boston.
15 Q.   Are there any human resources related
16 employees that you supervise?
17 A.   No.
18 Q.   Are there any other human resources
19 related employees in the southeast region of Bright
20 Horizons other than yourself?
21 A.   No.
22 Q.   And can you briefly describe your job
23 duties and responsibilities?
24 A.   Yes. Employee relations, counsels,
25 reprimands, training, coaching.

Page 10

1  Q.   If there is an employee complaint of
2  harassment, discrimination, or retaliation in the
3  workplace in the southeast region for Bright Horizons,
4  are you involved in the investigations?
5  A.   Yes.
6  Q.   What involvement would you normally have
7  in the investigation?
8  A.   They would call me with the incident. We
9  would go through the steps to determine what would
10 happen with the current employee. Collect statements.
11 In some cases the employee would be placed on
12 administrative leave, per the regional manager and the
13 HR. And we would basically go through the situation
14 together to determine next step.
15 Q.   And when you say go through the steps,
16 what are the steps?
17 A.   It depends on the situation. In some
18 cases they're placed on administrative leave and others
19 they're not. They're just supervised at the site.
20 Q.   Is it fair to say, though, an
21 investigation would be conducted in all cases?
22 A.   Yes.
23 Q.   Do you personally interview employees as
24 part of the investigation?
25 A.   Sometimes.

Page 11

1  Q.   Are there particular criteria that you
2  use in determining whether you're going to interview
3  employees or not?
4  A.   When there's confusion, when statements
5  or reports are -- need clarification. Those are the
6  main reasons.
7  Q.   What's your educational background?
8  A.   I have a degree in -- a Bachelor's degree
9  in Christian counseling.
10 Q.   Any masters or doctoral level degrees?
11 A.   No.
12 Q.   Any continuing education related to human
13 resources or employee relations?
14 A.   I have some.
15 Q.   Could you tell me about it?
16 A.   It's been so long ago. But it was in '90
17 -- I believe it was in '98 that I did take some course
18 work through SHRM --
19 Q.   Are you current --
20 A.   -- for about two years.
21 Q.   Are you currently a member of SHRM?
22 A.   Yes.
23 Q.   Any other professional organizations that
24 you are a part of?
25 A.   No.

Page 12

1  Q.   How did you get into the human resources
2  field?
3  A.   It fell in my lap.
4  Q.   Okay. What does that mean?
5  A.   It means that it was -- human relations
6  is pretty much my niche. I have done it for over 25
7  years in one capacity or another: Employee grievances,
8  counsel, interviewing employees.
9  Q.   Now we were talking about the southeast
10 region.
11 A.   Um-hum. (Indicating affirmatively.)
12 Q.   How many states does that encompass?
13 A.   Approximately 70.
14 Q.   I believe we're missing each other. How
15 many --
16 A.   We have -- in the southeast region we
17 have Florida and Georgia.
18 Q.   And then 70 centers within Florida and
19 Georgia?
20 A.   We just transitioned North Carolina from
21 my division -- my region -- my division. So it maybe
22 less than that now. It maybe 65 -- between 60 and 65
23 now.
24 Q.   Okay. So to make sure we're on the same
25 page --

Case 8:12-cv-01301-TBM   Document 40   Filed 06/28/13   Page 4 of 17 PageID 764

THEARLA KOZY                                          June 10, 2013
NORMAN vs. BRIGHT HORIZONS                                    13–16

**Page 13**

1  A.  Yes.
2  Q.  -- because I asked you how many states
3  and you said 70, and obviously there's not that many
4  states.
5  A.  I thought you said centers.
6  Q.  No.
7  A.  I'm sorry.
8  Q.  But to make sure we're on the same
9  page --
10 A.  Yes.
11 Q.  -- because it's important. The southeast
12 region is Florida and Georgia --
13 A.  Yes.
14 Q.  -- and encompasses roughly 65 to 70
15 centers; correct?
16 A.  That's correct. Thank you.
17 Q.  Sure. Thank you. Given the fact that
18 the southeast region encompasses only Florida and
19 Georgia; why do you work in Tennessee?
20 A.  In 15 years the division has changed
21 often. I've had Tennessee. I've had Texas. I've had
22 North Carolina.
23      And during those years, with the growth
24 of the company and the growth of our department, there
25 have been shifts in division vice presidents, regional

**Page 14**

1  managers, and, therefore, shifts in division
2  responsibilities as well.
3  Q.  Has anybody at Bright Horizons suggested
4  that you move closer to Georgia or Florida since those
5  are the two states in your region?
6  A.  No.
7  Q.  Do you feel like you can do an adequate
8  job, given the fact that you're so far away?
9  A.  Yes.
10 Q.  Does Bright Horizons utilize what's often
11 known as a progressive disciplinary policy?
12 A.  Yes.
13 Q.  Could you explain what the policy
14 dictates?
15 A.  The policy is verbal counsel, written
16 counsel, which are either a counsel or a reprimand. In
17 some cases a final reprimand -- one added step -- and
18 after that termination.
19 Q.  Are employees sometimes given action
20 plans?
21 A.  Yes.
22 Q.  Where would that fall in the progression?
23 A.  That would fall at the reprimand stage.
24 Let me go back. With the counsel -- with all counsels,
25 which are on our employee conference number, there's

**Page 15**

1  corrective action steps listed on that form.
2  Q.  But do employees from time to time
3  receive separate and distinct action plans?
4  A.  Yes. Those are usually done at the
5  reprimand stage.
6  Q.  Okay. Would that be something that would
7  be attached to the reprimand at that particular time?
8  A.  Yes.
9  Q.  All right. You said that it starts out
10 with verbal counsels.
11 A.  Um-hum. (Indicating affirmatively.)
12 Q.  When an employee is given a verbal
13 counseling is it your expectation, as the human
14 resources manager, that the manager giving the verbal
15 counseling memorialize it in writing somehow?
16 A.  In some cases.
17 Q.  Tell me why in some cases that you
18 wouldn't have that expectation.
19 A.  Go back. Ask the question again for me,
20 please.
21     MR. OWENS:  Could you repeat it, please?
22     THE REPORTER:  Yes.
23     (WHEREUPON, the court reporter read the
24 previous question, Page 15, Lines 17 thru 18.)
25     THE WITNESS:  The question before that.

