In the Matter Of:

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.

---

DEPOSITION OF

VANESSA SMITH, VOLUME I

*May 09, 2013*

---


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150

```
 1                    UNITED STATES DISTRICT COURT
                        MIDDLE DISTRICT OF FLORIDA
 2                          TAMPA DIVISION

 3

      JANICE NORMAN and
 4    VANESSA SMITH,

 5         Plaintiffs,

 6    vs.                        CASE NO.:  8:12-cv-01301-EAK-TBM

 7    BRIGHT HORIZONS FAMILY
      SOLUTIONS, LLC, d/b/a
 8    BRIGHT HORIZONS
      CHILDREN'S CENTERS,

 9

           Defendant.
10    _____/

11

12                  DEPOSITION OF VANESSA SMITH
                             VOLUME I
13

14    DATE:             Thursday, May 9, 2013

15    TIME:             9:53 a.m. - 12:06 p.m.

16    PLACE:            Office of Florida Roebig, P.A.
                        2101 West Platt Street
17                      Tampa, Florida 33606
                        813-855-1037
18

19    Reported by:
      DISCOVERY LITIGATION SERVICES, LLC
20    321-710-2150
      www.discoverylit.com
21
      Fransesca St. John,
22    Court Reporter

23    JOB NO.:  7744

24

25
```


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME I on 05/09/2013

DEPOSITION OF
Pages 2..5

Page 2

```
 1              A P P E A R A N C E S
 2    FOR THE PLAINTIFFS:
 3        GREGORY A. OWENS, ESQ.
          Florin Roebig, P.A.
 4        777 Alderman Road
          Palm Harbor, Florida 34683
 5        800-226-6581
          greg@florinroebig.com
 6
 7    FOR THE DEFENDANT:
 8        CARLOS J. BURRUEZO, ESQ.
          Littler Mendelson, P.C.
 9        111 North Magnolia Avenue, Suite 1250
          Orlando, Florida 32801
10        407-393-2900
          cburruezo@littler.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                  I N D E X
 2    TESTIMONY OF VANESSA SMITH
 3                                        PAGE
 4    Examination by Mr. Burruezo          4
 5
 6
 7
 8              E X H I B I T S
 9    NO.  DESCRIPTION                    PAGE
10    1   Bright Horizons Job Description   67
11    2   Employee conference memorandum    77
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                VANESSA SMITH,
 2    was duly sworn to tell the truth and nothing but the
 3    truth, and was examined and testified as follows:
 4                EXAMINATION
 5    BY MR. BURRUEZO:
 6        Q   Good morning, Ms. Smith.  It's a pleasure to
 7    see you again.  We've met once before, as you might
 8    recall, at the mediation of this case that we had some
 9    months ago.  I'm sure your counsel has had a chance to
10    meet with you and describe for you what the purpose of
11    this process is, and this is essentially to take your
12    deposition.  And what that means is we're going to have
13    a dialogue, a conversation concerning the claims that
14    you've raised in this case.
15                There are a few ground rules that I want to
16    mention to you so that we're on the same page as we go
17    through the process.
18                Number one, it's really important that we
19    communicate effectively in the course of your
20    deposition, so I really want to emphasize a few points
21    with regard to that.  One is that if you don't
22    understand my question, let me know that and I'll
23    rephrase it and make it more understandable.  It's
24    important for me to know that you've understood what
25    I've asked you.
```

Page 5

```
 1                And at the same time, if I don't understand one
 2    of your answers, I may ask you to clarify or repeat it
 3    if for some reason I'm not understanding what you're
 4    saying.  So this whole process is about communication,
 5    which is one of the most difficult things in life, in my
 6    experience, and that is to communicate effectively.  So
 7    it's really important that you listen to my question and
 8    that I listen to your answer so that we can have good
 9    communication in the course of the day.
10                I ask that you respond audibly, out loud, to
11    the questions I ask.  Sometimes in normal human
12    interaction you might nod your head or shrug your
13    shoulders or saying uh-huh or huh-uh.  The court
14    reporter's taking everything down that we're talking
15    about, and so it's important for her to hear audibly
16    what we're saying so that we can, again, communicate
17    effectively.
18        A   Okay.
19        Q   It's also important that we not speak at the
20    same time, because she can only take one person down at
21    a time.  And in the course of conversation you might
22    know how I'm going to conclude my question, and I might
23    know how you're going to conclude your answer, and we
24    might want to have a tendency to talk over each other,
25    but it will be very important for us to wait for the
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 6

1  other to be finished before we continue the
2  communication.
3          The other thing is, I'm originally from New
4  York, plus I'm of Hispanic origin, I have a tendency
5  sometimes to speak too fast, so tell me if I've done
6  that.  Or if I've garbled my words, or if I say
7  something you don't comprehend, let me know that and
8  I'll try to slow down and make my question
9  understandable.  I'm sure the court reporter will tell
10 me to slow down if I get too fast at some point.
11         If you need to take a break, let me know that
12 and I'll be happy to accommodate your wishes in that
13 regard.
14         And finally, you have been sworn under oath to
15 testify truthfully, so I will assume that whatever you
16 tell me is an honest answer, as if you were in a
17 courtroom, to whatever I've asked you.  Okay?
18     A   Okay.
19     Q   All right.  Go ahead and state your name and
20 spell your last name for the record.
21     A   My name is Vanessa Smith.  Last name is spelled
22 S-M-I-T-H.
23     Q   And where do you live, Ms. Smith?
24     A   I live at 5529, and it's spelled K-A-R-A-N,
25 Court.  And that's Lakeland, Florida 33811.

Page 7

1      Q   And with whom, if anyone, do you reside at this
2  address?
3      A   Right now I'm alone.
4      Q   Was there a point in time that someone lived
5  with you at this address?
6      A   Yes.
7      Q   And who that would have been?
8      A   That was my son.
9      Q   And what is his name?
10     A   Kevin.
11     Q   And how old is Kevin?
12     A   He's 19.
13     Q   Is his last name Smith as well?
14     A   Sams.
15     Q   S-A-M-S?
16     A   That's correct.
17     Q   And during what period of time did he live with
18 you at this address?
19     A   It's almost been two years.
20     Q   That he's left?
21     A   Well, two years -- it's almost been two years
22 since we moved in.  So when we first moved in from -- I
23 want to say, I want to say August.  I'm not sure about
24 the exact month of 2011.  Maybe September of 2011.
25     Q   So you moved into this Karan Court address

Page 8

1  sometime in August or September of 2011?
2      A   That's correct.
3      Q   And when you moved in, your son Kevin Sams
4  lived with you?
5      A   That's correct.
6      Q   And when did he move out?
7      A   It's been -- I'm just going to guesstimate, I'm
8  not sure, maybe eight or nine months now.
9      Q   Now, does he have any information at all
10 concerning the claims that you raise in this case?  In
11 other words, is he a witness to any of the events that
12 you described in the complaint?
13     A   No.
14     Q   Do you expect him to be a witness in this case
15 to testify on your behalf in any respect?
16     A   No.
17     Q   Are you married?
18     A   No, I'm not.
19     Q   Have you ever been married?
20     A   Yes.
21     Q   And during what period of time were you
22 married?
23     A   I was married to Kevin Sams from '92 to '97.
24     Q   Any other marriage besides the marriage that
25 you had to Mr. Smith?

Page 9

1      A   Sams.
2      Q   I'm sorry, Kevin Sams, I apologize.
3      A   Jerry Stevenson.
4      Q   And that is S-T-E-V-E-N-S-O-N?
5      A   That's correct.
6      Q   And during what period of time were you married
7  to Mr. Stevenson?
8      A   I don't remember.
9      Q   Was it before or after Mr. Sams?
10     A   It was before.
11     Q   Do you have a sense of the decade when you were
12 married to Mr. Stevenson?
13     A   In the '80s.
14     Q   And how long do you recall being married to
15 Mr. Stevenson?
16     A   I'm not sure.  Maybe two -- I'm not sure.
17     Q   Is there a particular reason why the
18 circumstances surrounding your marriage to Mr. Stevenson
19 appear to be foggy in your memory?
20     A   Is there a reason why?
21     Q   Right.
22     A   There's a lot of things that have happened
23 since in the '80s, so there's no -- there's nothing in
24 particular that I should hold onto that memory.
25     Q   Okay.  What is your date of birth?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

**Page 10**

1    A    November 16th, 1963.
2    Q    All right.  So you're 49?
3    A    Yes.
4    Q    And you would have been, probably in the 1980s,
5  in your early 20s?
6    A    Right.
7    Q    Do you remember how old you were when you
8  married Mr. Stevenson?
9    A    To be honest with you, I'm not sure.  I could
10  have been in my 20s.
11    Q    And where were you married, in what state and
12  city?
13    A    Florida.  It was Mulberry.
14    Q    And did you have a divorce proceeding or
15  dissolution of marriage proceeding as well at some
16  point?
17    A    Yes.
18    Q    And where was that?  Where did that take place?
19    A    Colorado Springs.
20    Q    Colorado Springs?
21    A    Colorado.
22    Q    In Colorado?
23    A    Mm-hmm.
24    Q    Any other marriages besides your marriages to
25  Mr. Sams and Mr. Stevenson?

**Page 11**

1    A    It was Lenard Franklin.
2    Q    And when were you married to Mr. Franklin?
3    A    It was after Mr. Stevenson.  But it was
4  annulled, I think it was maybe six months.
5    Q    Now when you say annulled, do you mean annulled
6  as part of some religious ceremony?
7    A    No.
8    Q    Was it a legal divorce or a legal annulment
9  that you obtained?
10    A    A legal divorce.
11    Q    And in what state and city did you obtain a
12  divorce from Mr. Franklin?
13    A    Bartow, Florida.
14    Q    And when were you married to Mr. Franklin?
15    A    I have no idea of the dates.
16    Q    And you said it was after Mr. Stevenson?
17    A    Right.
18    Q    And do you believe it was in the 1980s or
19  sometime after the 1980s when you were married to
20  Mr. Franklin?
21    A    I want to say it was maybe in the '90s, early
22  '90s.  I'm not sure.
23    Q    Do you have any children from either
24  Mr. Stevenson or Mr. Franklin?
25    A    Mr. Stevenson.

**Page 12**

1    Q    And how many children do you have from
2  Mr. Stevenson?
3    A    One.
4    Q    And what is the name of that child?
5    A    Rashawn Stevenson.
6    Q    Could you spell that?
7    A    R-A-S-H-A-W-N.  And that's Stevenson.
8    Q    S-T-E-V-E-N-S-O-N?
9    A    Yeah.
10    Q    And how old is Rashawn?
11    A    He's 27.  He's 26 or 27.
12    Q    Was Rashawn born during the time that you were
13  married to Mr. Stevenson?
14    A    Yes, he was.
15    Q    So would it be safe to say that if we did the
16  arithmetic calculation, that if we subtract the age that
17  your son Rashawn is from what year we're in, that
18  roughly we will get to the time period when you were
19  married to Mr. Stevenson in the 1980s?
20    A    Not really.
21    Q    Okay, let me ask it a little bit differently
22  then.  You told me a few minutes ago that Rashawn was
23  born during the marriage, correct?
24    A    That's correct.
25    Q    So if we look at the year that Rashawn was

**Page 13**

1  born, that would be an indicator about when you were
2  married to Mr. Stevenson, is that right?
3    A    It could give — yes, during that time, but not
4  the exact year or date.
5    Q    In what city and state was Rashawn born?
6    A    Colorado Springs, Colorado.
7    Q    And where does he live now?
8    A    Lakeland, Florida.
9    Q    Has he ever lived with you at this address,
10  Karan Court?
11    A    No, he hasn't.
12    Q    And how long have you lived in the Lakeland,
13  Florida area?
14    A    I want to say over — maybe 20 — over 20
15  years, I think.
