In the Matter Of:

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.

---

## DEPOSITION OF

## VANESSA SMITH, VOLUME II

*May 09, 2013*

---



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150

```
 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                     TAMPA DIVISION

 3
      JANICE NORMAN and
 4    VANESSA SMITH,

 5         Plaintiffs,

 6    vs.                        CASE NO.:  8:12-cv-01301-EAK-TBM

 7    BRIGHT HORIZONS FAMILY
      SOLUTIONS, LLC, d/b/a
 8    BRIGHT HORIZONS
      CHILDREN'S CENTERS,
 9
           Defendant.
10    _____/

11

12                DEPOSITION OF VANESSA SMITH
                          VOLUME II
13

14    DATE:            Thursday, May 9, 2013

15    TIME:            12:54 p.m. - 4:35 p.m.

16    PLACE:           Office of Florida Roebig, P.A.
                       2101 West Platt Street
17                     Tampa, Florida 33606
                       813-855-1037
18

19    Reported by:
      DISCOVERY LITIGATION SERVICES, LLC
20    321-710-2150
      www.discoverylit.com
21
      Fransesca St. John,
22    Court Reporter

23    JOB NO.:  7744

24

25
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

**Page 95**

1  A P P E A R A N C E S
2  FOR THE PLAINTIFFS:
3      GREGORY A. OWENS, ESQ.
       Florin Roebig, P.A.
       777 Alderman Road
4      Palm Harbor, Florida 34683
       800-226-6581
5      greg@florinroebig.com
6
7  FOR THE DEFENDANT:
8      CARLOS J. BURRUEZO, ESQ.
       Littler Mendelson, P.C.
9      111 North Magnolia Avenue, Suite 1250
       Orlando, Florida 32801
10     407-393-2900
       cburruezo@littler.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 96**

1              I N D E X
2  TESTIMONY OF VANESSA SMITH
3                                          PAGE
4  Examination by Mr. Burruezo                4
5  Certificate of Oath                      234
6  Certificate of Reporter                  235
7
8              E X H I B I T S
9  NO.  DESCRIPTION                         PAGE
10  3   Complaint documentation form - 4/18/11   118
11  4   Complaint documentation form - 4/20/11   120
12  5   Investigative Summary - 2011-090861-01   125
13  6   Complaint documentation form - 6 pages   130
14  7   Citibank Family Center - 4/25/2011       132
15  8   Wackenhut Incident Report                139
16  9   Letter dated May 2, 2011 to Ms. Horner   140
17  10  Bright Horizons Job Description          154
18  11  Correspondence dated June 16, 2011       158
19  12  Action Plan dated June 17, 2011          163
20  13  Employee conference memo dated 6/17/2011 168
21  14  Statement/Lukas B. dated June 17, 201    173
22  15  Correspondence dated June 20, 2011       176
23  16  Administrative Leave Memorandum          177
24  17  Complaint dated May 3, 2011              179
25  18  Termination memorandum                   193

**Page 97**

1             VANESSA SMITH - VOLUME II
2              EXAMINATION (Continued)
3       MR. BURRUEZO:  All right.  Welcome back from
4  your lunch break.
5  BY MR. BURRUEZO:
6       Q   And I wanted to sort of pick up the
7  conversation where we left off, Ms. Smith.  And we were
8  talking about the complaint which you raised concerning
9  Kristin Turner.  Do you recall that?
10      A   Yes.
11      Q   And you said that you raised that issue the
12 morning of, or before noon, I think is what you said.
13      A   It was during lunch time.
14      Q   At lunch time on the 15th of April of 2011.  Is
15 that right?
16      A   Right, that's correct.
17      Q   And what did you raise at that time, and to
18 whom?
19      A   Well, I called Mrs. Horner, because from the
20 classroom I wasn't allowed -- we weren't within
21 limitations to leave because the ratio, it was only two
22 teachers, and we had 10 children, so nobody could leave
23 the classroom.  And I called Ms. Horner.  I called
24 several other people to come and relieve me, and I
25 didn't get an answer.  And so when it was time for my

**Page 98**

1  lunch break, I got relief and I went straight to Mrs.
2  Horner's office.
3       Q   Okay.  So what time was that?
4       A   Now I'm not sure about the time.
5       Q   What would have been your normal lunch period?
6       A   It wasn't.  Because sometimes I worked 14 hours
7  and they said go take a two-hour lunch break, or go take
8  a three-hour lunch break, or go clock out.
9       Q   Okay.  So on this particular day, April 15,
10 2011, you don't specifically remember when your lunch
11 break was, is that right?
12      A   No, I don't.
13      Q   Do you have any records in your possession that
14 would show when it was that you took your lunch period
15 on that day?
16      A   Not that I know of.
17      Q   And when you say lunch period, it doesn't
18 necessarily mean at 12:00?
19      A   No.
20      Q   It could have been 11:00?  It could have been
21 2:00?  It could have been 4:00?  It could have been
22 whenever it was that you had your meal break?
23      A   Right.  Lunches normally started around 11:00
24 until like 2:00 or 3:00 in the evening.
25      Q   Okay.  And so on this particular day, April 15,



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

**Page 99**

1  2011, you don't have any specific memory or have any
2  documents in your possession that would help us identify
3  when it was specifically when your lunch break was and
4  when you went to go speak to Ms. Horner, is that right?
5       A   That's correct.
6       Q   Who was at the meeting with Ms. Horner and you
7  when you raised this issue concerning Ms. Turner?
8       A   She was in her office, and it was just the both
9  of us.
10      Q   Both of whom?
11      A   Myself and Ms. Horner, I'm sorry.
12      Q   Okay.  Did Janice Norman also go with you into
13  this meeting?
14      A   No.  At that time I didn't really know -- I
15  didn't know -- I didn't know she was aware.  All she did
16  was she came and relieved different people for lunch
17  breaks and restroom breaks.
18      Q   And what did you tell Ms. Horner at that time?
19      A   When I went into her office, I told her that I
20  was witnessing Kristin abusing children.  And she asked
21  me what was she doing.  And I told her, I says well she
22  was slinging kids on their nap cots because they
23  wouldn't stay on their nap cot, they wouldn't take a
24  nap.
25           And prior to that it was their lunch period,

**Page 100**

1  and she was slinging their food on the table, and if it
2  fell, if food fell on the floor, she'd pick it up off
3  the floor and throw it back on the plate.  And when the
4  kids refused to stay seated in their chairs, she'd take
5  her foot and slam them in the chair, but she slammed the
6  back of the chair up with their chests caved into the
7  table.
8       Q   And so were you alarmed by what you witnessed?
9       A   Was I alarmed?  Yes.  I talked to her several
10  times.  I said if you're having a -- because she was
11  cursing and carrying on, and obviously something was
12  going on with her that morning.  And I told her, I said
13  if, you know, something's going on with you, why don't
14  you call and see if you can go home, because, you know,
15  you shouldn't do that.  And like three or four times I
16  kept saying to her over and over be careful how you
17  handle the kids or whatever you're going through.  And
18  it got -- it went from bad to worse.
19      Q   And so that caused you to go to Ms. Horner?
20      A   Correct.
21      Q   And how long did your meeting with Ms. Horner
22  last?
23      A   I don't know if it was maybe 15 minutes or
24  less.
25      Q   And what did Ms. Horner say, if anything, in

**Page 101**

1  response to what you were reporting to her?
2       A   She told me, basically, that she was going to
3  take care of it, and she was going to go ahead and do
4  what was necessary to get it taken care of.  Then she
5  said go on and go to lunch.
6       Q   Okay.  And so you then went to lunch?
7       A   Yes.
8       Q   Did anything else happen in connection with
9  this issue for the remainder of the day?
10      A   From that point, when I came back from lunch,
11  instead of going into the classroom, they had me go into
12  what they call the Commons with another class.  And I
13  was there watching the children.  And then she later
14  called me back and she said that she would have me
15  document, you know, what happened.  And I told her, I
16  said okay.  She asked me was I willing to do that, and I
17  said yes.
18      Q   And did you document it?
19      A   When I went back in her office, it turned out
20  to be something else.  She told me that basically she
21  was going to make the call, and before she made the call
22  she wanted to talk to Kristin one on one, and she wanted
23  to meet with the supervisor and some of the other people
24  to find out, you know, what their version of it was.
25      Q   Before she made what call?

**Page 102**

1       A   To report child abuse.
2       Q   And so, let me go back to the question that I
3  asked that I'm not sure you answered.  And that was:
4  Did you document anything?
5       A   No, I never did.
6       Q   Okay.  So with regard to this significant event
7  that you witnessed, is it fair to say that you never
8  memorialized in writing and sent it to Linda Horner or
9  anybody else at Bright Horizons concerning the things
10  that you saw, is that right?
11      A   She told me I didn't need to.  But after the
12  fact, I did call DCF and report it.
13      Q   Okay, I just want you to stick to my question.
14  I'm going to ask you follow-up questions on these
15  issues, but I just want you to sort of narrowly focus on
16  the question that I've asked.  Because I know that you
17  followed up and you went to DCF and you did some other
18  things.  I'm aware of that.  And we'll talk about that
19  in a few moments.
20      A   Okay.
21      Q   But my question was:  Is if fair to say that on
22  this instance with regard to what you observed
23  Ms. Turner do, you didn't document in writing what you
24  had observed, is that right?
25      A   Right.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 103

1    Q   And are you aware of any call that Linda Horner
2  might have made to DCF or any other agency concerning
3  this report of abuse that you raised with her?
4    A   No, I'm not.  She told me that she was going to
5  take care of it.  She was going to talk to Kristin first
6  and the other supervisor on our wing, and that she would
7  get back with me.
8    Q   Okay.  So what else happened that day in
9  connection with this issue as far as your involvement?
10    A   As far as my involvement, basically they sent
11  me to another classroom.  And in that classroom, we were
12  going to the Commons.  So I went back to work.
13    Q   Okay.  And then you just at the end of the day
14  clocked out and left?
15    A   No.  At the end of the day is when I was in the
16  Commons working around, I think it was 4:00, and Ms. Sue
17  came, and that's when she called me down to her office.
18  And she had a clipboard, I guess to her chest, and
19  basically -- I was in the commons -- and I did see
20  Kristin that day, I have to take that back.  I seen her
21  in the Commons.
22         And she was in the Commons, I was in the
23  Commons with a different class, and she was bypassing.
24  And she made a comment, you know.  She was just
25  giggling, and she looked at me and she was like I'm not

Page 104

1  worried about anything.
2    Q   Let's go back to your story.  You, then, before
3  the end of the day met with Ms. Saunders?
4    A   Right.
5    Q   And also Brenda Hayes?
6    A   Right.
7    Q   Concerning what we discussed earlier involving
8  Exhibit 2?
9    A   That's correct.
10    Q   All right.  So it's your testimony that you
11  went to them around lunchtime whenever that was, you
12  then went back to work to report the issue involving
13  Kristin, you then went back to work at the Commons, and
14  later in the day before you were to leave you were
15  approached by Ms. Saunders and Ms. Hayes about Exhibit
16  Number 2?
17    A   Right.
18    Q   Now was there any discussion that you had with
19  either Ms. Saunders or Ms. Hayes concerning the issue
20  that you observed related to Ms. Turner?
21    A   No.  That's why I said I was really shocked
22  when they -- because when she called me into their
23  office, I thought maybe that's why they were calling me,
24  you know, to further discuss or give me that time that I
25  needed to write that report.  But that's not what it

Page 105

1  was about.
2    Q   And you're not aware of any discussion that
3  Ms. Horner might have had with either Ms. Hayes or
4  Ms. Saunders concerning what you reported involving
5  Ms. Turner, right?
6    A   No, I'm not aware of anything.
7    Q   So other than your own speculation, if you
8  will, there's no factual connection that you can draw
9  between the complaint that you raised to Ms. Horner
10  involving Ms. Turner, and the discussion that
11  Ms. Saunders and Ms. Hayes had with you about Exhibit 2,
12  is that right?
13    A   Could you repeat that?  I'm sorry.
14    Q   Sure.  Other than your own belief or
15  speculation that there might be a connection, you really
16  can't draw a connection between your complaint involving
17  Ms. Turner and the discussion you had with Ms. Saunders
18  and Ms. Hayes concerning Exhibit 2; is that right?
19    A   The timing of it all.  I just reported to the
20  director who was in her office before I went to lunch of
21  child abuse.
22    Q   But again, putting aside any timing issues or
23  any speculation on your part -- let me back up.  You're
24  not aware that Ms. Horner ever told Ms. Saunders or
25  Ms. Hayes about the issues you raised with Ms. Turner,

Page 106

1  right?
2    A   Right.  But she told me that she was going to
3  talk to the supervisor.
4    Q   That's not my question.
5    A   Okay, no.
6    Q   My question is:  You're not aware of any
7  discussion Ms. Horner had with either Ms. Saunders or
8  Ms. Hayes, correct?
9    A   No, I'm not.
10    Q   Okay.  So you don't know whether or not by the
11  time that Ms. Saunders and Ms. Hayes had had a
12  conversation with you, whether they knew anything
13  involving the allegations you raised about Ms. Turner,
14  right?
15    A   Right.
16    Q   The only people would know that -- and I guess
17  they'll be asked at some point -- the only people who
18  would know whether they had knowledge of the Ms. Turner
19  issue at the time they came to talk to you, would be
20  Ms. Saunders, Ms. Hayes and Ms. Turner, right?
21    A   Well, let me say this.  I was never allowed to
22  put the information that she asked me in writing on the
23  Bright Horizons form, because she said let me first
24  speak with the supervisor, who was Ms. Saunders, and let
25  me speak with Mrs. Turner, and then what we'll do is,



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME II on 05/09/2013

DEPOSITION OF
Pages 107..110

Page 107

1  after I speak with them, I'll allow you to give me your
2  report in writing. And she said I'll take care of it.
3      Q  Yeah, but that wasn't my question. I really
4  want us to be able to communicate as effectively as
5  possible. I know it's been a long — it's now, you
6  know, past lunchtime, you haven't had much sleep, but I
7  really need you to focus on my question. And I'm going
8  to give you all the chances in the world to say whatever
9  you want to say. And your counsel will also have a
10  chance to ask you questions at the end of the
11  deposition. But I really need you to focus on my
12  question and answer my question.
13          My question is: You're not aware of any
14  conversation between Ms. Horner, Ms. Saunders and
15  Ms. Hayes —
16      A  No.
17      Q  — concerning anything you raised with
18  Ms. Horner involving Ms. Turner?
19      A  No, I'm not.
20      Q  Okay. So by the time that Ms. Saunders and
21  Ms. Hayes came to speak with you about Exhibit 2, you
22  don't know whether they knew anything involving
23  Ms. Turner that you raised, is that right?
24      A  Right.
25      Q  So the only connection that you draw between

Page 108

1  your complaint at lunchtime, whenever that was, and the
2  conversation you had with Ms. Saunders and Ms. Hayes
3  about Exhibit 2, is timing? That is, you went,
4  according to you, to Ms. Horner first, later in the day,
5  Ms. Saunders and Ms. Hayes come to you about Exhibit 2,
6  right?
7      A  Right.
8      Q  But it would be complete speculation on your
9  part whether or not Ms. Saunders and Ms. Hayes had any
10  knowledge of any claims involving Ms. Turner at that
11  point, right?
12      A  Well, yes.
13      Q  Okay. And in fact, in the conversation you had
14  with Ms. Saunders and Ms. Hayes concerning Exhibit 2,
15  Ms. Horner was not involved in that meeting, was she?
16      A  No. She had left.
17      Q  Okay. So when you factually kind of look at
18  this, you reported the situation concerning Ms. Turner
19  to Ms. Horner?
20      A  Right.
21      Q  And the issue that they raised with you was
22  between Ms. Saunders and Hayes and you, not involving
23  either Ms. Turner or Ms. Horner, correct?
24      A  Correct.
25      Q  All right. Then it would be complete

Page 109

1  speculation, or at least you're speculating that the
2  Exhibit 2 that you were given, and the conversation you
3  had concerning Exhibit 2, was in response to any
4  complaint you raised involving Ms. Turner; is that
5  right?
6      A  Not really.
7      Q  Well, what facts do you have to support it
8  besides timing?
9      A  Basically, I wasn't given the form to fill out.
10  And I was still waiting on her to complete her —
11  whatever she said she had to do before she wanted me to
12  write the report. And I can't write a report while
13  we're watching kids. Somebody has to relieve me to
14  write that report.
15      Q  Okay. But that doesn't really answer the
16  question. I'm saying, it would be speculation for you
17  to draw a connection between these two events, except
18  for timing?
19      A  Well, because it wasn't true. So that's pretty
20  much why I figured out of all the things that had
21  happened during the course of the day, and all of a
22  sudden I'm getting documented for something that's not
23  true, I can only believe that it was because I reported
24  child abuse.
25      Q  Well, again, that's based on speculation. And

Page 110

1  let's sort of dissect this a little bit. I understand
2  and appreciate you don't agree with what's written on
3  Exhibit 2. You deny that these events ever happened,
4  right?
5      A  Right. And by law —
6      Q  Hang on a minute, let me ask the question.
7          The document on Exhibit 2, if you want to look
8  at it, starts by saying it was reported that on April 13
9  at about 6:00 p.m. a parent told a staff member that
10  there were three toddlers in the bathroom of Room A6
11  with no teacher. Okay, they're not saying you did this,
12  they're saying it was reported that you did this?
13  There's a difference there, isn't there?
14      A  Right.
15      Q  Okay. So they documented it. And you agreed
16  with me earlier they had an obligation to document this.
17  They're documenting something that was reported to them;
18  isn't that right?
19      A  That's correct.
20      Q  They're not documenting something that they
21  themselves observed and said actually happened, are
22  they?
23      A  Right.
24      Q  Okay. So whether or not you believe this to be
25  true, or whether or not you contest whether this


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 111

1  happened, it doesn't matter for the question that I'm
2  asking. Because what I'm asking is, except for the
3  issue of timing, that is, one happening before the
4  other, you're drawing a connection between your
5  complaint and Exhibit 2 based on speculation, that one
6  was connected with the other; isn't that right?
7       A  Well, when she called me in, she didn't give me
8  this form. She had the clipboard still like this
9  sitting in the chair when I was in the office with Mrs.
10  Horner — not Ms. Horner, Ms. Hayes and Ms. Saunders was
11  sitting next to me. And she said the reason they called
12  me -- they started asking me questions about do you
13  remember locking a kid or leaving a kid in the bathroom.
14  They first said I locked a kid in the bathroom. That's
15  what Ms. Saunders said. Locked a kid in the bathroom.
16       Q  Yeah, we're not talking about that.
17       A  And she said a teacher told her, and then she
18  said a parent said. And it went from locking a kid in
19  the bathroom to this (indicating).