**Page 16**

1      (WHEREUPON, the court reporter read the
2  previous question, Page 15, Lines 12 thru 15.)
3  BY THE WITNESS:
4  A.  My recommendation has always been that
5  they put it in writing.
6  Q.  And it just may not be on the formalized
7  document.
8  A.  It's not on the formalized document.
9  It's usually in a Word document in a memo format.
10 Q.  And is it your expectation that those
11 managers place that Word document in the employee's
12 personnel file?
13 A.  Yes.
14 Q.  And speaking of personnel files, are
15 those kept as hardcopies, are they electronic files, or
16 both at Bright Horizons?
17 A.  They're both.
18 Q.  Where -- where would an employee, in the
19 southeast region, personnel file be kept physically?
20 A.  In the center.
21 Q.  In the center of where they work?
22 A.  Where they work, yes.
23 Q.  And I think you said there's also an
24 electronic copy that's kept for each employee; correct?
25 A.  Well, they would document on their

Page 17

1 computers, print off the document, and have a hardcopy
2 for the employee files.
3    Q.   But also put the electronic part in the
4 electronic file; correct?
5    A.   I'm not sure what they keep in their
6 offices. I know they would create the document on the
7 computers, and in some cases -- I don't know if they
8 keep them. I'm pretty sure that they might. But
9 there's always a hardcopy that goes in the employee's
10 file.
11   Q.   Is it the policy of Bright Horizons to
12 keep electronic personnel files for each employee?
13   A.   I don't know.
14   Q.   As the human resources manager for the
15 southeast region, you don't know?
16   A.   It's a policy to keep a hardcopy of the
17 employee file.
18   Q.   But it's your testimony that you don't
19 know whether it's Bright Horizons policy to keep
20 electronic files; correct?
21   A.   No, I don't.
22   Q.   Do you encourage the managers, within
23 your region, to keep electronic files for their
24 employees?
25   A.   No, I do not.

Page 18

1    Q.   I think you stated earlier that in some
2 cases a final written warning would be appropriate; do
3 you remember that?
4    A.   Um-hum. (Indicating affirmatively.)
5    Q.   Is that a yes?
6    A.   Yes. I'm sorry. Thank you.
7    Q.   Could you give me some scenarios that
8 come to your mind as to why -- a situation where it
9 would be appropriate to give an employee a final
10 written warning?
11   A.   Okay. In some cases where we feel that
12 additional training may need to -- may have needed to
13 be in place for the individual.
14   Q.   Okay. Any others?
15   A.   When a counsel -- when the counsels are
16 -- when there's some time between each counsel, a year,
17 a year and-a-half or so.
18   Q.   Generally speaking, is it your
19 expectation, as a human resources manager, that the
20 managers in the southeast region follow the present
21 disciplinary policy?
22   A.   It is my expectation.
23   Q.   And I understand that there are some
24 infractions that are so serious that it would allow
25 managers to jump over some of the steps --

Page 19

1    A.   Yes.
2    Q.   -- is that fair?
3    A.   That's correct.
4    Q.   And, again, from a general perspective,
5 would you expect the managers to give final written
6 warnings in all cases that, you know, wouldn't have
7 unique circumstances involved?
8    A.   No. Final -- written reprimands are not
9 required. They're on a case-by-case basis.
10   Q.   When an employee is disciplined in the
11 southeast region, are the managers expected to consult
12 with you prior to providing the employee with a
13 reprimand?
14   A.   The expectation is that they consult with
15 their regional manager first. If needed, they will
16 contact HR.
17       My expectation for terminations, and
18 performance related issues leading to that, I do expect
19 them to contact me.
20   Q.   And that's a good transition into the
21 termination process at Bright Horizons, at least in
22 your region.
23       When a manager in a particular center
24 believes that it's appropriate for an employee to be
25 terminated; do they have the flexibility and authority

Page 20

1 to make that decision on their own?
2    A.   No.
3    Q.   What would a manager at a center be
4 expected to do if they wanted to effectuate the
5 termination of an employee?
6    A.   To consult the regional manager, and HR.
7    Q.   HR being you; correct?
8    A.   Yes.
9    Q.   All right. And what is the purpose of
10 having the center manager contact the regional manager
11 and yourself?
12   A.   Policy.
13   Q.   Do you agree with the policy?
14   A.   I do.
15   Q.   Why do you think it's an important policy
16 to have?
17   A.   It's important because we don't want the
18 managers to make these decisions on their own.
19   Q.   Why not?
20   A.   It's important that the company is aware
21 of the level of performance, and the termination.
22   Q.   Why?
23   A.   It is.
24   Q.   Do you not trust your local managers to
25 make those decisions on their own?



Page 21

1   A.   I trust the managers. Every manager has
2   a different skill set, and some may not have that HR or
3   that people related -- that HR aspect of it.
4   Q.   Okay. Do your regional managers?
5   A.   Yes. Yes.
6   Q.   Okay. The regional manager, at least in
7   this area, my understanding is Jennifer Todd or --
8   A.   Yes.
9   Q.   -- or Jennifer Whitley?
10  A.   Yes.
11  Q.   Tell me about Ms. Whitley's human
12  resources background.
13  A.   I don't know.
14  Q.   Is there ever a scenario where an
15  employee in the southeast region is terminated and
16  you're not consulted?
17  A.   There have in the past, yes.
18  Q.   Has that been a problem? I mean did
19  you --
20  A.   Can you explain?
21  Q.   Sure. Did you have a problem with the
22  fact that you weren't consulted as the human resources
23  manager?
24  A.   Yes.
25  Q.   Did you counsel or discipline the people

Page 22

1   who didn't involve you in any way?
2   A.   No.
3   Q.   Do you have the authority to discipline
4   the regional manager or the --
5   A.   No, I don't.
6   Q.   Can you recommend discipline for any of
7   the managers in the southeast, should you believe that
8   it's appropriate?
9   A.   Yes.
10  Q.   Who would you recommend it to?
11  A.   To the directors. Are you asking about
12  the directors or the regional managers?
13  Q.   Well, we'll start toward the top. If you
14  felt it was appropriate for the regional manager to be
15  disciplined, who would you make the recommendation --
16  A.   It would be the divisional vice
17  president.
18  Q.   And here locally in Florida in the Tampa
19  Bay area who would that be?
20  A.   It's Mark Mendel.
21  Q.   Okay. And if you felt like the director
22  of a particular center should be counseled or
23  reprimanded, who would you make that recommendation to?
24  A.   To the regional manager.
25  Q.   During the time that Ms. Todd or

Page 23

1   Ms. Whitley -- and I'm just going to call her
2   Ms. Todd --
3   A.   That's okay.
4   Q.   -- if that's okay with you.
5   A.   Okay.
6   Q.   During the time that you've worked with
7   Ms. Todd, have you ever made any recommendations that
8   she be reprimanded or counseled in anyway?
9   A.   No.
10  Q.   Now my client, Vanessa Smith, have you
11  ever met her?
12  A.   No, I have not.
13  Q.   How about Janice Norman, did you ever
14  meet her?
15  A.   No.
16  Q.   Did there come a point in time that you
17  were made aware of some allegations of child abuse at
18  the City Bank Center in Tampa?
19  A.   Yes.
20  Q.   How did you first become aware of that?
21  A.   It was a call from the center director
22  and regional manager.
23  Q.   Would that have been Ms. Horner and
24  Ms. Todd?
25  A.   Yes.