16    Q    Any other marriage besides the marriages to
17  Mr. Stevenson, Mr. Franklin, and I guess that's all
18  we've talked — and Mr. Sams?  Sorry.
19    A    No.
20    Q    So you've been married three times?
21    A    Yes.
22    Q    Now this morning when you walked in your
23  counsel handed me some verified Answers to
24  Interrogatories.
25    A    Okay.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

**Page 14**

1      Q   And these are the answers that you gave in
2 connection with certain questions that we posed to you.
3 And one of the questions that we asked was to list any
4 and all of your former spouses, and the only person who
5 you listed was Kevin Sams. You didn't list either
6 Mr. Stevenson or Mr. Franklin. Is there a reason why
7 you didn't list either of these other two men in the
8 answer to your Interrogatories?
9      A   I think I read it wrong. I thought it was the
10 last spouse that you were with. And I do apologize,
11 because of the work hours, I'm getting like maybe three
12 to four hours sleep.
13      Q   Okay. Any other individuals or — well, strike
14 that.
15      Let me ask you this. Any children from
16 Mr. Franklin, your marriage to Mr. Franklin?
17      A   No, sir.
18      Q   How many total kids do you have?
19      A   Two.
20      Q   And you've mentioned both of them, Kevin Sams
21 and Rashawn Stevenson?
22      A   That's correct.
23      Q   Do you anticipate your marital status changing
24 in the next six months?
25      A   No.

**Page 15**

1      Q   Are you currently taking any medication?
2      A   Yes, I am.
3      Q   And what medication are you currently taking?
4      A   I take medication for my blood pressure.
5 Enalapril.
6      Q   Enalapril?
7      A   Enapril (sic). It's E-N-A-P-R-I-L.
8      Q   And what dosage of enalapril do you take?
9      A   As needed, a double. But right now it's 10
10 milligrams. I've been under a lot of stress.
11      Q   And for how long have you been taking
12 enalapril?
13      A   I want to guesstimate maybe three years. Four
14 it could be. I'm not sure exactly.
15      Q   And who first prescribed enalapril to you?
16      A   I think it was an emergency room doctor.
17      Q   Pardon me?
18      A   I think that it was an emergency room doctor.
19      Q   And who has continued the prescription of
20 enalapril for you?
21      A   Dr. Patricia Eseverri.
22      Q   And is she with the Clark & Daughtrey Medical
23 Walk-in Clinic?
24      A   Yes, she is.
25      Q   And has she been your family physician

**Page 16**

1 effectively?
2      A   Yes.
3      Q   And how long have you been seeing her?
4      A   I think it's three years.
5      Q   Do you have a family —
6      A   I'm sorry, this is 2013, so I want to say about
7 maybe two and a half, three years, that's good.
8      Q   Okay. Do you have a family history of high
9 blood pressure?
10      A   Yes.
11      Q   Who else in your family has suffered from high
12 blood pressure?
13      A   My mom.
14      Q   What is her name?
15      A   Gussie Smith.
16      Q   And anyone else that you're aware of who has
17 high blood pressure in your family history?
18      A   My dad.
19      Q   What is his name?
20      A   Eldridge Smith.
21      Q   Anyone else who you're aware of who has high
22 blood pressure in your family history?
23      A   No, not that I'm aware of.
24      Q   And do you know how long your mom has had high
25 blood pressure?

**Page 17**

1      A   I have no idea.
2      Q   Has it been a long time?
3      A   I'm not sure. My mom didn't raise me.
4      Q   And what about your dad, has he had high blood
5 pressure for a long time?
6      A   I have no idea.
7      Q   And you're aware of their medical condition as
8 it relates to blood pressure through conversations
9 you've had with them?
10      A   Right.
11      Q   Who raised you?
12      A   My grandmother.
13      Q   And what is her name?
14      A   Warnella Armstrong.
15      Q   Can you spell Warnella?
16      A   W-A-R-N-E-L-L-A?
17      Q   W-A-R-N-E-L-L-A. Armstrong?
18      A   That's correct.
19      Q   And is she your mom's mom?
20      A   My father's mom.
21      Q   And is there a reason why your mom did not
22 raise you?
23      A   No. Basically my grandmother, my mom and my
24 dad, when they got married, everybody lived on the same
25 street, and she never had a daughter, so basically she



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME I on 05/09/2013

DEPOSITION OF
Pages 18..21

Page 18

1  would say let me keep her, y'all go to the beach.  And
2  that's what happened pretty much.
3      Q   How would you describe your relationship with
4  your mom?
5      A   It's pretty good.  Like sisters.
6      Q   Have you ever had any strain in your
7  relationship with your mom?
8      A   No, nothing that's not normal.
9      Q   Do you feel that your mom should have been more
10  involved in your upbringing?
11      A   No.  She was there, so.
12      Q   Did you physically live with your grandmother
13  or live with your mother and father?
14      A   I lived with my grandmother and my grandfather.
15      Q   And your parents lived in a separate home?
16      A   Next door.
17      Q   Okay.  Do you have any siblings?
18      A   Yes, I do.
19      Q   And how many siblings do you have?
20      A   Maybe 25, 26.
21      Q   And are the 25 or 26 brothers and sisters that
22  you have -- and I'm assuming they're a combination,
23  unless -- I've never encountered anybody who's had 26
24  girls or 26 boys when you have that many children.  Are
25  they all your natural blood brothers and sisters, or is

Page 19

1  there a combination of mothers and fathers?
2      A   Combination.
3      Q   Where do your parents live today?
4      A   Lakeland.
5      Q   Do they live together or apart?
6      A   No.  My dad's remarried, he lives in Lakeland.
7  And my mom, she lives in Lakeland.
8      Q   Is she remarried as well or?
9      A   No, she's not.
10      Q   Any other medications besides enalapril that
11  you take?
12      A   Yes.
13      Q   What other medications?
14      A   I wish I'd known, I would have brought the
15  list.  I can pull out the other couple that I have in my
16  purse and give you the name of them, because I don't
17  know them all by heart.
18      Q   Sure, okay.
19      A   This is -- and I'll spell it,
20  A-M-L-O-D-I-P-I-N-E.
21      Q   I'm sorry, I completely missed that, I
22  apologize.
23      A   That's okay.  It's A-M-L-O-D-I-P-I-N-E.  And
24  it's for my blood pressure.  It's 10 milligrams.
25      Q   And who prescribes that?

Page 20

1      A   Dr. Eseverri.
2      Q   And how long have you been taking this
3  particular medication for blood pressure?
4      A   Since March.
5      Q   Of 2013?
6      A   Of this year.
7      Q   And what was your purpose, or why is it that
8  you're taking this medication in addition to the one you
9  told me about earlier?
10      A   Because of my blood pressure.  It's for blood
11  pressure.
12      Q   Right.  Are you saying it's not controllable
13  simply with the other medication, is that what you're
14  suggesting?
15      A   Yes.
16      Q   Okay.  Any other medicines besides this one and
17  the one you told me about earlier?
18      A   Yes.
19      Q   How many others are there?
20      A   As needed I take Flexeril, and that's a muscle
21  relaxer, and oxycodone as needed for pain.
22      Q   And what pain do you experience?
23      A   Pain in my right neck.  Muscle spasms in my
24  back and my right shoulder.
25      Q   And what is the cause of these physical

Page 21

1  ailments that you just described?
2      A   I was in a car accident.
3      Q   And when was the car accident?
4      A   July of last year.
5      Q   July of 2012?
6      A   June, I'm sorry.
7      Q   June 2012?
8      A   Yes.
9      Q   And who prescribed the oxycodone?
10      A   The emergency -- no, I think it was the
11  emergency room doctor.  I'm not sure.
12      Q   And who's continued the prescription?  You've
13  been on it for almost a year.
14      A   I haven't asked for any more.  I still have
15  left over.  It's too strong.  I only take it basically
16  as needed, so it never finished.
17      Q   Have you taken one today?
18      A   Definitely not.  I've only had three hours of
19  sleep.  I had to work.
20      Q   I'm just asking if you have taken any
21  medications today.
22      A   No.  Just the blood pressure.
23      Q   Which ones have you taken today?
24      A   Just blood pressure.
25      Q   The two that you've described for me?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 22

1    A    Right.
2    Q    Any other medicines that you currently take?
3    A    There's more, but like I said I don't have a --
4    like I can't roll you off a list of them.  If I had
5    brought the -- if I had known you needed that I would
6    have brought that.
7    Q    Okay.  Well let's do this, and this might
8    happen throughout the day by the way, I'm going to make
9    a list of things that we're going to follow up on.  If
10   you could provide your counsel with that listing of
11   medicines, and he'll give it to me.
12   A    Okay.
13   Q    Today, before your deposition, what medications
14   have you taken in addition to your blood pressure
15   medicine, if any?
16   A    None.  Just blood pressure medicine.
17   Q    And the blood pressure medications that you've
18   taken this morning before coming today, does that affect
19   your ability to understand my questions or testify
20   truthfully in any way?
21   A    No.  I've only had three hours of sleep because
22   someone's on vacation, and in order for me to get hours
23   at my job, I took those hours, so I'm a little bit
24   foggy.
25   Q    And I understand.  And this is not an endurance

Page 23

1    test at all.  I understand and appreciate that you're
2    probably tired as a result of not having had much sleep,
3    so if you need to take a break let me know that.
4    A    Okay.
5    Q    All right.  So we've talked about your
6    medicines, and you're going to follow up and give your
7    counsel a listing of the ones that you can't recall.
8    A    Yes.
9    Q    And we've discussed also that you sort of lived
10   and have lived in the Lakeland area for about 20 years.
11   Was there ever a point in time outside of that 20-year
12   period where you moved away from Lakeland?
13   A    I lived in Mulberry.
14   Q    Okay.  And how far is that from Lakeland?
15   A    It's like less than five miles.  It's kind of
16   like a straight, one side of the street is Mulberry and
17   the opposite side is considered Lakeland, but not the
18   city limits.
19   Q    Now, you mentioned you were in a car accident
20   last summer.  Did you file any legal proceedings as a
21   result of that car accident?
22   A    Yes.
23   Q    And what is the status of that legal
24   proceeding?
25   A    Basically it's still pending.

Page 24

1    Q    And who's handling that proceeding for you?
2    A    Ira Serebrin.
3    Q    I'm sorry, what's the name of the lawyer?
4    A    I'll have to get his card out.
5    Q    You had said Ari?
6    A    Ira, I-R-A.
7    Q    Ira, okay.
8    A    I'm sorry, I didn't bring the card, but I have
9    his name programmed in my cell phone.
10   Q    Okay.  Well maybe during a break you can
11   retrieve that name for me.  I'm going to put a little
12   star.
13         Now, has a lawsuit actually been filed on your
14   behalf?
15   A    No, it hasn't.
16   Q    So it's sort of a pending threatened claim and
17   subject to negotiation at this point?
18   A    As far as I know.  Basically, the insurance
19   company, I guess he's dealing with them.
20   Q    Okay.  And what is the status of -- and I don't
21   want to hear any communication you've had with your
22   counsel, that's not my question.  My question is:  What
23   is the status of that?  Are you about to resolve the
24   claim?  Is it sort of sitting there?  What is the
25   current status of that threatened claim for that car

Page 25

1    accident you described last summer?
2    A    Right now I'm not sure.
3    Q    Okay.  Are there active negotiations?
4    A    Not that I know of.
5    Q    And if you filed a claim, what injuries are you
6    going to be seeking damages for?
7    A    Basically medical and loss -- basically
8    medical.