20       Q  Yeah, we're not really talking about that.
21  We've talked about Exhibit 2 already. We've talked
22  about the meeting you had. We've talked about the
23  things they said to you versus the things they wrote
24  down. We've explored that in detail. My question's a
25  little bit different from that. My question's not what

Page 112

1  they said to you or what was reported on the documented.
2       My question was: The only connection you draw
3  between your complaint involving Ms. Turner and Exhibit
4  2 is that timing; that is, that one happened before the
5  other, right?
6       A  Right.
7       Q  There's no other connection that you're aware
8  of. You're not aware that Ms. Horner had a conversation
9  with Ms. Saunders or Ms. Hayes. You're not aware that
10  anybody had any conversation with Ms. Turner concerning
11  what you reported to Ms. Horner. You're not aware of
12  any of those things?
13       A  That's right.
14       Q  So the only connection is the timing issue that
15  you've described for me?
16       A  Right.
17       Q  And there's no other basis that you're aware of
18  that connects these two events; is that right?
19       A  Right. Other than this being falsely accused
20  of something.
21       Q  Right. And you've told me about that already.
22       Now, in connection with this Exhibit 2 that we
23  discussed, it was a counseling, you certainly wrote your
24  opinion that you believed it was false. You've told me
25  here today that you believe it's false. At this point,

Page 113

1  you didn't lose any pay; is that right?
2       A  No, I didn't.
3       Q  You didn't lose any benefits, correct?
4       A  Right.
5       Q  You weren't demoted in any respect, were you?
6       A  No, not because of that.
7       Q  Okay. And you didn't suffer any other job
8  consequence based solely on what was discussed with you
9  on Exhibit 2, did you?
10       A  Being threatened, almost like I'm going to be
11  terminated for something that never happened.
12       Q  But that didn't happen. You were not
13  terminated, were you?
14       A  No.
15       Q  And the next day on April 16 you came to work,
16  or whenever it was that you reported the next day,
17  right?
18       A  Right.
19       Q  So you didn't suffer any job consequence as a
20  result of what was reported to you on April 15, 2011,
21  did you?
22       A  I was a little bit stressed out behind this
23  because the various supervisors that always, you know,
24  commented to me, were now — here I had a false — a
25  couple of false accusations against me.

Page 114

1       Q  That wasn't my question. Okay? I didn't ask
2  if you were stressed. Respectfully, I didn't ask if you
3  were stressed. I asked whether you suffered any job
4  consequence at the moment or shortly thereafter Exhibit
5  2 being given to you?
6       A  Not at the moment.
7       Q  Okay. And I understand your theory, that
8  ultimately you were let go in June and all these things
9  are connected. I completely understand that, but my
10  question is more narrow. There was nothing that
11  happened to you immediately because it was written on
12  Exhibit 2?
13       A  Right.
14       Q  Did you hear anything further from any Bright
15  Horizons management concerning your claims against
16  Ms. Turner after you reported Ms. Turner to Ms. Horner
17  on April 15th during your lunch break?
18       A  No, that was it. That's why I thought when she
19  called me, that's what they were calling me, to give me
20  that time to write that report.
21       Q  So you heard nothing further from any Bright
22  Horizons management team, Ms. Horner or anybody else
23  concerning your claims against Ms. Turner on the 15th of
24  April, on 16th of April, on the 17th of April, on the
25  18th of April? There was never another word spoken to


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME II on 05/09/2013

DEPOSITION OF
Pages 115..118

Page 115

1  you about what you raised involving Ms. Turner; is that
2  right?
3      A  Until I called DCF.
4      Q  Okay.  But what I'm saying is, no direct
5  communication between you and Bright Horizons involving
6  the allegations of Ms. Turner?
7      A  No, that was it.
8      Q  Okay.  And you never memorialized in writing
9  anything involving the child abuse that you observed,
10  did you?
11      A  No.  Because once I called and reported it, I
12  didn't have to write it.
13      Q  Okay.  But again, that wasn't my question.  My
14  question was:  You never put anything in writing to
15  Bright Horizons about what you observed, did you?
16      A  They refused to give me their form which is
17  required for documenting, and the times that I needed to
18  document.
19      Q  But you never wrote a memo or an email or a
20  letter of any kind, did you?
21      A  No.
22      Q  And you could have, right?
23      A  But I trusted that when I told the director
24  that she was going to — she said give her time, she was
25  going to call the other supervisor and Mrs. Turner, and

Page 116

1  she was going to talk to them first, and she was going
2  to take care of it.
3      Q  But you wrote a memo — after you got Exhibit
4  Number 2, you drafted a memo and sent it to Bright
5  Horizons management contesting legitimacy of Exhibit 2,
6  didn't you?
7      A  Yes.
8      Q  And you sent it to them contesting that this
9  was inappropriately given to you; isn't that right?
10      A  Right.
11      Q  In fact, on April 20th, you drafted a memo that
12  you sent to Linda Horner with a CC to Susan Saunders
13  concerning what you believed to be an inappropriate
14  giving to you a counseling report?
15      A  That's correct.
16      Q  And you never wrote something similar in
17  writing concerning significant child abuse that you say
18  you observed, did you?
19      A  No.  I called DCF hotline after I reported it
20  to my supervisor.  Which that's what they say their
21  procedure was, to report it to your director or to a
22  supervisor first.
23      Q  So you called DCF hotline.  Do you recall when?
24      A  I don't remember the exact date, but I do know
25  that I did give them time to look into it.  And I never

Page 117

1  got — I asked for the reports so that I could write it,
2  but I was refused.  They said we'll get to it, and they
3  never did.
4      Q  Okay.  Now, documentation shows that you
5  reported it on April 18th, 2011 at 2:30 in the
6  afternoon.  Does that sound familiar to you?
7      A  Yes.
8      Q  And the time that you said the incident
9  occurred was April 15th at 11:00 in the morning.  Does
10  that seem accurate?
11      A  Yes.
12      Q  And do you recall what it is that you reported
13  to DCF on the 18th of April of 2011?
14      A  When I called in, basically DCF said that there
15  had already been a call.  So I was like the second call.
16      Q  That wasn't my question.  My question was:  Do
17  you recall what you reported to DCF on April the 18th of
18  2011?
19      A  Yes.  The same thing I told Mrs. Horner, that
20  Kristin Turner was abusing children.  And they asked me
21  exactly to tell them or describe what she did, and
22  that's what I described.
23      Q  Well let me show you —
24          MR. BURRUEZO:  I'll have this marked as
25  Exhibit Number 3, the Intake Form of DCF

Page 118

1  concerning this particular event, your report.
2          (Defendant's Ex. No. 3 marked for
3          identification.)
4  BY MR. BURRUEZO:
5      Q  Okay, here's Exhibit 3.  This is the Department
6  of Children & Families' Intake Report of April 18th of
7  2011 at 2:30.  If you look in the middle of the page
8  where it says Details of Complaint, Concerns, there are
9  three things that are listed there.  Is there anything
10  there about child abuse?
11      A  This is not the report that I made.  This is
12  Child Care Licensing.  And that's two different —
13  they're up under Department of Children & Families, but
14  DCF investigator was Krisita Edwards.  I called in DCF
15  1-800 child abuse hotline, not — the Child Care
16  Licensing was for the problem with the license with the
17  facility, not with the reporting abuse to the children.
18      Q  Well, irrespective of the division of DCF, is
19  there anything in here about child abuse that you
20  reported on April the 18th of 2011 to DCF?
21      A  No.  Because this person — let's see — Vernon
22  Kilpatrick is a licensing agent.  He's not a DCF child
23  abuse investigator.
24      Q  That's not my question.
25      A  Okay.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME II on 05/09/2013

DEPOSITION OF
Pages 119..122

Page 119

1    Q   Let's focus again on the question. I know it's
2  been a long day so far. Is there anything in the
3  details of the complaint or concerns that are in this
4  form, this DCF form, that says anything about child
5  abuse?
6    A   Pretty much that's abuse. That's neglect.
7  That's a form of neglect. But not about Kristin Turner.
8  Similar to Kristin Turner. But that is a form of
9  neglect.
10    Q   But we've been talking about the incident you
11 raised, according to you to Ms. Horner about Kristin
12 Turner being abusive to children?
13    A   That's correct.
14    Q   And you called DCF on the 18th of April of 2011
15 to report the abuse of Kristin Turner according to what
16 you said?
17    A   Child abuse hotline, not child care licensing.
18    Q   Okay. We're going to look at all the DCF
19 documents in time. But this is the report that you made
20 on April 18th, 2011 to DCF, irrespective of the
21 division —
22        MR. OWENS:  Object to form. Finish your
23     question, sorry.
24 BY MR. BURRUEZO:
25    Q   — there's nothing in this that says anything

Page 120

1  about the child abuse you described earlier involving
2  Kristin Turner, is there?
3        MR. OWENS:  Object to form. Go ahead.
4        THE WITNESS:  No.
5  BY MR. BURRUEZO:
6    Q   All right. So at least with regard to this DCF
7  document of the report you made, three days after you
8  say it occurred, they do not document the complaint by
9  you on this form that says anything about the kind of
10 abuse you described that Ms. Turner engaged in, does it?
11    A   No, it doesn't.
12    Q   Okay, let's go to Exhibit 4.
13        (Defendant's Ex. No. 4 marked for
14        identification.)
15 BY MR. BURRUEZO:
16    Q   Let me show you what's been marked as Exhibit
17 Number 4. And this is a very similar intake form by DCF
18 that shows a complaint to them about a situation at the
19 facility where you worked. And the date of this report
20 is April 20th, 2011, and there is a report of alleged
21 inappropriate discipline. Now, do you believe that this
22 is the Kristin Turner issue?
23    A   I'm not sure.
24    Q   It could be, though? That could be what you
25 described earlier, right, inappropriate discipline?

Page 121

1    A   Well, it was abuse. I didn't — I never —
2  even though it's inappropriate, I described it as child
3  abuse, because that's what it was. I never said — even
4  though it was inappropriate, my word to her was child
5  abuse.
6    Q   Well, the document that DCF has is this. And
7  this is what is alleged to have been reported to them.
8  Now you don't have any memo to DCF or letter to DCF or
9  anything that you drafted to them in written form that
10 describes your complaint, does it?
11    A   They recorded my conversation. It was Vernon
12 Kilpatrick from Child Care Licensing who took this
13 report for licensing part. It was — I don't know who
14 did this, but the investigator, Krisita Edwards, the
15 child protective service investigator for child abuse.
16 And there was also another lady that was there from
17 Child Care Licensing, which is two different entities.
18 So Vernon does not handle child abuse complaints. I
19 would never call my childcare license agent to report a
20 child abuse complaint.
21    Q   Okay. That wasn't my question.
22    A   But I'm saying, according to this, which —
23 there was two people reporting child abuse or whatever.
24 I knew, because I have a director's credential, to call
25 1-800 child abuse.

Page 122

1    Q   But that wasn't the question.
2    A   So I was a part of this, but I didn't — I
3  didn't call this in. Not this one.
4        MR. OWENS:  Vanessa, when you're saying this
5     to him, make sure you tell him if it's Exhibit
6     3.
7        THE WITNESS:  Exhibit 3, okay.
8        MR. OWENS:  So he knows what you're talking
9     about.
10 BY MR. BURRUEZO:
11    Q   All right. But that wasn't my question. My
12 question is a very simple one, I think.
13    A   I'm sorry.
14    Q   And that was, you never sent DCF a memo, an
15 email, or anything written to describe whatever it is
16 that you reported to them when you did, right?
17    A   That's not their — it's either one of three
18 ways.
19    Q   But that's not my question. It's a yes or no.
20    A   No.
21    Q   Okay. You didn't?
22    A   No.
23    Q   Okay. You never put anything in writing?
24    A   No.
25    Q   So all we have is documentation by DCF


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 42   Filed 06/28/13   Page 10 of 38 PageID 812

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.         DEPOSITION OF
VANESSA SMITH, VOLUME II on 05/09/2013                                      Pages 123..126

Page 123

1  concerning what was reported to them. Whether you agree
2  it's accurate or not is a whole different question. I'm
3  not asking that question. All we have in writing is
4  what they have reported or taken down to be the
5  complaint that was reported to them.
6           On April 18th it was reported that there was
7  issues involving children being sick and toilets not
8  flushing. On April 20th, it was reported that
9  inappropriate discipline was administered, right?
10 Exhibit 3 and Exhibit 4, is that right?
11    A  I see that.
12    Q  Okay. There is no document that we've seen yet
13 that says anything about abuse, right?
14    A  Right, so far.
15    Q  And we don't have a written document by you to
16 DCF that says anything about abuse, do we?
17    A  No, we don't.
18    Q  Okay. So all we have to support what you've
19 said is a conversation you had with Linda Horner during
20 your meal break on April 15 concerning what you believed
21 to be inappropriate, abusive behavior by Kristin Turner?
22    A  That's correct.
23    Q  Okay. Now, do you know what was the result of
24 DCF's investigation into the allegations that were
25 raised to them, as evidenced in Exhibits 3 and 4?

Page 124

1     A  What were the results?
2     Q  Of the investigation were.
3     A  When you say DCF, are you talking about child
4  abuse or Child Care Licensing?
5     Q  The Department of Children & Families, whatever
6  division or department investigated the complaints
7  raised with them.
8     A  No, I never knew what the outcome was.
9     Q  Did you ever follow up with anyone at the
10 Department of Children & Families to find out —
11    A  Yes.
12    Q  Let me finish the question. To find out what
13 the result of the investigation was?
14    A  Yes.
15    Q  And with whom did you speak?
16    A  I called Ms. Krisita Edwards, the child
17 protective investigator for child abuse, and I told her
18 that I wanted to make myself available, and if she
19 needed me, or if she needed any other information, she
20 was welcome to contact me.
21    Q  Okay. I appreciate your indulgence. Because
22 of the way our conversation's been going, it's not in
23 the order that I was anticipating, so I'm moving some
24 things around. So that's why I'm searching for a
25 particular document, because it hasn't come up in the

Page 125

1  way that I thought it was going to come up.
2           MR. BURRUEZO:  I'll have this marked as
3     Exhibit Number 5. I think that's where we're
4     at.
5           (Defendant's Ex. No. 5 marked for
6     identification.)
7  BY MR. BURRUEZO:
8     Q  Let me show you what's been marked as Exhibit
9  Number 5. All right, this is the Investigative Summary
10 from the person who investigated the allegations that
11 were lodged actually by you concerning Ms. Turner.
12          A couple of things I want to point out to you,
13 at least as reported by this investigator in this
14 particular division. If you look at the allegation
15 narrative in Section 1, it says that on 4/8, April 8th,
16 2011, daycare employee, Ms. Turner, was slinging and
17 slamming children on the diaper table. So it was
18 reported to them on April 20th.
19          Do you see the date of the receipt of the
20 complaint? It was reported to DCF on April 20th that on
21 April the 8th, 2011, Ms. Turner had done these things.
22 So this April 8th date is different than the report that
23 was made earlier, according to you, as this event taking
24 place on April 15th?
25    A  May I say something?

Page 126

1     Q  Yeah, go ahead.
2     A  There were two reports made. One of these
3  reports I didn't make. I only made one report to the
4  child abuse hotline. Prior to that, I can't speak for
5  the other person, but I called in one report, not two.
6     Q  Okay. So I guess — I appreciate what you're
7  saying. I guess what I'm suggesting to you is that the
8  reports that were given to DCF indicate a date of the
9  incident as being different. You said this occurred on
10 April the 15th?
11    A  Right.
12    Q  This particular report says the incident
13 occurred on April the 8th of 2011.
14    A  See, I don't know who — I don't know, and they
15 didn't give me information about — when I called in my
16 report — when I called in the report to DCF, I gave my
17 version of what I'd seen. And then when I came back to
18 work, they, the investigators were there, Child Care
19 Licensing, Vernon Kilpatrick I think it is, and Krisita
20 Edwards, the investigator.
21    Q  All right. Well, the two reports that we've
22 seen earlier to DCF, Exhibits 3 and 4, say nothing about
23 Ms. Turner slinging anybody on any tables, correct?
24    A  Right. But this is a complaint to Child Care
25 Licensing. And this is about the abuse of the children.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 42   Filed 06/28/13   Page 11 of 38 PageID 813

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.      DEPOSITION OF
VANESSA SMITH, VOLUME II on 05/09/2013                                  Pages 127..130

**Page 127**

1  So it was done correctly, but there were two reports.
2     Q   Right.  So which report did you — which is the
3  incident you reported?  I guess let me ask it that way.
4     A   I haven't seen it yet.
5     Q   Okay.  So you're saying that Exhibit 5 is not
6  the report that you made?
7     A   No.
8     Q   Okay.  So you're saying someone else reported
9  that on April the 8th, 2011, Ms. Turner was slinging and
10  slamming children on the diaper table?
11     A   I would assume so, because this one I didn't —
12     Q   All right.  So, in any event, I guess for
13  purposes of this next question it doesn't really matter
14  who made this report, the assessment or Summary of
15  Findings is found on the last page.  When DCF conducted
16  its investigation of the alleged abuse by Ms. Turner,
17  they found, as you will see on page 3 in the last
18  sentence, that the case was being closed as unfounded.
19  That is, they found no support for the allegation that
20  Ms. Turner was abusing children.  Do you see that?
21     A   Right, mm-hmm.
22     Q   Okay.  So at least DCF concluded in its
23  investigation that the allegations of child abuse on the
24  part of Ms. Turner were unfounded?
25     A   Right.  They told me that the case was

**Page 128**

1  unfounded because the children were only one, and they
2  were not able to tell them that she actually did it.
3     Q   Well it doesn't matter what they told you.  The
4  reasons for their decision are listed on page 3 of 3; is
5  that right?
6     A   Right, that's correct.
7     Q   So this will explain why it is they found what
8  they did, correct?
9     A   Correct.
10     Q   All right.  Now was there also a report to a
11  different agency to your knowledge?
12     A   Yes.
13     Q   And what agency was that?
14     A   Child Care Licensing.
15     Q   Okay.  And was there any other agency that was
16  made aware of the allegations involving Ms. Turner, to
17  your knowledge?
18     A   Yes.  They were all there taking recorded
19  statements when I gave my statement.
20     Q   Okay.  What other agencies were investigating
21  the allegation against Ms. Turner?
22     A   Well, it was child abuse, Krisita Edwards, she
23  was the investigator.  She had a recorder.  There was
24  Vernon Kilpatrick from Child Care Licensing, he was
25  there.  And the other lady, all I know is her first name

**Page 129**

1  was Janice.  I don't remember her last name.  But they
2  recorded the statements that I gave.  And we were at,
3  actually, Bright Horizons when I gave the statements.
4     Q   Okay.  And who was the entity that was
5  investigating — strike that.
6         So, what was your understanding of the — who
7  were the investigating agencies, to your understanding?