Page 24

1   Q.   What did they tell you?
2   A.   They informed me that there was an
3   allegation of a teacher, by the name of Kristin,
4   inappropriately handling a child.
5   Q.   Did -- let's start with Ms. Horner. Did
6   Ms. Horner tell you how she first became aware of the
7   allegation?
8   A.   From Vanessa.
9   Q.   Okay. So Ms. Horner --
10  A.   From Vanessa.
11  Q.   All right.
12  A.   Yes.
13  Q.   So Ms. Horner told you that Ms. Smith
14  informed her -- or made the allegation to her about
15  Ms. Turner?
16  A.   Yes.
17  Q.   And was it your understanding that
18  Ms. Todd had become aware of it because Ms. Horner told
19  her?
20  A.   Yes.
21       MR. LEO: Objection to form. I'm just
22       stating an objection for the record.
23       THE WITNESS: Okay.
24       MR. LEO: You can answer.
25



Case 8:12-cv-01301-TBM   Document 40   Filed 06/28/13   Page 7 of 17 PageID 767

THEARLA KOZY
NORMAN vs. BRIGHT HORIZONS
June 10, 2013
25–28

Page 25

1  BY MR. OWENS:
2  Q.  Unless he tells you -- unless he
3  instructs you not to answer, go ahead and answer the
4  question --
5  A.  Okay.
6  Q.  -- to the best of your ability.
7  A.  Okay.
8  Q.  Did you subsequently become aware that
9  governmental officials, either locally or in the State
10 of Florida, were conducting an investigation into the
11 matter?
12 A.  Yes.
13 Q.  Did you find that out during that same
14 conversation with Ms. Horner and Ms. Todd?
15 A.  I don't recall if it was that -- at that
16 time, particular time.
17 Q.  When you first learned from Ms. Horner or
18 Ms. Todd about what was going on at that particular
19 center, did you make any recommendations as to what you
20 thought they should do as managers?
21 A.  Yes.
22 Q.  Okay. What were your recommendations?
23 A.  They were to place the employee on
24 administrative leave, get her statement, as well as
25 interview the staff who she works with on a regular

Page 26

1  basis.
2  Q.  Was Ms. Turner placed on administrative
3  leave to your knowledge?
4  A.  I believe she was.
5  Q.  And were either Ms. Horner or Ms. Todd or
6  anybody able to get a statement from Ms. Turner?
7  A.  Yes.
8  Q.  Did you see the statement?
9  A.  Yes.
10 Q.  Who provided it to you?
11 A.  I -- I don't know for sure. I'm sure one
12 of them would have E-mailed it to me.
13 Q.  And after you received the statement,
14 what did you do with it?
15 A.  We continued to review, and gather other
16 statements from other employees.
17 Q.  Okay. What specifically, with regard to
18 Ms. Turner's statement, where --
19 A.  Yes.
20 Q.  -- did you physically place it?
21 A.  Oh, in my office.
22 Q.  Do you still have it?
23 A.  I believe so.
24 Q.  Did you provide it to the company's
25 attorneys?

Page 27

1  A.  I provided all the documents that I had.
2  Q.  Now another thing that you brought up was
3  getting statements from other teachers within the --
4  A.  Um-hum. (Witness indicating
5  affirmatively.)
6  Q.  -- facility; correct?
7  A.  Yes.
8  Q.  All right. Did you personally travel
9  down to the particular center to take the statements?
10 A.  No, I did not.
11 Q.  And when we say "take the statements" --
12 obviously there could be a difference --
13 A.  Um-hum. (Indicating affirmatively.)
14 Q.  -- do you know if there were individuals
15 who actually sat down and interviewed the particular
16 teachers or did they just ask them to give handwritten
17 statements?
18 A.  Linda interviewed the -- the teachers.
19 Q.  Did Ms. Horner provide you with her notes
20 from the interviews?
21 A.  Yes.
22 Q.  Would you have kept those in the same
23 place generally --
24 A.  Yes.
25 Q.  -- you kept Ms. Turner's statement?

Page 28

1  A.  Um-hum. (Indicating affirmatively.)
2  Q.  Other than Ms. Horner, do you know if
3  anybody else interviewed employees at the -- at the
4  center?
5  A.  No, I do not.
6  Q.  Were there any employees who provided
7  their own typed out or handwritten statements about
8  what they witnessed or what they didn't witness?
9  A.  I don't recall.
10 Q.  Is it fair to say you reviewed all the
11 notes and all the statements --
12 A.  Yes.
13 Q.  -- from the investigation?
14 A.  Yes.
15 Q.  Did you personally come to any
16 determination as to whether these allegations should be
17 founded or unfounded?
18 A.  Yes.
19 Q.  Okay. And what was your ultimate
20 finding?
21 A.  I don't recall. I do recall more than
22 one person observed the behavior. So it would have
23 been a counsel or reprimand, depending on the
24 performance -- the past performance history.
25 Q.  Okay. When you say more than one person



Case 8:12-cv-01301-TBM   Document 40   Filed 06/28/13   Page 8 of 17 PageID 768

THEARLA KOZY
NORMAN vs. BRIGHT HORIZONS
June 10, 2013
29–32

Page 29

1 observed the behavior, what specific behavior?
2   A.   The rough handling, moving -- the rough
3 handling.
4   Q.   And given that more than one individual
5 observed Ms. Turner handling children roughly, why
6 didn't you just make the recommendation that she be
7 immediately terminated from the job?
8   A.   I don't recall the circumstances. It's
9 been a while.
10   Q.   Well, you would agree that these were
11 serious allegations against this woman; correct?
12   A.   Yes.
13   Q.   Was there any sort of disagreement
14 between yourself, Ms. Todd, and Ms. Horner, about what
15 sort of discipline should be levied, if any, against
16 Ms. Turner?
17   A.   Can you repeat that?
18   Q.   Of course. I guess -- maybe I'll take a
19 step back.
20       Were there discussions between yourself
21 and Ms. Todd about whether Ms. Turner should be
22 disciplined in connection with these allegations of --
23   A.   Yes, there were.
24   Q.   Was there any sort of disagreement
25 between the two of you as to whether -- or to what