9    Q    And you were going to say something else, loss?
10   A    I went through a lot of medical problems, so
11   basically medical.
12   Q    Are you also going to be seeking damages for
13   any emotional harm that might have resulted because of
14   that car accident?
15   A    It depends on what my physicians -- what the
16   results are.
17   Q    Do you feel that you've suffered emotional harm
18   because of what happened in that car accident?
19   A    Emotionally?  No.
20   Q    Have you sought any counseling or therapy or
21   treatment for anything that relates — and what I mean
22   treatment, I'm not talking about medical treatment, I'm
23   talking about treatment for any emotional conditions or
24   mental conditions you think you might have suffered
25   related to that car accident?



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 26

1    A   Yes.
2    Q   And what counseling or therapy have you
3  received?
4    A   Basically I've had tests done.
5    Q   Who has provided -- or, excuse me -- who has
6  administered those tests?
7    A   Dr. Tindell.  And Dr. Tobon, she's a
8  neurologist.
9        COURT REPORTER:  I'm sorry, who's the second
10  doctor?
11       THE WITNESS:  Tobon.  I'm sorry, I didn't
12  know what I was going to -- I would have brought
13  all that information.  I can't just off of the
14  top of my head.  Dr. Kimberly T-O-B-O-N.
15 BY MR. BURRUEZO:
16   Q   Can you spell Tobon?
17   A   T-O-B-O-N.
18   Q   And Kimberly.  And what type of doctor is Dr.
19 Tobon?
20   A   She's a Board-certified neurologist.
21   Q   And Dr. Tindell?
22   A   And Dr. Tindell, she's a psychiatrist.
23   Q   Okay.  What is Dr. Tindell's first name?
24   A   I'm sorry, I don't have her information on me,
25  I just have Dr. Tobon's.

Page 27

1    Q   And Dr. Tindell you said is a psychiatrist?
2    A   Right.
3    Q   And how many times have you sought treatment
4  from Dr. Tindell?
5    A   I would say maybe four or five.
6    Q   And has Dr. Tindell diagnosed you with any
7  medical condition or emotional condition?
8    A   Emotional, no.  Basically nothing -- no
9  emotional.  It's just memory, short-term memory loss.
10   Q   All right, let me sort of -- let's back up.
11 And I want to explore this to some degree, Mrs. Smith,
12 because unless I'm missing something, and I might be,
13 but I'm looking at your Interrogatory responses and I
14 don't see any mention of Dr. Tindell or Dr. Tobon.  And
15 so I feel the need to kind of explore this somewhat
16 further.
17       So the record is clear, and what I'm referring
18 to is, there was an Interrogatory answer -- excuse me,
19 Interrogatory question that asked you to identify any
20 and all medical treatment that you have had, and you
21 respond giving some information, Dr. Eseverri and
22 Margaret Wimberly and some other folks, but there's no
23 mention of Dr. Tindell or Dr. Tobon.  So let me sort of
24 explore this, if I could, for a couple of moments.
25       You said that Dr. Tobon is a neurologist.  Is

Page 28

1  that right?
2    A   That's correct.
3    Q   And what is Dr. Tobon assisting you with, as
4  you understand it?
5    A   For the car accident, when I -- like I said,
6  when I was going over the Interrogatories, and I do
7  apologize, when I read over those, it was three hours of
8  sleep, and basically I thought it was pertaining to
9  Bright Horizons, not the car accident.
10   Q   So Dr. Tobon is treating you for what?
11   A   For my neurology.  I have the pain in my right
12 shoulder, and muscle spasms.
13   Q   So any muscle spasms or pain that you have in
14 your shoulder, related to this car accident you had in
15 June of 2012, correct?
16   A   Yes, it does.
17   Q   It has nothing to do with anything relating to
18 your employment at Bright Horizons?
19   A   No.  I just had that accident.  It was last
20 year.
21   Q   Okay.  So any physical ailments of the kind
22 that you've been describing, you're not going to ask
23 Bright Horizons to compensate you for those ailments
24 that you have, but rather that's something that relates
25 to the car accident, is that right?

Page 29

1    A   Correct.  Yes, definitely.
2    Q   Now Dr. Tindell, you said that she was a
3  psychiatrist and that you visited with her or sought
4  treatment from her about four times.  Is that right?
5    A   Right.
6    Q   And so are you aware of -- well, let's
7  establish a time period first, strike that.
8        In terms of your visits with Dr. Tindell, when
9  have these visits occurred?
10   A   The dates, I have no idea.  It was after,
11 sometime after the car accident.
12   Q   And who is it that first, to your best memory,
13 suggested you go visit with a psychiatrist as it relates
14 to your issues involving the car accident?
15   A   It was Dr. Tobon.
16   Q   Okay.  And what issue were you experiencing at
17 the time that Dr. Tobon, to your understanding, felt
18 that Dr. Tindell could assist you?
19   A   Basically really bad headaches.
20   Q   Anything else?
21   A   That's it as far as I know.
22   Q   And are you aware of any emotional conditions,
23 if any, that Dr. Tindell has diagnosed concerning you?
24   A   Not that I know of.
25   Q   You said that you have short-term memory problems?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Page 30

1    A    That was related from the car accident.
2    Q    Okay.  And how do these short-term memory
3  problems affect you?
4    A    Wow.  I don't know how to answer that, I'm
5  sorry.  Basically, if you -- if we're having a
6  conversation, I can remember everything you said.
7    Q    Well, give me a concrete example, if you can,
8  of your short-term memory problem.
9    A    I can't do that.  She did tests on it, and so,
10  I mean, they would have it.
11    Q    Okay.  So, for example, will you remember
12  tomorrow that we had a deposition today?
13    A    Definitely.
14    Q    Will you remember the substance of our
15  conversation?
16    A    Yes.
17    Q    And this sounds like a silly question, and
18  forgive me for asking it in this way, I just don't know
19  how to ask it, to be candid.  So, in terms of your
20  short-term memory issues, what does short term mean?  Is
21  it days, weeks, months?  Is it something longer?  You
22  know, how short is short I guess is what I'm asking.
23    A    Well, if I had to describe it, I know if I turn
24  my stove on, to turn it off.  I know to lock my doors.
25  I know I don't forget things like my keys or anything

Page 31

1  like that.  If it's something that is, I guess, brand
2  new to me, brand new information or something brand new.
3  I remember, I guess what -- the important things that I
4  need to remember.  And all that's considered minute, I
5  just kind of erase that because it's stressful.
6    Q    Okay.  Like, for example, when we started your
7  deposition today I asked you about your marital history,
8  and you couldn't recall the dates of your marriages, at
9  least as it relates to two of your previous husbands.
10         Is your memory problem more of a long-term
11  memory where you can't remember things in the distant
12  past, or is it more of a short-term memory problem where
13  you can't remember things you did yesterday, or the day
14  before, or a week ago?
15    A    I don't think I was diagnosed with long-term
16  memory loss.  It was a basic test that she had done.
17  And basically when it comes down to marriage, I don't
18  hang onto my past, and so there's no need for me to --
19  to me that's -- personally, to me, that's not important,
20  as far as remembering what date I got married to my
21  first husband, or the divorce.  Because I, according to
22  what I believe, that is my past and I let that go.
23         And I've been divorced now from my last husband
24  15 years, so I don't -- my ex-husbands, they remarried,
25  they have families.  I rarely see them.  If I

Page 32

1  communicate with them, I never talk about when we were
2  married or anything to do, you know, with that.  So I
3  can't even relate to that anymore.
4    Q    Are there any traumas that you experienced in
5  those marriages that have caused you to want to move on
6  or forget certain things about them?
7    A    Trauma?
8    Q    Right.
9    A    No.
10    Q    Like abuse, for example?
11    A    My first marriage was abusive.
12    Q    Okay.  And how was it abusive, in what respect?
13    A    It was physically abusive.
14    Q    And that's the marriage to Mr. Stevenson?
15    A    That's correct.
16    Q    The one that lasted for about two or three
17  years?
18    A    Yes.
19    Q    And he physically beat you and abused you?
20    A    Right.
21    Q    Was there a point in time that he was
22  incarcerated for domestic violence or any issues
23  relating to legal matters that came up because of his
24  abuse?
25    A    Yes.

Page 33

1    Q    Did you seek any therapy or counseling as a
2  result of the physical abuse you suffered at the hands
3  of Mr. Stevenson?
4    A    We both went to counseling, because he was in
5  the military.  We both dated in high school, so he was
6  okay until he went to the military.  So basically as it
7  relates from him being in the military, he changed.
8    Q    Do you feel like you have unresolved issues or
9  lingering problems as a result of the physical abuse
10  that you suffered in the 1980s at the hands of
11  Mr. Stevenson?
12    A    For two years, no.  Since then, I mean, his
13  wife, myself -- his kids stay at my house with my son.
14  I mean, we all get along.
15    Q    Okay.  And what about Mr. Franklin, any abuse
16  at the hands of Mr. Franklin?
17    A    No, sir.
18    Q    And what about Mr. Sams?
19    A    No.
20    Q    What was the reason for your divorce from
21  Mr. Sams?
22    A    He traveled a lot.  He was gone a lot.  And
23  basically, according to his career, he was in a van, and
24  he was always gone.
25    Q    And how long were you married to Mr. Sams?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 34

1      A   From 1992 until '97.
2      Q   Any issues of infidelity or abuse in connection
3  with that marriage?
4      A   No.
5      Q   Any other diagnoses that you're aware of that
6  Dr. Tindell has made in connection with her treatment of
7  you?
8      A   Basically — not that I'm aware of.  Nothing
9  other than what's between them two.  I guess the
10 neurology, the nerve part, the damage that I've
11 suffered.
12     Q   And what is the nerve damage you've suffered?
13     A   I'm not sure of all of it, but it's basically
14 around in the disc in my neck and on the right side of
15 my shoulders and back.
16     Q   Has Dr. Tindell prescribed any medicines to
17 you?
18     A   No.
19     Q   Have you ever been diagnosed with depression?
20     A   No.
21     Q   Or anxiety disorder or PTSD, or anything of an
22 emotional nature?
23     A   Yes.  That was before the accident.
24     Q   And when were you diagnosed with having what
25 condition?

Page 35

1      A   Anxiety and stress disorder.  And that was at
2  Lakeland Regional, and Dr. Eseverri.
3      Q   So if I look at Dr. Eseverri's records, they're
4  going to show, according to you, that you were diagnosed
5  with some kind of anxiety or stress disorder by her?
6      A   I was diagnosed at Lakeland Regional and also
7  Dr. Eseverri, that was from Bright Horizons, the stress
8  that I went through there.
9      Q   Now, I want to focus — I'm not asking about
10 where that came from, I just want to focus on the
11 medical or emotional condition.  So what you're telling
12 me, if I understand you correctly, is that you were
13 diagnosed by a physician at Lakeland Regional with
14 having anxiety or stress disorder?
15     A   That's correct.
16     Q   And which doctor at Lakeland Regional diagnosed
17 you with having some anxiety or stress disorder?
18     A   Dr. Schillinger.
19     Q   Okay.  And Dr. Schillinger prescribed this
20 after seeing or visiting with you how many times?
21     A   I went into the emergency room.  I first went
22 to Dr. Eseverri because my blood pressure was really
23 elevated and I was having shortness of breath.  And when
24 they checked me there, they said that I was in the
25 process -- she thought that I was probably getting ready

Page 36

1  to have a stroke, and they were going to call the
2  paramedics to have me go straight to the emergency room.
3      Q   Okay.  So you were diagnosed by Dr. Schillinger
4  with anxiety and stress disorder.  Was any medication
5  administered because of that?
6      A   Yes.  He was the one that prescribed the
7  oxycodone.  I think it was oxycodone.