8     A   Child care — three of them came out.  And from
9  my understanding, when they came out to do the
10  investigation, it was child abuse, the investigator
11  Krisita Edwards; Child Care Licensing, I don't know why
12  they were there, but they were there.  And they all had
13  recorders.  And they all three were there.  And they
14  took my statement.  And they all three asked questions.
15     Q   Okay.  You said Krisita Edwards, right, was
16  one of the investigators?
17     A   She was the investigator for the child abuse.
18     Q   And her name appears on the first page of
19  Exhibit Number 5; is that right?
20     A   That is correct.
21     Q   So she concluded after her investigation, the
22  Child Abuse Unit or investigative unit concluded that
23  the allegations were unfounded; is that right?
24     A   That's correct.
25         MR. BURRUEZO:  Please mark this as Exhibit

**Page 130**

1  Number 6.
2         (Defendant's Ex. No. 6 marked for
3         identification.)
4  BY MR. BURRUEZO:
5     Q   Let me show you now what's been marked as
6  Exhibit Number 6.  And this involves the Hillsborough
7  County Child Care Licensing office.  Do you see that?
8     A   Yes.
9     Q   Now this document is very similar to the one
10  that we saw earlier, Exhibit Number 3.  Except that this
11  document has some additional signatures at the bottom.
12  Do you see that?  If you compare Exhibit 3 to Exhibit 6,
13  you'll see that there are some additional signatures
14  which appear at the bottom.  There's an investigator's
15  signature, and a review by some other people.  Do you
16  see that?
17     A   Yes, I see it.
18     Q   And if you flip to the fourth page of Exhibit
19  6, you'll see that that page is similar to Exhibit 4,
20  except, like the cover page of Exhibit 6, there are some
21  additional signatures which appear on that document.  Do
22  you see that?
23     A   You said the fourth page?
24     Q   The fourth page of Exhibit 6 is similar to
25  Exhibit 4, except that there are additional initials and



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 42   Filed 06/28/13   Page 12 of 38 PageID 814

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.          DEPOSITION OF
VANESSA SMITH, VOLUME II on 05/09/2013                                      Pages 131..134

Page 131

1   markings at the bottom of the page.
2       A   Right.
3       Q   All right.  Now, going back to the first page
4   of Exhibit 6, if you turn the page on Exhibit 6, you'll
5   see that the findings by Burnis Kilpatrick on April 21,
6   2011 is that the allegations of sick children not being
7   isolated, drinking water not available, toilets not
8   flushing properly, were found to be un-provable.  Do you
9   see that?
10      A   Yes.
11      Q   And if you turn to the last page of Exhibit 6,
12  the complaint concerning the inappropriate discipline is
13  likewise found by Mr. Kilpatrick as being un-provable.
14  Do you see that?
15      A   Yes, I do.
16      Q   Okay.  So the things that we know that have
17  been documented by the Department of Children &
18  Families, one of which contains the allegations you
19  claim you raised with Ms. Horner, were all deemed by the
20  investigative agencies to be either un-provable or
21  unfounded.  Is that right?
22      A   Right.
23      Q   Okay.  So there was not any corroboration by
24  any of the investigating agencies of anything that you
25  reported to Ms. Horner, you say during your meal break

Page 132

1   on April 15.  Is that right?
2       A   That's correct.
3       Q   Okay.  Do you recall someone by the name of
4   Barbara Liptak?
5       A   No, I don't.
6       Q   Do you know whether she was a co-worker of
7   yours at the Citibank Family Center?
8       A   I never heard of her.
9           MR. BURRUEZO:  Can I have you mark this as
10  Exhibit 7?
11          (Defendant's Ex. No. 7 marked for
12          identification.)
13  BY MR. BURRUEZO:
14      Q   Okay.  Have you had a chance to look at Exhibit
15  Number 7?
16      A   No, I haven't.
17      Q   Okay.  Did I give it to you?
18      A   You didn't give one to me.
19      Q   Oh, I'm sorry.  Of course you didn't look at
20  it, it was over here.
21      A   (Witness reviews document.)
22      Q   Okay.  Have you had a chance to review?
23      A   I just read it.
24      Q   And do you recall who Barbara Liptak is now?
25      A   I don't know Barbara Liptak.  But I'm going to

Page 133

1   assume that -- I don't know which person she is.  I
2   don't know a Barbara Liptak.
3       Q   Do you agree with any of the statements made in
4   here?
5       A   No, I don't.  But I'm familiar with that one
6   about the -- about my lunch being stolen out of the
7   refrigerator.  I never accused anybody, because I didn't
8   know who took it.  I never said you did it, none of
9   that.  I just reported it to Ms. Hayes, which was
10  actually Brenda Hayes.
11          I just went in there and I said I went to
12  Publix on my lunch break and I bought Luncheon to take
13  home because I got off so late, and I tied it up and put
14  my name on it and stuck it in the fridge.  And at the
15  close of the day, it wasn't there.  So went on home.  I
16  forgot and went on home.  And the next morning I came,
17  and I had to come in early, so when I went to the fridge
18  to put my lunch in there, I went back in there and I was
19  looking for it and it wasn't there.
20          So another lady was in the employee lounge and
21  I just said well I bought some meat and it's not there,
22  so.  She said well why don't you go tell security.  I
23  said it's not that big of a deal, you know.  And I went
24  on to work.  And so Ms. Hayes called me in her office
25  and asked me -- she said I heard that someone stole

Page 134

1   something from you.  I'm like, well they might have
2   mistakenly took it by accident, but I don't think they
3   would steal Luncheon, it's not that big of a deal, I'm
4   not worried about it.  And I went on back to work.
5           So she says go down there and look in the
6   refrigerator again.  And I went down there, it wasn't
7   there.  And at the end of the day when I got ready to go
8   home, she says go back down there and look in the
9   freezer.  And the meat had been taken out of the bag and
10  it was put in the freezer, and it was -- it was not
11  frozen, but it was still like somebody had just placed
12  it in there.
13          And they said that they had a problem with an
14  employee, she didn't give me the name, that was taking
15  people's food out of the refrigerator.  And I didn't
16  know who the employee was.  It wasn't that big of a
17  deal.  It was like, you know, four or five bucks.  And
18  it was nothing for me to jump up and leave, because if I
19  knew somebody was hungry I would have gave it to them.
20      Q   But as you sit here today, you don't recall who
21  Barbara Liptak is?
22      A   No, I don't.
23      Q   And would you agree -- well, let me ask this
24  question first.  Is any of this document, this memo that
25  was written, accurate in your opinion?  Is there


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 42   Filed 06/28/13   Page 13 of 38 PageID 815

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.          DEPOSITION OF
VANESSA SMITH, VOLUME II on 05/09/2013                                       Pages 135..138

Page 135

1   anything that's truthful in here concerning the
2   interactions that Ms. Liptak said she had with you?
3       A   What is truthful, even though I don't know who
4   this person is, is about my -- the Luncheon meat, what I
5   just told you.
6       Q   Tell me on this document what you would say is
7   truthful.  Like describe for me where, you know, which
8   paragraph, which line.
9       A   I'm trying to think of who Barbara is.  Only
10  thing I can believe, that Barbara is -- but then we've
11  never had a confrontation, so.  Well, I never left
12  anybody in the classroom.  We always had to sign out and
13  wait for a relief.  I don't know who that is.
14      Q   Okay.  Well let me do it this way.  I'm going
15  to read the document, and you tell me what part is true.
16      A   Okay.
17      Q   It says:  I've worked with Ms. Vanessa often
18  during Ms. Kristin's break and also hers.  At the
19  beginning of March, 2011 when coming to do bathroom
20  breaks, she told me that she had to confront me about
21  saying something to a parent about her having an affair
22  with the parent.  I was very upset about this, knowing I
23  had not said anything to any parents or staff members.
24  We ended up going to Ms. Linda's office to talk about
25  this.  She told Ms. Linda different statement, that I

Page 136

1   talked about the affair to other teachers.
2           Is any of that true?
3       A   No.  The only person that basically was teasing
4   me about a parent -- and this guy was younger than my
5   son -- he would come into the classroom on lunch hour
6   just to check on his daughter, and we always had two
7   teachers in the classroom, so one of the teachers went
8   to lunch and there was two other teachers on the other
9   side.  And when he left they were making jokes about how
10  mean he is and how friendly he was to me.
11          So they just said to me, Ms. Vanessa got a new
12  boyfriend.  And I'm like are you -- you know, they were
13  just teasing.  So it was never anything, you know, taken
14  seriously.  I never got upset about it.  We all laughed.
15  I laughed with them, because I said my son is, you know,
16  26, or he was younger at that time, but.
17      Q   It continues:  Ms. Vanessa made me cry in
18  Ms. Linda's office because she was accusing me of things
19  I did not do.  A few days later, she was telling another
20  teacher that I and teachers from Classroom A8 were
21  saying that I tried to forgive and forget and to be nice
22  when working with her, but two weeks later she accused
23  me of stealing her meat/cheese from the staff room
24  fridge.  This was another situation where I was in Ms.
25  Sue's office crying because she was telling staff

Page 137

1   members, I was stealing her food.  The next day staff
2   members found the food in the fridge where Ms. Vanessa
3   said I had put it back in the fridge and put a curse on
4   it.
5           Is any of that true?
6       A   No.
7       Q   It says:  Ms. Vanessa also left me with eight
8   children in the room and went in the bathroom without
9   calling front desk to let them know she had to go.  I
10  explained to her twice that she could not do that.  Next
11  time if she do that I will talk to management about
12  that.  She left me to look after eight of the children
13  while she spent a long time writing out papers.  When
14  asked to stop and to help me with the children, she got
15  upset, and yelling at me, you take care of the kids.
16          After all that has gone on, I do not want to go
17  back to work with Ms. Vanessa.  I told Ms. Sue Saunders
18  that Ms. Vanessa scares me and I cannot trust her, she
19  comes up with false statements, and I am concerned about
20  leaving Ms. Vanessa on her own with the children.
21          Now, would you agree that if these things were
22  true, that it certainly would be inconsistent with some
23  of the principles that we discussed earlier in the job
24  description about team work, about professionalism,
25  about caring for the children, keeping them safe, so on

Page 138

1   and so forth?
2       A   I agree with what you said in the job
3   description.  But I also agree that out of all these
4   statements that have been made, they're supposed to
5   report it and let the professionals -- when something
6   like this happens, it's supposed to be reported.  And if
7   they neglect to report it, they can get charged for
8   not -- because we all are mandated reporters of child
9   abuse if it's in good cause, not for retaliation.
10  Because you get mad at me, I'm going to call on you, I
11  don't care if you don't like me, I have to work with you
12  and I'm there to serve the children.
13          So all of this stuff that they're flipping and
14  coming back at me with, and the same policy, the same
15  job description that I have that we're mandated
16  reporters and we're supposed to be team workers, I just
17  wonder why they never called child abuse.  Because
18  according to some of this stuff that they're saying that
19  I did, I mean, I should have been fired a long time ago
20  and in jail, or left in the hands of the investigators
21  to investigate this.
22      Q   Okay.  I didn't ask you anything about that.
23  My question was -- I understand that you disagree with
24  what's written in Exhibit 7, and that's not my question
25  as to whether you disagree with it or not.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME II on 05/09/2013

DEPOSITION OF
Pages 139..142

Page 139

1    Would you agree that if any of this stuff were
2  true, that it would be a violation of the job
3  description and the principles put in the job
4  description?
5     A   Yes, definitely.
6     Q   Okay.
7         MR. BURRUEZO:  Number 8.
8             (Defendant's Ex. No. 8 marked for
9             identification.)
10 BY MR. BURRUEZO:
11    Q   Let me show you Exhibit 8.
12    A   (Witness reviews document.)  This one's true.
13    Q   I thought you might say that.  Exhibit 8 just
14 to — and we don't need to spend much time on this — is
15 an incident report concerning something you reported to
16 Wackenhut Security, which I'm assuming is the building
17 security.
18    A   Right.
19    Q   Concerning an incident involving your car and
20 some person that you observed.  Is that right?
21    A   That's correct.
22    Q   Okay.  Is there anything in here that's not
23 accurate in terms of what you reported at the time?
24    A   No.
25    Q   And you didn't receive any kind of discipline

Page 140

1  from Bright Horizons because of anything you reported to
2  Wackenhut about your car, right?
3     A   Right.
4     Q   And the date of the incident, according to
5  this, was April 8th, 2011.  Is that right?
6     A   I'm not sure about the date.  I'm not sure
7  about the date, because the actual incident that I
8  reported, I had to sign it, and this is not the one that
9  I signed, so I don't know what the date is.
10            (Defendant's Ex. No. 9 marked for
11            identification.)
12 BY MR. BURRUEZO:
13    Q   Let me show you what's been marked as Exhibit
14 Number 9.  And it's a memo, handwritten by you it seems.
15 Is that your signature, by the way, at the bottom?
16    A   Yes, it is.
17    Q   And is this your handwriting?
18    A   Yes, it is.
19    Q   Okay.  It says to Linda Horner, Director, from
20 Vanessa Smith, May 2, 2011, re job transfer:  I'm
21 requesting a job transfer to another Bright Horizons
22 center, full-time status and same pay.  I'm very
23 uncomfortable here at Citigroup due to the complaint,
24 Internal and DCF investigations of my co-worker and
25 management.  There are position announcements recently

Page 141

1  posted, Moffitt Center, USF Center.  If you have any
2  questions, please contact me.
3     A   That's correct.
4     Q   Okay.  Is there anything in here that is not
5  accurate in terms of what you reported to them at the
6  time?
7     A   No.
8     Q   And the reasons you wanted to transfer were the
9  things that you said in the middle paragraph, which was
10 your level of discomfort because of the complaint,
11 internal and DCF investigations of my co-worker and
12 management.  Is that right?
13    A   That's correct.
14    Q   And this is what you're referencing here as the
15 Kristin Turner situation?
16    A   Yes.
17    Q   Is there anything else that you're referencing
18 here in the middle paragraph besides the Kristin Turner
19 situation?
20    A   No.
21    Q   So your desire to move away from this
22 particular Bright Horizons Center, the Citibank Center,
23 was because of the situation involving your reporting to
24 DCF and management the alleged abuse that you say you
25 observed by Kristin Turner?

Page 142

1     A   Well, the other thing was I had not been placed
2  back in the classroom, so I was just sitting in the
3  conference room all day.
4     Q   It doesn't say anything about that, does it?
5     A   No, it doesn't.  But I didn't know why I wasn't
6  able to go back to work with the kids.
7     Q   So after the complaint that you lodged with
8  Ms. Horner that day, you said you wanted to go to work
9  with kids in the Commons, right?
10    A   Yes.
11    Q   So when is it that you alleged that you were
12 not put back in your teaching role?
13    A   When I returned back to work.
14    Q   Which was when?
15    A   The days — after DCF came out to the center to
16 investigate and talk with Ms. Turner herself.  Because
17 she had been out, and I had been out.
18    Q   Okay.  So we're talking about sort of the end
19 of April, of April 21, 22, based on the dates of those
20 reports; is that right?
21    A   Yes.
22    Q   So it's your testimony that after April 21 or
23 April 22 when you returned, and after the interviews
24 took place, that you had no further teaching assignments
25 in the classroom with the kids?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 42   Filed 06/28/13   Page 15 of 38 PageID 817

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.          DEPOSITION OF
VANESSA SMITH, VOLUME II on 05/09/2013                                      Pages 143..146

Page 143

1    A   That's correct.
2    Q   And there's no memo by you, there's no email by
3 you, there's no letter by you to any Bright Horizons
4 management complaining to them your desire, if what you
5 say is true, to go back into the classroom to teach; is
6 that right?
7    A   Right.  They basically said that I needed to —
8 they gave me like two different jobs.  Well, they re-did
9 the job description and had me sign it.  They changed
10 the job description from the beginning of what I had to
11 something else.  And then they said they wanted me to go
12 have an employee physical.  And then prior to that they
13 said they wanted me to start doing Bright Horizons
14 training modules, which they say I hadn't completed,
15 that needed to be completed.
16    Q   And that what you described to me is not
17 anywhere written on Exhibit 9, correct?
18    A   Right.
19    Q   And the only reason you cite in Exhibit 9 for
20 transferring or requesting a transfer is the discomfort
21 that you feel because of the issues you raised
22 concerning Kristin Turner, right?
23    A   Well, no.  I was being harassed.  And, I mean,
24 instead of me working, I was basically being called into
25 my supervisor's office.  She was questioning me over and

Page 144

1 over in reference to the investigation about the
2 complaint that was made.  And then she told me she never
3 knew about it.  And she downplayed the whole thing.
4    Q   Well where is it written in here about
5 harassment?
6    A   It's not in this one.
7    Q   Okay.  And that's my point, that in your letter
8 requesting a transfer on May 2nd, you say nothing about
9 harassment, you say nothing about sitting around not
10 doing any real work, in your view, you say nothing about
11 those things, and the only thing you cite is the
12 investigation concerning your co-worker, Ms. Turner.
13    A   Right.  That's what basically all this is
14 about.
15    Q   And what happened with your request for a
16 transfer?
17    A   I was notified when I returned to work that the
18 transfer request had been approved.  And they normally,
19 I guess would have interviewed me for the three
20 positions that were available, but they chose a center
21 to send me to and they told me to go report there.  And
22 they gave me a letter.
23    Q   So what you had asked for, you received, which
24 was a transfer to the Moffitt Center?
25    A   I didn't ask for the Moffitt.  I put down three

Page 145

1 positions, and they chose one.  I had an attachment of
2 the three positions with this.
3    Q   Okay.  Well Exhibit 9, it says in the third
4 paragraph, there are position announcements recently
5 posted, Moffitt Center, USF Center.
6    A   And there was also another one.  USF has two
7 centers.  I think it's USFAA.
8    Q   But you only listed, is that one or two?
9    A   Well, I should have listed three, but I had the
10 attached with the letter.
11    Q   What is this reference?  The Moffitt Center is
12 at USF, isn't it?
13    A   They're two separate campuses.  They're on the
14 same campus, but only Moffitt Center employees can go to
15 Moffitt, and USF students and employees can go to USF.
16 And then they have a USFAA, which is, all three of them
17 are there, but there are certain employees and students
18 can go to certain ones.
19    Q   And at least you got a transfer to one of the
20 three that you claim you asked for, and that's the
21 Moffitt Center?
22    A   Yes.
23    Q   Okay.  So they assigned you to a place you
24 asked to be assigned, correct?
25    A   They chose one and assigned me to one out of

Page 146

1 the three.
2    Q   Okay.  When you went to the Moffitt Center,
3 what was the management team that you reported to there?
4    A   That was Marilyn Fuller.  She was the director.
5    Q   And what other persons were there to whom you
6 reported?
7    A   Marilyn Fuller.  Janice Williams was the
8 program manager.
9    Q   Janice Williams?
10    A   Right.  And her assistant director.  I can't
11 think of her name.  But it was three of them that were
12 there.