Page 30

1 level of discipline Ms. Turner should have levied
2 against her?
3   A.   I don't recall.
4   Q.   When you and Ms. Todd would communicate
5 about the Kristin Turner issue, did you communicate via
6 E-mail or by phone or both?
7   A.   Both.
8   Q.   Do you still have any of the E-mail
9 communications between the two of you?
10   A.   I'm sure I do.
11   Q.   Have you provided those to your -- to the
12 company's lawyers?
13   A.   Yes.
14   Q.   How about Ms. Horner, did you have any
15 communications with her about whether Ms. Turner should
16 be disciplined?
17   A.   I'm sure we were on a conference call
18 together.
19   Q.   Did Vanessa Smith ever have any specific
20 conversations with you about Kristin Turner, and how
21 she treated the children?
22   A.   I'm thinking. I don't remember.
23   Q.   And a similar question with Janice
24 Norman; did Janice Norman ever contact you, or vice
25 versa, meaning did you and Ms. Norman ever have a

Page 31

1 conversation about anything that she observed with
2 regard to Ms. Turner's treatment of the children?
3   A.   I don't remember. And I will say the
4 reason I'm hesitating is because I can't remember which
5 one. One of them did.
6   Q.   Okay.
7   A.   And I can't recall which one.
8   Q.   Okay. Whichever one it was -- let's at
9 least work through that conversation --
10   A.   Okay.
11   Q.   -- did they reach out to you or did you
12 reach out to whichever one?
13   A.   They reached out to me.
14   Q.   And do you remember generally the
15 substance of the conversation?
16   A.   It was a complaint about Kristin and her
17 conduct. The person also felt that she wasn't being
18 treated fairly at the workplace. And that was the gist
19 of the conversation.
20   Q.   Do you know if there were parents who had
21 their children removed from Ms. Turner's classroom as a
22 result of the investigation?
23   A.   Yes.
24   Q.   Do you know how many?
25   A.   I recall one.

Page 32

1   Q.   Has there been any lawsuit against Bright
2 Horizons from any of those parents who removed their
3 children from the classroom?
4   A.   Not to my knowledge.
5   Q.   Did you have any conversations with any
6 of the parents as to their -- as to the reasons why
7 they removed their children?
8   A.   No, I did not.
9   Q.   Were you at some point notified of the
10 various governmental agencies, that were involved in
11 investigating Ms. Turner, as to the result of their
12 investigations?
13   A.   I was. It was brought to my attention.
14 I don't recall the results of that investigation.
15   Q.   I think we agreed that these were serious
16 allegations against Ms. Turner. Given that, why didn't
17 you make the trip down to Florida to participate in the
18 investigation into the allegations against her?
19   A.   We typically don't. The regional manager
20 onsite manages the situation.
21   Q.   Looking back on it, do you think it would
22 have been important to have a human resources
23 professional involved?
24   A.   I was involved.
25   Q.   But personally?



Case 8:12-cv-01301-TBM  Document 40  Filed 06/28/13  Page 9 of 17 PageID 769

THEARLA KOZY
NORMAN vs. BRIGHT HORIZONS
June 10, 2013
33–36

Page 33

1  A. In person, not necessarily.
2  Q. Why not?
3  A. It's rare that I go in person.
4  Q. Why is that?
5  A. It's typically not -- it's usually not
6  necessary. A regional manager is always onsite, has a
7  strong handle on it, and is managing it on the ground.
8  HR can handle it from where we are.
9  Q. As somebody whose been doing human
10 resources work for a long time; do you find yourself to
11 be fair and impartial when it comes to
12 employee/relations matters?
13 A. Yes.
14 Q. And, given that, do you think that it
15 would have been important for you to be involved in
16 these employee interviews to ensure that the employees
17 weren't being coerced in anyway as to what to say?
18 A. Can you repeat your question?
19 Q. Of course. Given your impartiality, do
20 you think it would have been important for you to be
21 present, during these employee interviews related to
22 Ms. Turner, to ensure that the managers who were
23 interviewing them were not coercing them to say certain
24 things, and were accurately taking down everything that
25 they said?

Page 34

1  A. No, I do not.
2  Q. Why not?
3  A. As you mentioned earlier, I trust the
4  directors and I also trust the regional managers to do
5  the right thing.
6  Q. Following both the internal and external
7  investigations related to Ms. Turner, were there any
8  further complaints to any governmental agencies with
9  regard to the Citibank Center where my clients worked?
10 A. I don't recall.
11 Q. Were you ever made aware of a June 17th,
12 2011 complaint about children not being provided water
13 at that location?
14 A. Yes.
15 Q. How did you learn about that?
16 A. That was also from Jennifer -- Jennifer
17 Todd.
18 Q. Did Ms. Todd tell you who made the
19 complaint about the water issue?
20 A. I don't recall. I don't remember.
21 Q. Jumping back a little bit to the
22 progressive disciplinary policy.
23 A. Um-hum. (Indicating affirmatively.)
24 Q. Is -- let me ask it this way. Are the
25 steps followed regardless of the type of infraction

Page 35

1  that the employee engages in?
2  A. (No response.)
3  Q. For example, if the employee were to
4  receive a memorialized reprimand -- for tardiness, for
5  example -- but then the next time there was just a
6  complaint about how they performed their job; would
7  that follow those steps or would those be two separate
8  reprimands in the process? Do you see what I'm saying?
9  A. No.
10 Q. Okay.
11 A. I think I do but --
12 Q. Okay. It's kind of a hard question but
13 I'll try -- let's try to work through it.
14 A. Okay.
15 Q. If you have an employee whose supervisor
16 reprimands them for tardiness.
17 A. Yes.
18 Q. And puts it on the formal company
19 document that we've talked about.
20 A. Um-hum. (Indicating affirmatively.)
21 Q. And then that same employee, a couple of
22 months later, engages in some other workplace
23 infraction unrelated to tardiness. Would the steps of
24 the policy be followed or would those be considered two
25 separate infractions, so new step -- or a new step one