8      Q   Okay.  And after your visits with Dr.
9  Schillinger in the emergency room at Lakeland Regional,
10 have you gone to any other physician to deal with any
11 anxiety or stress disorder which you feel you were
12 diagnosed with at the time?
13     A   I had to follow up with Dr. Eseverri.
14     Q   What kind of doctor is she?
15     A   She's my primary physician.
16     Q   But is she, do you know if she's an internist
17 or just a family physician?
18     A   I think she's internal medicine.  I'm not sure,
19 but I think that's what she is.
20     Q   Okay.  After your hospitalization at Lakeland
21 Regional in 2011, as you described them in your
22 Interrogatory answers, did you visit with any doctor who
23 specializes in emotional conditions like a psychiatrist,
24 a psychologist, a therapist?
25     A   No.

Page 37

1      Q   Have you sought any direct treatment from any
2  counselor or therapist or physician, whether an M.D. or
3  D.O., concerning any anxiety disorder, stress disorder,
4  depression, or anything that relates to any emotional or
5  mental condition you might have been experiencing at
6  that time?
7      A   Basically, I talked to — basically it was Dr.
8  Eseverri that I spoke with.  And she did all kinds of
9  tests and everything was fine.
10     Q   Okay.  So according to Dr. Eseverri, is it your
11 testimony that she feels, as a result of testing that
12 she's done, that you no longer suffer from any kind of
13 anxiety or stress disorder, is that right?
14     A   No, that's not what I'm meaning.
15     Q   Okay.  Here's an example of, we're not
16 communicating very well, because that's what I
17 understood your last answer to be.  So let me back up to
18 make sure that I have the full information that I think
19 I might need in connection with your claims here.
20         And let's do this sort of chronologically,
21 because sometimes I find that when I look at things in a
22 chronological way, it's easier to get to the nuts and
23 bolts of things.
24         You describe in your answers, and you've told
25 me that roughly in May of 2011 you went to Lakeland



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 41   Filed 06/28/13   Page 12 of 25 PageID 789

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.       DEPOSITION OF
VANESSA SMITH, VOLUME I on 05/09/2013                                    Pages 38..41

Page 38

1  Regional Medical, correct?
2      A  Right.
3      Q  Because of some anxiety you were feeling, high
4  blood pressure, there was an impression by your
5  physicians at the emergency room that you might have
6  been getting a stroke, or on the way to getting a
7  stroke.  Is that right?
8      A  Well, no.  I went to first, Dr. Eseverri,
9  because she's my primary physician.  And when I got
10 there, the nurse took my vitals, and then she came in
11 and took the vitals, and they said that I was in the
12 process of probably having a stroke and she was going to
13 call the paramedics if I didn't have someone to take me
14 straight to the emergency room.  So it was basically her
15 referring me to go there because they couldn't treat me.
16     Q  Okay.  So then you went to Lakeland Medical?
17     A  Right, emergency room.
18     Q  To the emergency room?
19     A  Right.
20     Q  And in the emergency room you encountered Dr.
21 Schillinger?
22     A  Yes.
23     Q  Any other physicians who you encountered at
24 that time?
25     A  No.  After I seen him, then I was referred back

Page 39

1  to Dr. Eseverri.
2      Q  Okay.  Were you hospitalized?  That is, were
3  you, when you went to the emergency room, did they admit
4  you into the hospital?
5      A  No.  I stayed there pretty much a full day, but
6  they didn't admit me.
7      Q  And what did they do while you were in the
8  hospital in the emergency room?
9      A  I had an EKG.  I had some lab work done.  I
10 had — I know they were checking to see if I had had a
11 heart attack or a stroke, or some other things they had
12 done.
13     Q  And what was the determination, that you had
14 had a heart attack, or that you had not had a heart
15 attack?
16     A  I had not had a heart attack.
17     Q  And what was the determination with regard to a
18 stroke, that you had one or didn't have one?
19     A  Not.  He said not.
20     Q  Okay.  And what was the ultimate diagnosis?
21 What did they say in the emergency room after they ran
22 these batteries of tests that you had suffered from when
23 you were there?
24     A  He said it was stress, anxiety, and that it
25 could kill me.  Whatever was causing the stress and the

Page 40

1  anxiety, that was causing my blood pressure to rise that
2  high.
3      Q  Okay.  So then Dr. Schillinger prescribes
4  oxycodone?
5      A  I think it was oxycodone.
6      Q  Anything else that you recall that he
7  prescribed for you at that time?
8      A  Not that I can remember.
9      Q  All right.  So then you go back to Dr.
10 Eseverri?
11     A  Right.  He referred me back to her.
12     Q  All right.  Now here's where I think our
13 communication broke down.  Putting aside Dr. Eseverri
14 for a moment, who you prescribed to me as being sort of
15 a family physician or internist, correct?
16     A  Right.
17     Q  Have you gone to see any doctor, including
18 psychologists or psychiatrists, who specializes in
19 emotional conditions, in the treatment of emotional
20 conditions?
21     A  No.
22     Q  Okay.  Have you been referred by either Dr.
23 Schillinger or Dr. Eseverri to go and visit with a
24 psychiatrist or psychologist or any kind of therapist
25 who deals with emotional conditions?

Page 41

1      A  No.
2      Q  Have you visited, since your hospitalization in
3  May of 2011, with any psychiatrist or psychologist or
4  therapist of any kind, besides Dr. Tindell, who you
5  mentioned to me you had gone to see because of your car
6  accident?
7      A  That's correct.
8      Q  So the question, it was a long question, let me
9  try again.  Putting aside Dr. Tindell who you've gone to
10 see for car accident issues, okay, putting that doctor
11 aside, have you visited with any other psychiatrist or
12 psychologist or therapist to deal with any emotional
13 conditions?
14     A  No.
15     Q  So it's safe to say that since your employment
16 concluded — or strike that.
17        Is it safe to say that during and after your
18 employment with Bright Horizons, you have never been
19 diagnosed by any professional who specializes in
20 emotional conditions —
21     A  Yes, I have.
22     Q  Okay, let me finish the question.  You've never
23 been diagnosed by any specialist who deals with
24 emotional conditions with any kind of emotional
25 condition or harm; is that right?



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME I on 05/09/2013

DEPOSITION OF
Pages 42..45

Page 42

1    A   During the time that I was employed with Bright
2    Horizons, before any of what took place when I reported
3    the child abuse happening, I had seen a psychologist.
4    And everything was fine.
5       Q   Okay.  Who did you visit and when?
6       A   I would have to get her name, because I don't
7    have it with me.
8       Q   Okay.  So if I understand what you just said,
9    during your employment before you reported any abuse,
10   that you visited with a psychologist?
11      A   Right.
12      Q   And that psychologist didn't find that you had
13   any kind of problem or emotional condition, correct?
14      A   That's correct.
15      Q   And since that time, that is during your
16   employment and after your employment with Bright
17   Horizons, there's been no medical professional dealing
18   with emotional conditions who have diagnosed you with
19   having any kind of emotional condition whatsoever; is
20   that right?
21      A   Other than after the car accident with Dr.
22   Tindell.
23      Q   Okay.  And Dr. Tindell's diagnosis deals with
24   short-term memory unrelated to your employment with
25   Bright Horizons, right?

Page 43

1    A   I would assume it would be safe to say so.
2       Q   Okay.  And I want to further clarify the time
3    period.  And we're going to get into this in detail as
4    we talk about your experiences at Bright Horizons.
5          You reported the abuse in or around April 15 or
6    so of 2011.  So what your testimony is to me, if I
7    understand you correctly, is that in around that time,
8    you visited with a psychologist whose name we don't
9    know, who found you to be fine?
10      A   That's correct.
11      Q   Okay.  And after your employment ended in June
12   of 2011, and before your visiting Dr. Tindell, there's
13   been no psychiatrist, psychologist, licensed mental
14   health counselor, therapist of any kind, who's found or
15   diagnosed you with having any kind of emotional
16   condition; is that right?
17      A   That's right.
18      Q   Okay.
19         MR. OWENS:  Can we have a short break so I
20   can get a drink?
21         MR. BURRUEZO:  Sure.
22            (Short break was taken.)
23   BY MR. BURRUEZO:
24      Q   All right, going on the record now.  And I
25   appreciate, you just showed me the card for Ira

Page 44

1    Serebrin, S-E-R-E-B-R-I-N, who is a lawyer who's
2    representing your interest in the personal injury matter
3    involving the June 2012 car accident.  Is that right?
4       A   That's correct.
5       Q   Okay.  I appreciate you looking for that, so
6    that's one less thing I got to worry about.  I can cross
7    it off my list.
8          All right, let's shift gears a little bit
9    and — well actually, before we shift gears, there's one
10   or two or three more questions I thought I should ask
11   along the lines so I don't have to come back to it
12   later.
13         Let's sort of do it this way.  I'll ask the
14   broader question first, and maybe it will capture
15   everything and then it'll avoid the need for me to do it
16   in a more broken down way.  But the broad question is
17   this:  During your employment and after your employment
18   with Bright Horizons, what medical diagnoses have there
19   been concerning you from the doctors you have seen or
20   been treated by?
21      A   During my employment with Bright Horizons, I
22   can say the one was stress and anxiety.  My blood
23   pressure has continued to stay elevated.  The other was
24   injuries to my knees.
25      Q   And does that concern a workers' compensation

Page 45

1    claim?
2       A   That's correct, right.
3       Q   For some accident that happened in the
4    workplace?
5       A   Well, it wasn't an accident.  It was, I guess
6    repetitious of being on the cement floor on my knees,
7    and then lifting kids that were 30 pounds, 10 kids, five
8    times a day, or changing diapers.
9       Q   All right.  So stress and anxiety, and we
10   talked about that, Dr. Schillinger at the emergency
11   room.  Injuries to your knees related to some repetitive
12   motion that was part of a workers' compensation claim
13   that you filed.  Anything else that you were diagnosed
14   with that you know of?
15      A   From Bright Horizons?
16      Q   From the time that you started your employment
17   at Bright Horizons and up to the car accident.
18      A   Oh, okay.  Yes.  There was a couple of kids,
19   diarrhea and viruses were going around in the classroom
20   and the kids were getting sick.  Children weren't being
21   sent home, so of course I got sick and I ended up going
22   to the Fast Track at the Clark & Daughtrey because I
23   couldn't get an appointment in to see my doctor, so they
24   told me go to the walk-in clinic.
25      Q   All right.  So you had some issue with diarrhea



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME I on 05/09/2013

DEPOSITION OF
Pages 46..49

Page 46

1    while you were employed?
2        A    Right.
3        Q    Okay.  Anything else besides these three things
4    you have mentioned to me, the stress, the anxiety,
5    injuries to the knees and the diarrhea?
6        A    And my blood pressure was elevated.
7        Q    Now I realize that you're not a physician, and
8    neither am I, but is it possible that your blood
9    pressure condition is a hereditary issue that has
10   resulted because of your family history of blood
11   pressure?
12       A    I don't believe so.  I believe that as long as
13   I'm exercising, eating, I'm not stressed out about
14   anything, my blood pressure's normally normal.
15       Q    Well I'm not asking about what you necessarily
16   believe.  I'm just asking, in the realm of medical
17   possibilities, isn't it possible that you might have a
18   blood pressure problem because you just have a family
19   history of it?
20       A    I don't think so.  It could be, I just don't
21   believe so.
22       Q    Okay.  So even though you might have reluctance
23   to believe it, you recognize that it's a possibility?
24       A    Under normal circumstances -- under normal
25   circumstances, I'm normally fine.  But if there's

Page 47

1    something that causes me to be stressed or pressured,
2    unnecessary pressure, I guess, yes, I believe that
3    causes my blood pressure and everything else to elevate.