13    Q   And when you went to the Moffitt Center, did
14 you receive any training at that time?
15    A   Training at the Moffitt Center?
16    Q   Right.
17    A   I don't recall any training, other than
18 basically the first day I got there things that
19 happened.  But I don't remember training.
20    Q   And what was the assignment that you were given
21 when you went to the Moffitt Center?
22    A   According to the letter from —
23    Q   No, when you went to the Moffitt Center, what
24 job were you given?  Where were you placed?
25    A   I was given a teacher's position.  According to



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME II on 05/09/2013

DEPOSITION OF
Pages 147..150

**Page 147**

1  the letter, it would be full time, keep my same pay,
2  same benefits, and I was to report there to Marilyn
3  Fuller, the director.
4      And after I got there, Ms. Fuller said she knew
5  nothing about the position. As a matter of fact, she
6  said she didn't have — she didn't know that they
7  transferred me. And she said that I had two strikes
8  against me. And the one was because I had already
9  reported child abuse against Kristin Turner over at
10  Citi. And the second one was that I got her involved in
11  the middle of it.
12      Q  All right. Let me sort of slow down because
13  you've said quite a bit here.
14      It's your testimony that when you went to the
15  Moffitt Center you had a meeting with Ms. Fuller who was
16  the director of that center?
17      A  That is correct.
18      Q  And in this meeting, Ms. Fuller said to you
19  that you had two strikes against you?
20      A  That's correct.
21      Q  And one involved that you had called DCF. Is
22  that right?
23      A  That's correct.
24      Q  And the other involved the allegations you made
25  against Kristin Turner?

**Page 148**

1      A  The other one involved having her in the middle
2  of — they put her in the middle of it.
3      Q  Was there anyone else in the room besides you
4  and Ms. Fuller when this meeting took place?
5      A  Janice Williams, the program — I think she was
6  program coordinator.
7      Q  Okay. Anyone else besides those two
8  individuals and you in the room when Ms. Fuller
9  allegedly said this?
10      A  Yes, her assistant director. And I can't
11  remember her name right now, I have it written down.
12      Q  Were you alarmed by anything that Ms. Fuller
13  said to you?
14      A  Yes.
15      Q  And what did you do about it, if anything?
16      A  I called HR and I reported it to Thearla Kozy.
17      Q  And what did you say to Thearla Kozy and when?
18      A  The same day I called her up and I told her —
19  I said Ms. Fuller said she didn't have a position for me
20  and she didn't know that I was being transferred there.
21  And basically the same thing she said, that I already
22  had two strikes against me, one for reporting child
23  abuse and the other for pulling her in the middle of it.
24      Q  And what did Ms. Kozy say?
25      A  She told me that she was going to call her and

**Page 149**

1  do a conference meeting with myself, and all of us would
2  be there, including, she would get the regional manager,
3  Jennifer — and I don't know her last name now — on a
4  conference call.
5      Q  Did that happen?
6      A  Yes.
7      Q  And tell me what was discussed in the
8  conference — first of all, tell me who was on the
9  conference call and what was discussed.
10      A  Well, it was Thearla Kozy. It as Jennifer, the
11  regional manager. Thearla Kozy, the HR manager. And
12  then it was myself, Ms. Fuller, Janice Williams, the
13  program coordinator, and her assistant director in the
14  office. And she said that —
15      Q  Who is the regional manager that you said was
16  on the call?
17      A  Jennifer. I don't know her — I forgot her
18  last name.
19      Q  So it was the regional manager, Thearla, you,
20  Janice Williams?
21      A  And the assistant director. I can't think of
22  her name.
23      Q  And we don't know what her name is. So it's
24  five of you on the call. Is that right?
25      A  It's myself — it was two people on the call,

**Page 150**

1  and the others, we were sitting in the office.
2      Q  And what was discussed on the call?
3      A  Ms. Kozy said that she had approved the
4  position for me to transfer, and she said she had
5  talked — she had discussed that with Ms. Fuller way
6  before I ever came to the center, and that Ms. Fuller
7  did know about it. And then basically, who was it,
8  Jennifer, I think she made a comment about, something
9  about I needed to be a little bit more friendly and work
10  as a team or something. She couldn't wait to do my
11  evaluation.
12      Q  And is that what she said or is that just your
13  commentary?
14      A  No, that's what she said.
15      Q  Okay. And what did you say in response?
16      A  I didn't say anything. I was just listening
17  and writing.
18      Q  And did you complain about this conversation
19  later?
20      A  No.
21      Q  Did you raise the issue with Thearla Kozy about
22  what you thought of the conversation?
23      A  No, I didn't.
24      Q  Why not?
25      A  I had just gotten at the center. And basically



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME II on 05/09/2013

DEPOSITION OF
Pages 151..154

**Page 151**

1  she told me if there was any more problems, to give her
2  a call.  So at that point I let her handle it.
3     Q    And what was the assignment you were given at
4  that center after the call?
5     A    Basically, I asked for a schedule and I never
6  received a schedule, so I was like a floater.
7     Q    In a teaching position?
8     A    Right.
9     Q    Was there a point in time when you moved to the
10  infant room?
11     A    Yes.
12     Q    Do you recall when that was?
13     A    It wasn't in the beginning.  It was almost in
14  the end of my time being there.
15     Q    When you transferred to the Moffitt Center, do
16  you recall what the date was that you started there?
17     A    It was the 9th.  I want to say May 9th, if I'm
18  not mistaken.
19     Q    Okay.  You made the request on May 2nd?
20     A    Right.
21     Q    And you were transferred on May 9th to the
22  Moffitt Center, correct?
23     A    Right.
24     Q    And you were moved to the infant room on May
25  the 16th of 2011; isn't that right?

**Page 152**

1     A    No.  They put that in paperwork, but that never
2  happened until close to the end of my time there.
3     Q    Now what paperwork do you have in your
4  possession that would prove the contrary, that is, that
5  you didn't go there on May 16th?
6     A    I don't.  They had me sign a document that I
7  was going to be permanent in the infant room, and they
8  never put me in there.  I was working in the VPK, with
9  the voluntary pre-kindergarten kids, and I worked with
10  three year olds, two year olds, but I never did go in
11  the infant room until just before my time when they
12  terminated me.
13     Q    So what you're saying is, notwithstanding the
14  documentation that shows you moved to the infant room in
15  May of 2011, on May 16th of 2011, that that's not
16  correct?
17     A    Right.  They didn't put me in there.  Most of
18  my time I would go in there for maybe an hour, but I
19  actually worked in the other classrooms for three hours
20  here, four hours there, and I was like a floater.  So
21  just before I was — they were getting ready to
22  terminate me, that's when they started putting me in the
23  infant room.
24     Q    Okay.  Now there's no difference in pay in
25  terms of whether you're in the infant room or with the

**Page 153**

1  VPK or with two year olds; is that right?
2     A    Not with the — it's not.  With VPK you're
3  supposed to get paid more.
4     Q    But that wasn't my question.  My question was:
5  Although the documents say that you moved to the infant
6  room on May 16th, 2011, you're suggesting that that's
7  false, that you weren't in there on May 16th, 2011; is
8  that right?
9     A    Right.  Because —
10     Q    All right, let me ask the question.
11     A    Okay.
12     Q    Whether it's false or true, it doesn't really
13  matter with regard to the terms and conditions of your
14  employment at the Moffitt Center.
15        In other words, you received the same pay no
16  matter what classroom you were assigned to.  You
17  received the same benefits no matter what class you're
18  assigned to.  You had the same pay and benefits that you
19  had had when you transferred from Citi to Moffitt
20  Center.
21        So there was no qualitative difference in terms
22  of the benefits that you enjoyed as an employee of
23  Bright Horizons, irrespective of what classroom you were
24  assigned to.  Isn't that right?
25     A    Right.

**Page 154**

1     Q    So whether you were in the infant center on May
2  16th or June 16th, it doesn't really matter because you
3  enjoyed the same benefits and pay that you would have
4  enjoyed no matter where you were assigned, correct?
5     A    As far as pay and benefits are concerned.
6        MR. BURRUEZO:  Let's go ahead and take a
7  10-minute break.  It's almost 2:30.
8        MR. OWENS:  Sure.
9        (Short break was taken.)
10  BY MR. BURRUEZO:
11     Q    All right.  I wanted to pick up on a point you
12  made earlier, Ms. Smith.  You had mentioned to me that
13  you were asked to sign a second job description?
14     A    Yes.  Well, I signed three, actually.
15     Q    You signed three?
16     A    Right.
17     Q    Well, let me show you a second one, Exhibit 10.
18        (Defendant's Ex. No. 10 marked for
19        identification.)
20  BY MR. BURRUEZO:
21     Q    Let me show you Exhibit 10, while I find other
22  copies.
23        All right.  And you'll see, Ms. Smith, that
24  Exhibit 10 is very similar to Exhibit 1, which was the
25  job description that we discussed at the start of your



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 155

1  deposition.  Do you see that?
2      A  Yes.
3      Q  And this is also a job description for the
4  teaching position.  Isn't that correct?
5      A  That's correct.
6      Q  And the principles that are set forth in terms
7  of work expectations in connection with that job
8  description are very similar to the ones that are also
9  set forth in Exhibit 1, right?
10     A  Yes.
11     Q  And at the time that you signed this job
12 description on June the 7th of 2011, you had already
13 transferred to the Moffitt Center.  Indeed, you had
14 transferred there on the 9th of May of 2011.  Is that
15 right?
16     A  That's correct.  But I don't know if this is
17 the actual job description that I signed.  There was
18 one — I signed three.
19     Q  Okay.  If you look at the last page of Exhibit
20 10, is that your signature that appears at the bottom?
21     A  Yes.
22     Q  Do you have any reason to believe that that's
23 not the job description that you signed on the 7th of
24 June, 2011?
25     A  It may not be, because they made me sign one in

Page 156

1  April also.
2      Q  Well, let's just deal with the one that we have
3  in front of us.
4      A  Okay.
5      Q  And I'm telling you that the one that you
6  signed on June the 7th is the one that's been marked as
7  Exhibit Number 10.
8      A  Okay.
9      Q  And you'll agree that certainly in June of 2011
10 when you signed this job description, that all the same
11 expectations concerning professionalism and team work
12 and treating children with respect and dignity and
13 ensuring their safety and security were important
14 aspects of your position with Bright Horizons, and in
15 particular, at the Moffitt Center?
16     A  Right.
17     Q  In fact, throughout your employment with Bright
18 Horizons, you'll agree that it was incumbent upon you to
19 adhere to the expectations set forth in the job
20 descriptions as we've discussed in the course of your
21 deposition?
22     A  Right.
23     Q  And that any deviation from those expectations
24 would be a legitimate reason to terminate an employee
25 who hadn't followed the rules as set forth in the job

Page 157

1  description?
2      A  That's correct.
3      Q  Now when you ran your daycare center, did you
4  ever have occasion to terminate employees?
5      A  Yes.
6      Q  And what circumstances, for example, would have
7  given you the occasion to terminate employees?
8      A  Basically I terminated an employee because they
9  were not documenting the incident/accident reports.
10     Q  So you recognize the importance as a manager,
11 as a business owner, to ensure that employees comply
12 with your expectations of them?
13     A  That's correct.
14     Q  Now, before your transfer to the Moffitt
15 Center, which you had put in a request as of May 2nd,
16 you had some correspondence with Thearla Kozy sort of
17 concerning your reasons for transfer.  Is that right?
18 Your reasons for wanting to be transferred?
19     A  Right.
20     Q  And you told her about some of the situations
21 that had happened to you while employed at Citibank
22 Center?
23     A  That's correct.
24     Q  And based on the discussions you had with her,
25 and based on the availability of positions elsewhere,

Page 158

1  like the Moffitt Center, she agreed to provide you what
2  she viewed as a fresh start at a new location so that
3  you could sort of start anew.  Is that right?
4      A  Right, that's correct.
5      Q  So you would agree that human resources'
6  response and reaction to your request was a favorable
7  one to you?  It gave you that chance to have a fresh
8  start?
9      A  Well, yes.
10     Q  All right.  I want to show you Exhibit 11.
11        (Defendant's Ex. No. 11 marked for
12        identification.)
13 BY MR. BURRUEZO:
14     Q  All right, I've handed you what's been marked
15 as Exhibit Number 11.  And it's a memo written by Tracy
16 Childer.  Does that seem familiar to you?
17     A  Yes.  The memo is not familiar, but that name I
18 know.  I remember Tracy.
19     Q  All right.  It says — so this is dated June
20 16th, 2011:  At approximately 4:55 p.m. on Wednesday,
21 June 15th, Lukas' mom came to pick him up and she told
22 me that she here early because she did not want him to
23 be left in the care of Vanessa without any of the other
24 primary teachers present.
25        She said that she felt that on the previous day



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

**Page 159**

1  when she had come to pick him up, that Ms. Vanessa was
2  very rough with him as she was applying the diaper
3  cream.  She said Ms. Vanessa had put quite a lot on and
4  that she was being rough and Lukas was crying and she
5  was not soothing him.
6         I told her to come talk to Ms. Marilyn and she
7  said that she was too upset to do that at the time and
8  that she had to calm down before talking to Ms. Marilyn.
9         Immediately after she exited the building, I
10 came to Ms. Marilyn and Ms. Katina and asked if Mom had
11 come to them, and they both said "No."  And I told them
12 what Mom had said.
13        Did this event occur as described here by
14 Tracy?
15     A   Not the way they described it.  But this did --
16 similar.  Basically, I was in the classroom with the
17 nightshift supervisor.  They had taken me out of the VPK
18 classroom and they said they needed me to go to the
19 infant room because it was getting close to going home
20 time.
21        And so not aware of the children or their
22 schedules, the nightshift supervisor, who was Keisha,
23 I'm not sure of her last name, I asked her, I said can
24 you let me know what I need to do to help you out.  And
25 she says well these two kids are getting ready to leave,

**Page 160**

1  and if you could change Baby Lukas before his, she said
2  dad, comes and picks him up.
3         And so I went to pick -- the baby was crying.
4  He was sitting on the floor crying because a teacher had
5  left.  And when I picked him up, I went and rocked him
6  for a little bit.  And she says well you need to go
7  ahead and change him because Dad is going to pick him
8  up.
9         So when I was at the diaper-changing station
10 changing him, he had calmed down.  But then he started
11 crying again.  And she was standing there kind of giving
12 me the update on the rest of the kids and what time they
13 were leaving.
14        And while I had the -- the baby was on the
15 diaper-changing table.  I had to put ointment on him,
16 and he was -- he started crying.  And all of a sudden,
17 this lady comes -- I had my back turned, and the
18 supervisor was standing at the table talking to me, and
19 she just comes in and shoves me out of the way from
20 behind and grabs the baby and pulled him off the -- she
21 snatched him and went and laid him on the floor.  And I
22 was just shocked.  I said do you think I did something
23 to him.  And she said no.  And she says I just don't,
24 you know, don't want my baby being changed when he's
25 crying.

**Page 161**

1         So basically the program manager was standing
2  in the window looking, and then Keisha said let me go
3  talk to her because she has a mental problem, and that
4  he was over in USF's day care and they had problems with
5  her over there, so they allowed her to bring the child
6  to Moffitt.  And I had never seen her.
7      Q   Okay.  So --
8      A   Didn't know who she was.  Didn't know her name.
9  And after all of that, I asked the program coordinator,
10 Janice Williams, I says well I need an incident report.
11 And so she says no, I need to contact Marilyn, who was
12 at that time over at Citi all day in a meeting.  And so
13 she refused to give me an incident report.  So she says
14 well go ahead and write your own incident, and what I'll
15 do is I'll sign it or I'll have Marilyn sign it in the
16 morning.
17        Well, when I came back to work, Marilyn said
18 she didn't have time, she didn't want to see me, she
19 didn't want to talk about it, she already knew
20 everything, she refused.  And basically they told me to
21 go to work.  And I says well let me make a copy of the
22 two incident reports, and I gave one to Janice and one
23 to Marilyn.  And basically they said we'll talk to you
24 about it later.
25     Q   Well generally, the general substance of what's

**Page 162**

1  in Exhibit 11 is pretty accurate with some modifications
2  that you described, correct?
3      A   Yes, with the modifications.
4      Q   As a result of this episode, was there any
5  action taken by Bright Horizons against you, in your
6  estimation?
7      A   Yes.  Bright Horizons didn't protect me for --
8  I've never known anybody to come on somebody's job, and
9  unless something is going on, shove an employee for no
10 apparent reason and not apologize or not say something,
11 and then nothing be done about it.
12     Q   Well, you're the only one that has reported
13 that this mother ever shoved you, correct?
14     A   Right.
15     Q   Everybody else who witnessed this event,
16 everybody else who had any knowledge of this denied
17 observing this mother shove you.  Isn't that true?
18     A   That's true.
19     Q   In fact, you filed a police report claiming
20 batter against this mother, did you not?
21     A   That's right.
22     Q   And the police investigation found no merit to
23 your claim of battery, correct?
24     A   That's correct.
25     Q   So the only person on the planet who's

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 163

1  suggesting this mother battered you is you?
2      A   That's correct.
3      Q   Even the people who witnessed this event don't
4  corroborate what you've said.  Is that right?
5      A   That's correct.
6      Q   Okay.
7          MR. BURRUEZO:  Exhibit 12.
8          (Defendant's Ex. No. 12 marked for
9          identification.)
10  BY MR. BURRUEZO:
11     Q   Let me show you Exhibit Number 12.  And it's a
12  fairly long document, but the body of it deals with sort
13  of teaching principles and program principles.  What I
14  wanted to highlight really are the beginning portion and
15  the ending.  It's June 17th, 2011.  It's a memo to you
16  from Marilyn Fuller.  It's entitled Action Plan.
17         And it says:  The purpose of this plan is to
18  review your job performance as teacher and to establish
19  timelines whereby criteria and standards must be met for
20  continued employment.  Over the past two months, we have
21  discussed numerous concerns about your job performance,
22  particularly regarding positive teamwork,
23  professionalism, and interactions with parents.  Your
24  performance is considered unacceptable by Bright
25  Horizons Family Solutions standards and needs to be

Page 164

1  addressed immediately.  If your performance is not
2  corrected by today and ongoing, you will be released
3  from your position of teacher.  If your performance has
4  any additional negative impact on the center before that
5  date, thereby disrupting that program, you will be
6  released immediately.
7          And then there's a discussion of the
8  principles, the HEART principles of people and
9  partnership and program.
10         And then there's a sort of action steps that
11  say:  When concerns about your performance are brought
12  to your attention, listen calmly to the person offering
13  the information and consider how you might resolve the
14  issue.  If you disagree with the information being
15  offered, please feel free to explain why you feel the
16  information is inaccurate.  Use a respectful tone of
17  voice and language when addressing this person.  Follow
18  supervisors' instructions.  Insubordinate/disruptive
19  behavior is not acceptable.  Raising your voice to
20  others or using unprofessional, offensive, threatening
21  or insulting language is unacceptable.