Page 36

1  in the process would be started?
2  A. It depends on the circumstances.
3  Q. Okay.
4  A. In some cases, yes. In others, if
5  there's more than one or two infractions of the same
6  prior to that one, it may lead to the next step because
7  they all fall under the unsatisfactory job performance.
8  Q. And we started to touch upon the fact --
9  and agreed upon the fact -- that there were some
10 infractions in the workplace that are so serious that
11 could result in immediate termination.
12 A. Um-hum. (Indicating affirmatively.)
13 Q. At Bright Horizons, in your opinion, what
14 are some of those types of infractions? Imagine --
15 A. Biting a child and leaving marks.
16 Q. Child abuse and neglect?
17 A. Child abuse and neglect, yes.
18 Q. And maybe being intoxicated on the job;
19 would that be one?
20 A. Not necessarily.
21 Q. Okay.
22 A. We have the option of rehab. And we
23 remove them from the environment of course.
24 Q. Outside of abuse and neglect of children,
25 can you think of any other infractions at Bright

Case 8:12-cv-01301-TBM   Document 40   Filed 06/28/13   Page 10 of 17 PageID 770

THEARLA KOZY
NORMAN vs. BRIGHT HORIZONS
June 10, 2013
37–40

Page 37

1 Horizons that are so serious it would warrant an
2 immediate and prompt termination?
3     A.   Without prior counsel?
4     Q.   Without prior counsels.
5     A.   That would do it.
6     Q.   Let's start with my client, Vanessa
7 Smith.
8     A.   Okay.
9     Q.   Did you participate in the decision to
10 terminate her employment?
11    A.   Yes.
12    Q.   And what level of participation did you
13 have in that decision?
14    A.   I don't understand your question.
15    Q.   Sure. Well, let's -- let's start it this
16 way. Why was Ms. Smith terminated from her job at
17 Bright Horizons?
18    A.   I'm trying to keep them separate in my
19 head here.
20    Q.   Well, maybe we can make it easier on each
21 other.
22         Is it your understanding that at some
23 point in time Vanessa Smith transferred from the Citi
24 location to the USF Moffitt location?
25    A.   Yes.

Page 38

1     Q.   All right. So we'll agree that Ms. Smith
2 is that person. Okay?
3     A.   Yes.
4     Q.   Let's start with her.
5     A.   Okay.
6     Q.   Why was Ms. Smith terminated from her
7 position at Bright Horizons?
8     A.   I'm going to start with unprofessional
9 conduct. There had also been several parent complaints
10 leading up to her termination.
11    Q.   Okay. Anything else?
12    A.   I know there's more but I can't recall
13 right this minute.
14    Q.   Now the parent complaints, were any of
15 those in writing to your knowledge?
16    A.   I don't know.
17    Q.   How did you become aware of these alleged
18 parent complaints?
19    A.   Through the center director and the
20 regional manager.
21    Q.   And the center director, for Ms. Smith at
22 that time, would have been Ms. Fuller; correct?
23    A.   Yes.
24    Q.   Did either Ms. Fuller or Ms. Todd provide
25 you with any sort of notes that they had taken related

Page 39

1 to parent complaints about Ms. Smith?
2     A.   Yes.
3     Q.   Did you receive those via E-mail or fax?
4     A.   E-mail.
5     Q.   Do you still have those E-mails?
6     A.   Yes.
7     Q.   Did you provide the E-mails to your
8 attorney -- to the company's attorneys?
9     A.   Yes.
10    Q.   When you received those notes, from
11 either Ms. Fuller or Ms. Todd, did you place them in
12 some sort of file?
13    A.   Yes.
14    Q.   Okay. Is that a file that you kept at
15 your house?
16    A.   Yes. Um-hum. (Indicating affirmatively.)
17    Q.   Similarly did you provide that file to
18 the company's attorneys?
19    A.   Yes.
20    Q.   And you had also brought up, as a reason
21 for Ms. Smith's termination, unprofessional conduct.
22    A.   Um-hum. (Indicating affirmatively.)
23    Q.   What did you mean by that?
24    A.   There was several parent complaints and
25 also faculty complaints leading up to her termination,

Page 40

1 and also -- oh, God, I'm trying to keep them straight.
2         Without my file and without notes, it's
3 very difficult to remember back to 2011.
4     Q.   How did you first become aware of the
5 desire, on the part of either Ms. Fuller or Ms. Todd,
6 to terminate Ms. Smith's employment?
7     A.   How did I become aware of it?
8     Q.   Um-hum.
9     A.   A phone call from the regional manager.
10    Q.   Do you remember what Ms. Todd told you
11 during that phone conversation?
12    A.   No, I don't. We may need to come back to
13 that. But, no, I don't right now.
14    Q.   All right. Was it your understanding at
15 the time that Ms. Todd was recommending that Ms. Smith
16 be terminated from her job?
17    A.   Say that again.
18    Q.   Sure. When you had that conversation
19 with Ms. Todd, was it your understanding that Ms. Todd
20 was recommending to you, as the HR manager, that
21 Ms. Smith be terminated?
22    A.   Not at that time. The initial call came
23 in just to discuss what happened. There hadn't been a
24 final decision made yet.
25    Q.   When you say "what happened", what are



Page 41

1  you referring to?
2  A.  In terms of why she was placed on
3  administrative leave, and I'm just drawing a blank.
4  Q.  Okay. Well --
5  A.  Because it's all -- it's all -- you know,
6  I know the incident where the parent allegedly alleged
7  that she pushed her.
8  Q.  Ms. Smith alleged?
9  A.  Yes.
10  Q.  Okay.
11  A.  Alleged, yes, and that was prior to this.
12  I also recall, prior to this, that she told them that
13  she was going to call the police because of it. And
14  shortly after that we discovered that she had contacted
15  parents as well.
16      And with all the other pieces that we
17  were dealing with prior to that, which we were going --
18  using our progressive counseling steps -- she had --
19  there were six other situations at this center leading
20  up to this, that at this point her conduct was -- was
21  unprofessional, unacceptable, and was detrimental to
22  the company, to the center itself, and to our client.
23  Q.  Okay. And at that time did you know that
24  many of those prior circumstances that you're referring
25  to were not documented in any way, shape or form?