4        Q    Okay.  Is it safe to say that -- you know,
5    you've been gone from Bright Horizons for nearly two
6    years now, your employment ended in June of 2011.  Is it
7    safe to say that there's nothing related to your former
8    employment that causes you today any stress or anxiety?
9        A    No.
10       Q    Okay.  Are you saying that it does?
11       A    Yes.
12       Q    Or is it the litigation process that's causing
13   you stress and anxiety?
14       A    I wouldn't say it's the litigation.  I would
15   say the stress and anxiety comes from me there, working,
16   doing my job, having a job and going to work, doing what
17   I'm supposed to do.  And then after I report the child
18   abuse incident, then I'm all of a sudden, I'm put in a
19   position where I'm now being falsely accused of things.
20   I felt that I was being retaliated against because I
21   reported the child abuse.  And financially, like I lost
22   my livelihood.
23       Q    I understand what your theory is, and we're
24   going to spend a lot of detail and time going through
25   the particulars of your employment, and your feelings

Page 48

1    about your employment.  I guess my question is a little
2    bit broader than that.  And that is:  Since you've been
3    gone two years, it's safe to say that there's nothing
4    about your employment at Bright Horizons two years ago
5    that impacts you today, is that right?
6        A    No, I wouldn't say that.
7        Q    Okay.  So what is it about your employment two
8    years ago that impacts you today?
9        A    Basically, I'm actually not doing what I was
10   trained to do, what I enjoyed doing, what I went to
11   school for, what I was actually going to college to get
12   a degree to do.  I've accepted a lower-paying job,
13   something that I really don't enjoy, but just to keep
14   income coming in.
15            It's caused my family to kind of split.  It's
16   caused -- not having -- it's caused a lot of pressure of
17   not having a job, not being able to pay bills that I
18   could normally pay.  Not being in a position to -- my
19   son wanted to get a college education, now he became
20   like helping me out financially, and then he later on
21   moved out of the house.  So it's like redirected my
22   whole life.
23            And then being homeless, sleeping in a car for
24   a couple of months, that wasn't a pretty picture.  So
25   all of that, needless to say, it's affected me in some

Page 49

1    type of way.
2        Q    Okay.  And we'll come back to that.  We'll
3    spend more time talking about how it's affected you,
4    toward the end of your deposition.  I guess despite all
5    the things that you've mentioned to me, which, you know,
6    upon hearing you say them, seemed pretty difficult.
7        A    Yeah.
8        Q    You've not obtained any kind of therapy or
9    counseling for any of the things that you've described,
10   have you?
11       A    No, I haven't.
12       Q    Okay.  And why haven't you?
13       A    Well, when I was terminated from Bright
14   Horizons, I lost my health insurance.  And there were so
15   many different -- because I guess that was during the
16   time when the economy was pretty bad with jobs and
17   everything, and I didn't have -- I couldn't afford to
18   pay to go see or get counseling.
19       Q    Have you sought any free services available to
20   you in your community?
21       A    Yes, I have.
22       Q    And what did you look for?
23       A    I went in and I asked for things pertaining to
24   my health wise, provision for counsel, for therapy.
25       Q    Where did you go?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 50

1    A   I went to — they have Polk County — it's a
2    Polk County Health Clinic.
3        Q   And it's your testimony under oath that you
4    went to the Polk County Health Clinic and sought
5    counseling for any emotional feelings or experiences you
6    were having at the time?
7        A   For health-related issues, yes.
8        Q   Okay, I'm not talking about health-related, I'm
9    talking about emotional-related issues, counseling and
10   therapy.  You've just described for me, for example, a
11   number of difficult experiences you've had post your
12   employment termination from Bright Horizons.  And my
13   question to you is very particular, not related to any
14   medical conditions, but very particular to any emotional
15   issues that you were experiencing as a result of these
16   difficult times.
17           Did you seek any counseling or therapy for any
18   emotional conditions you say you were experiencing at
19   the time?
20       A   No.
21       Q   And my question is why not?
22       A   Basically because I talked to my — I was
23   trying to get my health taken care of.  Which, like I
24   said, my blood pressure, and some other things I was
25   having problems with, under control.

Page 51

1        Q   And I'm not — please don't take my questions
2    as being argumentative.  I'm not in any way arguing with
3    you, I'm just trying to put myself where you were.  So
4    you've experienced these things, I haven't.  So my
5    efforts here are to try to kind of recreate the past and
6    understand the past, which is what this exercise is all
7    about in some respects.
8            And so my question to you is:  If what you say
9    you experienced is correct based on your own life
10   perceptions and experiences, why wouldn't you seek
11   counseling and therapy for any emotional harm that you
12   say that you were suffering at that time?
13       A   Financially and health wise, because I was
14   focused more on my health and getting my blood pressure
15   under control, to keep from, what the doctor told me,
16   preventing from having a stroke or a heart attack.  And
17   basically those were more important to me to make sure,
18   as far as my health wise, that all of that was under
19   control.
20       Q   Okay.  So what you're saying to me, and correct
21   me if I'm wrong, is that at that point in time you sort
22   of prioritized what was more important to you.  At that
23   time, getting your physical health in line was more
24   important than dealing with any emotional health issues?
25       A   Basically, when I went in to see my doctor and

Page 52

1    I spoke with her in reference to certain things, she
2    said that my health, my physical health, was more
3    important, and I could always find another job.  But my
4    physical health was more important.  And that's
5    basically where she left off.
6        Q   Okay.  I wasn't asking about what she thought,
7    I'm asking about what you prioritized.  And I guess —
8        A   That's what I thought.  I went by, she was the
9    professional, she did the tests.  So basically that's
10   what I mainly focused on, getting my physical health —
11   being treated for that, because financially, that's all
12   I could afford.
13       Q   Okay.  Well then that brings me back to — the
14   question was:  In light of the way that you prioritized
15   what was important to you from a health perspective, is
16   it safe to say that you didn't undertake any effort at
17   all to find out what available services were open to you
18   in the community, that were free, for example, to deal
19   with any emotional health issues?
20       A   No.
21       Q   Okay.  Are you aware, in fact, that in the Polk
22   County area and where you live, that there are indeed
23   free services available to deal with emotional health
24   issues?
25       A   No, I wasn't aware at that time.  I was under a

Page 53

1    lot of stress and pressure.
2        Q   Okay.  So, I guess let's go ahead and shift
3    gears.  What I'd like to do is focus on the period after
4    your employment with Bright Horizons, and then a little
5    bit before your employment with Bright Horizons, and
6    then we'll come back and talk about your employment at
7    Bright Horizons.
8        A   Okay.
9        Q   So to put this in a time perspective, your
10   employment at Bright Horizons ended in late June of
11   2011.  Is that right?
12       A   Yes.
13       Q   And after your employment in June of 2011 with
14   Bright Horizons, what was the next job that you held
15   after your employment ended at Bright Horizons?
16       A   Circle K.
17       Q   And how long did you work for Circle K?
18       A   I started March 1st of this year.
19       Q   And you remain employed?
20       A   Yes.
21       Q   And how many hours a week do you work at Circle
22   K?
23       A   Anywhere from 18 to sometimes 24 hours.
24       Q   A week?
25       A   Yes.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME I on 05/09/2013

DEPOSITION OF
Pages 54..57

Page 54

1    Q   And what is your rate of pay at Circle K?
2    A   $8.25 an hour.
3    Q   Have you had any other employment since your
4  employment at Bright Horizons ended besides the Circle K
5  job?
6    A   I've had a temporary job.
7    Q   Okay.  And when was that?
8    A   That was for two weeks.  And that was with
9  Hallmark/Sykes?
10   Q   Sykes?
11   A   Right.
12   Q   And what did you do there?
13   A   It was telecommunications.
14   Q   What does that mean?
15   A   Marketing, telemarketing.
16   Q   And what were you telemarketing?
17   A   Hallmark products.
18   Q   And where was this job located?
19   A   In Lakeland.
20   Q   And who was the employer specifically?
21   A   Sykes.
22   Q   And what two-week period were you employed
23  there?
24   A   I think — I would say April 15th through, I
25  guess, the 26th.  I think that was the Friday.  It was

Page 55

1  two weeks.
2    Q   Of what year?
3    A   Of this year.
4    Q   Of 2013?
5    A   Mm-hmm.
6    Q   Any other employment besides Circle K and the
7  two-week experience at Sykes?
8    A   No, that's it.
9    Q   Any services that you provided at all to anyone
10  for pay since your employment at Bright Horizons?
11   A   No, not that I know of.
12   Q   Like, for example, have you done babysitting?
13   A   Oh, yes.  But those are my grandkids.
14   Q   Have you received compensation for babysitting?
15   A   That was — yes, I was.  For one month.
16   Q   Okay.  And whose child did you babysit?
17   A   It was my son's daughter.
18   Q   And so she paid you for babysitting?
19   A   He paid me.
20   Q   He paid you.  And how much did he pay you?
21   A   I think it was 700.  I think it was $700.  726,
22  something like that.
23   Q   And how did you arrive at a compensation
24  amount?
25   A   They stayed overnight.

Page 56

1    Q   I mean, how did it come to $726, I guess?  Let
2  me ask you, were you paid by the hour?  Were you paid by
3  the day?  How was it determined?
4    A   It was his three kids, and they had to go out
5  of town, emergency.
6    Q   So how is it that the amount of $726 was
7  arrived at?
8    A   Because we went by the number of children, and
9  that included me giving them meals.  That paid for gas
10  and their meals.
11   Q   Okay.  And how much did you charge per child?
12   A   I didn't go by per child, we went by the meals
13  and the time that they were going to be gone.  So
14  whatever amount I spent on food was —
15   Q   And how long was the babysitting for?
16   A   For three weeks.
17   Q   Any other babysitting you did for anyone else
18  for pay?
19   A   No, that's it.
20   Q   Now, my understanding, and correct me if I'm
21  wrong, is that before you went to go work at Bright
22  Horizons, that you, for a very long time, operated a
23  childcare family home.  Is that right?
24   A   Yes.
25   Q   For almost nine years you operated your own

Page 57

1  business.  Is that correct?
2    A   Yes, it is.
3    Q   And did you operate this business out of your
4  home?
5    A   Yes.
6    Q   And were you, when you operated your business
7  out of your home, were you under or subject to
8  Department of Children & Families licensing?
9    A   Yes, I was.
10   Q   And is there a reason why after your employment
11  ended at — well, strike that.
12      Let me ask it a little bit differently.  You
13  were employed at Bright Horizons for about six months;
14  is that right?
15   A   Right.
16   Q   And prior to your employment with Bright
17  Horizons, you did have your own business for almost nine
18  years, right?
19   A   Right.
20   Q   So is there a reason why after your six-month
21  tenure with Bright Horizons you didn't go out and
22  reconstitute your business that you had had for almost
23  nine years?
24   A   Yes.
25   Q   And what was the reason?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.       DEPOSITION OF
VANESSA SMITH, VOLUME I on 05/09/2013                                    Pages 58..61

Page 58

1     A   Financial reasons.  I didn't have funds to.
2     Q   And what were the funds that were necessary to
3   reconstitute your business?
4     A   To reconstitute that, it would have required
5   that I had to apply -- first of all, get permission from
6   a landlord to do it.  And the second thing would be I
7   would have to have had a fenced-in area for the children
8   to play in.  And the third thing would have been, I
9   would have had to go out and purchase all of the
10  materials and supplies, which could have went anywhere
11  from about $10,000 starting over.
12    Q   And what happened to all the supplies that you
13  had had prior to joining Bright Horizons?
14    A   Prior to joining Bright Horizons, what I did
15  with those supplies was I had a yard sale and I sold all
16  of those.