22         And then there's a conclusion that talks about
23  what is going to happen, you know, moving forward.
24         It says the director and/or your supervisor
25  will meet with you to review these job requirements and

Page 165

1  action items, and will periodically observe your
2  classroom during this time.  The purpose of these
3  meetings is to provide you with guidance, coaching and
4  feedback and to monitor your progress.  The director
5  will meet with you biweekly to determine the question of
6  your continued employment.  If your performance is not
7  corrected by today and ongoing, you will be released
8  from your position of teacher.  If your performance has
9  any additional negative impact on the center...
10         And then it repeats some of the things said at
11  the beginning paragraph.
12         And then it says:  If you successfully complete
13  the plan, the requirement is that you will continue to
14  maintain these expectations for the remainder of your
15  employment.
16         And this is dated June 17th, 2011.  And there's
17  a notation that you refused to sign the document.  Do
18  you see that?
19     A   Yes.
20     Q   Do you recall the meeting that you had with
21  Marilyn Fuller and Jennifer Todd on this day?
22     A   I recall the meeting, but this wasn't
23  available.
24     Q   Well it says you refused to sign it.  So are
25  you saying that the document wasn't handed to you at the

Page 166

1  time of the meeting?
2      A   No, it wasn't.
3      Q   So what was it that you were refusing to sign?
4      A   Basically, I don't remember refusing to sign
5  anything.  I do remember that prior to the 17th when the
6  parent came in, they were supposed to meet with me in
7  regards to this as well as some other complaints that I
8  had previously emailed to Ms. Kozy in reference to what
9  was going on and what was happening at the center.
10  Because for some time, my supervisor, she would yell at
11  me in front of the parents for no apparent reason.
12     Q   And who's that?
13     A   Marilyn Fuller.  She started yelling at me in
14  front of the parents and other employees.  She would
15  call me in and tell me that I needed to resign because
16  it was more of them, witnesses against me, than if I
17  tried to sue them.
18         And then she turned around and told me that
19  Jennifer, the regional manager, had told her and the two
20  employees, Janice Williams, as well as — I've seen her
21  name, Katina, the assistant director -- that if they
22  didn't participate, they would all lose their jobs.  And
23  she said that they didn't want to do what they were
24  doing to me but they had no choice.
25         And she said that she even decided to take some



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 167

1    time off because she was thinking about quitting Bright
2    Horizons. And she said that basically Jennifer was
3    racist, and that she was doing all of Jennifer's dirty
4    work and not getting paid for Jennifer's job.
5            And they sent what happened to Citibank, with
6    me reporting over there, they sent it to her center and
7    she was upset about it because they had worked so hard
8    to convince the parents to come back, because that
9    center was actually getting ready to close. And they
10   pulled her out of St. Pete at a center over there with
11   the hospital, that she had good clientele with the
12   relationship with the parents and doctors over there.
13       Q   Okay. Well you haven't filed claims of racial
14   discrimination in this case; is that right?
15       A   Right.
16       Q   So this case is not about racial
17   discrimination. You didn't file a claim with the EEOC
18   claiming racial discrimination. You haven't filed a
19   lawsuit claiming racial discrimination. You had the
20   opportunity to do that, but you didn't. Isn't that
21   right?
22       A   That's correct.
23       Q   Okay. What we're dealing with here is a claim
24   of whistleblower and related claims concerning what you
25   believe to be some whistleblowing on your part. Is that

Page 168

1    right?
2        A   That's correct. But I'm just telling you what
3    the meeting — you said you wanted to know what the
4    meeting was about, and basically this is prior to this
5    meeting. On that day she had been asking me to resign
6    before Jennifer came over, because Jennifer was due to
7    be there for a meeting in reference to complaints that I
8    had made, the harassment.
9        Q   Well we'll talk about that. We'll get to the
10   timing. But I want to focus on the documents that I'm
11   showing you. Okay?
12       A   Okay.
13           MR. BURRUEZO:  Okay, let's go to Exhibit 13.
14           (Defendant's Ex. No. 13 marked for
15           identification.)
16   BY MR. BURRUEZO:
17       Q   All right, let me show you Exhibit 13, which is
18   a Bright Horizons Family Solutions Employee Conference
19   Memo. This evidences on the same date, June 17th, a
20   reprimand document that was being issued to you that
21   shows Marilyn Fuller and Jennifer Todd in attendance at
22   this conference.
23           Do you recall the meeting you had with Jennifer
24   Todd and Marilyn Fuller on June 17th, 2011?
25       A   That's correct.

Page 169

1        Q   And this document evidences the things that
2    they discussed with you in formalizing the reprimand
3    that they were issuing to you at the time. Is that
4    right?
5        A   No.
6        Q   Okay. Well, let's go through it then.
7            It says that: Once again it has been brought
8    to my attention that your lack of communication and
9    attention to detail as it related to the care and
10   attention to children has caused real issues at the
11   center.
12           On June 15th, 2011, a parent requested a
13   meeting with Marilyn Fuller. Specifically regarding how
14   much diaper cream was being applied to her child and how
15   rough Vanessa was handling the child. After further
16   review, we discovered this was not the first parent
17   complaint.
18           On June 8th, 2011 you failed to give a
19   child food that was labeled and identified for him.
20   Although you agreed that the food was clearly labeled,
21   you stated you did not give the food because you were
22   already accused and did not want to be attacked again.
23           On May the 23rd, 2011 a child was mistakenly
24   fed a jar of carrots. In addition to above-mentioned
25   parent issues, it was also brought to my attention

Page 170

1    yesterday that you left the classroom yesterday out of
2    ratio.
3            Your performance and conduct are in direct
4    violation of company policies outlined in the Employee
5    handbook pages 38 and 39: Number 3, Carelessness in
6    caring for children; number 4, Leaving children
7    unattended or out of ratio or failing to provide proper
8    supervision for children; number 10, Failure to follow
9    instructions and directions from a supervisor; number
10   13, Conduct that is detrimental to children or Bright
11   Horizons' reputation in the community; and number 17,
12   Unsatisfactory or inadequate job performance.
13           It says has the employee been counseled for
14   similar incident? Yes. Verbal, May 11th, June 7th,
15   June 8th, June 14th. Written counseling on April 15th,
16   2011. And then the Action Plan, which is what we
17   discussed a moment ago as Exhibit 12. And there are
18   other, you know, concluding comments with regard to the
19   expectations the company was having of your continued
20   employment.
21           Do you see that?
22       A   Yes, I see it.
23       Q   All right. And this also says that you
24   refused — excuse me — it says that the employee will
25   provide a written statement, but that you were refusing



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME II on 05/09/2013

DEPOSITION OF
Pages 171..174

**Page 171**

1   to sign this particular document.  Do you see that?

2     A   Yes, I see it.

3     Q   So is it safe to say, Ms. Smith, that they,

4   they being Ms. Fuller and Ms. Todd, at the June 17th

5   meeting, presented you with a reprimand, presented you

6   with the Action Plan, and that you at that time refused

7   to sign either document?

8     A   These were provided to me through internet.

9   This was emailed to me.

10    Q   That wasn't my question.

11    A   I never received this in my hand from them on

12   this date.

13    Q   Okay.  So you're saying that they're just

14   making this up and you refused to sign it?

15    A   I never was --

16    Q   Is that your testimony?

17    A   Yes.

18    Q   That they're just making it up?

19    A   I don't know about -- you know, I didn't sign

20   it because I never received it the date that they said

21   that I'm receiving it.  I received this through an email

22   after requesting the reason why when I found out that I

23   was being suspended, which was on Father's Day, on a

24   Sunday.

25    Q   Okay.  So you're saying that the management

**Page 172**

1   team -- is it your testimony that the management team at

2   the Citi Center, and the management team which is

3   different than the management team at Moffitt, are all

4   conspiring against you to make up stuff, to say that you

5   refused to sign documents, you weren't presented, that

6   somehow all of this is a concoction to make you look

7   bad, is that what your testimony is?

8    A   Exactly.  Because the same manager that

9   transferred me over there, and the same manager that had

10   something to do with my termination is Jennifer Todd,

11   the regional manager, after the director over there was

12   on leave of absence.

13    Q   But that wasn't my question.  My question is:

14   Is it your view that all of these folks have conspired

15   against you to just make stuff up?

16    A   That's right.

17    Q   Including falsely saying they have presented

18   you with documentation at meetings that they reported

19   they've had with you, that you say was never presented

20   to you?

21    A   Right.  I want to comment on the carrots.

22    Q   On the carrot thing, it's really unimportant at

23   this point.  I think I want to ask about the document

24   trail and what was presented to you.

25     So you're saying that all these individuals

**Page 173**

1   presented no documents to you whatsoever in connection

2   with any meetings as they were counseling you, and that

3   you didn't refuse to sign anything that was presented to

4   you, is that what you're saying?

5    A   I didn't say all of them, because I said Mrs.

6   Saunders earlier, and Mrs. Hayes, they presented me with

7   the document, but that it was not true information.

8     I'm saying that on June 17th the meeting that I

9   was supposed to have was to discuss me sending Mrs. Kozy

10   memos by email stating that I felt that I was being

11   retaliated against, I was being harassed at the centers.

12   And I had said that my supervisor was yelling at me in

13   front of parents and my co-workers, as well as some

14   other things that were happening.

15     And she had her assistant to give me a call,

16   and she told me the date, which was going to be June

17   17th, that they would do a conference call and meet with

18   me in reference to my complaints.  So when I -- before I

19   got to the meeting, all that day, Ms. Fuller was calling

20   me in and asking me to resign, and telling me the

21   reason, how she got really involved in all of this.

22    Q   All right.  Let's move onto Exhibit 14.

23     (Defendant's Ex. No. 14 marked for

24     identification.)

25    THE WITNESS:  First time seeing this.

**Page 174**

1   BY MR. BURRUEZO:

2    Q   And this is a memo dated June 17th, 2011 from

3   Keisha Gaines.  Do you know who Keisha Gaines is?

4    A   Yes.

5    Q   And who was she?

6    A   She was the nightshift program coordinator.

7   She was the one that was in the room the evening that I

8   was changing Baby Lukas.  She was standing beside the

9   diaper-changing table.  She was the one who told me to

10   get him.

11    Q   Okay.  And go ahead and read this to yourself.

12    A   (Witness reviews document.)

13    Q   Have you had a chance to read Keisha's memo?

14    A   Yes.

15    Q   Is there anything in there that you believe to

16   be not accurate?

17    A   Yes.

18    Q   What part is not accurate?

19    A   Well, there's several things in here.  I wasn't

20   already in the room.  As I said earlier, I just walked

21   -- because they pulled me from one classroom into the

22   other.  And going into a classroom, the first thing I do

23   is, the teacher or whoever's in there, ask them what can

24   I do to help, because I didn't know any of these

25   children or their parents.



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.      DEPOSITION OF
VANESSA SMITH, VOLUME II on 05/09/2013                                    Pages 175..178

Page 175

1     And so basically the child was crying. He was
2  sitting on the floor. And I picked him up, kind of took
3  him over and rocked him, and I comforted him. And so
4  she says well you need to change him, because I asked
5  her who -- you know, she giving me the update of who
6  was getting ready to go home and how to help. And she
7  was standing at the diaper-changing table while I was
8  changing him, and he started crying again.
9     But I did comfort him. And as far as -- I
10 don't see on here anything about the diaper cream that I
11 was accused of earlier, but anyways.
12     Q   So is it your view that any inaccuracies that
13 are in Keisha's are because she's part of the conspiracy
14 against you?
15     A   She was standing right beside me at the
16 diaper-changing table while I was changing him, telling
17 me about the other children that were getting ready to
18 leave. Kind of giving me an update on what was
19 happening in the classroom.
20     Q   That wasn't my question. My question was: Do
21 you think that Keisha's part of the conspiracy against
22 you?
23     A   Yes. She wants her job.
24     Q   And you're just speculating that's the case,
25 correct?

Page 176

1     A   Yes.
2     MR. BURRUEZO: Exhibit 15.
3     (Defendant's Ex. No. 15 marked for
4     identification.
5  BY MR. BURRUEZO
6     Q   Let me show you what's been marked as Exhibit
7  15. And this is a memo by Janet Williams. And I'll ask
8  you the same question. Just, if you read it to
9  yourself, and then let me know what part of it is
10 inaccurate, if any.
11     A   (Witness reviews document.) Okay, there are
12 several things in here that she's not being truthful
13 about. Basically it says here that she was standing
14 outside the infant -- okay, so she did see that when I
15 came into the classroom the child was sitting on the
16 floor crying. And basically I did rock him, and I
17 comforted him. And --
18     Q   My question was: Which part is not correct?
19     A   The part here -- it's not -- it's half truths
20 and mostly lies.
21     Q   Okay. So you're saying that Janet Williams is
22 also part of the conspiracy against you?
23     A   Yes.
24     Q   And it's speculation of course on your part
25 that she is, right?

Page 177

1     A   Right. Because Ms. Tracy had already left for
2  the day. When I came into the classroom, Ms. Tracy was
3  on her way leaving. That's why they came and got me,
4  because they said she had to leave. And that's why the
5  baby started crying.
6     MR. BURRUEZO: Okay. Exhibit 16.
7     (Defendant's Ex. No. 16 marked for
8     identification.)
9  BY MR. BURRUEZO:
10     Q   Let me show you what's been marked as Exhibit
11 16. And this is a memo to you from Marilyn Fuller, and
12 it's concerning administrative leave.
13     And it just says: As of today's date, you are
14 on administrative leave pending investigation of the
15 events which may have occurred on June 17, 2011. The
16 purpose of this investigation is to determine if you
17 have, in fact, engaged in any of the following
18 prohibited activities.
19     And it talks about, in essence, the situation
20 we've been discussing concerning Lukas.
21     And then it says: Please provide me with a
22 written statement outlining your perspective of the
23 incidents described on June 17 and return to the center
24 via fax within the next 24 hours.
25     So you will agree that when you received this

Page 178

1  memo that you were being put on administrative leave,
2  correct?
3     A   No. Basically, when I left that Friday, the
4  17th, I didn't know I was already suspended. Marilyn
5  called me, it was Father's Day, that Sunday evening
6  around 4:00, and said that don't report to work, you're
7  being placed on administrative leave. And I said for
8  what.
9     And so I emailed her, and I also emailed
10 Jennifer, because I had their cards with their email
11 address, requesting that they provide me documentation
12 of the reason why I was being placed on administrative
13 leave. She didn't say over the phone for what reason,
14 but she said that they would get back with me.
15     Q   All right. Well this is dated the following
16 day, June 20th. You said the 17th was a Friday,
17 correct?
18     A   Right.
19     Q   And I don't know if that's true, I would need
20 to check a calendar. But if we assume what you said is
21 true, that you had a discussion with them on the 17th --
22     A   Right.
23     Q   -- the day that those documents say that you
24 refused to sign them, and if you got a call Sunday
25 night, which is presumably the 19th, that you were being



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 42   Filed 06/28/13   Page 24 of 38 PageID 826

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.          DEPOSITION OF
VANESSA SMITH, VOLUME II on 05/09/2013                                       Pages 179..182

Page 179

1  put on administrative leave, the memo is not prepared
2  until the following day, June 20th, explaining why you
3  were being put on administrative leave. Do you see
4  that?
5      A   Right.
6      Q   Okay. Now, did you receive this document in
7  some form or fashion?
8      A   I received this document by email.
9      Q   Okay. And this is part of your production, so
10 let me see if -- I was going to use the full amount, but
11 I just -- it's easier, frankly, if I just pull out the
12 relevant documents.
13     MR. BURRUEZO: All right, go ahead and mark
14 this as Composite 17.
15         (Defendant's Ex. No. 17 marked for
16         identification.)
17 BY MR. BURRUEZO:
18     Q   All right, let me show you Composite 17. And
19 this is part of the production you have provided in this
20 case. And the first one deals -- and we can kind of go
21 page by page and kind of talk about its significance in
22 terms of what you have here.
23         May 3rd is the first document. It's an email
24 it appears that you sent to Thearla Kozy who's the human
25 resources person. Do you see that?

Page 180

1      A   Yes.
2      Q   And May 3rd is the day after you requested a
3  transfer. So this, I believe, is concerning your
4  conversation that you had had with Ms. Kozy as to the
5  reasoning for your request for a transfer from Citibank
6  to Moffitt, right?
7      A   Well, no. Because, basically, Mrs. Horner told
8  me that I wouldn't have a -- they were going to cut back
9  on staff, and basically I wouldn't have a position when
10 I was at Citi, when she was interrogating me in
11 reference to abuse, when I reported child abuse.
12     Q   Okay. I'm not talking about that.
13     A   That's what led up to this.
14     Q   You did a request for a transfer on May 2nd of
15 2011, correct?
16     A   Right.
17     Q   So then you had a conversation with Ms. Kozy
18 about your request to transfer to a new center, correct?
19     A   Prior to me having the conversation with
20 Ms. Kozy, I had had a conversation with her in April in
21 reference to -- and she asked me to provide her with
22 this information in email form or letter, but she needed
23 it right away.
24     Q   You sent this to her on May 3rd concerning the
25 incidents, according to you, that occurred on March 15th

Page 181

1  and March 16th concerning the diarrhea situation at
2  Citibank?
3      A   Right, because that's what she had questioned
4  me about. And she asked me to send her something in
5  writing in reference to what I responded to her with.
6      Q   So the email on May 3rd, which is one day after
7  you requested the transfer, you're telling Ms. Kozy
8  about the diarrhea incidents?
9      A   No, she's asking me. She called on the -- it
10 was the latter part of April, I think it was the 28th of
11 April. I have it -- I still have that copy of the note
12 that was given. She called the center where I was
13 working at Citi and she wanted to set me up on a call
14 where it went into the conference room, and she wanted
15 to discuss what happened in March.
16         She was saying this is -- what she wanted to
17 respond -- me to respond to her, she didn't want
18 anything about the child abuse, she wanted this. So she
19 started asking me what happened in March. And she told
20 me she wanted me to put that in writing and send it in
21 her right away.
22     Q   Okay. Well, the alleged child abuse that you
23 claim happened didn't occur until April, correct?
24     A   Right.
25     Q   So if you turn the page to the next day, the

Page 182

1  email you sent to Ms. Kozy, it then references the April
2  15th incident.
3      A   Right. So she called me back and she wanted me
4  to email her something about April 15th. And I was
5  basically responding to what she asked for.