Page 42

1  A.  Documented in what way?
2  Q.  In anyway. I mean the prior situations,
3  the six or more that you're referring to, many of those
4  were never documented in anyway by Ms. Smith's
5  supervisor --
6  A.  There are times --
7  Q.  -- isn't that true?
8  A.  There are times when verbal counsels are
9  done, and there are times when they're not in writing.
10     If the parent made the complaint, the
11  regional manager or I would be notified of that
12  complaint. There would be a conversation with her
13  which I'm -- which I believe there was about the
14  situation of whatever the parent was complaining about.
15  But at that time no document was created.
16  Q.  Why is it the human resources
17  professional wouldn't document that?
18  A.  Say that again.
19  Q.  As a human resources professional, why
20  wouldn't you document that?
21  A.  Well, there were some things I wasn't
22  aware of. I wasn't aware of some of the parent
23  complaints.
24     When they come in -- we trust the
25  director to manage those things on their own with the

Page 43

1  regional manager. Only when they get to a level that
2  it's causing a real disruption that they call HR in.
3  Does that answer your question?
4  Q.  Well, sort of. Is it important at these
5  particular centers to keep the parents of these
6  children happy?
7  A.  I don't understand your question. We are
8  expected to maintain, provide well-class welcome, and
9  ensure that all families and teachers receive that,
10  yes.
11  Q.  Because if you have unhappy parents
12  there's a possibility that they'll remove their
13  children from the center; correct?
14  A.  There's a possibility.
15  Q.  And if there's no children there's no
16  center; right?
17  A.  That's true.
18  Q.  And so when a parent complains about a
19  teacher, would you agree that that was taken seriously
20  by Bright Horizons?
21  A.  Yes.
22  Q.  And if it's taken seriously, why would it
23  not be somehow memorialized in writing that a parent
24  has made a complaint about a teacher?
25  A.  I can't answer that.

Page 44

1  Q.  You have brought up the fact that Vanessa
2  Smith contacted the police related to this situation
3  with a parent where she claimed that the parent had put
4  her hands on her.
5  A.  Um-hum. (Indicating affirmatively.)
6  Q.  Is that a yes?
7  A.  Yes. Sorry.
8  Q.  How did you become aware of that?
9  A.  It was after a meeting that we had with
10  Vanessa that I was called immediately after that
11  meeting to let me know that Vanessa had said that she's
12  going to call the police.
13  Q.  And then was there a point in time where
14  you learned that she, in fact, did call the police?
15  A.  I did, but I don't recall when.
16  Q.  Was there any sort of internal Bright
17  Horizons investigation done into this issue between
18  Ms. Smith and the parent?
19  A.  Yes.
20  Q.  Were -- did you come down here and
21  participate in that investigation in person?
22  A.  No, I did not.
23  Q.  Do you know who participated or -- well,
24  let me back up.
25     Do you know who locally did interviews as



Case 8:12-cv-01301-TBM   Document 40   Filed 06/28/13   Page 12 of 17 PageID 772

THEARLA KOZY
NORMAN vs. BRIGHT HORIZONS
June 10, 2013
45–48

Page 45

1  part of the investigation?
2  A.   The director did. I'm not sure about
3  Jennifer, but I know the director did.
4  Q.   Ms. Fuller?
5  A.   Ms. Fuller, yes.
6  Q.   Do you know what the results of that
7  investigation were?
8  A.   Interviewed one teacher -- the only
9  teacher that she would cochair with -- and she was
10 there at the time and in the same area at the time, and
11 saw that exchange, and we received her written
12 statement.
13 Q.   Do you know if anybody else was
14 interviewed as part of the investigation?
15 A.   I don't know.
16 Q.   Do you know if the parent, who had
17 allegedly put her hands on Ms. Smith, gave any sort of
18 statement about what happened?
19 A.   I don't recall if she gave a written
20 statement. But it was a verbal account to the
21 director.
22 Q.   Did -- did Ms. Fuller summarize the
23 verbal account by the parent in writing and provide it
24 to you?
25 A.   Yes.

Page 46

1  Q.   Do you still have that document?
2  A.   Yes.
3  Q.   Did you provide that to the company's
4  lawyers?
5  A.   I believe I did.
6  Q.   Did Ms. Smith provide a statement as to
7  what happened with regards --
8  A.   Yes.
9  Q.   -- to that parent?
10 A.   Yes.
11 Q.   Was that provided to you as well?
12 A.   Yes.
13 Q.   Other than Ms. Smith, the parent, and the
14 teacher who was present, to your knowledge was anybody
15 else interviewed as part of this investigation?
16 A.   I don't recall. I don't believe so.
17 Q.   If there were others that were
18 interviewed, would they -- would their statements or
19 summaries -- summaries of their statements have been
20 provided to you?
21 A.   Yes.
22      MR. OWENS: Can I have these marked P-1?
23      THE REPORTER: Sure.
24      (The EMPLOYEE COMPLAINTS were marked
25 PLAINTIFFS' COMPOSITE EXHIBIT NO. 1 FOR ID.)

Page 47

1  BY MR. OWENS:
2  Q.   All right. Ms. Kozy, I'm handing what's
3  been marked as Exhibit 1. It's several pages, so take
4  some time and leaf through it. And once you feel
5  comfortable, having had the opportunity to look at it,
6  just let me know when you're ready.
7  A.   Whose statement is this? There's no
8  signature on it.
9  Q.   We'll get to that. Just go ahead and
10 read through them, and we'll talk about them.
11 A.   Okay.
12 Q.   All set?
13 A.   Yes.
14 Q.   Okay. Ms. Kozy, I've handed you a group
15 of documents that I marked as a Composite Exhibit
16 marked No. 1. After having the opportunity to look
17 through those, do you recognize them?
18 A.   Yes.
19 Q.   Do you recognize all of them?
20 A.   Yes.
21 Q.   Generally speaking, what do you recognize
22 these documents in Exhibit 1 to be?
23 A.   These are employee complaints about
24 various encounters or experiences they've had with
25 Vanessa in the classroom.

Page 48

1  Q.   Do you have any understanding as to why
2  these particular employees put these statements
3  together?
4  A.   Looking at the date this was Moffitt.
5  And I recall shortly after these -- the dates are
6  throwing me a little bit.
7       But there had been many complaints from
8  faculty about Vanessa to management. So I'm sure that
9  Marilyn requested statements.
10 Q.   Well, you would agree, though, that some
11 -- some of these documents in Exhibit 1 are not
12 complaints about Ms. Smith; correct?
13 A.   Um-hum. (Indicating affirmatively.)
14 Q.   You would agree with that?
15 A.   Some are.
16 Q.   Some are and some aren't; correct?
17 A.   Um-hum. (Indicating affirmatively.) Yes.
18 Q.   On the first page, the very top of the
19 page, it says specimen #10; do you see that?
20 A.   Um-hum. (Indicating affirmatively.) Yes.
21 Q.   Is that your handwriting?
22 A.   No.
23 Q.   Do you have any idea whose handwriting
24 that is?
25 A.   No.