17    Q   Okay.  Now during the time that you operated
18  your Smith's Childcare Family Home, did anyone ever file
19  a complaint against you for child abuse?
20    A   Never.
21    Q   Did anyone ever cite you -- strike that.
22        Did anyone ever complain about the services
23  that you provided out of your Smith Childcare Family
24  Home?
25    A   Never.

Page 59

1     Q   Were you ever cited by the Department of
2   Children & Families for not being in compliance?
3     A   Never.
4     Q   So if I go back and check DCF's records going
5   back to June of 2002, to January of 2011, it's your
6   testimony that I'll find that every inspection that you
7   had from DCF was one that found no violations
8   whatsoever?
9     A   That's right.  I've never been cited.  I've
10  never had anyone call in an abuse report on me.  I've
11  never -- any of that.
12    Q   And how often would DCF come and check your
13  facility?
14    A   I had multiple inspections during the month.
15  They could come out anytime.  It wasn't just DCF.  It
16  was Polk County School Coalitions who financed the
17  program, to make sure that the children were in a
18  learning and healthy environment.  So not only did DCF
19  come out, but it was the Early Learning Coalition, as
20  well as the food program, because I was licensed to feed
21  the children healthy meals.  And so like they also came
22  out as well.  And they didn't tell you when they were
23  coming out, they would just come.
24    Q   Did any agency of any kind who regulated or
25  oversaw your operation ever cite you for any deficiency

Page 60

1   related to your operations?
2     A   No, sir.  I have certificates.
3     Q   So if I do the research, a lot of which is
4   available to the public, you're telling me and it's your
5   testimony under oath that I will find that in the
6   nine-year period that you operated Smith's Childcare
7   Family Home, that there was never any issue or problem
8   whatsoever, no citation, nada, zip, zero, involving that
9   facility?
10    A   That's correct.
11    Q   And that every inspection, no matter, whatever
12  agency was conducted, gave you a clean bill of health,
13  so to speak?
14    A   That's right.
15    Q   And in your Interrogatory answer, you listed
16  Smith's Childcare Family Home and Spherion Staffing as
17  being two employment situations that you had in the
18  five-year period leading up to your employment at Bright
19  Horizons.  Did you have any other employment at all
20  during that period?
21    A   No.
22    Q   Now, I noted that while you operated your
23  Childcare Family Home, that you also did some temporary
24  work through Spherion Staffing.  And why were you doing
25  temporary work at the same time period that you were

Page 61

1   owning your own daycare facility?
2     A   Because I was working toward a degree, and for
3   certain levels it required that you have hands-on
4   training doing certain types of jobs.  And you had to
5   have so many community hours, whether you volunteered or
6   you actually got paid to do those.
7     Q   And what degree were you working toward?
8     A   I was working toward my associates degree.
9     Q   And where were you going to achieve that?
10    A   Polk Community College.
11    Q   Is that the same thing as Polk State College?
12    A   Right, they changed names.  It was Polk
13  Community, now it's Poke State.
14    Q   And what period were you going to Polk State
15  College to attain this AA degree?
16    A   When I started doing home day care, I started
17  in 2002, so at that particular point I had to first go
18  through the certification steps towards working.  I
19  could have just went and took classes just to get a
20  degree, but I actually wanted to work and get that
21  experience while I was obtaining a degree, so I had to
22  first become certified before obtaining a degree.
23    Q   When I asked you the question in the
24  Interrogatories concerning your educational background,
25  you mentioned that you got a diploma from Mulberry High



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 62

1  School, and then you also mentioned that you attended
2  Polk State College in 2009 — excuse me, in 2006 in
3  connection with early childhood education and your
4  director credential.  I don't see anything on here
5  concerning any work toward any of the degree that you
6  just were mentioning.
7      A   The CDA, I obtained that in 2006, and that was
8  the date on the certificate.  And then I obtained my
9  directors in 2009, but I actually started the
10  certification back in 2002, which I didn't list each
11  certification, because if I had — I didn't know that
12  you wanted all the — but those classes were working
13  toward what I have listed.
14     Q   Why don't we do this, because it sounds like
15  maybe there might have been some miscommunication or
16  misunderstanding in terms of what I was asking in some
17  of these questions.  I'm going to invite you to go back
18  and look at all the Interrogatories and ask you to
19  supplement the answers to the extent that they would be
20  more complete in response to the questions that are
21  being asked.
22         For example, you talk about — you just told me
23  a few minutes ago that you did this temporary staffing
24  in 2010 in connection with some schoolwork at Polk State
25  College, right?

Page 63

1      A   Right.  In order for me to maintain my
2  director's credential and my staff credential, I have to
3  have so many training hours in a center as well as at my
4  home.  And because I was working toward getting a
5  degree, I was required to have so many training hours
6  doing — what they consider training hours is not
7  working in my own home.  It had to be outside of my
8  home.
9      Q   Right.  So I'm assuming, based on what you
10  said, that you were trying to do some schoolwork in 2010
11  because you're doing some temporary work.
12     A   Right.
13     Q   But you don't list any schoolwork on your
14  answer in 2010, and that's the question that I have.  So
15  I'm going to ask you to go back and supplement, to more
16  completely respond to the questions about your full
17  educational background.  Okay?
18     A   Okay.
19     Q   As well as whatever else I might have asked
20  you.  I don't want to sort of be surprised with any
21  information.  I would like to have any complete
22  information that you have with regard to all the
23  questions that are being asked, like the two marriages
24  you didn't list on the past marriages question.  And
25  that's sort of what I'm driving at.

Page 64

1         Let's go ahead and now talk about your
2  experiences at Bright Horizons.  You became employed in
3  January of 2011.  Is that right?
4      A   Yes.
5      Q   And who is it that interviewed you when you
6  first became employed there?
7      A   Susan Saunders.
8      Q   And what was her position at the time?
9      A   Program coordinator.
10     Q   At the time of your departure from Bright
11  Horizons in June of 2011, did her position change in any
12  way to your knowledge?
13     A   Not that I know of.
14     Q   And she was a program coordinator for which
15  Bright Horizons facilities, or for all the Bright
16  Horizons facilities, if you know?
17     A   For Citi.
18     Q   And when you say Citi, you're making reference
19  to the Citibank Center?
20     A   Right.
21     Q   And so the record is clear, where is the
22  Citibank Bright Horizons facility located?
23     A   Queens Palm Drive.
24     Q   In Tampa?
25     A   Yes.

Page 65

1      Q   And again, so that we can put this contextually
2  in its right frame, the Bright Horizons childcare
3  facility involving Citi is one that's intended to be a
4  service to Citibank employees, correct?
5      A   Right.
6      Q   So Citibank employees are the ones who
7  typically have their child or children under the care of
8  that particular Bright Horizons facility?
9      A   Yes, that's the one.
10     Q   And who, at the time you became employed in
11  January of 2011, was the director of that facility?
12     A   Linda Horner.
13     Q   Who else was in a position of management when
14  you became an employee in January of 2011?
15     A   Brenda Hayes.  Haynes or Hayes.  I think it's
16  Hayes.
17     Q   And what was her position?
18     A   She was a program coordinator.
19     Q   And you mentioned Susan Saunders before.  She
20  also was a program coordinator, right?
21     A   Right.
22     Q   For that facility?
23     A   Right.
24     Q   Any other persons in management at that
25  facility who you reported to?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 66

1  A  No, not that I know of.  Just Linda Horner.
2  Q  And you became a teacher at that facility,
3  right?
4  A  Right.
5  Q  And what was your assignment as a teacher at
6  that Bright Horizons facility?
7  A  Basically to make sure that the children were
8  in a loving, learning environment.  To assist with —
9  well, provide lesson plans and assessments on the
10 children.  And to actually create activities according
11 to Bright Horizons' policies.
12 Q  And what was your rate of pay when you became
13 employed in January of 2011?
14 A  $13 an hour.
15 Q  And what training did you receive when you
16 first became employed at the Bright Horizons Citi
17 facility?
18 A  Like new hire orientation.  I don't remember.
19 It was basically like a new hire orientation, and
20 just — I don't remember any other training.
21 Q  And how long was the training that you
22 received?
23 A  I'm not sure.
24 Q  And do you recall for what period you received
25 training before you actually started performing services

Page 67

1  at the daycare center?
2  A  Well, actually, I actually did perform
3  services.  And whenever they allowed me to go with the
4  girl that was taking me to the training room, I was
5  already performing services.  And then every so often
6  when we were — if somebody came in, then, according to
7  the availability, they would let me go for training.
8  Q  So it's your testimony that whenever you became
9  employed in early January of 2011, that you immediately
10 assumed your position as teacher, and that from time to
11 time there would be training segments or modules that
12 you would attend —
13 A  Right.
14 Q  — depending on the availability of the
15 training and the availability that had you to go?
16 A  Right.
17 Q  Okay.  Do you recall any job description that
18 you were given in connection with your role as a teacher
19 at that Bright Horizons facility?
20 A  I remember when I first started the new-hire
21 packet, there was a job description.  And then of course
22 that changed twice since I was, you know, there.
23 MR. BURRUEZO:  I'm going to go ahead and
24 have this marked as Exhibit 1.  Thank you.
25 (Defendant's Ex. 1 marked for

Page 68

1                     identification.)
2  BY MR. BURRUEZO:
3  Q  Let me show you what has been marked as Exhibit
4  Number 1, which is the teacher job description for the
5  Bright Horizons Family Solutions.  It is a four-page
6  document, and it contains a signature on the last page.
7  Let me ask you to take a moment, Ms. Smith, to look at
8  the last page, and ask you to identify that signature
9  for me.
10 A  Yes, that's my signature.
11 Q  And it's dated January 11th, 2011.  Is that
12 right?
13 A  That's correct.
14 Q  Okay.  And this is an accurate copy of the job
15 description which you received on or about January 11th,
16 2011?
17 A  I think it is.
18 Q  Okay.  And just generally — and I'm not going
19 to ask you to read everything at this point, it's really
20 not pertinent for the purposes of my question — but in
21 a general way, if you look at the job description, there
22 is a listing — there's a heading called Major Functions
23 and Responsibilities.  Do you see that?
24 A  Yes, I do.
25 Q  And underneath those major functions and

Page 69

1  responsibilities, there are also some subheadings, the
2  first one being Interaction Between Staff and Children.
3  Do you see that?
4  A  Right.
5  Q  And that section deals with the importance of
6  treating children with respect and dignity, and caring
7  for their needs in a positive way, as a general matter.
8  Is that right?
9  A  That's correct.
10 Q  Okay.  The second major heading is Curriculum,
11 which deals with the educational purposes of your role
12 as a teacher.  Is that a fair statement?
13 A  Okay.
14 Q  If you turn to the second page, there's another
15 subheading there that deals with Parent/Guardian
16 Communication, which describes those particulars about
17 the need to maintain effective communication with the
18 parents of the kids who entrust in your care.  Is
19 that right?
20 A  Yes.
21 Q  The next one deals with physical environment,
22 health, safety and nutrition, which in essences deals
23 with what it says, maintaining a safe physical and a
24 risk-free environment for the kids in their care.  Is
25 that right?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 70

1    A   Yes.

2    Q   The next section deals with professionalism,
3  and that is, the intent of which is to deal with your
4  relationship with your co-workers and to act
5  professionally in the workplace.  Is that right?

6    A   That's right.

7    Q   The next one deals with teamwork.  If you turn
8  the page to 3, which again is an indicator that it's
9  important to work with your co-workers in a teamwork
10  type of fashion to maintain a positive workplace
11  setting.  Is that correct?

12    A   Yes.

13    Q   You will agree that the items that are listed,
14  that I've just described in a summary way, and listed on
15  this teacher description that you signed in January of
16  2011, were major and important elements of your function
17  as a teacher at the Bright Horizons facility that you
18  worked at?