6      Q   Right. And what you say concerning April 15th
7  in this email to Ms. Kozy on May the 4th is what you say
8  here: Ms. Kozy, I notice that you did not get the
9  second complaint. April 15, 2011, before lunch, a child
10 was seating (sic) at the lunch table and my co-worker
11 was sitting with her. The child started vomiting a lot.
12 I as well informed my supervisor, Susan Saunders. The
13 child was allowed to stay at the center around the other
14 children and teachers as well.
15     A   Right. And she was wanting to know about the
16 licensing coming out to the complaint with licensing,
17 because they were trying to figure out who called in the
18 report for Child Care Licensing in reference to the
19 facility.
20     Q   Well she didn't say that to you, that's your
21 speculation, correct?
22     A   No. She said that they -- Mrs. Saunders had
23 gotten -- that licensing came out, and she wanted to
24 know basically what happened or what I witnessed about
25 sick children.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 183

1    Q   Yeah, but she didn't say in her conversation
2  with you — Ms. Kozy didn't say to you I'm asking you
3  this question because I want to find out who reported
4  us?
5    A   No, she didn't say that, no.
6    Q   Okay.  When you said that a few moments ago,
7  that's your speculation that that's why they were asking
8  you these questions, but that's not what she said.
9    A   She said Child Care Licensing came out
10  because — and she wanted to know about the sick
11  children.  So she wanted to know how to respond to that,
12  because if it was sick children that were there and
13  they're not being sent home she wanted to know about it.
14  And she said that the regional manager wasn't doing her
15  job.
16    Q   And that's the point that I've been trying to
17  stress with you all day in the course of our
18  conversation.  I want to know sort of the facts in terms
19  of what happened.  The editorializing, or what you
20  believe, or the speculation that you have is really not
21  pertinent to what I'm asking.
22       You said a few moments ago that Thearla Kozy
23  was trying to find out who reported Bright Horizons to
24  DCF.  That's not correct.  That's what you believe in
25  your mind.  But the reason she was calling you was to

Page 184

1  find out whatever you knew about these incidents,
2  correct?
3    A   Well she told me she couldn't ask me questions
4  in reference to, because DCF had already started their
5  investigation.  And the only thing — when she first
6  called me, her conversation was could you put in writing
7  to me something that happened in reference to you being
8  out to work with the children that had diarrhea.
9    Q   And that's what you did?
10    A   She said nothing to me about the DCF
11  investigation.  None of that.  She said she didn't want
12  — because that was under DCF and they were doing the
13  investigation, and she said she couldn't really question
14  me about that.
15       So when I typed this, I didn't type in about
16  DCF because I had already given my statement, and it was
17  under investigation.  I had given it to Mrs. Horner.  I
18  had given it to DCF.  And I couldn't keep giving them
19  statements.  So she asked me about other things, not
20  about what happened with Kristin Turner.  Because
21  according to DCF, I was not allowed to give them other
22  statements in reference to that once the investigation
23  was open.  They weren't supposed to even question me
24  again after I made the first report to the director,
25  according to what Ms. Edwards told me, and told them.

Page 185

1    Q   Okay.  Well let's sort of flip to the next
2  page.  Flip again past the business cards.  And the next
3  one is May 5th.  Do you see the May 5th, 2011 letter
4  that you received concerning your transfer to Moffitt?
5    A   Right.
6    Q   And then it says:  Effective May 9th, you'll
7  report to the Moffitt Bright Horizons Center for work.
8  Right?
9    A   That's correct.
10    Q   And Jennifer Todd sent you this note?
11    A   Yes.
12    Q   And she CC'd Thearla Kozy, the human resources
13  manager, Linda Horner and Marilyn Fuller?
14    A   That's correct.
15    Q   Now on June the 15th of — this is the document
16  that you provided to us.  This is your statement as it
17  relates to the baby Lukas situation, right?
18    A   Right.
19    Q   And so you did provide to Ms. Fuller, two days
20  before the meeting you had with her and Jennifer Todd,
21  the statement concerning the baby Lukas situation,
22  correct?
23    A   Yes, I did.
24    Q   So they didn't deny you the opportunity to
25  provide a statement?  In fact, you did one two days

Page 186

1  before your meeting, correct?
2    A   Right.  Well, they wouldn't give me the Bright
3  Horizons form, because Bright Horizons has to keep
4  account of any incidents or accidents that happen.  So
5  they denied me the Bright Horizons form, and I typed
6  this on my own at home.
7    Q   But they didn't deny you your voice?  In fact,
8  you wrote a memo.  And if what you're saying is true,
9  that they didn't give you a particular form or a
10  specific form for you to use, they might have denied you
11  a piece of paper, but they didn't deny you your voice
12  because you spoke up and sent them a letter in terms of
13  what you wanted to say involving the baby Lukas
14  situation, correct?
15    A   Right.
16    Q   Now the first time you raised to HR, Ms. Kozy,
17  anything involving any singling out or not being treated
18  with dignity or respect from your co-workers, being
19  yelled at, was June 15th, 2011 in this written email you
20  sent to Ms. Kozy, correct?
21    A   Not the first time.  I had called her on
22  different occasions in reference to what was happening
23  there.
24    Q   Well, the first time you memorialized anything
25  to her — we've gone through your entire email trial.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.       DEPOSITION OF
VANESSA SMITH, VOLUME II on 05/09/2013       Pages 187..190

Page 187

1  You've communicated with Ms. Kozy on numerous
2  occasions --
3       A  Right.
4       Q  -- about certain things involving your
5  employment at Bright Horizons.  The first email that you
6  authored to Ms. Kozy concerning the baby Lukas
7  situation, and concerning your claims of harassment,
8  were not until June 15th, 2011, the day after the baby
9  Lukas situation, right?
10      A  Can't be.  Because I had been discussing with
11 her over the phone.  We had been having like phone
12 conversations.
13      Q  That wasn't my question.
14      A  Okay.
15      Q  My question was:  The first time you wrote to
16 her in email about anything involving your allegation of
17 being singled out at work or not being treated with
18 dignity and respect, was not until June 15th, 2011, the
19 day after the baby Lukas situation?
20      A  The first time I wrote her, but not called.  I
21 had called her prior.
22      Q  You called her prior to discuss the baby Lukas
23 situation before it even happened?
24      A  Not Baby Lukas.  I called her prior to what was
25 happening there, the harassment and all the other stuff.

Page 188

1       Q  Okay.  And do you have any records, phone
2  records, any notes to yourself, any memos to yourself
3  that memorialize any oral discussion you had with
4  Thearla Kozy prior to your written email to her of June
5  15th?
6       A  I may have.  Because I talked to Michael Ennis
7  over -- I talked to Michael Ennis, and he was typing
8  in -- he said he was emailing my complaints and
9  everything and forwarding them to Ms. Kozy.  Because
10 when I started emailing her, the emails started
11 returning back to me, and so he told me -- he gave me
12 his email address and he told me to email the complaints
13 to him and he would forward them to her.
14      Q  Well, where are those notes that you claim you
15 maintained in connection with your conversations that
16 you had with human resources prior to your June 15th,
17 2011 letter?
18      A  I know, like I said, I only made phone calls,
19 and I spoke with Michael Ennis in HR because I had been
20 sending her emails, and basically they were coming back
21 to me.  And when I got through to HR, I happened to get
22 Michael Ennis, who gave me HR Concerns, and he told me
23 to email the information to him and he would forward
24 them on to her.
25      Q  Well, where is the evidence that you made phone

Page 189

1  calls to human resources prior to June 15th of 2011 to
2  complain about being treated with indignity and
3  disrespect?
4       A  I may have them.
5       Q  Have you given them to your lawyer?
6       A  I think he has everything that I had.
7       Q  So is it safe to say that if it hasn't been
8  produced to us, it's because you haven't given it to
9  your lawyer?
10      A  Yes, definitely.
11      Q  And if there are no notes that indicate that
12 you made telephone calls prior to June 15th, 2011, then
13 it's safe to assume that they don't exist, correct?
14      A  I would think so.  But if I'm not mistaken, I
15 know that I made calls prior to this date here
16 (indicating).
17      Q  I understand that that's your assertion.
18 You're saying that you made calls and you had oral
19 discussions with representatives of human resources
20 prior to June 15, 2011.
21      A  Right.
22      Q  I understand that.  You told me earlier that
23 you made, or believe you might have jotted down some
24 notes of those conversations.  I then asked you whether
25 or not you've given them to your counsel.  You said you

Page 190

1  did.
2       And what I'm saying to you is, and I'm asking
3  you is:  If you've given them to your counsel, it's safe
4  to assume he's produced them to me, and if I don't have
5  any notes that show you've made calls to human resources
6  prior to June 15, 2011, it therefore follows logically
7  that no notes exist concerning any conversations you had
8  with human resources prior to June 15, 2011?
9       A  Okay, yes.
10      Q  Okay.  So at least that we know from paper, the
11 paper that we have in front of us today, is that you
12 didn't complain to human resources about allegations of
13 being treated with disrespect or indignity until after
14 the baby Lukas situation occurred, correct?
15      A  I can't say yes, because of the fact that all
16 of those meeting dates that they have that they
17 counseled me was when I came in to make complaints, and
18 they would have conference calls on those dates in
19 reference to my complaints.  And then they turn around
20 and put those were dates that they counseled me.  So if
21 that's what they're considering counseling, making up
22 false allegations against me on the dates that I
23 complained, they turned it around.
24      Q  That wasn't my question.  I understand that you
25 believe that everything that's been written about you --



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME II on 05/09/2013

DEPOSITION OF
Pages 191..194

Page 191

1    A   Not everything.  There's some things that are
2  true, and there's a lot that are not.
3    Q   Okay.  What, in terms of the counseling(s) that
4  have been written about you, are true.?
5    A   What in terms?  The one that I tried to explain
6  about walking into the infant room and I asked the
7  teacher is it time for the baby's lunch.  And she had a
8  jar of, I think carrots instead of sweet potatoes.  I
9  did feed the baby, according to her instructions, the
10  carrots.
11    Q   Okay.  So the only incident in your six months
12  of employment that has been documented concerning what
13  the company believes to be bad performance on your part,
14  the only incident to which you agree, is the one
15  involving feeding the carrots to the child which was not
16  supposed to have been fed to that child?
17    A   Right.  And whatever -- I don't know of any
18  other thing right now.
19    Q   And everything else we've covered in the course
20  of your deposition today that has been written by Bright
21  Horizons concerning your performance is false, in your
22  estimation?
23    A   That's correct.
24    Q   Okay.  And if we look only at the written
25  documents, the only complaint that we're aware of that

Page 192

1  you wrote in writing to Thearla Kozy about being treated
2  unfairly, is the June 15th email that came the day after
3  the baby Lukas complaint, correct?
4    A   Correct, for right now.
5    Q   All right, if we turn the page.  Let's turn it
6  again.  And again.  And I'm now looking at the June
7  20th, 2011 email from Marilyn Fuller to you with a CC to
8  Jennifer Todd.  Do you see that?
9    A   Yes, I see it.
10    Q   And it says:  Attached you will find the
11  Administrative Leave Memorandum.
12        And that's the document that we marked as
13  Exhibit 16.  Is that right?
14    A   Yes.
15    Q   So on June the 20th, the evening of June the
16  20th, Ms. Fuller is emailing to you the Administrative
17  Leave Memorandum, correct?
18    A   You said Exhibit 16?
19    Q   Mm-hmm.
20    A   Okay, yes.
21    Q   Okay.  I just want to establish the timing,
22  that's all.  The day that she emailed it to you is the
23  date that's written on the document.
24    MR. BURRUEZO:  I guess we're up to 18 now.
25        (Defendant's Ex. No. 18 marked for

Page 193

1        identification.)
2  BY MR. BURRUEZO:
3    Q   Let me show you what's been marked as Exhibit
4  18.  This document is dated June 23rd, and it's Employee
5  Conference Memo - Bright Horizons Family Solutions.  And
6  the box that's checked here in Termination.
7        It says:  On June 19th, you were placed on
8  administrative leave pending an investigation of actions
9  which were disruptive to the operations of Bright
10  Horizons's business interests.  During a meeting with
11  you on Friday, June 17th, we discussed parent complaints
12  regarding your interactions with children.
13        Now, what I've just read is correct, right?
14    A   That's correct what you read.
15    Q   You informed us that one of the parents had
16  attacked you when she didn't like how you applied diaper
17  cream to her child.
18        So that's what you told them, right?
19    A   No, that's not what I told them.
20    Q   Okay.  What did you tell them?
21    A   Basically I told them that I didn't know, I had
22  no idea.  I was changing a baby, the supervisor was
23  standing there, and she came out of the -- my back was
24  turned, and she shoved me from behind and snatched the
25  baby off the table.  I was in shock, so I asked her was

Page 194

1  she okay, because I thought something was -- and I asked
2  her do you think I did something to the baby.
3    Q   So is it your testimony that you didn't tell
4  them that the parent had attacked you, but, rather,
5  shoved you?
6    A   I don't know what I said because I was upset.
7  So when I said attacked or whatever, she shoved me.  It
8  wasn't -- she came in, evidently, and pushed me.  And I
9  went, kind of like stumbled and caught myself and moved
10  over, and she grabbed the baby.  Because I was standing
11  there working with my back turned.
12    Q   So is it possible, then, that you told them
13  that the parent had attacked you?
14    A   They seen it.
15    Q   That's not my question.  I'm relaying from the
16  memorandum that's being sent to you concerning your
17  termination of employment, and what they're saying in
18  the sentence I read to you was:  You informed us that
19  one of the parents had attacked you when she didn't like
20  how you applied diaper cream to her child.
21        And my question is simple:  Is this what you
22  said to Marilyn Fuller?
23    A   No.  I gave it to them in writing.  Everything
24  that I said they twisted it.
25    Q   Okay.  So --



37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Page 195

1    A   That's why I put that report.  And I asked them
2  for a Bright Horizons report, which there's like carbon
3  copies, one for me, one for their file and one for the
4  parent to sign.  But that's not the way they do things,
5  by the book, because whatever.
6    Q   Okay.  So you're saying that this sentence that
7  I read to you is twisted?
8    A   Right.
9    Q   Okay.  Then it says:  This allegation was not
10  shared with your supervisor at the time of the incident,
11  nor was it reported to center management.
12        Is that correct?
13    A   That's correct.
14    Q   Then it continues:  Bright Horizons conducted a
15  thorough investigation into the situation, which
16  included acquiring witness statements and giving you an
17  opportunity to provide a written statement outlining
18  your perspective.
19        That part's correct, right?
20    A   Yes.
21    Q   It was confirmed by the witness that the
22  alleged attack did not occur.  That's what the witness
23  said, right?
24    A   I don't know what she said.
25    Q   Bright Horizons determined at this time that

Page 196

1  your behavior was unacceptable, unprofessional and
2  insensitive to our parents.  Therefore you are being
3  released from employment effective immediately.  Because
4  you were found to have violated company policy, you will
5  not be paid for the time you spent on administrative
6  leave, nor are you eligible for re-hire at any Bright
7  Horizons facility.
8        And then it continues, and there's some
9  signatures at the bottom of the page.
10        Now let me ask you to just sort of distance
11  yourself for a moment, and let's just assume that this
12  is concerning employee X, not Vanessa Smith.
13    A   Okay.
14    Q   If employee X had done what's described in here
15  and made up a story about an attack that employee X had
16  been subjected to by a parent, completely made that up,
17  would you agree that that would be a terminable offense?
18    A   If that had happened with employee X, first the
19  police should have been notified, because a parent
20  does not have a right to come in on somebody's job and
21  shove them.
22        And if they find that a teacher is doing
23  something that's unlawful to the child, there's 1-800
24  Child Abuse should be posted as big as day, according to
25  the state laws, all over those classrooms, so even a

Page 197

1  child that's five years old can get a stepping stool and
2  climb up and call 1-800 without a teacher interfering
3  with that.  Because Bright Horizons, evidently, with all
4  the false statements that they've made against me makes
5  me sound like a criminal, and they never called the
6  police or reported it to Child Abuse.
7        So I'll go back to saying that employee X, if
8  somebody came to my home daycare, a parent, and shoved
9  one of the employees, the workers know the first thing
10  to do is not call me, call 911 and give the police the
11  report.  They put an incident report in the book and
12  they all sign it.  And then it goes in to DCF.  We call
13  DCF and let them know what happened so that they can go
14  out and investigate to make sure if that parent's on
15  drugs, or if there's a problem, or whatever happened
16  according to —
17        I'm not going to have somebody coming into my
18  business and shoving one of my employees because what
19  they think — because their child is crying because the
20  diaper is being changed.  Most people come in cursing
21  because you haven't changed a diaper, and they'll report
22  it to DCF.  So I don't understand why a parent would
23  feel it's okay to walk into somebody's job that they
24  don't know and shove somebody for no apparent reason?
25  Because they're changing a diaper and the baby's crying?

Page 198

1    Q   Okay, you've answered a question that I didn't
2  ask.  The question that I asked before you gave the
3  response you gave, was:  If employee X had made a false
4  report about a parent shoving and battering them, and
5  you determined that it was a false report, wouldn't it
6  be reasonable to terminate employee X?
7    A   No.
8    Q   So it's your testimony that it's okay for
9  employees, in this case employee X, to just make
10  something up about an alleged attack?
11    A   No.  Because, basically, if one of my employees
12  stated that a parent came in and shoved them, I'm going
13  to believe that that employee is not going to lie to me
14  about a parent coming into their job and shoving.  It's
15  just like if a parent walked into my office and said an
16  employee shoved them — that's why I said the first
17  thing that we're to do is to call 911.
18    Q   Ms. Smith, you've made it very clear to me in
19  the course of your deposition that you believe that
20  people can say lies and make things up.  In fact, in
21  this entire case it's your assertion that Bright
22  Horizons has made up all these things concerning you,
23  except the carrot incident.
24        So if you assume what you believe to be the
25  case, and let's apply it to your own daycare situation



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME II on 05/09/2013

DEPOSITION OF
Pages 199..202

Page 199

1  that you owned, if you had an employee that just made
2  something up about a parent, made up a story about a
3  parent beating them up or shoving them or battering
4  them, if you confirmed, as the owner of the daycare
5  center, that was a false story, would you, as the owner,
6  not find it incumbent upon you to terminate that
7  employee?
8       A  It depends.
9       Q  If you confirmed the employee made it up?
10      A  If I did an investigation, if I did, myself, an
11  investigation, we're talking about an organization
12  that's trying to protect their -- them.
13      Q  I'm not talking about Bright Horizons.
14      A  I'm talking about a real childcare center where
15  people write reports and we make reports and we're
16  trained that if this happens, this is what your response
17  is.
18      Q  Ms. Smith, I want you to follow me on this.
19      A  You call 911 and let the police handle it.
20      Q  Please follow me, okay.  Please follow me.
21  I'll give you all the time to say whatever you want to
22  say.