Case 8:12-cv-01301-TBM   Document 40   Filed 06/28/13   Page 13 of 17 PageID 773

THEARLA KOZY                                                        June 10, 2013
NORMAN vs. BRIGHT HORIZONS                                              49–52

**Page 49**

1  Q. Did you suggest to Ms. Fuller that she
2  should have employees write statements such as these in
3  Exhibit 1?
4  A. I don't recall. I do know that if --
5  vaguely I recall her telling me that employees had
6  concerns, and I often instruct them to have them
7  provide that in writing instead of a verbal -- simply a
8  verbal account.
9  Q. And why was it that all of these
10 statements were gathered on the same week that
11 Ms. Norman was terminated, and that Ms. Smith was given
12 a reprimand, an action plan, and placed on
13 administrative leave?
14 A. I couldn't answer that.
15 Q. And why was Janice Norman terminated from
16 her job at Bright Horizons?
17 A. Janice, there were supervision issues.
18 There was also contact of -- I think the last situation
19 was her contacting parents and sharing information
20 about a teammate, a member, not handling or -- I don't
21 want to use the word "handling" -- but that the teacher
22 was not a good teacher.
23 Q. Was Ms. Norman telling parents about the
24 situation with Kristin Turner to your knowledge?
25 A. I believe it was.

**Page 50**

1  Q. And that was the reason, ultimately, that
2  Ms. Norman was terminated from her job at Bright
3  Horizons?
4  A. Sharing confidential information and
5  being the second occurrence of it, I believe so.
6  Q. But the fact that there were complaints
7  about Ms. Turner was not confidential; was it?
8  A. No.
9  Q. In fact, Linda Horner, the center
10 director, contacted all of the parents, except for one,
11 and told them about the complaints about Ms. Turner;
12 right?
13 A. That's correct.
14 Q. Okay. So why was Ms. Norman terminated
15 for -- I guess as being the straw that broke the
16 camel's back, so to speak --
17 A. Um-hum. (Witness indicating
18 affirmatively.)
19 Q. -- why was Ms. Norman treated so harshly
20 and Ms. Horner not?
21 A. Say that again.
22 Q. Sure. Was Ms. Horner reprimanded in any
23 way for contacting the parents of the students in
24 Ms. Turner's room after the complaint about her?
25 A. I don't recall.

**Page 51**

1  Q. Okay. And would you agree that if
2  Ms. Horner was not reprimanded and Ms. Norman was for
3  talking to the parents about Ms. Turner and how she
4  treated the children, that that would be unequal
5  punishment?
6  A. I can't respond to that because I don't
7  recall.
8  Q. Okay. And I appreciate that. But I'm
9  telling --
10 A. Yes.
11 Q. -- I'm saying if, in fact, Ms. Horner was
12 not reprimanded, would you agree that that's unequal?
13 A. I can't --
14     MR. LEO: Objection to form.
15 BY THE WITNESS:
16 A. I can't respond to that without having --
17 yes, I can't respond to that.
18 Q. Well, I'm asking you to.
19 A. I can't respond to it because I can't
20 recall what actually took place with the other
21 employee.
22 Q. What do you mean by that?
23 A. What you asked me to do is speculate, and
24 what I'm trying to do is give you a factual answer.
25 And I don't want to say something that is incorrect.

**Page 52**

1  Q. Okay. And I'm just asking you to answer
2  a hypothetical. If -- one thing we know is that
3  Ms. Norman was reprimanded for it; correct?
4  A. Um-hum. (Indicating affirmatively.)
5  Q. All right. That's a yes?
6  A. Yes.
7  Q. All right. We don't know whether
8  Ms. Horner was or was not, correct -- at least you
9  can't remember at this time?
10 A. That's correct.
11 Q. Okay. And I'm telling you --
12 hypothetically, let's say that Ms. Horner was not
13 reprimanded for talking to the parents about it. Could
14 you agree if that were the case -- I'm not holding you
15 to it --
16 A. Okay.
17 Q. -- but if that were the case, that would
18 be unequal?
19 A. It would still depend on past performance
20 history.
21 Q. If there were no past performance
22 history, can we agree that it's unequal treatment?
23 A. You're forcing the answer, and I don't
24 like to do hypotheticals. Never have. It's very
25 uncomfortable.

Case 8:12-cv-01301-TBM Document 40 Filed 06/28/13 Page 14 of 17 PageID 774

THEARLA KOZY
NORMAN vs. BRIGHT HORIZONS
June 10, 2013
53–56

Page 53

1  Q. Can you provide me the answer, please?
2  A. He wants an answer. Under those
3  circumstances, yes, if it was only that.
4  Q. Under my hypothetical only.
5  A. Okay.
6  Q. Is that fair?
7  A. Okay.
8  Q. All right.
9  A. All right.
10 Q. Is it fair to say that you didn't
11 independently make the decision to terminate my
12 clients?
13 A. You're correct --
14 Q. Okay.
15 A. -- I did not.
16 Q. You gave -- is it fair to also say that
17 you gave Human Resources related assistance and
18 guidance in the decision-making process?
19 A. That's correct.
20 Q. Focusing on Ms. Smith, the one who
21 transferred.
22 A. Okay.
23 Q. Was there any sort of disagreement,
24 amongst the group of managers, in terms of whether
25 Ms. Smith should be terminated or whether she should be

Page 54

1  further reprimanded based on what happened toward the
2  end of her employment?
3  A. Not that I recall.
4  Q. Okay. The same question for Ms. Norman,
5  was there any sort of disagreement amongst managers in
6  terms of whether she should terminated or just further
7  reprimanded?
8  A. Not that I recall.
9  Q. Did Ms. Smith ever make a complaint to
10 you that she felt as though she was being harassed at
11 the USF Moffitt Center?
12 A. Yes.
13 Q. Was there an investigation conducted in
14 relation to that complaint?
15 A. Yes. Well, there was -- the claim of
16 harassment was around employees complaining about her
17 performance, and that she felt that there was always
18 something that they were complaining about.
19 Q. Did Ms. Smith tell you that she felt like
20 she was being treated differently by her supervisors
21 and coworkers after she was involved in the
22 investigation related to Ms. Turner?
23 A. Differently?
24 Q. Yes.
25 A. Not that I recall.