19    A   Yes.

20    Q   Okay.  In other words, you wouldn't suggest to
21  me in any way that it would be okay not to be a team
22  player, it would be okay to be unprofessional, it would
23  be okay to maintain poor communication with parents, or
24  that it would be okay to maintain a risky environment
25  for kids; is that right?

Page 71

1    A   Right.

2    Q   Okay.  And indeed, you would agree that when
3  you had your business, that the qualities that are
4  described in this job description are ones that are
5  important to adhere to, not only to foster the safety
6  and security of children that are entrusted in your
7  care, but to have the kind of working daycare facility
8  that parents can entrust in putting and placing their
9  kids?

10    A   That's correct.

11    Q   Now, when you started working at the Citibank
12  Center, who was the immediate co-worker that you had
13  when you worked in the particular classroom to which you
14  were assigned?

15    A   The immediate co-worker was Kristin Turner.

16    Q   Okay.  And what was the classroom that you were
17  assigned to with Ms. Turner?

18    A   It was, it was called the Infant Wing.  And we
19  had children that were like a year, but not quite two,
20  some of them just leaving another stage of infancy that
21  could walk and not quite talk yet.

22    Q   Okay.  So basically it was the wing of the
23  facility that dealt with very young infants to about
24  two-year-old children?

25    A   Right.

Page 72

1    Q   And what particular age group did you work with
2  at that time?

3    A   At that particular time, because I was still
4  doing training, I was actually floating around in all
5  the different classrooms.  But when they -- when you say
6  when they assigned me to a classroom, I was assigned
7  with, later assigned with Kristin.

8    Q   And dealing with which particular kids?

9    A   The one-year-old children, not quite able to --

10    Q   And how long did you work side by side with
11  Ms. Turner at that point?

12    A   I would say maybe -- I would say maybe two to
13  three months, if that.

14    Q   How would you describe your working
15  relationship with Ms. Turner?

16    A   We had a great working relationship.

17    Q   Any conflicts or issues between the two of you
18  while you worked side by side?

19    A   Never.

20    Q   Was there ever a time that you had any
21  differences of opinion or altercations with each other?

22    A   I didn't.  But she had with the person that was
23  taking me to training.

24    Q   Okay.  And who was that?

25    A   Maureen -- I'm not sure of her last name, but I

Page 73

1  think it's Monroe, the MM that you -- if you have that
2  training.

3    Q   So there's a co-worker named Maureen Monroe?

4    A   I think it is.

5    Q   And what particular assignment did she have at
6  the daycare facility?

7    A   I want to say she was -- I'm not sure of her
8  title.  But what she did was went around to check the
9  ratio of the classrooms and to relieve teachers to go to
10  lunch.  And she was like more of the assistant to
11  Ms. Saunders.

12    Q   And what was the issues or conflicts she had
13  with Kristin Turner, according to you?

14    A   I only witnessed one thing, and that was during
15  the time that I was being trained with Ms. Monroe.  She
16  was the one that was taking me to training and training
17  me.  We were in the classroom, and she had come in there
18  to pick up a sheet, some type of sheet that needed to be
19  signed.  And basically she had asked if Ms. Turner had
20  signed the sheet and if it was ready, and she threw the
21  sheet at her and called her the B word.

22    Q   Okay.  So it's your testimony that there was a
23  situation involving Maureen Monroe and Kristin Turner,
24  wherein Ms. Monroe called Ms. Turner a bitch?

25    A   No, Ms. Turner called Ms. Monroe the B word.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME I on 05/09/2013

DEPOSITION OF
Pages 74..77

**Page 74**

1    Q    And did that impact you in any way?
2    A    Yes.
3    Q    How did that impact you?
4    A    I was shocked.
5    Q    Did you complain to anybody at that point about
6    that encounter or experience between Ms. Turner and
7    Ms. Monroe, as you described it?
8    A    I told Ms. Saunders. And she said she would
9    take care of it.
10    Q    And when did this happen, to the best of your
11    memory?
12    A    It was in January when I first started working.
13    Q    Okay. Now when you reported this alleged
14    interaction between Ms. Monroe and Ms. Turner, nothing
15    bad happened to you, is that right?
16    A    No. Basically they all had a meeting, and I
17    don't know what was done at that.
18    Q    But it didn't involve you, it didn't concern
19    you?
20    A    No.
21    Q    Nothing bad happened to you as a result of this
22    episode involving Ms. Monroe and Ms. Turner, is that
23    correct?
24    A    No.
25    Q    Is that right?

**Page 75**

1    A    Right. Well, Ms. Monroe was the one that
2    reported it. And then when I went in to tell her, she
3    already knew about it. So she just said she already
4    knew about it and she was going to take care of it.
5    Q    So if I understand correctly, then, you were
6    not the first one to report this situation to the
7    management?
8    A    Right.
9    Q    And when you had gone in to report it, it
10    became clear to you that they already knew about it?
11    A    Right.
12    Q    Because Ms. Monroe went to report it herself?
13    A    Right.
14    Q    Are you aware of the result of any —
15    A    I have no idea.
16    Q    Here's an example of how we have to —
17    A    I'm sorry. I apologize.
18    Q    I know you knew what I was going to say, and I
19    knew what I knew I was going to say, but just for record
20    purposes, let me complete the question. Are you aware
21    of anything that resulted as related to this particular
22    incident?
23    A    I have no idea what happened.
24    Q    And it wouldn't have been appropriate for you
25    to even know how that transpired, because you were, at

**Page 76**

1    that point, not involved in any management at the
2    facility, right?
3    A    Right.
4    Q    So you would agree that it would have been
5    completely appropriate for management to handle the
6    situation and to maintain a confidence about how they
7    dealt with it and what was the result of any issues that
8    they looked into, is that right?
9    A    Definitely.
10    Q    Is that right?
11    A    Right.
12    Q    Now, do you recall an episode about three
13    months into your employment, or maybe four months into
14    your employment, where some parents reported that you
15    had left some children unattended?
16    A    I remember being accused of that.
17    Q    Okay. What do you recall about that?
18    A    Basically, after I had reported child abuse, I
19    remember being called into the office, Ms. Saunders, and
20    she told me to sit. There was a little bench by her
21    office, she said sit on this side. I was working with
22    the kids and she called me, and she had a pad in her
23    hand, and she put it up to her chest, and she said
24    follow me, go have a seat on the bench. And that's what
25    I did.

**Page 77**

1    And then while I was sitting there, she went
2    across to another office, which was Ms. Hayes' office,
3    Brenda Hayes, and they said a couple of things. And
4    then she called me over there to meet with her and
5    Mrs. Hayes.
6    Q    So it's your testimony that you were accused of
7    leaving children unattended after you made a report
8    about somebody else?
9    A    That's correct.
10    Q    And are you sure about that timeline?
11    A    Yes.
12    Q    Well, let me show you some documents that might
13    help you — help us clarify when certain things might
14    have occurred.
15    MR. BURRUEZO: Can you go ahead and mark
16    this as 2 please?
17    (Defendant's Ex. No. 2 marked for
18    identification.)
19    BY MR. BURRUEZO:
20    Q    Let me show you what has been marked as Exhibit
21    Number 2.
22    A    (Witness reviews document.)
23    Q    Have you had a chance to look at Exhibit 2,
24    Ms. Smith?
25    A    Yes.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME I on 05/09/2013

DEPOSITION OF
Pages 78..81

Page 78

1    Q   It's dated April 15th, 2011. And it involves
2    you. And the supervisor that's listed is Susan
3    Saunders. And it's an Employee Conference Memorandum
4    for Bright Horizons Family Solutions. And it involves a
5    counseling, that's what's checked on the form. And I'm
6    going to try to read it. And hopefully I'll get all the
7    words correct. And at some point, I believe
8    Ms. Saunders will be deposed, so we can ask her if my
9    reading was correct or not and consistent with her
10   writing.
11        But it says, "It was reported that on April 13
12   at about 6:00 p.m., a parent told a staff member that
13   there were three toddlers in the bathroom of Room A6
14   with no teacher."
15        Does that makes sense, Room A6?
16   A   Yes.
17   Q   "Ms. Vanessa was standing by the counter
18   outside of the changing area writing on papers. This is
19   in direct violation of policies Employee Handbook Number
20   4, leaving children unattended." Page 49. And number
21   17, unsatisfactory and inadequate job performance."
22        The next line concerning whether the employee
23   has been counseled for similar incidents, it says
24   verbally on the 28th of February, the 31st March when
25   she left a child unattended in the hallway.

Page 79

1        The corrective action listing: That Vanessa
2    needs to understand that children may never be left
3    alone and that the ratio for toddlers is one to five,
4    while the state's indicator is one to six.
5        So judging by what is written here, if you just
6    look at what is written here, on April 15th a discussion
7    was had with you about something that happened on April
8    13th concerning the allegation that you had left some
9    children unattended.
10       Do you recall the conversation you had with Ms.
11   Saunders concerning this?
12   A   Somewhat.
13   Q   And does this document — I'm not asking you
14   whether you agree with it or not — does this document
15   accurately reflect the substance of the conversation
16   that you had with Ms. Saunders?
17   A   Not really.
18   Q   Okay. And what is it about this document that
19   doesn't accurately reflect the conversation you had with
20   Ms. Saunders?
21   A   Basically, when I was called in, I didn't know
22   about this, of course, document, but I was asked by her
23   or Ms. Hayes do I remember locking kids in a bathroom.
24   Locking them. And at that point I was shocked, and I
25   said no I've never locked a child in a bathroom. And so

Page 80

1    she said do you think that you might have accidentally
2    left children in a bathroom, and I said no. I accounted
3    for all the children, and when I walked the children
4    over, I went into the room doors with them to make sure
5    that they were washing their hands.
6    Q   Okay. Was there anyone else in the classroom
7    besides you at that time?
8    A   No.
9    Q   And how many kids were in the room at that
10   time?
11   A   I would say it could have been maybe five or
12   six.
13   Q   And were you doing paperwork at that time?
14   A   During that time at the counter when I changed
15   the diaper, yes. I checked off changed diaper and the
16   time, because that's what's required.
17   Q   Okay. So the paperwork that you said you were
18   doing was —
19   A   For the —
20   Q   — filling out the report that you had changed
21   the diaper?
22   A   Right.
23   Q   All right. So what you're saying is that the
24   conversation you had with Ms. Saunders involved an
25   allegation that you had locked children in the bathroom?

Page 81

1    A   That's correct.
2    Q   Whereas this document doesn't say anything
3    about locking children in the bathroom, but rather,
4    leaving them unattended in the bathroom?
5    A   Right. That was the beginning of the
6    conversation. And then as time went on, then this
7    document was presented. As I read it, you know, it said
8    nothing about what she first brought to my attention,
9    saying that — first she said it was brought to her
10   attention that an employee said that a parent told them
11   that I had locked children in the bathroom. And she
12   changed it about three or four times. And then she said
13   well it wasn't an employee. They later changed it and
14   said well it was a parent that said that you locked
15   children in a bathroom. And I was like (indicating).
16       And during the times that they actually stated
17   that I supposedly locked children in the bathroom, there
18   was another parent in the classroom picking up his
19   daughter, and I remembered that parent because it was
20   his wife's birthday, and he normally didn't come in, but
21   for that particular day he came in a little bit earlier
22   to pick up his daughter. And she was sitting -- I had
23   already taken her in the restroom and washed her hands,
24   and she was sitting in the play area just across,
25   because the door levels are not a closed door, it's like



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME I on 05/09/2013

DEPOSITION OF
Pages 82..85

Page 82

1  a half of a door.