23      A  Okay.
24      Q  And your lawyer can just say -- he can ask you
25  at the end of the deposition what happened to you in

Page 200

1  your employment, and you can go on and on and describe
2  all the things you're trying to tell.  I'm not trying to
3  prevent you from telling me what you want me to say.
4  All I want to do is answer my question.  Okay?
5       A  Okay.
6       Q  So my question to you is quite simple, okay.
7  If you, as the owner of the Smith Daycare Center, Smith
8  Family Daycare Center, confirmed that one of your
9  employees had lied about an attack by a parent on them,
10  you actually confirmed that it was a lie, would you not
11  fire that employee as owner of the Smith Family Daycare
12  Center?
13      A  Not according to Florida State statutes for
14  child care.
15      Q  What Florida Statute tells me that you cannot
16  fire an employee who lies about an employee being
17  battered by a parent?  What statute says that?
18      A  Basically, if there's a misrepresentation, yes.
19  But if a parent -- if a worker tells me that a parent
20  came in and shoved them, I'm going to believe the worker
21  because they're trained to write the report, and I don't
22  have any reason to believe that a worker is going to lie
23  about a parent coming into the job and shoving them.
24      Q  That wasn't my question.  That wasn't my
25  question.

Page 201

1       A  I'm not going to terminate a worker because a
2  parent said that they didn't shove them and a worker
3  said they did.  There's other things to do about that,
4  but firing them, no, that's not going to happen.
5       Q  But that wasn't my point.  My question was:  If
6  you confirmed that the employee had been lying, you
7  actually, as owner of the daycare center, confirmed the
8  employee had been lying about the alleged incident.  And
9  you're saying you wouldn't fire the employee in that
10  instance if you confirmed that the employee had been
11  lying?
12      A  How can you confirm that an employee had lied
13  if it's the employee's word against the parent's word?
14  In order to save my business, you know who goes?  The
15  parent goes.
16      Q  Okay.  Well, if other people who observed the
17  incident denied that there was an attack or a shoving,
18  and if the police who investigate independently denied
19  there was an attack and shoving and can't confirm it,
20  even under those circumstances where you have other
21  witnesses and other investigations that can't confirm
22  the truth of what's being alleged by the employee, you
23  would keep that employee in your employ?
24      A  The police, Moffitt Center police are employed
25  by Moffitt and USF.  They're not like the City of Tampa

Page 202

1  Police, who -- I felt if they would have came and
2  investigated that, that something different would have
3  happened.
4       But those Moffitt police are under Moffitt and
5  USF.  It's almost like if I lived on a fort and a
6  compound, and I had police that worked on the compound,
7  we all get paid from the same pot.  So if they're going
8  to cover up to save Moffitt, or they're going to cover
9  up to save USF, I have no control of that.  I report it
10  just like a bully.
11      You send your kids to school, you have bullies
12  in school.  If the bully tells the teacher or the
13  principal this child did this to me, even if the person
14  didn't see it, it's the principal's responsibility to
15  investigate it and put a stop to the bullying.
16      Q  So what you're saying, then, it's your belief
17  that the Moffitt Center police are part of this
18  conspiracy?  Is that what you're saying?
19      A  Basically when I went to the Moffitt, to USF, I
20  didn't call Moffitt, I called USF.  I called 911, and
21  the Tampa police said they could not come out because it
22  was on the USF campus, and that they called the
23  Moffitt -- I mean the USF police.  When the USF police
24  came, he had to call the regular police station to find
25  out -- because they wouldn't even release that name of



37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME II on 05/09/2013

DEPOSITION OF
Pages 203..206

**Page 203**

1  the parent that had pushed me.
2     Q   So what evidence do you have, other than your
3  own speculation, that the Moffitt police are part of
4  this conspiracy against you?
5     A   Like I said, it was handled different.  Because
6  if it was happening in Lakeland, in Polk County, someone
7  would have been arrested.
8     Q   Have you accused anyone else of battering you?
9     A   Anybody that battered me, yes.
10    Q   Who?
11    A   What was I supposed to do?
12    Q   No, who you have accused of battering you in
13  the course of your lifetime?
14    A   The person that actually battered me.
15    Q   Who?
16    A   That would be my ex-husband.
17    Q   Okay.  Anybody else besides this parent that
18  you accused of battering you, and your ex-husband?
19    A   No.  Anybody that did.  I didn't accuse, I said
20  they did.  I don't go around —
21    Q   So if you wouldn't fire an employee after you
22  confirmed that the employee had lied, what employment
23  policies at the Smith Daycare Center would subject an
24  employee to termination?
25    A   Basically, like I said, there are — the

**Page 204**

1  training classes that we go through, they're with state
2  workers, they're with instructors from the college, and
3  we're not just — we don't just go to class and go get a
4  job at a daycare, we have to spend hours at other
5  people's centers with those same instructors and DCF
6  workers watching and documenting mistakes, so when you
7  go to work you don't go out there and make mistakes with
8  somebody else's children.
9     Q   That wasn't my question.
10    A   But what I was going to say is, basically,
11  that's not the way you handle daycare.  Because you're
12  going to have workers that don't do teamwork, and you're
13  going to have workers that do teamwork.  But if a parent
14  comes in to my place of business and shoves one of my
15  employees, and my employee says that that parent shoved
16  them, I'm going to say call 911.  I'm not going to fire
17  them.  If the police say it's unfounded, I'm not going
18  to fire that worker.
19    Q   So are there any sets of circumstances where
20  you would fire a worker?
21    A   If one of my employees in good faith called
22  1-800 child abuse, they don't have to tell me.  If
23  there's incidents going on, they have to write that,
24  that's required.  If there's an accident, they have to
25  write that.  It's not my business —

**Page 205**

1     Q   Ms. Smith, my question, is:  Under what
2  circumstances would you fire an employee at the Smith
3  Daycare Center?  That was my question.
4     A   If they abuse the children, as what all this
5  stuff they say that I did.  If they've been abusive to
6  the children.  But first I have to report it to DCF.
7  Because without me reporting it, then I've broken the
8  law.  I'm a mandated reporter.
9     Q   Well so am I.  So that's the only circumstances
10  under which you would fire an employee, is if they
11  engaged in child abuse?
12    A   Child abuse or fighting on the job.  There's
13  other reasons.  But I'm not going to go fire my employee
14  because they made a report that a parent came in and
15  shoved them while they're working.
16    Q   So you wouldn't fire an employee for lying?
17    A   How would I know that that's not true?  How
18  could I —
19    Q   That wasn't my question.  My question is if you
20  can confirm a lie.  You've confirmed a lie.  And my
21  point is that —
22    A   Yes, if I could confirm it, yes.  But in that
23  situation, no, I'm not going to — they're going to
24  write an incident report, they're going to call 911, and
25  the police and the law will handle that.  That's not in

**Page 206**

1  my hands.
2     Q   I think after about 15 minutes you finally
3  answered my question.  You told me that if you can
4  confirm a lie, you would fire the employee, correct?
5     A   Yes.
6     Q   Okay.  Now let me ask you, Ms. Smith, as a
7  general matter, what violations of a law, rule or
8  regulation do you believe that Bright Horizons engaged
9  in that you reported them about?
10    A   In general?
11    Q   Yeah.
12    A   Basically, I believe that because I reported,
13  in good faith, child abuse to their proper channels.  As
14  well as calling in the child abuse hotline, which is
15  normal.  Under normal circumstances you call 1-800 child
16  abuse and you don't have to tell your supervisor.  You
17  just pick up the phone and make the call and they come
18  out and do an investigation.
19    Q   Okay.  So one thing that you're claiming is
20  child abuse?
21    A   Right.  Because I reported child abuse, in good
22  faith, I believe that they retaliated against me through
23  conjuring up all of these write-ups and false documents
24  to terminate me, because I reported child abuse.
25    Q   Okay.  So in this case, you are relying on the



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 8:12-cv-01301-TBM   Document 42   Filed 06/28/13   Page 31 of 38 PageID 833

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.          DEPOSITION OF
VANESSA SMITH, VOLUME II on 05/09/2013                                      Pages 207..210

Page 207

1  laws concerning child abuse as being the basis, the
2  underlying basis for your claim of retaliation?  That
3  is, because you reported child abuse, that you were
4  fired and that this plan was put in place by Bright
5  Horizons to paper your file, to make up stories, to
6  develop a conspiracy among co-workers, law enforcement
7  personnel, DCF officials, as a way to retaliate against
8  you, which ultimately led to your termination of
9  employment, is that it?
10      A  I'm not including that DCF did anything wrong.
11  I think DCF did their job.  And as I was told, the kids
12  were not able to talk.  I'm not the lawmaker, I just
13  following the law, or try to.  And basically because the
14  child could not -- the children couldn't talk and say
15  who did what, it was unfounded.
16      But in good faith I made the report.  That's
17  what I'm required to do.  And as a result of it, all of
18  a sudden I went from being a good employee to, according
19  to what they have documented, a pretty bad person and
20  employee.
21      Q  Any other law, rule or regulation besides child
22  abuse that you are relying upon in this case?
23      A  Besides child abuse?  They neglected --
24  according to their own handbook, if an employee is doing
25  all this, why haven't they called child abuse.  They

Page 208

1  should have reported me so that DCF could investigate.
2      Q  Well that's my point.  You're talking about the
3  child abuse laws.  Is there anything else besides the
4  child abuse laws upon which you are relying in this case
5  to support your claim of retaliation?
6      A  Yes.  As far as the State Health Department.
7          (Cell phone rings.  Brief discussion off
8           the record.)
9      THE WITNESS:  But they were not only in
10  violation of the child abuse, but as far as the
11  health of the children, and the Health
12  Department, if a child is sick, we're supposed
13  to isolate them and then have that parent to
14  pick up the child.  If the parent is not
15  available, there's people that they have on the
16  emergency list, and they should be told that
17  before they are in care.
18      Because if it's not reported to the Health
19  Department that a virus -- or swine flu, for
20  instance, there's a form that twice a year day
21  cares have to, according to the state, have the
22  parents to sign.  And if a child is sick with
23  green or yellow mucus, fever, diarrhea, they're
24  to be isolated and sent home.
25  BY MR. BURRUEZO:

Page 209

1      Q  But you didn't report anything about health
2  issues, did you?
3      A  Yes, I did.
4      Q  We've been talking all day about child abuse
5  that you claim that you reported the Kristin Turner
6  situation to the management at Bright Horizons, and to
7  the Department of Children & Families, correct?
8      A  Right.  But in the document that you had
9  earlier, you stated that -- the one that I sent to
10  Thearla Kozy, I did state in there, a memo that I sent
11  to her, she asked me questions in reference to what was
12  the problem in the center back in March as far as
13  diarrhea going around in the center.  And that's what I
14  sent to her.
15      Q  Right.  But she asked you about if it existed.
16  But I didn't see any complaint by you to DCF or anybody
17  else concerning any health issue, correct?
18      A  When they did the investigation in reference to
19  the complaint that I had made, Child Care Licensing was
20  there asking me questions in reference to drinking water
21  in the center.  Somebody else made that report, but I
22  was questioned about it.
23      Q  Okay.  So what specific health laws did you
24  complain about, according to you, that provide the
25  substance of your claims in this case?

Page 210

1      A  The only person I complained to was my
2  supervisor.
3      Q  What health laws?  My specific question is:
4  What specific Florida health laws did you complain that
5  there was violation of in connection with your
6  complaints in this case?
7      A  They did not send the sick children home.
8      Q  What is the health law?  What in particular
9  is --
10      A  Basically they're required to isolate the
11  children and send --
12      Q  Can you provide me a statute number?
13      A  35 -- I haven't used it in a long time --
14  66(c).  I'm not sure, I'll have to get it.  But I think
15  it's Florida Statute -- I haven't used it in so long --
16  6522(c).
17      Q  Anything else besides the health law that you
18  just cited and the abuse laws?
19      A  Yes.  If an employee -- basically if they're
20  saying that I did all of this stuff, they're supposed to
21  report it to DCF.  They're required by law.  And also
22  they're required by law to have incident and accident
23  reports.
24      Q  Okay.  Anything else?
25      A  The same day that it happens, no matter how



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.      DEPOSITION OF
VANESSA SMITH, VOLUME II on 05/09/2013                                  Pages 211..214

Page 211

1   late you stay, you're supposed to have the employee to
2   write it, the supervisor sign it, or the person to
3   witness it, and give each person a copy.
4       Q   Anything else? Any other laws, rules or
5   regulations?
6       A   Yes. If someone comes into a childcare
7   facility and the workers are threatened, you're supposed
8   to call 911. If there's a threat or if someone comes
9   in, for instance, like with my situation she shoved me
10  from behind, immediately they should have called 911. I
11  didn't know her. They didn't know if she had a gun or
12  if she was on drugs or what her problem was.
13      Q   Well nobody but you saw the shoving, or
14  experienced the shoving. In fact, the other people in
15  the room didn't even observe that that had happened?
16      A   That's not --
17      Q   Nobody else but you could have called 911.
18  Isn't that right?
19      A   Well, I couldn't call 911 --
20      Q   And in fact you did.
21      A   -- because we're not allowed to have cell
22  phones. And then on top of that, we weren't allowed to
23  even get a report.
24      Q   Okay. What other laws, rules and regulations?
25      A   Like I said, the sick children law, that's

Page 212

1   reportable to the Health Department. Because if a virus
2   is going around, the Health Department should know, and
3   they contact the parents to make sure that the parents
4   have taken the child to the doctor. Or if they can't
5   afford it, they provide free health at the health clinic
6   so those children can be checked to make sure they don't
7   have the swine flu. The way it passes, that's
8   communicable diseases.
9       Q   Any other law, rule or regulation?
10      A   Yes. They violate not allowing the employee
11  themselves to pick up the phone and call 1-800 child
12  abuse. They want you to go through a supervisor. In
13  the real world, if a parent comes in and says you're
14  handling my child wrong, they can call 1-800 with their
15  cell phone. Because the number has to be posted where
16  it's in view and big enough for the children to see it
17  and pick up the phone and call.
18      Q   Any other law, rule issue or regulation?
19      A   Yes. They don't have anything in place to
20  protect workers that, in good faith like I said, report
21  child abuse, whether it's founded or unfounded.
22      Q   Anything else? I mean, you've sort of said the
23  same thing using different words, candidly. Any other
24  law, rule or regulation besides health and abuse?
25      A   Whenever someone is reported to DCF, they're

Page 213

1   required to have to go and take training through them on
2   reporting child abuse, the supervisors are.
3       Q   Again, that's the category of abuse. Anything
4   else besides health and abuse?
5       A   Not that I know of right now.
6       Q   Now you say in this case that you've been
7   damaged. How have you been damaged?
8       A   I've suffered severe damage as far as, my
9   reputation has been destroyed. Everything that I -- my
10  livelihood has been destroyed. My family has suffered.
11  Health issues. Basically, a lot of stress. I feel that
12  because I stood up for what was right, this is a result
13  of me standing up and telling the truth about an abuse
14  situation, and then all of a sudden I'm documented,
15  falsely accused of things that I would never even dream
16  of doing out of all the days and times and months and
17  years that I've spent working in child care. And I've
18  never had any of this. Nothing but good things in my
19  record.
20      Q   How has your reputation been damaged?
21      A   Basically it was hard for me to gain new
22  employment, because I had to list Bright Horizons down
23  as being my last employer, and whenever they called to
24  get a reference check, it wasn't a good one.
25      Q   Okay. What evidence do you have, unless you

Page 214

1   were a participant in whatever calls Bright Horizons had
2   with prospective employers, that they said negative
3   things about you?
4       A   Basically the employer that was going to hire
5   me, because everything was perfect until they called
6   Bright Horizons, said that they didn't give me a good
7   reference and that's why they couldn't hire me.
8       Q   And what is it that the prospective employer
9   said they said about you?
10      A   Basically they said that I was a troublemaker,
11  that I had reported child abuse, and that they
12  shouldn't -- they didn't feel that they should hire me,
13  and I was not eligible for re-employment.
14      Q   Who was this?
15      A   Pardon?
16      Q   Which employer was this, prospective employer?
17      A   Rooms To Go. It was a customer service
18  position.
19      Q   Okay, so it wasn't another daycare center?
20      A   No.
21      Q   Did you apply to any other daycare facilities?
22      A   Yes, I have. Many.
23      Q   And what evidence do you have that any of these
24  other prospective employers received negative
25  information from Bright Horizons about your former



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME II on 05/09/2013

DEPOSITION OF
Pages 215..218

Page 215

1  employment?
2      A   For daycare centers, I can't, no.
3      Q   So the only prospective employer who you can
4  cite today who you believe received information that
5  soiled your reputation was Rooms To Go?
6      A   There's others.
7      Q   What are the others?
8      A   I can't think of them off the top of my head.
9      Q   The only one you can remember right now is
10  Rooms To Go?
11     A   Right.
12     Q   And how much did that job pay?
13     A   I think it was starting out at $13 and
14  something an hour.
15     Q   When did you apply for that job?
16     A   I want to say 2011, September maybe.
17     Q   Any other evidence besides your failure to get
18  a job at Rooms To Go that you're going to rely on to
19  establish that your reputation's been damaged?
20     A   Yes.  This being placed in my personnel record.
21  I've never had that.  Nine years of --
22     Q   I'm talking about your reputation in the
23  community, I'm not talking about what's contained in
24  your personnel file.  Your personnel file's your
25  personnel file.  It doesn't get provided to anybody

Page 216

1  outside of the company.  Your public records.
2      A   Okay.
3      Q   My question is, specifically, you're making an
4  allegation in this case that your reputation's been
5  damaged, and you cited me one example of Rooms To Go,
6  which, according to you, they received an unfavorable
7  reference about your previous history at Bright
8  Horizons.
9      A   Right.
10     Q   My question is:  Besides Rooms To Go, what
11  other evidence do you have to support your contention
12  that your reputation in the community has been harmed?
13     A   Basically, like I said, everything that I've
14  lived for, I've worked for, went to school for, trained
15  for, because of this, at this point I don't know if I
16  want to do childcare again.
17     Q   Okay.  So have you pulled yourself out of
18  employment possibilities in the childcare field because
19  of your experience at Bright Horizons?
20     A   Yes.
21     Q   Okay.  So whether you have a good reputation or
22  a bad reputation in the childcare industry, it doesn't
23  matter, because you've voluntarily pulled yourself out
24  of prospective employment in that industry, correct?
25     A   No.  It's always good to have a good reputation

Page 217

1  because that lingers wherever you go.  If I wait 20
2  years from now, I still have to list that I worked for
3  Bright Horizons because it's a childcare center, and
4  Child Care Licensing is going to pull that record.  And
5  according to what they say, it's going to be either
6  counted favorably for me or against me.