Page 55

1  Q. Did Ms. Smith tell you that she felt like
2  the harassment was in response to her involvement in
3  the Kristin Turner situation?
4  A. No.
5  Q. We talked a little bit about Linda
6  Horner.
7  A. Um-hum. (Witness indicating
8  affirmatively.)
9  Q. I understand that she no longer works for
10 Bright Horizons; correct?
11 A. That's correct.
12 Q. How did her employment end with the
13 company?
14 A. Performance related issues.
15 Q. Sounds like she was terminated from her
16 position.
17 A. Yes.
18 Q. Could you give me just some examples of
19 some of the performance related issues with -- that led
20 up to Ms. Horner's termination?
21 A. Am I allowed to ask if that's relevant?
22 Watching too much court TV. And that's been forever,
23 too.
24       Let's see. She was on an action plan for
25 the last part of her year. For the most part, from her

Page 56

1  job performance review, and most of it had to do with
2  follow-up, completing tasks, that sort of thing.
3  Q. Were there -- was there a point in time
4  when Ms. Horner was criticized for the manner in which
5  she conducted the investigation into the Kristin Turner
6  allegations?
7  A. I don't recall that. I do recall that
8  there was some question about whether or not Vanessa --
9  the reason we moved her from that location to Moffitt
10 was to give her another opportunity, under another
11 supervisor, because she kept complaining she didn't get
12 the training; when, in fact, we knew she had. But we
13 wanted to move her just to give her one more chance to
14 see if she could do her -- do the job. So I do recall
15 hearing about that.
16 Q. Right. And my question was a little
17 different, though. With regard to Ms. Horner --
18 A. Right.
19 Q. -- was she ever disciplined in anyway in
20 terms of how she handled the investigation into the
21 allegations against Kristin Turner?
22 A. Oh, no.
23 Q. Do you know if Ms. Todd ever criticized
24 Ms. Horner for how she handled the investigation?
25 A. Criticized -- or I'm sorry. Commented to

THEARLA KOZY
NORMAN vs. BRIGHT HORIZONS

June 10, 2013
57–60

Page 57

1  me --
2  Q. Yes.
3  A. -- personally? No, not that I recall. I
4  don't remember.
5  Q. And I think I asked you this earlier, but
6  I apologize for not remembering the answer.
7  A. That's okay.
8  Q. When Ms. Smith spoke to you about her
9  feeling that she was being harassed, was there an
10 investigation that was conducted into her allegations
11 of harassment?
12 A. I know I spoke to her, and asked her
13 about her claim of harassment, and to be specific about
14 what that was.
15     And it was, as I stated, the number of
16 times that her peers and that her supervisor were
17 calling her into the office.
18 Q. Did Ms. Smith tell you that when she
19 arrived at the Moffitt Center that Ms. Fuller told her
20 that she had two strikes against her?
21 A. Did she tell me that?
22 Q. Yes.
23 A. No, she did not.
24 Q. Did Ms. Fuller ever tell you that she
25 told Ms. Smith that?

Page 58

1  A. No.
2  Q. Other than Ms. Smith and Ms. Norman, were
3  there any other employees, to your recollection, that
4  stated that they had witnessed Kristin Turner treating
5  the children inappropriately?
6  A. As far as I can recall, I believe there
7  was one other employee.
8  Q. Do you remember that employee's name?
9  A. No, I do not.
10 Q. Was it Wendy Orango?
11 A. Say that again.
12 Q. Wendy Orango possibly?
13 A. Possibly.
14 Q. But you're not certain?
15 A. No. I am certain of one. The reason it
16 sticks out is because so many others that they had not.
17 So I do recall that.
18     MR. OWENS: Let's take a short break and
19 I'm just going to look through my notes. You're
20 welcome to get water or whatever you need to do.
21     THE WITNESS: Okay.
22     (WHEREUPON, a brief recess was had.)
23     MR. OWENS: We'll go back on the record.
24 BY MR. OWENS:
25 Q. Ms. Kozy, we're back on the record.

Page 59

1  A. Yes.
2  Q. The same rules apply. You are still
3  under oath.
4     In your discussions with your local
5  managers related to both of my clients' terminations,
6  did the managers provide you with documentation to
7  review in anticipation of having those discussions
8  about possible termination of my clients?
9  A. Which managers? The director?
10 Q. Sure. The directors and the regional
11 manager.
12 A. Yes.
13 Q. And did you have the opportunity to have
14 a full opportunity to review those documents?
15 A. Yes, I did.
16 Q. When you reviewed those documents related
17 to my clients, were there any concerns that you had
18 about the manner in which prior counselling or
19 reprimands had been documented or were not documented?
20 A. I don't remember. I do know that there
21 were several dates on the counsel, and I always ask if
22 they were verbal or written, and they clarified those
23 points.
24 Q. So there -- it sounds to me like you're
25 saying that there were dates on some of these

Page 60

1  counseling forms?
2  A. Um-hum. (Indicating affirmatively.)
3  Q. And there was no documented evidence to
4  back it up; correct?
5  A. Yes.
6     MR. OWENS: All right. Ma'am, that's all
7  I have. I appreciate your time today.
8     THE WITNESS: Okay.
9     MR. LEO: No questions. Okay. We'll
10 read.
11    MR. OWENS: It's a read, and we'll order.
12    MR. LEO: And we'll take a copy.



800.211.DEPO (3376)
EsquireSolutions.com

Case 8:12-cv-01301-TBM   Document 40   Filed 06/28/13   Page 16 of 17 PageID 776

THEARLA KOZY
NORMAN vs. BRIGHT HORIZONS
June 10, 2013
61–64

**Page 61**

DEPOSITION ERRATA SHEET

Our Assignment No.: 378600
Case Caption: Janice Norman & Vanessa Smith versus Bright Horizons

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 20___.

_____
THEARLA KOZY

**Page 62**

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____

SIGNATURE:_____ DATE:_____
THEARLA KOZY

**Page 63**

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____

SIGNATURE:_____ DATE:_____
THEARLA KOZY

**Page 64**

CERTIFICATE OF REPORTER

STATE OF FLORIDA    )
COUNTY OF HILLSBOROUGH )

I, Barbara V. Days, RPR-CP, certify that I was authorized to and did stenographically report the deposition of THEARLA KOZY; that a review of the transcript was requested; and that the foregoing pages, numbered 1 through 65, are a true and complete record of my stenographic notes taken during said deposition.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 21st day of June, 2013.


_____
BARBARA V. DAYS, RPR-CP

THEARLA KOZY
NORMAN vs. BRIGHT HORIZONS

June 10, 2013
65

Page 65

1    CERTIFICATE OF OATH
2
3    STATE OF FLORIDA     ]
4    COUNTY OF HILLSBOROUGH  ]
5
6        I, the undersigned authority, certify that
7    THEARLA KOZY, personally appeared before me and was
8    duly sworn on the 10th day of June, 2013.
9
10
11       WITNESS my hand and official seal this 21st
12   day of June, 2013.
13
14
15
16
17   BARBARA V. DAYS, RPR-CP
     Notary Public - State of Florida
     My Commission No. EE 72703
18   Expires: March 17, 2015
19
20
21
22
23
24
25