2        So I was standing there in the bathroom, which
3  you can see on both sides of each classroom, and I had
4  the two kids sitting in the play area right next to the
5  bathroom playing with toys.
6        Q   Okay.  So this document reflects, would you
7  agree with me, an incident that doesn't sound as serious
8  as what was reported to you when you first had the
9  conversation, that is, whether you locked children in
10 the bathroom?
11       A   Both are serious to me, because they're both
12 false allegations.
13       Q   I didn't ask you if they were false.  Okay?
14       A   Yes.
15       Q   I just simply asked you what the document says.
16 The document says something that seems to be less
17 serious than an oral statement to you, sort of
18 suggesting or saying that it was reported you had locked
19 kids in the bathroom, correct?
20       A   To me, both are serious, whether -- even though
21 she made the statement that I locked children in the
22 bathroom and they changed it around three or four times,
23 and then she gave me this that says something a little
24 bit different, it's serious.
25       Q   Okay.  So you would agree, whatever it was,

Page 83

1  whether you -- well not just you, but if anyone locked a
2  child in a bathroom, or left a child unattended, that
3  that would be a violation of policy?
4        A   That's correct.
5        Q   So putting aside that you contest the
6  legitimacy of the allegation against you, you would
7  agree that the information contained on this document,
8  on its face, is a serious violation of policy when you
9  leave kids unattended?
10       A   That's correct.
11       Q   Okay.  And do you recall any discussions you
12 had on the 28th of February and the 31st of March
13 concerning your leaving children unattended in the
14 hallway?
15       A   Do I recall any discussions that I had?
16       Q   Right.
17       A   I remember writing a letter to the director in
18 reference to it.
19       Q   Okay.  I'm talking about specifically the
20 incidents that are described on this form.  You had
21 verbal counselings, according to this, on February 28th
22 and March 31st, concerning similar issues with involving
23 children unattended.
24       A   Never.  I was never counseled on the 28th, and
25 I was never counseled on the 31st.  That was my --

Page 84

1        Q   Well it says that you were verbally informed
2  and counseled concerning this.  Do you recall any
3  discussions that weren't memorialized in writing?
4        A   No.
5        Q   Is it possible that it happened but you just
6  don't have a memory of it?
7        A   No.
8        Q   And if you had had discussions, would they have
9  been with Brenda Hayes, with Susan Saunders, or someone
10 else?
11       A   Well, Mrs. Hayes, at this particular point, she
12 was the assistant director.  She was no longer a program
13 coordinator.  And so had that happened, I believe I
14 would have had to meet with them both, or whoever my
15 supervisor was.
16       Q   Okay.  What about Linda Horner, would you have
17 met with Linda Horner concerning any similar violations?
18       A   If she was there, yes.  The reason why Mrs.
19 Hayes was there was because Mrs. Horner wasn't there.
20       Q   Now you'll see that on this form, Exhibit
21 Number 2, it says:  Possible sequence of actions are not
22 taken.  Further counsel, reprimand, termination.
23            And you saw that?
24       A   Yes, I saw that.
25       Q   Now there is a section that says Employee

Page 85

1  Comments.  Is that your handwriting there?
2        A   Yes, it is.
3        Q   And those are your initials, VS, at the end of
4  it?
5        A   Yes.
6        Q   Okay.  Now in your Employee Comments, there's
7  nothing in there that says, and by the way, I was never
8  counseled on February 28th or March 31st, does it?
9        A   When I wrote "unaware of any such incident" and
10 "that I was falsely accused", "I know never
11 intentionally to leave a child alone in a restroom or
12 anywhere", that was for this whole thing.  I never
13 noticed -- I never just picked out these other dates.  I
14 asked her when we were talking --
15       Q   Right.  And that's my question.  I'm saying in
16 your Employee Comments it says nothing about never being
17 counseled on the 28th or the 31st, does it?
18       A   No.
19       Q   Okay.  And you will agree -- and again, I
20 understand you disagree with it and feel like it never
21 happened -- but you'll agree that it's the
22 responsibility of a daycare center's management to
23 address issues that are reported to them and the
24 employees who are accused of doing them, correct?
25       A   That's correct.


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 41   Filed 06/28/13   Page 24 of 25 PageID 801

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.      DEPOSITION OF
VANESSA SMITH, VOLUME I on 05/09/2013                                    Pages 86..89

Page 86

1    Q   And if they didn't address and document these
2  issues, they would be in violation of regulations,
3  governmental regulations, that require the
4  memorialization and documentation of incidents of this
5  kind?
6    A   That's correct.
7    Q   And you know that, because you operated your
8  own daycare center and knew that if you didn't document
9  things that had happened, that you could put at risk
10 your license to run a daycare facility, correct?
11   A   Yes.
12   Q   And in fact, when you ran a daycare center for
13 nearly nine years, I'm sure there were instances where
14 you documented allegations that were being made by or
15 against other teachers or workers in the facility,
16 correct?
17   A   Yes.
18   Q   And that would be part of the file that you
19 would present to DCF or any other administrative agency
20 who would come and investigate and review your daycare
21 facility, right?
22   A   That's correct.
23   Q   So again, putting aside for the moment of
24 whether you agree or disagree with what's said here, you
25 agree that what was done here in terms of documentation

Page 87

1  was exactly what was legally required of Bright Horizons
2  to do when something is called to their attention,
3  right?
4    A   No, not fully.
5    Q   Okay.  And what part of that do you disagree
6  with?
7    A   Well, I disagree with this because, basically,
8  none of this happened.  But when I look at the dates,
9  February 28th, according to what you were saying as far
10 as my business and with the state, you don't verbally
11 counsel anyone, you have to document.  You have the
12 teacher write a report saying what happened if there's
13 an incident or an accident.  And the teacher has to sign
14 that, not -- and then the supervisor signs it, and you
15 get a copy of it, and they put it in a file.  And when
16 the state comes out, you have incident/accident reports,
17 whether it's from the teachers or the children, or both.
18   Q   Okay.  So what you're saying, if I correctly
19 understand you, and correct me if I'm wrong if I'm not
20 articulating what you just said accurately, what you're
21 saying is that in this case Bright Horizons didn't
22 document enough?  That if it's true that someone made a
23 claim against you on the 28th of February and on the
24 31st of March, that those two incidents likewise should
25 have been documented in writing?

Page 88

1    A   Right.  As far as the state is -- as far as my
2  business was concerned, and the license that I have with
3  the state of Florida, if I left a child unattended, it
4  is to be documented, and I have to sign that document,
5  or I have to write an incident.  If I say no this didn't
6  happen, this is what happened, I'm supposed to write a
7  report.  And I sign that report, give it to my
8  supervisor, they make a copy, give it to me, and there's
9  a file that's kept in accident reports and incident
10 reports.
11   Q   So what you're saying is if these events
12 occurred on the 28th of February and the 31st of March,
13 that at this point, as of April 15th, 2011, there should
14 have been three written documents concerning allegations
15 you had left children unattended?
16   A   Right, with my initials or signature on them.
17   Q   Okay.  But that being said, there's nothing
18 inherently inappropriate, in fact, it's required that
19 this documentation be made when these allegations are
20 made, correct?
21   A   Well, it's inappropriate to list dates on here
22 that I had no idea of anything happening on these dates.
23   Q   Okay.  Well, let me restate it different.
24   A   And I never -- I'm sorry.
25   Q   That's okay.  Let me sort of ask the question

Page 89

1  differently, because we covered that piece.  I  just
2  wanted to say, with regard to the allegations of April
3  13 that were documented on April 15 of 2011, you would
4  agree that the documentation of that was appropriate?
5    A   No, sir, not according to the state policy,
6  state laws for day care.
7    Q   Okay, let me restate my question because I'm
8  not sure that you understood it, or we were not
9  communicating.
10       Putting aside the February 28th and March 31st
11 situations, which we've already discussed, okay, putting
12 that aside for a minute, you agree that the issue that
13 was raised to you on April 15 was appropriately
14 documented, whether you agree with it or not?
15   A   No, sir.
16   Q   Okay.  Why wasn't it appropriately documented?
17   A   Well, when we refer back to my day care that
18 was licensed through the state of Florida, I was
19 required to, when the incident happens, you don't leave
20 and wait two days later, you document -- if you have to
21 stay late, it has to be documented, and the teacher has
22 to write a report, and that report is signed by the
23 person that's responding.
24       If she said that, for instance, a parent came
25 in on the 13th, well on the 13th, no matter what time it


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 90

1   was, if I was there -- I had to be there in order for
2   the parent to say that.  So basically I would have had
3   to write a report not knowing that this parent made this
4   accusation of what happened in that classroom on the
5   13th, sign it, and it goes into an incident report.
6       Q   Right.  But you don't know when it was reported
7   to Ms. Saunders or Ms. Hayes, right?
8       A   Right.
9       Q   It's possible that it wasn't until the 15th
10  that a co-worker of yours who had talked to the parent
11  went to Ms. Saunders and Brenda Hayes to report what had
12  happened to days later?
13      A   Right.
14      Q   That's a possibility, right?
15      A   Right.
16      Q   So if that's the case, if we assume for
17  purposes of this question that Ms. Saunders and
18  Ms. Hayes were not aware of what happened on the 13th
19  until the 15th, they're going to document the first
20  instance when they learned of it, right?
21      A   Right.
22      Q   Is that right?  Is that fair?
23      A   Yes.
24      Q   So if you assume that for purposes of the
25  question, you would then say it would be appropriate for

Page 91

1   them to document what had happened in connection with
2   that event whenever they learned of it?
3       A   When they learned of it, yes.
4       Q   All right.  And I realize it's noontime, so
5   I'll be breaking pretty soon.  But I want to sort of
6   maybe button down one issue and then we can take a
7   break.
8           Now you said that you reported an issue to
9   Bright Horizons in around the same time, correct?
10      A   I think so.
11      Q   And what was it that you reported and to whom?
12      A   I think that's when I reported the child abuse.
13      Q   And what child abuse is that?
14      A   Kristin Turner, when she was inappropriately
15  slinging the children onto their nap carts and shoving
16  them with her foot, their chairs to the tables, where
17  their chests were caving in, and just cursing and
18  carrying on.
19      Q   And what did you report and to whom, at what
20  time?
21      A   When I was -- I called and Mrs. Horner didn't
22  answer her phone, and --
23      Q   Okay.  When was this?  What day?
24      A   I don't know the exact date.  I don't have
25  anything in front of me.

Page 92

1       Q   Okay.  So is it your testimony, as you sit here
2   today, that you're not certain as to when this event
3   involving child abuse with Ms. Turner occurred?
4       A   According to -- because it's been what, two
5   years almost, I don't know the exact date and time of
6   all of that information.  But when it happened, I do
7   remember what happened.
8       Q   Okay.  So I just want to focus right now -- and
9   I do want to hear the details of what you claim
10  occurred -- but I want to focus on what it is that you
11  reported to Bright Horizons in a situation involving
12  Kristin Turner.  And if your answer is I don't remember,
13  that's fine.
14      A   When did I -- what date did I actually report
15  it?
16      Q   Correct.  What date, what month, day and year
17  did you report a problem involving Kristin Turner to
18  Bright Horizons?
19      A   It was earlier, I want to say earlier during
20  the day when Mrs. Horner was there.
21      Q   Of April 15th, is what you're saying?
22      A   Yes, right.  I think it was -- just as I was
23  relieved to go to lunch.
24      MR. BURRUEZO:  All right.  Well let's go
25  ahead and take our lunch break.

Page 93

1   (Lunch break at 12:10; deposition resumed
2   at 12:50 p.m.)
3   (Conclusion of Volume I.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com