7      Q   I'm not talking speculation, about the history
8  or what might happen 20 years from now.  I want to talk
9  about what the actual situation is today.  I mean, the
10  Earth may crash next week and all of this won't matter.
11  And I'm not trying to be flippant.
12     A   Right.
13     Q   I'm just trying to point out what I'm talking
14  about here is what we know and in the present.  I'm not
15  talking about future possibilities, coulda, woulda,
16  shoulda.  I'm not talking about that, okay.
17         You made a statement to me that you don't have
18  any present interest to be involved in child care
19  because of your experiences at Bright Horizons.  And my
20  question was simply to you:  If that's the case, then
21  your reputation in the now doesn't matter, because if
22  you're not wanting to be employed in that field, it
23  doesn't really matter what your reputation is in child
24  care; isn't that right?
25     A   No, because it still counts.  When I go and

Page 218

1  fill out a job application, they want to know what I did
2  for the last 10 years.
3      Q   Did Circle K care?
4      A   Pretty much, no.  Circle K is not a career job
5  for me.  It's $8.25 an hour, and it's pretty hard to
6  live off of that.  I'm not a teenager living at home
7  with my mommy.
8      Q   Well, besides Rooms To Go, I'm hearing you say
9  that you can't provide to me any other situation where
10  it would establish, according to you, that your
11  reputation's been soiled.  Is that right?
12     A   Yes, it has been soiled.  Because of the things
13  that they trumped up and put in my personnel record --
14     Q   That's not my question.
15     A   -- and in the community where I live.
16     Q   Okay, my question is:  Besides Rooms To Go, you
17  can't cite to me any other concrete example where your
18  reputation has been soiled that's caused you not to have
19  a job opportunity that you sought, right?
20     A   For now I can't.
21     Q   Okay.  And when you were employed at Bright
22  Horizons, you said you were earning $13 an hour?
23     A   Yes.
24     Q   And so the livelihood that's been destroyed is
25  the difference in pay between what you were earning at



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.   DEPOSITION OF
VANESSA SMITH, VOLUME II on 05/09/2013                    Pages 219..222

Page 219

1 Bright Horizons versus what you're currently earning,
2 times the number of hours that you're working at Circle
3 K, right?
4      A   Right.  Including, I was taking care of my son.
5 I was head of household.
6      Q   Okay.  How much do you earn a month in income?
7      A   Anywhere -- like maybe $500 a month.
8      Q   Okay.  Is that your total income that you earn?
9      A   It could be more, it could be less.
10     Q   Okay.  What could make it more and what could
11 make it less?
12     A   Depending on the hours that they need me, or if
13 anybody's out sick or on vacation.
14     Q   Have you applied for a job that you received
15 and were given an offer, but one which you declined?
16     A   No.
17     Q   And what are your monthly expenses?
18     A   Probably about $3,000.
19     Q   $3,000 a month?
20     A   Right.
21     Q   So how is it that you're making up the $2500
22 deficit that you have on a monthly basis?
23     A   I had gotten loans, payday loans, loans from
24 friends, the online loans.
25     Q   Okay.  Where have you gotten loans, and how

Page 220

1 much are they for?
2      A   The one Quick Cash Loan, that was about a
3 thousand -- about $1200.  I'll pay those off, and every
4 time I pay it off they give me another loan for a higher
5 amount.  Payday loans, they were about $700 a month.  I
6 got like a litigation loan.  My sister-in-law --
7      Q   For how much?
8      A   I think that was about maybe $1200.  My
9 sister-in-law, she would loan me anywhere from five to
10 $600 a month.  My son actually got a job and he was
11 loaning me about $800 a month.  I have another son that
12 was loaning me about four, $500 a month.  And my cousin,
13 he was actually loaning me my car payment of about 400 a
14 month, and car insurance that was $178.
15     Q   So about $578 a month?
16     A   Yes.  There's another online loan that I got,
17 and that was, I want to say $900.  And I paid it back,
18 and then of course they went up higher, to the point
19 where I haven't been able to pay it.
20     Q   Any other loans?
21     A   That's it.
22     Q   And on your expense side, what are your
23 expenses that total $3,000 a month?
24     A   My rent is $649.  The electric runs anywhere
25 from $150 to $200 a month.  I have a water bill that's

Page 221

1 about $35 a month.  I have my cell phone, and it's like
2 $35 a month.  I have my car note, it's $378.  Well now
3 it's $441 a month.
4      Q   And what is the make and model of your car?
5      A   It's a Camry, Toyota Camry.
6      Q   What year?
7      A   2013.
8      Q   So you got a brand new 2013 car?
9      A   Right.
10     Q   And is anybody else besides you on the note?
11     A   No.
12     Q   And how you were you able to qualify for a
13 $441-a-month payment when your total income is $500 a
14 month?
15     A   Basically because that was a trade-in, and I
16 had credit in the GAP insurance.  And also I've got like
17 close to a $6,000 rebate for that car.  And I've been
18 through the Toyota program for three years making my
19 payments.
20     Q   So it's your testimony that despite the fact --
21 did you accurately report on your credit application to
22 Toyota what your income is?
23     A   Yes.
24     Q   And you're telling me that when you reported on
25 your total income to Toyota that you made $500 a month,

Page 222

1 that they gave you a car where your payment on that car,
2 not including insurance, is almost the same amount of
3 your total income?
4      A   Right.
5      Q   Okay.  And when did you get the car?
6      A   March 30th.  I was in the buy back program for
7 the 2010 that I actually had two tire blowouts, a dented
8 rim, and no way to get to work, and no money to buy
9 tires on that car, no money to pay the deductibles to
10 have that rim fixed.
11     Q   Did you have a car payment on that 2010?
12     A   Yes.
13     Q   And what was the payment on that?
14     A   378.  But the insurance was actually higher.
15 So since I got this car, I haven't made a payment in 60
16 days, the insurance went down 30 bucks and the payments
17 went up, so.
18     Q   What other expenses do you have monthly?
19     A   I have three credit cards.  I have --
20     Q   What are the total payments on the cards?
21     A   About $150 a month.
22     Q   What else?
23     A   I have medical for my prescriptions, my blood
24 pressure, and that's about $30 a month.  I have the loan
25 payments that I was making.  I'm no longer making those


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.     DEPOSITION OF
VANESSA SMITH, VOLUME II on 05/09/2013     Pages 223..226

Page 223

1  now. And the interest on the loans, I was paying those.
2     Q  How much is that?
3     A  One was 178, the other was 220 a month. And
4  payday loans you have to pay that back like every other
5  week. If I go back, I would pay an additional -- if I
6  got 350, I have to pay probably like 30 more dollars,
7  $35 more dollars, and then I can go back and get the
8  loan.
9     I have gas for my car, getting back and forth
10  to work, looking for jobs or going on job interviews. I
11  have to do laundry. Miscellaneous. Right now I don't
12  have to do miscellaneous on that car, it has warranties.
13  The only thing I have to do is put gas in it. My son,
14  as far as college, that career kind of crashed.
15     Q  How old is your son?
16     A  Nineteen.
17     Q  And he's of legal age and responsible for
18  himself at this point?
19     A  Yeah. But that was not his plan. That was not
20  my plan or his.
21     Q  I'm not a math genius, which is why I went to
22  law school, but my quick mathematical calculation comes
23  to about $2,000 a month in expenses. When you say you
24  have 3,000, it's because you've forgotten some things,
25  are you sort of inflating your expenses?

Page 224

1     A  I have more. Like I said, I have medical
2  bills. When I go see the doctor, it's $60 a pop. I
3  can't walk in there free.
4     Q  All right. So we've talked about your
5  financial situation. You would agree that in order to
6  calculate whatever back pay you might be entitled to,
7  it's just a matter of figuring out how much you earn now
8  versus what you would have earned at Bright Horizons,
9  and that arithmetic calculation comes up to some number,
10  and you would agree that that would be a way to
11  calculate your back pay, correct?
12     A  Yes.
13     Q  Okay. Are you seeking damages for emotional
14  pain and suffering?
15     A  Yes, I am.
16     Q  And how much are you asking, or how much do you
17  desire for compensation for your emotional pain and
18  suffering?
19     MR. OWENS: Just give your best answer to
20     the question.
21     THE WITNESS: I would say probably three
22     times the amount of what my salary would be.
23  BY MR. BURRUEZO:
24     Q  Okay. Is there a question that you were afraid
25  of me to ask you that I didn't ask you?

Page 225

1     A  Pardon?
2     Q  Was there a question you were afraid I'd ask
3  you today that I haven't asked?
4     A  Afraid?
5     Q  Yeah. Did you have some fear coming into your
6  deposition that I would ask you something, but I haven't
7  gone there yet?
8     A  No, I wasn't fearful, just sleepy. Kind of
9  tired. I didn't know what to expect, but.
10     Q  In response to one of your Interrogatory
11  answers, we asked you to list the witnesses who you
12  believe have relevant information, and you mentioned a
13  Katina last name unknown. I have found over the years
14  that when you talk about something for a number of hours
15  like we have, sometimes your memory gets jogged, or you
16  remember some name, or there might be a document that
17  might trigger a memory. Do you know who Katina is?
18     A  Yes. She's the assistant director at the
19  Moffitt Center. She was the one that was in the meeting
20  with Marilyn Fuller, myself and Janice.
21     Q  And do you remember Katina's last name?
22     A  I never knew her last name. All I knew was
23  Katina.
24     Q  What does she look like? Can you describe her?
25  Because when I go back and ask -- because they're not

Page 226

1  sure who that is either, but if I can provide a sort of
2  a description of her, maybe they can say, oh this is
3  that person.
4     A  She's a thin-build -- she's a black female.
5     Q  How tall? Tall, short? You said she was thin.
6     A  She may be tall. I think she's about my
7  height.
8     Q  Okay. Any other lawsuits you've filed besides
9  your workers' comp, this one, and the one that you're
10  contemplating for the June 2012 accident?
11     A  You mean previous or now? Right now?
12     Q  Previous?
13     A  Yes. It was a temporary job. It wasn't a
14  lawsuit, it was a whistleblower.
15     Q  And when did that happen?
16     A  Was it 2011? 2010? 2010, I was on an
17  assignment, a temporary assignment, doing some training
18  and getting paid, and I called my supervisor because
19  I was sick, throwing up. I had eaten some brownies that
20  someone brought in.
21     Q  And so what was the whistleblower claim that
22  you made against that employer?
23     A  Basically, I called her up and she told me that
24  she was going to look into it. And she called me back
25  and said don't come to work no more, you're fired.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME II on 05/09/2013

DEPOSITION OF
Pages 227..230

Page 227

1  Q  And so what happened after that?
2  A  Well, I was talking to one of my friends about
3  it, and I was talking to somebody else, and they said
4  that you need to call whistleblowers.  And I said what
5  is whistleblowers.  And they gave me the phone number.
6  Because when I was at Job Service — I think it was that
7  I was at Job Service in Lakeland looking for a job, and
8  I was telling one of the counselors that was helping me
9  with doing my resume, and I was telling her about it,
10  and also one of the instructors from the childcare
11  classes.
12       And they said you need to like, you know,
13  report her.  And I'm like report her for what.  And they
14  said well you can't fire somebody for telling them that,
15  you know, you got sick and you believe it was because of
16  something that you ate there at their place.
17  Q  What was the name of the employer?
18  A  It was through First Financial.  It was a
19  temporary assignment.
20  Q  So it was a bank institution?
21  A  No, it was a day care.  But they went under,
22  First Financial.
23  Q  So in 2010 or 2011?
24  A  2010, yeah.
25  Q  You claimed a whistleblower violation against a

Page 228

1  daycare center that you were working at?
2  A  Right.  I did some temporary work for her.
3  Q  And who is it that you were employed by?
4  A  First Financial.
5  Q  Where was that located?
6  A  In Lakeland, Florida.
7  Q  Do you remember the address?
8  A  Three different locations.
9  Q  Does it still exist?
10  A  No, she's been shut down.
11  Q  And did you get a monetary settlement?
12  A  They told her she had to pay me back.  It took
13  me 30 days to get a new job, and she had to give me a
14  good reference.  And so she gave me a letter of
15  reference and she paid me the $1200 salary for working.
16  Q  All right.  Forgive me, I may be missing it,
17  but I don't see anywhere in your Interrogatory answers
18  any reference to this First Financial.
19  A  It's not in there?
20  Q  And I asked you earlier today, you know, what
21  employment you've had subsequent to your employment at
22  Bright Horizons, and you never mentioned this place.
23  A  I think I told you that I — when you asked
24  about the training, that I had worked — I think you
25  said something about Spherion.  And also under my —

Page 229

1  when we were getting into it about the training part,
2  the thing about it is with the training, I never got to
3  explain that.  You said what dates did you go or you
4  started, I guess, college, because I had the dates that
5  I actually received my credentials.
6       When you're going for your — when you're going
7  to college to get those credentials, they require that
8  you train.  They don't count it as you working in your
9  own business.  You have to go into a licensed facility
10  where your instructors and licensed inspectors can come
11  out and observe you and train you there.  They observe,
12  and that's where you get your training from.
13       So a lot of them, if you're working past —
14  unless you volunteer to do so many hours, you work and
15  they put you on the payroll as a temporary assignment
16  just for training purposes.
17  Q  Well, Ms. Smith, respectfully, it seems to me
18  that you haven't given me complete answers to your
19  discovery responses.  I've asked you for your
20  educational history.  I've asked you for your work
21  history.  I've asked you for your marital history.  I
22  asked you a number of things, and in the course of your
23  deposition we've found that they're not complete
24  answers.
25       This is the first I hear anything about you

Page 230

1  claiming whistleblower against a former employer that's
2  similar to the business that you were employed at with
3  Bright Horizons.  I have not heard this before.  And
4  it's not in your Interrogatory answers.
5  A  I'm sorry, I thought that I put that in there.
6  Q  I'm going to ask you to do a little homework.
7  And that is, to go back, and, you know, subject to your
8  counsel telling you something different, to go back and
9  look at your answers and modify them, supplement them,
10  and give me complete answers.  Because, candidly, this
11  is making you appear like you're not being candid and
12  honest when you don't give me complete answers.
13       Any other employers that you had after your
14  experience with Bright Horizons?
15  A  No, that's it.
16  Q  Any other claims of employment discrimination
17  that you've made against any employer in the course of
18  your lifetime?
19  A  No, that's it.
20  Q  Any other claims of whistleblower that you've
21  lodged against any employer or any prospective employer
22  in the course of your lifetime?
23  A  No.
24  Q  Any other legal proceedings, threatened or
25  actual, that you've made in the course of your lifetime



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Page 231

1  besides the ones you've mentioned to me?
2      A   No.
3      Q   And that includes this lawsuit, the personal
4  injury lawsuit that you're contemplating as a result of
5  the car accident in June 2012, the whistleblower claim
6  against First Financial Daycare Facility?  And that
7  might be it.  Any other legal claims that you've made?
8      A   No, that's it.
9      Q   Any financial settlements that you've received
10  as a result of threatened legal action?
11      A   Threatened legal action?
12      Q   Correct.
13      A   No.
14      Q   Any financial settlements you've received as a
15  result of your asserting your rights under the law
16  against some other person or entity?
17      A   No.
18      Q   So the only settlements that you have received
19  is your workers' comp?
20      A   Yes.
21      Q   That's the other one I was missing.  Your
22  workers' comp, which was how much?
23          MR. OWENS:  Well, if it was subject to a
24  confidential settlement agreement, I don't want
25  her to be a party to breaching it.

Page 232

1          MR. BURRUEZO:  And that's true.
2  BY MR. BURRUEZO:
3      Q   Was it subject to a confidential agreement?
4      A   Yes, it was.
5      Q   Okay.  Was it against Bright Horizons?
6      A   Yes.
7      Q   So is Bright Horizons the other party who is
8  asking for the confidentiality of the commitment?
9      A   I think so.
10      Q   Well, I can find out.  I don't need you to tell
11  me how much it was.  I can find out on my own.
12      A   Okay.
13      Q   The $1200 you got from the other daycare center
14  for the whistleblower allegation, and the litigation
15  loans you've received, presumably for the car accident
16  that you had in June 2012.  Is that right?
17      A   No, the litigation loan is not from the car
18  accident.
19      Q   What is that from?
20      A   That was from Bright Horizons.
21      Q   That litigation loan is from Bright Horizons?
22      A   Right.
23      Q   And who was the issuer of that loan?
24      A   I don't know.  I don't have the paperwork with
25  me.

Page 233

1      Q   Is it just some loan company that provides you
2  a litigation loan?
3      A   Right.
4          MR. BURRUEZO:  I think I have no more
5  questions at this time.  I do reserve the right,
6  however, when you do supplement your answers, I
7  do want to have the opportunity to come and
8  question you for anything that you might change
9  in your Interrogatory answers.  But aside from
10  that, I think we're done.
11          MR. OWENS:  No questions here.  And she'll
12  read.
13          COURT REPORTER:  Were you ordering?
14          MR. BURRUEZO:  Yes.
15          COURT REPORTER:  Did you need a copy?
16          MR. OWENS:  I guess the discovery deadline's
17  getting close.  I'll let you know next week,
18  okay?
19          COURT REPORTER:  Sure.
20          (Deposition concluded at 4:35 p.m.)
21
22
23
24
25

Page 234

1                    CERTIFICATE OF OATH
2  STATE OF FLORIDA   )
3                     )
4  COUNTY OF POLK )
5
6      I, Fransesca St. John, Court Reporter and
7  Notary Public in and for the State of Florida at Large,
8  say that I have read the foregoing deposition of
9  VANESSA SMITH; and hereby declare under penalty of
10  perjury that the foregoing is true and accurate.
11
12      Executed this 15th day of May, 2013.
13
14                    _____
15                    Fransesca St. John, Court Reporter
                       Notary Public, State of Florida
16
17
18
19
20
21
22
23
24
25



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

JANICE NORMAN, et al. vs. BRIGHT HORIZONS FAMILY SOLUTIONS, et al.
VANESSA SMITH, VOLUME II on 05/09/2013

DEPOSITION OF
Page 235

Page 235

CERTIFICATE OF REPORTER

1

2    I, Fransesca St. John, Shorthand Reporter,

3  certify;

4    That the witness, VANESSA SMITH, was by me

5  duly sworn to testify the truth and nothing but the

6  truth.

7    That the foregoing proceeding was taken before me

8  at the time and place therein set forth;

9    That the testimony of the witness, the questions

10  propounded, and all objections and statements made at

11  the time of the examination were recorded

12  stenographically by me and were thereafter transcribed;

13    That the foregoing is a true and correct transcript

14  of my shorthand notes so taken.

15    I further certify that I am not a relative or

16  employee of any attorney of the parties, nor financially

17  interested in the action.

18    I declare under penalty of perjury under the laws of

19  Florida that the foregoing is true and correct.

20

21    Dated this 15th day of May, 2013.

22

23

24    Fransesca St. John, Court Reporter

25



## DISCOVERY
## LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com